# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE ("ACRL"),**
**SAMIR ALMASMARI**,
**SABAH ALMASMARY**,
**HANA ALMASMARI**,
**MOUNIRA ATIK**,
**WALID JAMMOUL**,
**ABUBAKER ABBASS**,

on behalf of themselves and others similarly situated,

    Plaintiffs,

v.

**DONALD TRUMP**, President of the United States, **U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS")**, **U.S. CUSTOMS AND BORDER PROTECTION ("CBP")**, **JOHN KELLY**, Secretary of DHS, **KEVIN K. MCALEENAN**, Acting Commissioner of CBP,

    Defendants.

Case No.: 17−cv−10310
Hon.: Victoria A. Roberts
Mag.: Stephanie D. Davis

---

## EX-PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

## **INTRODUCTION**

On January 27, 2017 Defendant President Donald Trump signed an Executive Order stating that the "entry into the United States" of non-citizens from Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen is "suspended" for 90 days from the date of the Executive Order. All Plaintiffs are either legal permanent residents or have valid immigrant visas and have either been denied their ability to travel to the United States or face a real and immediate threat of not being permitted to travel to Detroit, their place of residence, in violation of U.S. law.

Though the administration's interpretation of the Order has changed repeatedly, it has applied the Order to block longtime legal permanent residents from returning to this country, and the Order's text purports to grant the administration authority to continue denying entry to such residents. This entry ban is harming Plaintiffs and those similarly situated, along with their families whose loved ones are trying to visit them.

In addition to suffering these irreparable harms, Plaintiffs have a strong likelihood of success on their claims. The Executive Order has both the intent and effect of discriminating based on national origin and religion, in violation of the Constitution. Thus, strict scrutiny applies, and the order clearly fails to be narrowly tailored. Even if rational basis review applied, the Order would fail because it is motivated by discriminatory animus and bears no relationship to its purported ends. While preventing terrorist attacks is an important goal, the order does nothing to

further that purpose by denying admission to Plaintiffs or any of those similarly situated to Plaintiffs. The Order also violates the Immigration and Nationality Act.

In short, the Order is illegal, is causing and will continue to cause irreparable harm to Plaintiffs and those similarly situated, and is contrary to the public interest. As every law student learns in their first year of law school, "[t]he government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). This Court should fulfill its constitutional role as a check on executive abuse and temporarily bar enforcement of the Order nationwide.

## ARGUMENT

### A. Standard for Granting Temporary Relief

To obtain a temporary restraining order, Plaintiffs must establish 1) a likelihood of success on the merits; 2) that irreparable harm is likely in the absence of preliminary relief; 3) that the balance of equities tips in Plaintiffs' favor; and 4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008); Fed. R. Civ. P. 65(b)(1); *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015).

**B. Plaintiffs Are Likely to Prevail on the Merits Because the Executive Order is Illegal in Many Respects**

The Executive Order violates the Constitution in many respects as well as federal statutes. As explained below, Plaintiffs are highly likely to prevail on the merits.

    **i.    The Executive Order Violates the Equal Protection Clause**

The Fifth Amendment has an "equal protection component," *Harris v. McRae*, 448 U.S. 297, 297 (1980), and noncitizens "com[e] within the ambit of the equal protection component of the Due Process Clause," *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004). In equal protection analysis, the court first decides whether a challenged classification burdens a suspect or quasi-suspect class. *Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 219, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995)*. "If a protected class [such as race, religion, or national origin] or fundamental right is involved, this Court must apply strict scrutiny." *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (footnotes omitted); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (religion is an "inherently suspect distinction").

While courts generally give more latitude to the political branches in the immigration context, *see, e.g., Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), the

political branches are not granted *carte blanche*. In protecting its borders, this country does not set aside its values or its Constitution. *Id*. (the political branches' "power is subject to important constitutional limitations"); *INS v. Chadha*, 462 U.S. 919, 941-42 (1983) (Congress must choose "a constitutionally permissible means of implementing" its power over immigration).

Here, the Executive Order cannot pass muster under any standard of review. The Executive Order was purely created out of irrational fear and blind hostility and is at odds with the fundamental American promise that all are entitled to equal protection under the law.

### a. Strict Scrutiny Applies

First, the Executive Order plainly discriminates based on national origin by singling out people from seven countries for an outright ban on admission to the United States. Although administration officials have suggested that the Executive Order will not apply to green card holders, despite such a suggestion being at odds with the plain language of the Executive Order, the text of the Executive Order remains in effect regardless of the ever-changing instructions from Defendants and Plaintiffs in the case at bar, with valid green card, have in fact been denied entry. Lawful permanent residents are accorded the same constitutional protections as United States citizens. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953); *see also Bridges v. Wixon*, 326 U.S. 135 (1945) ("[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the

Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment."). "[C]lassifications. . . based on nationality . . . are inherently suspect and subject to close judicial scrutiny," *Graham*, 403 U.S at 372, and are "odious to a free people whose institutions are founded upon the doctrine of equality." *Oyama v. California*, 332 U.S. 633, 646 (1948) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

Second, the Executive Order discriminates based on religion. On its face, the Executive Order requires immigration officials to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." Sec. 5(b). Public comments by President Trump and his advisers make clear that the intent of this provision is to give preference to Christian refugees while disadvantaging Muslim refugees. Compl. ¶ 23, 40. Importantly, Plaintiffs need not show that intent to discriminate against Muslims was the sole purpose of the challenged action, but only that it was a 'motivating factor.' See *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes . . . [only] proof that a discriminatory purpose has been a motivating factor in the decision"). That standard is plainly met here based on the evidence presented.

Consequently, there can be no dispute that the executive order uses suspect classifications. And it does so not in furtherance of a congressionally authorized purpose, but rather in direct violation of federal law, which prohibits discrimination "in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). In short, this is an extraordinary case that falls well outside the run-of-the mill immigration context in which deference to the political branches applies. Since the President explicitly used suspect classifications in violation of federal law strict scrutiny applies.[1]

### b. The Executive Order Fails Strict Scrutiny

The Executive Order fails under strict scrutiny. The ban on admission of legal permanent residents and those with valid immigrant visas aliens is not narrowly tailored to further a compelling government interest.

The order cites three rationales to support its temporary ban on admission of nationals of seven countries: "To temporarily reduce investigative burdens on relevant agencies . . . , to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals."

---

[1] "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638; 72 S. Ct. 863, 871; 96 L. Ed. 1153, 1200 (1952) (Jackson, J., concurring) (footnotes omitted).

7 | P a g e

Sec. 3(c); see Compl., Exhibit A. The first rationale—essentially a desire to conserve resources by discriminating—is not compelling, and in any case the order is not narrowly tailored to achieve any of these goals.

The Order is severely overbroad. Section 3(c) bans those from disfavored countries without any evidence that any individual poses a threat of terrorism. It sweeps within its ambit infant children, the disabled, long-time U.S. residents, those fleeing terrorism, those who assisted the United States in conflicts overseas, and many others who the government has no reason to suspect are terrorists. Defendants simply cannot establish any factual basis for presuming that all people from a given country pose such a great risk that an outright entry ban—rather than less extreme measures—is warranted.

The Supreme Court has emphasized that equal protection guards against sweeping generalizations about categories of people based on traits such as national origin or religion.[2] Here, there is no connection between the rationales advanced to support the Executive Order and the means used to further those rationales.

---

[2] *See, e.g., Shaw v. Reno*, 509 U.S. 630, 647 (1993) (striking down racial gerrymander because "[i]t reinforces the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls"); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (strict scrutiny "ensures that the means chosen 'fit' [a purported] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate . . . prejudice or stereotype").

8 | P a g e

### ii. Plaintiffs Are Likely to Prevail on the Merits of Their Claim that the Executive Order Violates the Establishment Clause

The EO exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity. The EO therefore violates the Establishment Clause of the First Amendment by not pursuing a course of neutrality with regard to different religious faiths.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Thus, where a law "grant[s] a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Id*. at 246. In *Larson*, the law at issue did not mention any religious denomination by name, but drew a distinction between religious groups based on the percentage of their revenue received from non-members, which had the effect of harming certain religious groups. *Id*. at 231-32. Because the law was focused on religious entities and had the effect of distinguishing between them in a way that favored some, the Court applied strict scrutiny. *Id*. at 246-47.

The Court *Larson* approach applies here. The Executive Order's refugee provisions explicitly distinguish between members of religious faiths, granting priority to "refugee claims made by individuals on the basis of religious-based persecution" only if "the religion of the individual is a minority religion in the

individual's country of nationality." Section 5(b). President Trump and his advisers have made clear that the very purpose of this order is to tilt the scales in favor of Christian refugees at the expense of Muslims. Compl. ¶ 40. Accordingly, this case involves just the sort of discrimination among denominations that failed strict scrutiny in *Larson*, and the Executive Order should likewise be invalidated.

Even assuming *arguendo* that the Executive Order does not explicitly distinguish between denominations, the Court would still need to apply the three-part "Lemon test" to determine whether the government has violated the Establishment Clause. *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id*. at 612. While the government must satisfy all three prongs, here it can satisfy none.

First, the Executive Order's purpose is not "secular" because President Trump's purpose in issuing this Order—as confirmed by his own public statements—is to "endorse or disapprove of religion." *Wallace v. Jaffree*, 472 U.S. 38, 75-76 (1985). In analyzing government purpose, it is "the duty of the courts" to distinguish a "sincere" secular purpose from one that is either a "sham" or that is "secondary" to a "predominantly religious" purpose. *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 865 (2005) (internal quotation marks and citations omitted). This duty requires a Court to scrutinize all "probative evidence,"

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

to exercise "common sense," and to refuse "to turn a blind eye to the context in which [the] policy arose." *Id*. at 866 (alteration in original). In so doing, a court looks carefully at both the "historical context" of the government's action and "the specific sequence of events leading to [its] passage." *Id*. (alteration in original). As the Supreme Court has explained, this inquiry into purpose at times requires invalidation of an action that otherwise would have been constitutional: "One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage." *Id*. at 866 n.14. In short, given that President Trump's "actual purpose" in issuing this Order is to "endorse or disapprove of religion," *Wallace*, 472 U.S. at 75-76, the Order violates the first prong of the Lemon test.

The Order also violates Lemon's second prong, which requires that the "principal or primary effect . . . be one that neither advances nor inhibits religion." *See Lemon*, 403 U.S. at 612. In light of the evidence cited above, there is no doubt that the answer to this question is in the affirmative.

As to the third prong, the Order "foster[s] 'an excessive governmental entanglement with religion" by favoring one religious group over another, which "engender[s] a risk of politicizing religion." *Larson*, 456 U.S. at 252-53. Selectively burdening those of the Muslim faith and favoring those of the Christian faith creates improper "entanglement with religion." In short, because the Executive Order fails

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

11 | P a g e

the *Larson* test and every prong of the *Lemon* test, it unequivocally violates the Establishment Clause.

### iii.   Plaintiffs are Likely to Prevail on the Merits of Their Claim that the Executive Order Violates Due Process

"Procedural due process requires that the government's deprivation of life, liberty, or property, even if consistent with substantive due process, "be implemented in a fair manner." *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002). Additionally, due process requires that arriving immigrants be afforded those statutory rights granted by Congress and the principle that "[m]inimum due process rights attach to statutory rights." *Dia v. Ashcrof*, 353 F.3d 228, 239 (3d Cir. 2003) (alterations in original) (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996)).

In particular, lawful permanent residents and those with valid immigrant visas (who will become lawful permanent residents upon arrival) entering the United States have constitutional due process rights with respect to their entry to the United States. In evaluating the due process right available to a lawful permanent resident, "courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures. " *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

Section 3(c) of the Executive Order denies entry to the United States to all persons from Iraq, Syria, Iran, Libya, Somalia, Sudan and Yemen, including visaholders and legal permanent residents with the legal right to leave and re-enter the United States. Under that policy, legal permanent residents and visaholders travelling abroad will be deported if they attempt to re-enter the United States, and those who remain will be forced to refrain from international travel to avoid that devastating result. This draconian restriction violates the due process rights of those individuals.

The Fifth Amendment protects all persons who have entered the United States "from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 69, 77 (1976) (internal citation omitted). This protection applies to all persons within our borders, regardless of immigration status. *Id*. (Due Process Clause of the Fifth Amendment extends even to those "whose presence in this country is unlawful, involuntary, or transitory"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

A "temporary absence from our shores" does not deprive visaholders and legal permanent residents of their right to due process. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213 (1953) (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953) (holding that denial of re-entry to legal permanent resident must comport with due process where resident had spent four months abroad); *Ricketts v. Simonse*, No. 16 CIV. 6662 (LGS), 2016 WL 7335675, at *2–3 (S.D.N.Y. Dec. 16,

2016) (legal permanent resident who had spent a few weeks abroad and was caught with drugs upon re-entry entitled to due process).

Due process requires that legal permanent residents and visaholders not be denied reentry to the United States without "at a minimum, notice and an opportunity to respond." *Raya-Vaca*, 771 F.3d at 1204. "Aliens who have entered the United States—whether legally or illegally—cannot be expelled without the government following established procedures consistent with the requirements of due process." *Lanza v. Ashcroft*, 389 F.3d 917, 927 (9th Cir. 2004) (citing *Mezei*, 345 U.S. at 212). Specifically, due process guarantees that individuals denied re-entry be provided a "full and fair hearing of his [or her] claims" and "a reasonable opportunity to present evidence on his [or her] behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Gutierrez v. Holder*, 662 F.3d 1083, 1091 (9th Cir. 2011) (same).

The denial of re-entry to all visaholders and legal permanent residents from the impacted countries, without an opportunity to be heard, is a prima facie violation of those due process principles. The Executive Order provides that all individuals from the impacted countries be denied entry to the United States, irrespective of their immigration status. On its face, the Order bars legal permanent residents from impacted countries from reentry into the United States if they travel aboard. All Plaintiffs are directly impacted. The denial of re-entry to legal permanent residents and such visaholders absent an opportunity to be heard, much less "proceedings

conforming to . . . due process of law," is anathema to the Constitution. *Shaughnessy*, 345 U.S. at 212.

The Order's impact on the right to travel also violates due process. The Executive Order deprives noncitizens of the right to travel, a constitutionally protected liberty interest. *Kent v. Dulles*, 357 U.S. 116, 125 (1958) (holding that Secretary of State could not deny passports to Communists on the basis that right to travel abroad is a constitutionally protected liberty interest). The right to travel "may be as close to the heart of the individual as the choice of what he eats, or wears, or reads," and is "basic in our scheme of values." *Id*. at 126. For visaholders or legal permanent residents with family abroad, the de facto travel ban also denies the right to connect with their families, "a right that ranks high among the interests of the individual." *Id*. In contrast to these vital liberty interests, the denial of re-entry to noncitizens with lawful immigration status does nothing to advance the government's interest in the "efficient administration of the immigration laws at the border." *Landon*, 459 U.S. at 34. The denial of entry to all persons from the seven affected countries, irrespective of immigration status, and resulting travel ban violate the due process rights of legal permanent residents and visaholders.

### C. Plaintiffs' Are Suffering and Will Continue to Suffer Irreparable Harm Due to the Executive Order

To obtain preliminary relief, Plaintiffs must show that irreparable harm is likely before a decision on the merits can be issued. Plaintiffs meet this test on

several grounds.

First, because Plaintiffs shown a likelihood of success on its Establishment Clause claim, harm is presumed. *See, e.g., Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986) (applying same rule).

Second, even aside from the Establishment Clause claim, Plaintiffs' complaint, motion, and supporting evidence demonstrate overwhelming irreparable harm. The Sixth Circuit held that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). As explained in detail above and within the complaint, Plaintiffs have had numerous constitutional rights impaired or threatened. As such, a finding of irreparable harm is mandated.

### D. The Balance of Equities and Public Interest Greatly Favor Preliminary Relief

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Since this case involves the government as a party, the

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P.: (313) 983-4600 | F: (313) 983-4665

balance of equities factor merges with the fourth factor, public interest. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009).

The balance tips sharply in favor of Plaintiffs. The balance of equities and public interest always favors "prevent[ing] the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). In addition, Plaintiffs have shown irreparable, concrete harm as they are unable to travel to their place of residence in the United States. Additionally, as detailed above, the overbread of the order means that it does little if anything to further its alleged purpose of preventing terrorism. And the requested relief is narrowly tailored to affect only those parts of the Order causing Plaintiffs' harm. While Plaintiffs seeks a nationwide injunction, that relief is appropriate for two reasons: (1) Congress and the courts have emphasized the importance of uniformity in applying immigration policies nationwide; and (2) nationwide relief is necessary to ensure that Plaintiffs and those similarly situated are not stopped at other ports of entry around the country or interfered with by officials in Washington, DC, on their way anywhere else. *See, e.g., Texas v. United States*, 787 F.3d 733, 768-69 (5th Cir. 2015) (affirming nationwide injunction to ensure uniformity and provide full relief).

## **CONCLUSION**

The federal courts are the only entities that can immediately halt abuses by the executive branch. Plaintiffs ask this Court to play its constitutional role and grant

a nationwide temporary restraining order until such time as the Court can further consider the merits.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court grant a nationwide temporary restraining order until such time as the Court can further consider the merits.

Dated: February 2, 2017

Respectfully submitted,

AYAD LAW, P.L.L.C.

/s/ Nabih H. Ayad\_\_\_\_
Nabih H. Ayad (P59518)
Counsel for all Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

Helal Farhat (P64872)
Farhat & Associates, PLLC
Counsel for the Arab American
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126

Nida Samona (P45356)
Counsel for the Arab Chaldean
Council ("ACC")
363 W. Big Beaver Rd., Suite 300
Troy, MI 48084

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

Ali Hammoud (P73076)
Hammoud, Dakhlallah & Associates
Counsel for Yemini American
Benevolent Association ("YABA")
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126

Rula Aoun (P79119)
Co-Counsel for ACRL
4917 Schaefer Rd.
Dearborn, MI 48126

Kassem Dakhlallah (P70842)
Hammoud, Dakhlallah & Associates
Co-Counsel for ACRL
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126

Mona Fadlallah (P64197)
Natalie Qandah (P58434)
Vida Law Group, PLLC
Co-Counsel for ACRL
43050 Ford Rd., #160
Canton, MI 48187