IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARAB AMERICAN CIVIL RIGHTS LEAGUE ("ACRL"),
SAMIR ALMASMARI, SABAH ALMASMARY,
HANA ALMASMARI, MOUNIRA ATIK,
WALID JAMMOUL, NAGI ALGAHAIM,
KOKAB ALGAZALI, SHAIKA SHAGERA,
HEND ALSHAWISH, YUSRA AL SOUFI,
HASAN AL-AHMED, SALHA AL-TALAQA,

on behalf of themselves and others similarly situated,

      Plaintiffs,

v.

DONALD TRUMP, President of the
United States, U.S. DEPARTMENT               Case No.: 17−cv−10310
OF HOMELAND  SECURITY ("DHS"),              Hon.: Victoria A. Roberts
U.S. CUSTOMS AND BORDER                      Mag.: Stephanie D. Davis
PROTECTION ("CBP"),
JOHN KELLY, Secretary of DHS,
KEVIN K. MCALEENAN, Acting
Commissioner of CBP,

      Defendants.

_____/

## PLAINTIFFS' OPPOSITION TO MOTION TO DISSOLVE INJUNCTION

On February 2, 2017, this Court issued an order enjoining Defendants "from applying Sections 3(c) and 3(e) of the January 27, 2017 Executive Order against lawful permanent residents of the United States." Doc #8, Pg ID 70. Defendants now move to dissolve that injunction.[1] Defendants assert that "the Executive Order does not apply to LPRs," so "there is no actual dispute between the parties." Doc #15, Pg ID 111. Defendants' motion must be rejected.

It is hornbook law that a defendant's voluntary cessation of challenged conduct does not eliminate a case or controversy. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). This is a classic case of voluntary cessation.

---

[1] As a threshold matter, Defendants' motion is not properly before the Court because Defendants failed to comply with E.D. Mich. L.R. 7.1(a), which requires that movants must seek concurrence in the relief requested before filing a motion. To meet this requirement, Local Rule 7.1(a)(2) explains that there must be "a conference between the attorneys ... in which the movant explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought." L.R. 7.1(a)(2)(A). If a conference was not possible, then the counsel for the movant must certify that "despite *reasonable effort specified in the motion or request,* the movant was unable to conduct a conference." LR 7.1(a)(2)(B) (emphasis added). Defendants here did not seek concurrence prior to filing their motion, nor did they explain their failure to do so. A "failure to seek concurrence warrants denial of the Motion." *Ethridge v. Countrywide Home L, Inc.,* No. 12-10705, 2012 WL 12884664, at *1 (E.D. Mich. June 21, 2012), report and recommendation adopted No. 12-10705, 2012 WL 12884668 (E.D. Mich. July 25, 2012). *See also Intl Union v. TRW Auto US, LLC*, No. 11-cv-14630, 2016 WL 5661568, at *1 (E.D. Mich. September 30, 2016).

On its face, the Executive Order applies equally to all "aliens from countries referred to in section 217(a)(12) of the INA," without drawing any distinction between lawful permanent residents and other aliens. Executive Order § 3(c). In its initial implementation of the order, the Government interpreted it as applying to lawful permanent residents. It was only *after* this lawsuit was filed that Defendants sought to "clarify" that the order did not apply to lawful permanent residents. But that purported clarification did not change the language of the Executive Order, and Defendants could return to their initial interpretation of that order at any moment. Defendants' actions thus are a paradigm case in which a post-litigation concession does not eliminate a case or controversy.

Nor are Defendants correct that the Plaintiffs failed to establish the relevant preliminary injunction factors. Defendants' substantive argument on this point rests entirely on their erroneous assertion that there is no live controversy between the parties. Although this Court might appropriately issue a more extensive opinion explaining the basis for the February 2 injunction now that the most emergent aspects of the situation have passed, there is no ground to vacate that injunction.

## BACKGROUND

On January 27, 2017, the President issued the Executive Order that Plaintiffs challenge here. Section 3(c) of that order "proclaim[s] that the immigrant and

nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States" and accordingly "suspend[s] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order."  Section 3(g) of that order provides for case-by-case waivers of the exclusion mandated by Section 3(c):  "Notwithstanding a suspension pursuant to subsection (c) of this section . . . , the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked."

On its face, Section 3(c) suspends the entry of "aliens" from the listed countries.  The provision makes no distinction between lawful permanent residents of the United States and any other aliens.  And, indeed, when the Government initially implemented the Executive Order, it interpreted that section as applying fully to lawful permanent residents.  On January 28, a spokesperson for the Department of Homeland Security told Reuters that the order "will bar green card holders."[2]  Over the weekend of January 28 to 29, according to news reports,

---

[2] *Green Card Holders Will Need Additional Screening: White House*, REUTERS, Jan. 29, 2017, http://www.reuters.com/article/us-usa-trump-immigration-greencard-idUSKBN15C0KX (quoting Gillian Christensen, acting Department of Homeland Security spokeswoman).

government officials were applying the order to detain or bar the entry of lawful

permanent residents from the listed countries.[3]  As at least one lawsuit alleged, the

Government was going so far as to coerce lawful permanent residents from the

listed countries to sign paperwork renouncing their LPR status.[4]  On the morning

---

[3] See Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos
and Outcry Worldwide*, N.Y. TIMES, Jan. 28, 2017,
https://www.nytimes.com/2017/01/28/us/refugees-detained-at-us-airports-
prompting-legal-challenges-to-trumps-immigration-order.html?_r=0 ("Human
rights groups reported that legal permanent residents of the United States who hold
green cards were being stopped in foreign airports as they sought to return from
funerals, vacations or study abroad."); Chas Danner, *Judge Temporarily Blocks
Part of Trump's Ban on Refugees and Citizens From 7 Muslim-Majority Nations*,
NEW YORK, Jan. 28, 2017, http://nymag.com/daily/intelligencer/2017/01/trump-
bans-citizens-from-7-muslim-nations-and-all-refugees.html ("By late Saturday
afternoon, however, it was clear that Trump's order would be interpreted by U.S.
authorities in the broadest possible terms, with all foreign nationals from the seven
countries, including current U.S. visa holders like green-card-carrying lawful
permanent residents being unable to enter or board transportation for the U.S.");
Dara Lind, *Trump's Immigration Ban Initially Applied To Up To 500,000 Green
Card Holders*, VOX, Jan. 30, 2017,
http://www.vox.com/2017/1/28/14425150/green-card-ban-muslim-trump ("Over
the weekend, many permanent residents (green-card holders) were denied entry
into the US at the border, or refused to board planes, because they're nationals of
Iraq, Iran, Libya, Somalia, Sudan, Syria, or Yemen — countries that are covered
by the 90-day ban Trump signed into effect on Friday night."); Josh Gerstein &
Matthew Nussbaum, *White House Tweaks Trump's Travel Ban To Exempt Green
Card Holders*, POLITICO, Feb. 1, 2017,
http://www.politico.com/story/2017/02/white-house-green-card-holders-no-longer-
covered-by-trump-executive-order-234505 ("More than 100 green-card holders
were detained as they arrived at U.S. airports in the first day or so that Trump's
order was in place.").

[4] *See* Aziz v. Trump, 1:17-cv-116 (E.D. Va., filed Jan. 28, 2017).

of January 29, the White House Chief of Staff said, on a national news program,

that "of course" the exclusion applied to lawful permanent residents.[5]

On the evening of January 29, the Secretary of Homeland Security endorsed

the reading of the Executive Order as covering lawful permanent residents when he

issued a "statement" that indicated that lawful permanent residents would typically

receive "case-by-case" waivers under Section 3(g) of the Executive Order:

> In applying the provisions of the president's executive order, I hereby deem
> the entry of lawful permanent residents to be in the national interest.
> Accordingly, absent the receipt of significant derogatory information
> indicating a serious threat to public safety and welfare, lawful permanent
> resident status will be a dispositive factor in our case-by-case
> determinations.

Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents

into the United States, Jan. 29, 2017, go.usa.gov/x9AhN.  The Secretary did ***not***

state that Section 3(c) of the Executive Order did not reach lawful permanent

residents.  Rather, by relying on the case-by-case waiver authority, the Secretary's

statement suggested that lawful permanent residents *are* covered by Section 3(c)

and thus can receive relief from the entry bar only by receiving a waiver under

---

[5] Krishnadev Calamur, *What Trump's Executive Order on Immigration Does—and
Doesn't Do*, ATLANTIC, Jan. 30, 2017,
https://www.theatlantic.com/news/archive/2017/01/trump-immigration-order-
muslims/514844/ ("But when pressed by Chuck Todd, the show's host, on whether
the order affected green-card holders, [Priebus] replied: 'Well, of course it does. If
you're traveling back and forth, you're going to be subjected to further
screening.'").

Section 3(g).[6]  Nothing in the Secretary's statement in any way committed the Government to waive Section 3(c)'s bar in *any* particular lawful permanent resident's case. Rather, the statement indicated that individuals for whom there is "significant derogatory information" would not be eligible for the case-by-case waiver. The statement did not explain what "significant derogatory information" is, and that term is not defined in immigration law.

Moreover, because the Secretary's statement was a pure *ex cathedra* pronouncement, without any indication that it was required by the text of the Executive Order or any statute, even the minimal solace it offered to lawful permanent residents could be taken back at any time. Indeed, according to recent news reports, the President's chief strategist did not want the Secretary to take even the minimal steps he took to protect lawful permanent residents—and took the extraordinary step of confronting the Secretary and directing him not to issue the waiver order.[7]  It is impossible for the Plaintiffs, or this Court, to predict how

---

[6] See also Department of Homeland Security, "Fact Sheet: Protecting The Nation from Foreign Terrorist Entry To The United States" (January 29, 2017) ("Lawful Permanent Residents of the United States traveling on a valid I-551 will be allowed to board U.S. bound aircraft and will be assessed for *exceptions* at arrival ports of entry, as appropriate." (emphasis added)), available at: https://www.dhs.gov/news/2017/01/29/protecting-nation-foreign-terrorist-entry-united-states.

[7] See Josh Rogin, *Inside The White House-Cabinet Battle Over Trump's Immigration Order*, WASH. POST, Feb. 4, 2017,

differences of opinion within the White House about the scope of the Executive

Order will be resolved, and whether the government will once again reverse

course.

Plaintiffs, who include four lawful permanent residents who are citizens of

the listed countries, filed this action on January 31.  The next day, on February 1,

the White House Counsel issued a two-paragraph memorandum purporting to

"clarify" that Sections 3(c) and 3(e) of the Executive Order "do not apply" to

lawful permanent residents.  Memorandum to the Acting Secretary of State, the

Acting Attorney General, and the Secretary of Homeland Security from Donald F.

McGahn II, Counsel to the President (Feb. 1, 2017).  The memorandum noted,

with some understatement, that "there has been reasonable uncertainty about

whether those provisions apply to lawful permanent residents of the United

States."  *Id.*  It accordingly sought "to remove any confusion."  *Id.*  But the White

House Counsel's memorandum did not purport to modify, amend, or revoke any

the text of the Executive Order—something only the President, and not the White

House Counsel, has the power to do—nor did it point to even a single word of

Sections 3(c) and 3(e) that suggested that those provisions did ***not*** apply to lawful

permanent residents.  Rather, it offered only "interpretive guidance."  *Id.*  Like the

_____

https://www.washingtonpost.com/news/josh-rogin/wp/2017/02/04/the-white-
house-cabinet-battle-over-trumps-immigration-ban/?utm_term=.14c553e790d8.

Secretary's statement from three days earlier, the White House Counsel's supposed clarification could be taken back at any time.

Because of the repeated shifts in the Government's interpretation and enforcement of the Executive Order, the LPR plaintiffs are deterred from traveling outside of the United States for business or family visits.  Absent an injunction mandating that the Executive Order not be applied to bar lawful permanent residents, the LPR Plaintiff who is currently outside the United States fears that he will not be able to enter the United States, and he and the other Plaintiffs (who are now in the U.S.), fear that if they leave the country again, they will not be permitted to return.

The declaration of Susan Reed, managing attorney for the Michigan Immigrant Rights Center, shows that this government's ever-shifting position has left not just lawful permanent residents, but also attorneys specializing in immigration law uncertain about whether lawful permanent residents will be barred from entry if they leave the country. *See* Reed Declaration, Exh. 1.  Ms. Reed explains that:

> Based on the unprecedented nature of and lack of clarity in the Executive order, the continually evolving nature of the subsequent executive agency actions, the unresolved litigation, and the many qualifications in Department of Homeland Security statements, it is my opinion as an immigration practitioner that I cannot issue a general statement that any Lawful Permanent Residents, but particularly not those from the seven affected countries, may safely

travel and expect to be readmitted to the United States.  I cannot encourage anyone to expect to enter the U.S. on the same basis that they did before the issuance of the January 27, 2017 executive order and I cannot clearly communicate in practical terms what the new standards for entry are based on the information I have.

…

Because of the extreme brevity of  the government's statements on Lawful Permanent Residents, the initial confusion about the meaning of "immigrant visa" in the implementation of the Executive Order, the ongoing developments in litigation nationwide as the Department of Justice seeks to defend the Executive Order, and the uncertainty about the meaning of "significant derogatory information" or the standards for determining whether Lawful Permanent Residents are eligible for "exceptions" to the ban, I have continued to advise Lawful Permanent Residents from countries affected by the ban against travel.

*Id.* at ¶¶ 17, 20.

Accordingly, the Michigan Immigrant Rights Center website currently warns:

At first, the government said that the ban fully included people with Lawful Permanent Resident or "Green Card" status as well as any other visas. On Sunday, January 29, 2017, the government said that Lawful Permanent Residents would be allowed to return to the United States unless there is "significant derogatory information" about them. Immigration lawyers do not know what will be considered "significant derogatory information." So, we are discouraging all citizens of those countries from traveling outside of the United States for any reason. This includes travel to Canada.

*See* www.michiganimmigrant.org.

## ARGUMENT

### I.   In Light of the Government's Repeated Shifts in Interpretation of the Executive Order, There is a Live Controversy in This Case.

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' '[I]f it did, the courts would be compelled to leave "[t]he defendant . . . free to return to his old ways." ' "*Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1982); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953)).  Accordingly, to prevail on their motion to vacate the injunction, Defendants must meet a "*stringent*" standard of showing that "'subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203 (1968)) (emphasis added).  Defendants bear the "'*heavy burden of persua[ding]*' the court that the challenged conduct cannot reasonably be expected to start up again."  *Id.* (quoting *Concentrated Phosphate*, 393 U.S. at 203) (emphasis added).

Defendants cannot come close to meeting that demanding standard. Although Defendants now assert flatly that "[t]he Executive Order does not apply to LPRs," Doc #15, Pg ID 116, the Executive Order does not on its face distinguish between LPRs and others from the listed countries.  The order bars all "entry into

the United States" by aliens from the listed countries. Executive Order § 3(c).  The

Government's current interpretation of that language conflicts with the

interpretations government officials—up to and including the Secretary of

Homeland Security—placed on the Executive Order during the days preceding the

White House Counsel's February 1 memorandum.

Although the Government now takes the position, in accordance with that

memorandum, that the Executive Order does not reach lawful permanent residents,

the White House Counsel could withdraw that memorandum at any time.  Given

the many changes in the Government's position up to this point, there is certainly

at least a reasonable prospect that Defendants will change their position again.

Such a change is especially likely because: (1) news reports indicate that there is

disagreement among senior White House staff about whether the Executive Order

should apply to LPRs; (2) the White House Counsel's two-paragraph

memorandum contains absolutely no legal analysis or effort to tie its interpretation

to the text of the Executive Order; (3) the White House Counsel has no power to

alter the terms of an Executive Order; and (4) it is the Department of Justice's

Office of Legal Counsel, and not the White House Counsel, whose job it is "to

provide controlling advice to Executive Branch officials on questions of law."

U.S. Dep't of Justice, Office of Legal Counsel, *Best Practices for OLC Legal

Advice and Written Opinions* (July 16, 2010),

https://www.justice.gov/sites/default/files/olc/legacy/2010/08/26/olc-legal-advice-opinions.pdf.  In light of these facts, Defendants simply cannot show that it is "absolutely clear" that there is no reasonable prospect that they will revert to their former interpretation, *Friends of the Earth*, 528 U.S. at 189.

This case is strikingly similar to *A. Philip Randolph Institute v. Husted*, 838 F.3d 699 (6th Cir. 2016), in which the Sixth Circuit rejected a claim that voluntary cessation deprived the court of a case or controversy.  The plaintiffs in *A. Philip Randolph* sued to challenge certain procedures the State of Ohio used to keep its voter rolls current.  In particular, the plaintiffs alleged that the "confirmation notice form" the state sent to voters before removing them from the rolls did not comply with the requirements of the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*  During the litigation, the defendant Secretary of State implemented a new confirmation notice form that allegedly complied with federal law; he argued that the new form deprived the court of a case or controversy.  *A. Philip Randolph Inst.*, 838 F.3d at 712-713.

The Sixth Circuit rejected that argument.  The court reasoned that "the new confirmation notice form was issued pursuant to the Secretary's 'directive,' rather than any legislative process. Thus, this is not a case in which reversing the

cessation would be particularly burdensome." *Id.* at 713.[8]  The court also "note[d] that the circumstances of the Secretary's issuance of the new form"—in the midst of pending litigation challenging the old form—"d[id] not inspire confidence in his assurances regarding the likelihood of recurrence." *Id.*  So too here, it would not be at all difficult for Defendants to, once again, change their position regarding the application of the Executive Order to lawful permanent residents.  And the Government's repeated changes in position to this point hardly "inspire confidence." *Id.*

This case is also similar to the Sixth Circuit's decision in *Akers v. McGinnis*, 352 F.3d 1030 (6th Cir. 2003). In *Akers*, the plaintiffs challenged a written rule of the Michigan Department of Corrections (MDOC); during the course of the litigation, the rule was substantially revised. The Sixth Circuit rejected MDOC's mootness argument: "In the present case, as the promulgation of work rules appears to be solely within the discretion of the MDOC, there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action

---

[8] As the *A. Philip Randolph* court noted, even adopting new legislation might not have been enough to meet the defendant's burden, for "the Supreme Court has declined to defer to a governmental actor's voluntary cessation, even where that cessation occurred pursuant to legislative process." *Id.* (citing *City of Mesquite*, 455 U.S. at 289 ("[T]he city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.")).

terminates." *Id*. at 1035. Here, as in *Akers*, the Defendants are free to change their interpretation of the Executive Order at any time.

Defendant's argument is further weakened by the fact that the government made repeated unilateral changes to its interpretation of the Executive Order, reversing course repeatedly and under political pressure. *See Wall v. Wade*, 714 F.3d 492, 497 (4th Cir. 2013) (holding that a state prison's Ramadan policy change did not moot the claims, especially since "the fact that at least three separate policies have been utilized [] since 2009 indicates some degree of doubt that the new policy will remain in place for long"); *Longstreth v. Maynard*, 961 F.2d 895, 900 (10th Cir. 1992) (finding free exercise challenge was not moot due to change in hair grooming policy since policy had been repeatedly changed in the past); *Charles v. Daley*, 749 F.2d 452, 458 (7th Cir. 1984) (rejecting mootness argument because state had repeatedly made changes to the policy in question, thereby persuading the court that additional changes reverting back to the challenged policy "would not be unlikely"). As in *Wall*, *Longstreth*, and *Charles*, based on the history of changes in interpretation of the Executive Order – changes which here have occurred in rapid succession – there is every reason to believe that another policy reversal would take place.

Defendants rely on the unpublished case of *Libertarian Party of Ohio v. Husted*, 497 F. App'x 581 (6th Cir. 2012), but that case is inapposite.  There,

plaintiffs alleged that a state ballot access law violated the First Amendment.

While the litigation was ongoing, the state repealed the statute; as a result, there

remained "nothing to enjoin or declare unconstitutional." *Id.* at 583.  Here, by

contrast, the Executive Order that Plaintiffs challenge remains on the books.  That

order, on its face, still excludes "aliens" from the listed countries, without

distinguishing between lawful permanent residents and others.  All that has

changed is that, after initially interpreting the Executive Order in one way, the

Government now takes the directly opposite position and asserts that the Order

does not reach lawful permanent residents.  Absent an injunction, there is nothing

to stop the Government from reversing its position again.

As Ms. Reed of the Michigan Immigrant Rights Center explains, if the

government once again changes course, the potential harm to lawful permanent

residents is great:

> Lawful Permanent Residents in my experience tend to have
> overwhelming equities in the U.S. and generally have extremely low
> tolerance of risk with regard to being excluded or removed from the
> U.S..  Given the consequences that Lawful Permanent Residents face
> if they are excluded or removed from the U.S., I have had to carefully
> consider our organization's public information and ensure that our
> organization does not suggest courses of action that could result in
> exclusion or removal.

Reed Declaration, ¶18. Ms. Reed gives the example of a lawful permanent resident

from one of the listed countries who is a physician, has lived in the United States

for twenty years, is the son a U.S. citizen mother, and works in a medically

16

underserved area. He happened to be visiting friends in Canada when the Executive Order went into effect, and Ms. Reed assisted him in crossing the Canadian border on January 29, 2017, including preparing documents that would help him advocate for his readmission based on a "case-by-case" exception to the Executive Order for lawful permanent residents. *Id.*

The individual LPR Plaintiffs all have family outside of the United States, whom they would like to visit, and therefore the uncertainty about the meaning of the Executive Order is causing them real harm. But they are deterred from leaving the country by the prospect that the Government will change its position once again and bar them from returning. Many members of the organizational Plaintiff ACRL are in the same position. An injunction is necessary to prevent that harm.

The proposed order that Defendants attach to their motion would not protect the individual Plaintiffs and the Plaintiff organization ACRL's members from that harm. The proposed order includes a sentence that states the following: "The Court also confirms hereby that the Executive Order does not apply to Lawful Permanent Residents as explained in the guidance issued by the White House Counsel on February 1, 2017." Doc. #15-1 Pg ID 121. That language would serve no function, however. It does not purport to be binding on the Defendants—and, indeed, the whole point of Defendants' motion is to absolve them of any binding obligation to protect lawful permanent residents from the operation of the

17

Executive Order.  See Doc. #15, Pg ID 118 (arguing that the injunction should be

dissolved because "[t]he public suffers when the Government is subject to

injunctions that resolve no dispute and confer no rights but may still be invoked

against the Government").  If Defendants are right that there is no live controversy,

then a statement from this Court "confirm[ing]" the interpretation in the White

House Counsel's memorandum is a mere advisory opinion with no force or effect.

And if Defendants are wrong, and there is a live controversy, then there is no basis

for this Court to dissolve its injunction imposing a binding obligation on

Defendants to protect lawful permanent residents from the operation of the

Executive Order.  Because there is a live controversy, the injunction must remain

in effect.

## II.    The February 2 Injunction Satisfied Rule 65.

Defendants assert that Plaintiffs failed to establish the four factors necessary

for the grant of an injunction.  Doc. #15 Pg ID 117.  Defendants' argument on this

score rests entirely on the assertion that there is no live controversy between the

parties relating to the application of the Executive Order to lawful permanent

residents.  See *id.* at Pg ID 117-118.  As Plaintiffs have shown, that controversy

remains very much alive.  Moreover, Plaintiffs' original motion (Doc. #5) fully

establishes each of the injunction factors.  Because this Court issued its injunction

at a truly emergent moment, the written order was necessarily more summary than

one that might have been issued in a calmer time.  Now, with a greater luxury of time and in an abundance of caution, it may be appropriate for the Court to issue a supplemental order that more fully explains its reasoning in accordance with Fed. R. Civ. P. 65.  But there is no basis for vacating the injunction.

## CONCLUSION

For the foregoing reasons, the Motion to Dissolve Injunction should be denied.


Respectfully submitted,


**Attorneys for Arab American Civil Rights**                Dated: February 7, 2017
**League, Samir Almasmari, Sabah Almasmary,**
**Hana Almasmari, Mounira Atik, Walid**
**Jammoul, Nagi Algahaim, Kokab Algazali,**
**Shaika Shagera, Hend Alshawish and Yusra**
**Al Soufi:**

AYAD LAW, P.L.L.C.

/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
Co-Counsel for ACRL
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

/s/ Ali K. Hammoud
Ali K. Hammoud (P73076)
Counsel for Yemini American Benevolent Association ("YABA")
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

FARHAT & ASSOCIATES, PLLC

/s/ Helal Farhat
Helal Farhat (P64872)
Counsel for the Arab American Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

/s/ Nida Samona
Nida Samona (P45356)
Counsel for the Arab Chaldean Council ("ACC")
363 W. Big Beaver Rd., Suite 300
Troy, MI 48084
Nidas@myacc.org

/s/ Rula Aoun
Rula Aoun (P79119)
Co-Counsel for ACRL
4917 Schaefer Rd.
Dearborn, MI 48126
rula@acrlmich.org

VIDA LAW GROUP, PLLC

/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
Co-Counsel for Arab American Civil Rights League ("ACRL")
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Attorneys for Hasan Al-Ahmed and Sahla Al-Talaqani:**

/s/ Miriam Aukerman (P63165)
American Civil Liberties Union
Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

/s/ Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union
Fund of Michigan
Attorneys for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(734) 578-6814
msteinberg@aclumich.org

/s/ Samuel R. Bagenstos (P73971)
Cooperating Attorney,
American Civil Liberties Union Fund of Michigan
625 South State Street

Ann Arbor, Michigan 48109
(734) 647-7584
sbagen@gmail.com
Application for admission to the U.S. District Court for the Eastern District of
Michigan forthcoming

/s/ Margo Schlanger (N.Y. Bar #2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
734-615-2618
margo.schlanger@gmail.com
Application for admission to the U.S. District Court for the Eastern District of
Michigan forthcoming