# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ARAB AMERICAN CIVIL
RIGHTS LEAGUE, et al.,

        Plaintiffs,                    Civil No. 17-10310
                                            Hon. VICTORIA A. ROBERTS

      v.                               Mag. Judge Stephanie D. Davis

DONALD TRUMP, et al.,

        Defendants.
_____/

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' REQUESTFOR A PRELIMINARY INJUNCTION

Defendants, by and through their undersigned counsel, oppose

Plaintiffs' Request for a Preliminary Injunction. The grounds for this motion

are set forth more fully in the attached supporting brief.

CHAD A. READLER               Respectfully submitted,
Acting Assistant Attorney General
Civil Division                        /s/ Briana Yuh_____
                                      BRIANA YUH
WILLIAM C. PEACHEY          Ohio State Bar 0096087
Director                          Trial Attorney
                                      District Court Section
GISELA A. WESTWATER        Office of Immigration Litigation
Assistant Director                U.S. Department of Justice – Civil Division
                                      P.O. Box 868, Ben Franklin Station
EREZ REUVENI                 Washington, DC  20044
Senior Litigation Counsel         Telephone:  (202) 532-4165
                                      Facsimile:  (202) 305-7000
JOSHUA S. PRESS            E-mail:  Briana.Yuh@usdoj.gov
Trial Attorney

                                    *Counsel for Defendants*
Dated:  February 8, 2017

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ARAB AMERICAN CIVIL
RIGHTS LEAGUE, et al.,

        Plaintiffs,                          Civil No. 17-10310
                                                Hon. VICTORIA A.
      v.                                   ROBERTS
                                                Mag. Judge Stephanie D. Davis

DONALD TRUMP, et al.,

        Defendants.
_____/

## BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

### STATEMENT OF ISSUES PRESENTED

WHETHER PLAINTIFFS ARE ENTITLED TO A
PRELIMINARY INJUNCTION FROM A TEMPORARY
SUSPENSION OF ENTRY WHEN SIGNIFICANT
NATIONAL SECURITY INTERESTS ARE AT STAKE.

### MOST CONTROLLING AUTHORITY

*Kleindienst v. Mandel,* 408 U.S. 753 (1972)
*Knauff v. Shaughnessy*, 338 U.S. 537 (1950)
*Landon v. Plasencia*, 459 U.S. 21 (1982)
*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953)

# **TABLE OF CONTENTS**

BACKGROUND ....................................................................................2

    I.    The President's Order ...............................................3

    II.   Timeline of Significant Events and Procedural History ............6

    III.  Legal Background on Foreign Affairs Power ............................3

LEGAL STANDARDS .............................................................. 10

ARGUMENT ..................................................................... 11

    I.    Plaintiffs Cannot Sustain The Requirements For a Preliminary
        Injunction ................................................................. 11

      A. There is no Likelihood of Success On The Merits.................... 11

          i.     Procedural Due Process Claims .................................... 12

          ii.    Establishment Clause Under the First Amendment ....... 15

          iii.   Equal Protection Under the Fifth Amendment.............. 16

          iv.   Substantive Due Process Violation of Right to
               Familial Association ...................................................... 19

          v.     Administrative Procedure Act ....................................... 21

          vi.   Religious Freedom Restoration Act .............................. 24

      B. The Plaintiffs Have Not Shown Any Irreparable Harm ............. 26

      C. The Balance of Harms and Public Interest Require Denial
         of Relief. ................................................................. 27

CONCLUSION...................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ................................................................ 12

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) .............................................. 3, 9

*Al-Haramain Islamic Found., Inc. v. Bush*,
    507 F.3d 1190 (9th Cir. 2007) .................................................. 9

*Alliance for Children, Inc. v. City of Detroit Public Schools*,
    475 F. Supp. 2d 655 (E.D. Mich. 2007) ................................. 13

*Almario v. Att'y Gen.*,
    872 F.2d 147 (6th Cir. 1989) ............................................ 14, 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................ 22

*Ashki v. INS*,
    233 F.3d 913 (6th Cir. 2000) ............................................ 10, 15

*Azizi v. Thornburgh*,
    908 F.2d 1130 (2d Cir. 1990) ................................................. 11

*Bangura v. Hansen*,
    434 F.3d 487 (6th Cir. 2006) ................................ 10, 14, 16, 17

*Borey v. Nat'l Union Fire Ins.*,
    934 F.2d 30 (2d Cir. 1991) ..................................................... 23

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014) ........................................................... 22

*Cachu v. INS*,
    568 F.2d 625 (9th Cir. 1977) .................................................. 17

iv

*California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005 (9th Cir. 2000) .................................................. 21

*Caribbean Marine Servs. Co. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988) ..................................................... 24

*Castro v. United States Dep't of Homeland Sec.*,
    835 F.3d 422 (3d Cir. 2016) .............................................. 11, 12

*Cervantes v. INS*,
    510 F.2d 89 (10th Cir. 1975) .................................................... 17

*De Avilia v. Civiletti*,
    643 F.2d 471 (7th Cir. 1981) .................................................... 11

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) ................................................................. 8

*Dep't of State*,
    523 F.2d 554 (2d Cir. 1975) ..................................................... 17

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ........................................... 18

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988) .................................................. 21

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ............................................................... 14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................... 18

*Garcia v. Boldin*,
    691 F.2d 1172 (5th Cir. 1982) ................................................. 17

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ..................................................... 9

*Genesis HealthCare Corp. v. Symczyk*,
>    133 S. Ct. 1523 (2013) ............................................................... 24

*Guzman v. U.S. Dep't of Homeland Sec.*,
>    679 F.3d 425 (6th Cir. 2012) ...................................................... 14

*Haitian Refugee Ctr., Inc. v. Baker*,
>    789 F. Supp. 1552 (S.D. Fla. 1991) ............................................ 18

*Hamama v. INS*,
>    78 F.3d 233 (6th Cir. 1996) ........................................................ 14

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
>    480 U.S. 136 (1987) .................................................................... 13

*INS v. Aguirre-Aguirre*,
>    526 U.S. 415 (1999) ...................................................................... 8

*Jean v. Nelson*,
>    727 F.2d 957 (11th Cir. 1984) ............................................... 6, 15

*Kerry v. Din.*,
>    135 S. Ct. 2128 (2015) ................................................................ 16

*Khan v. Holder*,
>    608 F.3d 325 (7th Cir. 2010) ...................................................... 20

*Kleindienst v. Mandel*,
>    408 U.S. 753 (1972) ...................................................................... 6

*Kucana v. Holder*,
>    *558 U.S. 233 (2010)* .................................................................. 11

*Landon v. Plasencia*,
>    459 U.S. 21 (1982) ........................................................................ 2

*Lehr v. Robertson*,
>    463 U.S. 248 (1983) .................................................................... 16

*Lucero v. Detroit Pub. Sch.*,

    160 F. Supp. 2d 767 (E.D. Mich. 2001) ..................................................... 24

*Mathews v. Davis*,

    426 U.S. 67 (1976) .................................................................................... 14

*Mendez v. Major*,

    340 F.2d 128 (8th Cir. 1965) .................................................................... 17

*Shaughnessy v. United States ex rel. Mezei*,

    345 U.S. 206 (1953). ........................................................................... 10, 11

*Mostofi v. Napolitano*,

    841 F. Supp. 2d 208 (D.D.C. 2012) .......................................................... 17

*Munaf v. Geren*,

    553 U.S. 674 (2008) .................................................................................... 8

*Narenji v. Civiletti*,

    617 F.2d 745 (D.C. Cir. 1979) .................................................................. 15

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,

    434 U.S. 1345 (1977) ................................................................................ 25

*Newton v. INS*,

    *736 F.2d 336 (6th Cir. 1984)* .................................................................. 14

*Nken v. Holder*,

    556 U.S. 418 (2009) .................................................................................. 25

*Norton v. Southern Utah Wilderness Alliance*,

    542 U.S. 55 (2004) .................................................................................... 20

*Oforji v. Ashcroft*,

    354 F.3d 609 (7th Cir. 2003) .................................................................... 17

*Palestine Information Office v. Shultz*,

    674 F. Supp. 910 (D.D.C. 1987) ................................................................. 9

*Pittman v. Cuyahoga County Department of Children & Family Services*,

    640 F.3d 716 (6th Cir. 2011) ....................................................................... 16

*RadLAX Gateway Hotel v. Amalgamated Bank*,

    132 S. Ct. 2065 (2012) .............................................................................. 21

*Regan v. Vinick & Young*,

    862 F.2d 896 (1st Cir.1988) ..................................................................... 24

*Reuters Ltd. v. United Press Int'l., Inc.*,

    903 F.2d 904 (2d Cir.1990) ...................................................................... 23

*Rosales-Garcia v. Holland,*

    322 F.3d 386 (6th Cir. 2003) .................................................................... 10

*Roudnahal v. Ridge*,

    310 F. Supp. 2d 884 (N.D. Ohio 2003) ..................................................... 14

*Ruiz-Herrera v. Holder,*

    2013 WL 1136849 (N.D. Ga. Mar. 15, 2013) ........................................... 17

*Saavedra Bruno v. Albright,*

    197 F.3d 1153 (1999) .............................................................................. 19

*Sad v. INS,*

    246 F.3d 811 (6th Cir. 2001) .................................................................... 14

*Sampson v. Murray,*

    415 U.S. 61 (1974) .................................................................................. 23

*Silverman v. Rogers*,

    437 F.2d 102 (1st Cir. 1970) .................................................................... 17

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*,

    641 F.3d 197 (6th Cir. 2011) .................................................................... 13

*Southdown, Inc. v. Moore McCormack Res., Inc.*,

    686 F. Supp. 595 (S.D. Tex. 1988) ........................................................... 25

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ............................ 9

*Swartz v. Rogers,*
    254 F.2d 338 (D.C. Cir. 1958) ................................................................ 17

*United States ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ...................................................................... 3, 6, 8

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ............................................................................ 10

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
*Inc.*, 454 U.S. 464 (1982) ................................................................... 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ............................................................................ 22

*Village of Arlington Heights v. Metropolitan Housing Development*
*Corporation*, 429 U.S. 252 (1977) ......................................................... 15

*Waeschle v. Dragovic,*
    576 F.3d 539 (6th Cir. 2009) ................................................................ 11

*Wayte v. United States,*
    470 U.S. 598 (1985) ............................................................................ 25

*Webster v. Doe,*
    486 U.S. 592 (1988) ............................................................................ 18

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................ 25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................ 2, 8

*Wisconsin Gas Co. v. FERC,*
    244 U.S. App. D.C. 349, 758 F.2d 669 (D.C. Cir.1985)........................... 23

*Women's Med. Prof'l Corp. v. Baird*,

    438 F.3d 595 (6th Cir. 2006) ................................................................. 11

*Youngstown Sheet & Tube Co. v. Sawyer*,

    343 U.S. 579 (1952) .............................................................................. 7


## STATUTES

5 U.S.C. § 701(a)(1) .................................................................................. 19

5 U.S.C. § 701(a)(2) .................................................................................. 18

5 U.S.C. § 706(1) ...................................................................................... 20

8 U.S.C. § 1101(a)(20) ................................................................................ 5

8 U.S.C. § 1104(a) .................................................................................... 19

8 U.S.C. § 1152(a)(1)(A) ........................................................................... 20

8 U.S.C. § 1152(a)(1)(B) ........................................................................... 20

8 U.S.C. § 1158 ........................................................................................ 21

8 U.S.C. § 1182(a)(27) ................................................................................ 6

8 U.S.C. § 1182(f) ...................................................................................... 2

8 U.S.C. § 1185(a)(1) .................................................................................. 7

8 U.S.C. § 1187 .......................................................................................... 4

8 U.S.C. § 1187(a)(12) ........................................................................... 4, 15

8 U.S.C. § 1201(h) .................................................................................... 19

8 U.S.C. § 1201(i) ..................................................................................... 19

8 U.S.C. § 1225(b)(1) ................................................................................ 21

8 U.S.C. § 1231(b)(3) ................................................................................ 21

42 U.S.C. §§ 2000bb–1(a) ......................................................................... 22


## REGULATIONS

8 C.F.R. §§ 235.3(b)(4) ............................................................................. 21

# OTHER REFERENCES

Pub. L. No. 114-113 ............................................................................ 4

## __TABLE OF EXHIBITS__

Exhibit A – Executive Order: Protecting the Nation from Foreign Terrorist Entry

into the United States (Jan. 27, 2017) (Order)………………………………2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ARAB AMERICAN CIVIL
RIGHTS LEAGUE, et al.,

        Plaintiffs,                         Civil No. 17-10310
                                        Hon. VICTORIA A.
   v.                                    ROBERTS
                                        Mag. Judge Stephanie
DONALD TRUMP, et al.,          D. Davis

        Defendants.
_____/

**BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION**
**TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

The President is authorized by statute to "suspend the entry of ... any class of aliens" whenever the President determines their entry "would be detrimental to the interests of the United States[.]" 8 U.S.C. § 1182(f). Invoking that statutory authority and his constitutional authority to control the entry of aliens into this country, on January 27, 2017, the President issued Executive Order 13,769 (the "Executive Order"), titled "Protecting the Nation from Foreign Terrorist Entry into the United States." *See* Exhibit A.

The Executive Order's purpose is "to protect the American people from terrorist attacks by foreign nationals admitted to the United States" by taking steps

"to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism." *Id.* The President directed a temporary 90-day suspension of entry for aliens from seven countries previously identified by Congress or the Executive Branch as posing a heightened risk of terrorism; a temporary 120-day suspension of the U.S. Refugee Admissions Program; and a suspension of entry of Syrian nationals as refugees until the President determines that measures are in place "to ensure that admission of Syrian refugees is consistent with the national interest." Exec. Order §§ 3(c), (5)(a), (c). As another district court recently concluded, the Executive Order is a lawful exercise of the political branches' plenary control over the admission of aliens into the United States. *Louhghalam v. Trump*, No. 17-10154-NMG, 2017 WL 479779 (D. Mass. Feb. 3, 2017).

Despite the President's constitutional and congressionally-delegated authority to make determinations regarding national security and the entry of aliens to this country, Plaintiffs request entry of a preliminary injunction prohibiting enforcement of the Executive Order. They claim that the Executive Order violates due process because it is allegedly motivated by animus toward Muslims. Plaintiffs, however, cannot carry the heavy burden that must be met to justify such an "extraordinary remedy," particularly where the remedy would interfere with Congress' determination vesting the President, not a court or civilians, with making the relevant

2

judgments over national security and foreign affairs. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22, 25-26 (2008). Plaintiffs, however, cannot carry the heavy burden that must be met to justify such an "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22, 25-26 (2008), particularly where, as here, no constitutional violation exists because the President explicitly relied upon previously existing statutory and regulatory designations. *See* 8 U.S.C. § 1187(a)(12)(D)(ii).

Plaintiffs' attempts to rewrite federal immigration law conflict with the basic principle that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative," *Landon v. Plasencia*, 459 U.S. 21, 32 (1982), and that "it is not within the province of any court, unless expressly authorized by law, to review [that] determination," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). Plaintiffs also seek to contravene the considered judgment of Congress that the President should have the unreviewable authority to suspend the entry of any class of aliens. Finally, Plaintiffs seek an injunction that is vastly overbroad—it is untethered to Plaintiffs' particular claims; extends to aliens abroad, who are outside the territory of the United States; applies in part nationwide, effectively overriding the judgment of another district court that sustained the Executive Order against parallel challenges; and "deeply intrudes into

3

the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

## BACKGROUND

### I.     The President's Order

On January 27, 2017, the President issued an Executive Order "to protect the American people from terrorist attacks by foreign nationals admitted to the United States." Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States § 2, 82 Fed. Reg. 8977 (Jan. 27, 2017). The Executive Order directs a number of actions in the interests of national security. *Id.* §§ 2-11. The Secretary of Homeland Security is directed to conduct an immediate review to identify the "information needed from any country ... to determine that [an] individual seeking [an immigration-related] benefit is who the individual claims to be and is not a security or public-safety threat." *Id.* § 3(a). The Executive Order also directs a process for requesting necessary information from foreign governments that do not supply such information, and consequences for countries not providing it. *See id.* § 3(d)-(f).

While that review is ongoing, the Executive Order suspends entry for 90 days of aliens from seven countries previously identified as being associated with a heightened risk of terrorism pursuant to 8 U.S.C. § 1187(a)(12). Executive Order § 3(c). Section 1187(a)(12), enacted in 2015, modifies the Visa Waiver Program. Pub.

L. No. 114-113, 129 Stat. 2242, 2990 (2015). That program allows nationals of certain countries to travel to and apply for admission to the United States without a visa. *See* 8 U.S.C. § 1187. Section 1187(a)(12) bars from the visa waiver program individuals who are dual nationals of or have recently travelled to certain countries. Congress itself identified Iraq and Syria, and also included countries that have been designated by the Secretary of State as state sponsors of terrorism: Iran and Sudan. *Id.* § 1187(a)(12)(A)(i)(I)-(II), (ii)(I)-(II).

In addition, Congress authorized the Executive Branch to designate additional "countries or areas of concern" based on "whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States," "whether a foreign terrorist organization has a significant presence in the country or area," and "whether the country or area is a safe haven for terrorists." *Id.* § 1187(a)(12)(D)(ii). In February 2016, the Department of Homeland Security exercised that authority to bar from the Visa Waiver Program nationals of (and individuals who had recently travelled to) Libya, Somalia, and Yemen, in an effort to ensure that the Visa Waiver Program's "requirements are commensurate with the growing threat from foreign terrorist fighters."[1]

_____

[1] *DHS Announces Further Travel Restrictions for the Visa Waiver Program*, Feb. 18, 2016, https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program. Exemptions from the Executive Order's

## II.    Timeline Of Significant Events And Procedural History

On January 31, 2017, the American Arab Civil Rights League filed a Complaint for Declaratory and Injunctive Relief ("Complaint") on behalf of lawful permanent residents of the United States ("LPRs"), an immigrant visa-holder who had yet to be admitted to the United States, and the relative of an applicant for a visa. ECF No. 1. Plaintiffs, all nationals of Yemen or Syria, argued that the Executive Order violated the First Amendment, Fifth Amendment, Administrative Procedure Act, and Religious Freedom Restoration Act. *Id.*   Also on January 31, 2017, Plaintiffs filed an *ex parte* temporary restraining order. (ECF No. 5).

Following a teleconference held on February 2, 2017, the Court denied Plaintiffs' temporary restraining order regarding the Executive Order as it applies to immigrant visa holders and visa applications but permanently enjoined Defendants from applying §§ 3(c) and 3(e) of the Executive Order to LPRs, something Defendants represented that they were not doing as evidenced by the White House memorandum submitted by Defendants to the Court following the hearing. (ECF No. 8).[2] *Id.* Plaintiffs filed an Amended Complaint on February 5, 2017. ECF No. 13 (hereinafter, "Am. Compl."). In addition to the previously-named LPRs,

---

suspension of the entry of aliens from the seven countries identified under § 1187(a)(12) can be made on a case-by-case basis. Executive Order § 3(g).

[2]    As noted in the Government's motion to vacate the injunction (ECF No. 15), Defendants disagree with the Court's issuance of a permanent injunction.

immigrant visa holder, and parent of an applicant for an immigrant visa, the Amended Complaint joined an Iraqi national and two U.S. citizens who are married to and filed immigrant petitions on behalf of nationals of the affected seven countries. Am. Compl. ¶¶ 27–31, 52–65. Plaintiffs additionally joined seven individuals who are immigrant visa holders. Am. Compl. ¶¶ 19-65. Defendants now file this opposition to Plaintiffs' request for a preliminary injunction.

## III.   Legal Background on Foreign Affairs Power

The power to control the admission of aliens is an inherent attribute of national sovereignty. *See, e.g.*, *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). The Supreme Court has long recognized that the political branches of the federal government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country. *Id.*; *see also Kleindienst v. Mandel*, 408 U.S. 753, 765–66 & n.6 (1972). The political branches of the federal government therefore possess concurrent authority over immigration matters. *Jean v. Nelson*, 727 F.2d 957, 964 (11th Cir. 1984) (en banc) (collecting cases), *aff'd on non-constitutional grounds*, 472 U.S. 846 (1985).

Congress has delegated wide discretion to the President over aliens whom he believes are a threat to national security—above and beyond the President's inherent authority over foreign affairs. *See, e.g.*, 8 U.S.C. § 1182(f) (allowing executive officials to exclude aliens whom they believe will "enter the United States ... to

engage in activities [that] would ... endanger the welfare, safety, or security of the United States" and, "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States ... to suspend the entry of ... any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," respectively); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (noting how, when "the President acts pursuant to an express or implied authorization of Congress, *his authority is at its maximum*, for it includes all that he possesses in his own right plus all that Congress can delegate" (emphasis added)).

Viewing this case in terms of Justice Jackson's tripartite framework from *Youngstown*, Congress has supplemented the President's inherent Article II authority by delegating broad authority on two key issues. The best evidence for this delegation lies in both history and the statutory text—allowing the President to "suspend the entry of all aliens or any class of aliens ... or ... impose on the entry of aliens any restrictions he may deem to be appropriate" for as long as he considers necessary upon a finding that "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." *Id.* § 1182(f). And Congress has similarly authorized the Secretary of State to, in his discretion, revoke visas. *See id.* § 1201(i). Here, the Executive Order stems from the

8

President's constitutional authority, along with that delegated to him under the INA pursuant to 8 U.S.C. § 1182(f), with respect to the suspension of entry of certain classes of aliens. The Executive Order is intended "to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism," Executive Order § 1, and "to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes." *Id.* § 2.

## LEGAL STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Moreover, given the "remarkably broad delegations of its authority" Congress has provided the Executive Branch, as well as the implicit authority under Article II for the President to conduct affairs involving matters of national sovereignty, *Jean*, 727 F.2d at 965, courts have consistently "recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Knauff*, 338 U.S. at 543 ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.");

9

*see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988); *cf. Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("[W]e acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena."). Thus, injunctive relief that would "deeply intrude[] into the core concerns of the executive branch"—such as foreign affairs and national security—may be awarded only where the plaintiff "make[s] an *extraordinarily strong showing*" as to each element. *Adams*, 570 F.2d at 954-55 (emphasis added); *see Palestine Information Office v. Shultz*, 674 F. Supp. 910, 917 (D.D.C. 1987) ("[B]y seeking injunctive relief against the Executive's foreign policy action, plaintiffs ask this Court to approach the outer limit of its constitutional authority.").

## ARGUMENT

### I.   Plaintiffs Cannot Sustain The Requirements For a Preliminary Injunction

#### A.   *There is no Likelihood Of Success On The Merits*

While all four factors set forth in *Winter* must be considered in assessing a motion for preliminary injunctive relief, the moving party's likelihood of success on the merits is the most important. *Jones v. Caruso,* 569 F.3d 258, 277 (6th Cir. 2009) ("[T]he "likelihood of success" prong is the most important to our analysis[.]"). Because it is a threshold inquiry, when a "plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [*Winter*

elements].'" *Id*. Moreover, any inquiry into the merits must first consider threshold issues such as Article III standing and subject matter jurisdiction, which if not satisfied by the movant, require finding in the government's favor on this factor. If the plaintiff lacks standing under Article III, then the court lacks subject matter jurisdiction, and the case must be dismissed. *See e.g., Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101–02 (1998).

<u>i.</u>     <u>Procedural Due Process Claims</u>

The procedural due process claims of the non-citizen plaintiffs must fail at the threshold for the simple reason that aliens outside our borders have no constitutional right to entry or to a visa.[3]  *See Landon*, 459 U.S. at 32 ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."). Even at ports of entry, non-resident aliens have not entered the country and have no due process rights with respect to their request for admission beyond what Congress has affirmatively provided. *See id.*; *Mezei*, 345 U.S. at 213; *accord. United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (noting how "aliens receive constitutional protections [once] they have come *within* the territory of the United States and developed substantial connections with this country"

---

[3]    As clarified by the February 1, 2017 Memorandum, the Executive Order does not apply to LPRs. *See* White House Mem., ECF No. 7-1.

(emphasis added)); *Ashki v. INS*, 233 F.3d 913, 920 (6th Cir. 2000) (quoting *In re Longstaff*, 716 F.2d 1439, 1442 (5th Cir. 1983)) (noting that, "Congress can bar aliens from entering the United States for 'discriminatory and arbitrary reasons.'"); *Bangura v. Hansen*, 434 F.3d 487, 495 (6th Cir. 2006).

Under the Immigration and Nationality Act (INA), Congress has given the President broad discretion to suspend the entry of classes of aliens whom he believes would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). And under decisions such as *Mezei* and *Rosales-Garcia v. Holland,* 322 F.3d 386 (6th Cir. 2003), "excludable aliens do not have a constitutional right to enter or be admitted to the United States; indeed, no alien has a constitutional right to enter or be admitted to the United States." *Rosales-Garcia*, 322 F.3d at 412; *see Jean*, 727 F.2d at 972. This is particularly true where Congress has delegated to the Executive Branch authority over decisions to admit or exclude aliens. *See Castro v. United States Dep't of Homeland Sec*., 835 F.3d 422, 439-44 (3d Cir. 2016) (collecting cases).

In these circumstances, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S at 212 (quoting *Knauff*, 338 U.S. at 544).[4]  Under *Mezei* and related cases, admitting an

---

[4]   *See also* Gerald L. Neuman, "Discretionary Deportation," 20 *Geo. Immigr. L.J.* 611, 635 (2006) ("Since 1996, tens of thousands of aliens are denied entry every

alien into the country or allowing an alien to stay are decisions that have long been deemed "matter[s] of grace." *Kucana v. Holder*, 558 U.S. 233, 247 (2010) (internal quotation marks omitted). The Sixth Circuit has adhered to *Mezei* and its progeny, also finding "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Rosales-Garcia*, 322 F.3d at 410 (quoting *Mezei*). Plaintiffs thus cannot demonstrate a likelihood of success on the merits of their procedural due process claim.

ii.    <u>Establishment Clause Under the First Amendment</u>

Plaintiffs also allege that the Order violates the Establishment Clause because it "exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity." (Am. Compl. at ¶ 89). This claim is meritless for multiple reasons. First, unadmitted non-resident aliens (such as several of the individual plaintiffs) cannot assert rights under the Establishment Clause with respect to their attempt to gain entry into the United States for the same reasons (previously discussed) that they are not protected by the Due Process Clause. *See also* Laurence H. Tribe, *American Constitutional Law* § 5-18, at 973 (3d ed. 2000).

---

year in reliance on *Knauff*, without the opportunity to consult an attorney or present witnesses .... On the other hand, deportation from within the United States requires procedural due process, evaluated by the usual standards.").

Second, the only sections of the Executive Order addressing religion are §§ 5(b) and (e), discussing the admission of refugees who face persecution because of their membership in a minority religion. None of the Plaintiffs have standing to make such an argument, however, as none is a refugee seeking admission to the United States, and the Refugee Act does not establish any cause of action seeking to challenge the decisions of the Executive concerning the admission and placement of refugees. Aside from the ripeness problems of challenging § 5(b) (a program that will not resume in over three months, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)), Sections 5(b) and (e) will not directly affect *any* of the Plaintiffs here. Consequently, they are insufficiently injured to have Article III standing.[5]

Finally, §§ 5(b) and (e) provide accommodations for refugees from *all* countries in the refugee program, not just the seven countries specified in § 3(a). Their provisions do not favor any particular religious sect or affiliation, but are neutral with respect to all religions. *Louhghalam*, 2017 WL 479779, at *5 ("Nothing in Section 5 compels a finding that Christians are preferred to any other group.").

---

[5]   *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982); *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208–09 (6th Cir. 2011) (en banc) (teachers could not assert students' rights under the Establishment Clause); *Alliance for Children, Inc. v. City of Detroit Public Schools*, 475 F. Supp. 2d 655, 662-63 (E.D. Mich. 2007) (corporation providing educational services could not assert rights of students); *Louhghalam*, 2017 WL 479779, at *5 ("Although plaintiffs vigorously disagree with such a policy, that sincere disagreement is insufficient injury to confer standing.").

14

Nor does it violate the Establishment Clause to recognize that religious minorities are more likely to face persecution than members of a country's majority religion. *Cf. Hobbie v. Unemployment Appeals Comm'n of Fla*., 480 U.S. 136, 144–45 (1987) ("This Court has long recognized that the government may ... accommodate religious practices ... without violating the Establishment Clause."); 8 U.S.C. § 1187 Note 2. There is simply no truth to Plaintiffs' claim that the Executive Order "exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity." (Am. Compl. at ¶ 89).

### iii.   Equal Protection Under the Fifth Amendment

Plaintiffs claim that the Executive Order violates the equal protection component of the Fifth Amendment's Due Process Clause. (Compl. at ¶¶ 90–96). But again, Plaintiffs do not have rights under the Due Process Clause with respect to their request for entry into the United States. And in any event, where an equal protection claim is made to an immigration law, only rational basis review applies. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 83 (1976) (considering whether a law that made distinctions based on alien status was "wholly irrational"); *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 432 (6th Cir. 2012) ("[D]eference to Congress with respect to immigration law has led this court to uphold statutory distinctions between classes of aliens if predicated on a rational basis." (internal quotation marks omitted)); *Roudnahal v. Ridge*, 310 F. Supp. 2d 884, 892 (N.D.

Ohio 2003) (upholding a program requiring male nonimmigrant aliens from designated countries to be fingerprinted and registered because "the Executive is designed and entrusted to best shape our national security").

Rational basis review "does not require [courts] to identify the ... actual rationale for the distinction," only that "there are plausible reasons" for the law in question. *Hamama v. INS*, 78 F.3d 233, 237 (6th Cir. 1996). "[I]t is not necessary for Congress to have drawn the line at the (purportedly) most reasonable point ... but only that it had a rational purpose in drawing the line(s) as it did." *Newton v. INS*, 736 F.2d 336, 342 (6th Cir. 1984). "The role of the courts in analyzing an equal protection challenge to a federal immigration statute is limited to determining whether the statute at issue is conceivably related to the achievement of the federal interest." *Almario v. Att'y Gen.*, 872 F.2d 147, 152 (6th Cir. 1989) (internal quotation marks omitted). Indeed, the Sixth Circuit's standard may even be less than standard rational-basis review. *See Sad v. INS*, 246 F.3d 811, 822 (6th Cir. 2001) ("We review such classifications in immigration acts under a standard *even more deferential* than rational-basis review." (emphasis added)).

The Executive Order easily satisfies this relevant standard. From a constitutional perspective, the political branches are permitted to discriminate based on nationality in the context of immigration and entry into the United States. *See, e.g.*, *Ashki*, 233 F.3d at 920 ("discriminatory and arbitrary reasons" for

16

distinguishing among classes of aliens survive rational basis review); *Jean*, 727 F.2d at 978 n.30 ("[T]here is little question that the Executive has the power to draw distinctions among aliens on the basis of nationality."); *Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979) ("[C]lassifications among aliens based upon nationality are consistent with due process and equal protection if supported by a rational basis.").

Plaintiffs next allege that the Order stems from an "animus toward … Muslims." (Compl. at ¶ 92.)  But the plain language of the Executive Order includes there *nothing* discussing Islam or any other particular religion. Plaintiffs' support for this assertion, therefore, must be that the seven countries identified pursuant to 8 U.S.C. § 1187(a)(12) have majority Muslim populations. However, Plaintiffs cannot establish animus here, because the Order contains a visa waiver designation. But even if there is a disparate impact (explaining their citations to state or municipal equal protection cases such as *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977)), that does not call the validity of the order into question under *Fiallo*'s standard of review. There are legitimate national security reasons to temporarily suspend entries of nationals of these countries, pending a review and strengthening of the vetting process for visa applicants. Moreover, these seven countries were *already* identified pursuant to 8 U.S.C. § 1187(a)(12). Specifically, certain countries were identified in connection

17

with Congress's actions in the Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, and the Department of Homeland Security's subsequent designations in February 2016. It is not for the courts to second-guess these national security decisions within the context of immigration where, as here, those decisions are supported by a "facially legitimate and *bona fide* reason." *Fiallo*, 430 U.S. at 794; *accord Louhghalam*, 2017 WL 479779, at *7.

> iv.   Substantive Due Process Violation of Right to Familial Association

The U.S. citizen Plaintiffs' claim that the Order violates their "right to familial association" under the Constitution is also unavailing. (Am. Compl. at ¶ 100). The law in the Sixth Circuit is clear: "A denial of an immediate relative visa does not infringe upon the right to marry." *Bangura v. Hansen*, 434 F.3d 487, 496 (6th Cir. 2006). Perhaps even more directly on point, the Sixth Circuit earlier determined that "[t]he Constitution does not recognize the right of a citizen spouse to have his or her alien spouse remain in the country." *Almario v. Attorney General*, 872 F.2d 147, 152 (6th Cir. 1989);[6] *see also Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958)

---

[6]   Unlike *Bangura* and *Almario*, the authority Plaintiffs cite in support of their substantive due process claim is wholly inapposite. (Am. Compl. ¶ 100.)  Those cases (*Pittman v. Cuyahoga County Department of Children & Family Services*, 640 F.3d 716 (6th Cir. 2011) and *Lehr v. Robertson*, 463 U.S. 248 (1983)) concern due process rights in the child-custody context, not the effects that immigration actions have on U.S. citizen spouses.

(citizen has no constitutional rights violated by deportation of spouse); *Garcia v. Boldin*, 691 F.2d 1172, 1183 (5th Cir. 1982); *Burrafato v. U.S. Dep't of State*, 523 F.2d 554, 555 (2d Cir. 1975); *Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir. 1970); *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958). While there undoubtedly exists a constitutional right to marry, that right is simply not implicated by the Executive Order.

The Supreme Court's recent decision in *Kerry v. Din* did nothing to change the calculus. 135 S. Ct. 2128 (2015). In that case, Justice Kennedy's concurrence did not opine as to whether a U.S. citizen has a protected liberty interest in her marriage entitling her to limited judicial review. *Din*, 135 S.Ct. at 2139. Instead, Justice Kennedy concluded that "even assuming" Din had such an interest, "the notice she received regarding her husband's visa denial satisfied due process." *Id*. Regardless of this fine point, if the Court reaches the question of whether a citizen has a constitutional stake in an immigration action that affects her alien spouse, it should adopt the *Din* plurality's conclusion that the Due Process Clause confers no such interest. 135 S. Ct. at 2138 (Scalia, J.) ("Because Fauzia Din was not deprived of life, liberty, or property when the Government denied [her alien spouse] admission to the United States, there is no process due to her under the Constitution.") (internal quotation marks omitted). That holding is consistent not only with the Sixth Circuit's decisions in *Bangura* and *Almario*, but also the longstanding principle that "the due

19

process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980).

Even assuming *arguendo* that the Order has implicated Plaintiffs' substantive due process rights (which it has not), this Court's review of the Executive Order would be strictly limited. When the Executive exercises its immigration authority "on the basis of a facially legitimate and *bona fide* reason, the courts will [not] look behind the exercise of that discretion." *Mandel*, 408 U.S. at 770. Here, as the district court in *Louhghalam* recognized, the Executive Order states a facially legitimate and bona fide reason—ensuring "the proper review and maximum utilization of available resources for the screening of foreign nationals" and "that adequate standards are established to prevent infiltration by foreign terrorists." Executive Order, §§ 3(c), 5(a), (c). The Executive Order does so in part by incorporating the seven countries that were identified by Congress and the Department of Homeland Security as raising terrorism-related concerns. Accordingly, even assuming this Court could undertake the type of review contemplated by *Mandel* and *Din*, Plaintiffs' challenge would fail.

<u>v.</u>      <u>Administrative Procedure Act</u>

Plaintiffs failed to establish a substantial likelihood of success on the merits under the APA for several reasons. First, Plaintiffs cannot state a claim under the

APA against the Executive Order because the President is not an "agency" for the purposes of the APA. In *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), the United States Supreme Court concluded that the Presidency is not an "agency" as defined in the APA, § 701(b)(1). Courts have interpreted *Franklin* to prohibit review under the APA of actions by the President when he is exercising discretionary authority. *See, e.g., Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016). Here, Congress has granted the President authority to suspend entry for any class of aliens if such entry would be "detrimental to the interests of the United States." 8 U.S.C. 1182(f). Pursuant to, and without exceeding, that grant of discretionary authority, the President issued the Executive Order and suspended entry of aliens from the seven subject countries. The President's action is thus unreviewable under the APA. *See Detroit Int'l Bridge*, 189 F. Supp. 3d at 104-05.[7]

---

[7]   In addition, the APA precludes judicial review of any agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Webster v. Doe*, 486 U.S. 592, 594, 600-01 (1988) (holding that the Director of Central Intelligence had complete discretion over employee discharges, and thus judicial review was precluded). By its plain terms, 8 U.S.C. § 1182(f) vests discretion in the President to determine whether "the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," for the period "as he shall deem necessary," and to impose such conditions of entry as "he may deem appropriate." As a result, there is no discernable standard for judicial review of the President's determinations. *See Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1575-76 (S.D. Fla. 1991). Thus, even if Plaintiffs could challenge a Presidential finding under the APA, it would necessarily fail under these circumstances.

Second, Plaintiffs cannot assert a claim under the APA to the extent it is precluded by another statute. *See* 5 U.S.C. § 701(a)(1). Here, any challenge to the State Department's provisional revocation of a visa is precluded by 8 U.S.C. § 1201(i), which states in relevant part:

> [T]he consular officer or the Secretary of State *may* at any time, *in his discretion*, revoke such visa or other documentation .... There shall be no means of judicial review (including review pursuant to section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201(i) (emphasis added). Based on the plain language of 8 U.S.C. § 1201(i), Plaintiffs cannot establish a substantial likelihood of success on the merits with respect to any APA claim challenging the revocation of a visa.

Third, as stated earlier in this brief, an alien has no right to admission into this country.[8]   Thus, Plaintiffs have no likelihood of success on the merits of a claim under the APA seeking to require the Government to admit them into this country. The INA confers upon consular officers with exclusive authority to review applications for visas. *See* 8 U.S.C. §§ 1104(a), 1201(a). It is well established that "[o]btaining a visa from an American consul has never guaranteed an alien's entry into the United States. A visa merely gives the alien permission to arrive at a port of

---

[8]   Insofar as Plaintiffs are reasserting constitutional claims under the APA, their claims necessarily fail for the reasons stated earlier.

entry and have an immigration officer independently examine the alien's eligibility for admission." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999) (citing 8 U.S.C. § 1201(h)). Thus, any suggestion to the contrary by Plaintiffs is incorrect.

Fourth, it is far from clear that Plaintiffs are seeking to compel agency action under 5 U.S.C. § 706(1). And if they are, that would fail because they have failed to identify any discrete agency action that is legally required. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63-64 (2004). To the extent Plaintiffs claim that Congress's delegation through § 1182(f) is limited by 8 U.S.C. § 1152(a)(1)(A), § 1152(a)(1)(A) does not actually address—and thus does not circumscribe—the President's authority under § 1182(f). While it is true that § 1152(a)(1)(A) provides, with certain exceptions, that "no person shall receive any preference or priority or be discriminated against in the issuance of an *immigrant visa* because of the person's race, sex, nationality, place of birth, or place of residence," (emphasis added), § 1182(f) focuses on the *entry* of aliens, which is an entirely different step under the immigration laws. Indeed, an immigrant visa does not entitle an alien to admission to the United States, and even if an alien is issued a valid visa, he is subject to being denied admission to this country when he arrives at the border. *See, e.g.*, *Khan v. Holder*, 608 F.3d 325, 330 (7th Cir. 2010). There is thus no inconsistency between § 1152(a)(1)(A) and the President's issuance of the Executive Order under § 1182(f).

23

But even if § 1152(a)(1)(A) and § 1182(f) were inconsistent, 8 U.S.C. § 1152(a)(1)(B) makes clear that the statute does *not* "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications[.]" This establishes that the Executive Order is not covered by the restrictions of subsection (A), because the Executive Order directs a review and revision of procedures for processing of visa applications and adopts procedures for a temporary suspension and then resumption of processing of certain visa applications following that review. *See*, *e.g.*, Executive Order §§ 3(a), 5(a). Furthermore, while that review is pending, the Secretaries of State and Homeland Security have discretion to grant visas and other immigration benefits on a case-by-case basis. And, crucially, § 1152(a)(1)(B) permits, as here, a temporary suspension of entry pending completion of a review and revision of procedures for processing visa applications, which is not subject to any judicial review.[9]

---

[9]   Even if it applied, § 1152(a)(1)(A) would not restrict § 1182(f)'s broad grant of discretionary authority. Indeed, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). *See also United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("The intention of the legislature to repeal must be clear and manifest."). Any assertion that § 1152(a)(1)(A) limits that authority would mean that the President would be statutorily disabled from barring the entry of nationals of a country with which the United States was at war—a result that would raise serious constitutional questions, which is itself a sufficient reason to reject the State's reading. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

24

Finally, any argument based on the INA and implementing regulations, 8 U.S.C. § 1225(b)(1), 8 C.F.R. §§ 235.3(b)(4), 208.30 and 1003.42; 8 U.S.C. § 1158, and 8 U.S.C. § 1231(b)(3), *see* Amended Complaint, para. 104, lacks any persuasive force, as no Plaintiffs claim to have been deprived of any rights or privileges they otherwise would be entitled to under the INA. In any event, under elementary principles of statutory construction, the specific governs the general, such that the President's suspension of entry under § 1182(f) forecloses any argument that Plaintiffs must be permitted to travel to the United States on a visa and apply for admission under any of these authorities.

<u>v.</u>     <u>Religious Freedom Restoration Act</u>

The Religious Freedom Restoration Act of 1993 (RFRA) prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b). As amended by the Religious Land Use and Institutionalized Persons Act of 2000, RFRA's definition of "religious exercise" covers "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A); *see Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2754 (2014).

To succeed in a RFRA claim, Plaintiffs must demonstrate that the Government substantially burdened their sincere exercise of their religion. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2774 n.28 (2014); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). Here, Plaintiffs have failed to allege any facts that, if taken as true, could support such a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-681 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The order simply does not distinguish among religions, and thus cannot pose a substantial burden on religious exercise. And even if it did distinguish between religious groups, that is an equal protection claim, not a RFRA claim.

## B. The Plaintiffs Have Not Shown Any Irreparable Harm

At this time, Plaintiffs have not shown any irreparable harm. Plaintiffs must establish that irreparable harm is *likely,* not just possible, in order to obtain a preliminary injunction. *Winter*, 555 U.S. at 24. Irreparable harm represents a loss that cannot possibly be remedied at the conclusion of the litigation: "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing

irreparable harm and likelihood of success." *McNeilly v. Terri Lynn Land*, 684 F.3d 611, 615 (6th Cir. 2012). "To demonstrate irreparable harm, the plaintiffs must show that ... they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Irreparable harm cannot be speculative; "the injury complained of [must be] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.*; *see also Regan v. Vinick & Young*, 862 F.2d 896, 902 (1st Cir.1988) (finding that "speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction"); *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001).

Here, Plaintiffs' claims of injury relate to immigrant visa-holding individuals' inability to enter the United States after having expended considerable sums on their travel and fees to the U.S. government. *See generally* Am. Compl. ¶¶ 12-65. These claims fail for two reasons. First, the Executive Order imposes only a suspension, not a permanent ban, on entry of individuals from the designated countries. No plaintiff has alleged an irreparable harm that will result if a particular visa holder is unable to travel to the United States during this period of suspension. Moreover, any claim that a visa *applicant* or his petitioning U.S. citizen or LPR parent will suffer irreparable harm as a result of the 90-day suspension period is far too attenuated to satisfy standing. An applicant for an immigration benefit has no entitlement to

approval of such, and certainly the petitioner has no cognizable right to have an application adjudicated within 90 days. Nor can Plaintiffs base their request for injunctive relief on the claim that *others* who are not before this Court will suffer irreparable harm in the absence of preliminary injunctive relief. *E.g.*, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that *it* will be exposed to irreparable harm." (emphasis added)).

C. <u>The Balance of Harms and Public Interest Require Denial of Relief</u>

The final two factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—merge when the government is the opposing party. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982). The Executive Order places no disability on the LPR Plaintiffs, who are not contemplated by the presidential action. *See* White House Mem., ECF No. 7-1; *see also Louhghalam*, 2017 WL 479779, at *3.

While entry to the United States for immigrant visa-holding Plaintiffs is currently restricted, this restriction is only temporary. Thus, Plaintiffs cannot and do not make any concrete showing of how their alleged irreparable harm will outweigh the threatened harm that an injunction would cause, or that it would not "adversely

affect [the] public interest[.]" *Id.*; *Southdown, Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (petitioner's burden to show injunction causes "no disservice to unrepresented third parties"). Indeed, the Plaintiffs fail to acknowledge *any* potential harm to them or the public. This failure is fatal to Plaintiffs' request for the extraordinary remedy of a preliminary injunction. Any order that enjoins a governmental entity from lawfully enforcing our immigration laws and executive orders related to national security constitutes an irreparable injury that weighs heavily against the entry of injunctive relief. *See, e.g.*, *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). In this vein, the Supreme Court has specifically acknowledged that "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte v. United States*, 470 U.S. 598, 611 (1985). What was true then is still true today: the Court should not enter injunctive relief that overrides the President's national security decision.[10]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' request for a preliminary injunction.

---

[10] Finally, at most, any injunction issued against the Order should be limited to those who are already in the United States or those who have been here and seek to return to the country.

Dated:  February 8, 2017                    Respectfully submitted.

                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            AUGUST FLENTJE
                                            Special Counsel

                                            WILLIAM C. PEACHEY
                                            Director

                                            GISELA A. WESTWATER
                                            Assistant Director

                                            EREZ REUVENI
                                            Senior Litigation Counsel

                                            JOSHUA S. PRESS
                                            Trial Attorney

                                            /s/ Briana Yuh
                                            BRIANA YUH
                                            Ohio State Bar 0096087
                                            Trial Attorney
                                            District Court Section
                                            Office of Immigration Litigation
                                            U.S. Department of Justice – Civil Division
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, DC  20044
                                            Telephone:  (202) 532-4165
                                            Facsimile:  (202) 305-7000
                                            E-mail:  Briana.Yuh@usdoj.gov

                                            *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused a true and correct copy of the foregoing Defendants' Opposition to be served via CM/ECF upon the following:

> Helal A. Farhat
> Hfarhat@saflegal.com
>
> Kassem M. Dakhlallah
> Kassemdakhlallah@aol.com
>
> Natalie C. Qandah
> Natalie@vidalawpllc.com
>
> Nabih H. Ayad
> Ayadlaw@hotmail.com
>
> Michael J. Steinberg
> Msteinberg@aclumich.org
>
> Miriam J. Aukerman
> maukerman@aclumich.org
>
> Mona Fadlallah
> MONA@VIDALAWPLLC.COM
>
> *Counsel for Plaintiffs*

Dated:  February 8, 2017                    Respectfully submitted,

                                            /s/ Briana Yuh
                                            BRIANA YUH
                                            Trial Attorney
                                            District Court Section
                                            Office of Immigration Litigation

31

U.S. Department of Justice – Civil
Division
P.O. Box 868, Ben Franklin Station
Washington, DC  20044
Telephone:  (202) 532-4165
Facsimile:  (202) 305-7000
E-mail:  Briana.Yuh@usdoj.gov

*Counsel for Defendants*