# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE ("ACRL"),**
on behalf of itself, its members, and its clients,
**AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN
("ACLU"),** on behalf of itself and its members,
**AMERICAN ARAB CHAMBER OF COMMERCE,**
on behalf of itself and its members, **ARAB AMERICAN
AND CHALDEAN COUNCIL ("ACC"),** on behalf of
itself and its clients, **ARAB AMERICAN STUDIES
ASSOCIATION ("AASA"),** on behalf of itself and
its members, **HEND ALSHAWISH, SALIM ALSHAWISH,
YOUSEF ABDULLAH, FAHMI JAHAF, MOHAMED
ALSHEGA, ADEEB SALEH, SOFANA BELLA, HILAL
ALKATTEEB, and S.A., a minor through her Parent and
Next Friend, HILAL ALKATTEEB**, on behalf of themselves
and all others similarly situated,

     Plaintiffs,                       Case No. 17−cv−10310
                                        Hon. Victoria A. Roberts
v.                                       Mag. J. Stephanie D. Davis

**DONALD TRUMP**, President of the
United States, **U.S. DEPARTMENT OF HOMELAND
SECURITY ("DHS"), U.S. CUSTOMS AND BORDER
PROTECTION ("CBP"), U.S. CITIZENSHIP
AND IMMIGRATION SERVICES ("USCIS"),
U.S. DEPARTMENT OF STATE, U.S. DEPARTMENT
OF JUSTICE, OFFICE OF THE DIRECTOR OF NATIONAL
INTELLIGENCE, JOHN KELLY,** Secretary of DHS,
**KEVIN K. MCALEENAN**, Acting Commissioner of CBP,
**LORI SCIALABBA**, Acting Director of USCIS, **REX W.
TILLERSON,** Secretary of State, **JEFF SESSIONS,**
Attorney General, **MICHAEL DEMPSEY**, Acting Director of
National Intelligence, and the **UNITED STATES OF AMERICA**,

     Defendants.
_____/

1

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      President Donald Trump has been very clear about his desire to prevent Muslims from entering the United States. He specifically promised to do so as a candidate, calling on December 7, 2015 "for a total and complete shutdown of Muslims entering the United States." Throughout his campaign he reiterated his desire to prevent Muslims from coming to the United States and his belief that Muslims should not have equal rights with others in American society.

2.      On January 27, 2017, President Trump sought to fulfill his campaign promise by signing executive order 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "January 27 Order"), 82 Fed. Reg. 8977 (Raofield Decl. ¶ 3, Ex. A), which banned entry into the United States of both refugees and the nationals of seven predominantly Muslim countries.

3.      The January 27 Order was developed by advisors to Mr. Trump whom he tasked with finding a way to implement a Muslim ban indirectly, after his original campaign proposal to ban Muslims was criticized as blatantly unconstitutional religious discrimination. In addition, as President Trump admitted on national television, through the January 27 Order he intended to favor Christian refugees over Muslim refugees. Rarely in American history has governmental

2

intent—at the highest levels—to discriminate against a particular faith and its adherents been so plain.

4.      The January 27 Order resulted in chaos and widespread civil rights abuses at airports, demonstrations nationwide, and emergency litigation across the country.

5.      Implementation of the January 27 Order was halted by the courts. This court entered a nationwide injunction on February 2, 2017, which barred enforcement of the January 27 Order against lawful permanent residents, Dkt. 8, Pg. ID # 69. The next day, the U.S. District Court for the Western District of Washington entered a nationwide injunction that barred enforcement of many provisions of the January 27 Order against any non-citizen. *State of Washington v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), *motion for stay pending appeal denied*, 847 F.3d 1151 (9th Cir. 2017).

6.      Thereafter, President Trump promised to issue a new executive order. He claimed that injunctions by the courts imperiled national security. The President, however, delayed issuance of the new order. White House officials admitted that the purpose of the delay was to enable the President to benefit from favorable news coverage after his first address to Congress.

7.      White House officials explained that the revised order would contain only minor, technical changes from the January 27 Order, and would thus produce

the same basic policy outcome. That basic goal and outcome was, and remains, the exclusion of Muslims from the United States.

8.      On March 6, 2017, President Trump rescinded and replaced the January 27 Order with a revised document, executive order 13780, 82 Fed. Reg. 13209, effective March 16, 2017 (the "March 6 Order" or the "Executive Order"; together, we refer to the January 27 Order and the March 6 Order as the "Executive Orders") (Raofield Decl. ¶ 4, Ex. B).

9.      The January 27 Order and the March 6 Order have the same purpose and effect. Both were intended and designed to target and discriminate against Muslims, and both did and do just that in operation.

10.      The major provisions of the March 6 Order are nearly identical to those of the January 27 Order. The new order bans individuals from six of the seven predominantly Muslim countries identified in the January 27 Order – Yemen, Libya, Somalia, Sudan, Iran and Syria (the "Designated Countries") – from entering the United States for at least 90 days. Like the previous order, the March 6 Order suspends the entire United States Refugee Admissions Program for at least 120 days and reduces the maximum number of refugees allowed into the United States for the current fiscal year from 110,000 to 50,000. The March 6 Order also contains language that associates Muslims with violence, terrorism, bigotry and hatred. That language inflicts stigmatic and dignitary harms. As a

4

result, the March 6 Order will have the same discriminatory and stigmatizing impact on Muslims as the January 27 Order, which was itself a product of the President's clearly expressed intent to prevent Muslims from entering the United States.

11.     While the March 6 Order contains various additions and revisions intended to help insulate it from legal challenges that led to the enjoining of the January 27 Order, the Trump Administration has made clear that the March 6 Order is intended to effectuate the same policy outcome as the January 27 Order. The March 6 Order likewise suffers from the same fundamental constitutional and statutory defects as the January 27 Order.

12.     Like the January 27 Order, the March 6 Order violates cherished constitutional protections: the guarantee that the government will not establish, favor, discriminate against, or condemn any religion; the guarantee of freedom of speech and association; and the guarantee of equal protection of the laws.

13.     The United States was born in part of an effort to escape religious persecution, and the Religion Clauses of the First Amendment reflect the harrowing history of our Founders. More than two centuries later, our nation is one of the most religiously diverse in the world and has become a sanctuary for immigrants and visitors of all faiths and no faith, including refugees fleeing persecution in their homelands.

14.     The March 6 Order flies in the face of our historical commitment to welcome and protect people of all faiths, and no faith. It violates the "clearest command of the Establishment Clause"—"one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

15.     The United States was likewise founded on the principle that all people—regardless of their faith or where they are born—are created equal. Freedom of speech and assembly are similarly fundamental to our democracy. The equal protection guarantee of the Fifth Amendment reflects this country's rejection of official preferences on the basis of race, color, or religion. The First Amendment guarantees our right to hear from and associate with speakers of different faiths. The March 6 Order—which was motivated by animus toward Muslims and expressly discriminates on the basis of national origin—runs afoul of these core constitutional values as well.

16.     Plaintiffs challenge the March 6 Order as violating the Establishment Clause and the right to freedom of speech and association under the First Amendment, and the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

17.     Plaintiffs respectfully request that this Court issue appropriate declaratory relief and preliminarily and permanently enjoin the March 6 Order as a whole.

## PARTIES

### The Plaintiffs

18.     Plaintiff Arab American Civil Rights League ("ACRL") is a non-profit organization based in Dearborn, Michigan, that protects the civil rights of Arab Americans through education and advocacy. ACRL is a membership organization, the majority of whose members are practicing Muslims and are from Middle Eastern backgrounds, including from the Muslim-majority Designated Countries. Likewise, the majority of ACRL's clients are practicing Muslims and are from Middle Eastern backgrounds, including from the Muslim-majority Designated Countries. ACRL asserts claims on behalf of itself, its members, and clients. The rights of its clients that ACRL seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

19.     Plaintiff American Civil Liberties Union of Michigan ("ACLU") is a nonprofit membership organization with more than 36,000 members, head-quartered in Detroit, Michigan, and is a state affiliate of the national American Civil Liberties Union, which is itself a membership organization of more than a million members. The ACLU has long been dedicated to protecting the constitutional rights of its members and of all people in Michigan, including their

7

rights to religious liberty, freedom of speech and association, and equal protection of the laws. The ACLU asserts claims on behalf of itself and its members.

20.    The American Arab Chamber of Commerce (hereinafter "Chamber") is a non-profit, membership organization dedicated to promoting and empowering its member businesses. Located in Dearborn, Michigan, the Chamber is currently the largest Arab American business organization in the country. The Chamber seeks to promote its members by offering networking opportunities as well as by fostering trade between Michigan-based companies and businesses located in the Middle East. The Chamber's membership includes businesses founded or run by immigrants from the Designated Countries and by refugees. Many of these business leaders are Muslim. The Chamber asserts claims on behalf of itself and its members.

21.    Arab American and Chaldean Council ("ACC") is a human services non-profit, headquartered in Detroit, Michigan, which has existed since 1979 and whose mission is to support the overall well-being of the Middle Eastern community in the Metro Detroit region by providing services in public and behavioral health, along with a focus on education, English as a Second Language (ESL) classes, employment, training and placement, youth life skills classes in schools, youth recreation, cultural activities along with Woman, Infant and Children (WIC) and the Michigan Department of Health and Human Services

8

(DHHS) support. ACC asserts claims on behalf of itself and its clients. The rights of ACC's clients that it seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

22.     The Arab American Studies Association ("AASA") is a non-profit, nonpolitical organization of scholars and other persons interested in the study of Arab American history, ethnicity, culture, literature, art, music, politics, religion, and other aspects of the Arab American experience. The AASA is a membership organization, headquartered in Dearborn, Michigan. The AASA asserts claims on behalf of itself and its members.

23.     As set forth in greater detail below, implementation of the Executive Orders has caused substantial harm to, and will continue to harm, ACRL, its members, and its clients; the ACLU and its members; the American Arab Chamber of Commerce and its members; ACC and its clients; and AASA and its members.

24.     Plaintiff Hend Alshawish is a lawful permanent resident of the United States, a citizen of Yemen, and a Muslim. She is married to plaintiff Salim Alshawish. She resides in New York, and is a member of ACRL and of the American Civil Liberties Union.

9

25.     Plaintiff Salim Alshawish is a citizen of the United States and is Muslim. He is married to plaintiff Hend Alshawish. He resides in New York, and is a member of ACRL and of the American Civil Liberties Union.

26.     Plaintiffs Hend and Salim Alshawish have two children, aged 12 and 15, who are citizens of Yemen and are Muslim. The children have been unable to join their parents in the United States due to the Executive Orders.

27.     Plaintiff Yousef Abdullah has been a citizen of the United States since 2009 and is Muslim. He resides in Wayne County, Michigan and is a member of ACRL and of the ACLU.

28.     Plaintiff Yousef Abdullah is married to Hanan Alafif, a citizen of Yemen. Ms. Alafif is also Muslim. Ms. Alafif currently resides in Yemen. The Executive Orders have barred Ms. Alafif from joining her husband and their two young children in the United States.

29.     Plaintiff Fahmi Jahaf is a citizen of the United States and is Muslim. He resides in Wayne County, Michigan and is a member of ACRL and of the ACLU. Plaintiff is married to Basema Al Reyashi, a citizen of Yemen. Ms. Al Reyashi is also Muslim, and currently resides in Yemen. Due to the Executive Orders, Plaintiff Jahaf's wife cannot join him in the United States.

30.     Plaintiff Mohamed Alshega is a citizen of the United States and is a Muslim. He resides in Wayne County, Michigan and is a member of ACRL and of

the ACLU. Plaintiff's son, Badr Alshega, is a citizen of Yemen. Mr. Alshega is also Muslim and currently resides in Yemen. Due to the Executive Orders, Plaintiff Alshega's son cannot join his father in United States.

31.    Plaintiff Adeeb Saleh is a U.S. citizen and resident of Dearborn Heights, Michigan who is married to Amira Ahmed Ali Aleshawi, a citizen of Yemen. Mr. Saleh and Ms. Aleshawi are Muslim, and are members of ACRL and the ACLU. As a result of the Executive Orders, Ms. Aleshawi, who has been stranded in Malaysia for a year while her visa application was pending, cannot reunite where her husband and their three daughters in the United States.

32.    Plaintiff Sofana Bella is a U.S. citizen and resident of Grand Blanc, Michigan. She previously applied for a K-1 visa on behalf of her fiancé, Khalid Ahmed, a citizen of Sudan. She is a member of ACRL and of the ACLU.The Executive Orders prevent Ms. Bella from having her husband-to-be join her in the United States.

33.    Plaintiff Hilal Abdo Kaid Alkatteeb is a United States citizen and a Muslim who resides in Detroit, Michigan. He is a member of ACRL and of the ACLU. Mr. Alkatteeb's wife, Rim Mohammed Ahmed Shamsan, is citizen of Yemen and is Muslim. The Executive Orders have prevented Ms. Shamsan from joining her husband in the United States.

34.   Plaintiff S.A. is the two-year-old daughter of Hilal Abdo Kaid Alkatteeb and Rim Mohammed Ahmed Shamsan. S.A. is a United States citizen and is being raised in the Muslim faith. Plaintiff Alkatteeb is her parent and next friend.

35.   The Executive Orders prevent S.A. from living together with both of her parents in the United States, forcing her parents to choose between separating S.A. from her mother so that S.A. can live in safety in the United States, or having S.A. live with her mother in war-torn Yemen.

36.   As set forth in greater detail below, implementation of the Executive Orders has caused and will continue to cause harm to Plaintiffs Hend Alshawish, Salim Alshawish, Yousef Abdullah, Fahmi Jahaf, Mohamed Alshega, Adeeb Saleh, Sofana Bella, Hillal Alkatteeb, and S.A. (collectively, the "Individual Plaintiffs").

## The Defendants

37.   Defendant Donald Trump is the President of the United States. He issued the Executive Orders challenged in this suit. He is sued in his official capacity.

38.   Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services and U.S. Customs and Border

Protection. The Executive Orders assign DHS a variety of responsibilities regarding implementation and enforcement.

39.     Defendant U.S. Customs and Border Protection ("CBP") is an agency within DHS. CBP's responsibilities include inspecting and admitting immigrants and nonimmigrants arriving at international ports of entry, including airports and land borders. The Executive Order assigns CBP a variety of responsibilities regarding implementation and enforcement.

40.     U.S. Citizenship and Immigration Services ("USCIS") is an agency within DHS. USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States, and it therefore has a variety of responsibilities regarding implementation and enforcement of the Executive Order.

41.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government that is responsible for the issuance of immigrant and nonimmigrant visas abroad. The Executive Orders assign DOS a variety of responsibilities regarding implementation and enforcement.

42.     Defendant Department of Justice ("DOJ") is a cabinet-level department of the United States federal government which has certain responsibilities with respect to the Immigration and Nationality Act. The Executive

13

Order assigns certain responsibilities regarding implementation and enforcement to the Attorney General, who heads the Department of Justice.

43.     Defendant Office of the Director of National Intelligence ("ODNI") is an independent agency of the United States federal government. ODNI has specific responsibilities and obligation with respect to implementation of the Executive Orders.

44.     Defendant John Kelly is the Secretary of Homeland Security. Secretary Kelly has responsibility for overseeing enforcement and implementation of the Executive Orders by all DHS staff, and staff of DHS's component agencies, CBP and USCIS. He is sued in his official capacity.

45.     Defendant Kevin K. McAleenan is the Acting Commissioner of CBP and has responsibility for overseeing enforcement and implementation of the Executive Orders by all CBP staff. He is sued in his official capacity.

46.     Defendant Lori Scialabba is the Acting Director of USCIS and has responsibility for overseeing enforcement and implementation of the Executive Orders by all USCIS staff. She is sued in her official capacity.

47.     Defendant Rex W. Tillerson is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Executive Orders by all DOS staff. He is sued in his official capacity.

48.     Defendant Jeff Sessions is the Attorney General of the United States and oversees the DOJ's activities with respect to the Immigration and Nationality Act. The Executive Order assigns certain responsibilities regarding implementation and enforcement to the Attorney General. He is sued in his official capacity.

49.     Defendant Michael Dempsey is the Acting Director of National Intelligence, and has responsibility for overseeing enforcement and implementation of the Executive Orders by all ODNI staff. He is sued in his official capacity.

50.     Defendant United States of America includes all government agencies and departments responsible for enforcement and implementation of the Executive Orders.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343 and 1361. This court has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

52.     Venue is proper under 28 U.S.C. § 1391(e). Defendants are officers or employees of the United States acting in their official capacities, agencies of the United States, and the United States. Plaintiffs ACRL, ACLU, American Arab Chamber of Commerce, ACC, AASA, Abdullah, Jahaf, Alshega, Saleh, Bella, Alkatteeb, and S.A. are residents of this district, and no real property is involved in

this action. Further, a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### President Trump's Expressed Intent to Target Muslims and to Favor Christians Seeking to Enter the Country

53.    President Trump has repeatedly made clear his intent to enact policies that exclude Muslims from entering the United States and favor Christians seeking to enter the United States.

54.    On December 7, 2015, then-Presidential Candidate Trump issued a statement on his campaign website. Entitled "DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION," the statement declared that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."

55.    The statement invokes stereotypes of Muslims, falsely suggesting that all Muslims believe in "murder against non-believers who won't convert" and "unthinkable acts" against women.

56.    The statement suggests that a Muslim ban is necessary to prevent "horrendous attacks" on U.S. soil because "there is great hatred towards Americans by large segments of the Muslim population."

16

57.     Defending his proposed Muslim ban the next day, Candidate Trump told Good Morning America, "What I'm doing is I'm calling very simply for a shutdown of Muslims entering the United States—and here's a key—until our country's representatives can figure out what is going on."

58.     At the time President Trump took the oath of office, the statement remained on his campaign website. And while this fact has been highlighted in numerous lawsuits challenging the Executive Order, President Trump has elected to leave the statement on his campaign website to this day.

59.     When asked the same day on MSNBC how his Muslim ban would be applied by customs officials, Candidate Trump said, "That would be probably— they would say, are you Muslim?" A reporter followed up by asking, "And if they said yes, they would not be allowed in the country[?]" Candidate Trump responded, "That's correct."

60.     This overt religious animus was consistent with statements and proposals Candidate Trump had previously made. For example, on September 30, 2015, while speaking at a campaign event in New Hampshire, Candidate Trump said that the 10,000 Syrian refugees admitted by the Obama administration in 2016 "could be ISIS" and promised "if I win, they're going back!"

61.     In addition, in a series of interviews in the weeks prior to the release of his statement, Candidate Trump had indicated that he would require Muslims in

17

the United States to register with the government, and he had insisted that the country had "absolutely no choice" but to shut down mosques.

62.     Throughout the presidential campaign, Candidate Trump repeatedly reiterated his support for targeting Muslims seeking to enter the United States.

63.     On March 9, 2016, Candidate Trump stated, "I think Islam hates us. There's . . . a tremendous hatred there . . . . There's an unbelievable hatred of us . . . . [W]e can't allow people coming into this country who have this hatred of the United States . . . [and] of people that are not Muslim . . . ."

64.     The next day, during a debate, Candidate Trump said he would "stick with exactly" what he had said the night before. When asked if he was referring to all 1.6 billion Muslims worldwide, he explained, "I mean a lot of them." Candidate Trump stated later in the same debate, "There is tremendous hate. There is tremendous hate. Where large portions of a group of people, Islam, large portions want to use very, very harsh means."

65.     On March 22, 2016, Candidate Trump stated that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," adding, "You need surveillance. You have to deal with the mosques, whether we like it or not . . . . [T]hese attacks aren't . . . done by Swedish people, that I can tell you."

66.     The same day, Candidate Trump attacked Democratic candidate Hillary Clinton on Twitter, saying she wanted to "let the Muslims flow in."

67.     On June 13, 2016, one day after the Pulse nightclub shooting in Orlando, Candidate Trump delivered an address on "Terrorism, Immigration, and National Security," in which he declared: "I called for a ban after San Bernardino, and was met with great scorn and anger but now, many are saying I was right…. We cannot continue to allow thousands upon thousands of people to pour into our country, many of whom have the same thought process as this savage killer." In the address he blamed "Muslim communities" of refusing to "turn in the people who they know are bad—and they do know where they are."

### Development of the Pretext for Targeting Muslims Prior to the Election

68.     During the summer of 2016, in response to widespread outrage at his proposed Muslim ban, Candidate Trump worked with others to develop a pretext to disguise his religious animus and justify his determination to take action targeting Muslims.

69.     In May of 2016, Candidate Trump asked former New York City Mayor Rudolph Giuliani to put together a "commission" to advise Candidate Trump on his proposed Muslim ban.

70.     In a televised interview, Mr. Giuliani explained: "So when he first announced it, he said 'Muslim ban.' He called me up. He said 'Put a commission together. Show me the right way to do it legally.'"

71.     In early July 2016, Mr. Giuliani described a memorandum his commission had prepared for Candidate Trump, and he suggested that this memorandum had caused the candidate's proposal to shift from a "general ban" to "very specific, targeted criteria" focusing on specific countries.

72.     In a subsequent interview, Mr. Giuliani again attributed the purported evolution of the Muslim ban to the work of his commission, which included Congressman Michael McCaul and General Michael Flynn, among others: "We wrote a paper for him. And he amended it to the ban would be restricted to particular countries, and it would not be a ban. It would involve extreme vetting…. All the rest from countries [other than Syria] that contain dangerous populations of radical Islamic extremists, he will subject them to extreme vetting, but not a ban."

73.     In a July 24, 2016 interview on Meet the Press, Candidate Trump was asked if a plan similar to the Executive Orders at issue in this litigation was a "rollback" from "[t]he Muslim Ban." Candidate Trump responded: "I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territory." Candidate Trump continued: "People were so upset when I used the word 'Muslim.' 'Oh, you can't use the word 'Muslim.''

20

Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."

74.    In an address on August 15, 2016, Candidate Trump characterized a long list of terror attacks as all being linked by the "common thread" that they "involved immigrants or the children of immigrants." In this speech, invoking offensive Muslim stereotypes, he decried "the oppression of women and gays in many Muslim nations" and the targeting of "Christians driven from their homes," and he called for the establishment of an "ideological screening test" to ferret out those who do not share our values. He went on to proclaim that American "values should be taught by parents and teachers, and impressed upon all who join our society. Assimilation is not an act of hostility, but an expression of compassion."

75.    On August 17, 2016, the Trump campaign announced that Candidate Trump had convened a "Roundtable on Defeating Radical Islamic Terrorism," to discuss "improving immigration screening and standards" to keep radical Muslims out of the country. This group included, among others, General Flynn, then-Senator Jeff Sessions, former Mayor Giuliani, Congressman Peter King, former Attorney General Michael Mukasey, and Congressman McCaul.

76.    In a debate on October 9, 2016, one month before the election, Candidate Trump claimed that: "The Muslim ban is something that in some form has morphed into extreme vetting from certain areas of the world."

## Continued Development of the Executive Order
## During the Transition Period

77.     Ordinarily, the President consults relevant cabinet-level officials and agencies before issuing an Executive Order. However, the January 27 Executive Order did not arise out of the usual process.

78.     Shortly after his election victory, President-elect Trump selected General Flynn—a key member of the Giuliani commission—to serve as his national security adviser.

79.     Just a few months earlier, General Flynn had described "Islamism" in a televised speech as "a vicious cancer inside the body of 1.7 billion people on this planet" and stated that "it has to be excised."

80.     During the transition period following the election and before the inauguration, development of the January 27 Order was overseen by certain Trump advisors, including Stephen Bannon and Stephen Miller.

81.     Mr. Bannon has previously made anti-Muslim comments. He has stated that "most people in the Middle East, at least 50%, believe in being sharia-compliant," and that "[i]f you're sharia-compliant or want to impose sharia law, the United States is the wrong place for you."

82.     In 2003, Mr. Miller wrote: "We have all heard about how peaceful and benign the Islamic religion is, but no matter how many times you say that, it

cannot change the fact that millions of radical Muslims would celebrate your death for the simple reason that you are Christian, Jewish or American."

83.     During the transition period, members of the Trump transition team consulted with staff working for the House Judiciary Committee. It has been reported that these staffers carried out this work unbeknownst to members of the Committee, and were required to sign nondisclosure agreements. Committee Chairman Rep. Bob Goodlatte has verified that the staffers' involvement began after the election and ended before the inauguration.

84.     In late December 2016, as development of the January 27 Order was underway, President-elect Trump was asked whether he had changed his "plans to create a Muslim registry or ban Muslim immigration." He responded: "Hey, you've known my plans all along and it's, they've proven to be right. 100 percent correct."

## Issuance of the January 27 Order
## Following the Inauguration

85.     On January 20, 2017, Donald J. Trump became the 45th President of the United States of America.

86.     President Trump selected the controversial Rev. Franklin Graham to speak at his inauguration. Rev. Graham had spent the past fifteen years characterizing Islam as "a religion of war" and insisting Islam "has not been hijacked by radicals. This is the faith, this is the religion."

23

87.     As of January 20, 2017, news reports indicated that an executive order would be signed shortly and would restrict entry to the country by individuals from seven majority Muslim countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.

88.     On January 27, 2017, President Trump sought to fulfill his campaign promise by signing an executive order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

89.     The January 27 Order was intentionally designed to target Muslims, discriminate against Muslims, and disparage Islam, and it did just that in operation.

90.     Contemporaneous statements made by President Trump and his advisors around the signing of the Executive Order confirm President Trump's intent to discriminate against Muslims.

91.     For instance, during the signing ceremony, President Trump made clear that the order was targeted at Muslims, pledging that it would "keep radical Islamic terrorists out of the United States of America."

92.     In an interview with the Christian Broadcasting Network released the same day that he signed the Executive Order, President Trump stated that the Order was designed to give Christians priority when applying for refugee status. "If you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible," he said. "[T]hey were chopping off the heads

24

of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."

93.     Consistent with this expressed animus towards Muslims and preference for Christians, the January 27 Order clearly disfavored Muslims while giving special treatment to non-Muslims.

94.     Section 3 of the Order, for example, banned any entry for 90 days for individuals from seven countries. All seven of these countries are predominantly Muslim: Syria, Sudan, Iraq, Iran, Libya, Somalia, and Yemen.

95.     The January 27 Order did not single out any countries that are not majority-Muslim for disfavored treatment.

96.     The January 27 Order provided a mechanism for the government to extend and/or expand the ban at the end of the 90-day period. Section 3 of the Order directed the Secretary of Homeland Security to "immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat," and to "submit to the President a report on the results of the review . . . within 30 days of the date of this order." At that point, the "Secretary of State shall request all foreign governments that do not supply such information to start providing such information," and 60 days after

25

that – precisely at the end of the initial 90-day ban period – the January 27 Order provides for the President to issue a proclamation indefinitely banning travelers from a list of countries deemed to be non-compliant "until compliance occurs."

97.    On information and belief, despite the passage of more than 50 days, the 30-day review to be conducted by the Secretary of Homeland Security has not yet resulted in a report to the President.

98.    Section 5 of the January 27 Order banned the admission of Syrian refugees indefinitely and prohibited other refugee admissions for 120 days.

99.    The January 27 Order discriminated between persons of majority and minority faiths in their country of origin. Section 5(b) of the Order required the government to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality" once the 120-day ban on refugee admissions is complete.

100.    During those 120 days, moreover, Section 5(e) of the January 27 Order allowed the admission of certain refugees on a discretionary case-by-case basis, "only so long as [the Secretaries of State and Homeland Security] determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution."

26

101.   The President has conceded that these provisions were intended to allow Christian refugees to enter the United States, even while Muslim refugees from the same countries were prohibited from doing so. And indeed, Muslims were severely disadvantaged by the minority-faith preferences set forth in Sections 5(b) and 5(e).

102.   There is no statutory, regulatory, or constitutional basis for favoring refugees from minority faiths over refugees from majority faiths. There is no basis in the Refugee Act of 1980, as amended – which governs the admission of refugees to the United States and their resettlement herein – to prioritize refugees fleeing persecution on the basis of religion, as opposed to other congressionally-recognized bases. *See* 8 U.S.C. § 1101(a)(42) (defining "refugee").

103.   The indefinite ban on Syrian refugees contained in the January 27 Order also made plain, and put into practice, President Trump's intent to limit the entry of Muslims into the United States. In fiscal year 2016, Syrian refugees made up 32% of all Muslim refugees who entered the United States, but only 0.2% of the Christian refugees who entered the United States.

104.   Section 5(d) reduced, by more than half, the annual refugee admissions allotment that was set prior to the current fiscal year by President Obama (from 110,000 to 50,000).

27

105.    As of the end of February 2017, approximately 37,000 refugees had already been resettled in the United States. The number of refugees already somewhere in the U.S. Refugee Admissions Program pipeline – well over 50,000 – would put the U.S. refugee resettlement total above Section 5(d)'s reduced admissions cap of 50,000.

106.    As a result, upon information and belief, Defendants have already undertaken various actions to bring to a halt the U.S. refugee resettlement process as a result of Section 5(d)'s reduction in this fiscal year's figure.

107.    For example, upon information and belief, shortly after the January 27 Order was signed, Defendant USCIS, a component of Defendant Department of Homeland Security, cancelled nearly all refugee processing interviews abroad.

108.    Additionally, upon information and belief, Defendant Department of State has suspended security checks for refugees, a process that often takes between 18-24 months.

109.    Further, on information and belief, since the January 27 Order was signed, CBP has questioned foreign nationals entering the United States about their religious beliefs to determine whether or not they are Muslim and their degree of religiosity, and has subjected Muslim travelers to disproportionate and discriminatory scrutiny and interrogation.

## **The Chaotic and Irregular Implementation of the January 27 Order**

110.   The implementation of the January 27 Order was extremely unusual and chaotic. Upon information and belief, the White House bypassed regular channels for input and cooperation from other components of the Executive Branch, including the Secretaries of Homeland Security, Defense, and State. Moreover, upon information and belief, CBP was not given clear operational guidance during critical times in the implementation of the January 27 Order.

111.   The January 27 Order was signed without final review or legal analysis from DHS, which—along with the DOS—was principally charged with implementing the Order.

112.   Secretary of Homeland Security Kelly was reportedly in the midst of a conference call to discuss the Order when someone on the call learned from watching television that the Order they were discussing had been signed.

113.   Similarly, Secretary of Defense Mattis, who had publicly criticized President Trump's proposal to ban Muslims from the United States, reportedly did not see a final version of the order until the day it was signed, and was not consulted during its preparation.

114.   During the days leading up to and following the signing of the January 27 Executive Order, its scope and provisions were changed, despite the changes bearing no rational relationship to the purported reasons for the Order.

29

115.   For example, the night the January 27 Order was signed, the Department of Homeland Security issued guidance interpreting the Order as not applying to lawful permanent residents. Overnight, the White House overruled that guidance, applying the Order to lawful permanent residents subject to a case-by-case exception process. On information and belief, the decision to continue applying the January 27 Order to lawful permanent residents was taken on the advice of Mr. Bannon.

116.   After the detention at airports of many individuals, including lawful permanent residents, led to chaos nationwide, Secretary Kelly issued a statement "deem[ing] the entry of lawful permanent residents to be in the national interest." Secretary Kelly's statement was made pursuant to Section 3(g) of the order, which requires such a decision to be made jointly with the Secretary of State and "on a case-by-case basis."

117.   Finally, on February 1, the Counsel to the President purported to interpret the January 27 Order as exempting lawful permanent residents from the ban entirely.

118.   Similarly, initial guidance from DOS indicated that individuals with dual citizenship, with one country of citizenship subject to the ban, would be banned from entering the United States. On information and belief, word of a

change in that policy spread irregularly, with notice being given to airlines and foreign nations but contradicted in official U.S. government communications.

119.   Finally, CBP announced a changed policy, explaining, in response to the question "Does 'from one of the seven countries' mean citizen, national or born in?" that "Travelers are being treated according to the travel document they present."

120.   The government also reversed itself on its policy toward holders of Special Immigrant Visas from Iraq. Holders of these visas are clearly banned under the terms of the January 27 Order, and they were refused entry when it went into effect. However, on February 2, 2017, the government changed course and allowed them to enter the United States despite the January 27 Order.

121.   Still other aspects of the January 27 Order and its implementation demonstrate utter disregard for the individuals affected by it. For example, President Trump and officials involved in drafting the order knew that the Order would bar the entry of individuals who were literally mid-air when the Order was issued. Nonetheless, and absent any exigency that would justify it, the Order was signed late on a Friday afternoon and took immediate effect. That decision had a number of predictable consequences, including: making it more difficult for the federal employees tasked with enforcing the order to obtain instructions on how to interpret and enforce the Order's ambiguous provisions; prolonging the detentions

at airports of those affected, and leading many to be wrongfully deported; and increasing the difficulty advocates had in accessing their clients and the courts.

122.   Other actions taken by DHS and DOS to enforce the January 27 Order exhibited a zealous desire to go beyond even the draconian measures the Order actually requires.

123.   DOS, at the request of DHS, issued a letter purporting to provisionally revoke all immigrant and nonimmigrant visas of nationals of the seven designated countries on a categorical basis. The letter is dated January 27, 2017, but only came to light on January 31, 2017, when Department of Justice lawyers filed it in pending litigation. DOS stated that this action was taken to "implement[]" the January 27 Order.

124.   Ordinarily, visas are revoked only after individualized consideration of whether a particular visa should be revoked, not through mass simultaneous revocation of a broad swath of visas.

125.   Still further evidence of discriminatory intent and effect is reflected in the statements of President Trump and his Administration seeking to defend and justify the January 27 Order after it was issued.

126.   President Trump, for example, falsely stated that only 109 people were detained over the weekend following the issuance of the January 27 Order, even though he knew or should have known that the number was far higher.

32

127.   Indeed, pursuant to a federal district court order, the federal government has since revealed that at least 746 individuals were detained over a period of just 27 hours during the weekend after the January 27 Order was signed. This 27-hour period did not begin until a day after the January 27 Order went into effect. So the total number of detained persons was necessarily higher, and perhaps much higher.

128.   These chaotic, irregular, and irrational policies, policy changes, and statements indicate that the purported justifications for the January 27 Order were pretextual and support Plaintiffs' allegation that the Order was motivated by an intent to discriminate against Muslims.

## The Courts Enjoin Implementation of the January 27 Order

129.   On February 2, 2017, this Court issued a nationwide injunction prohibiting enforcement of Sections 3(c) and 3(e) of the January 27 Order against lawful permanent residents.

130.   On February 3, 2017, the United States District Court for the Western District of Washington (Robart, J.) enjoined the government from enforcing Sections 3(c), 5(a), 5(b), 5(c), and 5(e) of the January 27 Order.

131.   The same day and in response to the injunction, President Trump tweeted, "We must keep 'evil' out of our country!"

33

132.   President Trump also personally attacked Judge Robart as a "so-called judge," calling his opinion "outrageous," "ridiculous," and "terrible." President Trump falsely claimed that one consequence of Judge Robart's order is that now "anyone, even with bad intentions" must be allowed to enter the country, saying that the judge had "open[ed] up our country to potential terrorists" and put it in "such peril." President Trump advised the public to "blame him and the court system" if "something happens." Comments like this by a President about a sitting judge are extremely unusual, if not unprecedented, and reflect a fundamental lack of respect for important constitutional principles.

133.   The government appealed Judge Robart's order to the Ninth Circuit and sought a stay pending appeal.

134.   After hearing oral argument, the Ninth Circuit issued a published decision denying the government's motion for a stay, noting that "although courts owe considerable deference to the President's policy determinations with respect to immigration and national security, it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

135.   In reaching its holding, the Court noted that the "[t]he Government has pointed to no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States." *Id.* at 1168.

34

136.   The Court also acknowledged "evidence of numerous statements by the President about his intent to implement a 'Muslim ban'" and observed that "[i]t is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Id.* at 1167.

137.   Shortly after the Ninth Circuit issued its opinion, President Trump tweeted, "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!" He subsequently denounced the opinion as "a political decision" and stated, "[W]e're going to see them in court, and I look forward to doing that. It's a decision that we'll win, in my opinion, very easily."

138.   On March 7, 2017, the government withdrew its appeal of the February 3 Order, leaving in place the nationwide preliminary injunction of Sections 3(c), 5(a), 5(b), 5(c), and 5(e) of the January 27 Order.

## The Administration Struggles to Create Post-Hoc Justifications for the Executive Order

139.   Although some pronouncements by President Trump and his administration suggested that the government would seek to appeal the Ninth Circuit's decision, other White House officials indicated that they were drafting a new Executive Order in order to circumvent that court's and other judicial rulings regarding the constitutionality of the January 27 Order.

140.   On February 16, 2017, following the Ninth Circuit's per curiam decision, President Trump said, "[W]e can tailor the order to that decision and get just about everything, in some ways, more."

141.   On February 21, 2017, Senior White House Policy Advisor Stephen Miller, a key architect of the January 27 Order, stated that a revised order would be issued within a "few days" and that it was driven by the very same policy. "And so these are mostly minor, technical differences. Fundamentally, you are still going to have the same, basic policy outcome for the country." When Mr. Miller was asked whether changes were being made in an attempt to alleviate constitutional concerns, he was defiant: "The rulings from those courts were flawed, erroneous and false. The president's actions were clearly legal and constitutional."

142.   Around this time, senior White House officials began to leak accounts that President Trump had ordered DHS to work with DOJ to collect information that would justify the temporary ban on travel from the seven affected countries included in the January 27 Order. One White House official said, "DHS and DOJ are working on an intelligence report that will demonstrate that the security threat for these seven countries is substantial and that these seven countries have all been exporters of terrorism into the United States."

143.   Numerous intelligence officials began expressing their shock at this request, which was perceived as an attempt to politicize intelligence.

36

144.    At least two intelligence prior reports prepared by DHS refuted the justification for barring entry by individuals from the seven countries identified in the January 27 Order.

145.    One draft intelligence report prepared by DHS assessed the potential heightened threat of terroristic activity posed by individuals from the seven countries affected in the January 27 Order and concluded that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." This report found that less than half of the 82 individuals involved in terrorist activities since 2011 were foreign-born, and of those, "The top seven origin countries of the foreign-born individuals are: Pakistan (5), Somalia (3), and Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan (2)."

146.    A second intelligence assessment, prepared by DHS less than a week before issuance of the March 6 Order, concluded that "most foreign-born, U.S.-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry," and that many entered as minors and "nearly all parents who entered the country with minor-age children likely did not espouse a violent extremist ideology at the time they entered or at any time since, suggesting these foreign-born individuals were likely not radicalized by their parents." The report also found that integration and mentoring services provided by federal, state, and private

organizations to refugees and asylees could address underlying factors that lead to the radicalization of foreign-born U.S. residents.

147.    Counter to the Trump Administration's initial rhetoric emphasizing the urgency of a travel ban, the release of the March 6 Order was repeatedly delayed for political reasons.

148.    At one point, the White House indicated that President Trump would sign the Executive Order on March 1, 2017, but this was delayed yet again. One Administration official told a news outlet on February 28 that a reason for President Trump's delay in signing an updated Executive Order was "the busy news cycle," and the desire of the President that the new order "get plenty of attention."

149.    A senior Administration official told a different news outlet on March 1, 2017, that a related reason for the delay in releasing the updated Executive Order was the "positive reaction" to President Trump's "first address to Congress" on the evening of Tuesday, February 28, 2017. The official said, "We want the (executive order) to have its own 'moment.'" The article reported that "[s]igning the executive order Wednesday, as originally indicated by the White House, would have undercut the favorable coverage," and the senior Administration official "didn't deny the positive reception was part of the [A]dministration's calculus in pushing back the travel ban announcement."

150.   On February 27, 2017, Press Secretary Sean Spicer discussed the soon-to-be-issued March 6 revised order, saying: "the goal is obviously to maintain the way that we did it the first time."

### The March 6 Order Alleges a Different Purpose But Seeks the Same End Result

151.   On March 6, 2017—a full month after the District Court for the Western District of Washington enjoined the January 27 Order—President Trump issued the revised executive order. The March 6 Order is entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

152.   In a press briefing the day the March 6 Order was issued, Press Secretary Sean Spicer said that "the principles of the executive order remain the same." Spicer was correct: the key principle of anti-Muslim animus that doomed the January 27 Order to unconstitutionality was unchanged.

153.   The same day the March 6 Order was issued, President Trump sent an email to supporters saying the order was fulfilling his promise to "keep America safe" by imposing restrictions on immigration from countries associated with "radical Islamic terrorism."

154.   The same day the Department of Homeland Security published a "Q&A" document with answers to thirty-seven questions about the March 6 Order. *See* Raofield Decl. ¶5, Ex. C.

39

155.   Consistent with the statement of top administration officials that the new order would seek to accomplish the same goals as the original order, the March 6 Order, after explicitly referring to the Ninth Circuit's ruling, exempts certain categories of noncitizens that "have prompted judicial concerns" from the ban, and alters the original order's "approach to certain other issues or categories of affected aliens" "in order to avoid spending additional time pursuing litigation" over the constitutionality of the original order. *See* March 6 Order, Section 1(c), (i).

156.   The March 6 Order significantly revises and expands the purpose and policy sections of the January 27 Order, while keeping the substantive impact of the two Orders much the same.

157.   The January 27 Order stated that "[i]t is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States." The March 6 Order implicitly acknowledges that both U.S. and foreign citizens commit acts of terrorism, stating that "[i]t is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals." March 6 Order, Sec. 1. Yet the March 6 Order, like the January 27 Order, does not include any actions to address terrorist attacks by citizens of the United States.

158.   The purpose and policy sections of the January 27 Order drew heavily on stereotypes about Muslims, justifying the ban as protecting citizens from

foreign nationals "who would place violent ideologies over American law," "who intend to commit terrorist attacks in the United States," or "who engage in acts of bigotry or hatred (including 'honor' killings . . .)." January 27 Order, Sec. 1, 2. The March 6 Order replaces some of those discriminatory allusions to Muslims (although retaining others, as described below). The March 6 Order asserts that "conditions in six of the previously designated countries . . . demonstrate why their nationals continue to present heightened risks to the security of the United States." March 6 Order , Sec. 1(e). Brief country descriptions then follow. *Id.*

159.   The March 6 Order identifies only two concrete examples of persons who have committed terrorism-related crimes in the United States, after either entering the country "legally on visas" or entering "as refugees":

a.   "[I]n January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses." (Iraq is no longer covered by the travel ban.)

b.   "And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction[.]" *Id.* at 1(h). (The March 6 Order continues to bar entry to refugee children from Somalia.)

160.   Notwithstanding the revised and expanded "Policy and Purpose" section and certain other changes discussed more fully below, the March 6 Order is extremely similar to the January 27 Order in most important respects.

161.   Like the January 27 Order, the March 6 Order bans entry for a 90-day period for individuals from six of the same seven predominantly Muslim countries identified in the January 27 Order: Syria, Sudan, Iran, Libya, Somalia and Yemen. March 6 Order, Section 2(c). Iraq is now omitted from that list. The six Designated Countries have overwhelmingly Muslim populations that range from 90.7% to 99.8%.

162.   The comparable provision of the January 27 Order (Section 3(c)) was enjoined by the courts as unconstitutional. Nevertheless, the March 6 Order retains this unconstitutional provision.

163.   Section 3 of the March 6 Order differs from the original in that it does not immediately apply to individuals with existing visas,[1] and makes exceptions from its travel ban for lawful permanent residents, dual nationals traveling on

---

[1] Under Section 3(a), "the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order; (ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and (iii) do not have a valid visa on the effective date of this order." *See* March 6 Order, Section 3(a)(i)-(iii).

passports issued by a non-designated country, refugees living in the United States and certain other non-citizens.[2]

164.   Nevertheless, the March 6 Order bars entry for virtually all other nationals of the Muslim-majority Designated Countries, including: relatives of U.S. citizens from the listed countries; family members of U.S. citizens who are seeking to reunite with their families on immigrant visas; students who have been admitted to study in the United States but not yet received visas; prospective employees who have been offered positions but not yet obtained visas; students and employees who may need to renew their visas; and many other individuals protected by prior court injunctions.[3]

---

[2] Section 3(b) lists categorical "exceptions" from Section 2: lawful permanent residents; foreign nationals who are admitted or paroled into the United States "on or after the effective date of this order"; foreign nationals with "a document other than a visa . . . that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document"; dual nationals traveling on passports issued by a non-designated country; foreign nationals traveling on certain diplomatic visas; and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States.  *Id.* at Section 3(b)(i)-(iv).

[3] In the Department of Homeland Security's Q&A document about the March 6 Order, DHS relates that nationals from one of the six designated countries who are presently in the United States, and "in possession of a valid single entry visa," will have to obtain "a valid visa or other document permitting [them] to travel to and seek admission to the United States" in order to leave and obtain "subsequent entry to the United States." *See* Exhibit C, at Q4. DHS also relates that international students, exchange visitors and their dependents from the six designated countries—who are in the United States presently but whose visas "expire[] while the Executive Order is in place"— will have to "obtain a new, valid visa to return to the United States" if they have to "depart the country." *See id.* at Q25.

165.   Like the January 27 Order, the March 6 Order also provides a mechanism for the government to extend the 90-day ban at the end of the 90-day period and/or to expand the ban to nationals from additional countries. Section 2(a) of the March 6 Order directs the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." In addition, the March 6 Order explicitly provides that the review need not be conducted in a consistent manner between countries: "The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country." *Id.*

166.   As with the January 27 Order, the March 6 Order provides for the submission of a report on the Secretary of Homeland Security's review within 20 days (rather than 30 days), a period (50 days rather than 60 days) for countries to respond to the review, and a provision for the President to thereafter issue a proclamation indefinitely banning nationals from a list of countries deemed to be non-compliant. *Id.*, Section 2.

167.   The corresponding provisions of the January 27 Order (Section 3) were not enjoined by the courts, and remained in effect through March 15, 2017.

44

The country-by-country report required under the January 27 Order was due on February 26, 2017, eight days before the March 6 Order was issued. On information and belief, that report was not produced.

168.   The March 6 Order states that "Iraq presents a special case" because of the "close cooperative relationship between the United States and the democratically elected Iraqi government" and because the "Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal" (Section 1(g)). With this justification, the March 6 Order exempts foreign nationals of Iraq from the categorical ban on entry applicable to other countries originally targeted by the January 27 Order. Instead, Iraqis are subject to "thorough review" and "consideration of whether the applicant has connections with ISIS or other terrorist organizations" (Section 4).

169.   Like the January 27 Order, the March 6 Order cuts the number of refugees admissible to the United States for fiscal year 2017 from 110,000 to 50,000 and prohibits refugee admissions for 120 days, with an exception for discretionary case-by-case admissions. *Compare* January 27 Order, Section 5, *with* March 6 Order, Section 6.

170.   The 120-day suspension of refugee admissions—Section 5(a) of the January 27 Order—was enjoined by the courts as unconstitutional. Nevertheless, the March 6 Order retains that unconstitutional provision, now Section 6(a).

171.   Section 6(a) of the March 6 Order is almost identical to its predecessor—enjoined section 5(a)—and differs only cosmetically, such as by modifying the refugee suspension to exclude those already scheduled for travel. While the March 6 Order removes other refugee provisions enjoined by the courts (particularly section 5(c), which indefinitely suspended entry of Syrian refugees, and section 5(e)'s explicit preference based on religious minority status), removal of those provisions does not alter the virtually complete overlap between new section 6(a) and enjoined section 5(a).

172.   Section 6(a) of the March 6 Order, like its predecessor, provides that after the 120-day period is over, "the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined" that "additional procedures"—identified by those officials as being necessary "to ensure that individuals seeking admission as refugees do not pose a threat" to the United States—have been "implemented" and "are adequate to ensure the security and welfare of the United States."

173.   Although the March 6 Order several times describes the country ban as relating to "entry" into the United States, it also apparently bars ordinary visa processing for nationals of the six designated countries. Section 3(c) of the March 6 Order explains that "a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of" a person from the six countries. Issuance of a visa is described as a "[c]ase-by-case waiver" of what is evidently intended to be a ban not just on entry but on new visas, as well.

174.   The government conceded in a March 15, 2017 court hearing in that the March 6 Order halts visa processing for individuals from the Muslim-majority Designated Countries:

> Although the Second Executive Order does not explicitly bar citizens of the Designated Countries from receiving a visa, the Government acknowledged at oral argument that as a result of the Second Executive Order, any individual not deemed to fall within one of the exempt categories, or to be eligible for a waiver, will be denied a visa. Thus, although the Second Executive Order speaks only of barring entry, it would have the specific effect of halting the issuance of visas to nationals of the Designated Countries.

*International Refugee Assistance Project v. Trump*, No. TD-17-0361, slip op. at 21 (D. Md. March 16, 2017).

175.   Like the January 27 Order, the March 6 Order allows for waivers to the six-country ban on a discretionary case-by-case basis. For the country ban, the January 27 Order simply stated that visa and other immigration benefits may be issued "when in the national interest," while the March 6 Order provides nine examples of situations where a waiver could be appropriate, such as for "an individual needing urgent medical care." *Compare* January 27 Order, Section 3(g) *with* March 6 Order, Section 3(c). The circumstances enumerated in the March 6 Order reflect specific examples of individuals whose denial of entry pursuant to the January 27 Order resulted in the filing of lawsuits and widespread public outcry.

176.   Likewise, the refugee ban remains subject to waivers on the same terms as the January 27 Order : "[O]n a case-by-case basis, in their discretion, but only so long as [the Secretaries of State and Homeland Security] determine" that the refugee's admission (1) "is in the national interest," and (2) does not pose a threat "to the security or welfare of the United States." January 27 Order, Section 5(e); March 6 Order, Section 6(c).

177.   Like the January 27 Order, the March 6 Order reinforces stereotypes about Muslims and associates Muslims with violence, bigotry, and hatred, thereby discriminating against them and inflicting stigmatic and dignitary harms, among other types of injury.

48

178.   For example, Section 11 of the March 6 Order (Section 10 of the January 27 Order) requires the Secretary of Homeland Security to periodically publish information about the number of "foreign nationals" involved in, among other things, terrorism-related activities, radicalization, and "gender-based violence against women, including so-called 'honor killings'"—direct echoes of then-Candidate Trump's broad statements disparaging Islam and Muslims.

179.   Similarly, Section 6(d) of the March 6 Order (which is identical to Section 5(g) of the January 27 Order) seeks to expand the limited role State and local governments have in the refugee resettlement process beyond that envisioned by Congress. That section aims to authorize and facilitate the stated desire and intent of some states and localities in the United States to discriminate against lawfully-admitted refugees on the basis of their nationality and/or religion. *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902 (7th Cir. 2016) (affirming preliminary injunction on equal protection grounds of state executive order issued by then-Governor of Indiana Mike Pence that sought to prevent the resettlement in the State of refugees from Syria).

180.   In short, the March 6 Order was motivated by the same anti-Muslim purpose that motivated the January 27 Order. In replicating much of the substance of the January 27 Order, the new Order has the same effect as it predecessor: it broadly bans nationals from listed majority-Muslim countries from both entry and

49

receipt of visas; it suspends the U.S. Refugee Admissions Program in order to prevent the entry of Muslims into the United States; and it reinforces stereotypes about Muslims by associating them with terrorism, violence, bigotry and hatred.

181.   In the words of the United States District Court for the District of Hawaii, which granted a temporary restraining order against the March 6 Order on the evening of March 15, 2017, as this complaint was being finalized:

> Because a reasonable, objective observer—enlightened by the specific historical context, contemporaneous public statements, and specific sequence of events leading to its issuance—would conclude that the Executive Order was issued with a purpose to disfavor a particular religion, in spite of its stated, religiously-neutral purpose, the Court finds that Plaintiffs, and [the individual plaintiff] in particular, are likely to succeed on the merits of their Establishment Clause claim.

*Hawaii v. Trump*, No. 17-00050, slip op. at 28 (D. Haw. March 15, 2017).

182.   In response to the Hawaii restraining order, President Trump told a rally in Nashville the same evening:

> The order he blocked was a watered-down version of the first order that was also blocked by another judge and should have never been blocked to start with . . . . This new order was tailored to the dictates of the 9th Circuit's—in my opinion—flawed ruling . . . . And let me tell you something, I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first place.

### Immigrants and Refugees Are Already Very Carefully Screened

183.   Individuals applying for family or employer-based visas are subject to an extensive, demanding vetting process that was already in place long before the

Executive Orders were issued. A sponsor, such as an employer or family member, must first submit a petition on behalf of the visa applicant. In the case of family-based visas, the qualified sponsoring individuals must submit their petitions along with documentation establishing their U.S. citizenship or lawful permanent resident status, as well as documentation establishing their relationship with the visa applicant. Petitioners must also pay filing fees.

184.   Once petitions are approved, the applicants' information is then sent to the National Visa Center (NVC). The NVC collects additional fees, forms, and documents from visa applicants and their sponsors. Applicants must submit relevant birth certificates, adoption records, court and prison records, marriage certificates, marriage termination documents, military records, photocopies of passports, and police certificates (if 16 years old or older). Each sponsor must also submit an Affidavit of Support and demonstrate that he or she has the ability to support the applicant financially in the United States.

185.   Once the NVC has received all the relevant documentation, the visa applicant must submit Form DS-260 on the Consular Electronic Application Center. This form requires that the applicant fill in fields related to previous addresses; prior work, education, and training; family information; medical and health information; and criminal history.

51

186.   The information submitted in these various forms is screened against various federal databases to verify that the applicant is not on any U.S. terrorism watch lists and has not committed any immigration or criminal violations.

187.   Visa applicants are then scheduled for an interview with a consular officer. Visa applications are not considered complete until the applicant has interviewed with a consular officer.

188.   Individuals seeking refugee status in the United States must clear additional hurdles prior to admission.

189.   About three million refugees have been resettled in the United States since Congress passed the Refugee Act of 1980, which created the Federal Refugee Resettlement Program and the current national standard for screening and admission of refugees into the country.

190.   Most refugees admitted to the United States are screened and referred by the United Nations High Commissioner for Refugees (UNHCR). During the UNHCR screening process, screeners conduct multiple, detailed interviews with every refugee applicant. UNHCR screeners also collect initial documentation, conduct home country reference checks, and perform biological screening prior to referring successful applicants to a U.S. State Department Resettlement Support Center.

191.   Refugees recommended for resettlement in the United States are selected in accordance with criteria that give preference to survivors of torture, victims of sexual violence, targets of political persecution, families with multiple children, or those with female heads of household.

192.   Less than one percent of refugees worldwide are referred to the United States for resettlement.

193.   In addition to referrals from the UNHCR, the Department of State occasionally accepts referrals from United States embassies or specially trained nongovernmental organizations.

194.   Once the refugee applicant is referred to an Resettlement Support Center, refugee applicants are then subjected to an adjudication interview and a security screening, which is conducted jointly by DOS and DHS. The data collected is screened by several federal agencies, including the National Counterterrorism Center, FBI, DHS, Department of Defense, and the DOS.

195.   Results from security screenings from each agency are transmitted back to DHS and DOS, where specially trained DHS officers review initial screening results and conduct in-person interviews in the host country. These interviews focus on confirming the information collected at various stages in the process; additional interviews may be conducted as new information arises. If inconsistencies emerge at any point, the case is put on hold until they can be

resolved. DHS adjudicates the case only after all interviews and checks are completed. Officers from USCIS then review all of the information collected and conduct an additional in-person interview with each refugee applicant before deciding whether to approve the individual for resettlement in the United States. A Syrian refugee is likely to be interviewed at least three times over the course of this process.

196.   These security checks for refugee applicants frequently take 18-24 months or even longer.

197.   Following USCIS approval, all refugee applicants must undergo a health screening to address medical needs and identify contagious diseases.

198.   The final step is for USCIS to request "sponsorship assurance" from a U.S.-based resettlement agency.

199.   A senior administration official has estimated that, of the Syrian refugees admitted to the United States, 50% have been children, 25% are adults over 60, and about 2% have been single males of "combat age."

200.   As described above, because all refugees resettled in the United States undergo overlapping security screenings, interviews, and medical checks that involve numerous national security and intelligence agencies before being cleared for admission, the process leaves most refugees with less than a two-month window to travel to the United States. Families often have a smaller window,

sometimes as little as a few days, during which all security checks, biometric screenings, and medical screenings are valid at the same time.

201.   Because of the way the refugee screening process works, the effect of the March 6 Order, as well as its purpose and intent, is to halt the entire system, possibly for years, and make it extremely difficult for Muslim refugees and refugees from the Designated Countries to enter the United States. The March 6 Order by its terms suspends refugee resettlement for 120 days, but its practical effect is to deny entry to many refugees who have already waited for years to enter the United States, because even if the suspension is lifted after 120 days, the security checks, biometric screenings, and medical screenings of these applicants will no longer be valid.

### The Executive Orders Do Not Advance National Security

202.   There is no sound basis for concluding that Muslims generally, or Muslims from particular countries, are more likely to commit violent acts of terror than persons of other faiths or other countries.

203.   Many alternatives exist that do not involve targeting individuals based on their faith or nationality as a proxy for faith, are less restrictive than the March 6 Executive Order, and are more closely tailored to legitimate national security concerns.

204.   Though cast as a measure to improve national security, the Executive

Orders have been criticized by numerous national security experts as undermining

their stated purpose.

205.   On January 30, 2017, over 100 former U.S. intelligence officials

wrote a letter opposing the January 27 Order. The authors of this letter wrote,

> Simply put, this Order will harm our national security. Partner
> countries in Europe and the Middle East, on whom we rely for vital
> counterterrorism cooperation, are already objecting to this action and
> distancing themselves from the United States, shredding years of
> effort to bring them closer to us. Moreover, because the Order
> discriminates against Muslim travelers and immigrants, it has already
> sent exactly the wrong message to the Muslim community here at
> home and all over the world: that the U.S. government is at war with
> them based on their religion. We may even endanger Christian
> communities, by handing ISIL a recruiting tool and propaganda
> victory that spreads their horrific message that the United States is
> engaged in a religious war.

206.   Many these same officials also filed a joint statement with the Ninth

Circuit in *Washington v. Trump* further explaining the dangers posed by the

January 27 Order. The signatories, which included former Secretaries of State,

former CIA directors, former CIA deputy and acting directors, a former National

Security Advisor, and a former DHS Secretary, concluded that the January 27

Order would harm the interests of the United States in several respects, including

endangering American soldiers fighting alongside allies from the affected

countries; disrupting key counterterrorism, foreign policy, and national security

partnerships; endangering intelligence sources in the field; feeding ISIL

56

recruitment efforts; disrupting ongoing law enforcement efforts; hindering family reunification and humanitarian efforts; and causing severe economic damage to American citizens and residents.

207.   In a joint statement by Senators Lindsey Graham, who sits on the Senate Armed Services Committee, and John McCain, who sits on the Senate Armed Services Committee and Homeland Security and Governmental Affairs Committee, the two Republican Senators expressed their concerns about the poor vetting and lack of consultation between the White House and numerous federal departments tasked with protecting U.S. national security during the drafting of the January 27 Order. In their joint statement, the two senators wrote, "Our most important allies in the fight against ISIL are the vast majority of Muslims who reject its apocalyptic ideology of hatred. This executive order sends a signal, intended or not, that America does not want Muslims coming into our country. That is why we fear this executive order may do more to help terrorist recruitment than improve our security."

208.   U.S. counterterrorism officials expressed similar reservations about the January 27 Order. Paul Pillar, former Deputy Director of the CIA Counterterrorism Center, said, "The whole order is and will be read as another anti-Islam, anti-Muslim action by this president and his administration. It is not

targeted at where the threat is, and the anti-Islam message that it sends is more likely to make America less safe."

209.   Similarly, former CIA director Michael V. Hayden discussed the efforts by U.S. diplomats, military commanders, and agency station chiefs to limit the damaging fallout from the January 27 Order before concluding that the Order "inarguably has made us less safe. It has taken draconian measures against a threat that was hyped. The byproduct is it feeds the Islamic militant narrative and makes it harder for our allies to side with us."

210.   The March 6 Order did not quell the concerns of intelligence officials, military leaders and diplomats about the damage that the Executive Orders have done to national security.

211.   On March 10, 2017, a bipartisan group of 134 cabinet Secretaries, senior government officials, diplomats, military service members and intelligence community professionals sent a letter to President Trump expressing their concern over March 6 Order. The letter states:

> We are deeply concerned that the March 6, 2017 executive order halting refugee resettlement and suspending visa issuance and travel from six Muslim-majority countries will, like the prior version, weaken U.S. national security and undermine U.S. global leadership…. The revised executive order will jeopardize our relationships with allies and partners on whom we rely for vital counterterrorism cooperation and information-sharing. To Muslims— including those victimized by or fighting against ISIS—it will send a message that reinforces the propaganda of ISIS and other extremist groups, that falsely claim the United States is at war with Islam.

Welcoming Muslim refugees and travelers, by contrast, exposes the lies of terrorists and counters their warped vision….

Following the 9/11 attacks, the United States developed a rigorous system of security vetting for travelers to our homeland, leveraging the full capabilities of the intelligence and law enforcement communities. Since then, the U.S. has added enhanced vetting procedures for travelers and has revised them continuously. Our government applies this process to travelers not once, but multiple times. Refugees are vetted more intensively than any other category of traveler. They are screened by national intelligence agencies and INTERPOL, their fingerprints and other biometric data are checked against terrorist and criminal databases, and they are interviewed several times. These processes undergo review on an ongoing basis to ensure that the most updated and rigorous measures are applied, and any additional enhancements can be added without halting refugee resettlement or banning people from certain countries.

### The Grave Harm to the Plaintiffs, Their Members and Their Clients

212.    Implementation and enforcement of the Executive Orders has already caused the organizational Plaintiffs, their members and their clients, as well as the Individual Plaintiffs, substantial, concrete, and particularized injury, and will continue to harm them if not permanently enjoined.

213.    The Individual Plaintiffs and many of the members and clients of the organizational Plaintiffs are Muslim. The Executive Orders convey an official message of disapproval and hostility towards Muslims, making clear that the government deems them outsiders, not full members of the political community. This marginalizes them, subjects them to suspicion and scrutiny and political

isolation on the basis of religion and national origin, and inflicts other stigmatic and dignitary injuries.

214.   The March 6 Order deeply affects the Individual Plaintiffs and the members and clients of the organizational Plaintiffs by conveying to them that the United States discriminates against individuals who share their ethnicity and who hold the same religious beliefs, including members of their own families.

215.   The Plaintiffs believe that, as a result of the March 6 Order, there is now a favored and disfavored religion in the United States—in other words, that a religion has been established.

### Arab American Civil Rights League (ACRL)

216.   The ACRL works to build coalitions, promote understanding and cooperation and combat negative stereotypes. Led by prominent civil rights attorneys and advocates, the ACRL offers the community it serves a solid commitment to ensuring that their rights are protected and preserved.

217.   ACRL works with Arab Americans from around the state of Michigan, which is home to the second largest Arab American community in the United States. ACRL's members have been and continue to be affected by both the January 27 and the March 6 Order.

218.   Many of ACRL's members are refugees and/or family members of people seeking to enter the United States as refugees. Many of ACRL's members

60

are from the Muslim-majority Designated Countries and/or are family members of people from the Designated Countries who are seeking to immigrate to, travel to, study in, work in, or remain in the United States.

219.   Due to the March 6 Order, members of ACRL live in forced separation from family members who are unable to enter the United States.

220.   ACRL members were stranded abroad following issuance of the January 27 Order, and ACRL has been working continuously with these members and other impacted individuals to ensure their return to the United States. Other ACRL members face real and immediate threats of future harm, including the inability to reunite with family members from the Muslim-majority Designated Countries and the inability to travel outside the United States with assurance that they will be able to return to the United States.

221.   The March 6 Order blocks ACRL's members, including U.S. citizens and lawful permanent residents, from receiving visits from, and/or reunifying with, their family members who live in the Muslim-majority Designated Countries.

222.   ACRL's members and clients who are Muslim or who are from the Designated Countries have been marginalized as a result of the anti-Muslim message conveyed by the Executive Orders and subjected to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin.

223.   ACRL has also been directly affected by the Executive Orders because it has had to divert resources from its ordinary activities to cope with the fall-out from the Orders. ACRL has had to devote extensive leadership, attorney, and staff resources to responding to crises facing ACRL members as a result of the Orders, as well as to address widespread confusion and fear in the community that ACRL serves.

224.   ACRL's clients face numerous hurdles to bringing suit in their own name, including language and cultural barriers, lack of financial resources, rising Islamophobia which would subject them to intense scrutiny if they participate in litigation, and fear of retaliation by the Defendants given that Defendants have made anti-Islamic statements and have pledged aggressive action against immigrants and refugees.

## American Civil Liberties Union of Michigan

225.   The ACLU of Michigan is dedicated to protecting constitutional rights, including freedom of religion, freedom of speech, freedom of association and equal protection of the laws. The ACLU of Michigan and its members are harmed by the Executive Orders.

226.   As a result of the Executive Orders, the ACLU has had to divert its resources from other organizational activities to address the consequences of those orders. After the January 27 Order was issued, the ACLU responded to the crisis

by coordinating emergency legal assistance for impacted individuals and

responding to numerous individual requests for assistance. Now that the March 6

Order has taken effect, the ACLU is beginning to respond in a similar way to the

March 6 Order. As a direct result of the Executive Orders, ACLU staff have

spoken and will continue to speak at numerous community fora, have responded

and will continue to respond to media requests for information, and have

distributed and will continue to distribute Know Your Rights materials to impacted

communities.

227.   The ACLU has members who are directly affected by the March 6

Order and its implementation, including individuals whose immediate family

members are nationals of the Muslim-majority Designated Countries.

228.   The March 6 Order blocks the ACLU's members, including U.S.

citizens, from receiving visits from, and/or reunifying with, their family members

who live in the Muslim-majority Designated Countries.

229.   The ACLU has members of many faiths—Islam, Christianity, Judaism

and others—whose ability to live out the teaching of their faiths, to interact with

co-religionists and members of other faiths, and to provide assistance to

immigrants and refugees as a matter of religious conviction is directly affected by

the Executive Orders.

230.   The ACLU has members who are U.S. citizens, permanent residents and other persons residing in the United States who wish to hear the speech of and associate with people of all faiths who are now unable to travel to the United States because of the March 6 Order.

231.   The ACLU regularly organizes events to educate the public on pressing matters of public concern, including speakers who address civil liberties and civil rights issues of the moment.

232.   The ACLU is organizing an event, tentatively entitled "Voices of the Muslim Ban," which will bring prominent human rights activists and other speakers from the Muslim-majority Designated Countries to speak in Michigan. The ACLU anticipates that hundreds of people, including ACLU members, will attend the event.

233.   Because the Executive Orders and Islamophobia are matters of pressing public concern, because the Executive Orders have created widespread fear within the Muslim and Arab-American communities in Michigan, and because the ACLU believes it is vitally important to counteract the rising tide of Islamophobia before it becomes even worse, the ACLU wishes to hold the "Voices of the Muslim Ban" event as soon as possible. Depending on speaker availability, the ACLU wishes to hold the "Voices of the Muslim Ban" event in early June.

234.   Organizing an event of this scale requires advance planning, including securing a venue on a specified date, organizing visas and travel arrangements for the invited speakers, and promoting the event.

235.   The ACLU's ability to organize the "Voices of the Muslim Ban" event with the ACLU's chosen speakers depends on the ability of those speakers to enter the United States to participate in the event on a specified date.

236.   The March 6 Order directly interferes with the ACLU's ability to plan for and hold the Voices of the Muslim Ban event by barring the entry of speakers from the Muslim-majority Designated Countries for 90 days, by providing for a future Presidential proclamation prohibiting the entry of speakers from the Muslim-majority Designated Countries beyond 90 days, and by conditioning both visas and entry of speakers from the Muslim-majority Designated Countries on a waiver.

237.   The March 6 Order will either prevent the ACLU from bringing in the ACLU's desired speakers or will create obstacles to bringing in those speakers that would not exist for speakers who are not from the Muslim-majority Designated Countries.

238.   Because, and only because, the speakers invited by the ACLU are from the Muslim-majority Designated Countries, those speakers cannot enter the

United States to speak with the ACLU and its members unless the speakers obtain a case-by-case waiver under Section 3(c) of the March 6 Order.

239.   Because Section 3(c) of the March 6 Order does not provide narrow, objective or definite standards for the issuance of case-by-case waivers, the ACLU does not know when or whether waivers will be approved, thereby interfering with the ACLU's ability to plan for and organize the "Voices of the Muslim Ban" event.

240.   Under Section 3(c) of the March 6 Order, in order for the speakers invited by the ACLU to speak at the "Voices of the Muslim Ban" event, Defendants must evaluate the proposed purpose of their travel to the United States and decide that denying those speakers the opportunity to speak would cause "undue hardship" and that their entry into the United States "would be in the national interest." Defendants cannot make such an assessment without considering the identity of the speaker and the content of the speech.

241.   The ACLU is further concerned that the desired speakers from the Muslim-majority Designated Countries will decline to come to the United States as a result of the Executive Orders. Some foreign speakers who are Muslim or whose national origin is in one of the Designated Countries are now refusing to come to the United States because they do not want to be subjected to possible prolonged and intrusive questioning, including questioning about their religious beliefs, as

has reportedly begun occurring at ports of entry since issuance of the January 27 Order.

242.   If the ACLU is able to hold the "Voices of the Muslim Ban" event, the ACLU may seek to organize or co-sponsor similar events featuring speakers impacted by the March 6 Order in the future.

## The American Arab Chamber of Commerce

243.   The Chamber seeks to promote and empower its member businesses on a local, national and international level. The Chamber seeks to strengthen its members by offering networking opportunities, events, and seminars to promote member businesses. The Chamber also seeks to promote its member businesses internationally by fostering trade between Michigan-based companies and businesses located in the Middle East, including in the Designated Countries. To this end, the Chamber provides international referrals, sponsorship of delegations and trade missions; and resources for accessing Middle Eastern business markets.

244.   As the largest American-Arab business organization in the country, much of the Chamber's work focuses on building economic and cultural bridges, locally, nationally, and globally. Internationally, the Chamber fosters trade and establishes relationships between the U.S. and Middle Eastern countries, and many of the Chamber's member businesses have direct connections to Middle Eastern countries, including the Designated Countries. These efforts are largely led by the

Chamber's International Business Development Committee, which pursues

projects to connect Chamber members with international business opportunities.

As part of its mission, the International Business Development Committee seeks to

foster closer business relationships and trade through trade missions between the

United States and the Middle East, including the Designated Countries.

245.   In order to establish and sustain their businesses, the Chamber's

members must be able to interact with businesspeople from the Designated

Countries and be able to invite those businesspeople to the United States. The

Executive Orders directly interfere with the ability of the Chamber's members to

conduct such business dealings.

246.   Many of the Chamber's members have employees who are

immigrants from the Designated Countries or are refugees. The March 6 Order

makes it more difficult and expensive for the Chamber's members to recruit, hire,

and retain the best employees, and undermines ability of the Chamber's members

to attract talent, business, and investment to the United States.

247.   The Executive Orders also disrupt the Chamber's mission of

encouraging constructive relations and enhancing mutual understanding between

the United States and Arab nations. The Chamber has received numerous inquiries

from its membership as to whether the enforcement of the Executive Orders will

strain relations between the United States and Arab nations, thereby undermining

the Chamber's mission of promoting greater understanding between the American people and Arab nations. Members are concerned that the Executive Orders create a negative stigma on Muslims and immigrants from the Designated Countries, directly conflicting with the missions and purposes of Chamber.

248.   The Chamber's membership includes businesses created or run by refugees and immigrants from the Designated Countries. Many of these business leaders are Muslim. Chamber members have been marginalized as a result of the anti-Muslim and anti-Arab message conveyed by the Executive Orders. These members have been subjected to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin.

249.   The Chamber assists its members with the certification and legalization process for exports. While this service is not limited to Arab nations, given the Chamber's members and its mission, this certification process primarily deals with exports intended for Arab nations, which includes the Designated Countries. The Chambers' export certification and legalization services have been adversely affected by the Executive Orders.

250.   Because of the Executive Orders, members of the Chamber cannot travel unencumbered and cannot complete legitimate business and social obligations unencumbered. These Executive Orders disrupt existing business ties with businesses in the Designated Countries, hinder the development of economic

ties with the Designated Countries, and restrict the creation of any future business ventures between the Chamber's members and the Designated Countries.

## The Arab American and Chaldean Council ("ACC")

251.   ACC's mission is to serve the Middle Eastern community of Southeast Michigan by maximizing the community's skills, resources, and expertise. ACC's programs – many of which are directed towards immigrants, refugees, and their families – deliver various programs in public and behavioral health, Woman, Infant and Children (WIC), Department of Health and Human Services (DHHS), Partnership, Accountability Training and Hope (PATH) services as well education, employment training, job readiness, English as a Second Language ("ESL") classes, Youth Life skills education, along with youth recreation and cultural activities. The ACC also seeks to promote understanding between the Middle Eastern community, its Middle Eastern clients and the larger community of Metropolitan Detroit. ACC has 40 outreach offices and annually serves more than 80,000 individuals in the metro Detroit.

252.   Many of ACC's clients are recent immigrants and refugees from the Middle East, and/or family members of people seeking to enter the United States as refugees or immigrants from the Middle East. Many of ACC's clients are from the Designated Countries and/or are family members of people from the Designated Countries. Many of ACC's clients are Muslim. Likewise, many of

ACC's staff are refugees, immigrants from the Designated Countries, or family members of refugees and immigrants from the Designated Countries.

253.   The Executive Orders, by promoting the idea that people from majority-Muslim, Middle Eastern countries are dangerous and should be treated differently, directly interfere with ACC's ability to carry out its mission and harm ACC's clients.

254.   As a result of the Executive Orders, ACC has had to divert its resources from other organizational activities to address the consequences of those orders. For example, because ACC's clients and the community it serves have been severely impacted by the Executive Orders, ACC's senior leadership, as well as front-line staff, have had to set aside other responsibilities in order to educate the community about the Executive Orders, meet with other impacted organizations, respond to extensive press inquiries, and address pressing questions from impacted clients.

255.   The Executive Orders also directly interfere with many of the ACC's programs, which are too numerous to be set out here. A few representative programs that are harmed by the Executive Orders are described below.

256.   ACC operates a variety of programs specifically to support refugees and immigrants. The Executive Orders threaten these programs because many

71

potential future clients for these programs will no longer be able to enter the United States.

257.   ACC's Health Assessment Program, available in Wayne, Oakland and Macomb County, provides health screenings to refugees within 30 days of their arrival to the United States. These screenings involve the review of patient's medical history vision, hearing, and dental health by trained professionals. Clients also receive age-appropriate immunizations and laboratory exam services to check for health concerns such as diabetes, anemia, Hepatitis and Tuberculosis. In 2015, this program provided 7,210 services to 1,442 individuals. The Executive Orders, by halting admission of refugees and reducing the number of refugees admitted, interferes with ACC's Health Assessment Program and directly harms ACC's refugee clients in those programs.

258.   ACC's Behavioral Health Division, which consists of five outpatient clinics, offers a comprehensive, community-based, outpatient program to address the emotional and psychological needs ACC's clients. Since many of the ACC's clients are refugees who have experienced persecution or even torture, the Behavioral Health Division offers services that focus on family, PTSD and severe trauma treatment. The Executive Orders, by halting admission of refugees and reducing the number of refugees admitted and barring entry to individuals from the

Designated Countries, interferes with ACC's ability to carry out these programs. The Executive Orders also directly harm the clients of this program.

259.   ACC also assists refugee students and immigrant students, many of whom are from the Designated Countries, with ESL classes, career counseling, certification or professional license achievement, enrollment, and financial aid applications through three outreach offices at different Oakland Community College campus sites. The Executive Orders harm this program by barring admission into the United States for many future participants of the program. The Executive Orders also harm ACC's current clients in this program, who may not be able to obtain the necessary immigration documents to complete their studies, and harm ACC which must now expend resources advising these impacted students.

260.   The ACC provides a variety of employment and job training services for immigrants and refugees through its PATH program. The PATH program includes job counseling, resume writing workshops, vocational training, ESL and vocational ESL classes, and job placement services. Additionally, to ensure that all individuals can pursue a career, the PATH program offers access to Child Care services. The Executive Orders directly harm ACC's clients in the PATH program and also interfere with the PATH Program's ability to pursue community and economic development by interfering with the ability of potential immigrant and refugee entrepreneurs to enter the United States and by diverting resources of

Growth Center staff to addressing problems faced by their clients as a result of the Executive Orders.

261.   The ACC offers a range of English as a Second Language training courses as well as bilingual and trilingual services that help refugee and immigrant clients understand and complete official government documents. The Executive Orders, by halting admission of refugees and citizens of the Designated Countries, interferes with the ACC's ability to carry out these programs.

262.   The March 6 Executive Order, by restricting the flow of clients for ACC's programs and affecting funding for those programs, will have a significant financial impact on ACC. ACC anticipates that, as a result of the March 6 Executive Order, it will have to lay off staff from the impacted programs, or reassign those staff to fill vacancies in other programs. The March 6 Executive Order also impacts ACC's decisions whether to renew certain leases because it is unclear whether ACC will be able to continue the programs for which it had previously leased those spaces.

263.   Some of ACC's clients and staff who are United States citizens or lawful permanent residents have close family members who are nationals of the Designated Countries. The March 6 Executive Order prevents those ACC clients and staff from receiving visits from, and/or reunifying with, their family members who live in the Muslim-majority Designated Countries or who are refugees. Due to

the March 6 Order, ACC clients live in forced separation from family members who are unable to enter the United States.

264.   ACC's clients face numerous hurdles to bringing suit in their own name, including language and cultural barriers, lack of financial resources, rising Islamophobia which would subject them to intense scrutiny if they participate in litigation, and fear of retaliation by the Defendants given that Defendants have made anti-Islamic statements and have pledged aggressive action against immigrants and refugees.

### The Arab American Studies Association ("AASA")

265.   The AASA facilitates communication among scholars through meetings; promotes cooperation among members of the Association and persons or organizations concerned with Arab American Studies; stimulates academic research in Arab American Studies; and explores intersections and comparative approaches among Arab American, Arab, and diasporic Arab experiences. The AASA and its members are harmed by the Executive Orders.

266.   The AASA has members who are U.S. citizens or lawful permanent residents whose national origin is from one of the Designated Countries, members with close family who are nationals of the Designated Countries, and members who engage in scholarly collaboration with nationals of the Designated Countries.

267.   Many AASA members work on issues of transnational migration, which requires study of where, why and how people leave their countries of origin and where, why and how they migrate to new areas. Such research necessarily involves research in countries where transnational migration originates, as well as close collaboration with scholars from those countries.

268.   Because the Designated Countries are significant sources of transnational migration, it is particularly important for the AASA members to travel to those countries for research; to recruit faculty and graduate students from those countries; and to invite scholars from those countries for academic conferences, academic exchanges, and other scholarly collaboration. The March 6 Executive Order interferes with the ability of AASA members to do all of those things.

269.   AASA members, particularly those who conduct research related to the Designated Countries, fear that they will be precluded from traveling to the Designated Countries when those countries institute reciprocal actions in response to the Executive Order, as Iran has already done.

270.   The AASA and its members believe that in order for Arab American Studies to move forward as a field, it is critical that U.S.-based institutions recruit faculty and students from the Designated Countries, particularly given that these countries are pivotal to current understandings of transnational migration. AASA's

members who are U.S.-based faculty have, in the past, sought to recruit potential colleagues and students from the Designated Countries. Due to the March 6 Executive Order, AASA members can no longer recruit potential colleagues and students from the Designated Countries since those faculty and students will be unable to obtain visas to work or study in the United States.

271.   AASA and its members have the goal of advancing learning and exchanging ideas with other scholars in the areas of Arab American studies, Middle Eastern Studies, Migration Studies and similar disciplines. This requires AASA and its members to be able to hear from, speak with, debate with and associate with scholars from the Designated Countries. The March 6 Executive Order will prevent AASA and its members from inviting scholars from the Designated Countries to present at academic conferences and engage in other collaborative research and scholarship projects.

272.   Some of AASA's members who are United States citizens or lawful permanent residents have close family members who are nationals of the Designated Countries. The March 6 Executive Order prevents those AASA members from receiving visits from, and/or reunifying with, their family members. For example, one AASA member, who is a United States citizen and an assistant professor for U.S.-Arab Cultural Politics at a major university, has ailing parents in Yemen, including a mother whose health is critical and for whom he wishes to

77

obtain medical care in the United States. That AASA member cannot bring his parents to the United States.

273.   The AASA will itself be harmed by the Executive Order. As part of its goal to advance learning, facilitate communication and promote cooperation, AASA sponsors conferences and other events that serve as a forum for scholarship, intellectual engagement, and pedagogical innovation. Due to the March 6 Order, scholars from the Designated Counties will not be able participate in those conferences. AASA selects papers for its conferences based on the quality of the scholarship, not the nationality of the scholar, and its ability to make such merit-based decisions will be impaired if it cannot invite scholars from the Designated Countries. The AASA also fears that it will not be able to hold academic conferences outside the United States because AASA members who are nationals of the Designated Countries currently based at U.S. institutions may be unable to attend for fear of being unable to return to the United States.

274.   In addition, the March 6 Order could cause financial harm to AASA, by depriving it of membership dues and conference registration fees from individuals who cannot come to the United States as a result of the March 6 Executive Order.

**The Individual Plaintiffs**

275.   Plaintiffs Hend and Salim Alshawish have four children. Two of the children, A.A. and M.A., aged 3 and 7, are U.S. citizens and are currently residing in the United States. Two of the children, J.A.1 and J.A.2, aged 11 and 15, are citizens of Yemen and are currently in Yemen.

276.   In November 2010, Mr. Alshawish petitioned for immigrant visas to bring his wife, Plaintiff Hend Alshawish, and their two Yemeni-citizen children, J.A.1 and J.A.2, to the United States.

277.   Ms. Alshawish and the two minor children underwent extensive security and medical screening, and attended a consular interview.

278.   On December 28, 2016, Ms. Alshawish was finally issued an IR1 spousal visa to enter the United States as a lawful permanent resident. Her visa was set to expire in six months.

279.   However, upon the completion of the interview, the immigrant visas of the two minor children were not issued at the same time. Ms. Alshawish intended to wait till her children's visas were issued before traveling to the United States.

280.   On January 27, 2017, the date the January 27 Order was issued, Ms. Alshawish was in Egypt with J.A.1 and J.A.2. Mr. Alshawish had traveled to Egypt

around September 20, 2016 to join her and their children before traveling back to

the U.S. together.

281.   As a result of the January 27 Order, Ms. Alshawish was barred from

traveling to the United States.

282.   Ms. and Mr. Alshawish closely monitored the news regarding the

Executive Order. They heard many inconsistent reports from government officials

about whether immigrant visas, such as the IR1 spousal visa Ms. Alshawish had

obtained, would be revoked and whether individuals with immigrant visas would

be allowed to obtain lawful permanent resident status.

283.   For that reason, Ms. Alshawish and Mr. Alshawish decided to travel

to the United States as soon as they learned that the January 27 Order had been

enjoined by the courts, as it was unclear whether the injunction would be

overturned on appeal. They booked last-minute tickets at considerable expense in

order to ensure that Ms. Alshawish had the opportunity to enter the country while

there was a window of opportunity to do so.

284.   The decision to travel was heart-wrenching for Ms. Alshawish and

Mr. Alshawish, because the immigrant visa applications for their two minor

children, J.A.1 and J.A.2, were still in administrative processing and had not yet

been approved. The couple had to decide whether Ms. Alshawish should travel

while the injunction was in effect, allowing her to join her husband and two U.S.-

citizen children in the United States and become a lawful permanent resident, even though that meant leaving her two Yemeni-citizen children behind.

285.   In desperation, Ms. Alshawish and Mr. Alshawish decided to have Mr. Alshawish's sister in Egypt care for J.A.1 and J.A.2, while Ms. Alshawish, Mr. Alshawish and their two U.S. citizen children traveled to the United States.

286.   On February 5, 2017, Ms. Alshawish was allowed to board a flight to the United States, and was allowed enter the United States. Upon entry, her status became that of a lawful permanent resident. She is currently living with her two U.S.-citizen children.

287.   Mr. Alshawish returned to Egypt on March 4, 2017 to care for J.A.1 and J.A.2. The children's applications for immigrant visas have not yet been approved.

288.   The March 6 Order prohibits citizens of Yemen, including J.A.1 and J.A.2, from entering the United States, and halts ordinary visa processing.

289.    Due to the March 6 Order, Mr. and Ms. Alshawish cannot reunite their family by bringing their two Yemeni-citizen children to the United States to be with their mother and father and two U.S.-citizen siblings.

290.   Mr. Alshawish, who works at a grocery store, is currently unable to work because he is in Egypt caring for J.A.1 and J.A.2, which imposes significant financial stress on the family.

291.   Plaintiff Fahmi Jahaf, a U.S. citizen, married his wife, Basema Al Reyashi, in February 2011. Mr. Jahaf filed an immigrant petition for his wife after their marriage. The couple then waited four years to receive notice of the scheduling of a consular interview.

292.   Mr. Jahaf found out the case was dismissed in September 2015 for failure to respond to certain notices, but it was later determined that the National Visa Center has been sending notices to the wrong address. Mr. Jahaf refiled a petition in July 2016 for his wife and submitted documentation proving that the National Visa Center had been sending the letters to the wrong address. The National Visa Center expedited his petition and visa application when they learned they had made a mistake.

293.   Ms. Al Reyashi's case completed processing on January 2, 2017, and she has been waiting for an interview since that time. Ms. Al Reyashi lives in a region in Yemen where there is intense conflict and that is bombed regularly.

294.   Mr. Jahaf has been waiting for six years for his wife's visa to be approved so that she can join him in the United States.

295.   The March 6 Order prohibits citizens of Yemen, including Ms. Al Reyashi, from entering the United States, and halts ordinary visa processing.

296.   Due to the March 6 Order, Mr. Jahaf cannot bring his wife to the United States.

297.   Plaintiff Mohamed Alshega, a United States citizen, filed a petition in 2005 for his son, Badr Alshega, to come to the United States. Because Badr was over 21 years old, he was not eligible for immediate travel to the U.S and had to wait for his priority date to become current. Because of the limited number of visas available for adult children of U.S. citizens, petitioners generally must wait years for a visa to become available.

298.   Not only does Badr Alshega's father, Plaintiff Alshega, live in Michigan, but Badr Alshega's entire family lives in Michigan.

299.   In January 2017, after the family had waited 12 years, Badr Alshega's priority date became current, and he travelled to Djibouti for an interview at the U.S. Embassy. Shortly thereafter, the January 27 Executive Order was issued, preventing Badr Alshega from obtaining the visa for which he and his father had waited for so long.

300.   At the embassy, Badr Alshega's passport was taken from him. He was told the embassy would mail his passport and visa and notify him when his visa was ready. Because Badr Alshega does not have a passport to travel back to Yemen, he has incurred the expense of remaining in Djibouti until he receives his visa.

301.   The March 6 Order prohibits citizens of Yemen, including Badr Alshega, from entering the United States, and halts ordinary visa processing.

302.   Due to the March 6 Order, Plaintiff Alshega cannot bring his son to the United States.

303.   Plaintiff Yousef Abdullah is a United States citizen and is married to Hanan Alafif, a national of Yemen. They have two children who are United States citizens and are Muslim. The two children, K.A. and Y.A., ages 6 and 3, currently reside in the United States with their father, Mr. Abdullah.

304.   Ms. Alafif has been unable to join her spouse and children in the United States due to the Executive Orders.

305.   The children, K.A. and Y.A., have not seen their mother since December 2015.

306.   Mr. Abdullah's youngest child, Y.A. age 3, has Type 1 Diabetes. He is administered insulin shots on a daily basis and frequents the hospital. Plaintiff Abdullah has been struggling to care for his sick child without the assistance and companionship of his wife. Y.A. urgently needs the care and support of his mother as he battles his illness. Mr. Abdullah, who works as restaurant server, takes significant time off from work to care for his sick child.

307.   In January 2016, Mr. Abdullah petitioned for an immigrant visa to bring his wife, Ms. Alafif, to the United States.

308.   Ms. Alafif's case has completed processing as of October 6, 2016. Since then, she has been waiting to be scheduled for a consular interview. She is

currently in Yemen and will have to travel to Djibouti when she receives an appointment date.

309.   Mr. Abdullah was informed that as a result of the Original Executive Order, the Embassy had placed a freeze on the scheduling of visa appointments.

310.   On March 8, 2017, the National Visa Center accepted Ms. Alafif's case for expedited processing and forwarded her case to the U.S. Embassy Consulate General in Djibouti. Because it takes several weeks for a decision to be made, Ms. Alafif did not have a visa to enter the United States as of March 16, 2017, the effective date of the March 6 Order.

311.   The March 6 Order prohibits citizens of Yemen, including Ms. Alafif, from entering the United States.

312.   Due to the March 6 Order, Plaintiff Abdullah cannot reunite with his wife, Ms. Alafif, by bringing her to the United States. Also due to the March 6 Order, their children K.A. and Y.A. will continue to be separated from their mother.

313.   Plaintiff Adeeb Saleh is a U.S. citizen who is married to Amira Ahmed Ali Aleshawi, a citizen of Yemen. The couple has three daughters and an infant son. Mr. Saleh also has two sons from a previous marriage.

314.   Mr. Saleh has been trying to bring his wife to the United States for almost five years. Ms. Aleshawi began the visa application process in April 2012, while residing in Yemen with the couple's first daughter, then an infant.

315.   For the past five years Mr. Saleh and Ms. Aleshawi have jumped through hoop after hoop in attempting to get her visa approved over the past five years. Initially, reviewing officers did not recognize the dissolution of Mr. Saleh's first marriage and, therefore, did not recognize his marriage to Ms. Aleshawi in 2005. Following a successful appeal that recognized Mr. Saleh's current marriage, Ms. Aleshawi's visa application was again delayed, and Mr. Saleh was required to submit to paternity testing to establish that he was the father of the children he has with Ms. Aleshawi.

316.   In January 2016, Ms. Aleshawi and the couple's children (then three) traveled from Yemen to Malaysia in order to proceed with the visa application process (which they could not complete in Yemen). Mr. Saleh traveled to Malaysia in March 2016 to join his wife and daughters.

317.   The couple's daughters had visas for Malaysia that were set to expire in May 2016, so the family could not stay there. The family had not yet received Ms. Aleshawi's visa for the United States. Mr. Saleh decided to return to the U.S. with only his daughters, who are U.S. citizens. This was a devastating decision for the family since the girls had lived with their mother for their entire lives.

318.   In late 2016, Mr. Saleh returned to Malaysia to assist his wife who was seven months pregnant at the time. Mr. Saleh decided not to uproot his daughters a second time, leaving them in the care of his sisters-in-law.

319.   Mr. Saleh is currently with Ms. Aleshawi and their infant son in Indonesia. While Ms. Aleshawi's visa application was being processed through the Malaysian consulate, her visa authorizing her stay in Malaysia expired and she was forced to relocate to Indonesia.

320.   Throughout this entire visa application saga, Mr. Saleh's international travel and various family expenses have depleted his savings of more than $52,000. Additionally, Mr. Saleh he has accrued substantial debt.

321.   The March 6 Order bars Ms. Aleshawi entering the U.S., thereby preventing Mr. Saleh from living with his wife and their children in the United States. If he relocated his family to Yemen, they would be in danger due to the war there. Moreover, Mr. Saleh has had bone cancer and requires regular medical care from his physicians in the United States.

322.   Mr. Saleh has already spent almost five years waiting to reunite his family. The March 6 Executive Order extends that wait indefinitely.

323.   Plaintiff Sofana Bella, a U.S. citizen, became engaged to her fiancé, Khalid Ahmed, a citizen of Sudan, in June 2015.

324.    Shortly after the engagement, Ms. Bella and Mr. Ahmed applied for a K-1 visa, which is often referred to as a "fiancé visa." While eligibility for K1 visas is restricted to, among other things, couples that have known each other for at least two years prior to filing a petition, Ms. Bella and Mr. Ahmed were confident that they would qualify for a waiver to this requirement based on the Sudan's long-established customs regarding courtship. In support of their waiver application, Ms. Bella and Mr. Ahmed submitted notarized letters from their respective families testifying to the strength of the relationship. Nevertheless, their application to waive the two-year relationship requirement was denied.

325.    When Ms. Bella initially applied to sponsor Mr. Ahmed's visa, the engaged couple planned to get married in March 2017. Because Mr. Ahmed did not have a visa by then, the couple postponed their marriage.

326.    Ms. Bella and Mr. Ahmed have now known each other for the requisite two years required to obtain a "fiancé visa," and are preparing a new K1 visa application.

327.    The March 6 Order prohibits citizens of Sudan, including Mr. Ahmed, from entering the United States. Due to the March 6 Order, Ms. Bella cannot bring her fiancé Mr. Ahmed to the United States where they wish to live as a family.

328.    Plaintiff Hilal Abdo Kaid Alkatteeb, a citizen of the United States, is married to Rim Mohammed Ahmed Shamsan, a citizen of Yemen.

88

329.    Mr. Alkatteeb and Ms. Shamsan have a two-year-old daughter, plaintiff S.A., who is a U.S. citizen but who has been living with her mother, first in Yemen and then in Malaysia. Mr. Alkatteeb is also the primary caregiver for his mother and father, both of whom suffer from debilitating illnesses and live with him in Detroit, Michigan.

330.    In December 2015, Mr. Alkatteeb applied for an IR1 immigrant visa for his wife Shamsan. Because of the war in Yemen, Ms. Shamsan fled to Malaysia approximately a year and ten months ago, and has been living there while waiting for her visa to be processed.

331.    Ms. Shamsan underwent extensive security and medical screening as part of the visa application process.

332.    Mr. Alkatteeb traveled to Malaysia in February 2017 to assist his wife in the visa application process. Neither Mr. Alkatteeb nor Ms. Shamsan have permission to work while in Malaysia; their inability to work imposes an enormous financial strain on the family. Mr. Alkatteeb has already spent approximately $70,000 including immigration expenses, living expenses, and airfare.

333.    Ms. Shamsan was scheduled for a visa interview to be held on February 21, 2017.

334.    On January 28, 2017, the day after the January 27 Executive Order was issued, Ms. Shamsan's visa interview appointment was cancelled via e-mail.

335.   On February 10, 2017, the family received a second e-mail indicating that as a result of court decisions, the Department of State had resumed processing immigrant visa applications for individuals who were nationals of Syria, Iraq, Iran, Libya, Somalia, Sudan and Yemen.

336.   Ms. Shamsan went to her visa interview on February 21, 2017, and thereafter supplied additional paperwork. To date she has not received a visa.

337.   Malaysia allows noncitizens to remain in the country only temporarily. Mr. Alkatteeb is permitted to remain in Malaysia only until April 13, 2017, and Ms. Shamsan and their child will be forced to leave Malaysia by June 3, 2017.

338.   If Ms. Shamsan does not receive a visa, she will have no other option but to return to Yemen, despite the widespread violence there.

339.   Ms. Shamsan's brother was killed in Yemen when a bomb hit the building where he worked. All of Mr. Alkatteeb's father's immediate family members have perished in the war in Yemen.

340.   As a result of the Executive Orders, Mr. Alkatteeb and Ms. Shamsan are now forced to make an agonizing and life-threatening decision. Mr. Alkatteeb can return to the United States with their U.S. citizen daughter, who may then be separated from her mother forever, leaving Ms. Shamsan behind to risk her life

traveling back to Yemen. Or Mr. Alkatteeb can leave his daughter with her mother, knowing that they could both lose their lives if they return to Yemen.

341.   It is unclear whether the Individual Plaintiffs are eligible for a waiver under Section 3(c) of the March 6 Executive Order, whether such a waiver will be granted if they are eligible, or how long the process of seeking a waiver could take.

342.   For the Individual Plaintiffs, pursuing a waiver on the theoretical possibility that it could be granted will involve additional time and expense. Consular processing for individuals from the Designated Countries frequently requires travel to a U.S. embassy in a third country.

343.   By requiring a waiver for any visa or entry into the United States from the Designated Countries, the Executive Orders impose additional obstacles to the reunification of the Plaintiffs' families. Those obstacles were imposed for the purpose of preventing Muslims from entering the United States.

## CLASS ACTION ALLEGATIONS

344.   The Individual Plaintiffs bring this action on their own behalf and on behalf of a class of all others similarly situated—that is, persons in the United States for whom the March 6 Order interferes with family reunification (the "Plaintiff Class"). The Plaintiff Class includes but is not limited to individuals in the United States who currently have an approved or pending petition to the United

States government to be reunited with family members who are nationals of the Designated Countries, or who will soon file such petition.

345.   The Plaintiff Class is so numerous that joinder is impracticable. According to the Annual Report of the Visa Office, in 2015, the last year for which data are available, the United States issued approximately 70,000 immigrant and non-immigrant visas to nationals from the six Designated Countries. The U.S. government previously estimated that between 60,000 and 100,000 people were affected by Section 3(c) of the January 27 Order.

346.   A large number of such persons reside, or have recently resided, in Michigan. Many thousands of Arab-Americans in Michigan are originally from the Designated Countries. In fiscal year 2016, Michigan ranked fourth among states resettling refugees, receiving over 4,250.

347.   The claims of the Plaintiff Class members share common issues of law, including but not limited to whether the March 6 Order violates their right to religious liberty, equal protection, freedom of speech and freedom of association under the First and Fifth Amendments to the United States Constitution.

348.   The claims of the Plaintiff Class members share common issues of fact, including but not limited to whether the March 6 Order was adopted with the purpose of discriminating against Muslims and whether that Order is being or will be enforced so as to prevent Plaintiff Class members or their family members from

obtaining visas and entering the United States from abroad or from re-entering the United States should they choose to leave the United States briefly, even though they would otherwise be admissible.

349.   The claims of the Individual Plaintiffs are typical of the claims of members of the Plaintiff Class.

350.   The Individual Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. The Individual Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Individual Plaintiffs include experienced civil rights attorneys and are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

351.   Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

### COUNT I

### FIRST AMENDMENT
### ESTABLISHMENT CLAUSE

352.   Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

353.   The Establishment Clause of the First Amendment prohibits the federal government from preferring one religion over another.

354.   The March 6 Order constitutes unlawful discrimination against Muslims, disfavoring and disadvantaging Islam as compared to other religions, and establishing a preference for one religion over another. Defendants have not pursued a course of neutrality with regard to different religious faiths.

355.   Defendants' statements and actions in implementing the Executive Orders have the effect of discriminating against Muslims, disfavoring and disadvantaging Islam, and establishing a preference for one religion over another.

356.   References in the March 6 Order to non-religious justifications for the actions taken in that Order are transparently a pretext for the underlying aim to establish this preference.

357.   Through the actions described in this Complaint, Defendants have violated the Establishment Clause. Defendants' violation inflicts ongoing harm

upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

358.   The March 6 Order has the purpose and effect of inhibiting religion, and is neither justified by, nor closely fitted to, any compelling governmental interest.

## COUNT II

### FIFTH AMENDMENT
### EQUAL PROTECTION

359.   Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

360.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees the right to equal protection of the laws.

361.   The equal protection requirement of the Due Process Clause requires strict scrutiny of governmental classifications that are based on religion.

362.   The March 6 Order was substantially motivated by animus and a desire to discriminate on the basis of religion and has a disparate effect on persons of the disfavored religion.

363.   The equal protection requirement of the Due Process Clause requires strict scrutiny of governmental restrictions on fundamental rights.

364.   The March 6 Order burdens fundamental rights by restricting the ability of the Individual Plaintiffs and those similarly situated, and of the members

and clients of the organizational Plaintiffs, to associate with their families and raise their children.

365.   The March 6 Order was substantially motivated by animus and a desire to restrict the fundamental rights of Muslims, and has a disparate effect on the ability of Muslims versus non-Muslims to exercise their fundamental rights to associate with their families and raise their children.

366.   The statements of President Trump and his advisors, as well as the other information set out in this Complaint, provide direct evidence that the March 6 Order was adopted for discriminatory reasons, and that the March 6 Order is not tailored to the asserted government goal of promoting national security.

367.   The March 6 Order is not narrowly tailored to serve a compelling governmental interest, and thereby violates the equal protection requirement of the Due Process Clause.

368.   For the same reasons, the March 6 Order is not rationally related to a legitimate government interest.

369.   The March 6 Order, as well as Defendants' statement regarding the order and their actions to implement it, discriminate against individuals based on their religion and restrict their fundamental rights without lawful justification.

370.   Through the actions described in this Complaint, Defendants have violated the equal protection guarantee of the Fifth Amendment. Defendants'

96

violation inflicts ongoing harm upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

## COUNT III

## FIRST AMENDMENT
## FREEDOM OF SPEECH AND ASSOCIATION

371.   Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

372.   The First Amendment to the United States Constitution protects the marketplace of ideas; the right to receive information; the right to access social, political, esthetic, moral and other ideas and experiences; and the right to association.

373.   Plaintiffs have a right to hear, speak, debate with, and associate with individuals whose entry into the United States is curtailed by the March 6 Order.

374.   The March 6 Order restricts Plaintiffs' ability to hear from, speak with, debate with, and associate with nationals of the Designated Countries, a restriction which is based on the identity, national origin and religion of the speaker.

375.   The March 6 Order does not provide a facially legitimate and bona fide reason for denying entry into the United States to persons with whom Plaintiffs wish to speak, debate or associate, or whose ideas they wish to hear. The

ostensibly neutral reasons for denying entry that are listed in the Executive Order were made in bad faith and as a pretext for denying entry of Muslims into the United States.

376.   The March 6 Order conditions Plaintiffs' ability to hear from, speak with, debate with or associate with nationals of the Designated Countries in face-to-face interactions within the United States on the ability of those nationals to obtain a case-by-case waiver under Section 3(c) of the March 6 Order .

377.   Section 3(c) of the March 6 Order provides that a case-by-case waiver cannot be granted unless "the foreign national has demonstrated to the [CBP] officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest."

378.   Section 3(c) of March 6 Order operates as a licensing scheme for speakers from the Designated Countries, but does not provide narrow, objective or definite standards for the issuance of case-by-case waivers. Section 3(c) of March 6 Order gives the government unfettered discretion to determine whose speech will be permitted and whose speech will not.

379.   Section 3(c) of the March 6 Order operates as a content-based restriction on protected First Amendment activities because it permits or requires Defendants to evaluate the content of those activities to determine whether denying

entry of a speaker from the Designated Countries would cause "undue hardship" and whether allowing Plaintiffs to hear from, speak with, debate with and associate with the speaker would "be in the national interest."

380.   Similarly, Section 3(c)(iii) of the March 6 Order , which provides that a case-by-case waiver "could be appropriate" where "the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations," operates as a content-based restriction on protected First Amendment activities because it permits or requires Defendants to evaluate the content of those activities to determine whether they are "significant" enough to merit entry into the United States.

381.   Section 3(c) of the March 6 Order permits or requires Defendants to engage in unconstitutional content-based and viewpoint-based discrimination because Defendants must determine whether denying entry of a speaker from the Designated Countries would cause "undue hardship" and whether allowing Plaintiffs to hear from, speak with, debate with and associate with the speaker would "be in the national interest."

382.   The March 6 Order does not provide a facially legitimate and bona fide reason for requiring nationals of the Designated Countries to seek a case-by-case waiver in order to enter the United States, thereby making it more difficult for

Plaintiffs to hear from, speak with, debate with and associate with nationals of the Designated Countries. The ostensibly neutral reasons for requiring nationals of the Designated Countries to seek a case-by-case waiver that are listed in the Executive Order were made in bad faith and as a pretext for denying entry of Muslims into the United States.

383.   Defendants' violation of the First Amendment inflicts ongoing harm upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, request that this Honorable Court grant the following relief:

A.   Issue a preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns and all persons acting in concert or participating with them from implementing or enforcing the March 6 Order;

B.   Enter a judgment pursuant to 28 U.S.C. § 2201 declaring that the March 6 Order is unlawful and invalid;

C.   Award Plaintiffs reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act or any other applicable law; and

D.   Grant such other and further relief as the Court deems equitable, just and proper.

Dated: March 16, 2017          Respectfully submitted,

### Counsel for Arab American Civil Rights League

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
_____
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
_____
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
_____
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
_____
/s/ Natalie C. Qandah
_____
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

### Counsel for American Arab Chamber of Commerce

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
_____
Helal Farhat (P64872)
Counsel for the American Arab
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

**Counsel for Arab American and Chaldean Council**

/s/ Nida Samona
Nida Samona (P45356)
Attorney at Law
Arab Chaldean Council ("ACC")
363 W. Big Beaver Rd., Suite 300
Troy, MI 48084
(248) 559 1990
Nidas@myacc.org

**Counsel for Hend Alshawish, Salim Alshawishm, Yusef Abdullah, Fahmi Jahaf, and Mohamed Alshega**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

/s/ Ali K. Hammoud
Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

**Counsel for American Civil Liberties Union of Michigan, Arab American Studies Association, Adeeb Saleh, Sofana Bella, Hilal Alkateeb and S.A., a minor through her Parent and Next Friend, Hilal Alkatteeb**

/s/ Miriam Aukerman
Miriam Aukerman (P63165)
American Civil Liberties Union Fund
of Michigan
1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org


/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org


/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)
Nishchay H. Maskay (D.C. Bar
#998983)
Frederick C. Benson (D.C. Bar
#1033399) (application forthcoming)
William J. Murray (D.C. Bar
#1011089) (application forthcoming)
Ingrid L. Price (D.C. Bar #1017436)
(application forthcoming)
Taylor M. Steffan (D.C. Bar
#1045250) (application forthcoming)
Covington & Burling LLP


/s/ Samuel R. Bagenstos
Samuel R. Bagenstos (P73971)
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 647-7584
sbagen@gmail.com


/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar
#2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

One City Center
850 10th Street, NW
Washington, D.C.  20001
(202) 662-5072
Email: jraofield@cov.com