## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J.  Stephanie D. Davis

### Statement Regarding Concurrence

Pursuant to E.D. Mich. L.R. 7.1(a), on March 15, 2017, Plaintiffs' counsel e-mailed Defendants' counsel seeking concurrence in this motion.  On March 15, 2017, Attorney Briana Yuh of the U.S. Department of Justice stated that Defendants do not concur.

### PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

Plaintiffs, by and through undersigned counsel, hereby move for expedited discovery.  In support of their Motion, Plaintiffs rely upon the accompanying Brief in Support of Their Motion to Expedite Discovery and the Declaration of Jason Raofield in Support of Plaintiffs' Motion for Expedited Discovery (Attachment C, hereinafter "Raofield Decl.") and exhibits thereto, which are incorporated herein by reference.  A proposed order is attached.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J.  Stephanie D. Davis

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY

Plaintiffs request entry of an order requiring Defendants to respond on an expedited basis to the very narrowly tailored discovery requests submitted with this motion.  Good cause exists to grant expedited discovery because the discovery sought bears directly on Plaintiffs' claim that the executive action at issue was motivated by religious animus and based on a pretextual justification.  The requested discovery is thus directly relevant to demonstrating likelihood of success on the merits of a motion for preliminary injunction to be filed by Plaintiffs.

## I.    FACTUAL BACKGROUND

### A.    The Overt Religious Animus Leading to the Executive Order

In a press release issued on December 7, 2015—a copy of which is still posted on his campaign website—Candidate Trump declared that as President he

would immediately implement "a total and complete shutdown of Muslims entering the United States." In that statement, he insisted that this Muslim Ban was necessary to prevent "horrendous attacks" on U.S. soil because "there is great hatred towards Americans by large segments of the Muslim population." *See* Raofield Decl., ¶ 3, Ex. A.

This statement was not an anomaly: it was consistent with statements and proposals Candidate Trump had made and would continue to make throughout the presidential campaign. In fact, in a series of interviews in the weeks prior to his press release, Candidate Trump had indicated that he would require Muslims in the United States to register with the government, and he insisted that the country had "absolutely no choice" but to shut down mosques. *See* Raofield Decl., ¶¶ 4, 5, Exs. B, C.

In March 2016, Candidate Trump explained his rationale during an interview with CNN: "I think Islam hates us. There is something—there is something there that is a tremendous hatred." *See* Raofield Decl., ¶ 6, Ex. D. During a debate the following day, when asked whether his comments were meant to refer to all 1.6 billion Muslims worldwide, he responded, "I mean a lot of them!" Later in the debate he characterized the threat as involving "large portions of a group of people, Islam, large portions want to use very, very harsh means." *See* Raofield Decl., ¶ 7, Ex. E. In an interview later that month, he asserted: "Frankly, look, we're having

2

problems with the Muslims, and we're having problems with Muslims coming into the country." *See* Raofield Decl., ¶ 8, Ex. F. That same day, he attacked Hillary Clinton in a tweet, saying she wanted to "let the Muslims flow in. No way!" *See* Raofield Decl., ¶ 9, Ex. G.

On June 13, 2016, one day after the Pulse nightclub shooting in Orlando, Candidate Trump delivered a major address on "Terrorism, Immigration, and National Security," in which he defiantly declared: "I called for a ban after San Bernardino, and was met with great scorn and anger but now, many are saying I was right. . . . We cannot continue to allow thousands upon thousands of people to pour into our country, many of whom have the same thought process as this savage killer." He also accused "Muslim communities" of refusing to "turn in the people who they know are bad—and they do know where they are." *See* Raofield Decl., ¶ 10, Ex. H.

In a similar address on August 15, 2016, Candidate Trump cataloged a long list of terror attacks he said were linked by the "common thread" that they all "involved immigrants or the children of immigrants." In this speech, invoking offensive Muslim stereotypes, he decried "the oppression of women and gays in many Muslim nations" and the targeting of "Christians driven from their homes," and he called for the establishment of an "ideological screening test" to ferret out those who do not share his values. He went on to proclaim that American "values

3

should be taught by parents and teachers, and impressed upon all who join our society.  Assimilation is not an act of hostility, but an expression of compassion." *See* Raofield Decl., ¶ 11, Ex. I.

Following his election victory, the open hostility toward Islam continued unabated.  President-elect Trump selected General Michael Flynn to serve as his national security adviser despite the fact that General Flynn had described "Islamism" in a speech a few months earlier as "a vicious cancer inside the body of 1.7 billion people on this planet and it has to be excised."  *See* Raofield Decl., ¶ 12, Ex. J.  He also selected as his senior advisor Stephen Bannon, who had said in a radio interview that "most people in the Middle East, at least 50%, believe in being sharia-compliant" and that the United States is "the wrong place" for them.  *See* Raofield Decl., ¶ 13, Ex. K.

In December 2016, when the President-elect was asked whether he had changed his "plans to create a Muslim registry or ban Muslim immigration," he responded:  "Hey, you've known my plans all along and it's, they've proven to be right.  100 percent correct."  *See* Raofield Decl., ¶ 14, Ex. L.  In yet another unmistakable message to Muslims, he asked Rev. Franklin Graham to speak at his inauguration despite (or perhaps because of) the fact that Graham has spent the past fifteen years characterizing Islam as "a religion of war," and insisting Islam

"has not been hijacked by radicals.  This is the faith, this is the religion."  *See*
Raofield Decl., ¶ 15, Ex. M.

> **B.**      **The First Unconstitutional Executive Order**

After just one week in office, President Trump signed Executive Order
13769, 82 Fed. Reg. 8977 (Jan. 27, 2017) (the "E.O."), banning entry by
individuals from seven predominantly Muslim countries (Iran, Iraq, Libya,
Somalia, Sudan, Syria, and Yemen), banning admission of refugees from Syria
indefinitely, and prohibiting all other refugee admissions for 120 days.  During
fiscal year 2016, admissions from Syria accounted for nearly a third of all Muslim
refugee admissions; and 99% of Syrian refugees were Muslim while less than 1%
were Christian.  *See* Raofield Decl., ¶ 16, Ex. N.  Plaintiffs allege that President
Trump targeted Syria because he could bar entry by large numbers of Muslims
with little impact on Christian refugee admissions.  Indeed, on the same day that he
signed the E.O., President Trump said in an interview that Christian refugees
claiming religious persecution would be given priority over Muslims.  *See* Raofield
Decl., ¶ 17, Ex. O.

Around the country, states, nonprofit organizations, and individuals initiated
emergency legal proceedings alleging that the intent and effect of the E.O. was to
discriminate against Muslims and disparage Islam.  Those allegations found a
wealth of support in the public record, as discussed above.

The fallout was swift and devastating.  As chaos overtook the airports, President Trump insisted that the threat posed by Muslim immigration was so pervasive that it would compromise national security to allow even a few days to prepare for orderly implementation.  Indeed, when Judge Robart entered a TRO blocking key portions of the E.O., President Trump tweeted:  "Just cannot believe a judge would put our country in such peril.  If something happens blame him and court system.  People pouring in.  Bad!"  *See* Raofield Decl., ¶ 18, Ex. P.

### C.    The Attempt to Disguise the Overt Religious Animus

President Trump's position was (and is) that his exercise of executive power was not motivated by religious animus.  Notwithstanding the litany of public statements to the contrary, President Trump implies that he had a change of heart and decided not to pursue a Muslim Ban after all.  Instead, he purportedly chose to focus on individuals presenting the greatest risk to our country by barring entry of individuals from seven specific countries.

There is enormous reason to be skeptical.  First, the seven countries targeted by the January 27 E.O. are all overwhelmingly Muslim.  Second, as the Ninth Circuit noted in *Washington v. Trump*, despite "repeated invitations" to do so, the government "pointed to no evidence that any alien from any of the countries

named in the Order has perpetrated a terrorist attack in the United States."[1]  Third, as discussed in detail in Section II(A), the evidence suggests that Candidate Trump merely worked with others to construct a sham justification—using nationality as a proxy for faith—to disguise the religious animus motivating his action.

### D.    The Second Unconstitutional Executive Order

On March 6, 2017, President Trump signed Executive Order 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017) (the "Revised E.O."), which had an effective date of March 16, 2017 and replaced Executive Order 13769 (the "Original E.O."). Although the Revised E.O. includes some changes, it retains the core features of the Original E.O., including a ban on entry for a period of 90-days by individuals from six of the same seven predominantly Muslim countries, a mechanism to extend that ban indefinitely, suspension of refugee admissions for 120 days, and a drastic reduction in the cap on total refugee admissions.  For the reasons discussed below, the evidence clearly suggests that the Revised E.O. is motivated by the same religious animus as the Original E.O.

First, during a town hall on February 21, 2017, White House senior advisor Stephen Miller, a chief architect, announced that the Revised E.O. was driven by the very same policy.  "And so these are mostly minor, technical differences. Fundamentally, you are still going to have the same, basic policy outcome for the

---

[1] *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam).

country."  Indeed, when asked directly whether changes were being made in a good faith attempt to alleviate constitutional concerns, Mr. Miller was defiant: "The rulings from those courts were flawed, erroneous and false.  The president's actions were clearly legal and constitutional."  *See* Raofield Decl., ¶ 19, Ex. Q. Similarly, following the Ninth Circuit's decision in *Washington v. Trump*, Mr. Trump said "we can tailor the order to that decision and get just about everything, in some ways, more."  *See* Raofield Decl., ¶ 20, Ex. R.  And in a press briefing the day the Revised E.O. was issued, Press Secretary Sean Spicer said "the principles of the executive order remain the same."  *See* Raofield Decl., ¶ 21, Ex. S.

Second, in an after-the-fact attempt to justify his action, President Trump instructed the Departments of Homeland Security and Justice to "demonstrate that the security threat for these seven countries is substantial and that these seven countries have all been exporters of terrorism into the United States."  Intelligence officials reportedly viewed this post-hoc review as "a conclusion in search of evidence."  *See* Raofield Decl., ¶ 22, Ex. T.

Third, two recent intelligence reports actually *refuted* the President's justification for targeting entry by individuals from specific countries:

- The draft of one report was titled "Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States," and it found that less than half of the 82 individuals involved in terrorist activities since 2011 were foreign-born, and of those:  "The top seven origin countries of the foreign-born individuals are: Pakistan (5), Somalia

(3), and Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan (2)." *See* Raofield Decl., ¶ 23, Ex. U.

- The other report found that "most foreign-born, US-based violent extremists [were] likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry," and that many entered as minors and "nearly all parents who entered the country with minor-age children likely did not espouse a violent extremist ideology at the time they entered or at any time since, suggesting these foreign-born individuals were likely not radicalized by their parents." *See* Raofield Decl., ¶ 24, Ex. V.

If President Trump had been motivated by national security concerns as opposed to religious animus, he would have understood from these intelligence reports that his approach would *not* improve security. Nevertheless, he persisted. The Revised E.O. now targets six of the seven largely Muslim countries that were originally targeted (Iraq was removed), only one of which was among the "top seven" countries identified in the intelligence report discussed above.

Faced with a lack of real evidence to support his pretextual justification, President Trump resorted to declaring, in Section 1(b)(iv) of the Revised E.O., that the Original E.O. "did not provide a basis for discriminating for or against members of any particular religion" and "was not motivated by animus toward any religion." That transparent proclamation does nothing to refute the evidence that his actions were driven by deep-seated and long-standing animus toward Muslims.

## II.    THE NARROW DISCOVERY REQUESTED

This case comes down to a clear factual dispute.  Plaintiffs allege that President Trump's executive action is motivated by overt religious animus hidden behind a flimsy pretext that has been refuted by multiple intelligence reports. President Trump insists that, although he originally proposed "a total and complete shutdown of Muslims entering the United States," he had a change of heart and acted entirely without religious animus when he barred entry by individuals from specific predominantly Muslim countries.  Thus, the parties have offered two competing versions of events, only one of which can be true.  And the Defendants are in possession of the evidence necessary to resolve this dispute.

At this stage of the litigation, Plaintiffs seek narrowly-tailored expedited discovery of three specific categories of evidence.  The requests include a total of 5 document requests (Attachment A) and 10 interrogatories (Attachment B). Although this case will ultimately require much broader discovery, Plaintiffs have limited their discovery requests to topics that are (i) at the heart of the dispute between the parties and directly relevant to likelihood of success on the merits for a motion for preliminary injunction, and (ii) avoid issues of executive privilege.[2]

---

[2] As the case proceeds, this expedited discovery will also inform the parties and the Court as to whether Plaintiffs have a need for discovery *not available from other sources* that may be sufficient to overcome any potential assertion of executive privilege.  *See, e.g., Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973).

### A.    The Pivotal Role of the Giuliani Commission Prior to the Election

Plaintiffs seek evidence from *prior to the election* that is directly relevant to the question whether Candidate Trump's position genuinely evolved from a Muslim Ban to a focus on the risk presented by individuals from specific countries. Plaintiffs allege that, in fact, Candidate Trump merely worked with others during that period to develop a pretext in order to *disguise* his religious animus and *justify* action targeting Muslims once he became President.

In May of 2016, following widespread condemnation of his proposed Muslim Ban, Candidate Trump turned to former New York City Mayor Rudolph Giuliani.  In numerous public appearances since that time, Mr. Giuliani has indicated that he responded by putting together a "commission" to advise Candidate Trump.

In early July 2016, Mr. Giuliani described a memorandum his commission had prepared for Candidate Trump, and he suggested that this memorandum had caused the candidate's proposal to shift from a "general ban" to "very specific, targeted criteria" focusing on specific countries.  *See* Raofield Decl., ¶ 25, Ex. W. Later that month, Candidate Trump was asked whether this reflected a rollback of his blanket ban on Muslims, and he said: "I actually don't think it's a rollback.  In fact, you could say it's an expansion."  *See* Raofield Decl., ¶ 26, Ex. X.  But when asked about this again in a debate one month before the election, he claimed that:

11

"The Muslim ban is something that in some form has morphed into extreme vetting from certain areas of the world."  *See* Raofield Decl., ¶ 27, Ex. Y.

On November 15, 2016, in a nationally televised interview one week after the election, Mr. Giuliani again attributed the purported evolution of the Muslim Ban to the work of the Giuliani commission:

> Actually, within a day or two of his saying that, he called me and asked me to put a little group together that included Congressman McCaul, General Flynn — I can't remember who else, a few other people.  We wrote a paper for him. And he amended it to the ban would be restricted to particular countries, and it would not be a ban.
>
> It would involve extreme vetting….  All the rest from countries [other than Syria] that contain dangerous populations of radical Islamic extremists, he will subject them to extreme vetting, but not a ban.  *See* Raofield Decl., ¶ 28, Ex. Z.

This was the genesis of the purported policy shift, and a key member of the Giuliani commission was General Flynn who, during the campaign, described "Islamism" as a "vicious cancer inside the body of 1.7 billion people on this planet."  *See* Raofield Decl., ¶ 12, Ex. J.

On January 27, 2017, during the signing ceremony for E.O. 13769, President Trump said the intent was to keep "radical Islamic terrorists" out of the country. *See* Raofield Decl., ¶ 29, Ex. AA.  In defending it in the days that followed, the administration's allies again pointed to the pivotal role of the Giuliani commission. Tellingly, when Mr. Giuliani was asked why it targeted seven overwhelmingly

Muslim countries, he explained:  "So when he first announced it, he said 'Muslim ban.'  He called me up.  He said 'Put a commission together.  Show me the right way to do it legally.'"  *See* Raofield Decl., ¶ 30, Ex. BB.  That is consistent with Plaintiffs' allegation that President Trump was motivated by religious animus and merely looking for a way to overcome legal challenges.

Congressman McCaul, Chairman of the House Committee on Homeland Security, was identified by Mr. Giuliani as a key member of the commission.  Rep. McCaul spoke publicly about the role of the Giuliani commission, although he described the President's action as diverging from the recommendations in the memorandum the commission prepared in "May or June" of 2016.  *See* Raofield Decl., ¶ 31, Ex. CC.  According to the spokeswoman for Rep. McCaul's committee:  "The white paper did talk about the idea of a Muslim ban, but in the context of what a bad idea that was."  *See* Raofield Decl., ¶ 32, Ex. DD.

The work of the Giuliani commission is central to whether President Trump's action was based on religious animus, as Plaintiffs allege, or "evidence" of risk.  Plaintiffs' requests have been narrowly crafted to find those answers:

- Document Request No. 1 seeks production of a single document (the memorandum produced by the Giuliani commission prior to the election) that has been the subject of extensive public discussion by those involved in its drafting.

- Document Request Nos. 2-4 seek other documents prior to the election involving specific individuals, including members of

13

the Giuliani commission, a related "Roundtable on Defeating Radical Islamic Terrorism," and the Trump Campaign.

- Interrogatory Nos. 1-4 seek basic information regarding the individuals involved in the relevant policy discussions prior to the election, and basic information regarding those discussions.

**B.**    **The Important Role of Congressional Staffers Prior to the Inauguration**

Plaintiffs seek evidence that is directly relevant to the question whether,

*prior to the inauguration*, Congressional staffers were involved in communications

demonstrating that the action was motivated by religious animus, or confirming

that nationality was used as a pretext for targeting Muslims.

Following the election, members of the transition team consulted with staff

working for the House Judiciary Committee.  It has been widely reported that these

staffers carried out this work unbeknownst to members of the Committee, and

Committee Chairman Rep. Bob Goodlatte has verified that the staffers'

involvement ended before the inauguration.  *See* Raofield Decl., ¶¶ 33-35, Exs. EE,

FF, GG.  Plaintiffs seek discovery of communications involving those

Congressional staffers prior to the inauguration:

- Document Request No. 5 seeks documents and communications involving Congressional staffers who contributed to the relevant policy discussions.

- Interrogatory No. 5 seeks basic information regarding the Congressional staffers involved in those policy discussions.

14

C.   **Five Discrete Interrogatories Regarding Statements in the Executive Orders**

Finally, Interrogatory Nos. 6-10 seek limited information regarding specific statements in the executive orders, to establish the factual basis for the directives.

## III.   THE ORDER REQUESTED

To facilitate orderly and expedited discovery, Plaintiffs request an order requiring Defendants:  (1) to produce within 2 business days a copy of the single document called for by Document Request No. 1 (the memorandum prepared by the Giuliani commission); (2) to respond within 5 business days to Interrogatory Nos. 1-10; and (3) to produce within 10 business days documents responsive to Document Request Nos. 2-5.

## IV.   GOOD CAUSE EXISTS TO GRANT EXPEDITED DISCOVERY

The Court may, for good cause, authorize discovery prior to the Rule 26(f) meeting of the parties.  *See* Fed. R. Civ. P. 26(d) 1993 Advisory Committee Notes ("Discovery can begin earlier [than the limitation established by Rule 26(d)(1) ] . . . by local rule, order, or stipulation.  This will be appropriate in some cases, such as those involving requests for a preliminary injunction.").  Litigants are entitled to expedited discovery "upon a showing of good cause," *North Atlantic Operating Co. v. Huang*, 194 F. Supp. 3d 634, 637 (E.D. Mich. 2016), which exists "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Fabreeka Int'l Holdings, Inc. v.*

15

*Haley*, No. 15-cv-12958, 2015 WL 5139606, at *5 (E.D. Mich. Sept. 1, 2015) (internal citations and quotation marks omitted).

Good cause for expedited discovery exists at this stage in the litigation in cases where a preliminary injunction is sought. "The courts within the Sixth Circuit have endorsed the view, expressed in the Committee Notes, that expedited discovery is generally appropriate in cases requesting preliminary injunctive relief." *Radio Sys. Corp. v. Sunbeam Prod., Inc.*, No. 3:12-CV-648, 2013 WL 416295, at *2 (E.D. Tenn. Jan. 30, 2013); *see SEC v. Wilson*, No. 12-cv-15062, 2012 WL 5874456, at *4 (E.D. Mich. Nov. 20, 2012) (authorizing discovery prior to preliminary injunction hearing, including depositions, subpoenas, interrogatories, document requests, and requests for admissions, and requiring responses to discovery within seven days); *see also Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 456 (D.S.D. 2014) (permitting "expedited discovery in order to prepare a motion for preliminary injunction"); *OMG Fid., Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 305-06 (N.D.N.Y. 2006) (permitting expedited discovery, where "plaintiff contemplate[d] a motion for a preliminary injunction," to permit plaintiff "to develop evidence for use in support of such a motion").

## A.   Expedited Discovery Will Facilitate the Court's Determination of a Motion for Preliminary Injunction.

The discovery sought by Plaintiffs will inform the Court's ruling on Plaintiffs' forthcoming motion for a preliminary injunction, when the Court will

16

need to consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd*, 545 U.S. 844 (2005) (internal quotations omitted).

### 1.   *Religious Animus Is a Fundamental Part of Plaintiffs' Claims.*

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).  Plaintiffs seek expedited discovery to support their motion for a preliminary injunction.

Plaintiffs have asserted claims based on violations of their First and Fifth Amendment rights.  These claims are based on the fundamental truth that the "Constitution's guarantee of equality 'must at the very least mean that a bare [governmental] desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)).  Government action may not be motivated by a "discriminatory purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66

17

(1977); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508
U.S. 520, 534 (1993) ("The Free Exercise Clause, like the Establishment Clause,
extends beyond facial discrimination. . . . Official action that targets religious
conduct for distinctive treatment cannot be shielded by mere compliance with the
requirement of facial neutrality.").

Although the executive branch has significant authority in matters
concerning immigration, that authority does not extend to committing
unconstitutional acts.  While "the Executive may exercise its plenary power over
immigration and visa issues negatively on the basis of any 'facially legitimate and
bona fide reason,'" *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 415
(S.D.N.Y. 2006) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972)), a
facially legitimate and bona fide reason means "any *constitutionally permissible*
reason."  *Id.* at 415 n.17 (emphasis in original); *see also Zadvydas v. Davis*, 533
U.S. 678, 695 (2001) (stating that Executive and Legislative Branch decision-
making on immigration matters "is subject to important constitutional
limitations").  Discriminating against individuals on the basis of their religion is
not constitutionally permissible.

This Court will therefore need to determine whether the Revised E.O. "was
motivated by intentional discrimination," which "'demands a sensitive inquiry into
such circumstantial and direct evidence of intent as may be available.'"  *Farm*

*Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (quoting *Vill. of Arlington Heights*, 429 U.S. at 266). In conducting this inquiry, courts must consider the precise types of evidence sought by Plaintiffs here, including the "historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes"; the "specific sequence of events leading up the challenged decision"; the existence of "[d]epartures from the normal procedural sequence"; the existence of "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Vill. of Arlington Heights*, 429 U.S. at 267-68. Courts need not limit this inquiry to "the last in a series of governmental actions," where "the history of the government's actions" has bearing on the animus inquiry. *McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005).

As discussed in Sections I and II, the discovery sought is directly relevant to probability of success on the merits because it is precisely the type of evidence the Court must consider in assessing Plaintiffs' allegation that the President's action was motivated by religious animus and used nationality as a pretext for faith. *Cf. CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1074 (E.D. Mich. 2011) (Roberts, J.) (denying motion for preliminary injunction without prejudice, and

19

noting that if plaintiffs needed more evidence to show likelihood of success on the merits, "they should file a motion for expedited discovery").

### 2.    *Expedited Discovery Is Warranted Because Plaintiffs Are Suffering Irreparable Harm.*

As detailed in Plaintiffs' Second Amended Complaint, Plaintiffs, their members, and their clients, are suffering irreparable injury due to the violation of their constitutional and statutory rights. The Revised E.O. prevents families from reuniting and denies organizational plaintiffs the ability to engage in activities that are central to their missions. "[I]f . . . a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *McCreary Cnty.*, 354 F.3d at 445 ( (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *see also Detroit Free Press v. Ashcroft*, 303 F.3d 681, 710 (6th Cir. 2002) ("[E]ven a minimal infringement upon First Amendment rights constitutes irreparable injury sufficient to justify injunctive relief."). These injuries cannot be remedied by an award of monetary damages and are precisely the types of irreparable harm for which preliminary injunctions are appropriate. And Plaintiffs need expedited discovery to support their motion for a preliminary injunction. Time is therefore of the essence.

In addition, enjoining the Revised E.O. would not work substantial harm on others. Indeed, the Sixth Circuit has noted that in the immigration context, where the government can still review individual cases, it does not cause substantial harm

20

to enjoin the application of an overbroad rule.  *Detroit Free Press*, 303 F.3d at 711.

And the public's interest is unquestionably served by ensuring that the laws

enacted in the United States are free from invidious religious discrimination.  *See

id.* (finding that the public interest was served by an injunction prohibiting closed

immigration proceedings because "we are a country deeply committed to

preserving the rights and freedoms guaranteed by our democracy").

> **B.    Plaintiffs' Requests Are Narrowly Tailored and Will
>         Not Unduly Burden Defendants.**

Courts have found that expedited discovery is particularly appropriate where

the requests are "narrowly tailored to only seek the discovery that is warranted at

this early stage of the litigation."  *Psychopathic Records Inc. v. Anderson*, No. 08-

cv-13407, 2008 WL 4852915, at *2 (E.D. Mich. Nov. 7, 2008) (ordering third-

party discovery of the defendant's email correspondence).  As explained in Section

II above, Plaintiffs' requests are carefully crafted to seek narrow categories of

evidence, during specific time periods, and involving specific individuals,

regarding topics directly relevant to likelihood of success on the merits.

## V.    CONCLUSION

For these reasons, this motion for expedited discovery should be granted.

Dated:  March 16, 2017                              Respectfully submitted,

**Counsel for Arab American Civil Rights League**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
_____
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
_____
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

/s/ Rula Aoun
_____
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
_____
/s/ Natalie C. Qandah
_____
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Arab Chamber of Commerce**

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
_____
Helal Farhat (P64872)
Counsel for the Arab American
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

**Counsel for Arab American and Chaldean Council**

/s/ Nida Samona
Nida Samona (P45356)
Attorney at Law
Arab Chaldean Council ("ACC")
363 W. Big Beaver Rd., Suite 300
Troy, MI 48084
(248) 559 1990
Nidas@myacc.org

**Counsel for Hend Alshawish, Salim Alshawishm, Yusef Abdullah, Fahmi Jahaf, and Mohamed Alshega**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

/s/ Ali K. Hammoud
Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

23

**Counsel for American Civil Liberties Union of Michigan, Arab American Studies Association, Adeeb Saleh, Sofana Bella, Hilal Alkateeb and S.A., a minor through her Parent and Next Friend, Hilal Alkatteeb**

/s/ Miriam Aukerman
Miriam Aukerman (P63165)
American Civil Liberties Union Fund
of Michigan
1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org


/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org


/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)
Covington & Burling LLP
One City Center
850 10th Street, NW
Washington, D.C.  20001
(202) 662-5072
Email: jraofield@cov.com

/s/ Samuel R. Bagenstos
Samuel R. Bagenstos (P73971)
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 647-7584
sbagen@gmail.com


/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar
#2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

## CERTIFICATE OF SERVICE

This motion and the accompanying brief, attachments, declaration, and exhibits thereto were filed on March 16, 2017, via the Court's ECF system, which provides notice to all counsel of record.

/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J. Stephanie D. Davis

## <u>[PROPOSED] ORDER</u>

Having considered Plaintiffs' Motion for Expedited Discovery ("Motion"), the briefs in support thereof, the proposed Document Requests submitted as Attachment A to the Motion, and the proposed Interrogatories submitted as Attachment B to the Motion, the Court finds that good cause exists to grant the motion for expedited discovery and orders that:

Plaintiffs' Motion is GRANTED.

Defendants shall produce the document sought in Document Request No. 1 (as set forth in Attachment A to the Motion) within 2 business days of the date of this Order.

Defendants shall respond to Interrogatory Nos. 1 through 10 (as set forth in Attachment B to the Motion) within 5 business days of the date of this Order.

Defendants shall produce the documents sought in Document Request Nos. 2-5 (as set forth in Attachment A to the Motion) within 10 business days of the date of this Order.

**IT IS ORDERED.**

_____

Victoria A. Roberts
United States District Judge

Dated: _____

2