# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J. Stephanie D. Davis

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, by and through their undersigned counsel, oppose Defendants' Motion to Dismiss. The grounds for this opposition are set forth more fully in the attached supporting memorandum.

Dated: May 8, 2017

Respectfully submitted,

### Counsel for Arab American Civil Rights League

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Arab Chamber of Commerce**

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
Helal Farhat (P64872)
Counsel for the American Arab
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

**Counsel for Hend Alshawish, Salim Alshawish, Yousef Abdullah, Fahmi
Jahaf, and Mohamed Alshega**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)

6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


/s/ Ali K. Hammoud
Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, Adeeb Saleh, Sofana Bella, Hilal Alkatteeb and S.A., a minor through her Parent and Next Friend, Hilal Alkatteeb**

/s/ Miriam Aukerman
Miriam Aukerman (P63165)
American Civil Liberties Union Fund
of Michigan
1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org


/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org

/s/ Samuel R. Bagenstos
Samuel R. Bagenstos (P73971)
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 647-7584
sbagen@gmail.com


/s/ Margo Schlanger
Margo Schlanger (N.Y. Bar
#2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

/s/ Jason C. Raofield

Jason C. Raofield (D.C. Bar #463877)
Covington & Burling LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5072
jraofield@cov.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J. Stephanie D. Davis

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS ................................................................... 2

I.  Plaintiffs Plausibly Allege that the Executive Order Is Motivated By Religious Animus, and that the National Security Justification Is a Pretext. .................................................................................................. 2

    A.  The Record Is Replete with Public Statements Confirming that the Executive Order's Intent was to Prevent Immigration by Muslims. ............................................................................................ 2

    B.  The Nationality-Based National Security Justification Was Developed as a Pretext. ........................................................................ 3

    C.  The Original Executive Order (January 27) ........................................ 4

    D.  The Revised Executive Order (March 6) ........................................... 5

    E.  The National Security Justification Is a Sham. .................................. 7

STANDARD OF REVIEW ................................................................... 8

ARGUMENT ........................................................................................ 10

I.  PLAINTIFFS' CLAIMS ARE JUSTICIABLE. ................................. 10

    A.  The Individual Plaintiffs Have Standing. .......................................... 10

        1.  Stigmatic Harm ........................................................................ 11

        2.  Separation of Families ............................................................. 15

        3.  Economic Harm ....................................................................... 19

    B.  The Organizational Plaintiffs Have Standing. ................................... 19

    C.  Plaintiffs' Claims are Ripe for Adjudication. .................................... 23

II.    THE FACT THAT THIS IS AN IMMIGRATION CASE DOES NOT
       DEPRIVE   THE   COURT   OF   ITS   POWER   TO   ADDRESS
       CONSTITUTIONAL VIOLATIONS. ......................................................... 24

       A.    The Immigration Context Does Not Insulate Constitutional
             Violations from Judicial Review........................................................ 24

       B.    Even If *Mandel* Applies, Whether the Asserted National Security
             Purpose Is Bona Fide Is a Question of Fact that Cannot Be
             Decided on a Motion to Dismiss......................................................... 26

       C.    *Mandel* Does Not Apply. .................................................................. 28

III.   THE    COMPLAINT    STATES    PLAUSIBLE    CLAIMS    FOR
       VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS............ 30

       A.    The Complaint States an Establishment Clause Claim. ..................... 30

             1.    Plaintiffs Have Plausibly Alleged That The Purpose of the
                   Executive Order Is Religious, Not Secular............................. 31

             2.    Plaintiffs Have Plausibly Alleged that the Effect of the
                   Executive Order Is to Endorse Religion. ................................ 34

             3.    This Court Is Entitled to Consider All Relevant Evidence
                   of the Purpose and Effect of the Revised EO. ........................ 37

       B.    The Complaint States an Equal Protection Claim.............................. 40

       C.    The Complaint States a Claim for Violation of Plaintiffs' Right
             to Free Speech and Association. ........................................................ 44

       CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ky. v. Grayson Cty.*,
   591 F.3d 837 (6th Cir. 2010) ...................................................................34

*ACRL v. Trump*,
   ECF #8 (Feb. 2, 2017) ...............................................................................5

*Adland v. Russ*,
   307 F.3d 471 (6th Cir. 2002) ...................................................................13

*Allen v. Wright*,
   468 U.S. 737 (1984) (abrogated on other grounds by *Lexmark Int'l,*
   *Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)) ....................12

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
   389 F.3d 536 (6th Cir. 2004) ................................................................19, 20, 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................9

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) ...............................................................14

*Aziz v. Trump*,
   No. 17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017)....................5, 25, 27

*Bangura v. Hansen*,
   434 F.3d 487, 496 (6th Cir. 2006) ............................................................18

*Barry v. Lyon*,
   834 F.3d 706 (6th Cir. 2016) ..............................................................20, 21

*Bays v. City of Fairborn*,
   668 F.3d 814 (6th Cir. 2012) ....................................................................45

*Brownell v. We Shung*,
   352 U.S. 180 (1956)...................................................................................18

*Cardenas v. United States*,
  826 F.3d 1164 (9th Cir. 2016) ....................................................26

*Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010) (*en banc*) ...................................11, 14

*Chae Chan Ping v. United States*,
  130 U.S. 581 (1889) ...................................................................27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ...................................................................37

*City of Cleburne v. Cleburne Living Center, Inc.*,
  473 U.S. 432 (1985) ...................................................................41

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...................................................................19

*Courtney v. Smith*,
  297 F.3d 455 (6th Cir. 2002) ......................................................17

*Darweesh v. Trump*,
  No. 17-cv-480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017) ..............5

*Edwards v. Aguillard*,
  482 U.S. 578 (1987) ...................................................................38

*Epperson v. Arkansas*,
  393 U.S. 97 (1968) .....................................................................38

*F.R.C. Int'l, Inc. v. United States*,
  278 F.3d 641 (6th Cir. 2002) ........................................................8

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ...................................................25, 29, 40, 41

*Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*,
  491 F.3d 320 (6th Cir. 2007) ....................................................9, 10

*Glassman v. Arlington City*,
  628 F.3d 140 (4th Cir. 2010) .......................................................39

*Glassroth v. Moore*,
   335 F.3d 1282 (11th Cir. 2003) ...........................................................................38

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006)............................................................................................38

*Handy-Clay v. City of Memphis*,
   695 F.3d 531 (6th Cir. 2012) ...............................................................................9

*Harbin-Bey v. Rutter*,
   420 F.3d 571 (6th Cir. 2005) .............................................................................41

*Hawai'i v. Trump*,
   No. 17-00050, 2017 WL 1167383 (D. Haw. Mar. 29, 2017)...........25, 31, 33, 35

*Hawai'i v. Trump*,
   No. 17-00050, 2017 WL 1011673 (D. Haw. Mar. 15, 2017).....................*passim*

*Hernandez v. CIR*,
   490 U.S. 680 (1989)............................................................................................37

*INS v. Chadha*,
   462 U.S. 919 (1983)............................................................................................25

*INS v. Pangilinan*,
   486 U.S. 875 (1988)............................................................................................27

*Int'l Refugee Assistance Project ("IRAP") v. Trump*,
   No. 17- 0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017)........................*passim*

*Kerry v. Din*,
   135 S. Ct. 2128, 2141 (2015)......................................................................26, 28

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972).....................................................................................*passim*

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004)............................................................................................20

*Larson v. Valente*,
   456 U.S. 228, 255 (1982)....................................................................................31

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)...............................................................30, 34, 37

*United States ex rel. London v. Phelps*,
   22 F.2d 288 (2d Cir. 1927) ...............................................................17

*Lowe v. SEC*,
   472 U.S. 181 (1985)...........................................................................26

*Mandel. Bertrand v. Sava*,
   684 F.2d 204 (2d Cir. 1982) .............................................................27

*McCormick v. Miami Univ.*,
   693 F.3d 654 (6th Cir. 2012) ..............................................................9

*McCreary Cty. v. ACLU*,
   545 U.S. 844 (2005).................................................................*passim*

*Modrovich v. Allegheny Cty.*.
   385 F.3d 397 (3d Cir. 2004) .............................................................39

*Moss v. Spartanburg Cty. Sch. Dist. Seven*,
   683 F.3d 599 (4th Cir. 2012) ............................................................13

*Mulligan v. Schultz*,
   848 F.2d 655 (5th Cir. 1988) ............................................................17

*N.E. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of
   Jacksonville*,
   508 U.S. 656 (1993)...........................................................................24

*Nadarajah v. Gonzales*,
   443 F.3d 1069 (9th Cir. 2006) ..........................................................27

*Nguyen v. INS*,
   533 U.S. 53 (2001).............................................................................41

*Ohio Nat'l Life Ins. Co. v. United States*,
   922 F.2d 320 (6th Cir. 1990) ............................................................10

*Parsons v. U.S. Dep't of Justice*,
   801 F.3d 701 (6th Cir. 2015) ......................................................10, 11

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007)...................................................................17

*Peoples Rights Org. v. City of Columbus*,
   152 F.3d 522 (6th Cir. 1998) ............................................................41

*Phelps v. Hamilton*,
   59 F.3d 1058 (10th Cir. 1995) ..........................................................39

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ..............................................36, 41, 42

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000).....................................................................23, 34

*Sarsour v. Trump*,
   No. 17-cv-120, 2017 WL 1113305 (E.D. Va. Mar. 24, 2017) ...................*passim*

*Smith v. City of Cleveland Heights*,
   760 F.2d 720 (6th Cir. 1985) ............................................................13

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
   641 F.3d 197 (6th Cir. 2011) (*en banc*)...........................................18

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
   788 F.3d 580 (6th Cir. 2015) ............................................................34

*Stanley v. Georgia*,
   394 U.S. 557 (1969).........................................................................44

*United States v. Chem. Found.*,
   272 U.S. 1 (1926).............................................................................40

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
   454 U.S. 464 (1982).........................................................................14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).....................................................................42, 43

*Washington v. Davis*,
   426 U.S. 229 (1976).........................................................................42

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ...................................................................*passim*

*Washington v. Trump*,
    No. 17-cv-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) ...........................5

*Weinbaum v. City of Las Cruces*,
    541 F.3d 1017 (10th Cir. 2008) ...........................................................................39

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)...............................................................................................24

**Statutes**

8 U.S.C. § 1152(a)(1)(A) ...........................................................................................29

8 U.S.C. § 1187 ..........................................................................................................36

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ...............................................................26

## **INTRODUCTION**

Although other courts have enjoined the Revised Executive Order ("Revised EO") after finding that plaintiffs had satisfied the much more stringent standard of establishing likelihood of success on the merits, Defendants nevertheless ask this Court to conclude that Plaintiffs have not even plausibly alleged a claim sufficient to overcome a motion to dismiss. Even the lone court that declined to enjoin the Revised EO did so only because "[p]laintiffs have not made a clear showing that they are likely to succeed on the merits." *Sarsour v. Trump*, No. 17-cv-120, 2017 WL 1113305, at *12 (E.D. Va. Mar. 24, 2017).

It is therefore no surprise that much of Defendants' motion to dismiss is spent ignoring and resisting the well-pleaded factual allegations of the Second Amended Complaint ("SAC" or "Complaint"). For example, the Complaint contains extensive factual allegations showing that the Revised EO is based on religious animus and that the national security interests identified by Defendants are mere pretext. Ignoring those allegations, Defendants repeatedly insist that "the Order is based solely on national security interests."[1] *See* Br. Pg. ID 1036. Thus, the motion is

---

[1] Courts have reached the opposite conclusion. *See, e.g., Hawai'i v. Trump*, No. 17-00050, 2017 WL 1011673, at *14 (D. Haw. Mar. 15, 2017) ("Any reasonable, objective observer would conclude . . . that the stated secular purpose of the Executive Order is, at the very least, 'secondary to a religious objective' of temporarily suspending the entry of Muslims." (citations omitted)).

1

premised on assertions directly at odds with Plaintiffs' detailed factual allegations, which must be accepted as true for purposes of this motion.

Next, Defendants argue that it is irrelevant whether the Order was motivated by religious animus or whether its after-the-fact justification is pretextual. According to Defendants, because the Revised EO deals with immigration and makes no express mention of religion, it is immune from judicial review. As other courts reviewing the Executive Orders have *universally* held, however, the Constitution is not so feeble. The Court should deny Defendants' motion to dismiss.

## STATEMENT OF FACTS

I.  **Plaintiffs Plausibly Allege that the Executive Order Is Motivated By Religious Animus, and that the National Security Justification Is a Pretext.**

A.   The Record Is Replete with Public Statements Confirming that the Executive Order's Intent was to Prevent Immigration by Muslims.

Beginning in December 2015, then-Candidate Trump called for a "total and complete shutdown of Muslims entering the United States." SAC ¶¶ 1, 54. In a statement that remains on his website to this day, he insisted this Muslim ban was necessary because "there is great hatred towards Americans by large segments of the Muslim population." *Id.* ¶ 56. This followed a series of interviews in which Candidate Trump said he would shut down mosques and require Muslims in the United States to register with the government. *Id.* ¶ 61.

The ban on Muslim immigration became a cornerstone of the Trump campaign. The rationale was simple: "Islam hates us," and "we can't allow people coming into this country who have this hatred of the United States." *Id.* ¶ 63. When asked during a debate whether his comments referred to all Muslims worldwide, he responded, "I mean a lot of them!" *Id.* ¶ 64. "There is tremendous hate. Where large portions of a group of people, Islam, large portions want to use very, very harsh means." *Id.* He also accused "Muslim communities" of refusing to "turn in the people who they know are bad—and they do know where they are." *Id.* ¶ 67.

B.    The Nationality-Based National Security Justification Was Developed as a Pretext.

Following widespread condemnation of his proposed Muslim ban, Candidate Trump sought to develop a pretextual justification to ban entry by Muslims. He asked Rudolph Giuliani to put together a "commission" to help him design a Muslim ban, and to "show [him] the right way to do it legally.'" *Id.* ¶¶ 69-70. The commission recommended that nationality be used as a proxy for religion. *Id.* ¶¶ 71-72. As a result, Candidate Trump modified his proposal: "People were so upset when I used the word 'Muslim' . . . . And I'm okay with that, because I'm talking territory instead of Muslim." *Id.* ¶ 73. But when asked whether this was a "rollback" from his proposed "Muslim ban," he said "I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territory." *Id.* Shortly before the

3

election, Candidate Trump said his proposed "Muslim ban" had "morphed into extreme vetting from certain areas of the world." *Id.* ¶ 76.

Following the election, President-elect Trump again confirmed his intentions. For example, in December 2016, when asked if he had changed his plan to "ban Muslim immigration," he stated: "Hey, you've known my plans all along and it's, they've proven to be right. 100 percent correct." *Id.* ¶ 84.

C.    The Original Executive Order (January 27)

President Trump wasted no time. Just seven days after taking office, he issued an Executive Order based on the approach suggested by the Giuliani commission. It banned entry by nationals of seven predominantly Muslim countries for 90 days, and provided a mechanism to extend the ban thereafter. *Id.* ¶¶ 94, 96. It also suspended the U.S. Refugee Assistance Program for 120 days, lowered the annual number of refugee admissions for fiscal year 2017 from 110,000 to 50,000, created a preference for refugees of minority religions, and banned Syrian refugees indefinitely. *Id.* ¶¶ 98-104. Moreover, the White House bypassed regular channels for input from other components of the Executive Branch, including the Secretaries of State, Defense, and Homeland Security. *Id.* ¶ 110-113.

The Executive Order went into effect immediately. *Id.* ¶ 121. Chaos ensued, resulting in widespread civil rights abuses at airports, demonstrations nationwide,

and emergency litigation across the country. *Id.* ¶ 4. The next day, a district court in New York issued a nationwide stay of deportations under the Order. *Darweesh v. Trump*, No. 17-cv-480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017). This Court and other district courts soon enjoined significant portions of the Order. *ACRL v. Trump*, ECF #8 (Feb. 2, 2017); *Aziz v. Trump*, No. 17-cv-116, 2017 WL 580855, at *8-9 (E.D. Va. Feb. 13, 2017) (holding that the Order likely violated the Establishment Clause); *Washington v. Trump*, No. 17-cv-141, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) (enjoining the Order nationwide).

The Government appealed the injunction entered in *Washington v. Trump*. SAC ¶ 133. Following oral argument, the Ninth Circuit denied the Government's motion for a stay pending appeal, noting that "although courts owe considerable deference to the President's policy determinations with respect to immigration and national security, it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

D.   The Revised Executive Order (March 6)

After the Ninth Circuit declined to order a stay, the White House announced that a revised executive order would be issued. President Trump stated that "we can tailor the order to [the Ninth Circuit] decision and get just about everything, in some

5

ways, more." SAC ¶ 140. Press Secretary Sean Spicer confirmed that "the goal is obviously to maintain the way that we did it the first time." *Id.* ¶ 150. And senior advisor Stephen Miller said the revised order would contain "mostly minor, technical differences" and achieve "the same, basic policy outcome." *Id.* ¶ 141.

That is *exactly* what President Trump did when he issued the Revised EO on March 6. Indeed, President Trump himself described the new order as a "watered-down version of the first order." *Id.* ¶ 182. Thus, the Revised EO, like the Original EO, banned entry for 90 days by individuals from six of the original seven overwhelmingly Muslim countries, which have populations ranging from 90.7% to 99.8% Muslim. *Id.* ¶ 161. It again established procedures to extend the ban (or make it permanent). *Id.* ¶ 165. And it shut down the refugee program for 120 days, and reduced the annual number of refugees from 110,000 to 50,000. *Id.* ¶ 169.

In attempt to avoid further judicial scrutiny, however, several changes were made. Most obviously, to facilitate the Defendants' claim of facial neutrality, the express minority-religion preference and indefinite Syrian refugee ban were both removed. *Id.* ¶ 171. Despite the purported national security justification, individuals with recently approved visas were exempted, as were lawful permanent residents, dual nationals, and certain other non-citizens. *Id.* ¶ 163. And to create the appearance of agency consultation, the Defendants papered the file with a last-minute letter from

6

the Departments of Justice and Homeland Security. Br. Pg. ID 1017 (citing March 6 letter as proof that the Revised EO was issued "at the urging of the Attorney General and Secretary of Homeland Security").

E.     The National Security Justification Is a Sham.

The revised version of the executive order asserted the same rationale as the original—*i.e.,* providing time for a review of visa-issuance and refugee admissions procedures—even though some 48 days had already passed between implementation of the two orders. The Revised EO now identified factual information purportedly justifying a ban on entry by individuals from the six designated countries.[2] However, as Plaintiffs have alleged in detail, in February 2017, President Trump had ordered the Department of Homeland Security ("DHS") to collect intelligence that could be used to justify his actions. SAC ¶¶ 142-44. The effort backfired, because the resulting intelligence reports *expressly refuted* the purported national security justification. *Id.* ¶ 145 (concluding that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity" and, in any event, only 3 of the 82 foreign-born individuals involved in terrorist activities in the U.S. since 2011 were

---

[2] The Revised EO pointed to only two concrete examples of persons who have committed terrorism-related crimes in the U.S. after either entering legally on visas or as refugees: a case involving Iraqi nationals (who are no longer banned) and a case involving a Somali native who came to the U.S. as a child. Revised EO § 1(h).

from one of the six designated countries); *id.* ¶ 146 (concluding that "most foreign-born, U.S.-based violent extremists likely radicalized several years *after* their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry") (emphasis added).

Even intelligence reports demonstrating the *absence* of any correlation between terrorism and individuals from the six countries could not deter President Trump. Thus, the Revised EO simply ignored those reports, and instead excerpted passages from a 2015 State Department report describing conditions in the six countries generally, and then declared without any basis that those conditions "demonstrate why their nationals continue to present heightened risks to the security of the United States." Revised EO § 1(e).

In sum, the operative facts here are those alleged in the Complaint. Those facts are that the Revised EO was motivated by religious animus and that the national security justification is a mere pretext.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) and 12(b)(6). *See* Br. Pg. ID 1020-21.[3] In considering a Rule 12(b)(6) motion to dismiss for failure to state a

---

[3] Judgment on the pleadings pursuant to Rule 12(c), which Defendants also seek, is plainly improper, since Defendants have not yet answered the Complaint. *See, e.g.*, *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 642 (6th Cir. 2002).

claim, a court must "assume the veracity of [plaintiff's] well-pleaded factual allegations." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The factual allegations must merely "state a claim to relief that is plausible on its face," by "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" based on the court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 678–79. All reasonable inferences must be drawn in the plaintiff's favor. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

Here, the inquiry under Rule 12(b)(1) collapses into the Rule 12(b)(6) inquiry. Defendants largely make legal arguments that the Court lacks jurisdiction, insisting Plaintiffs lack standing because their claims are either unripe or are not directed at the Plaintiffs themselves. *See* Br. Pg. ID 1022-27. In considering such a "facial attack on [] subject-matter jurisdiction," the Court must "take[] the allegations in the complaint as true," giving them the same deference they would be afforded under Rule 12(b)(6). *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). To the extent Defendants challenge the factual basis of subject matter jurisdiction by arguing, for instance, that the Revised EO is not motivated by anti-Muslim animus, *see* Br. Pg. ID 1025-27, their argument "implicates an element of the cause of action," *e.g.* whether there is an Establishment Clause violation.

9

*Gentek*, 491 F.3d at 330.[4] Therefore, the Court must accept Plaintiffs' facts as true, "*find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim." *Id.* (citation omitted) (emphasis in original).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE JUSTICIABLE.

To have standing, Plaintiffs must show (1) an "injury in fact"; (2) that "the injury fairly can be traced to the challenged action"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710, 713, 715 (6th Cir. 2015) (internal quotation marks omitted). Defendants do not even attempt an individualized review of the stigmatic harms, financial losses, or injuries from family separation that the complaint details for each Plaintiff. SAC ¶¶ 213-343.

### A.   The Individual Plaintiffs Have Standing.

The individual Plaintiffs readily satisfy these requirements. These Plaintiffs suffer three distinct injuries: stigma, family separation, and economic cost. Each of these injuries is directly traceable to the Revised EO and can be redressed by an

---

[4] If the Court concludes examination of jurisdictional facts is necessary to resolve certain of Defendants' arguments, the Court should allow discovery and invite submission of evidence, as the "trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

10

injunction. In other cases challenging the Executive Orders, courts have found standing based on such injuries. *See Washington*, 847 F.3d at 1159; *Sarsour*, 2017 WL 1113305, at *5; *Int'l Refugee Assistance Project ("IRAP") v. Trump*, No. 17-0361, 2017 WL 1018235, at *5-6 (D. Md. Mar. 16, 2017); *Hawai'i v. Trump*, No. 17-00050, 2017 WL 1011673, at *9-10 (D. Haw. Mar. 15, 2017).

### 1.   Stigmatic Harm

The Executive Orders stigmatize Muslims, thereby harming the individual Muslim Plaintiffs and the Muslim members and clients of the organizational Plaintiffs. SAC ¶¶ 18-34; *see also Parsons*, 801 F.3d at 712 ("Stigmatization . . . constitutes an injury in fact for standing purposes."). "The Executive Orders convey an official message of disapproval and hostility towards Muslims, making clear that the government deems them outsiders, not full members of the political community." SAC ¶ 213. The Revised EO, in particular, conveys to Plaintiffs the message "that the United States discriminates against individuals who share their ethnicity and who hold the same religious beliefs, including members of their own families." *Id.* ¶ 214.

The Revised EO is thus "a daily experience of contact with a government that officially condemns one's religion." *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1052 n.33 (9th Cir. 2010) (*en banc*). As members of the religion that is singled out for particular condemnation—and as

11

individuals denied the opportunity to live with their families in the United States because of it—the individual Plaintiffs have been "personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)) (internal quotation marks omitted); *see also Hawai'i*, 2017 WL 1011673, at *16 (stigma provided standing to challenge the Revised EO); *Sarsour*, 2017 WL 1113305, at *5 (stigma combined with family separation and travel limitations gave standing to challenge the Revised EO).

Because stigma pervades the entire Revised EO, Defendants are wrong to suggest that Plaintiffs' standing is limited to challenging Section 2(c).[5] Br. Pg. ID

---

[5] Plaintiffs specially allege that "the March 6 Order" (not just one subsection) "reinforces stereotypes about Muslims and associates Muslims with violence, bigotry and hatred, thereby discriminating against them and inflicting stigmatic and dignitary harms, among other types of injury." SAC ¶ 177; *see also id.* ¶¶ 213-15. Other sections of the Revised EO are arguably even more explicit than Section 2(c) in denigrating Muslims. For example, Section 11 of the Revised EO orders publication of information about "foreign nationals" involved in "so-called 'honor killings,'" echoing "then-Candidate Trump's broad statements disparaging Islam and Muslims." *Id.* ¶ 178. Moreover, many of the injuries experienced by the organizational plaintiffs, their members, and their clients stem from the refugee provisions in Section 6 of the Revised EO. *Id.* ¶¶ 218-19 (ACRL members separated from family due to refugee provision); ¶ 229 (ACLU members unable to provide assistance to refugees as matter of religious conviction); ¶ 246 (Chamber's members hire refugees, and Revised EO makes it more difficult and expensive to recruit, hire, and retain the best employees); ¶ 248 (Chamber's members include refugee-run businesses whom the Revised EO "subject[s] to baseless suspicion, scrutiny, and

1014. In *Smith v. City of Cleveland Heights*, 760 F.2d 720, 722 (6th Cir. 1985), the Sixth Circuit held that "noneconomic 'stigmatic' injury" gave standing to a black resident to challenge a city policy that deterred other African Americans from moving into the community. The court concluded that the city's action had "label[ed]" African Americans "as undesirable for purposes of housing policy" and thus forced "the black citizen [to] live on a daily basis with a sense of disrespect officially established as law." *Id.* at 722-23. So too here.

Because "one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are *outsiders,* not full members of the political community,'" stigmatic injury is particularly important in Establishment Clause cases. *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012) (quoting *McCreary Cty. v. ACLU,* 545 U.S. 844, 860 (2005)) (emphasis in *Moss*). An Establishment Clause plaintiff has standing if he has experienced "direct and unwelcome contact" with an exclusionary religious message. *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002). Where, as here, the Government has gone further and officially condemned Plaintiffs' religion, that action goes "beyond the 'personal and

---

social isolation"); ¶¶ 252, 256-62 (describing harm to ACC's refugee clients and ACC's refugee-assistance programs).

unwelcome contact' that suffices for standing." *Awad v. Ziriax*, 670 F.3d 1111, 1122 (10th Cir. 2012); *see also Catholic League*, 624 F.3d at 1052 (plaintiffs had standing to challenge city council resolution based on its anti-Catholic message).

Contrary to Defendants' suggestion (Br. Pg. ID 1024-25), this case is nothing like *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). There the plaintiffs challenged a transfer of property to a religious organization with which they had no dealings; the transfer did not target or affect them in any way. *Id.* at 486-87. They "claim[ed] nothing" in the way of injury besides the constitutional violation itself. *Id.* at 485. The Court held that the presumed "psychological consequence" produced by the mere "observation of conduct with which one disagrees" was, by itself, insufficient for standing. *Id.* Unlike in *Valley Forge*, Plaintiffs here are challenging an action that targets *their* religion for condemnation. *See Awad*, 670 F.3d at 1122-23 (official action that "condemns [plaintiff's] religious faith and exposes him to disfavored treatment" goes "significantly beyond a 'psychological consequence' from disagreement with observed government conduct"); *Catholic League*, 624 F.3d at 1052 (stigmatic injury is sufficiently "concrete harm where the 'psychological consequence' is produced by government condemnation of one's own religion or endorsement of

14

another's in one's own community"). Defendants' reliance on cases where there was no such condemnation is misplaced.[6]

2.    Separation of Families

The Revised EO kept the individual Plaintiffs apart from close family members—including spouses, children, and a parent—some of whom remain in conflict-torn areas. Plaintiffs Hend and Salim Alshawish are unable to live in the United States with their 11- and 15-year-old Yemeni-citizen children, because the Revised EO bars the children from entering the country. SAC ¶¶ 275-89. Mr. Alshawish (a U.S. citizen) is thus living in Egypt to care for those children, while Ms. Alshawish (a lawful permanent resident of the United States) remains in this country to care for their two younger U.S. citizen children. *Id.* ¶¶ 287-89. Plaintiff Yousef Abdullah (a U.S. citizen) was impeded from moving to the United States with his wife Hanan Alafif, a citizen of Yemen whom the Revised EO barred from entering the country; Ms. Alafif was thus forced to live separately not only from her husband but from her six- and three-year-old U.S. citizen children, for whom Mr. Abdullah is the caregiver. *Id.* ¶¶ 303-12. Plaintiff Adeeb Saleh (a U.S. citizen) cannot

---

[6] *See* Br. Pg. ID 1024-25 (citing *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) (challenge to tuition tax credit); *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815 (7th Cir. 2014) (challenge to parsonage tax exemption); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007 (9th Cir. 2010) (challenge to recitation of Pledge of Allegiance)).

return to the country with his wife Amira Aleshawi (a Yemeni citizen); Mr. Saleh, Ms. Aleshawi, and their infant son currently reside in Indonesia, while their three U.S. citizen daughters remain in the United States with other family members. *Id.* ¶¶ 313-22. Plaintiff Mohamed Alshega (a U.S. citizen) was prevented from bringing to the United States his son, a citizen of Yemen whom the Revised EO barred from entering the country. *Id.* ¶¶ 297-302. Plaintiff Hilal Alkatteeb (a U.S. citizen) and his two-year-old daughter, Plaintiff S.A. (a U.S. citizen), were impeded from living in the United States with Mr. Alkatteeb's wife and S.A.'s mother, Rim Shamsan (a Yemeni citizen). ¶¶ 328-40. Plaintiff Fahmi Jahaf (a U.S. citizen) cannot live in the United States with his non-citizen wife, because the Revised EO barred her from receiving a visa to enter the country. *Id.* ¶¶ 291-96. And Plaintiff Sofana Bella (a U.S. citizen) was forced to postpone her wedding to her fiancé (a citizen of Sudan) because the Revised EO barred him from entering the country. *Id.* ¶¶ 323-27.

Defendants suggest that the family separation resulting from the Revised EO does not constitute sufficient injury. As other courts considering the EOs have found, however, this injury is legally cognizable. *See IRAP*, 2017 WL 1018235, at *6 ("Individual Plaintiffs who seek the entry of family members from the Designated Countries into the United States face the same harm of continuing separation from their respective family members"); *Hawai'i*, 2017 WL 1011673, at *9 (finding

standing for American citizen plaintiff because "his mother-in-law will be unable to enter the country"); *Washington*, 847 F.3d at 1159 (finding standing for challenge to Original EO because it separated university students from "their families abroad").[7] These decisions are fully consistent with other case law finding that immigration decisions denying an American citizen the opportunity to live in the United States with his family create sufficient injury to confer standing. *See, e.g.*, *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007).

Defendants incorrectly argue that the doctrine of consular nonreviewability bars the individual Plaintiffs from asserting injuries based on the separation from their families. Br. Pg. ID 1022-1023. The individual Plaintiffs "are not challenging the discretion of consuls" in ruling on visa applications. *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988). Instead, they are attacking a categorical policy decision embodied in the Revised EO—a policy decision that causes them injury. Consular nonreviewability does not bar challenges to such policies. *See id.*[8]

---

[7] The Sixth Circuit has said that even a 700-mile "geographic separation from [one's] family," with "the associated inconvenience and expense" of traveling "each weekend to be with them, might be a sufficient injury" under Article III. *Courtney v. Smith*, 297 F.3d 455, 460 (6th Cir. 2002). Here, the geographic separation is thousands of miles; it requires crossing an international border; and the Revised EO would completely prevent many of the Plaintiffs from even visiting their family.

[8] None of Defendants' cases (Br. Pg. ID 1023) are to the contrary. Indeed, the court in *United States ex rel. London v. Phelps*, 22 F.2d 288, 289-90 (2d Cir. 1927), considered the merits of a categorical challenge to an executive order requiring

17

Defendants' arguments that Plaintiffs lack third-party standing are similarly misplaced. Br. Pg. ID 1026-27. Defendants ignore that the individual Plaintiffs are asserting their *own* constitutional rights not to be condemned and targeted for unequal treatment because of their religion and ethnicity, and the organizational Plaintiffs are asserting those same rights for their members and clients. *See, e.g.,* SAC ¶¶ 213-15, 222, 229, 247-48, 253. Thus the fact that the individual Plaintiffs, as well as members and clients of the organizational Plaintiffs, are Muslim is not "entirely immaterial" (*cf.* Br. Pg. ID 1027) to the harm they suffer, but rather central the effect that Defendants' discriminatory EO has on them. *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 207 (6th Cir. 2011) (*en banc*), on which Defendants rely, involved no such condemnation. There, teachers sued to challenge their school board's decision—which in no way targeted the teachers' religion—to move certain services to a religious school at public expense. *See id.* at 202-04, 207. The contrast with the direct and targeted condemnation of the religion of Plaintiffs here is striking.

---

Canadian entrants to obtain a visa, much as Plaintiffs ask the Court to do here. In *Brownell v. We Shung*, the Court never analyzed consular nonreviewability, despite glancing at the issue in two footnotes. 352 U.S. 180, 184 n.3, 185 n.6 (1956). *Bangura v. Hansen* is inapposite, because it too did not address consular nonreviewability, and, in any event, Plaintiffs are not asserting a claim based on a substantive due process right to marry. 434 F.3d 487, 496 (6th Cir. 2006).

18

### 3. Economic Harm

The EOs have caused the individual Plaintiffs significant financial loss. *See Clinton v. City of New York*, 524 U.S. 417, 432 (1998) (financial loss qualifies as "injury in fact"). Mr. Alshawish is unable to work at his job at a U.S. grocery store because he is abroad caring for his Yemeni-citizen children. SAC ¶ 290. Mr. Abdullah must take significant unpaid time away from work to obtain medical treatment for his three-year-old U.S. citizen child, who has Type I diabetes; if his wife were allowed to enter the country, he could avoid that expense. *Id.* ¶ 306. Mr. Saleh has depleted more than $50,000 in savings and incurred substantial debt to travel to his family abroad. *Id.* ¶ 320. And Mr. Alkatteeb has spent approximately $70,000 to join his family in Malaysia, where neither he nor his wife has permission to work. *Id.* ¶ 332.

### B. The Organizational Plaintiffs Have Standing.

Defendants make little effort to challenge the standing of the five organizational Plaintiffs. An organization may have standing to sue in three ways. First, it "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Second, a

19

membership association may have standing to sue as a representative of its members. *Id.* at 541. An organization has associational standing if its "members have standing; if the interests at stake are relevant to the organization's purpose; and if the claims and relief do not require the participation of individual members." *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016). Finally, an organization has standing to assert the rights of its clients where the organization and the clients have a sufficiently close relationship, and the clients face a "hindrance" in protecting their own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130-134 (2004).

Each of the Plaintiff organizations has members who have been condemned, stigmatized, and otherwise materially injured by the Revised EO. The Revised EO condemns and stigmatizes Muslim members of all of the plaintiff organizations. SAC ¶¶ 213-15, 222, 247-48, 253. It also interferes with the ability of ACLU and AASA members to hear from and associate with individuals from the Designated Countries. *Id.* ¶¶ 230-41, 268, 271. It interferes with the ability of ACLU members "to live out the teaching of their faiths, to interact with co-religionists and members of other faiths, and to provide assistance to immigrants and refugees as a matter of religious conviction." *Id.* ¶ 229. It has limited the ability of members of the ACRL and the Chamber to travel outside of the country, for fear that they will not be readmitted once they leave. *Id.* ¶¶ 220, 250. It has interfered with the ability of

20

members of the Chamber, the ACC, and the AASA to conduct business. *Id.* ¶¶ 245, 250, 262, 273. And it has interfered with hiring, contracting, and student recruitment by members of the Chamber and the AASA. *Id.* ¶¶ 246, 268, 270. *See Washington*, 847 F.3d at 1160-61 (finding similar harms to proprietary interests of state universities sufficient for standing). These injuries are directly related to the missions of the plaintiff organizations. And "because the declaratory and injunctive relief sought pertains to the [Defendants'] policy as a whole," the case "does not require the participation of individual members to resolve." *Barry*, 834 F.3d at 716.

Two of the organizational Plaintiffs, ACRL and ACC, have clients who have been injured by the Revised EO. SAC ¶¶ 222, 252-53, 257-60, 263. These clients "face numerous hurdles to bringing suit in their own name, including language and cultural barriers, lack of financial resources, rising Islamophobia which would subject them to intense scrutiny if they participate in litigation, and fear of retaliation by the Defendants." *Id.* ¶¶ 224, 264; *see also id.* ¶¶ 18, 21.

The Revised EO also harms the organizations directly, giving them standing in their own right. The EO has adversely affected the Chamber's export certification and legalization services, and undermined its mission of encouraging business relationships between the U.S. and Arab nations. SAC ¶¶ 247, 249. The Revised EO, "by restricting the flow of clients for ACC's programs and affecting funding for

21

these programs, will have a significant financial impact on ACC;" ACC anticipates laying off staff and may not renew leases for offices housing the threatened programs. *Id.* ¶¶ 255-62. Plaintiffs ACRL, ACLU, and ACC have all had to devote time and resources to responding to the disruptions the Revised EO has caused to their members, clients, and communities. *Id.* ¶¶ 220, 223, 226, 254, 259-60. Such diversion of resources adversely affects the organizations' interests and thus supports standing. *See Am. Canoe*, 389 F.3d at 536, 546-47.

The Revised EO also violates the organizational Plaintiffs' rights under the Free Speech Clause of the First Amendment. The EO "directly interferes with [Plaintiff] ACLU's ability to plan for and hold" a "Voices of the Muslim Ban" event that it is organizing, because the EO "will either prevent the ACLU from bringing in the ACLU's desired speakers or will create obstacles to bringing in those speakers that would not exist for speakers who are not from the Muslim-majority Designated Countries." SAC ¶¶ 236, 237. And the EO impedes plaintiff AASA "from inviting scholars from the Designated Countries to present at academic conferences and engage in other collaborative research and scholarship projects." *Id.* ¶ 271. Defendants essentially acknowledge that the organizational Plaintiffs have standing to assert these claims. *See* Br. Pg. ID 1027.

C.    Plaintiffs' Claims are Ripe for Adjudication.

Defendants argue that Plaintiffs' claims are not ripe, because the ban on visas is subject to discretionary waivers. (Br. Pg. ID 1023-24.) That argument has been rejected by other courts. *Hawai'i*, 2017 WL 1011673, at *11; *IRAP*, 2017 WL 1018235, at *7.

Regardless of the prospect that a waiver might be granted in the future, Plaintiffs experienced immediate stigmatic injury from the moment the Revised EO was promulgated and targeted Muslims for condemnation. The Supreme Court has held that "the mere passage" of "a policy that has the purpose and perception of government establishment of religion" imposes an immediate harm, even if that policy has not yet been implemented to advance or attack a religion. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 314 (2000) (allowing challenge to policy that permitted religious invocations at school football games, even before it was certain that religious invocations would be presented).

Moreover, the waiver process under the Revised EO itself imposes onerous burdens. SAC ¶ 343. To obtain a waiver, an applicant must demonstrate (a) "undue hardship"; (b) "that his or her entry would not pose a threat to national security"; and (c) that the waiver "would be in the national interest." Revised EO, § 3(c). It is unclear whether the individual Plaintiffs' loved ones (or those of the organizational

23

Plaintiffs' members) are eligible for a waiver, whether such a waiver would be granted, or how long the process will take. *Id.* ¶ 341. Even a successful waiver application will entail additional time and expense, particularly because consular processing for individuals from the Designated Countries frequently requires travel to a U.S. embassy in a third country. *Id.* ¶ 342; *see also id.* ¶¶ 233-41 (explaining how waiver process makes it more complicated for the ACLU to organize the "Voices of the Muslim Ban" event). By singling out individuals from the Designated Countries for these burdens, the Revised EO imposes a concrete harm that creates a justiciable controversy now, regardless of whether the Plaintiffs' loved ones might ultimately succeed in obtaining a waiver. *N.E. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

## II. THE FACT THAT THIS IS AN IMMIGRATION CASE DOES NOT DEPRIVE THE COURT OF ITS POWER TO ADDRESS CONSTITUTIONAL VIOLATIONS.

### A. The Immigration Context Does Not Insulate Constitutional Violations from Judicial Review.

The thrust of the Government's argument is that the normal rules of constitutional review do not apply because this is an immigration case, and that therefore this Court has no power to review executive immigration actions. That is simply incorrect. Executive action on immigration is "subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). Courts

24

retain their "responsibility under the Constitution" in immigration cases, *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977), and can review whether the political branches are implementing their power over immigration matters through "constitutionally permissible means." *INS v. Chadha*, 462 U.S. 919, 941 (1983).

Given this framework, it is no surprise that courts reviewing the Executive Orders have *universally* rejected the Government's argument that executive immigration actions are unreviewable. *Hawai'i v. Trump*, No. 17-00050, 2017 WL 1167383, at *6 (D. Haw. Mar. 29, 2017) (noting that every court to have considered the constitutionality of either executive order has rejected the Government's argument that the Court's review "ends at the Executive's door"); *IRAP*, 2017 WL 1018235, at *15; *Sarsour*, 2017 WL 1113305, at *11; *Aziz*, 2017 WL 580855, at *6 (Congress cannot "delegate to the president the power to violate the Constitution.").

In light of these decisions, the Government casts its argument of non-reviewability as one of judicial deference, insisting this Court may consider only whether the Revised EO's asserted national security purpose is "facially legitimate and bona fide." Br. Pg. ID 1031 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972)). That argument fails both because *Mandel* does not apply here and because, even if it did, Plaintiffs have plausibly alleged that the Revised EO's purpose is to discriminate against Muslims, so that the asserted purpose is not "bona fide."

25

B.   Even If *Mandel* Applies, Whether the Asserted National Security Purpose Is Bona Fide Is a Question of Fact that Cannot Be Decided on a Motion to Dismiss.

*Mandel* does not apply for the reasons set forth below. But if it did, *Mandel* would not, as the Government argues, permit the court simply to rubber-stamp executive actions despite evidence of unconstitutional motives. Rather, *Mandel* requires a justification that is both "facially legitimate" and "bona fide." 408 U.S. at 770. "Bona fide," of course, means "in good faith" or "without deceit or fraud." Black's Law Dictionary (10th ed. 2014); *see also Lowe v. SEC*, 472 U.S. 181, 208 (1985) (explaining that the term "bona fide" "translates best to 'genuine'").

A justification is not "bona fide" under *Mandel* if there is evidence of bad faith. *Cardenas v. United States*, 826 F.3d 1164, 1172 (9th Cir. 2016). Therefore, under the controlling opinion of Justice Kennedy in *Kerry v. Din*—a case the Government conveniently omits from its briefing—where the plaintiff makes an "affirmative showing of bad faith" that is "plausibly alleged with sufficient particularity," the court can look behind the Government's justification to test whether it is "bona fide." 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring in the judgment). Courts have not shied away from rejecting government rationales as failing this basic test. *See, e.g.*, *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082-83 (9th Cir. 2006) (rejecting assertion of national security risk as "based on facially

26

implausible evidence"); *Aziz*, 2017 WL 580855, at *8 ("If the proffered 'facially legitimate' reason has been given in 'bad faith,' it is not 'bona fide.").

Moreover, when the Government "discriminate[s] invidiously against a particular race or group," that "exercise of [government] power would not be 'legitimate and bona fide' within the meaning" of *Mandel*. *Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir. 1982). Thankfully, the years in which federal courts themselves endorsed invidious stereotypes to justify exclusionary immigration policy are long gone. *Compare Chae Chan Ping v. United States*, 130 U.S. 581, 595, 606 (1889) (Chinese Exclusion Case) (describing Chinese immigrants as "hordes" threatening to "overrun" the U.S.), *with INS v. Pangilinan*, 486 U.S. 875, 886 (1988) (giving careful consideration to allegations that racial animus against Filipinos infected immigration decision making).

Plaintiffs (here and around the country) have plausibly alleged that the asserted national security justification is not "bona fide" but is, rather, a pretext for religious discrimination.[9] Defendants dispute those allegations, asserting a national

---

[9] *See, e.g.*, SAC ¶¶ 53-128 (describing development of Original EO, including establishment of a commission under Mr. Giuliani charged with figuring out a legal way to create a Muslim ban); ¶¶ 142-44 (describing directives to DHS to develop reports to justify travel bans); ¶¶ 145-46 (describing findings of intelligence agencies that country of citizenship was unlikely to indicate future terrorist activity, and that entry restrictions would be ineffective); ¶¶ 147-49 (describing delay of Revised EO, despite alleged national security emergency, so that President could bask in positive

security justification. Br. Pg. ID 1033. On a motion to dismiss, however, Plaintiffs'
non-conclusory factual allegations must be accepted as true, and the Complaint more
than plausibly alleges that the purported national security justification is not "bona
fide," but rather is a pretext for discrimination.

C.   _Mandel_ Does Not Apply.

Given the factual dispute about whether there is a "bona fide" justification for
the Revised EO, the Court need not decide now whether _Mandel_ applies. But as other
courts have previously found, _Mandel_ deference is inapplicable here in any event.
_Washington_, 847 F.3d at 1162; _IRAP_, 2017 WL 1018235, at *16.

First, the "facially legitimate and bona fide" standard is typically applied to
congressional decisions, or individual visa denials implementing congressional
policy. _See, e.g., Din_, 135 S. Ct. at 2128. "The present case, by contrast, is not about
the application of a specifically enumerated congressional policy to the particular
facts presented in an individual visa application" but rather about "the
President's _promulgation_ of sweeping immigration policy." _Washington_, 847 F.3d
at 1162 (9th Cir. 2017). As the Ninth Circuit explained with respect to the Original

---

press coverage); ¶¶ 160-80 (describing similarities between Original and Revised
EOs); ¶ 182 (quoting President Trump as describing the Revised EO as a "watered-
down version of the first order"); ¶¶ 141, 150 (describing statements by executive
branch officials that purpose of Revised EO is the same as the Original EO).

EO, "[s]uch exercises of policymaking authority at the highest levels of the political branches are plainly not subject to the *Mandel* standard." *Id.*

The premise of *Mandel* was that *Congress*, not the Executive, has "plenary power to make rules for the admission of aliens." 408 U.S. at 766 (internal quotation marks omitted); *see also Fiallo*, 430 U.S. at 796 ("[T]he particular classes of aliens that shall be denied entry altogether . . . have been recognized as matters solely for the responsibility of the Congress . . . ." (internal quotation marks and citation omitted)). The Government cites no case—and as far as Plaintiffs are aware, there is none—applying *Mandel* to independent presidential policy.

Such deference would be particularly inappropriate where, as here, the President's actions exceed the authority that "Congress has delegated . . . to the Executive." *Mandel*, 408 U.S. at 769. While Congress has delegated certain immigration powers to the Executive, with respect to immigrant visas in particular—the type of visas at issue for the individual Plaintiffs in this case—Congress has also enacted a specific bar on nationality discrimination in 8 U.S.C. § 1152(a)(1)(A), which dictates that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." Because Congress did

29

not authorize the President to discriminate in making immigration policy, *Mandel* deference does not apply.

Second, Plaintiffs are not aware of any court having applied *Mandel* deference to an Establishment Clause or religious discrimination claim. As discussed in more detail below in Section III.A, the anti-Muslim message of the Revised EO violates the core Establishment Clause command that the government may not disfavor a particular religion. *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005). This injury does not depend on a visa denial to a particular individual (as in *Mandel*), but on the stigmatic harm the EO imposes on Muslims. This distinction reflects the role of the Establishment Clause as a structural restriction on the Government's authority to condemn any religion.

## III. THE COMPLAINT STATES PLAUSIBLE CLAIMS FOR VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS.

### A. The Complaint States an Establishment Clause Claim.

The facts alleged in the Complaint establish that the Revised EO violates the Establishment Clause. A government action satisfies the Establishment Clause only if it has a "secular . . . purpose," has a "primary effect . . . that neither advances nor inhibits religion," and does not "foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971) (internal citation and

quotation marks omitted). The EO fails this test,[10] as other courts have recognized in finding that the plaintiffs are likely to succeed on their Establishment Clause claims. *See Hawai'i*, 2017 WL 1167383, at \*6; *IRAP*, 2017 WL 1018235, at \*16.

1. Plaintiffs Have Plausibly Alleged That The Purpose of the Executive Order Is Religious, Not Secular.

When "a religious objective permeate[s] the government's action," it is impermissible. *McCreary*, 545 U.S. at 863. To determine the purpose of a government action, courts must examine "readily discoverable fact," including the "text, legislative history, and implementation" of the action, from the perspective of an "objective observer" "familiar with the history of the government's actions and competent to learn what history has to show." *Id.* at 862, 866. The court must also determine whether the Government's stated secular purpose was "genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864. While "savvy officials [who] had disguised their religious intent so cleverly" might escape an Establishment Clause violation, *id.* at 863, the same is not true when "the divisive thrust of the official action [is] inescapable," *id.* at 861, as it is here.

---

[10] Given the Order's targeting of Muslims, explicit anti-Muslim statements linked to the Order, the exceedingly thin non-discriminatory justifications provided by the government, and the history of its enactment, the Revised EO also fails the *Larson v. Valente* test, which imposes strict scrutiny on government action designed "to burden" "selected religious denominations." 456 U.S. 228, 255 (1982).

31

The facts alleged in the Complaint make clear that the Revised EO was the culmination of a longstanding effort by the President to exclude Muslims from the United States. As early as December 2015, Candidate Trump called "for a total and complete shutdown of Muslims entering the United States." SAC ¶ 1. In May 2016, he commissioned an effort to repackage this ban, asking Rudolph Giuliani to advise on "the right way to [ban Muslims] legally." *Id.* ¶ 70. He then explained in July 2016 that he had reframed his ban to target "territory instead of Muslim," which he lauded as a Muslim ban "expansion" rather than "rollback." *Id.* ¶ 73. In October 2016, he candidly disclosed that "[t]he Muslim ban . . . ha[d] morphed into extreme vetting from certain areas of the world." *Id.* ¶ 76.

On January 27, 2017, President Trump issued the Original EO, which, among other provisions, banned the entry of individuals from seven majority-Muslim countries (and no others), and expressly preferred refugee applications from "religious minorit[ies]," *i.e.*, non-Muslims. *Id.* ¶¶ 94-95, 99-101. After the courts enjoined enforcement of the Original EO, the President issued the Revised EO. The Government decided to retain "just about everything" the Original EO was intended to accomplish. *Id.* ¶ 140. Senior officials described the Revised EO as having "minor, technical differences" but the "same, basic policy outcome" in order "to maintain the way we did it the first time." *Id.* ¶¶ 141, 150. The Revised EO was thus

32

essentially the Original EO beneath a thin veneer. *See Hawai'i*, 2017 WL 1167383, at *7 (describing "efforts to sanitize [the Original EO's] refugee provision" (internal quotation omitted)).

The Revised EO justifies the travel ban as necessary because "the risk of erroneously permitting entry of a national of one of these [six] countries who intends to commit terrorist acts . . . is unacceptably high." Revised EO § 1(f). However, just one month before the Revised EO was issued, DHS reported that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." SAC ¶¶ 142-46. Other "indicia of pretext" include the fact that the White House delayed issuing the Revised EO to allow the President to bask in favorable press coverage from his congressional address on February 28, "which detracts from the national security urgency claimed by the Administration." *Hawai'i*, 2017 WL 1011673, at *15; SAC ¶¶ 147-49. And in a transparent attempt to bolster a post hoc fiction to justify the Revised EO, the Attorney General and Secretary of Homeland Security issued a letter on the very day the Revised EO was announced that claimed to propose that very policy. *See* Br. Pg. ID 1017.

These allegations denude the national security pretense of any shred of legitimacy, and are more than sufficient to survive a motion to dismiss. The Government challenges these factual allegations, instead characterizing the Revised

EO as having a "secular purpose" (Br. Pg. ID 1037). The Government's stated national security purpose is a blatant "litigating position," *McCreary*, 545 U.S. at 871, and not the EO's predominant purpose. In any event, the (even easier) question at this stage is whether Plaintiffs have made sufficiently plausible allegations to state a claim that the EO had an impermissible religious purpose. They have.

      2.    Plaintiffs Have Plausibly Alleged that the Effect of the Executive Order Is to Endorse Religion.

The Complaint also sufficiently alleges that the Revised EO violates the Establishment Clause because its "primary effect" is to "advance[] [or] inhibit[] religion." *Lemon*, 403 U.S. at 612-613. "[A] challenged governmental action has a religious effect where it 'is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their religious choices.'" *ACLU of Ky. v. Grayson Cty.*, 591 F.3d 837, 845 (6th Cir. 2010) (quoting *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 597 (1989)). A court considers this prong too from the perspective of "an objective observer, acquainted with the text, . . . history, and implementation'" of the action. *Grayson Cty.*, 591 F.3d at 854 (6th Cir. 2004) (quoting *Santa Fe*, 530 U.S. at 308). The critical question is whether the government action "conveys a message of endorsement or disapproval." *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 587 (6th Cir. 2015).

34

The allegations in the Complaint make clear that the Revised EO conveys a "message of . . . disapproval" of Islam. After months of widely publicized anti-Muslim statements by the President and his closest advisors, the Government imposed a ban on travel that affected only countries with populations that are more than 90% Muslim. SAC ¶ 161. It imposed additional screening procedures on people from Iraq, which is "more than 99% Muslim." *IRAP*, 2017 WL 1018235, at *2; SAC ¶ 168; Revised EO § 4. It suspended admissions of refugees, after a year when Muslims made up nearly half of the refugees settled in the United States, more than in any prior year. *See Hawai'i*, 2017 WL 1167383, at *8 n.6. And it did so weeks after the President had issued the Original EO, which, among other things, specifically favored the immigration of Christian refugees over Muslim refugees, and was later described by the President and his advisors as being intended to have the same effect as the Revised EO. SAC ¶¶ 100, 140-41.

The Government again resorts to a factual dispute that is inappropriate for a motion to dismiss. *See, e.g.*, Br. Pg. ID 1035 (making assertions as to the impact of the Order on Muslims worldwide); *id.* Pg. ID 1035-36 (characterizing the relevance and accuracy of the analysis used to justify the Order); *id.* Pg. ID 1043 (arguing what the "actual effect" of the Order is). In any event, none of the defenses offered by the Government meaningfully address the allegations in the Complaint. It is irrelevant

that the travel ban does not yet apply to every Muslim or every Muslim-majority country, just as it is irrelevant that the Revised EO also bars the few non-Muslims from the six banned countries. *Hawai'i*, 2017 WL 1011673, at *12 (calling these arguments illogical and finding that "targeting these countries likewise targets Islam"). Moreover, the EO is not saved by the fact that the Designated Countries were previously made ineligible for the Visa Waiver Program. *See* 8 U.S.C. § 1187. That statute simply requires individualized review of non-Visa Waiver country nationals. Its history, goals and effect differ dramatically from those of the EO, and provide no support for the Defendants' actions here. Similarly, although Defendants make much of a series of cases challenging the National Security Entry-Exit Registration System ("NSEERS"), the NSEERS cases did not involve Establishment Clause claims. *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008).

Again, the relevant Establishment Clause question is what "message" is conveyed by the government's actions. The text, history, and implementation of the Revised EO as alleged in the Complaint make clear that the EO conveys an unmistakable and impermissible message that the United States Government disapproves of Islam and Muslims.

3.    This Court Is Entitled to Consider All Relevant Evidence of the Purpose and Effect of the Revised EO.

In its concerted effort to evade the Establishment Clause, the Government invents a number of novel roadblocks to this Court's review.

First, the Government suggests that the Court can consider the purpose and effect of a government action only if it expressly references religion. Not so. It is well established that where a law appears to be facially neutral, courts apply *Lemon*. *E.g.*, *Hernandez v. CIR*, 490 U.S. 680, 695 (1989). Because the Establishment Clause "extends beyond facial discrimination," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993), the *Lemon* test was designed to discern whether a religious purpose hides under a secular façade.

Second, Plaintiffs' claims do not require the Court to engage in "psychoanalysis." Br. Pg. ID 1032. To the contrary, the public statements alleged here constitute "readily discoverable fact," *McCreary*, 545 U.S. at 862, and their meaning is self-evident and highly relevant. *See IRAP*, 2017 WL 1018235, at *13 ("[E]xplicit, direct statements of President Trump's animus towards Muslims . . . allow the Court to identify the purpose of this government action without resort to 'judicial psychoanalysis.'").

37

Third, there is no authority for the Government's view that the Court may only review statements made while the President is in office.[11] *See IRAP*, 2017 WL 1018235, at *13.[12] The statements cited in the Complaint are part of the Revised EO's "historical context" and "the specific sequence of events leading to" its issuance. *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987). Courts routinely rely on statements from political campaigns when considering Establishment Clause claims. *See, e.g.*, *Glassroth v. Moore*, 335 F.3d 1282, 1284-85, 1297 (11th Cir. 2003) (campaign materials of a state candidate); *Epperson v. Arkansas*, 393 U.S. 97, 107-08, 109 n.16 (1968) (campaign advertisements). Nor is there any reason to think that considering statements from the Trump campaign will have a "chilling effect" on legitimate political debate; the statements alleged here were hardly offhand statements on the campaign trail or general statements of religious faith, but were

---

[11] The Government's argument here, which is that candidates are not government actors but rather "private persons", Br. Pg. ID 1042, contradicts its own position in opposing discovery, which is that Defendant Trump is entitled to executive privilege for documents from "before the President took office but concerning actions to be taken when he became President." R. 82, Pg. ID 1132.

[12] Nor is there any basis for the Government's assertion that the Court should disregard "informal" statements by government officials. The only case cited, *Hamdan v. Rumsfeld*, 548 U.S. 557, 623 n.52 (2006), observed merely that an illegal presidential action cannot be saved by a government official's self-serving statements to the press. It says nothing about what evidence a court may consider in an Establishment Clause case, where a court is specifically required to consider context in determining the purpose and effect of a government action.

38

instead oft-repeated policy pronouncements that ripened into official action. As Defendants concede, "stigmatization and alienation caused by the government *publicly* communicating a message favoring or disfavoring religion is the harm that Establishment Clause jurisprudence seeks to avoid." Br. Pg. ID 1032.[13]

Fourth, the issuance of the Revised EO did not, as the Government suggests, "reduce[] the probative value of the President's statements" such that the Court should not rely on them. Br. Pg. ID 1043. To the contrary, courts throughout the country have properly relied on those statements to understand the purpose of the EOs. *IRAP*, 2017 WL 1018235, at *3-4, 11 (considering statements made by Candidate and President-Elect Trump about Muslims and his intended Muslim ban); *Hawai'i*, 2017 WL 1011673, at *13 (same).[14] The Government further suggests that, since the Revised EO did not amount to a "complete shutdown" on entry by

---

[13] The cases cited by the Government are inapposite. One set of cases merely held that views of people with no government or decisionmaking role were irrelevant to Establishment Clause claims. *See Glassman v. Arlington City*, 628 F.3d 140, 147 (4th Cir. 2010) (church members); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (the artist who created the challenged display); *Modrovich v. Allegheny Cty.*. 385 F.3d 397, 411 (3d Cir. 2004) (the public and a judge with no role in the decision). In others, the courts merely declined to consider prosecutors' campaign statements about policy in deciding whether to intervene in state criminal cases. *E.g.*, *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995).

[14] The *Sarsour* case relied on by Defendants is an outlier, and even it considered the statements relevant (before concluding that the plaintiffs had not shown a likelihood of success). *Sarsour*, 2017 WL 1113305, at *12.

39

Muslims, the President's statements are irrelevant. That argument has been expressly rejected. *IRAP*, 2017 WL 1018235, at *13 ("direct statements" confirm the nationality-based travel ban was intended "as nearly as possible" to "approximate a Muslim ban without calling it one"). In any event, judicial review cannot be evaded simply because the final policy differs from an initial proposal.

Finally, the so-called "presumption of regularity" for actions of public officials (Br. Pg. ID 1040) does not immunize the Executive Branch from judicial review. Indeed, *McCreary* declined to apply such a presumption. 545 U.S. at 902 n.9, 912 (Scalia, J., dissenting); *see also United States v. Chem. Found.*, 272 U.S. 1, 14 (1926) (presumption rebutted by evidence that official acted improperly).

### B.   The Complaint States an Equal Protection Claim.

The allegations in the Complaint also establish that the Revised EO violates equal protection by impermissibly discriminating based on religion.

The Government's only response to the equal protection claim is to try to confine the Court to *Mandel* or rational basis review, relying on cases in which there was no claim of religious discrimination.[15] *See* Br. Pg. ID 1045. It is well established,

---

[15] In *Fiallo*, on which the Government relies, the Court upheld differential treatment accorded by statute to children of U.S. citizen mothers versus U.S. citizen fathers, because line-drawing about family ties—an unavoidable part of immigration law—turned on "policy questions entrusted exclusively to the political branches." 430 U.S. at 798. That is, as in *Mandel*, there were competing legitimate governmental

40

however, that claims of religious discrimination are subject to heightened scrutiny.[16]

*Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005) (holding that when a government action "invades a fundamental right, such as . . . religious freedom, the law will be sustained only if it is suitably tailored to serve a compelling state interest" (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985) (internal quotation marks omitted))).

*Rajah*, 544 F.3d 427, supports Plaintiffs, not the Government. There the plaintiffs brought a selective prosecution challenge to the National Security Entry-Exit Registration System (NSEERS), arguing that although they were in the country unlawfully, they had been selectively targeted for deportation based on their religion. *Id.* at 434. The Second Circuit agreed that "selective prosecution based on an animus of that kind" would be unconstitutional, *id.* at 438, but rejected the religious

---

concerns. But in leaving such judgments to Congress, neither *Mandel* nor *Fiallo* authorized government action based on improper animus. Indeed, in subsequent caselaw, the Supreme Court made clear that the very policy upheld in *Fiallo*, far from deriving from impermissible animus, passes muster under heightened scrutiny. *See Nguyen v. INS*, 533 U.S. 53, 61 (2001).

[16] The Revised EO fails rational basis review in any event, because the Government cannot establish that it has "employed rational means to further its legitimate interest." *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998); *see also Cleburne*, 473 U.S. at 446-47, 450 (holding that a "bare desire to harm a politically unpopular group" based on an "irrational prejudice" is not a legitimate government interest that satisfies rational basis review).

41

discrimination claim there because the plaintiffs had provided insufficient evidence "that the Program was motivated by an improper animus toward Muslims." *Id*. at 439. Here, by contrast, the Complaint sets out the discriminatory purpose and effect of the EO in detail.

Therefore, as with the Establishment Clause claim, the Complaint's allegations that the Revised EO discriminatorily targets Muslims must be accepted as true. *See supra* Section III.A. First, the Complaint chronicles the months of anti-Muslim statements by Candidate Trump and his advisers and the plan to "legalize" the Muslim ban by targeting particular countries. SAC ¶¶ 53-84; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The historical background of the decision is one evidentiary source."). Second, the Complaint explains how the Revised EO's burdens fall disproportionately on Muslims. *See*, *e.g.*, SAC ¶ 161 (more than 90% of the citizens of the Designated Countries are Muslim); *id.* ¶¶ 177-78 (uses language based on Muslim stereotypes in establishing reporting requirements); *id.* ¶ 201 (effectively halts resettlement of refugees from Muslim countries); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred . . . [when] the law bears more heavily on one [protected class] than another."). Third, the Complaint alleges that Defendants "[d]epart[ed] from the normal procedural

sequence" by failing to obtain agency input before issuing the Original EO, and then delaying issuance of the Revised EO to allow the President to benefit from unrelated press coverage. SAC ¶¶ 6, 110-13; *see also Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). Finally, the Complaint alleges that the Revised EO does not promote its asserted national security goal.[17] The Government's own experts have found that the Revised EO's classifications will not promote the asserted interest in national security, and DHS determined that suspending nationals of the six countries will not promote national security. SAC ¶¶ 145-46. No recent major terrorist attack on U.S. soil has been committed by a national of any of the Designated Countries, and immigrants and refugees were already carefully screened before the EOs were imposed. *Id.* at ¶¶ 135, 183-201.

In sum, the Complaint plausibly alleges that the Revised EO discriminates based on religion and is not tailored to its asserted national security goal. SAC ¶¶ 359-370.

---

[17] Indeed, the allegations in the Complaint, taken as true, show that the Revised EO is not even rationally related to its asserted national security goal.

C.   The Complaint States a Claim for Violation of Plaintiffs' Right to Free Speech and Association.

It is settled law that the "Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The Revised EO impinges on Plaintiffs' right to hear from, speak with, debate with, and associate with nationals of the banned countries, including by impeding the ability of the organizational Plaintiffs to bring speakers from those countries to the United States, and therefore violates the First Amendment.[18]

Defendants respond to the First Amendment claim by raising a factual dispute, inappropriate on a motion to dismiss, over whether the organizational Plaintiffs will actually be "prevent[ed] . . . from conducting their programming . . . ." Br. Pg. ID 1047. Relatedly, they suggest that the First Amendment violation is excused by the possibility that the Government will issue a waiver under Section 3(c) of the Revised EO, which allows a "consular officer" or "CBP official[]" to exercise "discretion" and "decide on a case-by-case basis" to authorize an individual's entry, such as "for significant business or professional obligations." Revised EO § 3(c)(iii). These provisions give an individual official the authority to decide whether a planned speech is "significant" enough to satisfy the official. This amounts to an

---

[18] For the reasons discussed above in Section II, Plaintiffs' First Amendment claim is not foreclosed by *Mandel*.

unconstitutional content-based restriction on speech. *Bays v. City of Fairborn*, 668 F.3d 814, 821 (6th Cir. 2012). Moreover, given that the issuance of a waiver is uncertain, not bound by any timetable, and in the "discretion" of individual officials, Plaintiffs are unable to rely on that prospect when planning events. SAC ¶¶ 234-41; 268; 273.

## **CONCLUSION**

Defendants ask this Court to ignore the allegations of animus in the Complaint and instead take the Government at its word that the EO was adopted solely to protect national security. Defendants seek not judicial deference but judicial abdication. This is a motion to dismiss, and it is the words of the Complaint, not those of the Government, that must be taken as true. The Complaint plausibly states claims for constitutional violations by Plaintiffs with standing. The motion should be denied.

45

Dated: May 8, 2017                              Respectfully submitted,

## Counsel for Arab American Civil Rights League

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

## Counsel for American Arab Chamber of Commerce

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
Helal Farhat (P64872)
Counsel for the American Arab
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

46

**Counsel for Hend Alshawish, Salim Alshawish, Yousef Abdullah, Fahmi Jahaf, and Mohamed Alshega**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
_____
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
_____
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


/s/ Ali K. Hammoud
_____
Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

/s/ Rula Aoun
_____
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
_____
/s/ Natalie C. Qandah
_____
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

47

**Counsel for American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, Adeeb Saleh, Sofana Bella, Hilal Alkatteeb and S.A., a minor through her Parent and Next Friend, Hilal Alkatteeb**

/s/ Miriam Aukerman

Miriam Aukerman (P63165)
American Civil Liberties Union Fund
of Michigan
1514 Wealthy SE, Suite 242
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

/s/ Samuel R. Bagenstos

Samuel R. Bagenstos (P73971)
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 647-7584
sbagen@gmail.com

/s/ Michael J. Steinberg

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Kary L. Moss (P49759)
American Civil Liberties Union Fund
of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org

/s/ Margo Schlanger

Margo Schlanger (N.Y. Bar
#2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

/s/ Jason C. Raofield

Jason C. Raofield (D.C. Bar #463877)
Covington & Burling LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5072
jraofield@cov.com

48

## CERTIFICATE OF SERVICE

This Memorandum was filed on May 8, 2017, via the Court's ECF system, which provides notice to all counsel of record.


/s/ Jason C. Raofield
_____
Jason C. Raofield
(D.C. Bar #463877)