# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

ARAB AMERICAN CIVIL RIGHTS     |
LEAGUE ("ACRL"), et al.,     |
    |
    |    Case No. 17−cv−10310
    |    Hon. Victoria A. Roberts
    |    Mag. J. Stephanie D. Davis
*Plaintiffs*,     |
    |
v.     |    Date:  May 19, 2017
    |
DONALD J. TRUMP, President of the     |
United States, et al.,     |
    |
*Respondents*.     |
_____|

## BRIEF OF FORMER NATIONAL SECURITY OFFICIALS
## AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Harold Hongju Koh
Hope Metcalf
RULE OF LAW CLINIC
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
203-432-4932

/s/ John Doroghazi
John Doroghazi
Jonathan M. Freiman
Tahlia Townsend
WIGGIN AND DANA LLP
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
203-498-4584

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................ii

INTEREST OF *AMICI CURIAE*.................................................................. 1

ARGUMENT ................................................................................................. 2

I.    THE REVISED EXECUTIVE ORDER CANNOT BE JUSTIFIED ON NATIONAL SECURITY OR FOREIGN POLICY GROUNDS ................ 3

    A.    There is no national security or foreign policy basis for suspending entry of aliens from the six named countries. ......................................... 5

    B.    The suspension of refugee admissions is not justified by national security or foreign policy concerns. ...................................................... 11

II.   THE REVISED EXECUTIVE ORDER'S OVERBREADTH HARMS OUR NATIONAL SECURITY AND FOREIGN POLICY INTERESTS. ............................................................................................ 14

    A.    The Order is of unprecedented scope.................................................... 14

    B.    The Order will do serious damage to our national security and foreign policy interests.......................................................................... 15

        1.    The Order will endanger U.S. troops in the field............................ 15
        2.    The Order will disrupt essential counterterrorism, foreign policy, and national security partnerships. ................................................. 16
        3.    The Order will hinder domestic law enforcement efforts. .............. 17
        4.    The Order will have a devastating humanitarian impact. ............... 18
        5.    The Order will cause economic damage to American citizens and residents. .......................................................................................... 18

III.  THE REVISED EXECUTIVE ORDER PERPETUATES THE BASIC STRUCTURAL FLAWS OF THE ORIGINAL ILL-CONCEIVED, POORLY IMPLEMENTED AND ILL-EXPLAINED ORDER.. ............. 19

CONCLUSION............................................................................................. 24

APPENDIX: LIST OF AMICI

# TABLE OF AUTHORITIES

## Cases

*Aziz v. Trump*, No. 1:17-cv-00116-LMB-TCB, __ F.Supp.3d __, 2017
WL 580855 (E.D. Va. Feb. 13, 2017) .................................................................6

*U.S. v. Fordice*, 505 U.S. 717 (1992) ............................................................. 19, 20

*Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252
(1977).............................................................................................................. 19, 20

*Washington v. Trump*, No. 17-35105, __ F.3d__, 2017 WL 526497,
slip op. (9th Cir. Feb. 9, 2017) .......................................................................6, 19

## Statutes

8 U.S.C. § 1182.................................................................................................21

8 U.S.C. § 1187................................................................................................. 10

## Regulations

Exec. Order No. 11,030,  27 Fed. Reg. 5,847 (Jun. 19, 1962) ..............................22

Exec. Order No. 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981).............................15

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (May 24, 1992).............................15

Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015)...............................15

Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016)............................15

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) .................................3

Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017)...................................3

## Other Authorities

Adams Nager, et al., *The Demographics of Innovation in the United
States*, Information Technology & Innovation Foundation (Feb. 16).................19

Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, CATO at Liberty (Jan. 25, 2017)..............4, 12

Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, Cato Institute (Sept. 13, 2016) ..........................................6

Alex Nowrasteh, *42 Percent of 'Terrorism-Related' Convictions Aren't for Terrorism*, Cato Institute (Mar. 6, 2017) ........................6

Amy Pope, *The Screening Process for Refugee Entry into the United States* (Nov. 20, 2015) .........................................12

Andorra Bruno, Iraqi and Afghan Special Immigrant Visa Programs, Cong. Research Serv. (2016)......................................9

Andorra Bruno, *Syrian Refugee Admissions and Resettlement in the United States: In Brief*, Cong. Research Serv. (2006) .......................13

Annex of Statistical Information, Country Reports on Terrorism (June 2015).................................................................7

Br. for Technology Companies and Other Businesses as Amici Curiae in Support of Appellees, Washington v. Trump, No. 17-35105, __ F.3d __, 2017 WL 526497 (9th Cir. Feb. 9, 2017).............................19

Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold War* 1 (2008)................................24

Central Intelligence Agency, *11 September 2001 Hijackers* ....................................5

Edward Alden, *The Closing of the American Border* 104-06 (2008).....................21

Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017).......................... 22, 23

Felicia Schwartz & Ben Kesling, Countries Under U.S. Entry Ban Aren't Main Sources of Terror Attacks, The Wall St. J. (Jan. 29, 2017)...............................................................6

Geneva Sands et al., *Officials Aim to Clarify Impact on Dual Nationals From Trump's Immigration Executive Order*, ABC News (Feb. 1, 2017)..........................................................23

George Washington University Program on Extremism, *ISIS in America: From Retweets to Raqqa* 6 (Dec. 2015) .................................................6

Henry B. Hogue, Cong. Research Serv., RS22979, Presidential Transition Act: Provisions and Funding (2016)....................................21

Joby Warrick, *Jihadist Groups Hail Trump's Travel Ban as a Victory*, Wash. Post (Jan. 29 2017) ...................................................................17

Jon Finer, *Sorry, Mr. President: The Obama Administration Did Nothing Similar to Your Immigration Ban*, Foreign Policy (Jan. 30, 2017).........................................................................................9, 21

Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017) .......................................................................................22

Kevin Liptak, *Travel Ban Remains Sticking Point in Trump Calls with US Allies*, CNN (Feb. 9, 2017) ................................................................16

Kristina Cooke & Joseph Ax, *U.S. Officials Say American Muslims Do Report Extremist Threats*, Reuters (Jun. 16, 2016) ........................17

Matthew Nussbaum et al., *White House Creates Confusion About Future of Trump's Travel Ban*, Politico (Feb. 21, 2017)..................4, 23

Memorandum from Stuart Levey, Assoc. Deputy Att'y Gen., to Dan Levin, Counsel to the Att'y Gen., & David Ayres, Dep't of Justice Chief of Staff  (Oct. 3, 2001)...............................................................21

Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017) ......................................................................................... 22, 23

Michael V. Hayden, *Former CIA Chief: Trump's Travel Ban Hurts American Spies – and America*, Wash. Post (Feb. 5, 2017)................16

Molly Redden, *Trump Powers "Will not be Questioned" on Immigration, Senior Official Says*, The Guardian (Feb. 12, 2007).......6

Muslim Public Affairs Council, *Data on Post-9/11 Terrorism in the United States* (Jun. 2012) ...................................................................17

Nora Ellingsten, *It's Not Foreigners Who Are Plotting Here: What the Data Really Show*, Lawfare (Feb. 7, 2017) ............................................................. 6

Patrick O'Neill, *How Academics Are Helping Cybersecurity Students Overcome Trump's Immigration Order*, Cyberscoop (Jan. 30, 2017) ................ 19

Peter Bergen et al., *Terrorism in America After 9/11,* New America Foundation ........................................................................................................ 5

Rebecca Savransky, *Iraq Parliament Approves 'Reciprocity Measure' In Trump Immigration Ban's Wake*, The Hill (Jan. 30, 2017) ........................... 16

Refugee Processing Center, Interactive Reporting, Admissions and Arrivals ...................................................................................................... 9

Sabrina Siddiqui, *Trump Signs 'Extreme Vetting' Executive Order for People Entering the US*, The Guardian (Jan. 27, 2017) ................................. 5

Stephanie Ott, *What Happens to Iraqis who Worked with the U.S. military*, Al Jazeera (Feb. 1, 2017) ................................................................ 15

*Ten Years After 9/11: Preventing Terrorist Travel, Hearing Before the United States S. Comm. on Homeland Sec. and Governmental Affairs*, 112th Cong. 522 (2011) (written statements of Rand Beers and Janice L. Jacobs) ................................................................................ 9

*The Security of U.S. Visa Programs: Hearing Before the S. Comm on Homeland Sec. & Governmental Affairs*, 114th Cong. (2016) (written statements of David Donahue and Sarah R. Saldaña) ..................... 8

The White House, *Visa Waiver Program Enhancements* (Nov. 30, 2015) ....................................................................................................... 10

Thomas R. Eldridge, et. al., *9/11 and Terrorist Travel: A Staff Report of the National Commission on Terrorist Attacks Upon the United States* (2004) ................................................................................................ 21

U.S. Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016) ....................... 10

U.S. Dep't of Homeland Security, *U.S. Citizenship and Immigration Services* (Dec. 3, 2015) ................................................................................ 13

U.S. Dep't of Commerce, *Department of Commerce Releases October Travel and Tourism Expenditures* (Dec. 15, 2016) ............................................. 18

U.S. Dep't of State et al, *Report to the Congress, Proposed Refugee Admissions for Fiscal Year 2016* (2016) ................................................ 15

U.S. Dep't of State, *U.S. Refugee Resettlement Processing for Iraqi and Syrian Beneficiaries of an Approved I-130 Petition* (Mar. 11, 2016) ....................................................................................................... 13

U.S. Dep't of State, *The Refugee Processing and Screening System* ....................... 4

U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs* ............................ 12

U.S. Dep't of State, *Visa Waiver Program* .............................................................. 10

U.N. High Commissioner for Refugees, *Resettlement* ............................................ 14

Urban Justice Center, International Refugee Assistance Project, *IRAP Stands With Iraqi Allies of the United States Affected by Executive Order* (Feb. 1, 2017) .......................................................................................... 15

William Glaberson & Helene Cooper, *Obama's Plan to Close Prison at Guantánamo May Take Year*, N.Y. Times (Jan. 12, 2009) ........................... 21

## INTEREST OF *AMICI CURIAE*

Amici curiae are former national security, foreign policy and intelligence officials who have worked on pressing national security matters in the U.S. government.  A number of amici have worked at senior levels in administrations of both political parties.  Amici have collectively devoted decades to combatting the various terrorist threats that the United States faces in an increasingly dangerous and dynamic world.  Amici have all held the highest security clearances.  A significant number were current on active intelligence regarding credible terrorist threat streams directed against the United States as recently as one week before the January 27, 2017 Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" ("January 27 Order"), and weeks before the March 6, 2017 Executive Order bearing the same title ("March 6 Order").

On February 16, 2017, amici filed an amicus brief in *Darweesh v. Trump* in the U.S. District Court for the Eastern District of New York, expressing our view that the January 27 Order "cannot be justified on national security or foreign policy grounds" and "would undermine the security of the United States."  Amici have reached the same conclusion about the March 6 Order, which presents and preserves the same core problems as its predecessor.  Amici all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to

1

the United States.  Amici nevertheless do not believe that risk merits the blanket and counterproductive bans on entry into the United States established by the Order, either in its original form or as revised.

## ARGUMENT

The March 6 Order serves no persuasive national security or foreign policy purpose.  Left in place, the Order will do long-term damage to our national security and foreign policy interests.  It will endanger troops in the field, and disrupt key counterterrorism and national security partnerships.  It will aid the propaganda effort of the Islamic State in Iraq and the Levant ("ISIL") and support its recruitment message.  By feeding the narrative that the United States is at war with Islam, the Order will impair relationships with the very Muslim communities that law enforcement professionals rely on to address the threat of terrorism.  And it will have a damaging humanitarian and economic impact.

Indeed, the March 6 Order preserves the same problematic features of the January 27 Order that were outlined in the original brief filed by many of the same amici in *Darweesh*.  The March 6 Order continues to impose a blanket ban on entry from the listed countries that cannot be justified on national security or foreign policy grounds.  The March 6 Order continues to depart from the particularized review based on credible intelligence-based threats that has been a core premise of our border security efforts across decades of administrations led by

2

Presidents from both parties.  And rebranding a proposal first advertised as a

"Muslim Ban" as "Protecting the Nation from Foreign Terrorist Entry into the

United States" did not disguise the January 27 Order's discriminatory intent, or

make it necessary, effective, or faithful to America's Constitution, laws, and

values.  The few changes introduced in the March 6 Order do not cure this

discriminatory intent, or suddenly provide a persuasive basis for the Order on

national security or foreign policy grounds.

## I.   THE REVISED EXECUTIVE ORDER CANNOT BE JUSTIFIED ON NATIONAL SECURITY OR FOREIGN POLICY GROUNDS.

On January 27, 2017, President Donald Trump signed an executive order

imposing a number of suspensions on the entry of non-citizens into the United

States.[1]  The President's stated goals for the Order were to "protect[] the nation

from foreign terrorist entry into the United States" and to "ensure that those

approved for admission do not intend to harm Americans and that they have no

ties to terrorism."[2]  On March 6, 2017, following weeks of litigation, the

Administration issued a revised version of the Executive Order.[3]  This March 6

Order revokes the January 27, 2017 Order and makes several changes to that

Order, including exempting green card holders and valid visa holders from the

immigration restrictions and removing Iraq from the list of excluded countries.

[1] Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017).
[2] *Id.*
[3] Exec. Order 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017).

However, the Order continues to suspend travel from the listed countries for 90 days from its effective date. The Order continues to suspend refugee admissions for 120 days.[4] And in the words of a senior advisor to President Trump, the Order still aims to guarantee the "same basic policy outcome."[5]

As former U.S. officials responsible for the national security and foreign relations of the United States in multiple presidential administrations, amici have devoted their careers to the safety and welfare of the American people. Yet the March Order continues to bear no rational relation to the President's stated aim of protecting the nation from foreign terrorism. It targets countries whose nationals have committed no lethal terrorist attacks on U.S. soil in the last forty years. It suspends the entry of refugees—the vast majority of whom are vulnerable women and children[6]—when in the modern era of screening, no refugee has ever killed a U.S. citizen in a terrorist attack in the United States.[7]

Even now, months after the signing of the original January 27 Order, Respondents have supplied no persuasive information to justify such a categorical

---

[4] A redlined comparison of the two Orders can be found at: http://aclum.org/wp-content/uploads/2017/03/2017_1_27-Muslim-Ban-EO-Word-VS.-2017_3_06-Muslim-Ban-EO.pdf.

[5] Matthew Nussbaum et al., *White House Creates Confusion About Future of Trump's Travel Ban*, Politico (Feb. 21, 2017).

[6] U.S. Dep't of State, *The Refugee Processing and Screening System*, https://www.state.gov/documents/organization/266671.pdf.

[7] Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, CATO at Liberty (Jan. 25, 2017) [hereinafter "Nowrasteh Jan. 2017"].

ban, even in revised form.  They make no showing that our immigration system has suffered from inadequate consideration of national origin or religious affiliation, and identify no flaw in the current individualized vetting procedures, developed by national security officials across several presidential administrations in response to particular threats identified by U.S. intelligence.

### A.   There is no national security or foreign policy basis for suspending entry of aliens from the six named countries.

No legitimate national security purpose is served by the Order's blanket ban on entry by nationals of Syria, Sudan, Iran, Somalia, Libya, and Yemen.

First, not a single American has died in a terrorist attack on U.S. soil at the hands of citizens of these six nations in the last forty years.[8]  The January Order opened with a reference to the September 11, 2001 attacks, and White House officials have since pointed to those attacks as justification for its restrictions.[9]  But none of the September 11 hijackers were citizens of the six targeted countries.[10]  In fact, multiple studies show that the overwhelming majority of individuals charged with, or who died committing, terrorist-related crimes inside the United States after September 11 were U.S. citizens or legal permanent residents.[11]

---

[8] *Id.*

[9] Jan. 27 Order §1; Sabrina Siddiqui, *Trump Signs 'Extreme Vetting' Executive Order for People Entering the US*, The Guardian (Jan. 27, 2017).

[10] Central Intelligence Agency, *11 September 2001 Hijackers*, https://www.cia.gov/news-information/speeches-testimony/2002/DCI_18_June _testimony_new.pdf.

[11] *See* Peter Bergen et al., *Terrorism in America After 9/11,* New America Foundation,

The U.S. government provided no evidence to the contrary in the January 27 Order.[12]  The March 6 Order now offers the assertion that "[s]ince 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States."  The Order does not cite any support for this statement.  But a similar set of data relied on by White House officials to justify the January 27 Order has been widely criticized for its definition of terrorism-related offenses.[13]

Second, Respondents have identified no persuasive evidence that a heightened or particularized threat has suddenly arisen from the six countries.  The January 27 Order offered no such explanation at all.  The March 6 Order offers a series of excerpts from the 2015 State Department Country Reports on Terrorism and elsewhere, describing these nations as home to violent extremist groups and not cooperative with U.S. counterterrorism efforts.  However, the Country Reports merely confirm the imprecision of the Order's country bans, pointing out, for

---

www.newamerica.org/in-depth/terrorism-in-america/; George Washington University Program on Extremism, *ISIS in America: From Retweets to Raqqa* 6 (Dec. 2015), https://cchs.gwu.edu/isis-in-america;
Nora Ellingsten, *It's Not Foreigners Who Are Plotting Here: What the Data Really Show*, Lawfare (Feb. 7, 2017); *see also* Felicia Schwartz & Ben Kesling, *Countries Under U.S. Entry Ban Aren't Main Sources of Terror Attacks*, The Wall St. J. (Jan. 29, 2017); Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis,* Cato Institute (Sept. 13, 2016) [hereinafter "Nowarsteh Sept. 2016"].

[12] *See* Washington v. Trump, No. 17-35105, __ F.3d __ at 26, 2017 WL 526497, slip op. (9th Cir. Feb. 9, 2017); Aziz v. Trump, No. 1:17-cv-00116-LMB-TCB, __ F.Supp.3d __ at 6, 2017 WL 580855 (E.D. Va. Feb. 13, 2017).

[13] *See, e.g.,* Molly Redden, *Trump Powers "Will Not be Questioned" on Immigration, Senior Official Says*, The Guardian (Feb. 12, 2007); Nowaresteh Jan. 2017, *supra* note 7; Alex Nowrasteh, *42 Percent of 'Terrorism-Related' Convictions Aren't for Terrorism*, Cato Institute (Mar. 6, 2017).

example, that over 55 percent of terrorist attacks in 2015 took place in five countries (Iraq, Afghanistan, Pakistan, India and Nigeria), *none of which are subject to the travel ban.*[14]   At any rate, the Order does not plausibly make the case that the threat from these areas has increased such that a sudden country-based ban is needed, or that a suspension of travel will lead to improved counter-terrorism efforts or information sharing with these countries.   And, as amici explain later, there is ample reason to believe the Order will compromise our security programs.

The only other evidence cited by the Order is a pair of anecdotal cases in which individuals who were originally refugees from the listed countries were later sentenced for terrorism-related crimes.   But one of those cases involved terror activities undertaken before the individual came to the United States, and not on U.S. soil, and vetting procedures have already been reviewed and revised to address the issues raised by that entry.   The other individual did not execute on his plans at all and in any event was admitted as a small child and radicalized here in the United States, making it difficult to see how a travel suspension to improve the vetting process would have made any difference to this entry.   And of course, mere mention of these two cases hardly refutes the multiple, careful analyses showing that they are very much the exception rather than the rule.[15]

---

[14] Annex of Statistical Information, Country Reports on Terrorism 2015 (June 2016).
[15] *See supra* note 11.

A number of amici were current on active intelligence concerning all credible terrorist threat streams directed against the United States as of January 20, 2017.  They know of no specific threat that—just weeks later—would have justified the January 27 ban.  Amici are also unaware of any new national security basis having surfaced in the weeks between the January and March Orders.

Third, Respondents have identified no flaw in existing procedures that would justify the travel bans.  Since the September 11, 2001 attacks, the United States has developed a rigorous vetting system leveraging the full capabilities of the law enforcement and intelligence communities.  This vetting system is applied to travelers not once, but multiple times, and it is continually re-evaluated to ensure its effectiveness.  Successive administrations have strengthened the vetting process through robust information-sharing and data integration.  This approach allows identification of potential terrorists without blanket bans.[16]

Respondents offer no reason to move abruptly to a national origin-based ban when the United States already has a tested system of individualized vetting, developed and implemented by national security professionals across the government.  Indeed, information continues to surface that confirms that country-based bans are the wrong approach, including a Department of Homeland Security

---

[16] *See, e.g., The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 114th Cong. (2016) (written statements of David Donahue and Sarah R. Saldaña), https://www.hsgac.senate.gov/hearings/the-security-of-us-visa-programs.

document that was prepared in response to a request from the new Administration and that states that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."[17]

Finally, the Order cannot be defended as a mere continuation of recent U.S. counterterrorism policy. Because threat streams constantly evolve, when serving as national security officials amici sought continually to improve vetting. That effort included reviews conducted in 2011 and 2015-16 in response to particular threats identified by intelligence sources. In 2011, after receiving derogatory information regarding two Iraqi nationals who had entered as refugees, the U.S. government undertook an extensive interagency review of its vetting system. The flow of refugees from Iraq slowed during the pendency of the review[18] and, upon its completion, the U.S. government implemented stronger security procedures in areas of identified vulnerability.[19]

Likewise, in late 2015 and early 2016, in response to the emerging threat

---

[17] *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States* [hereinafter "*Citizenship Unlikely*"], available at https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf.

[18] Refugee Processing Center, Interactive Reporting, http://ireports.wrapsnet.org/Interactive-Reporting/EnumType/Report?ItemPath=/rpt_WebArrivalsReports/MX%20-%20Arrivals%20by%20Nationality%20and%20Religion; Jon Finer, *Sorry, Mr. President: The Obama Administration Did Nothing Similar to Your Immigration Ban*, Foreign Policy (Jan. 30, 2017).

[19] *Ten Years After 9/11: Preventing Terrorist Travel, Hearing Before the United States S. Comm. on Homeland Sec. and Governmental Affairs*, 112th Cong. 522 (2011) (written statements of Rand Beers and Janice L. Jacobs), https://www.hsgac.senate.gov/hearings/ten-years-after-9/11-preventing-terrorist-travel; Andorra Bruno, *Iraqi and Afghan Special Immigrant Visa Programs*, Cong. Research Serv., 14 (2016).

posed by ISIL, the U.S. government took several steps to strengthen the Visa Waiver Program, which allows citizens from thirty-eight approved countries to travel to the United States without first obtaining a visa. President Obama introduced a series of new measures to enhance security screenings and traveler risk assessments and to bolster our relationship with partner countries.[20] Around the same time, President Obama signed into law a statute that removed from the Visa Waiver Program nationals of existing Visa Waiver Program countries who: (1) had been present in Iraq, Syria, Iran or Sudan after March 1, 2011, or (2) were dual nationals of one of those four countries.[21] Several months later, the Secretary of Homeland Security—acting under the new statute and in consultation with the Director of National Intelligence and the Secretary of State—expanded the list to include Yemen, Libya and Somalia.[22]

Contrary to Respondents' claims, these previous reforms provide no justification for a blanket, group-based ban on the entry of nationals from the six countries. The enhancement of security in the refugee system allowed for *more*

---

[20] The White House, *Visa Waiver Program Enhancements* (Nov. 30, 2015), https://obamawhitehouse.archives.gov/the-press-office/2015/11/30/fact-sheet-visa-waiver-program-enhancements; U.S. Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

[21] 8 U.S.C. § 1187; U.S. Dep't of State, *Visa Waiver Program*, https://travel.state.gov/content/visas/en/visit/visa-waiver-program.html.

[22] The exemptions for Yemen, Libya and Somalia applied to those who had traveled to or been present in those countries, not dual nationals. U.S. Dep't of Homeland Security, *supra* note 20.

*searching, individualized vetting* of travelers, the opposite of the Order's categorical ban. Similarly, the Visa Waiver Program reforms did not automatically bar anyone—including nationals of any country—from travel to the United States. The affected individuals were simply required to obtain *individually-vetted visas*, just like nationals of the over 150 nations not in the Visa Waiver Program.

To keep our country safe from terrorist threats, the U.S. government must gather all credible evidence about growing threat streams—including through the best available intelligence—to thwart those threats before they ripen. Through the years, national security-based immigration restrictions have: (1) responded to specific, credible threats based on individualized information, (2) rested on the best available intelligence, and (3) been subject to thorough interagency legal and policy review. The present Order does not rest on such tailored grounds, but rather on (1) generalized bans, (2) not supported by any new intelligence that Respondents have cited or of which amici are aware, and (3) not vetted through careful interagency legal and policy review.

## B.    The suspension of refugee admissions is not justified by national security or foreign policy concerns.

The March 6 Order's 120-day ban on refugee admissions serves no national security or foreign policy purpose. Amici know of no factual basis for Respondents' claim that refugees pose a particular security threat to the United States that would justify the Order's categorical bans.

11

From 1975 to the end of 2015, over three million refugees were admitted to the United States.  According to a recent study, only three have killed people in terrorist attacks on U.S. soil.[23]  All three were Cuban refugees, who murdered three people in two attacks in the 1970s.  Critically, these refugees were admitted and carried out their crimes before the creation of the modern refugee vetting system in 1980.[24]  No refugee has killed an American in a terrorist attack in the United States since that system was put in place.[25]  According to the study, only twenty refugees were convicted of any terrorism-related crimes on U.S. soil in that same period.[26]

Refugees already receive the most thorough vetting of any travelers to the United States.[27]  Refugee candidates are vetted recurrently throughout the resettlement process, as "pending applications continue to be checked against terrorist databases, to ensure new, relevant terrorism information has not come to light."[28]  By the time refugees referred by the United Nations High Commissioner for Refugees ("UNHCR") are approved for resettlement in the United States, they have been reviewed by UNHCR, the National Counterterrorism Center, the Federal

---

[23] Nowrasteh Sept. 2016, *supra* note 11.

[24] *Id.*

[25] *Id.*

[26] *Id.* ( "The chance of an American being murdered in a terrorist attack caused by a refugee is 1 in 3.64 *billion* per year"); *see also* Nowrasteh Jan. 2017, *supra* note 7.

[27] U.S. Dep't of State, *U.S. Refugee Admissions Program FAQs*, https://www.state.gov/j/prm/releases/factsheets/2017/266447.htm.

[28] Amy Pope, *The Screening Process for Refugee Entry into the United States* (Nov. 20, 2015), https://obamawhitehouse.archives.gov/blog/2015/11/20/ infographic-screening-process-refugee-entry-united-states.

Bureau of Investigation, the Department of Homeland Security, the Department of Defense, the Department of State, and the broader U.S. intelligence community. [29]

The refugee vetting process is also reviewed and strengthened on an ongoing basis in response to particular threats.[30]  For Syrian applicants, the Department of Homeland Security recently added a layer of enhanced review that involves collaboration between the Refugee, Asylum, and International Operations Directorate and the Fraud Detection and National Security Directorate.  Among other measures, this review provided additional, intelligence-driven support to refugee adjudicators that U.S. officials could then use to more precisely question refugees during their security interviews.[31]  Respondents allege no specific information about any vetting step omitted by current procedures.

While the United States' own individualized vetting process is the most important step, additional considerations make the U.S. refugee system difficult for terrorists to exploit.  Under current vetting procedures, refugees often wait eighteen to twenty-four months to be cleared for entry.[32]  Further, of all refugees deemed

---

[29] U.S. Dep't of State, *supra* note 28.

[30] U.S. Dep't of Homeland Security, *U.S. Citizenship and Immigration Services* (Dec. 3, 2015), https://www.uscis.gov/sites/default/files/ USCIS/Refugee%2C%20Asylum%2C%20and%20Int%27l%20Ops/Refugee_Security_Screening_Fact_Sheet.pdf.

[31] U.S. Dep't of State, *supra* note 6; Andorra Bruno, *Syrian Refugee Admissions and Resettlement in the United States: In Brief*, Cong. Research Serv., 4-5 (2016).

[32] U.S. Dep't of State, *U.S. Refugee Resettlement Processing for Iraqi and Syrian Beneficiaries of an Approved I-130 Petition* (Mar. 11, 2016),

eligible for resettlement by UNHCR, less than one percent were resettled in any country at all in 2015,[33] so a would-be terrorist posing as a refugee has very little chance of being resettled *anywhere*, let alone the United States.  Finally, the UNHCR places refugees in dozens of countries, and refugees do not decide which country accepts them, meaning that the odds of any individual refugee being settled into the United States in particular are exceedingly low.

## II.   THE REVISED EXECUTIVE ORDER'S OVERBREADTH HARMS OUR NATIONAL SECURITY AND FOREIGN POLICY INTERESTS.

The March 6 Order's overreach will do lasting harm to the national security and foreign policy interests of the United States.

### A.   The Order is of unprecedented scope.

We know of no case where a President has invoked authority under the Immigration and Nationality Act to suspend admission of such a sweeping class of people.  Even after the September 11 attacks, the U.S. government did not invoke the provisions of law cited by the Administration to broadly bar entrants based on nationality, national origin or religious affiliation.  Across the decades, executive orders under the Immigration and Nationality Act usually have targeted specific

---

https://www.state.gov/j/prm/releases/factsheets/2016/254649.htm.
[33] U.N. High Commissioner for Refugees, *Resettlement*, http://www.unhcr.org/en-us/resettlement.html.

government officials,[34] undocumented immigrants,[35] or individuals whose personalized screenings indicated that they posed a national security risk.[36]  No example in the modern era approaches the breadth of this Order, which with one stroke of the pen bans more than 180 million people in six separate countries from traveling to the United States based solely on their national origin.

> **B.    The Order will do serious damage to our national security and foreign policy interests.**

The Order will harm U.S. interests in a number of respects.

> ### 1.    The Order will endanger U.S. troops in the field.

The Order will affect interpreters and others who have assisted our troops at great risk to their own lives.  While Iraq has been removed from the list of banned countries, the Order halts the U.S. Refugee Assistance Program for 120 days for all countries. This pause will affect tens of thousands of individuals who assisted the United States and who are waiting for admission under the already backlogged "Priority 2" program.[37][38]  Thus, removing Iraq from the Order does not eliminate the effects its citizens – our key partners – will feel. By discouraging future

---

[34] *See, e.g.*, Proclamation No. 6958, 61 Fed. Reg. 60,007 (Nov. 22, 1996).

[35] *See, e.g.*, Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (May 24, 1992); Exec. Order No. 12,324, 46 Fed. Reg. 48,109 (Sept. 29, 1981).

[36] *See, e.g.*, Exec. Order No. 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016); Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015).

[37] The "Priority 2" program provides an alternative to the Special Immigrant Visa program.

[38] U.S. Dep't of State et al., *Report to the Congress, Proposed Refugee Admissions for Fiscal Year 2016,* at 57 (2016); Stephanie Ott, *What Happens to Iraqis who Worked with the U.S. military*, Al Jazeera (Feb. 1, 2017); Urban Justice Center, International Refugee Assistance Project, *IRAP Stands With Iraqi Allies of the U.S. Affected by Executive Order* (Feb. 1, 2017).

assistance and cooperation from these and other affected military allies and

partners, the Order will jeopardize the safety and effectiveness of our troops.

### 2. The Order will disrupt essential counterterrorism, foreign policy, and national security partnerships.

The Order will disrupt key counterterrorism, foreign policy, and national

security partnerships critical to U.S. efforts to address the threat posed by terrorist

groups such as ISIL.  The Order has already sparked intense international criticism

and alienated U.S. allies and partners.  Countries in the Middle East expressed

disapproval and even threatened reciprocal measures, jeopardizing years of

diplomatic outreach.[39]  We can certainly anticipate a similar reaction to the current

Order, if it is permitted to go into effect.

The Order will also endanger U.S. intelligence sources in the field.  For up-

to-date information, intelligence officers rely on human sources in some of the

countries listed.  The Order breaches faith with those sources, who have risked

much or all to keep Americans safe, and whom our officers promised to protect.[40]

Finally, by suspending visas, the Order halts the collection of important

intelligence that occurs during visa screening processes, information that can be

---

[39] Rebecca Savransky, *Iraq Parliament Approves 'Reciprocity Measure' In Trump Immigration Ban's Wake*, The Hill (Jan. 30, 2017); The Guardian, *UN says Trump's revised travel ban will worsen plight of refugees* (Mar. 7, 2017); Kevin Liptak, *Travel Ban Remains Sticking Point in Trump Calls with US Allies*, CNN (Feb. 9, 2017).

[40] Michael V. Hayden, *Former CIA Chief: Trump's Travel Ban Hurts American Spies – and America*, Wash. Post (Feb. 5, 2017).

used to recruit agents and identify regional trends of instability.[41]

### 3.   The Order will hinder domestic law enforcement efforts.

Domestic law enforcement relies heavily on partnerships with American Muslim communities to fight homegrown terrorism.[42]  One report found that since September 11, 2001, Muslim communities have helped U.S. security officials prevent nearly two out of every five Al-Qaeda plots threatening the United States.[43]  By alienating Muslim-American communities in the United States, the Order will harm our efforts to enlist their aid in identifying radicalized individuals who might launch attacks of the kind recently seen in San Bernardino and Orlando.

The Order's disparate impact on Muslim travelers and immigrants also feeds ISIL propaganda and sends a message to the Muslim community at home and abroad  that the U.S. government is at war with them based on their religion.  Less than a day after President Trump signed the January 27 Order, jihadist groups began citing its contents in recruiting messages online.[44]  By handing ISIL the message that the United States is engaged in a religious war, the revised Order may endanger Christian communities overseas.

---

[41] This process is particularly important in countries like Iran and Libya, where internal conflict or lack of diplomatic ties limit on-the-ground intelligence collection.
[42] Kristina Cooke & Joseph Ax, *U.S. Officials Say American Muslims Do Report Extremist Threats*, Reuters (Jun. 16, 2016).
[43] Muslim Public Affairs Council, *Data on Post-9/11 Terrorism in the United States* (Jun. 2012), http://www.mpac.org/assets/docs/publications/MPAC-Post-911-Terrorism-Data.pdf.
[44] Joby Warrick, *Jihadist Groups Hail Trump's Travel Ban as a Victory*, Wash. Post (Jan. 29 2017).

### 4.    The Order will have a devastating humanitarian impact.

The Order will have a devastating humanitarian impact.  First and foremost, the Order will disrupt the travel of men, women and children who have been victimized by actual terrorists.  Next, tens of thousands of other travelers today face deep uncertainty about whether they may travel to or from the United States for reasons including medical treatment, study or scholarly exchange, funerals or other pressing family reasons.  While the Order allows the Secretaries of State and Homeland Security to admit travelers from targeted countries on a case-by-case basis, in our experience it would be unrealistic for these overburdened agencies to apply such procedures to every one of the thousands of affected individuals with urgent and compelling needs to travel.  Finally, closing our borders to refugees who otherwise would have had the opportunity to resettle in the United States will keep them in dangerous conditions and shift the burden to overstretched allies who are currently accepting far more than their fair share of refugees.

### 5.    The Order will cause economic damage to American citizens and residents.

Finally, the Order will affect foreign travelers who annually inject hundreds of billions of dollars into the U.S. economy, supporting well over a million U.S. jobs.[45]  Since the initial Order issued, dozens of affected companies have noted the

---

[45] U.S. Dep't of Commerce, *Department of Commerce Releases October Travel and Tourism Expenditures* (Dec. 15, 2016), http://trade.gov/press/press-releases/2016/department-of-

damaging impact the travel ban can be expected to have on strategic economic

sectors including defense, technology, and medicine.[46]  About a third of U.S.

innovators were born outside the United States, and their scientific and

technological innovations have contributed to making our nation and the world

safe.[47]  The harm caused by the ban to the economic dynamism of our country will

carry long-term negative and serious consequences for our national security.

## III.  THE REVISED EXECUTIVE ORDER PERPETUATES THE BASIC STRUCTURAL FLAWS OF THE ORIGINAL ILL-CONCEIVED, POORLY IMPLEMENTED AND ILL-EXPLAINED ORDER.

The Supreme Court has observed that "[d]epartures from the normal

procedural sequence . . .  might afford evidence that improper purposes are playing

a role" in government action.  *Vill. Of Arlington Heights v. Metro. Hous. Dev.*

*Corp.*, 429 U.S. 252, 267 (1977).  What is more, this evidence cannot be cured by a

later-in-time order that preserves the essential features of the first.  *See U.S. v.*

*Fordice*, 505 U.S. 717 (1992) (holding that Mississippi's re-classification of

---

commerce-releases-october-travel-tourism-expenditures-121516.asp.

[46] *See, e.g.,* Br. for Technology Companies and Other Businesses as Amici Curiae in Support of Appellees, Washington v. Trump, No. 17-35105, __ F.3d__, 2017 WL 526497 (9th Cir. Feb. 9, 2017).

[47] Adams Nager, et al., *The Demographics of Innovation in the United States*, Information Technology & Innovation Foundation 29 (Feb. 2016), http://www2.itif.org/2016-demographics-of-innovation.pdf.  For example, Iran's universities have produced an "inordinate amount of intellectual talent in computer science and cybersecurity."  These scientists are drawn to U.S. universities where their research is used by entities such as the Office of Naval Research and DARPA.  Patrick O'Neill, *How Academics Are Helping Cybersecurity Students Overcome Trump's Immigration Order*, Cyberscoop (Jan. 30, 2017), https://www.cyberscoop.com/trump-immigration-ban-cybersecurity-iran-protests/.

colleges and universities in ways that were facially neutral but perpetuated racial segregation violated *Brown v. Board of Education*); *Vill. Of Arlington Heights*, 429 U.S. at 267 (noting that the "specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes").

The process that produced the January 27 Order departed from the traditional national security policy-making process, with little to no consultation or scrutiny across the Departments of State, Justice, Homeland Security or the Intelligence Community. And while further thought no doubt went into the March 6 Order, on its face it seems structured to mimic the original ban as closely as possible. As Justice Thomas has explained, "if a policy remains in force, without adequate justification and despite tainted roots and segregative effect, it appears clear – clear enough to presume conclusively – that the State has failed to disprove discriminatory intent." *Fordice*, 505 U.S. at 747 (Thomas, J., concurring).

In every recent administration, Presidents considering a change to immigration policy have followed an interagency review process that allows security professionals to ensure that relevant uncertainties are addressed by policy and legal experts, appropriate preparations are made for implementation, and potential risks are effectively mitigated. Before recommendations are submitted to the President, the National Security Council oversees a legal and policy process that typically includes the following important components: a review by career

professionals in government institutions charged with implementing an order; a review by those institutions' career lawyers to ensure legality and consistency in interpretation; and a senior policy review across all relevant agencies, including Deputies and Principals at the cabinet level.[48]  This practice of interagency deliberation has been followed even—and especially—in times of national emergency to set temporary exclusions or establish criteria for admission.  In the immediate aftermath of the September 11, 2001 attacks, when the Bush Administration considered whether the President should invoke 8 U.S.C. § 1182(f) to bar certain immigrants or take other actions to secure the border, officials consulted across the national security agencies to arrive at a decision.[49]  The 2011 reexamination of the vetting system[50] and the 2015-16 Visa Waiver Program reforms[51] reflect similar interagency consultation.

The process that produced the January 27 Order departed sharply from this standard practice.  Amici know of no process underway before January 20, 2017 to change current immigration vetting procedures.  According to extensive reporting,

---

[48] This is no less true of executive orders issued at the start of a presidency.  *See, e.g.,* Henry B. Hogue, Cong. Research Serv., *Presidential Transition Act: Provisions and Funding* (2016); William Glaberson & Helene Cooper, *Obama's Plan to Close Prison at Guantánamo May Take Year*, N.Y. Times (Jan. 12, 2009).

[49] Edward Alden, *The Closing of the American Border* 104-06 (2008); Thomas R. Eldridge et al., *9/11 and Terrorist Travel: A Staff Report of the National Commission on Terrorist Attacks Upon the United States* 151-54 (2004); Mem. from Stuart Levey, Assoc. Deputy Att'y Gen., to Dan Levin, Counsel to the Att'y Gen., & David Ayres, Dep't of Justice Chief of Staff (Oct. 3, 2001).

[50] Jon Finer, *supra* note 19.

[51] *See supra* notes 21-23 and surrounding text.

Respondents followed no such process in producing the January 27 Order.[52]  Nor,

apparently, did the White House consult officials from any of the seven agencies

tasked with enforcing immigration laws, much less the congressional committees

and subcommittees that oversee them.  There is every indication that that Order

received little, if any, advance scrutiny by the Departments of State, Justice,

Homeland Security or the intelligence community.[53]

As telling, the January 27 Order apparently issued without interagency legal

process.  In recent history, administrations of both parties have followed a protocol

of submitting proposed Orders to the Attorney General, the Justice Department's

Office of Legal Counsel and all other agency legal offices involved with enforcing

the law.[54]  Legal review by multiple agencies helps to identify potentially

unforeseen legal implications, determines the lawfulness of the proposed action,

and analyzes whether the proposed text has established legal meaning that can be

interpreted consistently with other laws and regulations.  Here, the White House

---

[52] The Secretary of Homeland Security reportedly received his first full briefing as the President signed the January 27 Order.  Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017).  The Secretary of Defense was neither consulted during drafting nor given an opportunity to provide input.  Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017).  Most State Department officials reportedly first heard of the Order through the media.  Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017).

[53] Customs and border officials reported that their superiors could not provide clear guidance about the new policy.  Shear & Nixon, *supra* note 53; *see also* Allen & O'Brien, *supra* note 53 (quoting CBP chief of passenger operations at John F. Kennedy International Airport declaring, "[w]e are as much in the dark as everybody else.").

[54] *See, e.g.,* Exec. Order No. 11,030, 27 Fed. Reg. 5,847 (Jun. 19, 1962).

reportedly never asked the Department of Homeland Security for pre-promulgation legal review, so "[t]he Department . . . was left making a legal analysis on the order after [President] Trump signed it."[55]  Unsurprisingly, the January 27 Order contained ambiguities and inconsistencies that caused serious confusion, forcing agencies to improvise and the White House to reverse itself at least once.[56]

Although the White House apparently consulted more agencies in the days before the March 6 Order, the process after January 27, 2017 plainly was meant to preserve the structure, substance and purpose of the original Order.  Indeed, White House political advisor Stephen Miller admitted that the March 6 Order would reflect "mostly minor technical differences," and achieve "the same basic policy outcome for the country," statements that were echoed by other senior officials.[57]

Ultimately, there is scant evidence that the country-based ban maintained in the Order emerged from the considered perspective of national security experts from multiple affected agencies.  In fact, a document that recently surfaced from the Department of Homeland Security shows just the opposite.  Asked by the new administration to identify the terrorist threat from the listed countries, DHS officials reached two critical conclusions:  that citizenship is likely an unreliable indicator of terrorist threat, and that few of the listed countries are home to terrorist

---

[55] Perez et al., *supra* note 53; Shear & Nixon, *supra* note 53.
[56] Allen & O'Brien, *supra* note 53; Geneva Sands et al., *Officials Aim to Clarify Impact on Dual Nationals From Trump's Immigration Executive Order*, ABC News (Feb. 1, 2017).
[57] Matthew Nussbaum et al., *supra* note 5.

groups that threaten the west.[58]  To date, the Administration has not explained how the Orders' country-based bans forestall terrorist threats or why more narrowly tailored measures would not address our country's national security concerns.

## CONCLUSION

Ours is a nation of immigrants, committed to the faith that we are all equal under the law and that we abhor discrimination, whether based on race, religion, sex, or national origin.  As government officials, amici sought diligently to protect our country, even while maintaining an immigration system free from intentional discrimination, a system that applies no religious tests and that measures individuals by their merits, not by stereotypes of countries or groups.

Unjustified blanket bans on certain countries or classes of people are beneath the dignity of the nation and Constitution that amici took oaths to protect.  Although our nation was founded by immigrants fleeing religious persecution, the Order discriminates based on religion.  Although our Constitution enshrines the principle that all are equal under the law, the Order discriminates on the basis of national origin.  And although the United States accepted over four million refugees in the decades after World War II,[59] the Order willfully ignores the greatest refugee crisis since that time.

---

[58] *Citizenship Unlikely, supra* note 18.
[59] Carl J. Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold War* 1 (2008).

24

Allowing the March 6 Order to take effect would wreak havoc on our nation's security and deeply held American values and would threaten innocent lives.  Denying the motion to dismiss and allowing adjudication of the underlying legal issues would not jeopardize national security but would simply preserve the *status quo ante,* subjecting travelers to all the existing, rigorous vetting processes.

For all these reasons, amici support Plaintiffs in opposing the Defendants' motion to dismiss, and seeking to block the March 6 Order from going into effect.

Respectfully submitted,

/s/ John Doroghazi

|  |  |
|---|---|
| Harold Hongju Koh | John Doroghazi |
| Hope Metcalf | Jonathan M. Freiman |
| RULE OF LAW CLINIC | Tahlia Townsend |
| Yale Law School | WIGGIN AND DANA LLP |
| 127 Wall Street, P.O. Box 208215 | 265 Church Street |
| New Haven, CT 06520-8215 | New Haven, CT 06508-1832 |
| 203-432-4932 | 203-498-4584 |

*Counsel for Amici Curiae**

---

* We are grateful for the contributions of Phil Spector, Danieli Evans, Clare Ryan, and Yale Law School Rule of Law Clinic students Benjamin Alter, Colleen Culbertson, Idriss Fofana, Alexandra Mahler-Haug, Abigail Olson, Aisha Saad, Mitzi Steiner, Aleksandr Sverdlik, Beatrice Walton, Emily Wanger, Zoe Weinberg, Tianyi Xin, and Nathaniel Zelinsky.  The Rule of Law Clinic is organized separately from the Jerome N. Frank Legal Services Organization, a counsel for petitioners in a separate challenge to the Order.  No counsel authored this brief in whole or in part; no party or party's counsel or any person other than amici, their members, and counsel, contributed money for this brief. The views expressed by Yale Law School clinics are not necessarily those of the Yale Law School.

# APPENDIX: LIST OF *AMICI*

1.      Madeleine K. Albright served as Secretary of State from 1997 to 2001.  A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997.  She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

2.      John R. Allen served as Special Presidential Envoy for the Global Coalition to Counter ISIL from 2014 to 2015.  Previously, he served as Commander of the International Security Assistance Force and U.S. Forces Afghanistan.

3.      Jeremy Bash served as Chief of Staff at the U.S. Department of Defense from 2011 to 2013, and as Chief of Staff at the Central Intelligence Agency from 2009 to 2011.

4.      Rand Beers served as Deputy Homeland Security Advisor to the President of the United States from 2014 to 2015.

5.      Daniel Benjamin served as Ambassador-at-Large for Counterterrorism at the U.S. State Department from 2009 to 2012.

6.      Antony Blinken served as Deputy Secretary of State from 2015 to January 20, 2017.  He also served as Deputy National Security Advisor to the President of the United States from 2013 to 2015.

7.      R. Nicholas Burns served as Under Secretary of State for Political Affairs from 2005 to 2008.  He previously served as U.S. Ambassador to NATO and as U.S. Ambassador to Greece.

8.      William J. Burns served as Deputy Secretary of State from 2011 to 2014.  He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

9.      James Clapper served as U.S. Director of National Intelligence from 2010 to January 20, 2017.

10.     David S. Cohen served as Under Secretary of the Treasury for Terrorism and Financial Intelligence from 2011 to 2015 and as Deputy Director of the Central Intelligence Agency from 2015 to January 20, 2017.

11.     Eliot A. Cohen served as Counselor of the U.S. Department of State from 2007 to 2009.

12.     Ryan Crocker served as U.S. Ambassador to Afghanistan from 2011 to 2012, U.S. Ambassador to Iraq from 2007 to 2009, U.S. Ambassador to Pakistan from 2004 to 2007, U.S. Ambassador to Syria from 1998 to 2001, U.S. Ambassador to Kuwait from 1994 to 1997, and U.S. Ambassador to Lebanon from 1990 to 1993.

13.     Daniel Feldman served as U.S. Special Representative for Afghanistan and Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the National Security Council.

14.     Jonathan Finer served as Chief of Staff to the Secretary of State from 2015 until January 20, 2017, and Director of the Policy Planning Staff at the U.S. State Department from 2016 until January 20, 2017.

15.     Michèle Flournoy served as Under Secretary of Defense for Policy from 2009 to 2013.

16.     Robert S. Ford served as U.S. Ambassador to Syria from 2011 to 2014, as Deputy Ambassador to Iraq from 2009 to 2010, and as U.S. Ambassador to Algeria from 2006 to 2008.

17.     Suzy George served as Deputy Assistant to the President and Chief of Staff and Executive Secretary to the National Security Council from 2014 to 2017.

18.     Phil Gordon served as Special Assistant to the President and White House Coordinator for the Middle East, North Africa and the Gulf from 2013 to 2015, and Assistant Secretary of State for European and Eurasian Affairs from 2009 to 2013.

19.     Avril D. Haines served as Deputy National Security Advisor to the President of the United States from 2015 to January 20, 2017.  From 2013 to 2015, she served as Deputy Director of the Central Intelligence Agency.

20.     General (ret.) Michael V. Hayden, USAF, served as Director of the Central Intelligence Agency from 2006 to 2009.  From 1995 to 2005, he served as Director of the National Security Agency.

21.     Christopher R. Hill served as Assistant Secretary of State for East Asian and Pacific Affairs from 2005 to 2009.  He also served as U.S. Ambassador to Macedonia, Poland, the Republic of Korea, and Iraq.

22.     John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

23.     Prem Kumar served as Senior Director for the Middle East and North Africa on the National Security Council staff of the White House from 2013 to 2015.

24.     Marcel Lettre served as Under Secretary of Defense for Intelligence from 2015 to 2017.

25.     Sen. Richard Lugar served as U.S. Senator for Indiana from 1977 to 2013, and as Chairman of the Senate Committee on Foreign Relations from 1985 to 1987 and 2003 to 2007, and as ranking member of the Senate Committee on Foreign Relations from 2007 to 2013.

26.     John E. McLaughlin served as Deputy Director of the Central Intelligence Agency from 2000 to 2004 and as Acting Director in 2004.  His duties included briefing President-elect Bill Clinton and President George W. Bush.

27.     Lisa O. Monaco served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to January 20, 2017.

28.     Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.

29.     James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017.  He served in the State Department from

c

1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

30.     Matthew G. Olsen served as Director of the National Counterterrorism Center from 2011 to 2014.

31.     Leon E. Panetta served as Secretary of Defense from 2011 to 2013. From 2009 to 2011, he served as Director of the Central Intelligence Agency.

32.     Jeffrey Prescott served as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017.

33.     Samantha J. Power served as U.S. Permanent Representative to the United Nations from 2013 to January 20, 2017.  From 2009 to 2013, she served as Senior Director for Multilateral and Human Rights on the National Security Council.

34.     Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009 to 2013 and as National Security Advisor from 2013 to January 20, 2017.

35.     Anne C. Richard served as Assistant Secretary of State for Population, Refugees and Migration from 2012 to January 20, 2017.

36.     Kori Schake served as the Deputy Director for Policy Planning at the U.S. State Department from December 2007 to May 2008.  Previously, she was the director for Defense Strategy and Requirements on the National Security Council in President George W. Bush's first term.

37.     Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees and Migration from 2009 to 2011.  From 1993 to 2001, he was responsible for refugee and humanitarian issues on the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

38.     Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

d

39.     Vikram Singh served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

40.     James B. Steinberg served as Deputy National Security Adviser from 1996 to 2000 and as Deputy Secretary of State from 2009 to 2011.

41.     Jake Sullivan served as National Security Adviser to the Vice President from 2013 to 2014. From 2011 to 2013, he served as Director of the Policy Planning Staff at the U.S. State Department.

42.     William Wechsler served as Deputy Assistant Secretary for Special Operations and Combating Terrorism at the U.S. Department of Defense from 2012 to 2015.

43.     Samuel M. Witten served as Principal Deputy Assistant Secretary of State for Population, Refugees, and Migration from 2007 to 2010.  From 2001 to 2007, he served as Deputy Legal Adviser at the State Department.

## <u>CERTIFICATE OF SERVICE</u>

I, John Doroghazi, hereby certify that on May 19, 2017, the foregoing

document was filed and served through the CM/ECF system.

Dated May 19, 2017                 Respectfully Submitted,

                                   <u>/s/ John Doroghazi</u>
                                   John Doroghazi
                                   Jonathan M. Freiman
                                   Tahlia Townsend
                                   WIGGIN AND DANA LLP
                                   265 Church Street, P.O. Box 1832
                                   New Haven, CT 06508-1832
                                   203-498-4584

                                   *Counsel for Amici Curiae*