## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, *et al.*,

    *Plaintiffs,*

*v.*

**DONALD TRUMP**, *et al.*,

    *Defendants.*

Case No. 2:17-cv-10310-VAR-SDD

Honorable Victoria A. Roberts

Mag. J. Stephanie D. Davis

---

## BRIEF OF *AMICI CURIAE* CONSTITUTIONAL LAW PROFESSORS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Kimberly Thomas (Mich. Bar #P66643)
701 South State Street
3032 South Hall
Ann Arbor, MI 48109
(734) 647-4054
kithomas@umich.edu

SIMPSON THACHER & BARTLETT LLP
Abram Ellis (N.Y. Bar #4402962)
900 G Street, Northwest
Washington, DC 20001
(202) 636-5579
aellis@stblaw.com

Alan Turner (N.Y. Bar #4000147)
Reena Mittelman (N.Y. Bar #5219761)
Jerry Fang (N.Y. Bar #5417191)
Patricia Yan (N.Y. Bar #5499173)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
aturner@stblaw.com
reena.mittelman@stblaw.com
jerry.fang@stblaw.com
patricia.yan@stblaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES PRESENTED ..................................................... ii

STATEMENT OF MOST APPROPRIATE AUTHORITIES ............................... iii

INDEX OF AUTHORITIES ..................................................................................iv

INTERESTS OF *AMICI CURIAE* ..........................................................................1

SUMMARY OF ARGUMENT ..............................................................................3

ARGUMENT .........................................................................................................4

     I.     United States Law Once Condoned Immigration Exclusion
           Based On Race And Ethnicity But Has Since Rejected Such
           Invidious Actions ......................................................................4

     II.    The Supreme Court Has Recognized Meaningful Limits On
           The Political Branches' Authority Over Immigration ......................10

     III.   Challenges To Immigration Decisions Are Justiciable ......................15

     IV.   Sections 1182(f) And 1185(a), Like Other Statutory Provisions,
           Must Be Construed To Avoid Raising Serious Constitutional
           Questions ..............................................................................20

     V.    The Risks Of Undue Deference: A Return To Lessons From
           History ..................................................................................23

CONCLUSION ....................................................................................................25

## STATEMENT OF THE ISSUES PRESENTED

1.  How the assertion of an unchecked Executive power in the immigration context to justify the Executive Order is informed by the historical legal context that demonstrates the dangers of judicial deference to Executive immigration actions that discriminate on the basis of nationality and race.

2.  What the scope of deference to the Executive should be, given the critical role of the judiciary in our constitutional system of reviewing and checking Executive actions alleged to be unconstitutional or to exceed delegated Congressional authority, whether or not those actions relate to immigration or national security.

3.  Whether the claims here are justiciable, given that a variety of other challenges to governmental immigration decisions and actions have been found to be justiciable, and every other court to examine the Executive Order at issue here has reached the merits.

4.  Whether the congressional delegation of authority to the President under Sections 1182(f) and 1185(a) of the Immigration and Nationality Act can be read to authorize the President to exercise powers in a manner that discriminates unconstitutionally.

## STATEMENT OF MOST APPROPRIATE AUTHORITIES

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986)

*Allende v. Schultz*, 845 F.2d 1111 (1st Cir. 1988)

*Aziz v. Trump*, --- F. Supp. 3d ---, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017)

*Doe v. Trump*, --- F. Supp. 3d ---, No. 17-cv-112, 2017 WL 975996 (W.D. Wis. Mar. 10, 2017)

*Gomez v. United States*, 490 U.S. 858 (1989)

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)

*Hawaii v. Trump*, --- F. Supp. 3d ---, No. 17-cv-50, 2017 WL 1011673 (D. Haw. Mar. 15, 2017)

*I.N.S. v. Chadha,* 462 U.S. 919 (1983)

*Int'l Refugee Assistance Project v. Trump*, --- F. Supp. 3d ---, No. 17-cv-361, 2017 WL 1018235 (D. Md. Mar. 16, 2017)

*Marbury v. Madison*, 5 U.S. 137 (1803)

*U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017)

*Zadvydas v. Davis*, 533 U.S. 678 (2001)

8 U.S.C. § 1152(a) (§ 1152(a) of the Immigration and Nationality Act)

## <u>INDEX OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abourezk v. Reagan*,
   785 F.2d 1043 (D.C. Cir. 1986) ................................................................. 13, 18

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) .................................................................................. 25

*Allende v. Schultz*,
   845 F.2d 1111 (1st Cir. 1988) ................................................................ 13, 18

*Am. Acad. of Religion v. Napolitano*,
   573 F.3d 115 (2d Cir. 2009) ................................................................... 13, 17

*Aziz v. Trump*,
   --- F. Supp. 3d ---, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va.
   Feb. 13, 2017) .......................................................................................... 19

*Bertrand v. Sava*,
   684 F.2d 204 (2d Cir. 1982) ................................................................... 14

*Boumediene v. Bush*,
   553 U.S. 723 (2008) .................................................................................. 17

*Chae Chan Ping v. United States*,
   130 U.S. 581 (1889) ................................................................................ 7, 10

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) .................................................................................. 25

*Doe v. Trump*,
   --- F. Supp. 3d ---, No. 17-cv-112, 2017 WL 975996 (W.D. Wis.
   Mar. 10, 2017) .......................................................................................... 19

*Fiallo v. Bell*,
   430 U.S. 787 (1977) .................................................................................. 14

*Fisher v. Univ. of Tex. at Austin*,
   -- U.S. ---, 133 S. Ct. 2411 (2013) .......................................................... 24

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893)..................................................................7

*Galarza v. Szalczyk*,
   745 F.3d 634 (3d Cir. 2014) ...................................................12

*Gomez v. United States*,
   490 U.S. 858 (1989)................................................................20

*Guessous v. Fairview Prop. Invs.*,
   828 F.3d 208 (4th Cir. 2016) ...................................................7

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006)................................................................16

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004)................................................................17

*Hawaii v. Trump*,
   --- F. Supp. 3d ---, No. 17-cv-50, 2017 WL 1011673 (D. Haw. Mar.
   15, 2017) ................................................................................19

*Hazama v. Tillerson*,
   851 F.3d 706 (7th Cir. 2017) .................................................17

*I.N.S. v. Cardoza-Fonseca*,
   480 U.S. 421 (1987)......................................................... 12, 16

*I.N.S. v. Chadha*,
   462 U.S. 919 (1983)................................................................11

*I.N.S. v. St. Cyr*,
   533 U.S. 289 (2001)................................................................21

*Int'l Refugee Assistance Project v. Trump*,
   --- F. Supp. 3d ---, No. 17-cv-361, 2017 WL 1018235 (D. Md. Mar.
   16, 2017) ................................................................................19

*Jean v. Nelson*,
   472 U.S. 846 (1985)...................................................... 16, 21, 22

*Johnson v. Robison*,
   415 U.S. 361 (1974)................................................................20

*Kerry v. Din*,
  --- U.S. ---, 135 S. Ct. 2128 (2015)................................................................ 13, 14

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)........................................................... 12, 13, 14, 17

*Korematsu v. United States*,
  323 U.S. 214 (1944)........................................................... 23, 24, 25

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953)....................................................................8

*Louhghalam v. Trump*,
  --- F. Supp. 3d ---, No. 17-cv-10154, 2017 WL 479779 (D. Mass.
  Feb. 3, 2017) ...........................................................................19

*Loving v. Virginia*,
  388 U.S. 1 (1967).....................................................................25

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1999)..................................................................15

*Mandel v. Mitchell*,
  325 F. Supp. 620 (E.D.N.Y. 1971) ...............................................17

*Marbury v. Madison*,
  5 U.S. 137 (1803).....................................................................10

*Negusie v. Holder*,
  555 U.S. 511 (2009)............................................................ 12, 16

*Oyama v. California*,
  332 U.S. 633 (1948).................................................................10

*Printz v. United States*,
  521 U.S. 898 (1997).................................................................12

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ......................................................15

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978).................................................................24

*Sarsour v. Trump*,
   --- F. Supp. 3d ---, No. 1:17-cv-120, 2017 WL 1113305 (E.D. Va.
   Mar. 24, 2017)..................................................................................20

*Shaughnessy v. U.S. ex rel. Mezei*,
   345 U.S. 206 (1953).............................................................................9

*Spokeo, Inc. v. Robins*,
   --- U.S. ---, 136 S. Ct. 1540 (2016)....................................................16

*U.S. ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)..................................................................... 11, 12

*U.S. ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950)........................................................................8, 16

*United States v. Ju Toy*,
   198 U.S. 254 (1905).............................................................................7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church*
   *& State, Inc.*,
   454 U.S. 464 (1982)...........................................................................16

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ...........................................................19

*Webster v. Doe*,
   486 U.S. 592 (1988)...........................................................................20

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................ 10, 20, 21

## Legislative Materials

70 Cong. Rec. 3620 (1929) (statement of Rep. William Thomas
   Fitzgerald) ...........................................................................................6

70 Cong. Rec. 4907 (1929) (statement of Rep. Jed Johnson) ...................6

H.R. Rep. No. 45-62 (1879)......................................................................5

H.R. Rep. No. 68-350 (1924).....................................................................6

H.R. Res. 683, 112th Cong. (2012)...........................................................8

REPORT OF THE COMM'N ON WARTIME RELOCATION AND INTERNMENT
 OF CIVILIANS, PERSONAL JUSTICE DENIED (1982)...................................24

S. Res. 201, 112th Cong. (2011)................................................................8

**Statutes**

22 U.S.C. § 6411...................................................................................23

8 U.S.C. § 1182(a)(27)...........................................................................13

8 U.S.C. § 1182(a)(3).............................................................................23

8 U.S.C. § 1182(f).............................................................................. 22, 23

8 U.S.C. § 1185(a) .............................................................................. 22, 23

Act of April 27, 1904, ch. 1630, 33 Stat. 428 (1904) ....................................5

Act of February 5, 1917, ch. 29, § 3, 39 Stat. 874 (1917) ...........................5

Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58 (1882)........................5

Chinese Exclusion Repeal Act of 1943, ch. 344, 57 Stat. 600 (1943) ...................8

Expatriation Act of 1907, ch. 2534, § 3, 34 Stat. 1228 (1907)..................6

Immigration Act of 1924, ch. 190, § 11, 43 Stat. 153 (1924)..................6

Immigration Act of 1924, ch. 190, § 13, 43 Stat. 153 (1924)..................6

Immigration and Nationality Act, ch. 477, § 311, 66 Stat. 163 (1952) ...................8

Immigration and Nationality Act, Pub. L. No. 89-236, sec. 202, § 2(a),
 79 Stat. 911 (1965) (*codified at* 8 U.S.C. § 1152(a)) ......................................8, 22

Naturalization Act of 1790, ch. III, 1 Stat. 103 (1790)...............................5

Page Act of 1875, ch. 141, 18 Stat. 477 (1875)........................................5

**Rules and Regulations**

Proclamation No. 4417, An American Promise, 41 Fed. Reg. 7,741
 (Feb. 20, 1976).................................................................................24

## Other Authorities

Charles D. Weisselberg, *The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. Pa. L. Rev. 933 (1995) ............................................................9

Gabriel J. Chin, *Segregation's Last Stronghold: Race Discrimination and the Constitutional Law of Immigration*, 46 UCLA L. Rev. 1 (1998) ...................................................................................9

Gillian E. Metzger, *Ordinary Administrative Law as Constitutional Common Law*, 110 Colum. L. Rev. 479 (2010) .....................................11

Hiroshi Motomura, Americans in Waiting: The Lost Story of Immigration and Citizenship in the United States (2006) ............................5

Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545 (1990) ...............................................................9

Ian Haney-Lopez, White By Law: The Legal Construction of Race (1996) ................................................................................7

Jamal Greene, *The Anticanon*, 125 Harv. L. Rev. 380 (2011) ................................23

Judith Resnik, *"Within its Jurisdiction": Moving Boundaries, People, and the Law of Migration*, 160 Proc. Am. Phil. Soc'y 117 (2016) .......................9

Khaled A. Beydoun, *Between Muslim and White: The Legal Construction of Arab American Identity*, 69 N.Y.U. Ann. Surv. Am. L. 29 (2013) ..............................................................................7

Leti Volpp, *The Citizen and the Terrorist*, 49 UCLA L. Rev. 1575 (2002) ...................................................................................7

Louis Henkin, The Age Of Rights (1990) ............................................................10

Peter H. Schuck, *The Transformation of Immigration Law*, 84 Colum. L. Rev. 1 (1984) ...........................................................................9

Stephen H. Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 Sup. Ct. Rev. 255 (1984) ..........................................9

ix

T. Alexander Aleinikoff, *Detaining Plenary Power: The Meaning and Impact of* Zadvydas v. Davis, 16 Geo. Immigr. L.J. 365 (2002)...........................9

Vicki C. Jackson, *Standing and the Role of Federal Courts: Triple Error Decisions in* Clapper v. Amnesty International USA *and* City of Los Angeles v. Lyons, 23 Wm. & Mary Bill Rts. J. 127 (2014) ...................16

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* are scholars of constitutional law, federal court jurisdiction, and the law of immigration, national security, and citizenship.[1] Because of our areas of expertise, *Amici* write to provide an overview of the history and governing legal principles of judicial review of Executive Branch decisions related to immigration and national security. Given the jurisprudence, *Amici* believe that this Court should reach the merits of the claims that the Executive's actions were in excess of its statutory authority and violated the Constitution.

*Amici* are the following scholars[2]:

**Bruce Ackerman**, Sterling Professor of Law and Political Science, Yale Law School;

**Janet Cooper Alexander**, Frederick I. Richman Professor of Law, Emerita, Stanford Law School;

**Stuart Banner**, Norman Abrams Professor of Law, UCLA School of Law;

---

[1] *Amici* certify that no party's counsel authored any part of this brief, and no party or person other than *Amici* or their counsel made any monetary contribution intended to fund preparation or submission of this brief. All parties have consented to the filing of this *amicus curiae* brief.

[2] Institutional affiliations are included for identification purposes only and do not represent the views of the institutions.

1

**Erwin Chemerinsky**, Dean of the School of Law, Distinguished Professor of Law, and Raymond Pryke Professor of First Amendment Law, University of California, Irvine School of Law;

**Gabriel J. Chin**, Edward L. Barrett Chair of Law and Martin Luther King, Jr. Professor of Law, UC Davis School of Law;

**Kristin Collins**, Professor of Law and Associate Dean for Intellectual Life, Boston University School of Law;

**Brandon L. Garrett**, Justice Thurgood Marshall Distinguished Professor of Law, University of Virginia Law School;

**Geoffrey Hoffman**, Clinical Associate Professor, University of Houston Law Center;

**Catherine Y. Kim**, Associate Professor of Law, University of North Carolina School of Law;

**Hiroshi Motomura**, Susan Westerberg Prager Professor of Law, UCLA School of Law;

**Burt Neuborne**, Norman Dorsen Professor of Civil Liberties, New York University School of Law;

**Gene R. Nichol**, Boyd Tinsley Distinguished Professor of Law, University of North Carolina School of Law;

**Judith Resnik**, Arthur Liman Professor of Law, Yale Law School;

**Jonathan Weinberg**, Professor of Law, Wayne State University Law School.

## SUMMARY OF ARGUMENT

*Amici* make four points. First, it is essential to evaluate the Executive's assertions of unfettered discretion, plenary power, and non-reviewability of decisions related to immigration in the historical context of U.S. immigration law and policy. This history demonstrates the harm of excessive deference to Executive Branch claims that national security requires the government to target groups based on nationality and race. The powerful exemplar is, of course, the evacuation and detention of more than 100,000 Japanese-Americans during World War II, to which the courts acceded and for which both the Executive and Congress later apologized. Since World War II, however, immigration law—as reflected both in legislation and in the jurisprudence of the Supreme Court—has evolved to reflect emerging norms of racial equality and individual liberty.

Second, courts have developed and articulated meaningful constraints on the immigration authority of the political branches. While Congress and the President are entitled to deference on matters related to immigration and national security, they have no authority to ignore the Constitution. Animated by concerns relating to individual rights, separation-of-powers, and federalism, courts have sought to ensure that the political branches do not violate constitutional prohibitions on arbitrary decision-making or promote invidious discrimination.

3

Third, *Amici* explain the role of justiciability doctrines in the development of these constraints. Although petitioners in the array of litigated immigration cases have not always succeeded in overturning decisions on the merits, courts have generally reached the merits rather than rely on justiciability doctrines such as ripeness and standing to avoid making decisions. Those merits decisions underscore that the refusal to permit entry to individuals affects not only persons outside the United States, but also citizen and U.S. resident family members, employers, universities, States, localities and the public at large.

Fourth, when responding to claims related to immigration, courts have regularly sought to examine whether, under the doctrine of constitutional avoidance, statutes should be read to allow unfettered Executive Branch authority. Even in the face of text seeming to constrain judicial review, the courts have shouldered the responsibility of ensuring that America's rule of law applies to actions of American officials.

## ARGUMENT

### I. United States Law Once Condoned Immigration Exclusion Based On Race And Ethnicity But Has Since Rejected Such Invidious Actions

No student of United States history can ignore that our Nation's immigration policies once routinely employed notions of racial and cultural inferiority to exclude classes of noncitizens as threats to our safety and stability. And when these practices were challenged, the government regularly asserted that its authority was

4

unconstrained—or "plenary." But the lesson to be drawn from this unhappy history is the importance of America's rejection of racial and ethnic restrictions on immigration. Just as Congress and the courts were once central in permitting such discrimination, so too Congress and the courts have been essential to the revision of those practices. Below, we sketch the rise and fall of overt discrimination in immigration based on race and ethnicity.

From the late eighteenth century through World War II, both Congress and the courts condoned immigration exclusion based on race and ethnicity. As early as the Naturalization Act of 1790, Congress restricted immigrant eligibility for citizenship to "free white person[s]." Ch. III, 1 Stat. 103 (1790). Beginning in 1875, Congress enacted a series of laws targeting and ultimately prohibiting virtually all Chinese immigration. *See, e.g.*, Page Act of 1875, ch. 141, 18 Stat. 477 (1875); Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58 (1882); Act of April 27, 1904, ch. 1630, 33 Stat. 428 (1904). Congress asserted that these measures were needed to remedy "a standing menace to the social and political institutions of the country." H.R. Rep. No. 45-62, at 3 (1879). In 1917, Congress expanded the scope of excludability by creating an "Asiatic Barred Zone," stretching from Saudi Arabia to the Polynesian islands. *See* Act of February 5, 1917, ch. 29, § 3, 39 Stat. 874, 876 (1917); *see generally* HIROSHI MOTOMURA, AMERICANS IN WAITING: THE LOST STORY OF IMMIGRATION AND CITIZENSHIP IN THE UNITED STATES 103 (2006).

The Immigration Act of 1924 went further, barring entry of all immigrants unless they were eligible for citizenship, which at that time encompassed only "free white persons" and "aliens of African nativity and . . . persons of African descent." *See* ch. 190, § 13, 43 Stat. 153, 161–62 (1924); H.R. Rep. No. 68-350, at 6 (1924) (internal quotation marks omitted). The Act also imposed strict national-origin quotas. *See* § 11, 43 Stat. at 159–60. Again, such measures were characterized as necessary to our national survival: "If . . . the principle of individual liberty, guarded by a constitutional government created on this continent nearly a century and a half ago, is to endure, the basic strain of our population must be maintained . . . ." H.R. Rep. No. 68-350, at 13.

As hostility emerged toward other groups, claims were made that they, too, would bring poverty, disease, alcohol, labor competition, and other challenges to America's identity. One Representative claimed that "hordes of undesirable aliens . . . [were] undermining [the] health, integrity, and moral fiber of the forthcoming generations." 70 Cong. Rec. 4907 (1929) (statement of Rep. Jed Johnson). Another argued the need to stop foreigners from "poisoning the American citizen." 70 Cong. Rec. 3620 (1929) (statement of Rep. William Thomas Fitzgerald). Moreover, gender and racial stereotypes interacted, as legislation mandated that American women who married noncitizens lost their United States citizenship. Expatriation Act of 1907, ch. 2534, § 3, 34 Stat. 1228, 1228–29 (1907).

6

The courts likewise endorsed invidious exclusions through references to the "plenary" power of the political branches over immigration. For example, in *Chae Chan Ping v. United States*, a unanimous Court reasoned that in light of the "Oriental invasion" posing a "menace to our civilization," if Congress "considers the presence of foreigners of a different race in this country . . . to be dangerous to its peace and security, their exclusion is not to be stayed." 130 U.S. 581, 595, 606 (1889); *see also United States v. Ju Toy*, 198 U.S. 254, 259–60, 263–64 (1905) (denying habeas review over exclusion of individual claiming U.S. citizenship); *Fong Yue Ting v. United States*, 149 U.S. 698, 732 (1893) (sustaining expulsion of U.S. resident for failing to produce a "white" witness to testify to his lawful presence). Such discrimination frequently conflated race with national origin and ethnicity.[3]

Beginning in the middle of the twentieth century, however, both Congress and the Supreme Court moved decisively away from these attitudes. In 1943, Congress repealed the prohibition on Chinese admissions. *See* Chinese Exclusion Repeal Act

---

[3] Today, the conflation of Muslim and Arab identity and the discrimination against "persons who 'appear Middle Eastern, Arab, or Muslim'" have been well chronicled. *See generally, e.g.*, Khaled A. Beydoun, *Between Muslim and White: The Legal Construction of Arab American Identity*, 69 N.Y.U. Ann. Surv. Am. L. 29 (2013); Leti Volpp, *The Citizen and the Terrorist*, 49 UCLA L. Rev. 1575 (2002); IAN HANEY-LOPEZ, WHITE BY LAW: THE LEGAL CONSTRUCTION OF RACE 106 (1996); *see also Guessous v. Fairview Prop. Invs.*, 828 F.3d 208, 225 (4th Cir. 2016) (noting that anti-Muslim animus may constitute "race" discrimination).

of 1943, ch. 344, 57 Stat. 600 (1943).[4] In 1952, Congress guaranteed that the "right of a person to become a naturalized citizen of the United States shall not be denied or abridged because of race or sex . . . ." Immigration and Nationality Act, ch. 477, § 311, 66 Stat. 163, 239 (1952). Then, in 1965, it finally rejected the premise of racialized national exclusivity by abandoning the national-origin immigrant quota systems. *See* Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911, 911–12 (1965). Moreover, it specifically provided that with regard to the issuance of immigrant visas, "[n]o person shall receive any preference or priority or be discriminated against . . . because of his race, sex, nationality, place of birth, or place of residence." *Id*. at 911.

Within the judiciary, the insistence on constitutional protections in the immigration context initially was uneven. On the one hand, *Kwong Hai Chew v. Colding* rejected the contention that a lawful permanent resident could be excluded from the United States without being given notice of the charges justifying his exclusion and an opportunity to object. 344 U.S. 590, 603 (1953). On the other hand, both *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), which sustained exclusion of a war bride without any hearing, and *Shaughnessy v. U.S. ex rel. Mezei*,

---

[4] Decades later, both the House and Senate apologized for the government's policies of Chinese exclusion. *See* H.R. Res. 683, 112th Cong. (2012); S. Res. 201, 112th Cong. (2011).

345 U.S. 206 (1953), which upheld the exclusion and indefinite detention of a returning noncitizen without a hearing, represented steps backwards.

Subsequent to those Cold War era decisions, however, the Supreme Court— while continuing to recognize the need for appropriate deference—retreated from the *Knauff/Mezei* licensing of unfettered government power in immigration decisions. *See generally* Charles D. Weisselberg, *The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. Pa. L. Rev. 933 (1995). A wealth of scholarship has chronicled this shift in doctrine as due process and equal protection norms came to be reflected—albeit with variations— in immigration law. *See, e.g.*, Peter H. Schuck, *The Transformation of Immigration Law*, 84 Colum. L. Rev. 1, 4 (1984); Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545, 547 (1990); T. Alexander Aleinikoff, *Detaining Plenary Power: The Meaning and Impact of* Zadvydas v. Davis, 16 Geo. Immigr. L.J. 365, 365–66 (2002); Gabriel J. Chin, *Segregation's Last Stronghold: Race Discrimination and the Constitutional Law of Immigration*, 46 UCLA L. Rev. 1, 54– 58 (1998); Judith Resnik, *"Within its Jurisdiction": Moving Boundaries, People, and the Law of Migration*, 160 Proc. Am. Phil. Soc'y 117, 133 (2016); Stephen H. Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 Sup. Ct. Rev. 255, 257–58 (1984).

The vision of law that supported judicial approval of such discriminatory legislation and produced pejoratives such as "'the yellow peril,'" *Oyama v. California*, 332 U.S. 633, 658–59 (1948) (Murphy, J., concurring), have come to be seen as tragic moments in our Nation's history. As Professor Louis Henkin put it, the invidious discrimination sanctioned in *Chae Chan Ping* had become "an embarrassment"; indeed, *Chae Chan Ping* and cases like it represented "relics of a bygone, unproud era." LOUIS HENKIN, THE AGE OF RIGHTS 137 (1990).

## II.   The Supreme Court Has Recognized Meaningful Limits On The Political Branches' Authority Over Immigration

Our democratic system obligates the judiciary to constrain any unconstitutional excesses of the political branches. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Notwithstanding the deference afforded to immigration regulation by the political branches, the Supreme Court has imposed meaningful constraints on legislative and Executive overreach. The Court's jurisprudence on immigration reflects its oversight of both individual constitutional rights as well as structural separation-of-powers norms. For example, in *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), rejecting the Executive's claim of authority to indefinitely detain a noncitizen who had been ordered deported but could not be repatriated to another country, the Court emphasized that even in the realm of immigration, the political branches remain "subject to important constitutional limitations."

10

Further, the Supreme Court has enforced structural norms designed to protect against "arbitrary" immigration decisions by any single branch of government. In *I.N.S. v. Chadha,* 462 U.S. 919 (1983), the Court rejected Congress's attempt to impose a one-house legislative veto over an Executive Branch decision to deport a particular alien, emphasizing that the procedural requirements of bicameralism and presentment were necessary "to protect the whole people from improvident laws," to ensure that federal policymaking is subject to "full study and debate in separate settings," and to "preclud[e] final arbitrary action of one person." *Id*. at 951.

Similarly, the Court has exercised meaningful review over agencies' immigration decisions to protect separation-of-powers norms requiring careful deliberation, reasoned decision-making, and non-arbitrariness, just as it has over administrative decisions outside of the immigration context. *See, e.g.*, Gillian E. Metzger, *Ordinary Administrative Law as Constitutional Common Law*, 110 Colum. L. Rev. 479, 499 (2010). *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), is illustrative. There, the Supreme Court held that the Attorney General deprived a noncitizen of a fair hearing on an application for discretionary relief from removal when he circulated the alien's name on a list of "'unsavory'" characters who should be deported. *Id.* at 264. The Court concluded that, although the Attorney General retained ultimate discretionary authority to grant or deny such relief, the Attorney General could not circumvent regulatory procedures requiring the Board of

11

Immigration Appeals to first render judgment on such applications. *Id*. at 267; *see also I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421 (1987) (rejecting Executive's interpretation of statutory term "well-founded fear of persecution" for asylum admissions); *Negusie v. Holder,* 555 U.S. 511, 514 (2009) (rejecting Executive's interpretation of provision disqualifying individuals who were "coerced" into persecuting others from eligibility for asylum). In sum, notwithstanding the discretion properly recognized in the political branches with respect to many aspects of immigration law, the courts remain responsible for ensuring that those powers are exercised consistently with constitutional norms.[5]

To be sure, when reviewing the merits of immigration decisions, courts have sometimes deferred to the Executive's judgments. In *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972), the Court held that the Attorney General's decision to deny a waiver of inadmissibility to an alien would be sustained as long as the government provided a "facially legitimate and bona fide reason" for its decision. Subsequent courts generally have been unwilling to "look behind" the government's stated justification when the justification itself was facially legitimate and bona fide. *See,*

---

[5] Further constraints on the political branches' immigration powers have come from the structure of "Our Federalism," illustrated by decisions applying—in the immigration context—the non-commandeering principle of *Printz v. United States*, 521 U.S. 898 (1997). *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[T]he federal government cannot command the government agencies of the states to imprison persons of interest to federal officials.").

*e.g.*, *Kerry v. Din*, --- U.S. ---, 135 S. Ct. 2128 (2015) (Kennedy, J., concurring) (denial premised on terrorist activity); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009) (denial premised on material support for terrorism).

Such deference, however, does not amount to a judicial rubber stamp. To the contrary, courts have shown less deference when the government's stated justifications raised constitutional concerns. For example, in both *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), and *Allende v. Schultz*, 845 F.2d 1111 (1st Cir. 1988), the government denied visas to noncitizens based on their affiliation with groups deemed hostile to the United States. The Executive cited to its broad statutory discretion under 8 U.S.C. § 1182(a)(27), which barred the entry of aliens who "seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." While acknowledging *Mandel*'s standard of deference, the First Circuit and the D.C. Circuit interpreted the statute narrowly to bar an alien's entry only if the reason for the threat to public interest, welfare, safety, or security was "*independent of* the fact of membership in or affiliation with the proscribed organization." *Abourezk,* 785 F.2d at 1058 (emphasis in original); *see also Allende,* 845 F.2d at 1116.

That approach is consistent with Justice Kennedy's concurrence in *Kerry v. Din*, which involved the denial of a visa to the spouse of a United States citizen.

13

Justice Kennedy's opinion—joined by Justice Alito (thereby providing a majority to sustain the visa denial)—concluded that the government had provided a "facially legitimate and bona fide" reason for its decision based on its individualized conclusion that Din's husband had been involved in terrorist activity. 135 S. Ct. at 2140. But *Din* did not involve allegations of invidious discrimination or arbitrary classifications, and Justice Kennedy noted that under *Mandel*, an "affirmative showing of bad faith" *would* require a court to "'look behind'" the stated reasons for a decision. *Id.* at 2141; *see also Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir. 1982) (holding that "discretion may not be exercised to discriminate invidiously against a particular race or group or to depart without rational explanation from established policies," and that such exercise would fail *Mandel*'s standard). These cases reflect that the government's reasons must be *both* "facially legitimate" and "bona fide," and where the government's *stated* reasons rely on constitutionally suspect and arbitrary classifications, courts will exercise closer scrutiny.

Pursuant to such scrutiny, courts have sometimes sustained the use of suspect or quasi-suspect classifications in immigration decisions. In *Fiallo v. Bell*, the Court sustained a legislative provision denying preferential immigration status based on the relationship between an illegitimate child and his or her biological father. 430 U.S. 787, 794 (1977). And in *Rajah v. Mukasey*, the Second Circuit upheld the special registration program implemented shortly after 9/11 requiring non-

14

immigrant males over the age of 16 from twenty-five countries, all but one of which was predominantly Muslim, to appear for registration and fingerprinting and to present immigration documents. 544 F.3d 427, 435–39 (2d Cir. 2008).

But neither race nor ethnicity nor religion is a facially legitimate reason for excluding aliens, and national-origin classifications are upheld only in narrow circumstances. Indeed, even in *Rajah*, the court "agree[d] that a selective prosecution based on [] animus [toward Muslims] would call for some remedy." *Id.* at 438–39 (finding, however, no evidence of "improper animus toward Muslims"). As *Rajah* demonstrates, while the political branches may sometimes employ disfavored classifications to regulate immigration, courts will carefully scrutinize such classifications—especially where animus might be at issue.

## III.   Challenges To Immigration Decisions Are Justiciable

Doctrines of justiciability represent important concerns about when the federal judiciary should assess claims of violations of legal rights. The now-classic statement of the standing doctrine comes from Justice Scalia's plurality opinion in *Lujan v. Defenders of Wildlife*: To establish standing, a plaintiff must allege (1) an "injury in fact" that is (2) "fairly . . . trace[able] to the challenged action of the defendant," and that is (3) "likely" to be "redressed by a favorable decision." 504 U.S. 555, 560–61 (1999) (citations omitted). The injury-in-fact must be both concrete and particularized. *See Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540,

15

1545 (2016). This requirement helps ensure that federal courts resolve legal problems in a "factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). However, while standing and other justiciability doctrines enshrine important separation-of-powers principles, they should not be used to insulate large categories of political branch behavior from judicial review. *See generally* Vicki C. Jackson, *Standing and the Role of Federal Courts: Triple Error Decisions in* Clapper v. Amnesty International USA *and* City of Los Angeles v. Lyons, 23 Wm. & Mary Bill Rts. J. 127 (2014).

Supreme Court jurisprudence makes clear that even when noncitizens do not have a "right" to enter or to remain in the United States, they can be heard on the merits of their claims that they were treated unlawfully. *See, e.g.*, *Negusie,* 555 U.S. at 513–15 (discretionary denial of asylum); *Cardoza-Fonseca*, 480 U.S. at 424–25 (same); *Jean v. Nelson*, 472 U.S. 846, 853–54 (1985) (discretionary grants of parole for migrants without documents); *Accardi*, 347 U.S. at 266–68 (discretionary suspension of deportation). The Supreme Court has even addressed the merits of claims brought by noncitizens outside the United States believed to have engaged in terrorism. *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). In each case, the Court concluded that while Executive Branch claims based on national security are properly entitled to significant deference, that deference is not a "'blank check.'" *Id.*

16

at 576–78, 636 (2006) (Breyer, J., concurring) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)); *see also Boumediene v. Bush*, 553 U.S. 723, 771–72 (2008).

The Court has further found that U.S. citizens and residents have standing to challenge denial of a visa to a noncitizen when it implicates their own constitutional interests. In *Mandel*, the Court held that the First Amendment interests of American professors who had invited Mandel to speak at their conferences made the case justiciable because the professors themselves suffered a constitutionally cognizable injury. The lower court explained:

> Here the plaintiffs other than Mandel are directly involved with Mandel's entry because they have invited him, and they expect to participate in meeting with him or expect to be among his auditors. No more is required to establish their standing. . . . The special relation of plaintiffs to Mandel's projected visit gives them a specificity of interest in his admission, reinforced by the general public interest in the prevention of any stifling of political utterance, that abundantly satisfies 'standing' requirements.

*Mandel v. Mitchell*, 325 F. Supp. 620, 632 (E.D.N.Y. 1971). Circuit courts have followed this approach. *See, e.g.*, *Hazama v. Tillerson*, 851 F.3d 706, 707 (7th Cir. 2017) (holding that district court improperly concluded it lacked jurisdiction to review visa denial); *Am. Acad. of Religion*, 573 F.3d at 118 (exercising jurisdiction over visa denial).

In addition, where plaintiffs challenge a *policy* of visa denials rather than the application of a concededly legitimate policy to a particular individual, the case

17

remains justiciable regardless of whether particular individuals have been denied or granted a visa pursuant to the policy. For example, in *Abourezk*, 785 F.2d at 1043, the government had denied visas to several groups of noncitizens on the basis of the applicants' membership with organizations or governments hostile to the United States. The government argued that there was no live case or controversy because the State Department considers each visa application on a case-by-case basis. Rejecting that contention, the Court of Appeals concluded that "the reasons for the visa denials offered . . . indicate that the prospect of future denials of applications . . . is a genuine, and not merely a theoretical, possibility." *Id.* at 1052. Similarly, in *Allende*, the court held that the case was not moot even though the applicant had ultimately obtained permission to enter:

> Although the specific application of that policy against Allende in March 1983 is moot, the validity of that policy in general remains a live controversy. And since the existence of the policy continues to effect [*sic*] the actions of the plaintiffs who may reasonably expect that the government will oppose future plans to extend speaking invitations to Allende, we find the Article III case or controversy requirement satisfied.

845 F.2d at 1115 n.7. In both cases, the government's general policy of denying visas to members of particular organizations rendered the injury sufficiently likely even if the policy was not applied uniformly in every case.

Consistent with these principles, all of the federal courts that have examined the January 27 Executive Order addressed the merits, and all but one found that

questions of its constitutional infirmity warranted enjoining the Order's enforcement. In *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017), a unanimous Ninth Circuit panel concluded that the State plaintiffs had established standing to challenge the Order and were likely to succeed on the merits of their due process claims. In *Aziz v. Trump,* --- F. Supp. 3d ---, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017), a Virginia district court found that the Commonwealth of Virginia had standing; a likelihood of success on the merits of its Establishment Clause claim in light of the government's public statements regarding its policy; and that evidence of bad faith precluded deference to the government's stated rationale under the "facially legitimate and bona fide reason" standard. *But cf. Louhghalam v. Trump*, --- F. Supp. 3d ---, No. 17-cv-10154, 2017 WL 479779 (D. Mass. Feb. 3, 2017) (denying extension of temporary restraining order).

Likewise, all four district courts considering the legality of the revised March 6 Executive Order have reached the merits, and three enjoined implementation of that Order, finding that it raises the same constitutional concerns as the original Order. *See Int'l Refugee Assistance Project v. Trump*, --- F. Supp. 3d ---, No. 17-cv-361, 2017 WL 1018235 (D. Md. Mar. 16, 2017) (finding likelihood of success on Establishment Clause claim); *Hawaii v. Trump,* --- F. Supp. 3d ---, No. 17-cv-50, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) (same); *Doe v. Trump*, --- F. Supp. 3d ---, No. 17-cv-112, 2017 WL 975996 (W.D. Wis. Mar. 10, 2017) (finding plaintiff's

19

claims "have at least some chance of prevailing for the reasons articulated by other courts" to warrant temporary restraining order). *But see Sarsour v. Trump*, --- F. Supp. 3d ---, No. 1:17-cv-120, 2017 WL 1113305 (E.D. Va. Mar. 24, 2017) (denying motion for temporary restraining order). None of these courts refused to consider the plaintiffs' claims on justiciability grounds.

## IV.   Sections 1182(f) And 1185(a), Like Other Statutory Provisions, Must Be Construed To Avoid Raising Serious Constitutional Questions

It is a "cardinal principle" of statutory interpretation that when an Act of Congress raises "a serious doubt" as to its constitutionality, the Supreme Court "will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas*, 533 U.S. at 689 (internal quotation marks omitted). The Supreme Court has repeatedly emphasized that it will "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989). Moreover, statutes in tension with basic constitutional values are construed in accord with strong "clear statement" presumptions, requiring that—in the absence of explicit language—a statute will not be interpreted to trench on those fundamental values. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603–05 (1988); *Johnson v. Robison*, 415 U.S. 361, 373–74 (1974).

Recognizing that the political branches' regulation of immigration "is subject to important constitutional limitations," *Zadvydas*, 533 U.S. at 695, the Supreme

20

Court has repeatedly applied the canon of constitutional avoidance to limit immigration provisions that on their face appeared to confer unconstrained authority. In *I.N.S. v. St. Cyr*, 533 U.S. 289, 311 (2001), for instance, the Court rejected the government's claim that a statute providing that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain crimes precluded judicial review over a habeas challenge. Concluding that such a reading would raise serious constitutional questions under the Suspension Clause, the Court held that the denial of discretionary relief for a removable alien is subject to judicial review. In *Zadvydas*, too, where the statute contained no time limit on the detention of certain aliens, the Court read the statute to include an implicit reasonableness limitation and emphasized that "[w]e have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation." 533 U.S. at 689.

Likewise, in *Jean v. Nelson*, the Supreme Court rejected the Eleventh Circuit's ruling that the Executive Branch may deny parole to arriving aliens on the basis of race or national origin notwithstanding Equal Protection guarantees. 472 U.S. 846 (1985). The Court held that the lower court had erred in failing to employ the doctrine of constitutional avoidance. Although Congress had delegated to the Executive broad discretion to "parole into the United States temporarily under such conditions as he may prescribe . . . any alien applying for admission into the United

21

States," the Court recognized that such delegation did not authorize decisions on the basis of race or national origin. *Id.* at 855–56.

Like the provision at issue in *Jean v. Nelson,* the provisions relied upon by the government here—sections 1182(f) and 1185(a)—appear to grant broad discretion to the Executive Branch. *See* 8 U.S.C. § 1182(f); 8 U.S.C. § 1185(a). Just as the Supreme Court did in *Jean v. Nelson*, this Court should read those broad delegations of authority in a manner to avoid reaching thorny questions concerning the constitutionality of arbitrarily excluding individuals from the United States on the basis of race, ethnicity, national origin, or religion. Such a reading is particularly warranted in light of Congress's explicit prohibition against discrimination in section 1152(a). That provision, part of the Immigration Act of 1965 enacted *after* sections 1182(f) and 1185(a), guarantees: "No person shall . . . be discriminated against in the issuance of an immigrant visa because of [the person's] race, sex, nationality, place of birth, or place of residence . . . ." Pub. L. No. 89-236, sec. 202, § 2(a), 79 Stat. 911 (1965) (*codified at* 8 U.S.C. § 1152(a)). Concededly, section 1152(a) does not on its face extend to the issuance of nonimmigrant visas, which were not the focus of the Immigration Act of 1965, nor does it prohibit discrimination on the basis of religion. Nonetheless, it reflects a congressional and constitutional norm disfavoring traditionally suspect classifications. The revised Order is also in tension

22

with the specific statutory criteria for excluding persons believed to be involved in terrorist activity. *See* 8 U.S.C. § 1182(a)(3).[6]

Given the seriousness of the constitutional issues raised by the Executive Order of March 6, 2017, the canon of constitutional avoidance compels reading sections 1182(f) and 1185(a) as complying with the anti-discrimination norms enacted by Congress and embedded in the Constitution.

## V.   The Risks Of Undue Deference: A Return To Lessons From History

Judicial deference to Government assertions of national security threats posed by particular nationalities or ethnicities has had tragic results, as exemplified most powerfully by the courts' response to Japanese internment during World War II. *Korematsu v. United States*, 323 U.S. 214 (1944), has rightly become part of an "anticanon"—deployed as an example of what United States law no longer accepts as constitutional. *See* Jamal Greene, *The Anticanon*, 125 Harv. L. Rev. 380, 396, 456–60 (2011). In *Korematsu*, the Supreme Court, by a 6-3 vote, deferred to the government's assertion that national security required the detention of over 100,000 Japanese-Americans based on their ethnicity alone. 323 U.S. at 218–19. A

---

[6] The revised Order is also at odds with this Nation's leadership role in protecting religious freedom in both domestic and international settings. In 1998, Congress established an Office of International Religious Freedom in the State Department, which prepares Annual Reports on International Religious Freedom. *See* 22 U.S.C. § 6411. This congressional directive is inconsistent with the notion that Congress intended to authorize the President to discriminate on the basis of religion.

23

Congressional Commission later concluded that no evidence supported the claim of military necessity for internment, and that it was instead the result of "race prejudice, war hysteria and a failure of political leadership." *See* REPORT OF THE COMM'N ON WARTIME RELOCATION AND INTERNMENT OF CIVILIANS, PERSONAL JUSTICE DENIED 18 (1982). President Ford formally terminated the Order in 1974, calling it a "setback to fundamental American principles" and urging the Nation "to resolve that this kind of action shall never again be repeated." Proclamation No. 4417, An American Promise, 41 Fed. Reg. 7,741 (Feb. 20, 1976). And in 1984, the district court granting Fred Korematsu a writ of *coram nobis* characterized his case as a "constant caution that in times of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees." *Korematsu v. United States*, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984).

One more aspect of *Korematsu* bears elaboration. The Court has come to invoke the decision for the proposition that strict scrutiny applies to racial classifications under the equal protection doctrine. "'All legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny.'" *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (quoting *Korematsu*, 323 U.S. at 216); *see also Fisher v. Univ. of Tex. at Austin*, --- U.S. ---, 133 S. Ct. 2411, 2422–23 (2013) (Thomas, J., concurring);

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995); *Loving v. Virginia*, 388 U.S. 1, 11 (1967). As the Court explained in *City of Richmond v. J.A. Croson Co.*, "[t]he history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." 488 U.S. 469, 501 (1989) (citing *Korematsu*, 323 U.S. at 235–40).

## CONCLUSION

Plaintiffs' claims regarding the legality and constitutionality of the March 6, 2017 Executive Order are properly before this Court. *Amici* respectfully support Plaintiffs' opposition to Defendants' motion to dismiss their claims.

Dated:  May 23, 2017

Respectfully submitted,

| | |
|---|---|
| ___/s/ Kimberly Thomas___ . | SIMPSON THACHER & BARTLETT LLP |
| Kimberly Thomas (Mich. Bar #P66643) | ___/s/ Abram Ellis___ . |
| 701 South State Street | Abram Ellis (N.Y. Bar #4402962) |
| 3032 South Hall | 900 G Street, Northwest |
| Ann Arbor, MI 48109 | Washington, DC 20001 |
| (734) 647-4054 | (202) 636-5579 |
| kithomas@umich.edu | aellis@stblaw.com |
| | |
| *Counsel for Amici Curiae* | Alan Turner (N.Y. Bar #4000147) |
| | Reena Mittelman (N.Y. Bar #5219761) |
| | Jerry Fang (N.Y. Bar #5417191) |
| | Patricia Yan (N.Y. Bar #5499173) |
| | 425 Lexington Avenue |
| | New York, NY 10017 |

25

(212) 455-2000
aturner@stblaw.com
reena.mittelman@stblaw.com
jerry.fang@stblaw.com
patricia.yan@stblaw.com

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to E.D. Mich. L.R. 5.1, the foregoing brief is double-spaced and uses a proportionally spaced, 14-point type size.


Dated:  May 23, 2017                    SIMPSON THACHER & BARTLETT LLP


                                        By    */s/ Abram Ellis*
                                              Abram Ellis (N.Y. Bar #4402962)

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will electronically serve all counsel of record.

*/s/ Abram Ellis*

Abram Ellis (N.Y. Bar #4402962)

28