## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ARAB AMERICAN CIVIL RIGHTS LEAGUE, et al., | |
| Plaintiffs, | Case No. 2:17-cv-10310-VAR-SDD |
| v. | Hon. Victoria A. Roberts |
| DONALD TRUMP, et al., | Mag. J.  Stephanie D. Davis |
| Defendants. | |

## DECLARATION OF JASON RAOFIELD IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Pursuant to 28 U.S.C. § 1746(2), I, Jason Raofield, hereby declare as follows:

1.        I am a Partner at the firm of Covington & Burling and serve as counsel to American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, Adeeb Saleh, Sofana Bella, Hilal Alkateeb and S.A.

2.        I respectfully submit this declaration in support of Plaintiffs' Motion to Compel Production of Documents.

3.        Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' First Set of Document Requests to Defendants, dated April 6, 2017.

4.      Attached hereto as **Exhibit B** is a true and correct copy of Defendants' Response and Objections to Plaintiffs' First Set of Document Requests, Request No. 1, dated May 19, 2017, and the exhibits thereto.

5.      Attached hereto as **Exhibit C** is a true and correct copy of Defendants' Rule 26(a)(1)(A) Initial Disclosures, dated May 19, 2017.

6.      Attached hereto as **Exhibit D** is a true and correct copy of a printout of a press release from Donald J. Trump for President, Inc., dated December 7, 2015 and titled "Donald J. Trump Statement on Preventing Muslim Immigration," printed from https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.

7.      Attached hereto as **Exhibit E** is a true and correct copy of the relevant portions of a transcript of an Anderson Cooper 360° interview of Donald Trump, dated March 9, 2016 and titled "Exclusive Interview with Donald Trump," printed from http://transcripts.cnn.com/TRANSCRIPTS/1603/09/acd.01.html.

8.      Attached hereto as **Exhibit F** is a true and correct copy of a printout of an CNS News article, dated March 11, 2016 and titled "Trump Doubles Down on 'Islam Hates Us'; 'I Don't Want to Be So Politically Correct'," printed from http://www.cnsnews.com/news/article/susan-jones/trump-doubles-down-islam-hates-us-i-dont-want-be-so-politically-correct.

2

9.      Attached hereto as **Exhibit G** is a true and correct copy of a printout of a Washington Times article, dated March 22, 2016 and titled "Trump on Brussels Attacks: 'We're Having Problems with Muslims'," printed from http://www.washingtontimes.com/news/2016/mar/22/donald-trump-brussels-we-have-be-very-very-careful/.

10.     Attached hereto as **Exhibit H** is a true and correct copy of a printout of a CNN article, dated November 22, 2016 and titled "Michael Flynn in August: Islamism a 'Vicious Cancer" in Body of All Muslims That 'Has to Be Excised,'" printed from http://www.cnn.com/2016/11/22/politics/kfile-michael-flynn-august-speech/.

11.     Attached hereto as **Exhibit I** is a true and correct copy of a printout of a NJ Advance Media for NJ.com article, dated July 9, 2016 and titled "Giuliani Says He's Source of Trump's Shift on Muslim Ban," printed from http://www.nj.com/politics/index.ssf/2016/07/exclusive_giuliani_source_of_trump _shift_on_muslim.html.

12.     Attached hereto as **Exhibit J** is a true and correct copy of a printout of a CNN article, dated July 24, 2016 and titled "Trump on Latest Iteration of Muslim Ban: 'You Could Say It's an Expansion,'" printed from http://www.cnn.com/2016/07/24/politics/donald-trump-muslim-ban-election-2016/.

13.     Attached hereto as **Exhibit K** is a true and correct copy of a printout of a Politico article, dated October 9, 2016 and titled "Trump Defends Proposal for Muslim Ban As Call for 'Extreme Vetting,'" printed from http://www.politico.com/story/2016/10/2016-presidential-debate-donald-trump-muslim-ban-extreme-vetting-229468.

14.     Attached hereto as **Exhibit L** is a true and correct copy of a printout of the relevant portion of a transcript of a CNN State of the Union interview, dated November 13, 2016 and titled "Interview With Former New York Mayor Rudy Giuliani," printed from http://www.cnn.com/TRANSCRIPTS/1611/13/ sotu.01.html.

15.     Attached hereto as **Exhibit M** is a true and correct copy of a printout of a Texas Tribune article, dated February 7, 2017 and titled "At Homeland Security Hearing, McCaul Calls Trump's Travel Ban Rollout 'Problematic,'" printed from https://www.texastribune.org/2017/02/07/michael-mccaul-calls-trumps-travel-ban-rollout-problematic/.

16.     Attached hereto as **Exhibit N** is a true and correct copy of a printout of a McClatchy Washington Bureau article, dated January 30, 2017 and titled "GOP Lawmaker Says He Warned Trump Against 'Muslim Ban,'" printed from http://www.mcclatchydc.com/news/politics-government/white-house/article129703344.html.

4

17.     Attached hereto as **Exhibit O** is a true and correct copy of a printout of a Washington Post article, dated May 13, 2017 and titled "Judge Orders Government to Turn Over Documents from Rudy Giuliani on Travel Ban," printed from https://www.washingtonpost.com/news/post-nation/wp/2017/05/13/judge-orders-government-to-turn-over-documents-from-rudy-giuliani-on-travel-ban/?utm_term=.a1f6ee48283e.

18.     Attached hereto as **Exhibit P** is a true and correct copy of a printout of a Washington Post article, dated January 29, 2017 and titled "Trump asked for a 'Muslim ban,' Giuliani says - and ordered a commission to do it 'legally'," printed from https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.75466c390ef0.

19.     Attached hereto as **Exhibit Q** is a true and correct copy of a printout of a Dallas News article, dated February 2, 2017 and titled "Texas Rep. Michael McCaul: Don't blame me for Trump travel ban", printed from https://www.dallasnews.com/news/politics/2017/02/02/texas-rep-michael-mccaul-blame-trump-travel-ban.

20.     Attached hereto as **Exhibit R** is a true and correct copy of a printout of a New York Times article, dated March 15, 2017 and titled "2 Federal Judges

Rule Against Trump's Latest Travel Ban", printed from

https://www.nytimes.com/2017/03/15/us/politics/trump-travel-ban.html.

21.      Attached hereto as **Exhibit S** is a true and correct copy of a printout of

U.S. Department of Justice Press Release No. 17-579, dated May 25, 2017 and

titled "Statement by Attorney General Jeff Sessions on the Fourth Circuit Court of

Appeals Decision," printed from https://www.justice.gov/opa/pr/statement-

attorney-general-jeff-sessions-fourth-circuit-court-appeals-decision.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, May 26, 2017

/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar
#463877)
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, D.C.  20001
(202) 662-5072
jraofield@cov.com

## <u>INDEX OF EXHIBITS</u>

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| A | Plaintiffs' First Set of Document Requests to Defendants, dated April 6, 2017. |
| B | Defendants' Response and Objections to Plaintiffs' First Set of Document Requests, Request No. 1, dated May 19, 2017. |
| C | Defendants' Rule 26(a)(1)(A) Initial Disclosures, dated May 19, 2017. |
| D | Printout of a press release from Donald J. Trump for President, Inc., dated December 7, 2015 and titled "Donald J. Trump Statement on Preventing Muslim Immigration" |
| E | Relevant portions of a transcript of an Anderson Cooper 360° interview of Donald Trump, dated March 9, 2016 and titled "Exclusive Interview with Donald Trump" |
| F | Printout of an CNS News article, dated March 11, 2016 and titled "Trump Doubles Down on 'Islam Hates Us'; 'I Don't Want to Be So Politically Correct'" |

| Exhibit | Description |
|---------|-------------|
| G | Printout of a Washington Times article, dated March 22, 2016 and titled "Trump on Brussels Attacks: 'We're Having Problems with Muslims'" |
| H | Printout of a CNN article, dated November 22, 2016 and titled "Michael Flynn in August: Islamism a 'Vicious Cancer" in Body of All Muslims That 'Has to Be Excised'" |
| I | Printout of a NJ Advance Media for NJ.com article, dated July 9, 2016 and titled "Giuliani Says He's Source of Trump's Shift on Muslim Ban" |
| J | Printout of a CNN article, dated July 24, 2016 and titled "Trump on Latest Iteration of Muslim Ban: 'You Could Say It's an Expansion'" |
| K | Printout of a Politico article, dated October 9, 2016 and titled "Trump Defends Proposal for Muslim Ban As Call for 'Extreme Vetting'" |

| Exhibit | Description |
|---------|-------------|
| L | Printout of the relevant portion of a transcript of a CNN State of the Union interview, dated November 13, 2016 and titled "Interview With Former New York Mayor Rudy Giuliani" |
| M | Printout of a Texas Tribune article, dated February 7, 2017 and titled "At Homeland Security Hearing, McCaul Calls Trump's Travel Ban Rollout 'Problematic'" |
| N | Printout of a McClatchy Washington Bureau article, dated January 30, 2017 and titled "GOP Lawmaker Says He Warned Trump Against 'Muslim Ban'" |
| O | Printout of a Washington Post article, dated May 13, 2017 and titled "Judge Orders Government to Turn Over Documents from Rudy Giuliani on Travel Ban" |
| P | Printout of a Washington Post article, dated January 29, 2017 and titled "Trump asked for a 'Muslim ban,' Giuliani says - and ordered a commission to do it 'legally'" |

| Exhibit | Description |
|---------|-------------|
| Q | Printout of a Dallas News article, dated February 2, 2017 and titled "Texas Rep. Michael McCaul: Don't blame me for Trump travel ban" |
| R | Printout of a New York Times article, dated March 15, 2017 and titled "2 Federal Judges Rule Against Trump's Latest Travel Ban" |
| S | Printout of U.S. Department of Justice Press Release No. 17-579, dated May 25, 2017 and titled "Statement by Attorney General Jeff Sessions on the Fourth Circuit Court of Appeals Decision" |

# RAOFIELD DECLARATION

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J.  Stephanie D. Davis

## PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS
## TO DEFENDANTS

Plaintiffs hereby propound the following First Set of Document Requests to Defendants under Rule 34 of the Federal Rules of Civil Procedure.

## DEFINITIONS AND INSTRUCTIONS

A.    Definitions

As used herein, the identified terms or abbreviations have the following meanings:

1. **"DOCUMENT REQUEST"** refers to Plaintiffs' First Set of Document Requests to Defendants in this action.

2. **"TRUMP CAMPAIGN"** means Donald J. Trump for President, Inc., Trump Make America Great Again Committee, and all of their affiliates,

parents, subsidiaries, predecessors, successors, partnerships, partners, and all related entities, as well as their officers, directors, employees, internal and outside counsel, agents, representatives, consultants, spokespeople, advisers, and any other person(s) acting under their control or on their behalf.

3. **"PROPOSED MUSLIM BAN / EXTREME VETTING / TRAVEL BAN"** means any and all proposals by or on behalf of Donald J. Trump involving any of the following: prohibitions or restrictions on entry into the United States by Muslims, enhanced vetting procedures for Muslims seeking to enter the United States, prohibitions or restrictions on entry into the United States by individuals from a list of countries to be identified, enhanced vetting procedures for individuals seeking to enter the United States from a list of countries to be identified, or the policy or policies reflected in Executive Order 13769 or Executive Order 13780.

4. **"EXECUTIVE ORDER 13769"** refers to Executive Order No. 13769, entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States," which was issued on January 27, 2017, and published at 82 Fed. Reg. 8977-82.

5. **"EXECUTIVE ORDER 13780"** refers to Executive Order No. 13780, entitled "Protecting the Nation From Foreign Terrorist Entry Into the

United States," which was issued on March 6, 2017, and published at 82 Fed. Reg. 13209-19.

      6.  "**IDENTIFY**" means:

      a.    when used with respect to a natural person, provide his or her full name, last known business address and telephone number, and last known business position or title and affiliation;

      b.    when used with respect to a document or written communication, provide its date; the name and job title of the preparer(s), sender(s), and recipient(s) of the document or written communication; the name and job title of all persons to whom copies of the document or written communication were furnished; the subject matter of the document or written communication; and the present or last known location and custodian or custodians of the document or written communication; except that with respect to any document produced in response to Plaintiffs' Document Requests, you need only identify such document by listing its date, the name of the sender and recipient of the document, or the stamped production number if any;

      c.    when used with respect to oral communications, provide the nature and substance of the communication, the date when and place where such oral communication occurred, each person who participated in the communication, and each person present when the communication occurred.

7. "**COMMUNICATION**" means any meeting, telephone conversation, facsimile, incoming or outgoing e-mail message, text message, face-to-face conversation, letter, or other written, oral, or electronic transmittal or exchange of information.

8. "**MEETING**" means any discussion or conversation involving two or more people, whether conducted in person, by telephone, or electronically, and whether held formally or informally, and whether or not scheduled in advance, including conferences, conference calls, online meetings, and videoconferences.

9. "**DOCUMENT**" means, without limitation, and whether or not they are publicly available, the originals, marked copies, drafts, regardless of origin, whether sent or received, whether made or used internally, and both sides thereof, of the following items, whether printed, recorded, taped, written by hand, or produced, reproduced, or stored by any mechanical or electronic process: agreements, brochures, communications, contracts, correspondence, diaries, electronic mail ("e-mail") messages, letters, memoranda, manuals, handbooks, circulars, policy statements, minutes of meetings or conferences, notes, reports, summaries or records of personal conversations or interviews, summaries or records of telephone conversations, summaries or records of negotiations or investigations, computer printouts, computer tapes, computer programs, and any and all other electronically stored information (including available meta data),

4

tangible things, writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, or other data or data compilations in whatever form they exist.  The term "DOCUMENT" also means every copy of a document where such copy is not an identical duplicate of the original.  Any copy of a document bearing any comment or notation that is not a part of the original text is to be considered a separate "DOCUMENT."  Any draft or other preliminary form of any document is also to be considered a separate "DOCUMENT."

10. **"PERSON"** means any natural person, firm, corporation, partnership, proprietorship, cooperative, association, joint venture, organization, governmental body, committee, commission, group, or other entity, and any agent or employee of any of those individual entities.

11. **"RELATE OR REFER**" or "**RELATING OR REFERRING**" shall be construed broadly and shall mean, for example, pertaining to, containing, describing, reflecting, regarding, illustrating, mentioning, evidencing, embodying, constituting, supporting, discussing, or having any logical or factual connection whatsoever with the subject matter in question.

12. "**YOU**" and "**YOUR**" refer to the Defendants in this action, including all of their departments, agencies, employees and agents, and any other person or entity acting or purporting to act on their behalf, at their direction, or under their supervision.

5

13. All uses of the conjunctive herein include the disjunctive and vice versa. Words in the singular form include the plural form and vice versa.

B.    Instructions

1. Produce all documents in your possession, custody, or control, or otherwise available to your employees, agents, consultants, attorneys, and accountants, whether past or present.

2. Produce in their entirety all documents that respond, in whole or in part, to any portion of the production requests, including any and all attachments and enclosures. Produce all electronically stored information in native form, with all meta data intact.

3. Produce all drafts, marked-up versions, preliminary versions, or other non-identical copies of documents requested, and produce all documents with all hand-written notations, marginalia, and interlineations intact.

4. If any information is withheld by you under a claim of privilege, please set forth in your written response for each document or information for which a claim of privilege is made:

(a)    Principals.  The name and title of the author(s), sender(s), addressee(s), and recipient(s) of the document.

(b)    Date.  The date of the document.

6

(c)     <u>Publications</u>.   The date and title of each person to whom the contents of  the document has been disclosed by copy, exhibition, reading, summarization, or otherwise.

(d)     <u>Descriptions</u>.   A description of the nature and subject matter of the document.

(e)     <u>Privilege</u>.   A statement of the privilege(s) and the basis or bases upon  which the privilege(s) is or are asserted.

5.   If any document is withheld under a claim that only part of a document is exempt from production by reason of a privilege or privileges, produce the part(s) of the document that are not claimed to be exempt from production by reason of a privilege or privileges.

6.   If you cannot produce a requested document for any reason, identify the document as fully and accurately as possible and state the reason(s) that the document cannot be produced.

7.   Affix Bates numbers to all documents produced.

8.   These Requests are continuing in nature.   Therefore, you are obligated to provide, by way of supplemental responses and documents, whatever information may hereafter be obtained by you, or by anyone on your behalf, that will supplement this request.

## DOCUMENT REQUESTS

1. A copy of the "memorandum" (or "white paper") that Rudolph Giuliani and others provided to Donald J. Trump or others working for or on behalf of the Trump Campaign in approximately May to July 2016, which was discussed extensively by Mr. Giuliani during public appearances on or about July 8, 2016, November 13, 2016 and January 28, 2017, by Rep. Michael McCaul in public appearances in late January and early February 2017, and by Susan Phelan, Spokeswoman for the House Committee on Homeland Security, on or about January 30, 2017.[1]

**RESPONSE:**

---

[1] http://www.nj.com/politics/index.ssf/2016/07/exclusive_giuliani_source_of_trump_shift_on_muslim.html; www.cnn.com/TRANSCRIPTS/1611/13/sotu.01.html); https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.75466c390ef0; http://www.mcclatchydc.com/news/politics-government/white-house/article129703344.html; https://www.texastribune.org/2017/02/07/michael-mccaul-calls-trumps-travel-ban-rollout-problematic/.

2.   All documents or communications created <u>after May 10, 2016 and prior to July 10, 2016</u> referring or relating to the Proposed Muslim Ban / Extreme Vetting / Travel Ban, and which involve the "commission" or "group" discussed extensively by Rudolph Giuliani, Rep. Michael McCaul and Susan Phelan in the public appearances referenced in Document Request No. 1.  This request includes but is not limited to drafts of the document requested in Document Request No. 1, and any responses to that document (or drafts of that document) by Donald J. Trump or others working for or on behalf of the Trump Campaign.

**RESPONSE:**

3.   All documents or communications created <u>after July 8, 2016 and prior to November 8, 2016</u> which refer or relate to the Proposed Muslim Ban / Extreme Vetting / Travel Ban, and which were created by, sent by, or received by any of the following individuals: (i) Donald J. Trump, (ii) Rudolph Giuliani, (iii) Senator Jeff Sessions, (iv) Kansas Secretary of State Kris Kobach, (v) Stephen Bannon, or (vi) Stephen Miller.

**RESPONSE:**

4. All documents, communications, or analyses created <u>after November 8, 2016 and prior to January 20, 2017</u> which refer or relate to the Proposed Muslim Ban / Extreme Vetting / Travel Ban, and which were created or transmitted by any of the "several" Congressional employees or staff members referenced in news articles published in late January or early February 2017.[2] This request includes but is not limited to the nondisclosure agreements reportedly signed by the Congressional employees or staff members at issue in this request.

**RESPONSE:**

---

[2] http://www.politico.com/story/2017/01/trump-immigration-congress-order-234392; http://www.cnn.com/2017/01/31/politics/house-staff-worked-on-trump-executive-orders/; https://www.msn.com/en-us/lifestyle/family-relationships/capitol-hill-staff-secretly-wrote-trump%E2%80%99s-travel-ban-order/vp-AAmrcKo.

Dated: April 6, 2017                      Respectfully submitted,

                                          /s/ Jason C. Raofield
                                          Jason C. Raofield (D.C. Bar #463877)
                                          Covington & Burling LLP
                                          One CityCenter
                                          850 10th Street, NW
                                          Washington, D.C. 20001
                                          (202) 662-5072
                                          Email: jraofield@cov.com

                                          *Counsel for Plaintiffs American Civil
                                          Liberties Union of Michigan, Arab
                                          American and Chaldean Council,
                                          Arab American Studies Association,
                                          Adeeb Saleh, Sofana Bella, Hilal
                                          Alkateeb and S.A., a minor through
                                          her Parent and Next Friend, Hilal
                                          Alkatteeb*

**CERTIFICATE OF SERVICE**

On April 6, 2017, I caused to be served PLAINTIFFS' FIRST SET OF

DOCUMENT REQUESTS TO DEFENDANTS on all Parties to this action in the

following manner:

(1)   On counsel for Plaintiffs by electronic mail

(2)   On counsel for Defendants by hand delivery and electronic mail to the

following:

Joshua S. Press (Joshua.Press@usdoj.gov)
Briana Yuh (Briana.Yuh@usdoj.gov)
Gisela Westwater (Gisela.Westwater@usdoj.gov)
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
450 5th Street, NW
Washington, DC  20530

/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)

# RAOFIELD DECLARATION

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ARAB AMERICAN CIVIL RIGHTS
LEAGUE, *et al.*,

      Plaintiffs,                                  Case No. 17-10310

          v.                                      Hon. Victoria A. Roberts

DONALD TRUMP, President of the United
States, *et al.*,

      Defendants.
_____/

## DEFENDANTS' RESPONSE AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS, REQUEST NO. 1

Pursuant to Federal Rule of Civil Procedure 34 and this Court's Order dated May 11, 2017 (ECF No. 89) ("May 11 Order"), Defendants hereby submit their objections and response to Document Request No. 1 ("Request No. 1" or "Request") of Plaintiffs' First Set of Document Requests (the "Requests"). Defendants' Objections are based on the information known to Defendants at this time, and are made without prejudice to assertion of additional objections should Defendants identify additional grounds for objection.  Defendants reserve the right to assert additional objections with respect to Plaintiffs' remaining document requests and interrogatories.  Defendants intend to move the court for a protective order relating to this Request and additional discovery requests.

1

Document Request No. 1 seeks discovery of a document allegedly created during the presidential campaign by a private individual to provide advice to candidate Donald J. Trump in his personal capacity, some five months before he was elected President.  Plaintiffs seek that document on the theory that it is relevant to the underlying motive behind an official government policy (Executive Order 13,780, the "Executive Order") signed by the President many months later in his official capacity, after he took the oath of office and formed his Administration, and that such motive is relevant to the Executive Order's legality.  That theory cannot support a finding even of relevance, much less one of proportionality to the needs of the case, as required by Federal Rule of Civil Procedure 26.

Importantly, Defendants reiterate that the discovery requests in this case, if found to be relevant, could raise substantial and complex issues relating to privilege, legal authority over campaign materials, and third-party interests related to those materials, that call for careful consideration.  Requiring a response addressing those interests in one week is not reasonable, particularly in light of the fact that two nationwide injunctions remain in effect, and appellate courts are currently considering the overarching legal issues that apply here and that are inextricably intertwined with the scope of permissible discovery in this matter.[1]

---

[1] Both the Fourth and the Ninth Circuits have heard oral arguments on those matters and are likely to issue legal opinions bearing directly on these issues.  *See*

Indeed, in one of the other cases challenging the same Executive Order, the district court concluded that a stay of all district court proceedings (including discovery) was warranted, pending resolution of the Ninth Circuit appeal, in part because the Ninth Circuit's decision is likely to resolve legal issues that bear on the appropriate scope of discovery and "potentially complex privilege" issues, and because of the "'high respect' owed to the Executive" in protecting him against the burden of discovery. *See Washington v. Trump*, No. 2:17-cv-00141, ECF No. 189 at pp. 9, 11, 2017 WL 2172020 (W.D. Wash., May 17, 2017) (attached hereto as Exhibit 1). Accordingly, in addition to the specific objections set forth below, Defendants object to the truncated process ordered here that is inconsistent with the federal rules governing discovery, with the practical needs presented in this case, and with the significant issues presented.

---

generally *Int'l Refugee Assistance Proj. v. Trump*, No. 17-1351 (4th Cir.); *Hawai'i v. Trump*, No. 17-15589 (9th Cir.).

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS:

1.     Defendants object to the definition of "Proposed Muslim Ban /
Extreme Vetting / Travel Ban" because it purports to encompass any and all
proposals by or on behalf of Donald Trump, regardless of whether these proposals
were advanced during his candidacy, while he was a private citizen, or during his
presidency; Defendants further object to this definition as vague and overbroad in
that it does not define what is meant by "countries to be identified."  Defendants
also object to the definition to the extent it improperly characterizes the policy or
policies reflected in Executive Order 13769 or Executive Order 13780 and to the
extent it suggests that Executive Order 13769 is relevant to the Court's evaluation
of Executive Order 13780.

2.     Defendants object to the definition of "Communication" on the
grounds that it is overly broad and unduly burdensome, because it is defined so
broadly as to include verbal or non-written communications, which is beyond the
scope of Rule 34.  *See* Fed. R. Civ. P. 34 (allowing requests to inspect or produce
documents, electronically stored information, or tangible items).

3.     Defendants object to the definition of "Meeting" on the grounds that it
overlaps with the definition of "Communication" and is therefore vague and
confusing.  Defendants further object to the definition of "Meeting" on the grounds
that it is overly broad and unduly burdensome because it is defined so broadly as to

4

include verbal or non-written communications, which is beyond the scope of Rule 34. *See* Fed. R. Civ. P. 34 (allowing requests to inspect or produce documents, electronically stored information, or tangible items).

4.    Defendants object to the definition of "Document" on the grounds that it is overly broad and unduly burdensome.  Furthermore, Defendants are not required to produce publicly available materials as there is a less burdensome manner for Plaintiffs to obtain these materials.  Fed. R. Civ. P. 26(b)(2)(C)(i).

5.    Defendants object to the definition of the terms "you" and "your" on the grounds that they are overly broad and unduly burdensome.  Subject to specific objections enumerated below and in subsequent objections, Defendants will construe "you" and "your" to refer to the departments and agencies that are named Defendants in this case.

6.    Defendants object to the definition of "Trump Campaign" as overbroad and unduly burdensome because it includes not only the official campaign entity, but unofficial entities and all affiliates, "related entities," and "any other person(s) acting under their control or on their behalf."  Defendants will construe the "Trump Campaign" to mean the official campaign entity "Donald J. Trump for President, Inc."

7.    Defendants object to Plaintiff's Instruction No. 1, in that it includes in the definition a statement, "or otherwise available to your employees, agents,

consultants, attorneys, and accountants, whether past or present," which is contrary to the Sixth Circuit standard for possession, custody, or control. Under that standard, parties are obligated to produce only those documents within their actual possession or those documents for which the party has a "the legal right to obtain [] on demand." *In re Bankers Trust Co.*, 61 F.3d 465, 469 (6th Cir. 1995); *see also Frye v. CSX Transp., Inc.*, 2016 WL 2758268, at * 4 (E.D. Mich. May 12, 2016) ("The Sixth Circuit and other courts have consistently held that 'documents are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody or control, *or has the legal right to obtain the documents on demand*.") (emphasis in original). Defendants are only under the obligation to produce relevant, non-privileged information, to the extent that it exists, if individuals, operating in their official governmental capacity, have responsive, non-privileged information that is under the possession, custody or control of the named Defendants or that they have the legal right to obtain on demand.

8.    Defendants object to the format of production proposed in Instruction No. 2. To the extent that responsive, non-privileged materials exist, Defendants will produce them in PDF format. Fed. R. Civ. P. 34 (b)(2)(D) ("The response may state an objection to a requested form for producing electronically stored information. If the responding party objects to a requested form—or if no form

6

was specified in the request—the party must state the form or forms it intends to use.").

9.       Defendants object to Instruction No. 3 of Plaintiffs' Requests, in that it calls for material that may be privileged as detailed further below.

10.      Defendants object to Instruction No. 4(c) of Plaintiffs' Requests as an unduly burdensome requirement and outside of the scope of the obligations for privilege logs as required under Federal Rule of Civil Procedure 26(b)(5). Defendants reserve the right to create a categorical privilege log.

## DOCUMENT REQUEST NO. 1

A copy of the "memorandum" (or "white paper") that Rudolph Giuliani and others provided to Donald J. Trump or others working for or on behalf of the Trump Campaign in approximately May to July 2016, which was discussed extensively by Mr. Giuliani during public appearances on or about July 8, 2016, November 13, 2016 and January 28, 2017, by Rep. Michael McCaul in public appearances in late January and early February 2017, and by Susan Phelan, Spokeswoman for the House Committee on Homeland Security, on or about January 30, 2017.[2]

## Objections to Document Request No. 1:

## Discovery is Premature.

1.   Given that the Court has not yet determined whether it has Article III

jurisdiction over Plaintiffs' complaint, or any or all of the claims asserted therein, it

is inappropriate to proceed with discovery as to the merits.   Defendants have

moved to dismiss in part for lack of subject-matter jurisdiction because Plaintiffs

have failed to meet their burden to establish standing.   *See* Defendants' Motion to

Dismiss (ECF No. 76), at pp. 9-14.   As the Court recognized, it has not yet decided

that issue.   May 11 Order (ECF No. 89), at p. 4 (Court is "not one-hundred percent

certain" that plaintiffs have standing).   The Court, therefore, has no jurisdiction to

---

[2] http://www.nj.com/politics/index.ssf/2016/07/exclusive_giuliani_source_of_trump_shift_on_muslim.html; www.cnn.com/TRANSCRIPTS/1611/13/sotu.01.html); https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-bangiuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.75466c390ef0; http://www.mcclatchydc.com/news/politics-government/white-house/article129703344.html; https://www.texastribune.org/2017/02/07/michael-mccaul-calls-trumps-travel-ban-rolloutproblematic/.

proceed to the merits of the case, which includes discovery on the merits. *See Steel Co v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1988) ("Without jurisdiction the court cannot proceed at all in any cause."); *cf. Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 38 (1st Cir. 2000) ("[C]ompelling public policy reasons support stringent limitations on discovery [in cases against the federal government] pending the resolution of threshold jurisdictional questions."); *Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) ("Federal Rule of Civil Procedure 45 grants a district court power to issue subpoenas as to witnesses and documents, but the subpoena power of a court cannot be more extensive than its jurisdiction.  It follows that if a district court does not have subject-matter jurisdiction over the underlying action, and the process was not issued in aid of determining that jurisdiction, then the process is void[.]"); *U.S. v. Morton Salt Co.*, 338 U.S. 632, 641-42 (1950) ("Federal judicial power itself extends only to adjudication of cases and controversies and it is natural that its investigative powers should be jealously confined to these ends.").

Although the Court suggested (May 11 Order, at p. 4) that *Steel Co.* does not preclude discovery as to "standing and/or ripeness," those are jurisdictional matters, and discovery as to those issues, to allow a court to make a determination as to jurisdiction provides no support for the Court's conclusion that it can order discovery on the merits when it has not yet determined its own jurisdiction.  And

9

Plaintiffs have not asserted that discovery is necessary to support their arguments as to standing. Accordingly, it is improper for the Court to proceed with discovery before it resolves whether it has Article III jurisdiction, particularly where that discovery is directed at the President.

2. Request No. 1 is likewise premature because the Court has not yet ruled on Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 76). As Defendants have explained, Defendants believe that their Motion to Dismiss will likely dispose of all or some of the claims in this action, rendering discovery ultimately unnecessary or, at the very least, narrowing the scope of the Complaint and thus the scope of relevant discovery. Although Defendants acknowledge that the Court "is not convinced that [Defendants' Motion to Dismiss] will be fully dispositive," May 11 Order at p. 4, the Court unduly discounted Defendants' argument that resolving the Motion to Dismiss would, at a minimum, dispose of or narrow some claims, and would likely resolve some of the substantive legal disputes which will, in turn, shape the appropriate discovery inquiry. Moreover, two nationwide injunctions of the Executive Order remain in effect, and appellate courts are currently considering the overarching legal issues that apply here and that are inextricably intertwined with the scope of permissible discovery in this matter.

In light of that, proceeding with discovery before the Court has resolved the necessary legal standards and issues that will bear upon the appropriate scope of discovery is inappropriate. *See* Ex. 1, *Washington v. Trump*, No. 2:17-cv-00141, ECF No. 189, at pp. 5-6 (explaining that a stay pending the Ninth Circuit appeal is warranted because the appeal "is likely to decide legal issues that will impact the court's resolution of the parties' discovery disputes [] by clarifying 'the applicable law or relevant landscape of facts that need to be developed.'"); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997) ("If the district court dismisses a nonmeritorious claim before discovery has begun, unnecessary costs to the litigants and to the court system can be avoided. Conversely, delaying ruling on a motion to dismiss such a claim until after the parties complete discovery encourages abusive discovery and, if the court ultimately dismisses the claim, imposes unnecessary costs."). Until the Court resolves those issues and the other legal arguments in favor of dismissal, the materials sought by Plaintiffs "are not useable for any substantive purpose," and the requested discovery thus should be denied. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 982 (6th Cir. 2003).

Moreover, the Court's conclusion (May 11 Order, at p. 6) that, because discovery here will implicate complex privilege issues, "there is no point in delaying discovery," is backwards. If there is a possibility that the legal issues

11

could be resolved such that Plaintiffs' proposed discovery exceeds the bounds of

permissible discovery, then this Court could avoid altogether the potentially thorny

privilege issues that might otherwise arise as well as avoid the potential intrusion

on the Executive by permitting discovery directed at the President. *See* Ex. 1,

*Washington v. Trump*, ECF No. 189, at pp. 5-6, 9, 11.

3.   Request No. 1 is premature under Federal Rule of Civil Procedure 26(d)

because the parties have not conferred under Federal Rule of Civil Procedure 26(f).

Fed. R. Civ. P. 26(d)(1), (d)(2)(B); *Rumburg v. McHugh*, No. 10-CV-11670-DT,

2010 U.S. Dist. LEXIS 76840, at *2 (E.D. Mich. July 29, 2010) ("The federal rules

provide that discovery may not be sought from any source before the parties have

conferred under Federal Rule of Civil Procedure 26(f)."). Plaintiffs served the

instant Requests on Defendants on April 6, 2017. These discovery requests are

considered "early Rule 34 requests" under Federal Rule of Civil Procedure

26(d)(2) because they were served prior to a Rule 26(f) conference; early Rule 34

requests are not considered served until the first Rule 26(f) conference, with

responses due 30 days thereafter. Fed. R. Civ. P. 34(b)(2)(A). Although the

parties have disputed whether a Rule 26(f) Conference did in fact occur on April 6,

2017, (*see* Tr., Apr. 13, 2017, Status Conference, at pp. 7-9 (attached hereto as

Exhibit 2)), the Court has made no determination that a 26(f) Conference occurred.

In fact, at an April 13, 2017, Status Conference, the Court indicated that a proper

12

Rule 26(f) Conference had not occurred.  Ex. 2, at p. 16 (stating that the Court may later order the parties to conduct a Rule 26(f) Conference that "comports with the court rules").  The May 11 Order (ECF No. 89) also does not address whether a Rule 26(f) Conference occurred.  Defendants continue to maintain that such a conference has not occurred as there are a variety of Rule 26(f) conference topics, such as production format, that have not been addressed by the parties and must be discussed pursuant to Rule 26(f).

A Rule 26(f) conference must occur, pursuant to Rule 26(d)(2), before early discovery requests are considered served.  The 30 days to respond to early discovery requests only begins to run once the Rule 26(f) conference occurs.  A Rule 26(f) Conference has not occurred in this case and thus Request No. 1 has not yet been served on Defendants.  Although Fed. R. Civ. P. 26(d)(1) allows a court to permit discovery prior to a Rule 26(f) conference, Rule  26(d)(2), which applies to early discovery requests, does not contain this clause.  The Court should not modify the period to respond to early discovery requests served under Rule 26(d)(2) as it runs contrary to the language of the rule and the purpose of early discovery requests.[3]  Therefore, Defendants should have thirty days to respond

---

[3] "Rule 26(d)(2) is added to allow a party to deliver Rule 34 requests to another party more than 21 days after that party has been served even though the parties have not yet had a required Rule 26(f) conference. Delivery may be made by any party to the party that has been served, and by that party to any plaintiff and any other party that has been served. *Delivery does not count as service; the requests*

from the first Rule 26(f) conference.  It is prejudicial to require Defendants to

respond in one-quarter of the time normally allotted by Fed. R. Civ. P. 34(b)(2)

and Rule 26(d)(2).

Moreover, the Request is premature because the Court's May 11 Order

regarding discovery was purportedly issued under Federal Rule of Civil Procedure

16(b) (*see* May 11 Order, at p. 7), yet the Order was issued before a Court

conference with the parties and without the benefit of a Rule 26(f) Report from the

parties, either of which is a prerequisite to an order under Rule 16(b).  *See* Fed. R.

Civ. P. 16(b)(1).   The Court did not hold a Rule 16 Scheduling conference, but

instead re-characterized an April 13, 2017, Status Conference as a Rule

16(b)(1)(B) Scheduling Conference, after that status conference had already

occurred.  *See* May 11 Order (ECF No. 89), at p. 2 (determining, after the fact, that

a previous status conference constituted a conference of the parties sufficient to

satisfy Rule 16(b)(1)(B)).  The April 13, 2017, Status Conference was not

described by the Court as a "Scheduling Conference" before, during, or directly

after that conference; rather, it was repeatedly styled by the Court as a "Telephonic

---

*are considered to be served at the first Rule 26(f) conference.* Under Rule
34(b)(2)(A) the time to respond runs from service. This relaxation of the discovery
moratorium is designed to facilitate focused discussion during the Rule 26(f)
conference. Discussion at the conference may produce changes in the requests. The
opportunity for advance scrutiny of requests delivered before the Rule 26(f)
conference should not affect a decision whether to allow additional time to
respond."  2015 Advisory Committee Note to Fed. R. Civ. P. 26 (emphasis added).

Status Conference."[4]   Indeed, the Court noted at the Status Conference that it would later hold a "[scheduling] conference with the parties."  Ex. 2, at p. 16.  The Advisory Committee Notes recognize the importance of advance notice of the Rule 16(b)(1)(B) conference so that the parties have notice in advance that a "Scheduling Conference" is upcoming and can conduct their Joint 26(f) conference.  *See, e.g.,* Fed. R. Civ. P. 16(b) Advisory Committee Note to 1993 amendment ("[W]hen setting a scheduling conference, the court should take into account the effect this setting will have in establishing deadlines for the party to meet under revised Rule 26(f)").  That notice requirement was not satisfied here.

## The Request is Beyond the Scope of Proper Discovery Under Rule 26(b)(1) Because it Seeks an Alleged Campaign Document from the Government Entities.

Request No. 1 seeks a memorandum, if it exists, that Plaintiffs allege "Rudolph Giuliani . . . provided to Donald J. Trump or others working for or on behalf of the Trump Campaign in approximately May to July 2016."  *See* Requests at p. 8.  Defendants object to Request No. 1 as overbroad and outside the scope of discovery, unduly burdensome, and harassing because, "considering . . . the parties' relative access to relevant information," Plaintiffs have supplied no reason

---

[4]Docket Entry of April 5, 2017 ("Set Deadlines/Hearings: TELEPHONIC Status Conference set for 4/13/2017 at 2:30 PM before District Judge Victoria A. Roberts."; Minute Entry of April 13, 2017 ("Minute Entry for proceedings before District Judge Victoria A. Roberts: Telephonic Status Conference held on 4/13/2017 (Court Reporter: Janice Coleman) (CPin) (Entered: 04/13/2017).").

to believe that campaign materials would be contained in official files of any of the government defendants. Fed. R. Civ. P. 26(b)(1). Plaintiffs' request for a campaign document is more properly directed at the Trump campaign or Mr. Giuliani—or Rep. McCaul, or Ms. Phelan (the two other individuals Plaintiffs allege to have publicly discussed the purported document). This is so for several reasons.

First, because the request seeks what they allege to be a campaign document, Plaintiffs are seeking discovery from the wrong entity. Plaintiffs have not brought suit against Donald J. Trump for President, Inc., the official Presidential campaign committee. *See* Requests at p. 1 (defining "Trump Campaign"). Rather, they have sued Defendants, in their official government capacities, who do not in that capacity have authority over Donald J. Trump for President, Inc. or its files. The official Trump campaign committee is an incorporated entity that exists wholly apart from the Trump Administration. That private entity continues to exist, and Plaintiffs could seek campaign materials from it, but they apparently have not done so. Plaintiffs appear to believe that because some of the Defendants—such as the President—were involved in the campaign in their personal capacities, the campaign files are therefore available for discovery in this action. *See* Requests at p. 8 (seeking papers that were "provided to Donald J. Trump or others working for . . . the Trump Campaign"). That is not correct. The files of Donald J. Trump for

President, Inc. are owned by that legal entity.  The campaign files did not become part of the government's official files simply because Mr. Trump won the election and is now the President.  Thus, any campaign files should be sought from the campaign itself.[5]

Second, Donald J. Trump for President, Inc. and/or Mr. Trump in his capacity as a former candidate may seek to assert discovery privileges of their own.  Because the campaign is not a party to this proceeding, those discovery privileges might not be heard or considered without their participation in the litigation.  *Cf. United States v. American Tel. & Tel.*, 642 F.2d 1285, 1292 (D.C. Cir. 1980) ("Without the right to intervene in discovery proceedings, a third party with a claim of privilege in otherwise discoverable materials could suffer "the obvious injustice of having his claim erased or impaired by the court's adjudication without ever being heard.").  Importantly, the campaign could seek to assert interests that protect its internal deliberative materials from disclosure in a law suit challenging official government action.  *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161-62 (9th Cir. 2010) (recognizing a First Amendment interest in protecting the internal deliberative materials of a political campaign as against discovery in civil litigation).  In a case like this one, where that discovery is not

---

[5] As discussed below, however, even if responsive documents are properly sought from a third party, Defendants may nonetheless assert any applicable privileges protecting against the release or disclosure of such document.

being sought from the entity most likely to possess it, and the correct entity may want to assert privilege claims available to it, the proper course is to require Plaintiffs to seek discovery directly from the third party.

Third, requiring a burdensome search for campaign materials in official government files, and particularly in the Executive Office of the President, would be disproportionate to the needs of the case—particularly since the President is not subject to suit for injunctive relief with respect to performance of his official duties, *see* pp. 23-24, *infra*. The anticipated benefit of such a search is exceedingly slight as compared to the burden of conducting the search and the intrusion on the Executive.

Plaintiffs have identified no reason as to why Defendants would possess a document allegedly created for use by Donald J. Trump for President, Inc. The government agency Defendants were of course not part of the official Trump campaign committee and, during the time period relevant to the request, were under a different Presidential administration. Moreover, the defendant agencies employ thousands of individuals. Requiring a search for even one document, particularly where that document is not of the type maintained in the ordinary course of business, is unreasonable. "Even very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it." *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012). Of

course, Plaintiffs' discovery requests go far beyond the single document identified in Document Request No. 1, and the burden of searching for all the campaign materials encompassed by Requests Nos. 1-3, when Plaintiffs have not identified why they are likely to be located in official government files, does not justify the requested discovery.

And to the extent any of the individual Defendants participated in the Trump campaign in their personal capacities, the documents generated in connection with that work would be campaign documents, and Plaintiffs have not explained why those documents would exist in government files.

The President, of course, who is sued in his official capacity, was not President until long after these campaign materials were allegedly created. [6] Without a further showing as to why Plaintiffs cannot seek that document directly from the official Trump campaign entity and why a campaign document belonging to Donald J. Trump for President, Inc., might be within the President's official government files many months later. Plaintiffs have not demonstrated that Request No. 1 is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

---

[6] Plaintiffs have not alleged that the purported Giuliani memo was received by Donald Trump, personally, either as a candidate or as President. *See* Request No. 1 (requesting memo that "Giuliani and others provided to Donald J. Trump *or others* working for or on behalf of the Trump Campaign).

19

**The Request to Search for the Documents At Issue Must Be Rejected Under**
***Cheney***.

Defendants further object because asking the President or his close advisers

and cabinet secretaries to search for the materials sought in Request No. 1, and the

other related Requests, is not proportional to the needs of this case.  As we have

explained, Plaintiffs have not provided any reason to think that a document that is

allegedly a campaign document would be located in the official government files.

But even if this Court does not accept that flaw in the discovery request, requiring

a search for the document on the theory that it formed the basis for an Executive

Order issued by the President in his official capacity is not permitted under *Cheney*

without a heightened showing that has not been made here and could not be made

given the ready availability of the document, if it exists, from the campaign.

Under *Cheney*, Plaintiffs must make a heightened showing of need before

they can require a search for, and force the government to determine whether to

formally assert privileges with respect to, discovery sought from the President or

his close advisers.  *See Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S.

367 (2004) (reversing Court of Appeals decision that the Vice President and other

executive officials must first formally assert privilege before the Court may

address their separation-of-powers objections to discovery requests).  *Cheney*

acknowledged the special burden presented when "discovery requests are directed

to the Vice President and other senior Government officials who served on the

NEPDG to give advice and make recommendations to the President." *Id.* at 385. If the Court credits Plaintiffs' erroneous claim that campaign materials are relevant to the validity of the Executive Order, the discovery at issue here is nevertheless improper because of the concerns expressed in *Cheney*. Indeed, discovery here is even less proportional to the needs of the case here than in *Cheney*, because Plaintiffs' discovery is directly targeted at the President.

The Supreme Court in *Cheney* directed that courts must take special care to ensure that civil discovery requests do not intrude on the "public interest" in (1) "afford[ing] Presidential confidentiality the greatest protection consistent with the fair administration of justice"; and (2) "protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney*, 542 U.S. at 382. There must be a heightened showing of need made before allowing this kind of burdensome discovery. *Id.*[7]

Courts have thus applied *Cheney* to require a heightened showing of need before imposing the burden of responding to discovery, as the consideration and assertion of applicable privileges in these circumstances must be a "last resort."

---

[7] Although only the production of a single document (or objections thereto) is initially at issue here, the relevant inquiry is the scope of the discovery sought as a whole, and in this respect, the discovery being sought is similarly broad in scope to that sought in *Cheney*. But whether Plaintiffs seek one document or many, *Cheney* requires a heightened showing of need before permitting any discovery against the President or his close advisers.

21

*United States v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657, at *8 (C.D. Cal. Sept. 25, 2014); *see also Dairyland Power Co-op v. U.S.*, 79 Fed. Cl. 659, 662 (2007) ("The Court agrees with the Government that, in the case of a discovery request aimed at the President and his close advisors, the White House need not formally invoke the presidential communications privilege until the party making the discovery request has shown a heightened need for the information sought."). A showing of heightened need is necessary, as the Supreme Court has recognized that the separation of powers under our Constitution is directly implicated by subjecting the President to judicial process in matters arising out of the performance of his official duties. *Nixon v. Fitzgerald*, 457 U.S. 731, 748-55 (1982); *cf. Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). This is motivated not solely by the concern for maintaining Presidential confidentiality and preventing the need to address difficult separation of powers issues, but also with the distractions created by the burden of responding to discovery requests, and evaluating documents for the assertion of privilege, in light of the President's weighty official duties. *See Cheney*, 542 U.S. at 382, 385, 389-90.  The *Cheney* principle also properly avoids embroiling courts in difficult and potentially unnecessary privilege issues implicating the separation of powers.  *Id.*

Here, Plaintiffs have not demonstrated the required need for the document at issue.  Most importantly, because Defendants' Motion to Dismiss remains pending,

22

there cannot be a showing at this time of relevance.  Further, they have not shown

that the document is not available from other sources—such as from the campaign,

which is the actual identified owner of the document being sought.  *See* Request

No. 1 (seeking document allegedly drafted "on behalf of the Trump Campaign"

before the election); *see also* Request No. 2 (seeking pre-election documents

relating to an alleged campaign "'commission' or 'group'"); Request No. 3

(seeking documents created by various individuals in connection with the

campaign).  They cannot obtain these documents, if they even exist, because

Plaintiffs have failed to show—and could not show given that these are campaign

documents—that they are "not available with due diligence elsewhere." *Dairyland*

*Power*, U.S. Fed. Cl. at 668.

A related principle further precludes discovery from the President in these

circumstances.  A federal court cannot "enjoin the President in the performance of

his official duties." *see Mississippi*, 71 U.S. at 501; *see also County of Santa Clara*

*v. Trump*, 17-cv-00574, --- F. Supp. 3d ---, 2017 WL 1459081, at *29 (N.D. Cal.

April 25, 2017) ("extraordinary remedy of enjoining the President himself is not

appropriate").  *A fortiori*, a federal court likewise could not compel the President to

comply with a civil discovery request.  *Cf. Fitzgerald*, 457 U.S. at 748-55 (holding

that the President has absolute immunity for civil liability for acts within his

official responsibilities).  That conclusion is grounded on the President's "unique

constitutional position" and "respect for separation of powers." *See Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). Although the Supreme Court has recognized limited exceptions permitting judicial process against the President, *Clinton v. Jones*, 520 U.S. 681, 703, 704 n.39 (1997) (civil discovery permitted where private, rather than official, act was involved); *United States v. Nixon*, 418 U.S. 683, 710-13 (1974) (permitting subpoena directed at President for use in criminal prosecution), neither of those exceptions is relevant here. Pursuant to these principles, because the President is immune from this kind of civil injunctive action challenging his official conduct, he cannot properly be the subject of discovery in this civil litigation. The conclusion that civil discovery under Rule 26 is not available against the President here is likewise compelled by the fact that the President is not a properly named defendant to this civil injunctive action.

**The Requested Document, if it Exists, Would Be Irrelevant, and Even If Relevant, An Opportunity to Consider Privilege Assertions Would Be Necessary**.

Defendants object to Request No. 1 as overbroad and outside the scope of discovery under Federal Rule of Civil Procedure 26(b)(1) because it seeks a document that is neither relevant to the claims and defenses in this case nor "proportional to the needs of the case." And under *Cheney*, imposing a discovery burden on the President and his close advisers is improper, without first making the heightened showing discussed above, and further having established relevancy by,

24

among other things, considering the legal rules that are applicable to this case and the arguments made in the government's pending Motion to Dismiss. And even if this Court determined that the document were relevant and required a search for it, there would need to be an opportunity for the Defendants to consider and assert applicable privileges after obtaining and reviewing the document.

1. If the "memorandum" or "white paper" sought in this Request exists, it is not relevant to the legal issues presented in this case for several reasons.[8] Defendants have explained in the pending Motion to Dismiss that, because the Executive Order involves the ability of the political branches to exclude aliens who have no constitutional or statutory right to enter the United States, evaluating the constitutionality of the Executive Order does not require the Court to assess the subjective intent of the President. Under well-established law, the validity of the Executive Order turns on whether it is "facially legitimate and bona fide." *See, e.g.*, *Kleindeinst v. Mandel*, 408 U.S. 753, 770 (1972); *Fiallo v. Bell*, 430 U.S. 787,

---

[8] Other than stating generally that Plaintiffs "seek only limited discovery that will be relevant to any claim" (May 11 Order, at p. 4 (ECF No. 89)), the Court did not specifically resolve whether this requested document is relevant when it required Defendants to respond to the Document Requests and denied Defendants' request to postpone issuance of a scheduling order. *See id.* at p. 7. As the Court acknowledged, Defendants have not yet raised any specific objections to the discovery requests and the discovery topics, nor has the Court ruled on the relevance of these topics or the other burdens presented by the Requests. *See id.* at 8 ("Of course, Defendants may object to requests as allowed by the Federal Rules of Civil Procedure.").

796 (1977); *Almario v. Att'y Gen.*, 872 F.2d 147, 151 (6th Cir. 1989).  The Sixth

Circuit has explained that the "facially legitimate and bona fide reason" standard

"may be even lower," that is, less stringent, "than rational basis review."  *Bangura*

*v. Hansen*, 434 F.3d 487, 495 (6th Cir. 2006).  Rational basis review requires a

court to uphold government action if there is any rational justification for the

policy, and even rational basis review does not allow an inquiry into the subjective

intent of decisionmakers, which courts are ill-equipped to review.  *Heller v. Doe*,

509 U.S. 312, 319-20 (1993) (classification "must be upheld . . . if there is any

reasonably conceivable state of facts that could provide a rational basis for the

classification").  Moreover, the presumption of regularity here further supports the

actions of the President.  *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–

15 (1926) (explaining the presumption of regularity that attaches to federal

officials' actions).

Under the *Mandel* standard, Plaintiffs' discovery demand is irrelevant.  But

even if some evaluation beyond *Mandel* were appropriate, any such inquiry should

be limited to official government actions and thus should not include unofficial

statements or events that took place before the President's inauguration, which

would involve a "judicial psychoanalysis of a drafter's heart of hearts."  *See*

*McCreary Cnty. v. ACLU of Kentucky*, 545 U.S. 844, 862 (2005) (it is only an

"official objective" of favoring or disfavoring religion gleaned from "readily

26

discoverable fact" that implicates the Establishment Clause).  Plaintiffs' discovery

request, which focuses on a campaign document from a private political campaign,

is irrelevant to that analysis of official government action or the message presented

by official government action.  Further, as Plaintiffs' emphasis on *public*

statements implicitly concedes, only such objective manifestations of purpose are

even arguably relevant to whether the Executive Order amounts to an

establishment of religion or represents religious animus.  *See id.*   Relying on

internal campaign materials would not only implicate the campaign's constitutional

rights, as discussed above, it would "chill political debate during campaigns,"

*Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995).  At a minimum, the

"evidentiary universe" should be "limit[ed] . . . to activities undertaken while

crafting an official policy."  *Washington v. Trump*, No. 17-35105, Am. Order (Dkt

Entry No. 191), p. 6 (9th Cir. Mar. 17, 2017) (Kozinski, J., dissenting from denial

of rehearing en banc) (attached hereto as Exhibit 3).

Moreover, Plaintiffs' discovery request seeks evidence of religious animus

to support their claim that the Executive Order violates the Establishment Clause.

But violation of the Establishment Clause turns on whether the government

officially and publicly communicates a message favoring or disfavoring religion.

*See Board of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994)

(plurality op.); *McCreary*, 545 U.S. at 863 (explaining that, absent a "divisive

27

announcement" apparent to an outside observer, governmental action cannot not facially impermissibly advance religion). The Executive Order conveys no religious message and operates without regard to religion, and it was revised to eliminate any misperception of religious purpose. Thus, Request No. 1 is not relevant to the Establishment Clause analysis.

In addition, because Plaintiffs' discovery request seeks evidence only to support their Establishment Clause claim, it is not relevant or proportional to the needs of the case, as required by Rule 26(b)(1). As noted above, any evidence of religious animus is not relevant to an Establishment Clause claim where the official government action does not convey a religious message. This Court was mistaken when it stated that the "limited discovery" Plaintiffs seek "will be relevant to any claim." May 11 Order, at p. 4. All of Plaintiffs' discovery requests are aimed at seeking evidence of religious animus. It is inappropriate to allow discovery on those issues, especially before deciding threshold legal issues as to that claim, which would determine the appropriate scope of discovery (if any) on that claim.

Even if the requested campaign document could be relevant to a challenge against the initial executive order, that order has been revoked and replaced with a substantially revised second order, after consultation with and advice from cabinet members. Such actions show that the Executive Order at issue before this Court

28

does not have a religious purpose or message, as one court has concluded. *Sarsour v. Trump*, No. 17-cv-120, --- F. Supp. 3d ---, 2017 WL 1113305, at *12 (E.D. Va. Mar. 24, 2017) ("the substantive revisions reflected in [the Order] have reduced the probative value of the President's [past] statements" and undercut any claim that "the predomina[nt] purpose of [the Order] is to discriminate against Muslims based on their religion."); *see also Washington v. Trump*, No. 17-cv-00141, 2017 WL 1050354, at *5 (W.D. Wash. Mar. 17, 2017) (finding significant differences between the provisions, scope, and articulated purposes of the two executive orders).[9] Therefore, the document sought is outside the scope of discovery under Federal Rule of Civil Procedure 26(b)(1) because it is not relevant to the claims and defenses in this case or proportional to the needs of the case. *Omokehinde v. Detroit Bd. of Educ.*, 251 F.R.D. 261 (E.D. Mich. 2007) (denying discovery in part because documents sought could have no bearing on the elements of Plaintiff's claim). Requiring this discovery would be particularly inappropriate here, where the requested discovery would burden the President and senior advisers. *See Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 386 (2004) (recognizing the importance of "filter[ing] out insubstantial legal claims" before imposing discovery on the President or his advisers).

---

[9] *But see Hawai'i v. Trump*, --- F. Supp. 3d ---, 2017 WL 1011673 (D. Haw. Mar. 15, 2017); *Int'l Refugee Assist. Proj. v. Trump*, --- F. Supp. 3d ---, 2017 WL 1018235 (D. Md. Mar. 16, 2017).

2.  Even if the Court were to reject our objections that (1) discovery at this point is improper as there is no showing of need given the fact that two nationwide injunctions are in force and two appellate courts are considering the legal standards that govern identical challenges; (2) Request No. 1 is premature, in part because standing has not been established and no discovery conference has been held; (3) the Request was served on the wrong entity, since it seeks a campaign document rather than a government document; (4) requiring the President and his close advisers to search for the document sought is unwarranted under Supreme Court law absent a special showing of need that has not been made; and (5) the document is not relevant to the legal claims being brought by Plaintiffs, and if in the unlikely event the document were located in the official files of the Defendants, then there would need to be an opportunity for the Defendants to review the document and consider any privileges that may be applicable to it.  Of course, no claim of privilege could be properly evaluated or asserted until the document, if it exists, has been obtained from the proper source and reviewed.  And this Court may need to give other non-parties an opportunity to assert potential privileges, as well.  *See supra* pp. 17-18.

Plaintiffs' assertion that campaign and transition materials cannot be privileged is too simplistic, particularly since their own legal arguments depend on an assertion that the document at issue is relevant to determining the purpose of the

President's official action.  Although the Government maintains that campaign statements are not relevant here, and has moved to dismiss in part on this basis, if this Court concludes otherwise, production would not be warranted until there is an opportunity to fully consider any privileges that may apply to the materials— potential privileges that may be asserted either by the Defendants or third parties who are not parties to the litigation.  Accordingly, even if the Court rejects the objections identified above, that opportunity to consider the document and applicable privileges by interested parties would be necessary.

Ultimately, in addition to the irrelevance of these materials, the harm of potential loss of a privilege justifies limits on discovery at this time in this case. *See In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) ("Good cause [to limit discovery] exists if specific prejudice or harm will result from the absence of a protective order." (citations and internal quotations omitted)); *In re Cty. of Erie*, 473 F.3d 413, 416 (2d Cir. 2007) (recognizing harm of potential invasion of privilege and allowing a writ of mandamus to review discovery orders that potentially invade a privilege where the issue is one of first impression and the privilege may be lost); *Perry*, 591 F.3d at 1158-59 (same).

## The Document Sought Can Be Obtained from Another, Less Burdensome Source.

Relatedly, Request No. 1 is improper and unduly burdensome because it seeks information that could be more easily obtained from third parties. The Court

31

must limit discovery when "the discovery sought … can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C); *Metavante Corp. v. Emigrant Sav. Bank*, No. 05-CV-1221, 2008 WL 4722336, at *7 (E.D. Wis. Oct. 24, 2008) (noting prior holding denying motion to compel where the documents were available from a "more convenient" third-party source).  The claimed author of the document sought, or other individuals alleged to have knowledge of the document, are undeniably better sources from which to obtain this document in light of the burdens imposed on the government in searching for this document.

## The Request is Vague.

Defendants object to the Request as vague because, while it asks for just a single potentially identifiable memo created by Mr. Giuliani, it is not clear that there is a simple way to identify the specific, final memorandum being referenced without additional information that is in the hands of third parties (*i.e.*, Mr. Giuliani), not the government.  Without the participation of Mr. Giuliani (or perhaps the Trump campaign), Defendants ultimately must speculate regarding the specific document being sought.  That speculation would be based on figuring out exactly what document was being referred to by third parties in news reports.  That is, it asks Defendants to guess what document was referred to by third parties (Mr.

Giuliani, Rep. McCaul, and Ms. Phelan) in conversations with other third parties (members of the press).

**The Request Seeks Potentially Privileged Information.**

Defendants object on the basis that the Request seeks potentially privileged information.  As set forth above, Defendants maintain that any documents relating to the Trump Campaign are irrelevant; however, if the Plaintiffs were to establish that such documents are legally relevant, the document sought would then be potentially subject to a variety of privilege claims.   Further, Defendants lack sufficient information to determine if the document is covered by any privileges that may be asserted by third parties who are not parties to this litigation.

**<u>Response to Document Request No. 1:</u>**

Based on the foregoing objections, Defendants are not producing any documents in response to this Request because, among other things, the Request is premature, a search would place a burden on the President and senior level cabinet members under *Cheney* that is not justified because Plaintiffs have not made the required showing under *Cheney*, Plaintiffs are seeking a campaign document from official entities, the document is not relevant, and even if the document were relevant (and if it exists), there must be an adequate opportunity for the assertion of any potentially applicable governmental or campaign privileges.

Dated: May 19, 2017

CHAD A. READLER
Acting Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director

GISELA A. WESTWATER
Assistant Director

EREZ REUVENI
Senior Litigation Counsel

By: */s/ Katherine J. Shinners*
KATHERINE J. SHINNERS
Trial Attorney

34

United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0106
joshua.press@usdoj.gov

BRIANA YUH
Trial Attorney

*Attorneys for Defendants*

DRAFT
*Attorney Work Product – Privileged & Confidential*
*ACRL v. Trump*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 19, 2017, I served the foregoing document, DEFENDANTS' RESPONSE AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS, REQUEST NO. 1, via email to all counsel of record for the Plaintiffs per counsel's written consent to receive service electronically:

> Helal A. Farhat
> Salamey and Farhat
> 6053 Chase Road
> Dearborn, MI 48126
> Email: hfarhat@saflegal.com

> Jason C. Raofield
> Covington & Burling LLP
> 850 10th Street NW
> Washington, DC 20001
> Email: jraofield@cov.com

> Kassem M. Dakhlallah
> Hammoud, Dakhlallah & Associates PLLC
> 6050 Greenfield Road, Suite 201
> Dearborn, MI 48126
> Email: kassemdakhlallah@aol.com

> Mona Fadlallah
> P.O. Box 355
> Dearborn Heights, MI 48127
> Email: MONA@VIDALAWPLLC.COM

> Natalie C. Qandah
> Vida Law Group, PLLC
> 43050 Ford Road
> Suite 160
> Canton, MI 48187
> Email: natalie@vidalawpllc.com

DRAFT
*Attorney Work Product – Privileged & Confidential*
*ACRL v. Trump*

Nabih H. Ayad
Ayad Law, P.L.L.C.
645 Griswold Street
Suite 2202
Detroit, MI 48226
Email: ayadlaw@hotmail.com

Michael J. Steinberg
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Email: msteinberg@aclumich.org

Miriam J. Aukerman
American Civil Liberties Union of Michigan
West Michigan Regional Office
1514 Wealth St., SE
Grand Rapids, MI 49506
Email: maukerman@aclumich.org

Daniel S. Korobkin
American Civil Liberties Union Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
Fax: (313) 578-6811
Email: dkorobkin@aclumich.org

Margo Schlanger
625 So. State Street
Suite LR910
Ann Arbor, MI 48109
Email: margo.schlanger@gmail.com

Nishchay H. Maskay
Covington & Burling LLP
850 Tenth St., NW

DRAFT
*Attorney Work Product – Privileged & Confidential*
*ACRL v. Trump*

Washington, DC 20001
Email: nmaskay@cov.com


/s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Trial Attorney
United States Department of Justice
Office of Immigration Litigation

# EXHIBIT 1

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
8                    AT SEATTLE

9

10    STATE OF WASHINGTON, et al.,          CASE NO. C17-0141JLR

11                        Plaintiffs,       ORDER GRANTING MOTION
                 v.                         FOR STAY
12
      DONALD J. TRUMP, et al.,
13
                          Defendants.
14

15                    **I.     INTRODUCTION**

16         Before the court is Defendants' motion to stay these proceedings pending

17    resolution of the appeal of the preliminary injunction in *Hawaii v. Trump*, No. CV

18    17-00050 (D. Haw.).  (Mot. (Dkt. # 175)); *see also Hawaii v. Trump*, No. 17-15589 (9th

19    Cir.).  The court has considered Defendants' motion, Plaintiffs' opposition to the motion

20    (Resp. (Dkt. # 180)), Defendants' reply (Reply (Dkt. # 184)), the relevant portions of the

21    //

22    //

ORDER - 1

1  record, and the applicable law. Being fulling advised,[1] the court GRANTS Defendants'

2  motion.

## II.    BACKGROUND

4          This lawsuit arises out of President Donald J. Trump's recent issuance of two

5  Executive Orders on immigration: Executive Order No. 13,769 ("EO1") and Executive

6  Order No. 13,780 ("EO2").[2] This lawsuit began as a challenge to EO1. (*See* Compl.

7  (Dkt. # 1).) On February 3, 2017, this court issued a nationwide temporary restraining

8  order ("TRO") enjoining enforcement of sections 3(c), 5(a), 5(b), 5(c), and 5(e) of EO1.

9  (TRO (Dkt. # 52).) On appeal, the Ninth Circuit construed this court's TRO as a

10  preliminary injunction and declined to stay the preliminary injunction pending

11  Defendants' appeal of the preliminary injunction in the Ninth Circuit. *See Washington v.*

12  *Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017). On March 6, 2017, President Trump issued

13  EO2, which expressly revokes EO1. *See* EO2 ¶ 13. In addition, Defendants withdrew

14  their appeal of this court's injunction with respect to EO1. (9th Cir. Order (Dkt. # 111)

15  (granting unopposed motion for voluntary dismissal of appeal).)

16          Following the President's issuance of EO2, Plaintiffs filed a second amended

17  complaint incorporating new allegations and claims with respect to EO2. (SAC (Dkt.

18  # 152).) On March 15, 2017, Plaintiffs filed a motion seeking a TRO against

19  enforcement of Sections 2(c) and 6(a) of EO2. (TRO Mot. (Dkt. # 148).) Later that same

20

21          [1] No party has requested oral argument, and the court determines that oral argument is not necessary for its disposition of this motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

22          [2] EO2 expressly revoked EO1 effective March 16, 2017. *See* EO2 § 13.

ORDER - 2

1  day, in a separate suit, the federal district court in Hawaii enjoined the enforcement of

2  Sections 2 and 6 of EO2. *See Hawaii v. Trump*, No. CV 17-00050 (D. Haw.), Dkt.

3  ## 219-20. On March 17, 2017, the court entered a stay of Plaintiffs' motion for a TRO

4  in part because the federal district court in Hawaii entered a nationwide injunction that

5  provided Plaintiffs with the relief they sought. (3/17/17 Order (Dkt. # 164) at 8-9.) The

6  court also noted that "the Ninth Circuit's rulings on EO2 in *Hawaii v. Trump* will likely

7  have significant relevance to—and potentially control—the court's subsequent ruling

8  here." (*Id.* at 10.) Accordingly, the court concluded that "granting the stay of Plaintiffs'

9  TRO motion while the nationwide injunction remains in place . . . pending the outcome

10  of appellate proceedings in [the Hawaii] case would facilitate the orderly course of

11  justice." (*Id.*)

12      Defendants now seek a stay not just of Plaintiffs' motion for a TRO, but of the

13  entire case pending resolution of the appeal in *Hawaii v. Trump*. (*See* Mot.) Plaintiffs

14  oppose a stay. (*See* Resp.) The court now considers Defendants' motion.

15                    **III.    ANALYSIS**

16      The court "has broad discretion to stay proceedings as an incident to its power to

17  control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see also Landis v.

18  N. Am. Co.*, 299 U.S. 248, 254 (1936). This power applies "especially in cases of

19  extraordinary public moment" when "a plaintiff may be required to submit to delay not

20  immoderate in extent and not oppressive in its consequences if the public welfare or

21  convenience will thereby be promoted." *Clinton*, 520 U.S. at 707. In determining

22  whether to grant a motion to stay, "the competing interests which will be affected by the

ORDER - 3

1    granting or refusal to grant a stay must be weighed." *Lockyer v. Mirant Corp.*, 398 F.3d

2    1098, 1110 (9th Cir. 2005) (citing *CMAX*, *Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir.

3    1962)).  Those interests include:  (1) "the possible damage which may result from the

4    granting of a stay," (2) "the hardship or inequity which a party may suffer in being

5    required to go forward," and (3) "the orderly course of justice measured in terms of the

6    simplifying or complicating of issues, proof, and questions of law which could be

7    expected to result from a stay."  *Id.*  Here, the court finds that these factors weigh in favor

8    of granting Defendants' motion pending resolution of the appeal of the preliminary

9    injunction in *Hawaii v. Trump*.

10       **A.  The Orderly Course of Justice**

11          The court begins with the last factor—the orderly course of justice and judicial

12   economy.  District courts often stay proceedings where resolution of an appeal in another

13   matter is likely to provide guidance to the court in deciding issues before it.  *See Landis*,

14   299 U.S. at 254.  Where a stay is considered pending the resolution of another action, the

15   court need not find that the two cases involve identical issues; a finding that the issues are

16   substantially similar is sufficient to support a stay.  *See Landis*, 299 U.S. at 254; *see also*

17   *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) (stating

18   that the court's authority to stay one proceeding pending the outcome in another "does

19   not require that the issues in such proceedings are necessarily controlling of the action

20   before the court").  Here, the appeal in *Hawaii v. Trump* involves many issues that

21   overlap with the present litigation.  Indeed, both cases involve challenges to sections 2

22   and 6 of EO2.  (*See* SAC ¶¶ 196, 203, 209, 218, 224, 235, 240); *Hawaii v. Trump*, No.

CV 17-00050 DKW-KSC, 2017 WL 1011673, at *17 (D. Haw. Mar. 15, 2017) (issuing nationwide TRO regarding sections 2 and 6 of EO2).

Defendants argue that waiting for the Ninth Circuit's decision in the *Hawaii* case will likely provide guidance to the court in resolving discovery disputes relevant to Plaintiffs' claims.  (Mot. at 6-8.)  First, Defendants argue that Plaintiffs are seeking internal government records that Defendants believe are irrelevant because under *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), Defendants need only demonstrate a "facially legitimate and bona fide reason" for the Executive's exclusion of aliens.  (Mot. at 6.)  Plaintiffs contend that "the Ninth Circuit has already resolved . . . against Defendants" the issue of whether internal government documents are relevant to Plaintiffs' claims when it rejected application of the *Mandel* standard in *Washington*, 847 F.3d at 1162.  (Resp. at 7-8.)  However, in the *Hawaii* appeal, Defendants argue that the federal district court in *Hawaii* misread [the Ninth Circuit's] stay ruling in *Washington*. (*See* Mot. at 1 (citing appellants' brief).)  Plaintiffs obviously disagree with this position, but the salient point for purposes of Defendants' stay motion is that resolution of the *Hawaii* appeal is likely to provide guidance to this court on that issue and by extension on the appropriate scope of discovery.

Further, even if the Ninth Circuit were to determine in *Hawaii* that *Mandel* does not provide the applicable standard and that courts may look beyond the four corners of EO2, the Ninth Circuit's decision is likely to provide guidance on the scope of that review.  Although the Ninth Circuit is not considering discovery issues on appeal, it is likely to decide legal issues that will impact the court's resolution of the parties'

1   discovery disputes here by clarifying "the applicable law or relevant landscape of facts

2   that need to be developed." *See Washington v. Trump*, No. C17-0141JLR, 2017 WL

3   1050354, at *5 (W.D. Wash. Mar. 17, 2017) (quoting *Hawaii v. Trump*, No. CV

4   17-00050 DKW-KJM, 2017 WL 536826, at *5 (D. Haw. Feb. 9, 2017)).

5        In addition, Defendants are likely to move for dismissal under Federal Rules of

6   Civil Procedure 12(b)(1) and 12(b)(6).  (Mot. at 8.)  Defendants are likely to raise the

7   same arguments that they would have raised in opposition to Plaintiffs' TRO motion had

8   the court not stayed consideration of that motion.  (*Id.*)  For the same reasons that the

9   court determined that the Ninth Circuit's decision in *Hawaii* would be helpful in

10  resolving Plaintiffs' TRO motion, *see Washington*, 2017 WL 1050354, at *6, the Ninth

11  Circuit's decision will also likely help the court in resolving Defendants' motion to

12  dismiss.

13       Plaintiffs argue that the issues in the two cases are not perfectly matched and that

14  the Ninth Circuit's resolution of the appeal in *Hawaii* will leave various issues

15  unresolved before this court.  (*See* Resp. at 8-10.)  Resolution of the *Hawaii* appeal,

16  however, need not "settle every question of . . . law" to justify a stay.  *Landis*, 299 U.S. at

17  256.  It is sufficient that the *Hawaii* appeal will likely "settle many" issues and "simplify"

18  others, *id.*, such that a stay will facilitate the orderly course of justice and conserve

19  resources for both the court and the parties.  *See Fairview Hosp. v. Leavitt*, No.

20  05-1065RWR, 2007 WL 1521233, at *3 n.7 (D.D.C. May 22, 2007) (granting a stay

21  pending the resolution of another matter that would likely settle or simplify issues even

22  though resolution of the other matter "would not foreclose the necessity of litigation in

ORDER - 6

1   [the stayed] case"); *In re Literary Works in Elec. Databases Copyright Litig.*, No. 00 CIV

2   6049, 2001 WL 204212, at *3 (S.D.N.Y. Mar. 1, 2001) (same). Accordingly, the court

3   finds that this factor weighs in favor of granting Defendants' motion for a stay.

4       **B. Possible Harm to Plaintiffs if a Stay is Imposed**

5       Plaintiffs assert that there is a significant possibility that a stay will harm their

6   ability to obtain complete and accurate discovery. (Resp. at 3-6.) In particular, Plaintiffs

7   raise the specter that third parties may be free to destroy evidence during the stay. (*Id.* at

8   4-5.) They also assert that Defendants have disclaimed any obligation to locate or

9   preserve evidence that predates President Trump's inauguration on January 20, 2017.

10  (*Id.*)

11      The court first addresses Defendants' obligation to preserve evidence. Defendants

12  acknowledge that they "are aware of their obligation to preserve information in their

13  possession, custody, or control that *may* be relevant to the claims and defenses in this

14  case." (JSR (Dkt. # 177) at 9 (italics added).) To date, the court has not ruled that

15  evidence that predates January 20, 2017, is irrelevant to this case. Indeed, Plaintiffs'

16  second amended complaint expressly raises factual allegations concerning pre-

17  inauguration events.[3] (*See, e.g.*, SAC (Dkt. # 152) ¶ 141 ("Prior to his election, Donald

18  Trump campaigned on the promise that he would ban Muslims from entering the United

19

20      [3] "The 'obligation to preserve evidence arises when the party has notice that the evidence
        is relevant to litigation—most commonly when suit has already been filed, providing the party
21      responsible for the destruction with express notice, but also on occasion in other circumstances,
        as for example when a party should have known that the evidence may be relevant to future
22      litigation.'" *Ruiz v. XPO Last Mile, Inc.*, No. 05CV2125 JLS (KSC), 2016 WL 7365769, at *3
        (S.D. Cal. Dec. 19, 2016) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

1    States.").)  Indeed, the relevancy of this time period is one of the issues that Defendants

2    assert the *Hawaii* appeal may resolve and that supports imposing a stay.  (*See* Mot. at 7

3    ("[T]he Ninth Circuit's decision is likely to provide assistance in resolving disputes about

4    the appropriate time frame for any discovery.").)  Thus, until that issue is resolved, the

5    court expects all parties to abide by their obligation to preserve information in their

6    possession, custody, or control that may be relevant to Plaintiffs' claims and Defendants'

7    defenses—including evidence that predates January 20, 2017.  The entry of a stay in

8    these proceedings does not obviate either parties' obligation to ensure the preservation

9    such evidence, and the court expects all parties to fulfill their obligations in this regard.[4]

10   *See supra* n.3.

11        Plaintiffs also raise legitimate concerns about their need to obtain information and

12   preserve evidence from third parties.  (*See* Resp. at 5.)  To alleviate this potential harm,

13   Defendants suggest that Plaintiffs send preservation letters to the third parties at issue "to

14   notify them of the litigation and request that they preserve any potentially relevant

15   evidence."  (Reply at 5.)  If Plaintiffs do not believe that sending such letters will resolve

16   the issue of third-party evidentiary preservation, the court permits Plaintiffs to seek a

17   limited modification of the stay order to allow Plaintiffs to issue subpoenas to the third

18   parties.  The issuance of subpoenas to third parties would provide the force of a court

19

20        [4] Without citation to evidence, Plaintiffs assert that Defendants believe they "may discard
     probative evidence if it was created prior to Inauguration Day." (Resp. at 5.)  As noted above,
21   such a belief would be contrary to Defendants' obligations to preserve evidence that may be
     relevant to either Plaintiffs' claims or Defendants' defenses.  If there is evidence that a party to
22   this litigation has discarded probative evidence, the court expects such evidence to be brought
     before it forthwith.

ORDER - 8

1    order with respect to the preservation of this evidence and should assuage Plaintiffs' fears

2    that potentially relevant evidence might be destroyed.  The court would then stay any

3    required production under or response to the subpoenas until such time as the stay is

4    lifted, which will prevent Defendants from becoming embroiled in potentially complex

5    privilege and relevancy issues without the benefit of the Ninth Circuit's ruling in the

6    *Hawaii* case.[5]  (*See* Reply at 6.)

7        Plaintiffs are also concerned about the potential length of a stay.  The court is

8    sensitive to this concern, but notes that the Ninth Circuit ordered expedited briefing in the

9    *Hawaii* appeal and conducted oral argument on May 15, 2017.  *See Hawaii v. Trump*, No.

10   17-15589 (9th Cir.), Dkt. ## 14, 18.  Plaintiffs also raise the concern that the stay may

11   continue through an appeal to the United States Supreme Court.  (Resp. at 6-7.)

12   Although that may be true, the court also recognizes that litigation is inherently uncertain

13   and this litigation or the *Hawaii* litigation could end prior to reaching the United States

14   Supreme Court.  Further, the court will require the parties to submit a joint status report

15   within ten days of the Ninth Circuit's ruling in the *Hawaii* appeal so that the court can

16   reassess the continued appropriateness of the stay at that time.  Due to the short duration

17   of the stay Defendants seek and the safeguards that the court has implemented to mitigate

18   any harm to Plaintiffs—particularly with regard to the preservation of evidence—the

19

20

21

22

---

[5] In addition, requiring Plaintiffs to bring a motion prior to issuing any third-party subpoenas during the course of the stay will permit Defendants an opportunity to respond before any modification of the stay order.

ORDER - 9

1   court finds that the potential harm to Plaintiffs is insufficient to warrant denying

2   Defendants' motion.

### C. Possible Hardship or Inequity to Defendants if a Stay is Not Imposed

4         Defendants assert that, in the absence of a stay pending further guidance from the

5   Ninth Circuit, they will endure hardship due to "[t]he sheer volume of discovery" that

6   Plaintiffs anticipate serving on "the highest levels of government." (Mot. at 9, 10.) In

7   addition to written discovery and document requests, Plaintiffs anticipate up to 30

8   depositions of government officials, including White House staff and Cabinet-level

9   officers. (*Id.* at 10; *see also* Resp. at 11; Reply at 5 n.3 (stating that Plaintiffs indicated in

10   their initial disclosures that they believe the following officials have discoverable

11   information: President Donald Trump, Secretary of Homeland Security John Kelly,

12   Secretary of State Rex Tillerson, Attorney General Jefferson Sessions, former National

13   Security Advisor Michael Flynn, White House Counsel Donald McGahn, Presidential

14   Advisors Stephen Miller and Stephen Bannon, and White House Press Secretary Sean

15   Spicer); JSR at 8, 9 (stating that Plaintiffs propose that the parties be permitted to take up

16   to thirty (30) depositions per side).) Plaintiffs respond that "being required to defend a

17   suit, without more, does not constitute a 'clear case of hardship or inequity.'" (Resp. at

18   11 (quoting *Lockyer*, 398 F.3d at 1112 and *Landis*, 299 U.S. at 255).)

19         However, neither this lawsuit, nor the discovery Plaintiffs seek is typical. The

20   Supreme Court has declared that "the high respect that is owed to the office of the Chief

21   Executive . . . is a matter that should inform the conduct of the entire proceeding,

22   including the timing and scope of discovery, . . . and the Executive's constitutional

1    responsibilities and status are factors counseling judicial deference and restraint in the

2    conduct of litigation against it." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385

3    (2004) (alterations and internal citations omitted).  Plaintiffs' anticipated discovery will

4    likely lead to multiple discovery disputes.  (*See* JSR at 5-7 (relevance objections), 7-8

5    (privilege issues), and 11-12 (objections to taking depositions of high-ranking and White

6    House officials).)  In the context of this case, the "high respect" owed to the Executive

7    warrants a stay to protect Defendants from the burden of resource intensive discovery

8    while the Ninth Circuit addresses issues that may inform the appropriateness, scope, and

9    necessity of that discovery.  *See id.*; *see also Clinton*, 520 U.S. at 707 (stating that the

10   power to stay proceedings applies "especially in cases of extraordinary public moment").

11   Thus, the court concludes that this factor weighs heavily in favor of granting Defendants'

12   motion for a stay pending the outcome of the appeal in *Hawaii v. Trump*.

13        **D.  Summary of the Factors**

14        The court concludes that the relevant factors weighs in favor of staying these

15   proceedings pending the resolution of the appeal in *Hawaii v. Trump*.  Awaiting the Ninth

16   Circuit's opinion in that case will promote the orderly course of justice and judicial

17   economy.  In addition, Defendants have demonstrated they face hardship or inequity in

18   the absence of a stay in light of Plaintiffs' anticipated sweeping discovery and the unique

19   nature of this case involving the Chief Executive.  *See Cheney*, 542 U.S. at 385; *Clinton*,

20   520 U.S. at 707.  To the extent that Plaintiffs fear that a stay will harm their ability to

21   preserve evidence, the court has implemented measures described above to mitigate any

22   such possible effects.  *See supra* § III.B.  In addition, the Ninth Circuit has placed the

appeal on a fast track and oral argument has already occurred, so the stay will likely be of short duration. Finally, the court orders the parties to file a joint status report within ten days of the Ninth Circuit's ruling so that the court may evaluate the continued appropriateness of any stay at that time.

## IV. CONCLUSION

Based on the foregoing analysis, the court GRANTS Defendants' motion (Dkt. # 175) for a stay in these proceedings pending the Ninth Circuit's resolution of the appeal in *Hawaii v. Trump*. Should circumstances change such that lifting the stay is warranted, any party may move to lift the stay.

Dated this 17th day of May, 2017.

JAMES L. ROBART
United States District Judge

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION



Arab American Civil Rights League,
Hend Alshawaish, Sofana Bella,
American Civil Liberties Union of
Michigan, et al,

              Plaintiffs,                        Case No.  17-10310

          -vs-                                Detroit,  Michigan

Donald Trump, Department of Homeland
Security, U.S. Customs and Border
Protection, John Kelly and Kevin
McAlleenan,                             April 13, 2017

              Defendants.
_____/

TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE VICTORIA A. ROBERTS

UNITED STATES DISTRICT COURT JUDGE



Appearances:


For the Plaintiffs:                          Miriam J.  Aukerman
                                                 Michael J.  Steinberg
                                                     Rula Aoun
                                                     Nishchay Maskay


For the Defendants:                      Gisela Westwater
                                                  Joshua Press
                                                   Briana Yuh
                                                     Katherine Shinners


Proceedings taken by mechanical stenography, transcript produced by
computer-aided transcription

1                          Detroit, Michigan

2                          Thursday, April 13, 2017

3                          (At about 2:39 p.m.)

4                                - - - -

5                          (Call to Order of the Court)

6          THE COURT: Hello.  This is Judge Roberts and I understand Linda has

7    already done a roll call.  We are now on the record, so I will need you attorneys to

8    give your names again because -- can everyone hear me?

9          UNIDENTIFED ATTORNEY:  Yes, Your Honor.

10         THE COURT:  So we're calling the case of Arab American Civil Rights

11   League, et al versus Donald Trump, et al., civil case number 17-10310.  So for the

12   Plaintiffs please, appearances?

13         MS. AUKERMAN: Miriam Aukerman, ACLU of Michigan, Arab American

14   Studies Association and individual Plaintiffs Adeeb Saleh, Sofana Bella, Hilal

15   Alkatteeb and SA.

16         THE COURT:  All right.  Thank you.

17         MS. AOUN:  And Rula, R-u-l-a A-o-u-n on behalf of the ACRL, The

18   American Arab Chamber of Commerce, Plaintiff Hend Alshawaish, Salim Alshawish,

19   Yousef Abdullah, Fahmi Jahaf and Mohamed Alshega.

20         THE COURT:  Ok, for the Plaintiffs Linda took a roll call earlier.  Is

21   Michael Steinberg on line?

22         MR. STEINBERG: Yes, Your Honor.

23         THE COURT: And another -- Nishchay -- can you help me with that

24   name?

25         MR. MASKAY:  Yes, Nishchay Maskay, Your Honor.

1          THE COURT: Thank you very much.  Anyone else for Plaintiffs?  And

2    representing the Defendants?

3          MS. WESTWATER:  Yes, Your Honor.  Hello.  This is Gisela Westwater

4    here representing the Defendants.

5          MS. YUH:  Your Honor, this is Briana Yuh representing Defendants.

6          MR.  PRESS:  Josh Press representing the Defendants.

7          MS.  SHINNERS:   And Katherine Shinners representing the

8    Defendants.

9          THE COURT: Thank you, everyone.  So I wanted to have this

10   conference call just to get a better handle on exactly what is going on.  There have

11   been cases with similar allegations in other parts of the country and we have --

12   everyone has been paying very close attention to the developments in those cases.

13   The developments in this case have not been as robust and I do know that the

14   Plaintiffs here filed an Amended Complaint on March 16th.  There hasn't been

15   responsive pleading filed to that yet, and I want to talk about what that pleading is

16   going to look like.

17        Then just a day or so ago there was a Motion filed for leave to file excess

18   pages in that Motion to Dismiss.  I think I just signed the Order today granting that

19   extension and then noticed from the docket that that was withdrawn.  So can you,

20   Counsel for Defendants, just give me an update on what it is that you're going to be

21   doing?  And also Counsel before any of you speaks please give us your name so the

22   record is clear.

23        MS. WESTWATER:  Yes, Your Honor.  This is Gisela Westwater.  We

24   still intend to be -- the problem with the first filing was that some signature blocks were

25   missing from the Stipulated Order -- or from the Motion and therefore we are simply

1    re-filing, Your Honor.  So it is our -- both of the parties' intent that you would grant the

2    renewed Motion, however, with all the signature blocks, Your Honor.

3              THE COURT: All right.  So when is that coming?

4              MS. WESTWATER:  Your Honor, at present our answer deadline is

5    Monday.  We hope to have it filed tomorrow, but we have sort of been going off of our

6    original answer deadline until the Court had entered for the status conference, so that

7    has pushed us to try to file it for tomorrow, Your Honor..

8              THE COURT: Okay.

9              MS. WESTWATER:  And our intent is for it to be a fully dispositive

10   motion to dismiss dealing with all of -- we believe potentially resolving all of the issues

11   in this case.

12             THE COURT: Can you tell me if any motion similar to yours have been

13   filed in any other cases?

14             MS. WESTWATER:  No, they have not because in all of the other cases

15   up until this point the party -- the Plaintiffs have used preliminary injunctions and for

16   the cases where there has not been a definitive ruling on the preliminary injunction,

17   those cases are actually pending argument next week in the majority.  So I think as

18   this Court knows there was a Motion for Preliminary Injunction Hawaii, which was

19   granted, is currently on appeal and argument I believe is the 15th of May.  The 4th

20   Circuit there was two decisions; one was in the District of Maryland.  That was

21   granted.  It was more limited focusing simply on Section 2(c).  That has been

22   appealed to the 4th Circuit and argument is a week prior to that, so that would be I

23   believe at least the 8th, I believe, Your Honor.  We'll have in our filing, I'm sorry.

24             And there was another decision which was in the Eastern District of Virginia

25   which is quite telling.  It was actually a reversal of the earlier ruling of the Eastern

1   District regarding the original Executive Order and in this one the Motion for

2   Preliminary Injunction was denied on the basis there was not a likelihood of success

3   on the merits.

4          There are two Motions for Preliminary Injunction currently pending in the

5   District of DC.  There will be a hearing on that on the 21st on both of those together.

6   There also two cases pending with Motions in the Western District of Washington and

7   there are stay motions pending in that -- those jurisdictions asking the Court to stay

8   resolution of those until the Court has received guidance from the 9th Circuit and

9   based on those the Court has been allowing the Government in that case to prolong

10  and put off its answer while the Court resolves the stay motions.

11          THE COURT: All right.  And again, for Defense Counsel, do you believe

12  that any of the outcomes in these various Motions pending regarding preliminary

13  injunctions would inform the Court here?

14          MS. WESTWATER:  Absolutely, Your Honor.  We believe that the 9th

15  Circuit and the 4th Circuit both have I think we would say they're different

16  backgrounds.  The Courts will -- the 4th Circuit has already announced it will be going

17  on en banc.  The 9th Circuit is considering whether or not to go en banc, and so I

18  think both of these are going to be very important decisions which would certainly

19  assist this Court in any ruling.  While perhaps not controlling, I think they'll certainly be

20  persuasive.

21          THE COURT: And is the en banc hearing the one you said is coming up

22  on May 8th?

23          MS. WESTWATER: Yes, Your Honor.  It is the earlier hearing.

24          THE COURT: All right.  Counsel for Plaintiff, anything you want to put on

25  the record?

1          MS. AUKERMAN: This is Miriam Auckerman with the ACLU of
2    Michigan. Can you hear me, Your Honor?
3          THE COURT: The Court Reporter didn't get your name. I told her who
4    it is. It's Miss Aukerman.
5          MS. AUKERMAN: Yes. So our plan is to file a Motion for Preliminary
6    Injunction, but as the Court noted we had taken a somewhat approach than some of
7    the other Plaintiffs in the litigation. (Inaudible) We certainly don't know what the 9th
8    Circuit or what the 4th Circuit will do, but it's important although not controlling
9    decisions here, but we know that any Injunction issued by this Court would be
10   appealed, and so we feel that it's very critical to proceed with discovery to establish
11   the record that we think this Court will want to have and that we would want the Circuit
12   to have available to it upon appellate review of any Injunction issued by the Court. So
13   our goal here is to move forward, but to get first. (inaudible)
14         THE COURT: Miss Aukerman, for some reason you are clipping in
15   and out and so it's hard to get everything that you're saying.
16         MS. AUKERMAN: I'm not sure why that would be. So that's basically
17   our approach. I think what we would like to -- we see discovery as really critical here.
18   There's certainly a great deal of evidence of religious animus that the Government is
19   saying that that is not enough. They're saying that while candidate Trump was a
20   candidate and that there's not a connection to the Executive Orders, and so we're
21   trying to trace that through and we believe that discovery will make even clearer the
22   connection between animus and the Executive Orders and essentially explore what
23   Giuliani described as the right way to do it legally. And if the Government were willing
24   to stipulate that the Executive Orders are motivated by religious animus, we wouldn't
25   need discovery, but I understand they're not willing to stipulate to that and therefore

1    we want to move forward with discovery and then as soon as we have what we think

2    we need to provide that record, that we hope will help provide this Court what it needs

3    to issue the Preliminary Injunction that we seek.

4              THE COURT: So Miss Aukerman, give me the timing on this.  When the

5    Government is filing a Motion for Summary Judgment tomorrow, Monday a the latest,

6    when would this Motion for Preliminary Injunction be filed?

7              MS. AUKERMAN:  Well, we conferred with the Government on a Rule

8    26.  We have served discovery requests; that occurred last week on Thursday about

9    24 hours after that conference the Government indicated to us that they did not

10   consider that Rule 26 to have occurred and our -- we have pursuant to the Rule 26

11   have served interrogatories and requests for production and those are due on May

12   8th.  We're particularly -- what our goal here is to get those initial documents, initial

13   phase of documents, we hope obviously to get those through expedited discovery.

14   We respect that the Court thought that our requests were too broad and so we've

15   really taken that to heart and narrowed those requests.

16        The discovery that we're seeking is very narrow.  We're talking for example, the

17   Giuliani commissioned document is one single document that was requested and we

18   believe that those documents once produced will provide what we need to move

19   forward for the Preliminary Injunction.

20             THE COURT: Did you say, Miss Aukerman, that the Government did not

21   consider a Rule 26 meeting to have occurred?

22             MS.  AUKERMAN:  We, after the Court's Order indicating that we should

23   move forward with a Rule 26, we reached out to the Government requested that they

24   schedule that.  They initially did not want to schedule that.  Mr.  Raofield is leaving --

25   was on -- I was on vacation at the time.  He's on vacation this week.  He contacted

1    Mr. Press to say that in fact he'd be out of the country and could they -- hold the Rule

2    26(f).  They did agree to hold that on Thursday of last week, but then again withdrew

3    what they said was -- they then subsequently is not a Rule 26(f) after we served the

4    discovery requests which we are entitled to do under Rule 26.

5          THE COURT:  So let me -- I have a few questions -- but let me just stick

6    with this Rule 26 conference.  My question is for the Government.  Did a Rule 26

7    conference happen, and is it your intention to respond to discovery requests and to

8    produce initial disclosures?

9          MS. WESTWATER:  Your Honor, this is Gisela Westwater again.  As we

10    indicated to Plaintiffs in writing when they first requested a 26(f), we believe that under

11    the Rules it is the Court that triggers our obligations under Rule 26(f).  We indicated

12    this in writing.  We were very clear.  Instead Plaintiff's Counsel simply said they were

13    going out of the country, would we have a phone call with them when we were on the

14    phone.  We began trying to go through the description of the items in the 26(f) and we

15    objected.  We stated we are not prepared for a 26(f).  We were not ready to address

16    any of the discovery issues that -- we believed this would be an issue raised with this

17    Court and the appropriateness of discovery.  We believe in this Court's Order you

18    specifically said due to the nature of this case, good cause may exist delay entry of a

19    scheduling order and that's a quote and that's exactly -- that is exactly our position.

20    We believe this is absolutely the sort of case where a delay is appropriate, not just

21    because we are going to have a dispositive Motion to Dismiss filed in the next day,

22    but also because if you read in the notes to the rules in the 2015 amendments, this is

23    exactly the type of case and that is why the Court's were given the discretion to find

24    exceptional circumstances, good cause to delay issuing such an Order and that would

25    be questions like this, complex issues such as standing.  The Court rule has

| | |
|---|---|
| 1 | incumbent on the Court to examine its own jurisdiction, especially here where |
| 2 | Plaintiffs are asking for discovery into the White House into -- we have 14 Defendants |
| 3 | who are all huge governmental agencies which could have deliberative process. |
| 4 | There's separation of powers issues.  There's presidential communication issues that |
| 5 | are going to be raised.  We believe before the Court would delve into this as we've |
| 6 | mentioned to Plaintiffs, this is certainly something to be brought up before the Court |
| 7 | and we do not believe that Plaintiffs themselves could call us and turn what we |
| 8 | thought was just a discussion between the parties unilaterally into a 26(f) conference. |
| 9 | THE COURT: So Miss Westwater, is it the Government's position that |
| 10 | there are no issues of fact presented by this case?  And are you asking the Court to -- |
| 11 | let me finish my question.  And are you asking the Court to rule as a matter of law on |
| 12 | all of the claims in Plaintiffs' Amended Complaint? |
| 13 | MS. WESTWATER:  Well, first Your Honor, we would have as we said |
| 14 | sort of standing questions and other threshold jurisdictional issues.  If the Court did |
| 15 | not dismiss based upon those, we do believe yes, Your Honor, that there are no |
| 16 | factual issues, disputes that would keep this Court from ruling as a matter of law. |
| 17 | THE COURT: So I take it that Plaintiff feels very differently about that. |
| 18 | MS. AUKERMAN:  Absolutely, Your Honor.  I mean as is it clear by the |
| 19 | fact that there are existing Injunctions from multiple Courts and that multiple |
| 20 | Preliminary Injunctions have been issued.  We don't think that the likelihood of |
| 21 | success on their Motion to Dismiss is very high.  However, it is very clear from the |
| 22 | case law that they're simply filing a Motion to Dismiss does not -- is not a basis to stop |
| 23 | moving forward with discovery.  I mean there's extensive case law which we'd be |
| 24 | happy to provide to the Court within the Eastern District as well as elsewhere, saying |
| 25 | that essentially that would grind the wheels of justice to a halt if every time a |

1    defendant filed a dispositive motion, discovery simply has to stop.

2         With respect to the Government's assertions that we're trying to reach into the

3    White House, I think one of the things that we've done is to be extremely careful and

4    very limited in what we're requesting.  We are not dealing with issues where there's

5    exacted as privileged presidential communication privilege.  (sic)  We have sought

6    documents that predate the inauguration.  Defendants have elsewhere in other filings

7    made it very clear that they consider Candidate Trump to be a private citizen, not a

8    Government employee and that therefore, arguing those things shouldn't be taken to

9    reflect any kind of animus attributable to him as President, but that same argument

10   that mean that must also take a position that he's a private citizen for the purposes of

11   discovery.

12        So we're not talking about discovery into the White House.  We're talking about

13   only pre-election discovery which is very different in terms of the issues that it raises.

14   I think the Defendants' position as they made very clear, and Mr.  Maskay can talk

15   more about the Rule 26 conference because he participated in the conference and

16   the fact that they went through all of the Rule 26 issues.  I wasn't personally involved,

17   but he can speak to that better than I can and the fact that they went through of that.

18        But I think where we're at, Your Honor, is the Government is taking a position

19   that this should not be discovery at all, and our position is that they need to provide an

20   argument for why that should be the case. The normal rules of discovery are that

21   (inaudible) regardless of whether there's a dispositive motion pending and we would

22   like to move forward as quickly as possible so that we can provide -- we can move

23   forward with that Preliminary Injunction where we feel we need that discovery

24   because we want to provide the Court and the 6th Circuit with the record that it needs.

25        So what we will propose, Your Honor,  that you treat today's conference --

1        THE COURT:  Excuse me.

2        THE COURT REPORTER:  I'm not getting much of what you're saying.

3        MS. AUKERMAN:  Could you not hear me?

4        THE COURT REPORTER:  No, I can't hear you well.

5        MS. AUKERMAN:  Is this better?

6        THE COURT:  Are you on a landline or a cell phone?

7        MS. AUKERMAN:  I am on a landline.  I'm not on speakerphone, so I'm

8   not sure what the issue is.

9        THE COURT REPORTER:  I can hear you better now.

10       MS. AUKERMAN:  I'll try to repeat what I said before.  So our view is

11  that we want to provide the Court with -- we want to move forward with discovery.

12  The Government's position is that there should be no discovery whatsoever, and so at

13  this point really the case law is very clear that there's no basis to stop discovery

14  simply because one has filed a Motion to Dismiss.  There's tons of case law in the

15  Eastern District as well as elsewhere on that point.

16       So what we would like to see this Court do is move forward with a Scheduling

17  Order.  We'd be happy to provide the Court with proposed dates for discovery.  We

18  can do that by tomorrow with a Proposed Order.  I'm not sure that a further Rule 26

19  conference with the Government makes sense because their position is simply that

20  there should be no discovery at all.  So we would like to propose some dates to the

21  Court for what we think is appropriate.  We would like the Court to -- we'd like to make

22  sure that we get the discovery that we've already served in a timely fashion, that that

23  be responded to in a timely fashion because there really is no burden there and it was

24  properly served and so that we can proceed to provide the Court to move forward to

25  preliminary injunction that we would like to file, but where we feel we need to have

1  that discovery to supply this Court and ultimately the 6th Circuit with the full record

2  that we think the Court deserves.

3            THE COURT: Miss Westwater, these standing and threshold jurisdiction

4  questions that you say this case presents, they have been argued by the Government

5  in similar cases filed by Plaintiffs?

6            MS. WESTWATER:  Some of them have, Your Honor, and they have

7  actually been meritorious in some; in as I said in the Eastern District of Virginia and

8  originally in the District of Massachusetts.  Those are also things that seem to be

9  giving pause to the Judge in the Western District of Washington who is consider

10  staying the case to receive guidance from the 9th Circuit.

11            THE COURT: So I just have a question.  In the Eastern District of

12  Virginia and in Massachusetts the Courts held there was no jurisdiction?

13            MS. WESTWATER:    Oh, I'm sorry.  The Courts found --

14            THE COURT:  Excuse me.  Excuse me.

15            MR. PRESS:  Your Honor, there was no standing to challenge certain

16  provisions by certain Plaintiffs.  For example, in this case we have organizational

17  Plaintiffs who appear to be making their own free speech claims, as well as their  own

18  associational claims through some of the other individual Plaintiffs and --

19            THE COURT: Did a Court -- did a Court say that the organizational

20  Plaintiffs had no standing?

21            MR. PRESS:  So the District of Massachusetts in early or late January

22  said that they only had standing as to their own First Amendment claim and that none

23  of the Plaintiffs had standing to challenge the refugee provisions, for example.

24            MS. WESTWATER:  Your Honor, this is again Gisela Westwater.  In this

25  case Plaintiff challenged the entire Order which contains many provisions for which

1    they do not have standing to challenge.

2         THE COURT:  Who's speaking?

3         MS. WESTWATER:  I should also add, Your Honor,  that while Plaintiff

4    characterizes that there should never be any discovery at this point and therefore that

5    there's no reason to confer with us, we don't believe we've ever put that forward as

6    our position.  We have said simply that we believe at this juncture discovery is not

7    appropriate.  We do believe that our dispositive Motion to Dismiss could be granted,

8    in which case discovery would never be needed, but depending on the ruling that

9    comes out of this Court on that dispositive motion, we're unable to say what might be

10   proper or might be discoverable in the future.  So we do believe tomorrow with our

11   Motion to Dismiss we also intend to file a motion to extend the Rule 16 scheduling

12   conference and although the Plaintiffs have said that a Motion to Dismiss is not

13   enough for staying all discovery, in truth there is law in this Circuit that shows a

14   Motion to Dismiss along with other factors which we are including in our brief do

15   actually counsel and favor of staying and we would believe even if the Court were to

16   rule as we have in our brief the factors under Rule 16, that counsel for extending the

17   deadline, actually all of those are present in this case.  It's a complex case and there's

18   threshold issues.  It raises issues of first impression; in fact, Constitutional level.

19        This is a very important case.  There's discovery would be burdensome.  I

20   know that Plaintiffs say it's not.  However, they keep referring to discovery from

21   private citizen Trump.  I am actually -- all of us hear from the Defendants' side are

22   representing officials and agencies, so officials in their official capacity and agencies,

23   so this is discovery of anything.  Those are who they would be from.  They would be

24   documents in the possession of Government officials and so this does raise lots of

25   questions of first impression merely on the merits, but if this Court were to go into

1    discovery, it would raise significant issues of constitutional proportions s of discovery.

2    Even this, what Plaintiff characterizes as a limited discovery and therefore to

3    characterize it as posing no burden on the parties and this Court is really incorrect.

4    We would urge this Court instead to simply -- tomorrow we will be filing our motions,

5    as we said,  so also a Motion to Extend and we would ask the Court to allow us to

6    fully brief why this is a case in which it makes sense to extend the scheduling -- the

7    discovery deadlines, including the original Scheduling Order so that the Court can

8    proceed in a well-reasoned manner and at a pace that I think will give due authority or

9    due recognition of really the important issues in front of the Court.

10           MS. AUKERMAN:  This is Miriam Aukerman again.  Can you hear me?

11   If I may, you ask about how other Courts have responded to these arguments and the

12   same disability arguments about standing for example, have been raised in opposition

13   to the Preliminary Injunction motions in Maryland, in Hawaii, in Washington and the

14   Courts have again and again rejected those and have found that the Plaintiffs have

15   standing, and it's very clear that the Plaintiffs here will have standing and if there

16   should be one Plaintiff who doesn't haven't standing, even if there's a single Plaintiff

17   without standing, then there's standing for the purposes of the case.  And so it's very

18   clear based on how other Courts ruled that the Plaintiffs here will have standing.

19           So what we see, Your Honor, is an effort at delay by the Government.  These

20   are really delay tactics that the Government has been employing.  This case was filed

21   at the end of January.  We are now in April.  We're seeking basically to insure that we

22   get discovery, that the requests that we served get responded to by the beginning of

23   May, May 8th and that we then be able to move forward.  This is just a continual

24   process of trying to delay and delay and keep us from getting to -- moving forward

25   and getting the information that we need in order to provide the Court with the

1   Preliminary Injunction that we would like to file.  We want to get that evidence, and

2   there's no reason why we should off.  The Government has made it very clear that

3   think it's complicated and that they're going to fight tooth and nail not to release

4   anything and that they think that they're complicated issues.  If that's so, then there's

5   no reason not to get started with briefing those issues and let them respond to our -- I

6   mean we should move forward and if they think that there's privilege issues, then they

7   should articulate those and we should brief those and move forward with those rather

8   than just delaying everything and then two months from now after this Court has

9   rejected -- or three months from now after their Motion to Dismiss.  Then we move

10  forward into briefing whether or not exactly the privilege applies to a private citizen

11  and we spend another two or three months on that.  We want this case to move

12  forward.  The Court should not countenance this sort of delay tactics that the

13  Government is using to prevent us from moving forward with the case.

14  THE COURT: I've got a couple reactions.  We're not really operating by

15  a date the end of January.  I think the parties themselves through stipulation and

16  otherwise did not move this case forward for whatever reason, and then there was an

17  amended complaint that was filed March 8th, I believe.  March 16th -- March 16th, so

18  that's the date.  That's the operative date now and because of things that happened

19  before then, there really could not have been a scheduling conference to set dates.

20  So we're using March 16th as the date.

21  The Court is aware that even though an initial Motion to Dismiss or Motion for

22  Summary Judgment may be filed in response to an Amended Complaint, that doesn't

23  -- or in response to a Complaint, that doesn't mean that discovery is always at a

24  standstill.  In fact, in many cases I still will enter a discovery plan even though there

25  are those kinds of motions that are pending because of the possibility for delay and

1   because the case warrants that kind of attention.

2        So I understand that there are reasons not to enter a Scheduling Order when a

3   dispositive motion is pending, but there are also reasons to move forward.  So I will

4   look at your -- the papers that the Government plans on filing by Monday and the two

5   Motions that you plan on filing and will make a decision about whether the Court is

6   going to require the parties to have a Rule 26 conference and this would be a real

7   conference that comports with the court rules and you would submit your joint plan for

8   discovery and the Court would hold the conference with the parties but I will wait and

9   see what gets filed.

10       Also, standing jurisdiction issues are discoverable, are matters that the parties

11  can have discovery on, so if there is a question presented with respect to those

12  issues, they would be and could be a matter for discovery as well.

13       That's what I have.  If anyone has anything else they want to put on the record

14  but if not, we'll just wait for your papers to be filed.  Anything else that anyone has?

15            MS. WESTWATER: Nothing for the Defendants, Your Honor.

16            THE COURT:  Plaintiffs, anything?

17            MS. AUKERMAN:  Does my co-counsel have anything?

18            MR. STEINBERG:  No.

19            THE COURT: No?  Okay.  All right counsel.  Thank you very much.

20  We're adjourned.

21            **(Proceedings adjourned at about 3:12 p.m.)**

22                         - - -

23            **COURT REPORTER'S CERTIFICATION**

24

25

**JANICE COLEMAN, CSR 1095, RPR**
**OFFICIAL FEDERAL COURT REPORTER**
**(313) 234-2611**

 1  STATE OF MICHIGAN)

 2                  )  SS.

 3  COUNTY OF WAYNE  )

 4

 5      I, Janice Coleman, Federal Official Court Reporter, in and

 6  for the United States District Court for the Eastern District

 7  of Michigan, do hereby certify that pursuant to Section 753,

 8  Title 28, United States Code, that the foregoing is a true and

 9  correct transcript of the stenographically reported telephone

10  proceedings held in this matter to the best of my ability and

11  that the transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14                      /S/ JANICE COLEMAN

15                      JANICE COLEMAN, CSR NO. 1095, RPR

16                      FEDERAL OFFICIAL COURT REPORTER

17

18  DATED:  MAY 5, 2017

19

20

21

22

23

24

25

# EXHIBIT 3

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF WASHINGTON and STATE OF MINNESOTA, | No. 17-35105 |
| Plaintiffs-Appellees, | D.C. No. 2:17-cv-00141 Western District of Washington, Seattle |
| v. | |
| DONALD J. TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; REX W. TILLERSON, Secretary of State; JOHN F. KELLY, Secretary of the Department of Homeland Security; UNITED STATES OF AMERICA, | AMENDED ORDER |
| Defendants-Appellants. | |

Before: CANBY, CLIFTON, and FRIEDLAND, Circuit Judges.

This court in a published order previously denied a motion of the

government for a stay of a restraining order pending appeal. 847 F.3d 1151 (9th

Cir. 2017). That order became moot when this court granted the government's

unopposed motion to dismiss its underlying appeal. Order, Mar. 8, 2017. No party

has moved to vacate the published order. A judge of this court called for a vote to

determine whether the court should grant en banc reconsideration in order to

vacate the published order denying the stay. The matter failed to receive a

majority of the votes of the active judges in favor of en banc reconsideration.

Vacatur of the stay order is denied. *See U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994) (holding that the "extraordinary remedy of vacatur" is ordinarily unjustified when post-decision mootness is caused by voluntary action of the losing party).

This order is being filed along with a concurrence from Judge Reinhardt, a concurrence from Judge Berzon, a dissent from Judge Kozinski, a dissent from Judge Bybee, and a dissent from Judge Bea. No further opinions will be filed.

FILED

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Washington v. Trump*, No. 17-35105

REINHARDT, J., concurring in the denial of en banc rehearing:

I concur in our court's decision regarding President Trump's first Executive Order – the ban on immigrants and visitors from seven Muslim countries. I also concur in our court's determination to stand by that decision, despite the effort of a small number of our members to overturn or vacate it. Finally, I am proud to be a part of this court and a judicial system that is independent and courageous, and that vigorously protects the constitutional rights of all, regardless of the source of any efforts to weaken or diminish them.

Judge Kozinski's diatribe, filed today, confirms that a small group of judges, having failed in their effort to undo this court's decision with respect to President Trump's first Executive Order, now seek on their own, under the guise of a dissent from the denial of en banc rehearing of an order of voluntary dismissal, to decide the constitutionality of a second Executive Order that is not before this court. That is hardly the way the judiciary functions. Peculiar indeed!

FILED

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BERZON, J., concurring in the denial of reconsideration en banc.

I concur in the court's denial of rehearing en banc regarding vacatur. I have full confidence in the panel's decision. I write to emphasize that, although one would think otherwise from the three dissents from denial of rehearing en banc, judges are empowered to decide issues properly before them, not to express their personal views on legal questions no one has asked them. There is no appeal currently before us, and so no stay motion pending that appeal currently before us either. In other words, all the merits commentary in the dissents filed by a small minority of the judges of this court is entirely out of place.

Here is the background: A three-judge panel of this court decided that the Government was not entitled to a stay pending appeal of the district court's Temporary Restraining Order enjoining enforcement of the President's January 27, 2017 Executive Order. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017). The Government chose not to challenge the panel's order further but instead to draft a revised Executive Order, revoking the one that was before this court's panel. Exec. Order 13780 of March 6, 2017 §§ 1(i), 13, 82 Fed. Reg. 13209 (published Mar. 9, 2017). That Order was expressly premised on the panel opinion. *Id.* § 1(c), (i). The Government has since elected to dismiss this appeal,

1

and with it its stay request; it filed an unopposed motion to dismiss, which we granted, and did *not* in that motion ask that the panel, or an en banc court, vacate the panel's opinion.[1]

So there is now *no* live controversy before our court regarding either the merits of the underlying case or the propriety of the original restraining order. "In our system of government, courts have no business deciding legal disputes or expounding on law in the absence of . . . a case or controversy." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (internal quotation marks omitted) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

One judge of the court nonetheless called for a vote of the active judges as to whether to convene an en banc court for the sole purpose of vacating the panel's opinion. As the panel's March 15, 2017 order, denying rehearing en banc, notes, vacating an opinion where the losing party's voluntary actions have mooted the appeal is ordinarily improper. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25–27 (1994); *United States v. Payton*, 593 F.3d 881, 883–86 (9th Cir. 2010). And as Judge Bybee's dissent reflects, the only justification

---

[1] On the contrary, both parties have since relied on the opinion in staking out their positions. *See* Exec. Order 13780 § 1(c), (i); Resp. to Defs.' Notice of Filing of Exec. Order at 2-11, *Washington v. Trump*, No. 2:17-cv-00141-JLR (W.D. Wash. Mar. 9, 2017).

offered for vacating the opinion was a disagreement on the merits.

It is simply not an "exceptional circumstance[]" justifying the "extraordinary remedy of vacatur" that members of our court disagree with a panel opinion. *See Bonner Mall*, 513 U.S. at 26, 29. I am aware of *no* instance in which we have convened an en banc panel to vacate a precedential opinion on the basis of its merits, where no party seeks further appellate review or vacatur. *Compare Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 725–27 (9th Cir. 2007) (en banc) (Bybee, J., concurring) (vacating a panel opinion in light of a settlement agreement dependent on vacatur reached *after* a majority of the court already had voted to take the case en banc and designated the panel's opinion non-precedential). Rather, it is "inappropriate . . . to vacate mooted cases, in which we have no constitutional power to decide the merits, on the basis of assumptions about the merits." *Bonner Mall*, 513 U.S. at 27.

We as a court make the vast majority of our decisions through three-judge panels, and we abide by the decisions of those panels absent a decision by a majority of the active judges that there is good reason to reconsider the case with a larger, eleven-judge panel, determined by lot. *See* Fed. R. App. P. 35; Ninth Cir. R. 35-3; Ninth Cir. Gen. Order 5.1–5.5. Reconsidering a case before an en banc panel after full argument and coming to a new, reasoned decision—which might

3

reach the same result as the earlier panel decision or might conclude otherwise—is an entirely different matter from what was sought here: wiping out the panel's decision and leaving a vacuum. The en banc court would have no authority whatever to opine on the merits of the case or the propriety of the district court's stay, as there is simply no live appeal before us.

Article III of the United States Constitution precludes us from revisiting the issues addressed in the panel opinion at this point, as any decision rendered by the en banc court necessarily would be advisory. *See Already LLC*, 133 S. Ct. at 726. A few dissenting colleagues have nonetheless used the decision by the active judges of the court to decline to rewrite history as the occasion to attack the panel opinion on myriad grounds. As there is nothing pending before us, it would be entirely inappropriate to respond in detail—which, I presume, is precisely why the panel did not do so.

In some ways that is too bad. There is much to discuss, and such discussion would show that the panel's opinion was quite correct.

To take but one example: The cases Judge Bybee cites regarding the applicability of *Kleindienst v. Mandel*, 408 U.S. 753 (1972), do not govern the case as it came to the panel. None addresses whether the "facially legitimate and bona fide reason" standard articulated in *Mandel* applies to executive action that

4

categorically revokes permission to enter or reenter the country *already granted* by
the Executive Branch.  *See Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy,
J., concurring in the judgment); *Fiallo v. Bell*, 430 U.S. 787, 792–95 (1977);
*Cardenas v. United States*, 826 F.3d 1164, 1171–72 (9th Cir. 2016); *An Na Peng v.
Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012); *Bustamante v. Mukasey*, 531 F.3d
1059, 1062 (9th Cir. 2008); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 978–79
(9th Cir. 2006); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006);
*Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065–66 (9th Cir. 2003); *Noh v. INS*, 248
F.3d 938, 942 (9th Cir. 2001).  That the Second Circuit applied *Mandel*'s test to a
program requiring certain non-immigrants to provide information to authorities
(and to face removal only *after* undergoing "generally applicable legal [removal]
proceedings to enforce pre-existing immigration laws"), *see Rajah v. Mukasey*, 544
F.3d 427, 439 (2d Cir. 2008), in no way portends that application of *Mandel* was
appropriate here.  The question before our panel, unlike the one in *Rajah*,
concerned a sweeping Executive Order that *barred* from entry whole groups of
legal permanent residents and visa holders, among many others, *without* any
individualized determination regarding the revocation.  Presumably recognizing
the weight of these individuals' constitutional interests, the President excepted
them from the revised Executive Order.  *See* Exec. Order 13780 § 3.

5

Judges Kozinski and Bea likewise used the filing of the order denying rehearing en banc as to the question of vacating the panel opinion as a platform for providing their personal views as to the merits of that opinion. Both concern themselves with issues the panel expressly did not finally resolve. *See* Bea, J., dissenting from denial of rehearing en banc, at 3–6 (discussing *parens patriae* standing); Kozinski, J., dissenting from denial of rehearing en banc, at 3–7 (discussing the Establishment Clause); *Washington*, 847 F.3d at 1161 n.5, 1168 (explicitly declining to reach the questions of *parens patriae* standing and, after outlining the parameters of the appropriate Establishment Clause analysis, not coming to rest on the likelihood of success with respect to that issue). Further, Judge Kozinski expresses at some length his unhappiness with the invocation of the panel's Establishment Clause analysis in a recent district court order, once again venturing an opinion on an appeal not before us—in this instance, not because the appeal was withdrawn but because none has yet been filed.[2]

---

[2]Judge Kozinski also contests the scope of the Temporary Restraining Order the panel declined to stay, observing that relatively few of the affected individuals have lawful status. Again, this was not the occasion to opine on the contours of a now-moot injunction. And, contrary to Judge Kozinski's representation, the number of individuals covered directly by the panel's due process analysis was substantial—there were tens-of-thousands of individuals whose already approved visas were revoked. *See* Mica Rosenberg & Lesley Wroughton, *Trump's Travel Ban Has Revoked 60,000 Visas for Now*, Reuters, Feb. 3, 2017,

(continued...)

There will be ample opportunity, and probably soon, *see* Order Granting

Motion for Temporary Restraining Order, *Hawaii v. Trump*, No. 1:17-cv-00050

DKW-KSC (D. Haw. Mar. 15, 2017), for further review of the important issues

raised by the President's Executive Orders.  And it is apparent from the

Government's delay in promulgating a new Executive Order, and in the ten-day

delay in implementation within the revised Order, *see* Exec. Order 13780 § 14, that

no overwhelming exigency counsels in favor of abandoning the ordinary process of

adversarial appellate review.

I well understand the importance of the cases concerning these Executive

Orders.  They raise critical questions concerning the reach of executive and judicial

authority, and they could profoundly affect the lives of our citizens, our

communities, and our position in the world.  It is their very seriousness that, in my

view, commands that we as judges speak about them when we have authority to do

so, which is when we are asked by litigants to settle a dispute.  The court at large

has not been asked.  So my dissenting colleagues should not be engaging in a one-

sided attack on a decision by a duly constituted panel of this court.

We will have this discussion, or one like it.  But not now.

---

[2](...continued)
http://www.reuters.com/article/us-usa-immigration-visas-idUSKBN15I2EW
(citing figures provided by the Government).

FILED

Washington v. Trump, No. 17-35105

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**KOZINSKI**, Circuit Judge, with whom Circuit Judges **BYBEE**, **CALLAHAN, BEA** and **IKUTA** join, dissenting from the denial of reconsideration en banc.

I write separately to highlight two peculiar features of the panel's opinion. First, the panel's reasoning rests solely on Due Process. But the vast majority of foreigners covered by the executive order have <u>no</u> Due Process rights. Nevertheless, the district court enjoined the order's travel provisions in their entirety, even as applied to the millions of aliens who have no constitutional rights whatsoever because they have never set foot on American soil. See <u>Zadvydas</u> v. <u>Davis</u>, 533 U.S. 678, 693 (2001); <u>United States</u> v. <u>Verdugo-Urquidez</u>, 494 U.S. 259, 269 (1990). In short, the panel approves the district court's nationwide injunction using a rationale that applies to a small percentage of those covered by the President's order.

The panel itself seems to acknowledge this strange state of affairs when it notes that there "might be persons covered" by the district court's restraining order who have no Due Process claims. Panel Order at 23. "Might" indeed! The overwhelming majority of the hundreds of millions of people covered by the order lack Due Process claims; only a tiny proportion have been accorded lawful status. Yet the panel offers no explanation for allowing the district court's extraordinarily broad restraining order to stand in full. This St. Bernard is being wagged by a flea

on its tail.

Because we have an obligation to maintain as much of the order as is legal,
we normally ask:  Can we keep it operational in a way that avoids constitutional
conflict?  The law of our circuit is that we consider the severability of an executive
order just as we would consider the severability of a statute.  See Matter of Reyes,
910 F.2d 611, 613 (9th Cir. 1990); see also Minnesota v. Mille Lacs Band of
Chippewa Indians, 526 U.S. 172, 191 (1999) (assuming without deciding that the
same severability analysis applies to executive orders as to statutes).[1]  If we applied
this framework to the executive order, we would "refrain from invalidating more of
the [order] than is necessary" and "maintain the [order] in so far as it is valid."
Regan v. Time, Inc., 468 U.S. 641, 652 (1984).  This would have been easy:  We
could have approved the injunction as to the relatively few who have lawful status
in the United States and allowed the executive order to cover everyone else.  This
workable solution would have respected the President's prerogative to regulate
immigration as delegated to him by 8 U.S.C. § 1182(f), a provision about which
the panel says nothing.

_____

[1]  Indeed, we know that this executive order can be severed because the
district court did precisely that:  It enjoined the five subsections of the executive
order relating to travel and left the other eleven intact.  Washington v. Trump, No.
C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) (order granting
temporary restraining order).

Which brings me to the second peculiar feature of the opinion, a topic about which the panel says all too much: the Establishment Clause. While its opinion does not come to rest on this issue, the panel still sows chaos by holding "that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." Panel Order at 25. This matters because one Establishment Clause test requires a showing of secular purpose,[2] and the panel gives its imprimatur to considering the "numerous statements by the President" about Muslims, most of them made before he was elected or took office. Id. This holding has continued vitality: It was relied on only days ago by a district judge in Hawaii who, in the ongoing contretemps between our circuit and the executive, enjoined the President's new executive order nationwide. See Hawaii v. Trump, No. 17-00050 DKW-KSC (D. Haw. Mar. 15, 2017) (order granting temporary restraining order). Indeed, this holding is spreading like kudzu through the federal courts. See Int'l Refugee Assistance

---

[2]  I don't endorse Lemon v. Kurtzman, 403 U.S. 602 (1971), as the appropriate test in this context. Like Judge Bybee, I am puzzled why Lemon should be plucked from domestic contexts and applied to laws affecting immigration. See Bybee Dissental at 8 n.6. If we apply this test so casually to immigration policy, I see no reason it should not apply to every foreign policy decision made by the political branches, including our dealings with various theocracies across the globe. I see many reasons to resist this gross intrusion of the judicial power into foreign affairs.

Project v. Trump, No. 17-00361-TDC, at 5, 29 (D. Md. Mar. 16, 2017).

Taking a cue from the panel's opinion and citing a trove of informal and unofficial statements from the President and his advisers, see Hawaii at 33–37, the district judge found that plaintiffs had shown "a strong likelihood of succeeding on their claim" that the new order violates the Establishment Clause, id. at 41. And why shouldn't he? After all, the panel made this evidentiary snark hunt the law of the Ninth Circuit; the district judge was (in his own word) "commanded" to follow it. Id. at 32.

This is folly. Candidates say many things on the campaign trail; they are often contradictory or inflammatory.[3] No shortage of dark purpose can be found by sifting through the daily promises of a drowning candidate, when in truth the poor shlub's only intention is to get elected. No Supreme Court case—indeed no case anywhere that I am aware of—sweeps so widely in probing politicians for

---

[3] There is an anecdote, doubtless apocryphal, about Franklin Roosevelt during a whistlestop tour. He had two speeches that took opposite positions on a hot-button issue of the day. When the train stopped at a town that favored the issue, he would give his "pro" speech. And in towns that opposed the issue he'd give his "con" speech. One day he approached a town that his advisors told him was divided evenly between the pros and cons. FDR's advisers worried about how he'd handle the situation, but FDR was undaunted. He gave a speech and when he was done the pros in the audience believed he was in their corner and the cons were convinced he agreed with them. And that, friends, is the nature of electoral politics.

page 5

unconstitutional motives.[4]  And why stop with the campaign?  Personal histories,

public and private, can become a scavenger hunt for statements that a clever lawyer

can characterize as proof of a -phobia or an -ism, with the prefix depending on the

constitutional challenge of the day.

This path is strewn with danger.  It will chill campaign speech, despite the

fact that our most basic free speech principles have their "fullest and most urgent

application precisely to the conduct of campaigns for political office."

McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014) (citation and

internal quotation marks omitted).  And it will mire us in a swamp of unworkable

litigation.  Eager research assistants can discover much in the archives, and those

findings will be dumped on us with no sense of how to weigh them.  Does a Meet

the Press interview cancel out an appearance on Face the Nation?  Does a year-old

presidential proclamation equal three recent statements from the cabinet?  What is

the appropriate place of an overzealous senior thesis or a poorly selected yearbook

quote?

Weighing these imponderables is precisely the kind of "judicial

---

[4]  Respect for a coordinate branch should also counsel against focusing on campaign statements.  Candidate Trump, unlike President Trump, had not taken an oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8, and was not bound to "take Care that the Laws be faithfully executed," id. art. II, § 3.

psychoanalysis" that the Supreme Court has told us to avoid.  McCreary County v.

ACLU of Ky., 545 U.S. 844, 862 (2005).  The hopelessness of this weighing

exercise is why the Supreme Court has never "deferred to comments made by

[government] officials to the media."  Hamdan v. Rumsfeld, 548 U.S. 557, 623–24

n.52 (2006).  And it's why the panel's case citations for the supposedly "well

established" proposition that the President's informal statements are admissible,

upon closer inspection, turn out to refer to a much more limited universe: the text

of city council resolutions, early drafts of legislation, transcripts of legislative

discussions and contemporaneous statements by legislative members.  See Church

of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534–35 (1993);

Larson v. Valente, 456 U.S. 228, 254 (1982); Vill. of Arlington Heights v. Metro

Housing Dev. Corp., 429 U.S. 252, 268 (1977).  Limiting the evidentiary universe

to activities undertaken while crafting an official policy makes for a manageable,

sensible inquiry.  But the panel has approved open season on anything a politician

or his staff may have said, so long as a lawyer can argue with a straight face that it

signals an unsavory motive.

Even if a politician's past statements were utterly clear and consistent, using

them to yield a specific constitutional violation would suggest an absurd

result—namely, that the policies of an elected official can be forever held hostage

page 7

by the unguarded declarations of a candidate. If a court were to find that campaign

skeletons prevented an official from pursuing otherwise constitutional policies,

what could he do to cure the defect? Could he stand up and recant it all ("just

kidding!") and try again? Or would we also need a court to police the sincerity of

that mea culpa—piercing into the public official's "heart of hearts" to divine

whether he <u>really</u> changed his mind, just as the Supreme Court has warned us not

to? <u>See</u> <u>McCreary</u>, 545 U.S. at 862.

   This is yet another reason my colleagues err by failing to vacate this hasty

opinion. The panel's unnecessary statements on this subject will shape litigation

near and far.[5] We'll quest aimlessly for true intentions across a sea of insults and

hyperbole. It will be (as it were) a huge, total disaster.

---

   [5] Contrary to the claims of Judges Reinhardt and Berzon, the substance of
the panel's opinion continues to be highly relevant. Because the panel has refused
to vacate it, the opinion continues to be the law of the circuit and is being followed
by courts in the circuit and elsewhere. My criticism bears directly on the mistake
our court has made in failing to vacate the opinion, and will hopefully warn other
courts away from similar errors. My colleagues' effort to muzzle criticism of an
egregiously wrong panel opinion betrays their insecurity about the opinion's legal
analysis.

FILED

*Washington v. Trump*, No. 17-35105

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BYBEE, Circuit Judge, with whom KOZINSKI, CALLAHAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the denial of reconsideration *en banc*.

I regret that we did not decide to reconsider this case *en banc* for the purpose of vacating the panel's opinion. We have an obligation to correct our own errors, particularly when those errors so confound Supreme Court and Ninth Circuit precedent that neither we nor our district courts will know what law to apply in the future.

The Executive Order of January 27, 2017, suspending the entry of certain aliens, was authorized by statute, and presidents have frequently exercised that authority through executive orders and presidential proclamations. Whatever we, as individuals, may feel about the President or the Executive Order,[1] the President's decision was well within the powers of the presidency, and "[t]he wisdom of the policy choices made by [the President] is not a matter for our consideration." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165 (1993).

---

[1] Our personal views are of no consequence. I note this only to emphasize that I have written this dissent to defend an important constitutional principle—that the political branches, informed by foreign affairs and national security considerations, control immigration subject to limited judicial review—and not to defend the administration's policy.

This is not to say that presidential immigration policy concerning the entry of aliens at the border is immune from judicial review, only that our review is limited by *Kleindienst v. Mandel*, 408 U.S. 753 (1972)—and the panel held that limitation inapplicable. I dissent from our failure to correct the panel's manifest error.

## I

In this section I provide background on the source of Congress's and the President's authority to exclude aliens, the Executive Order at issue here, and the proceedings in this case. The informed reader may proceed directly to Part II.

## A

"The exclusion of aliens is a fundamental act of sovereignty." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Congress has the principal power to control the nation's borders, a power that follows naturally from its power "[t]o establish an uniform rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and from its authority to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, and to "declare War," *id.* art. I, § 8, cl. 11. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power . . . ."). The

2

President likewise has some constitutional claim to regulate the entry of aliens into the United States. "Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). The foreign policy powers of the presidency derive from the President's role as "Commander in Chief," U.S. Const. art. II, § 2, cl. 1, his right to "receive Ambassadors and other public Ministers," *id.* art. II, § 3, and his general duty to "take Care that the Laws be faithfully executed," *id. See Garamendi*, 539 U.S. at 414. The "power of exclusion of aliens is also inherent in the executive." *Knauff*, 338 U.S. at 543.

In the Immigration and Nationality Act of 1952, Congress exercised its authority to prescribe the terms on which aliens may be admitted to the United States, the conditions on which they may remain within our borders, and the requirements for becoming naturalized U.S. citizens. 8 U.S.C. § 1101 *et seq.* Congress also delegated authority to the President to suspend the entry of "any class of aliens" as he deems appropriate:

Whenever the President finds that the entry of any aliens or of any

class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*Id.* § 1182(f). Many presidents have invoked the authority of § 1182(f) to bar the entry of broad classes of aliens from identified countries.[2]

In Executive Order No. 13769, the President exercised the authority granted in § 1182(f). Exec. Order No. 13769 § 3(c) (Jan. 27, 2017), *revoked by* Exec. Order No. 13780 § 1(i) (Mar. 6, 2017). The Executive Order covered a number of subjects. Three provisions were particularly relevant to this litigation. First, the Executive Order found that "the immigrant and nonimmigrant entry into the United States of aliens from [seven] countries . . . would be detrimental to the interests of the United States" and ordered the suspension of entry for nationals (with certain exceptions) from those countries for 90 days. *Id.* The seven countries were Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. Second, it directed the Secretary of State to suspend the U.S. Refugee Admissions Program (USRAP) for 120 days.

---

[2] *See, e.g.*, Exec. Order No. 12324 (Sept. 29, 1981) (Reagan and Haiti); Proclamation No. 5517 (Aug. 22, 1986) (Reagan and Cuba); Exec. Order No. 12807 (May 24, 1992) (George H.W. Bush and Haiti); Proclamation No. 6958 (Nov. 22, 1996) (Clinton and Sudan); Proclamation No. 7359 (Oct. 10, 2000) (Clinton and Sierra Leone); Exec. Order No. 13276 (Nov. 15, 2002) (George W. Bush and Haiti); Exec. Order No. 13692 (Mar. 8, 2015) (Obama and Venezuela); Exec. Order No. 13726 (Apr. 19, 2016) (Obama and Libya).

However, exceptions could be made "on a case-by-case basis" in the discretion of the Secretaries of State and Homeland Security. Once USRAP resumed, the Secretary of State was "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual [was] a minority religion in the individual's country of nationality." *Id.* § 5(a), (b), (e). Third, it suspended indefinitely the entry of Syrian refugees. *Id.* § 5(c).

## B

Three days after the President signed the Executive Order, the States of Washington and Minnesota brought suit in the Western District of Washington seeking declaratory and injunctive relief on behalf of their universities, businesses, citizens, and residents that were affected by the Executive Order in various ways. The States also sought a temporary restraining order (TRO). On February 3, 2017, following a hearing, the district court, without making findings of fact or conclusions of law with respect to the merits of the suit, issued a nationwide TRO against the enforcement of §§ 3(c), 5(a)–(c), (e). The district court proposed further briefing by the parties and a hearing on the States' request for a preliminary injunction.[3]

---

[3] That same day, the district court for the District of Massachusetts denied a preliminary injunction to petitioners challenging the Executive Order on equal protection, Establishment Clause, due process, and APA grounds. *Louhghalam v.*

5

The United States sought a stay of the district court's order pending an appeal. A motions panel of our court, on an expedited basis (including oral argument by phone involving four time zones), denied the stay. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).

Among other things, the panel drew three critical conclusions. First, the panel held that, although we owe deference to the political branches, we can review the Executive Order for constitutionality under the same standards as we would review challenges to domestic policies. *See id.* at 1161–64. Second, the panel found that the States were likely to succeed on their due process arguments because "the Executive Order [does not] provide[] what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." *Id.* at 1164. Third, the panel found that there were at least "significant constitutional questions" under the Establishment Clause raised by the fact that the seven countries identified in the Executive Order are principally Muslim countries and the President, before and after his election, made reference to "a Muslim ban." *Id.* at 1168.

---

*Trump*, No. 17-10154-NMG, 2017 WL 479779 (D. Mass. Feb. 3, 2017). The following week, the district court for the Eastern District of Virginia granted a preliminary injunction against enforcement of the Executive Order in Virginia. The court's sole grounds were based on the Establishment Clause. *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 2017 WL 580855 (E.D. Va. Feb. 13, 2017).

In response to the panel's decision not to stay the district court's TRO
pending appeal, a judge of our court asked for *en banc* review. The court invited
the parties to comment on whether the entire court should review the judgment.
The U.S. Department of Justice asked that the panel hold the appeal while the
administration considered the appropriate next steps and vacate the opinion upon
the issuance of any new executive order. A majority of the court agreed to stay the
*en banc* process. In the end, the President issued a new Executive Order on March
6, 2017, that referred to the panel's decision and addressed some of the panel's
concerns. In light of the new Executive Order, the Department of Justice moved to
dismiss the appeal in this case. The panel granted the motion to dismiss but did not
vacate its precedential opinion.[4]

Ordinarily, when an appeal is dismissed because it has become moot, any
opinions previously issued in the case remain on the books. *U.S. Bancorp Mortg.
Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) ("Judicial precedents are
presumptively correct and valuable to the legal community as a whole. They . . .
should stand unless a court concludes that the public interest would be served by a

---

[4] Proceedings in the original suit filed by Washington and Minnesota are still
pending in the Western District of Washington. The State of Hawaii also filed suit
in the District of Hawaii and has asked for a TRO enjoining the second Executive
Order. *See* Plaintiffs' Motion for Temporary Restraining Order, *Hawai'i v. Trump*,
No. 1:17-cv-00050-DKW-KSC (D. Haw. Mar. 8, 2017), ECF No. 65.

vacatur." (citation omitted)). The court, however, has discretion to vacate its
opinion to "clear[] the path for future relitigation of the issues between the parties,"
*United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or where "exceptional
circumstances . . . counsel in favor of such a course," *U.S. Bancorp Mortg.*, 513
U.S. at 29. We should have exercised that discretion in this case because the panel
made a fundamental error.[5] It neglected or overlooked critical cases by the
Supreme Court and by our court making clear that when we are reviewing
decisions about who may be admitted into the United States, we must defer to the
judgment of the political branches.[6] That does not mean that we have no power of
judicial review at all, but it does mean that our authority to second guess or to
probe the decisions of those branches is carefully circumscribed. The panel's
analysis conflicts irreconcilably with our prior cases. We had an obligation to

---

[5] We have previously said that it is procedurally proper for a judge "to seek
an en banc rehearing for the purpose of vacating [a panel's] decision." *United
States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010).

[6] To be clear, the panel made several other legal errors. Its holding that the
States were likely to succeed on the merits of their procedural due process claims
confounds century-old precedent. And its unreasoned assumption that courts
should simply plop Establishment Clause cases from the domestic context over to
the foreign affairs context ignores the realities of our world. But these errors are
not what justified vacatur. Instead, it is the panel's treatment of *Kleindienst v.
Mandel*, 408 U.S. 753 (1972), that called for an extraordinary exercise of our
discretion to vacate the panel's opinion.

vacate the panel's opinion in order to resolve that conflict and to provide consistent guidance to district courts and future panels of this court.

## II

The panel began its analysis from two important premises: first, that it is an "uncontroversial principle" that we "owe substantial deference to the immigration and national security policy determinations of the political branches," *Washington*, 847 F.3d at 1161; second, that courts can review constitutional challenges to executive actions, *see id.* at 1164. I agree with both of these propositions. Unfortunately, that was both the beginning and the end of the deference the panel gave the President.

How do we reconcile these two titan principles of constitutional law? It is indeed an "uncontroversial principle" that courts must defer to the political judgment of the President and Congress in matters of immigration policy. The Supreme Court has said so, plainly and often. *See*, *e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."); *Harisiades*, 342 U.S. at 590 ("[N]othing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require us to equate our political judgment with

9

that of Congress."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210

(1953) ("Courts have long recognized the power to expel or exclude aliens as a

fundamental sovereign attribute exercised by the Government's political

departments largely immune from judicial control."); *Henderson v. Mayor of N.Y.*,

92 U.S. (2 Otto) 259, 270–71 (1876).  On the other hand, it seems equally

fundamental that the judicial branch is a critical backstop to defend the rights of

individuals against the excesses of the political branches.  *See INS v. Chadha*, 462

U.S. 919, 941 (1983) (reviewing Congress's use of power over aliens to ensure that

"the exercise of that authority does not offend some other constitutional

restriction" (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976))).

The Supreme Court has given us a way to analyze these knotty questions,

but it depends on our ability to distinguish between two groups of aliens:  those

who are present within our borders and those who are seeking admission.  As the

Court explained in *Leng May Ma v. Barber*,

> It is important to note at the outset that our immigration laws
> have long made a distinction between those aliens who have come to
> our shores seeking admission, . . . and those who are within the United
> States after an entry, irrespective of its legality.  In the latter instance
> the Court has recognized additional rights and privileges not extended
> to those in the former category who are merely "on the threshold of
> initial entry."

357 U.S. 185, 187 (1958) (quoting *Mezei*, 345 U.S. at 212).  The panel did not

10

recognize that critical distinction and it led to manifest error.  The panel's decision

is not only inconsistent with clear Supreme Court authority, but the panel missed a

whole bunch of our own decisions as well.

A

The appropriate test for judging executive and congressional action affecting

aliens who are outside our borders and seeking admission is set forth in *Kleindienst*

*v. Mandel*, 408 U.S. 753 (1972).  In *Mandel*, the government had denied a visa to a

Marxist journalist who had been invited to address conferences at Columbia,

Princeton, and Stanford, among other groups.  Mandel and American university

professors brought facial and as-applied challenges under the First and Fifth

Amendments.  The Court first made clear that Mandel himself, "as an unadmitted

and nonresident alien, had no constitutional right of entry."  *Id.* at 762.  Then it

addressed the First Amendment claims of the professors who had invited him.

Recognizing that "First Amendment rights [were] implicated" in the case, the

Court declined to revisit the principle that the political branches may decide whom

to admit and whom to exclude.  *Id.* at 765.  It concluded that when the executive

has exercised its authority to exclude aliens "on the basis of a facially legitimate

and bona fide reason, the courts will neither look behind the exercise of that

discretion, nor test it by balancing its justification against the First Amendment

11

interests of those who seek personal communication with the applicant." *Id.* at 770.

In this case, the government argued that *Mandel* provided the proper framework for analyzing the States' claims. The panel, however, tossed *Mandel* aside because it involved only a decision by a consular officer, not the President. *See Washington*, 847 F.3d at 1162 ("The present case, by contrast, is not about the application of a specifically enumerated congressional policy to the particular facts presented in an individual visa application. Rather the States are challenging the President's *promulgation* of sweeping immigration policy."). Two responses. First, the panel's declaration that we cannot look behind the decision of a consular officer, but can examine the decision of the President stands the separation of powers on its head. We give deference to a consular officer making an individual determination, but not the President when making a broad, national security-based decision? With a moment's thought, that principle cannot withstand the gentlest inquiry, and we have said so. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008) ("We are unable to distinguish *Mandel* on the grounds that the exclusionary decision challenged in that case was not a consular visa denial, but rather the Attorney General's refusal to waive Mandel's inadmissibility. The holding is plainly stated in terms of the power delegated by Congress to 'the

12

Executive.' The Supreme Court said nothing to suggest that the reasoning or outcome would vary according to which executive officer is exercising the Congressionally-delegated power to exclude."). Second, the promulgation of broad policy is precisely what we expect the political branches to do; Presidents rarely, if ever, trouble themselves with decisions to admit or exclude individual visa-seekers. *See Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency."). If the panel is correct, it just wiped out any principle of deference to the executive.

Worse, the panel's decision missed entirely *Fiallo v. Bell*, 430 U.S. 787 (1977), and *Fiallo* answers the panel's reasons for brushing off *Mandel*. In *Fiallo*, the plaintiff brought a facial due process challenge to immigration laws giving preferential treatment to natural mothers of illegitimate children. As in *Mandel*, the constitutional challenge in *Fiallo* was "based on [the] constitutional rights of citizens." *Id.* at 795. The Court acknowledged that the challenge invoked "'double-barreled' discrimination based on sex and illegitimacy." *Id.* at 794. Either ground, if brought in a suit in a domestic context, would have invoked some kind of heightened scrutiny. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (sex

13

discrimination); *Trimble v. Gordon*, 430 U.S. 762, 769 (1977) (illegitimacy). Rejecting the claim that "the Government's power in this area is never subject to judicial review," *Fiallo*, 430 U.S. at 795–96, 795 n.6, the Court held that *Mandel*'s "facially legitimate and bona fide reason" test was the proper standard:  "We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case."  *Id.* at 795; *see also id.* at 794 (rejecting "the suggestion that more searching judicial scrutiny is required").  Importantly, the Court reached that conclusion despite the fact the immigration laws at issue promulgated "sweeping immigration policy," *Washington*, 847 F.3d at 1162, just as the Executive Order did.

The panel's holding that "exercises of policymaking authority at the highest levels of the political branches are plainly not subject to the *Mandel* standard," *id.*, is simply irreconcilable with the Supreme Court's holding that it could "see no reason to review the broad congressional policy choice at issue [there] under a more exacting standard than was applied in *Kleindienst v. Mandel*," *Fiallo*, 430 U.S. at 795.

*Fiallo* wasn't the only Supreme Court case applying *Mandel* that the panel missed.  In *Kerry v. Din*, 135 S. Ct. 2128 (2015), the Court confronted a case in

14

which Din (a U.S. citizen) claimed that the government's refusal to grant her Afghani husband a visa violated her own constitutional right to live with her husband.  A plurality held that Din had no such constitutional right.  *Id.* at 2131 (plurality opinion).  Justice Kennedy, joined by Justice Alito, concurred in the judgment, and we have held that his opinion is controlling.  *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016).  For purposes of the case, Justice Kennedy assumed that Din had a protected liberty interest, but he rejected her claim to additional procedural due process.  "The conclusion that Din received all the process to which she was entitled finds its most substantial instruction in the Court's decision in *Kleindienst v. Mandel*."  *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment) (citation omitted).  After reciting *Mandel*'s facts and holding, Justice Kennedy concluded that "[t]he reasoning and the holding in *Mandel* control here.  That decision was based upon due consideration of the congressional power to make rules for the exclusion of aliens, and the ensuing power to delegate authority to the Attorney General to exercise substantial discretion in that field."  *Id.* at 2140.  Once the executive makes a decision "on the basis of a facially legitimate and bona fide reason," the courts may "'neither look behind the exercise of that discretion, nor test it by balancing its justification against' the constitutional interests of citizens the visa denial might implicate."  *Id.*

15

(quoting *Mandel*, 408 U.S. at 770). Applying *Mandel*, Justice Kennedy concluded that "the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under [8 U.S.C.] § 1182(a)(3)(B)." *Id.* at 2141. No more was required, and "[b]y requiring the Government to provide more, the [Ninth Circuit] erred in adjudicating Din's constitutional claims." *Id.*

The importance and continuing applicability of the framework set out in *Mandel* and applied in *Fiallo* and *Din* has been recognized in circumstances remarkably similar to the Executive Order. After the attacks of September 11, 2001, the Attorney General instituted the National Security Entry-Exit Registration System. That program required non-immigrant alien males (residing in the United States) over the age of sixteen from twenty-five countries—twenty-four Muslim-majority countries plus North Korea—to appear for registration and fingerprinting. One court referred to the program as "enhanced monitoring." *See Rajah v. Mukasey*, 544 F.3d 427, 433–34, 439 (2d Cir. 2008) (describing the program).[7] The aliens subject to the program filed a series of suits in federal courts across the

---

[7] The aliens subject to the program were designated by country in a series of notices. The first notice covered five countries: Iran, Iraq, Libya, Sudan, and Syria. *See Rajah*, 544 F.3d at 433 n.3.

United States.  They contended that the program unconstitutionally discriminated against them on the basis of "their religion, ethnicity, gender, and race."  *Id.* at 438. Similar to the claims here, the petitioners argued that the program "was motivated by an improper animus toward Muslims."  *Id.* at 439.

Citing *Fiallo* and applying the *Mandel* test, the Second Circuit held that "[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review."  *Id.* at 438 (alteration in original) (citation omitted).  The court then found "a facially legitimate and bona fide reason for" the registration requirements because the countries were "selected on the basis of national security criteria."  *Id.* at 438–39.  The court rejected as having "no basis" the petitioners' claim of religious animus.  *Id.* at 439.  The court observed that "one major threat of terrorist attacks comes from radical Islamic groups."  *Id.*  It added:

> Muslims from non-specified countries were not subject to registration. Aliens from the designated countries who were qualified to be permanent residents in the United States were exempted whether or not they were Muslims.  The program did not target only Muslims: non-Muslims from the designated countries were subject to registration.

*Id.*  Finally, the court refused to review the program for "its effectiveness and wisdom" because the court "ha[d] no way of knowing whether the Program's enhanced monitoring of aliens ha[d] disrupted or deterred attacks.  In any event,

17

such a consideration [was] irrelevant because an *ex ante* rather than *ex post* assessment of the Program [was] required under the rational basis test." *Id.* The Second Circuit thus unanimously rejected the petitioners' constitutional challenges and "join[ed] every circuit that ha[d] considered the issue in concluding that the Program [did] not violate Equal Protection guarantees." *Id.*; *see Malik v. Gonzales*, 213 F. App'x 173, 174–75 (4th Cir. 2007); *Kandamar v. Gonzales*, 464 F.3d 65, 72–74 (1st Cir. 2006); *Zafar v. U.S. Attorney Gen.*, 461 F.3d 1357, 1367 (11th Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 664–65 (7th Cir. 2006); *Shaybob v. Attorney Gen.*, 189 F. App'x 127, 130 (3d Cir. 2006); *Ahmed v. Gonzales*, 447 F.3d 433, 439 (5th Cir. 2006); *see also Adenwala v. Holder*, 341 F. App'x 307, 309 (9th Cir. 2009); *Roudnahal v. Ridge*, 310 F. Supp. 2d 884, 892 (N.D. Ohio 2003). The panel was oblivious to this important history.

The combination of *Mandel*, *Fiallo*, and *Din*, and the history of their application to the post-9/11 registration program, is devastating to the panel's conclusion that we can simply apply ordinary constitutional standards to immigration policy. Compounding its omission, the panel missed all of our own cases applying *Mandel* to constitutional challenges to immigration decisions. *See*, *e.g.*, *Cardenas*, 826 F.3d at 1171 (discussing *Mandel* and *Din* extensively as the "standard of judicial review applicable to the visa denial" where petitioner alleged

18

due process and equal protection violations); *An Na Peng v. Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012) (applying the *Mandel* standard to reject a lawful permanent resident's equal protection challenge against a broad policy); *Bustamante*, 531 F.3d at 1060 (applying *Mandel* to a due process claim and describing *Mandel* as "a highly constrained review"); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 978–79 (9th Cir. 2006) (applying *Mandel* to a due process challenge to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006) (using the *Mandel* standard to address an alien's challenge to the executive's denial of parole to temporarily enter the United States, and finding the executive's reasons "were not facially legitimate and bona fide"); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003) (applying *Fiallo* to a facial equal protection challenge based on "former marital status"); *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001) (applying *Mandel* when an alien challenged the revocation of his visa); *see also Andrade-Garcia v. Lynch*, 828 F.3d 829, 834–35 (9th Cir. 2016) (discussing review under *Mandel*). Like the Second Circuit in *Rajah*, we too have repeatedly "equated [the *Mandel*] standard of review with rational basis review." *Barthelemy*, 329 F.3d at 1065; *see An Na Peng*, 673 F.3d at 1258; *Ablang v. Reno*, 52 F.3d 801, 805 (9th Cir. 1995). It is equally clear from our cases that we apply *Mandel* whether we are

19

dealing with an individual determination by the Attorney General or a consular

officer, as in *Mandel* and *Din*, or with broad policy determinations, as in *Fiallo*.

The panel's clear misstatement of law justifies vacating the opinion.

B

Applying *Mandel* here, the panel's error becomes obvious: the Executive

Order was easily "facially legitimate" and supported by a "bona fide reason." As I

have quoted above, § 1182(f) authorizes the President to suspend the entry of "any

class of aliens" as he deems appropriate:

> Whenever the President finds that the entry of any aliens or of any
> class of aliens into the United States would be detrimental to the
> interests of the United States, he may by proclamation, and for such
> period as he shall deem necessary, suspend the entry of all aliens or
> any class of aliens as immigrants or nonimmigrants, or impose on the
> entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).[8]  Invoking this authority and making the requisite findings, the

President "proclaim[ed] that the immigrant and nonimmigrant entry into the United

States of aliens from [seven] countries . . . would be detrimental to the interests of

---

[8] Regrettably, the panel never once mentioned § 1182(f), nor did it
acknowledge that when acting pursuant it to it, the government's "authority is at its
maximum, for it includes all that [the President] possesses in his own right plus all
the Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J.,
concurring); *see Knauff*, 338 U.S. at 542 ("When Congress prescribes a procedure
concerning the admissibility of aliens, it is not dealing alone with a legislative
power.  It is implementing an inherent executive power.").

20

the United States," and he suspended their entry for 90 days.  Exec. Order No.

13769 § 3(c).  As the Executive Order further noted, the seven countries—Iraq,

Iran, Libya, Somalia, Sudan, Syria, and Yemen—had all been previously identified

by either Congress, the Secretary of State, or the Secretary of Homeland Security

(all in prior administrations) as "countries or areas of concern" because of terrorist

activity.[9]  The President noted that we "must be vigilant" in light of "deteriorating

conditions in certain countries due to war, strife, disaster, and civil unrest."  *Id.* § 1.

The President's actions might have been more aggressive than those of his

predecessors, but that was his prerogative.  Thus, the President's actions were

supported by a "facially legitimate and bona fide" reason.

Justice Kennedy indicated in *Din* that it might have been appropriate to

"look behind" the government's exclusion of Din's husband if there were "an

affirmative showing of bad faith on the part of the consular officer who denied [the

---

[9] *Iraq and Syria*:  Congress has disqualified nationals or persons who have been present in Iraq and Syria from eligibility for the Visas Waiver Program.  8 U.S.C. § 1187(a)(12)(A)(i)(I), (ii)(I).

*Iran, Sudan, and Syria*:  Under § 1187(a)(12)(A)(i)(II), (ii)(II), the Secretary of State has designated Iran, Sudan, and Syria as state sponsors of terrorism because the "government . . . repeatedly provided support of acts of international terrorism."

*Libya, Somalia, and Yemen*:  Similarly, under § 1187(a)(12)(A)(i)(III), (ii)(III), the Secretary of Homeland Security has designated Libya, Somalia, and Yemen as countries where a foreign terrorist organization has a significant presence in the country or where the country is a safe haven for terrorists.

husband's] visa." *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Because the panel never discussed *Din*, let alone claimed that Justice Kennedy's comment might allow us to peek behind the facial legitimacy of the Executive Order, I need not address the argument in detail. Suffice it to say, it would be a huge leap to suggest that *Din*'s "bad faith" exception also applies to the motives of broad-policy makers as opposed to those of consular officers.

Even if we have questions about the basis for the President's ultimate findings—whether it was a "Muslim ban" or something else—we do not get to peek behind the curtain. So long as there is *one* "facially legitimate and bona fide" reason for the President's actions, our inquiry is at an end. As the Court explained in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999):

> The Executive should not have to disclose its "real" reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even it if did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.

*Id.* at 491; *see Mezei*, 345 U.S. at 210–12; *Knauff*, 338 U.S. at 543.

The panel faulted the government for not coming forward in support of the Executive Order with evidence—including "classified information." *Washington*, 847 F.3d at 1168 & nn.7–8. First, that is precisely what the Court has told us we

22

should not do.  Once the facial legitimacy is established, we may not "look behind the exercise of that discretion." *Fiallo*, 430 U.S. at 795–96 (quoting *Mandel*, 408 U.S. at 770).  The government may provide more details "when it sees fit" or if Congress "requir[es] it to do so," but we may not require it.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment).  Second, that we have the capacity to hold the confidences of the executive's secrets does not give us the right to examine them, even under the most careful conditions.  As Justice Kennedy wrote in *Din*, "in light of the national security concerns the terrorism bar addresses[,] . . . even if . . . sensitive facts could be reviewed by courts *in camera*, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure."  *Id.*; *see Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.  Nor can courts sit in camera in order to be taken into executive confidences.").  When we apply the correct standard of review, the President does not have to come forward with supporting documentation to explain the basis for the Executive Order.

The panel's errors are many and obvious.  Had it applied the proper standard, the panel should have stopped here and issued the stay of the district

23

court's TRO.  Instead, the panel opinion stands contrary to well-established separation-of-powers principles.  We have honored those principles in our prior decisions; the panel failed to observe them here.  If for no other reason, we should have gone *en banc* to vacate the panel's opinion in order to keep our own decisions straight.

III

We are all acutely aware of the enormous controversy and chaos that attended the issuance of the Executive Order.  People contested the extent of the national security interests at stake, and they debated the value that the Executive Order added to our security against the real suffering of potential emigres.  As tempting as it is to use the judicial power to balance those competing interests as we see fit, we cannot let our personal inclinations get ahead of important, overarching principles about who gets to make decisions in our democracy.  For better or worse, every four years we hold a contested presidential election.  We have all found ourselves disappointed with the election results in one election cycle or another.  But it is the best of American traditions that we also understand and respect the consequences of our elections.  Even when we disagree with the judgment of the political branches—and perhaps *especially* when we disagree—we have to trust that the wisdom of the nation as a whole will prevail in the end.

24

Above all, in a democracy, we have the duty to preserve the liberty of the people by keeping the enormous powers of the national government separated. We are judges, not Platonic Guardians. It is our duty to say what the law is, and the meta-source of our law, the U.S. Constitution, commits the power to make foreign policy, including the decisions to permit or forbid entry into the United States, to the President and Congress. We will yet regret not having taken this case *en banc* to keep those lines of authority straight.

Finally, I wish to comment on the public discourse that has surrounded these proceedings. The panel addressed the government's request for a stay under the worst conditions imaginable, including extraordinarily compressed briefing and argument schedules and the most intense public scrutiny of our court that I can remember. Even as I dissent from our decision not to vacate the panel's flawed opinion, I have the greatest respect for my colleagues. The personal attacks on the distinguished district judge and our colleagues were out of all bounds of civic and persuasive discourse—particularly when they came from the parties. It does no credit to the arguments of the parties to impugn the motives or the competence of the members of this court; *ad hominem* attacks are not a substitute for effective advocacy. Such personal attacks treat the court as though it were merely a political forum in which bargaining, compromise, and even intimidation are acceptable

25

principles.  The courts of law must be more than that, or we are not governed by law at all.

I dissent, respectfully.

FILED

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Washington v. Trump*, No. 17-35105

BEA, Circuit Judge, with whom KOZINSKI, CALLAHAN, and IKUTA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join Judge Bybee's excellent dissent from the denial of rehearing en banc. I write separately to emphasize a serious error in the panel's conclusion that the due process claims advanced by Washington and Minnesota (collectively, "the States") were likely to succeed on the merits. States may not sue the federal government to assert due process rights for themselves, nor for their residents—much less non-resident aliens—under the Fifth Amendment, because the States are not proper party plaintiffs.[1] We should have taken this case en banc to correct this error in the panel's due process holding and the several errors identified by Judge Bybee in his dissent.

The States are not proper party plaintiffs to make claims under the Due Process Clause, because they are simply not "persons" protected by the Fifth Amendment.[2] *See South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966)

---

[1] The panel denied the government's motion for a stay solely on due process grounds. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). It specifically avoided deciding the First Amendment claim based on religious discrimination.
[2] I agree with the panel that the States have alleged proprietary harms to their public universities sufficient to establish Article III standing. The universities have spent money for procurement of visas for scholars, faculty, and students, which expenditures will be wasted if the visa holders are prevented from attendance at the state schools. What the States have not done, however, is establish that they have rights under the Due Process Clause of the Fifth Amendment to vindicate those proprietary harms.

1

("The word 'person' in the context of the Due Process Clause of the Fifth

Amendment cannot, by any reasonable mode of interpretation, be expanded to

encompass the States of the Union, and to our knowledge this has never been done

by any court.");[3] *United States v. Thoms*, 684 F.3d 893, 899 n.4 (9th Cir. 2012)

(quoting *Katzenbach*, 383 U.S. at 323); *Premo v. Martin*, 119 F.3d 764, 771 (9th

Cir. 1997) ("Because the State is not a 'person' for the purposes of the Fifth

Amendment, the State's reliance on the Due Process Clause was misplaced."

(citing *Katzenbach*, 383 U.S. at 323–24)).

Perhaps to avoid this pitfall, the panel goes one step further. It holds that,

"[u]nder the 'third party standing' doctrine, [the] injuries to the state universities

give the States standing to assert the rights of the students, scholars, and faculty

affected by the Executive Order." *Washington*, 847 F.3d at 1160. In taking this

step, the panel ignores direct, on-point Supreme Court precedent to the contrary.

---

[3] In *Katzenbach*, South Carolina sought "a declaration that selected provisions of the Voting Rights Act of 1965 violate the Federal Constitution," and "an injunction against enforcement of [those] provisions by the Attorney General." *Katzenbach*, 383 U.S. at 307. South Carolina filed its case directly in the Supreme Court, which had original jurisdiction to hear the case. *Id.* The Court denied South Carolina's request to enjoin the enforcement of the Voting Rights Act. In its response to South Carolina's claim that the Voting Rights Act denied South Carolina due process, the Court held that states may not bring due process claims under the Fifth Amendment because states are not persons protected by the Fifth Amendment. *Id.* at 323–24.

The States may not sue the federal government as *parens patriae* to protect their citizens from constitutional violations alleged to have been committed by the federal government. *See Katzenbach*, 383 U.S. at 324 ("Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate *parens patriae* of every American citizen."); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status." (citing *Missouri v. Illinois*, 180 U.S. 208, 241 (1901))); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 123 (7th ed. 2016) ("One important limit on parens patriae standing of state and local governments is that they may not sue the federal government in this capacity, though they may sue the federal government to protect their own sovereign or proprietary interests.").

The panel avoids this precedent, and holds that the States may sue the federal government on behalf of their residents' (and potential future residents')[4] constitutional interests under the Fifth Amendment because the States have third-party standing to do so.[5] None of the precedent cited by the panel supports its

---

[4] The panel holds that the States may assert "potential claims regarding possible due process rights of other persons," including "[visa] applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Washington*, 847 F.3d at 1166. The Supreme Court has already explained that the States have no rights of their own to assert under the Fifth Amendment, and have no basis for asserting the Fifth Amendment due process rights of their residents. In light of that precedent, I see no reason why the States would be permitted to assert due process claims on behalf of foreign individuals who have not yet received a visa, and who do not yet reside in the States that wish to assert claims on the individuals' behalves. The panel also does not explain what procedures as to notice (reason for denial) or due process hearing (proof of reasons) the federal government would need to provide non-resident visa applicants to satisfy due process upon the denial or suspension of entry pursuant to 8 U.S.C. § 1182(f). Suppose, for example, an Iranian national applies for a non-immigrant tourist visa on April 1, and hostilities break out between the United States and Iran on April 10, one day before the Iranian national expected to receive a visa. Is the Iranian national entitled to notice that his visa will not be issued because of the outbreak of hostilities and to a hearing to justify that the government's denial does not violate the Iranian national's due process rights? Before whom would that hearing be held, where would it take place, and what would be the required proof? Could the Iranian national file suit in a federal district court to assert his "possible" due process rights? The panel invites litigation by visa applicants and other non-resident foreign nationals to assert "potential claims regarding possible due process rights." *Id.* But, as Judge Bybee shows with precision, no alien has a right to enter the United States; it is a privilege which can be withheld. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

[5] The States did not raise third-party standing as a basis to assert the due process rights of their residents. Instead, the States argued that, as *parens patriae*, they may bring due process claims on behalf of their residents (and potential future

assertion—which, by the way, was never advanced by the States in their complaint,

their response to the federal government's emergency motion, or during oral

argument—that a state can evade the strictures of *Katzenbach* and *Mellon* through

_____

residents), citing *Mellon*, 262 U.S. at 481–82, 485 (1923), *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982), and *Massachusetts v. EPA*, 549 U.S. 497, 516–21, 520 n.17 (2007). Not so. Although *Mellon* cites *Missouri v. Holland*, 252 U.S. 416 (1920), for the proposition that a state may sue the federal government to protect *its own* quasi-sovereign interests, such as the right of a state to regulate the taking of wild game within its borders, *Mellon*, 262 U.S. at 482, *Mellon* also made clear that "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* at 485–86. In *Snapp*, Puerto Rico sued private individuals and companies engaged in the apple industry in Virginia, alleging that those individuals and companies violated federal statutes when they allegedly discriminated against qualified Puerto Rican farmworkers. The Fourth Circuit held that Puerto Rico, as *parens patriae*, could maintain its suit against the private defendants. The Supreme Court affirmed, and held that Puerto Rico could sue "to secure the federally created interests of its residents *against private defendants*," but also noted that states lack "standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. 592, 610 n.16 (emphasis added). Finally, in *Massachusetts v. EPA*, the Supreme Court held that Massachusetts alleged facts sufficient to establish standing—not to assert constitutional rights on behalf of its residents, but to assert a statutory right on behalf of the state's own quasi-sovereign interests—to sue the Environmental Protection Agency (EPA). *Massachusetts*, 549 U.S. at 517–21. The Court held that the state was entitled to "special solicitude" in the standing analysis because Congress accorded the states a procedural right to challenge agency action unlawfully withheld, and because the state owned much of the territory alleged to be affected by the EPA's withholding of agency action. *Id.* at 520. Here, neither the States nor the panel cite any congressional authorization for the States to bring their claims. None of the cases cited by the States or the panel supports a theory that a state, as *parens patriae*, may sue the federal government to assert the due process rights of its residents. The panel's uninvited leap to third-party standing completely avoids the precedents actually cited by the States, which more directly address the question whether states can sue the federal government to assert constitutional claims on behalf of their residents. The answer to that question is "No."

third-party standing doctrine. A closer look at third-party standing doctrine reveals just the opposite. *See Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) ("[T]here may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right. Second, we have considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Even if we assume a close relationship between the States' universities and their students, faculty, and scholars, the panel—and more importantly, the States—have not identified any hindrance to first parties' "ability to protect [their] own interests" here. *Id.*; *see also Louhghalam v. Trump*, ___ F. Supp. 3d ___, 2017 WL 479779 (D. Mass. Feb. 3, 2017) (reviewing constitutional claims arising from Executive Order 13769 brought by Iranian nationals who are employed as Associate Professors at the University of Massachusetts–Dartmouth). The panel's conclusion that the States may assert the due process rights of their residents (or potential future residents) under third-party standing doctrine renders *Katzenbach* and *Mellon* meaningless.

To the lay person, our discussion of third-party standing doctrine may seem pedantic and without recognition of the harm that could have resulted from the

6

grant of the federal government's motion to stay the temporary restraining order pending appeal. The important point is this: The States may not sue the federal government, either on their own behalf or on behalf of their citizens, to protect their residents' due process rights under the Fifth Amendment. Much less do the States have third-party standing as to non-resident aliens seeking entry into the country. Therefore, the panel erred when it concluded that the federal government did not establish a likelihood of success on the merits of the States' due process claims—the only claims fully addressed by the panel.

As the district court stated, but unfortunately failed adequately to apply in his temporary restraining order, "The work of the court is not to create policy or judge the wisdom of any particular policy promoted by the other two branches. That is the work of the legislative and executive branches and of the citizens of this country who ultimately exercise democratic control over those branches. The work of the Judiciary, and this court, is limited to ensuring that the actions taken by the other two branches comport with our country's laws, and more importantly, our Constitution." *Washington v. Trump*, No. C17-0141-JLR, 2017 WL 462040, at *3 (W.D. Wash. Feb. 3, 2017). At a minimum, the federal government established a likelihood of success on the merits that Executive Order 13769 comports with our country's laws and our Constitution. The government's motion for a stay of the temporary restraining order should have been granted. Our court should have

7

avoided the inclination to rule based on the political headwinds of a particular moment in history and taken this case en banc to correct the panel's significant errors.

8

# RAOFIELD DECLARATION

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ARAB AMERICAN CIVIL
RIGHTS LEAGUE, et al.,

        Plaintiffs,                  Civil No. 17-10310
                                       Hon. VICTORIA A. ROBERTS
v.                                   Mag. Judge Stephanie D. Davis

DONALD TRUMP, et al.,

        Defendants.

_____/

## DEFENDANTS' RULE 26(a)(1)(A) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendants respectfully submit their initial disclosures. Defendants reserve the right to modify or supplement these disclosures under Rule 26(e) if they become aware of additional relevant witnesses or documents.

    **A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment. Fed. R. Civ. P 26(a)(1)(A)(i).**

Plaintiffs' lawsuit challenges the legality and constitutionality of Executive Order No. 13,780 (Order) which, inter alia, temporarily suspends entry of certain foreign nationals from six countries that Congress and the previous Administration determined pose a heightened terrorism risk and for which vetting procedures

should be reviewed and potentially revised. 82 Fed. Reg. 13,209 (2017). The

reasons undergirding the President's decision to issue the Order are contained

within the Order's four corners. Because it would not be appropriate to look behind

the exercise of Executive authority in the context of suspending entry into the

United States of nationals of the designated countries or the Executive assessment

of measures required to protect national security, there are no individuals who are

likely to have discoverable information beyond what is stated in the Executive

Order.

**B.  A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment. Fed. R. Civ. P 26(a)(1)(A)(ii).**

As explained above, the President's reasons for issuing the Executive Order

are contained within the Executive Order itself. However, Defendants include as

attachments the following guidance documents formally issued by Defendants:

1. U.S Department of Homeland Security, Q & A: *Protecting the Nation from Foreign Terrorist Entry to the United States* (March 6, 2017), *available at* https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states#.2.

2. U.S. Department of State, Alert: *Executive Order on Visas* (March 22, 2017), *available at*

2

https://travel.state.gov/content/travel/en/news/important-

announcement.html.

**C. A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered. Fed. R. Civ. P 26(a)(1)(A)(iii).**

Not applicable.

**D. For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment. Fed. R. Civ. P 26(a)(1)(A)(iv).**

Not applicable.

Dated:  May 19, 2017                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        Civil Division

                                        WILLIAM C. PEACHEY
                                        Director

                                        GISELA A. WESTWATER
                                        Assistant Director

                                        EREZ REUVENI
                                        Senior Litigation Counsel

                                    By: */s/ Briana Yuh*
                                        BRIANA YUH
                                        Trial Attorney
                                        District Court Section

Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4165
Facsimile: (202) 305-7000
Briana.Yuh@usdoj.gov

JOSHUA S. PRESS
Trial Attorney

KATHERINE J. SHINNERS
Trial Attorney

*Attorneys for Defendants*

4

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 19, 2017, I served the foregoing document, DEFENDANTS' RULE 26(a)(1)(A) INITIAL DISCLOSURES, via email on all counsel of record for the Plaintiffs, per counsel's written consent to receive service electronically.

By: <u>*/s/ Katherine J. Shinners*</u>
     KATHERINE J. SHINNERS
     Trial Attorney
     United States Department of Justice
     Civil Division

# RAOFIELD DECLARATION

# EXHIBIT D



- DECEMBER 07, 2015 -

# DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION

(New York, NY) December 7th, 2015, -- Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad" and 51% of those polled, "agreed that Muslims in America should have the choice of being governed according to Shariah." Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

Mr. Trump stated, "Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life. If I win the election for President, we are going to Make America Great Again." - *Donald J. Trump*

---

Next Release: Donald J. Trump Announces State Directors in Massachusetts and Mississippi

Previous Release: Donald J. Trump Announces Statewide Leadership Team in Oklahoma

★ ★ ★   **CATEGORIES**   ★ ★ ★

## VIEW ALL

## STATEMENTS

## ANNOUNCEMENTS

## ENDORSEMENTS

## ADS

# RAOFIELD DECLARATION

# EXHIBIT E

Live TV

## TRANSCRIPTS

**Transcript Providers**

Shows By Category:

**Return to Transcripts main page**

## ANDERSON COOPER 360 DEGREES

**Exclusive Interview with Donald Trump. Aired 8-9p ET**

Aired March 9, 2016 - 20:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS
FINAL FORM AND MAY BE UPDATED.

(COMMERCIAL BREAK)

ERIN BURNETT, CNN HOST, OUTFRONT: Thanks so much for watching live from Miami. We will be back here
tomorrow night. AC 360 starts now.

[20:00:24] ANDERSON COOPER, CNN HOST: And good evening from Miami- Dade College. We are now just an hour
away from tonight's Univision Democratic debate seen right here on CNN. Bernie Sanders and Hillary Clinton are going to
take the stage shortly. She, of course, coming off a win in Mississippi, which was expected. What wasn't expected was his win
in Michigan. There is no overstatement to call it a shocker especially considering he was down by about 20 points in the polls
going in. So what happens on the debate stage behind me tonight has taken on a completely new level of importance in a race
that's gone to a new level.

First though, the Republicans who are going to be taking part in tomorrow's CNN debate at a nearby University of Miami. I
sat down today with Donald Trump the front-runner. And as you might imagine, he made headlines. He said that he expects a
softer tone tomorrow night at the debate. However, he is still calling his leading rival lying Ted. We will bring you the
interview in depth right after Sara Murray sets the Republican stage.

(BEGIN VIDEOTAPE)

DONALD TRUMP (R), PRESIDENTIAL CANDIDATE: I was watching the news in one of the rooms, and every single
advertisement was about me. And it was during my tournament. I'm turning my tournament. I go from tournament to horrible

TRUMP: And besides that. Iraq did not knock down the world trade center. Just in case you had any questions.

COOPER: Do you think Islam is at war with the west?

TRUIMP: I think Islam hates us. There is something -- there is something there that is a tremendous hatred there. There's a tremendous hatred. We have to get to the bottom of it. There's an unbelievable hatred of us.

COOPER: In Islam itself?

TRUMP: You're going to have to figure that out. OK. You'll get another Pulitzer, right? But you'll have to figure that out. But there's a tremendous hatred. And we have to be very vigilant. We have to be very careful. And we can't allow people coming into this country who have this hatred of the United States.

COOPER: I guess the question is ...

TRUMP: And of people that are not Muslim.

[20:35:01] COOPER: I guess the question is, is there a war between the west and radical Islam or between the west and Islam itself?

TRUMP: Well, it's radical but it's very hard to define. It's very hard to separate because you don't know who is who.

Look, these two young people that got married, she supposedly radicalized him. Who knows what happened?

COOPER: The San Bernardino killer?

TRUMP: The bottom line is they killed 14 people. They gave them baby showers. I mean, they were friends of theirs and they walked in and they killed them. There's unbelievable hatred.

You look at Paris, 138 people killed. Many, many people are going to die in the hospital. Mortally wounded, horribly wounded, horribly wounded. And they walk into a room and boom, boom, boom. There's a sickness going on that's unbelievable. And honestly, you have to get to the bottom of it.

COOPER: You talked about going after the families of terrorists. You now reversed that essentially ...

TRUMP: I didn't reverse anything.

COOPER: You would still want to go after the families of terrorists?

# RAOFIELD DECLARATION

# EXHIBIT F

**cns**news.com™ (/)

# Trump Doubles Down on 'Islam Hates Us'; 'I Don't Want to Be So Politically Correct'

By Susan Jones (/author/susan-jones) | March 11, 2016 | 5:18 AM EST



(CNSNews.com) - "I don't want to be so politically correct," Republican Donald Trump said Thursday night as he repeated his claim that "there is tremendous hate" on the part of Muslims toward America.

The controversy erupted Wednesday night, when Trump told CNN's Anderson Cooper (http://cnsnews.com/news/article/susan-jones/trump-i-think-islam-hates-us), "I think Islam hates us." At the CNN-hosted debate on Thursday, moderator Jake Tapper asked Trump, "Did you mean all 1.6 billion Muslims?"

"I mean a lot of them! I mean a lot of them," Trump responded."There's something going on that maybe you don't know about, maybe a lot of other people don't know about, but there's tremendous hatred. And I will stick with exactly what I said to Anderson Cooper."

2:17-cv-10310-VAR-SDD   Doc # 104-1   Filed 05/26/17   Pg 159 of 217   Pg ID 1836

# cnsnews.com™ (/)

Rubio, invited to weigh in, said, "a lot of people find appeal in the things Donald says, because he says what people wish they could say. The problem is, presidents can't just say anything they want. It has consequences, here and around the world."

Rubio then talked about two Christian missionaries in Muslim-majority Bangladesh who rely on "friendly Muslims" for their safety and security. "And they tell me that today they have a very hostile environment in which to operate in because the news is coming out that in America, leading political figures are saying that America doesn't like Muslims. So this is a real impact."

Rubio agreed that "radical Islam is a danger in the world," but he also reminded the audience that Muslims have fought and died for this country: "Anyone out there that has the uniform of the United States on and is willing to die for this country is someone that loves America -- no matter what their religious background may be."

"Marco talks about consequences," Trump said. "Well, we've had a lot of consequences, including airplanes flying into the World Trade Center, the Pentagon and could have been the White House. There have been a lot of problems.

"Now you can say what you want, and you can be politically correct if you want. I don't want to be so politically correct. I like to solve problems. We have a serious, serious problem of hate.

"There is tremendous hate. There is tremendous hate. Where large portions of a group of people, Islam, large portions want to use very, very harsh means. Let me go a step further. Women are treated horribly. You know that. You do know that. Women are treated horribly, and other things are happening that are very, very bad.

"Now I will say this, there is tremendous hatred. The question was asked, what do you think? I said, there is hatred. Now it would be very easy for me to say something differently. And everybody would say, oh, isn't that wonderful. We better solve the problem before it's too late," Trump warned, without explaining how he'd solve it.

Rubio, responding, said, "I'm not interested in being politically correct. I'm not interested in being politically correct. I'm interested in being correct."

The senator agreed that "Islam has a major problem on its hands" with radicalization, but he also said Americans need to work with Muslims who are not radicals. "We are going to have to work with people of the Muslim faith even as Islam itself faces a serious crisis within it of radicalization."

Returning to the topic several minutes later, Trump said, "In large mosques, all over the Middle East, you have people chanting 'death to the USA.' Now, that does not sound like a friendly act to me."

---

## Susan Jones

Bio (http://www.cnsnews.com/author/susan-jones) | Archive (http://www.cnsnews.com/author/susan-jones)
More from Susan Jones (http://www.cnsnews.com/author/susan-jones)

🐦 Follow (http://www.twitter.com/SJonesCNS)

Printer-friendly version (/print/news/article/susan-jones/trump-doubles-down-islam-hates-us-i-dont-want-be-so-politically-correct)

m/en/?template=colorbox&utm_source=mrctv-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
m/en/?template=colorbox&utm_source=mrctv-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
m/en/?template=colorbox&utm_source=mrctv-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
**You May Like**

(http://zcretuzft.iflmylife.com/entertainment/famous-women-70s-now/?utm_campaign=1970%27s%20Stars%20%20Safe%20-%20Desktop&utm_source=taboola&utm_medium=mrctv-
cns&utm_content=http%3A%2F%2Fcdn.taboolasyndication.com%2Flibtrc%2Fstatic%2Fthumbnails%2F8918cf78a985400a8eea530027ae391b.jpeg&utm_term=Barbi+Benton+Was+Gorgeous+In+The+70s%2C+But+W

**Barbi Benton Was Gorgeous In The 70s, But What She Looks Like Today Is Incredible**
IFLlife

(http://zcretuzft.iflmylife.com/entertainment/famous-women-70s-now/?utm_campaign=1970%27s%20Stars%20%20Safe%20-%20Desktop&utm_source=taboola&utm_medium=mrctv-
cns&utm_content=http%3A%2F%2Fcdn.taboolasyndication.com%2Flibtrc%2Fstatic%2Fthumbnails%2F8918cf78a985400a8eea530027ae391b.jpeg&utm_term=Barbi+Benton+Was+Gorgeous+In+The+70s%2C+But+W
(http://ncruxulft.hyperactivz.com/amazing-celebrity-weight-loss-stories?utm_campaign=Weight%20Loss%20PP%20V2%20-%20Desktop%20USA&utm_source=taboola&utm_medium=mrctv-
cns&utm_term=Pauley+Perrette+Flaunts+Her+Incredible+New+Look&utm_content=https%3A%2F%2Fprod-cm-minder-uploads.s3.amazonaws.com%2F360f88d1-0551-4a0e-a65b-0dc98190d048.jpg)

**Pauley Perrette Flaunts Her Incredible New Look**
Hyperactivz

# RAOFIELD DECLARATION

# EXHIBIT G

# Trump on Brussels attacks: 'We're having problems with Muslims'



*In this photo provided by Georgian Public Broadcaster and photographed by Ketevan Kardava, injured women are seen in Brussels Airport in Brussels, Belgium, after explosions were heard Tuesday, March 22, 2016. A developing situation left a number dead in explosions ... more >*

By David Sherfinski - *The Washington Times* - *Tuesday, March 22, 2016*

Republican presidential front-runner Donald Trump reacted to Tuesday's terrorist attacks in Brussels by invoking the Sept. 11, 2001, terrorist attacks and saying the United States has to be careful about who comes into the country.

"We have to be very careful. We're not babies. We can't do this anymore. We can't have these attacks anymore. We can't have World Trade Centers anymore, and...planes flying into the Pentagon," Mr. Trump said on "Fox and Friends."

"It's time to be smart, it's time to look carefully," he said. "People will come in, but we have to be very, very careful as to who comes into our country or we're going to have problems like you've never seen. We probably already will have, but we're going to have problems like you've never seen before."

**SEE ALSO: ISIS celebrates Brussels airport, subway blasts; supporters take to Twitter**

The attacks at an airport and metro in Belgium have killed at least 26 people and wounded dozens of others.

"Frankly, look, we're having problems with the Muslims, and we're having problems with Muslims coming into the country and we are seeing it, whether it's California where they killed 14 people," Mr. Trump said in a separate appearance on Fox Business Network.

Mr. Trump was referring to last year's San Bernardino terrorist attacks carried out by a radicalized husband-and-wife team, and he also mentioned last year's attacks in Paris. A suspect in the Paris attacks in November was taken into custody last week in Belgium.

**SEE ALSO: Obama condemns terror attacks in Brussels**

Mr. Trump had called for a temporary ban on Muslims entering the United States in the wake of the San Bernardino attacks last year.

"You need surveillance. You have to deal with the mosques, whether we like it or not," he said. "I mean, you know, these attacks aren't coming out of — they're not done by Swedish people, that I can tell you."

"Look, we have to be smart. We have to be vigilant. We have to watch very closely what's going on," he said. "We have to look at the mosques. We have to study what's going on."

Mr. Trump's Republican rivals in the presidential race also reacted to the news Tuesday.

In a statement on his Facebook page, Sen. Ted Cruz of Texas said that "our hearts break for the men and women of Brussels this morning."

"Make no mistake — these terror attacks are no isolated incidents," Mr. Cruz said. "They are just the latest in a string of coordinated attacks by radical Islamic terrorists perpetrated by those who are waging war against all who do not accept their extreme strain of Islam."

Ohio Gov. John Kasich, also a 2016 GOP candidate, said in a statement he's sickened by the pictures of the carnage, by the injuries and by the loss of life in Belgium.

"The wave of terror that has been unleashed in Europe and elsewhere around the world are attacks against our very way of life and against the democratic values upon which our political systems have been built," Mr. Kasich said.

"We and our allies must rededicate ourselves to these values of freedom and human rights. We must utterly reject the use of deadly acts of terror," he said.

Copyright © 2017 The Washington Times, LLC. Click here for reprint permission.

# RAOFIELD DECLARATION

# EXHIBIT H



# Michael Flynn in August: Islamism a 'vicious cancer' in body of all Muslims that 'has to be excised'

**By Andrew Kaczynski, CNN**

Updated 8:36 PM ET, Tue November 22, 2016

## Story highlights

Flynn: "This is Islamism, it is a vicious cancer inside the body of 1.7 billion people on this planet and it has to be excised."

In the same speech, Flynn falsely claimed that Florida Democrats voted to impose Islamic shariah law at the state and local level.

**(CNN)** — Donald Trump's pick to be national security adviser, retired Lt. Gen. Michael Flynn, called Islamism a "vicious cancer inside the body of 1.7 billion people" that has to be "excised" during an August speech.

Flynn, who has called Islam as a whole a "cancer" in the past, made the comments during a speech to the Ahavath Torah Congregation in Stoughton, Massachusetts. Video of his speech is available on YouTube and was reviewed by CNN's KFile.

"We are facing another 'ism,' just like we faced Nazism, and fascism, and imperialism and communism," Flynn said. "This is Islamism, it is a vicious cancer inside the body of 1.7 billion people on this planet and it has to be excised."



**Flynn's views a departure from US policy** 02:44

In the same speech, Flynn falsely claimed that Florida Democrats voted to impose Islamic shariah law at the state and local level. The claim, peddled by far-right blogs in 2014, was rated "pants on fire" by the independent fact-checking organization PolitiFact, which explained that the bill in question was about prohibiting judges from using foreign law in family law cases if the law conflicted with existing U.S. policy. Democrats voted against the bill, saying it was unnecessary and targeted Muslims in the state.

"Look up something called 'the American laws for American courts,'" Flynn said. "I don't know if it's happening up here in Massachusetts, it's happening in other states. I have had people in the media, mainstream media, say, 'oh, that's all a conspiracy, it's a lie.'"

"No, in the state of Florida," he continued. "The state of Florida they have 36 senators at the state level. 36 senators at the state level. 12, of them are Democrats, the Republicans hold the majority in the Florida state senate. All 12 Democrats, all 12 Democrats voted to impose shariah at the local and state level. Now, it was beaten because the Republicans are in charge. I'm telling you, this is 'American laws for America's courts.'"

Flynn didn't respond to a comment request for this story. CNN's KFile reported last week Flynn shared fake news and interacted with figures of the so-called alt-right on Twitter. On Monday, CNN's KFile reported Flynn said "who knows" when asked about a conspiracy about the 2013 sarin gas attack in Syria being a "false flag."



In the speech, Flynn fielded a question asking if President Obama was a Muslim.

"Okay let me repeat the question," Flynn said. "Is Obama doing this intentionally or is he incompetent and is he a Muslim? This is where I say we're to blame. We. We. You, me, are to



**Related Article:** Trump's pick for national security adviser once bashed torture, drone strikes, night raids

blame. All you have to do, and most people don't do these things, I do because it's part of who I am, all you got to do is read what he's written and listen to what he says. It's that simple."

"Well before he became president of the United States the first time, he said what he was going to do," Flynn added. "He said it. The second time -- fool me once, shame on me. Fool me twice, shame on you. I mean what happened? The second time he comes in -- honestly, the first time I was kind of hopeful. Maybe we're enlightened. This country, this is going to be a good guy. He says all these things. I'm listening to what he's saying. I'm like, 'wow. This is different. This is different.'

"This is an individual who has an ideology ,and he has apologized for all the ill will of the United States of America over our history, for who we have been. He has. The apology tour. His speech in Cairo was unbelievable. I'm sitting there and I'm listening to it because I was deployed at that time and we were watching what our president's saying because it's going to cause some impact, and boy did it cause some impact. It caused the Muslim world to blow up."

Watch the full speech:



"Field of Fight" with Ret. Lt. Gen. Michael T. Flynn

# RAOFIELD DECLARATION

# EXHIBIT I

2:17-cv-10310-VAR-SDD   Doc # 104-1   Filed 05/26/17   Pg 169 of 217    Pg ID 1846

# Giuliani says he's source of Trump's shift on Muslim ban

 By **Claude Brodesser-Akner | NJ Advance Media for NJ.com**
**Email the author**
on July 09, 2016 at 8:45 AM, updated July 09, 2016 at 12:25 PM

**TRENTON** -- Former New York City Mayor Rudy Giuliani says he is the reason presumptive Republican presidential nominee Donald Trump appeared to walk back his **call to temporarily ban all Muslims** from entering U.S. last month to instead focus on people from "terror countries."

In mid-May, Trump floated the idea of creating a commission "**perhaps headed by Rudy Giuliani**," to examine the threat of terrorism caused by foreign nationals entering the U.S. during an interview on Fox News.

As it turns out, it wasn't just pie-in-the-sky.

"He said he was **going to ask me** to put together a small group of people, and we've done that," said Giuliani, in an interview with NJ Advance Media on Friday afternoon.

Giuliani, who was once the associate attorney general under President Ronald Reagan, now runs **Giuliani Security & Safety**, a global security and investigative consultancy.

The former mayor said that soon after Trump raised the idea, he began advising the Trump campaign on immigration and security.

"I sent him a memo spelling out sort of what you can do, and what you can't do, and what you could do with legislation," said Giuliani, who served as mayor of New York during the 9/11 terror attacks.

 Trump 'unlikely' to pick Christie, sources say

Giuliani declined to share his entire memorandum or the members of his working group, but did offered a concise summary of his personal recommendations.

"I can tell you what I would do, which is set up a much more intense vetting process for people coming in from countries with large concentrations of people who want to kill us," he said.

Five days after the Dec. 2, 2015 **domestic terror attack** in San Bernardino which killed 14 people and left 22 seriously wounded, Trump issued a call "for a **total and complete shutdown** of Muslims entering the United States until our country's representatives can figure out what is going on."

It was immediately met with criticism and derision, even by Giuliani, who appeared on Fox News and said Trump's approach "violates the First Amendment" and that Trump had "**no reasonable basis for it**."

On April 19, when Trump had become only GOP presidential candidate with a realistic chance of winning the 1,237 delegate votes to clinch the nomination, Giuliani told CNN he vote for the mogul, but stopped short of an endorsement. Instead, he offered something of a flirtation.

"I'll endorse," said Giuliani at the time, "but I'm **not a part of the campaign**."

By the end of the month, the former mayor **had formally endorsed** Trump, and by mid-May, Trump came forth with his plan to enlist Giuliani formally as a policy adviser.

Little more was heard on the topic of restricting immigration based on religion until Trump, during a visit to Scotland late last month, clarified his position on his controversial Muslim ban.

"I don't want people coming in from the terror countries," Trump told reporters on the links of his Turnberry golf club in Scotland. "You have terror countries! I don't want them, unless they're very, very strongly vetted."

On Friday, Giuliani was asked if Trump had received his memorandum and taken it on-board as policy.

"I know he absorbed the memo," answered the former mayor, who said that Trump's mitigated statements on the Muslim ban revealed as much.

"You can't have a general ban, but you can have very specific, targeted criteria," Giuliani said. "You could certainly say 'We're not going to take any of the Syrian refugees.'"

His advice to Trump has been to focus on strengthening the vetting process particularly for nations with large Islamic populations -- even those who "in some cases are partial allies" of the U.S. "Like Pakistan, or Afghanistan" -- who have terror groups known to be operating within them.

"He is quite aware that most Muslims are not terrorists," Giuliani said of Trump. "He's trying to find a way to make our country safer."

*Claude Brodesser-Akner may be reached at **cbrodesser@njadvancemedia.com**. Follow him on Twitter **@ClaudeBrodesser**. Find **NJ.com Politics on Facebook**.*

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2017 New Jersey On-Line LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of New Jersey On-Line LLC.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ Ad Choices

# RAOFIELD DECLARATION

# EXHIBIT J



# Trump on latest iteration of Muslim ban: 'You could say it's an expansion'



**By Jeremy Diamond,** CNN

🕐 Updated 11:45 AM ET, Sun July 24, 2016

## Story highlights

Donald Trump is elaborating on his proposed ban of Muslims to the US

The GOP presidential nominee says he's focused country of origin, not religion

**(CNN) —** Donald Trump said his latest proposal to stop immigration "from any nation that has been compromised by terrorism" is an "expansion" of his blanket ban on Muslims, in an interview aired Sunday.

"I actually don't think it's a rollback. In fact, you could say it's an expansion," Trump told NBC's Chuck Todd on "Meet the Press." "I'm looking now at territory. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm OK with that, because I'm talking territory instead of Muslim."

Trump has not defined which countries would be included in that list of territories.



**Related Article:** The massive implications of Trump's Muslim travel ban in 5 maps

But in the interview aired Sunday, Trump refused to rule out banning individuals from top US allies like France and Germany, agreeing that "they have totally been" compromised by terrorism.

Trump's campaign and top surrogates have insisted over the last month that the real estate mogul had backed off his December proposal to bar all foreign Muslims from the US.

Trump announced in June that as president he would "suspend immigration from areas of the world when there is a proven history of terrorism against the United States, Europe, or our allies."

But questions remained as to whether that proposal was an expansion of his proposed ban on Muslims, or a rollback.

His campaign insisted in the weeks following that declaration that Trump was pivoting away from the blanket ban he called for in December.

His spokeswoman Hope Hicks first told CNN late last month that Trump supported banning Muslims from terror states, not all Muslims, as he had said in December. Those comments came after Trump suggested he would allow a Scottish Muslim to enter the US under his latest proposal.

"It is about terrorism and not about religion. It is about Muslims from countries that support terrorism," Trump's finance chairman Steve Mnuchin told reporters the same day, during Trump's trip to Scotland.

Republican National Committee Chairman Reince Priebus insisted earlier this month that Trump "has pivoted" away from his blanket ban to a new policy of banning individuals from terror states.

"He has said he has changed, and he has put that position on the table and that is his position. It is not a religious test. It is a ban on immigration from countries that harbor or train terrorists," Priebus said on CNN earlier this month.

But Trump has not once publicly disavowed his original policy proposal to ban all foreign Muslims from the US.

Trump last week in a joint interview with his vice presidential nominee, Indiana Gov. Mike Pence, said in response to a question about barring Muslims that he would call his ban one on "territories and terror states and terror nations."

Pence had rejected Trump's blanket ban on Muslims in December as "offensive and unconstitutional." But after getting the vice presidential nod Pence said he was "very supportive" of Trump's calls to suspend immigration from terror states.

# RAOFIELD DECLARATION

# EXHIBIT K

2:17-cv-10310-VAR-SDD   Doc # 104-1   Filed 05/26/17   Pg 175 of 217   Pg ID 1852

# POLITICO



"This is going to be the great Trojan horse of all time," Trump said. | AP Photo

## Trump defends proposal for Muslim ban as call for 'extreme vetting'

By **DANIEL STRAUSS** | 10/09/16 10:00 PM EDT

Donald Trump during Sunday's presidential debate defended his 2015 call to ban Muslim immigrants coming to the U.S. as a method of "extreme vetting."

"The Muslim ban is something that in some form has morphed into extreme vetting from certain areas of the world," Trump said.

Trump was asked by moderator Martha Raddatz if it was a mistake to advocate blocking Muslims from entering the country. Raddatz then pressed Trump, saying, "And why did it morph into that? No, answer the question."

"You you interrupt me all the time. Why don't you interrupt her?" Trump shot back.

"Will you please explain whether or not the Muslim ban still stands?" Raddatz said.

"It's called extreme vetting. We are going to areas like Syria where they're coming in by the tens of thousands because of Barack Obama and Hillary," Trump responded, before pivoting to saying that Clinton wants a 550 percent increase of Syrian refugees coming into the U.S.

"This is going to be the great Trojan horse of all time," Trump said. "We have enough problems in this country. I believe in building safe zones. I believe in having other people pay for them. As an example, the Gulf states who are not carrying their weight but they have nothing but money and take care of people.

"But I don't want to have — with all the problems this country has and all of the problems you see going on, hundreds of thousands of people coming in from Syria when we know nothing about them," Trump continued. "We know nothing about their values and nothing about their love for our country."

# RAOFIELD DECLARATION

# EXHIBIT L



Home

Live TV

Transcript Providers

Shows By Category:

**Return to Transcripts main page**

## STATE OF THE UNION

**Interview With Speaker of the House Paul Ryan; Interview With Former New York Mayor Rudy Giuliani; Donald Trump Ignored Muslim Ban Question; Interview With Michael Moore. Aired 9-10a ET**

Aired November 13, 2016 - 09:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[09:00:05]

(BEGIN VIDEOTAPE)

JAKE TAPPER, CNN ANCHOR (voice-over): President-elect Trump heads to the White House after an earthquake election few expected.

DONALD TRUMP (R), PRESIDENT-ELECT: Now it's time for America to bind the wounds of division.

TAPPER: Some say, not so fast, as protesters take to the streets in uproar.

UNIDENTIFIED PROTESTERS: Not my president!

TAPPER: What will Donald Trump's America and his White House look like? Top adviser and potential Cabinet pick Rudy Giuliani will be here.

Plus, Trump made big campaign promises, from Obamacare.

TRUMP: Repealing and replacing Obamacare.

This man didn't run for president because he wants to get rich. He's rich already.

TAPPER: All right.

GIULIANI: So, I don't think you're going to have that happen unless you try to make it happen.

TAPPER: All right.

Mr. Trump shook up the Republican primary back in December when he made this promise. Take a listen.

(BEGIN VIDEO CLIP)

TRUMP: Donald J. Trump is calling all and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is doing on.

(CHEERING AND APPLAUSE)

(END VIDEO CLIP)

TAPPER: So, just a simple question. Is that policy still operative?

GIULIANI: Well, you know, twice, you used things that he changed during the campaign. He did say that. That is correct.

Actually, within a day or two of his saying that, he called me and asked me to put a little group together that included Congressman McCaul, General Flynn -- I can't remember who else, a few other people. We wrote a paper for him. And he amended it to the ban would be restricted to particular countries, and it would not be a ban.

It would involve extreme vetting. The one -- the one place in which he would not let anyone in, unless it was an extraordinary circumstance, would be Syrian refugees. All the rest from countries that contain dangerous populations of radical Islamic extremists, he will subject them to extreme vetting, but not a ban. So, he said that about 100 times during the campaign from the time

that he made that -- from the time that he made that statement.

TAPPER: Yes, he said that was an expansion.

GIULIANI: So, you can go back.

# RAOFIELD DECLARATION

# EXHIBIT M

2:17-cv-10310-VAR-SDD Doc # 104-1 Filed 05/26/17 Pg 181 of 217 Pg ID 1858



# At homeland security hearing, McCaul calls Trump's travel ban rollout "problematic"

> U.S. Rep. Michael McCaul, the top House Republican on homeland security issues, strongly criticized the Trump administration Monday for the chaotic rollout last month of a travel ban of mostly Muslim countries.  f  y

BY **ABBY LIVINGSTON**   FEB. 7, 2017   11:55 AM



U.S. Rep. Michael McCaul at TTEvents discusses presidential candidate Donald Trump on Oct. 25, 2016. 📷 Bob Daemmrich

WASHINGTON — U.S. Rep. Michael McCaul, the top House Republican on homeland security issues, strongly criticized President Donald Trump's administration Monday for the chaotic rollout last month of his travel ban of mostly Muslim countries.



"The rollout of his executive order has been problematic," said McCaul. "It caused confusion here in Congress, across the country and around the world, and it caused real problems for people with lawful green cards or visas, who in some cases were already in the air when the order was signed."

A federal judge in Seattle suspended the order last Friday, a move that Trump strongly condemned. Critics of the ban have called it discriminatory against Muslims and clumsily enacted.

---

The Texas Tribune thanks its sponsors. Become one.

EMPOWERING SCHOOL LEADERS
RICE EDUCATION ENTREPRENEURSHIP PROGRAM

---

McCaul praised Trump "for trying to get things done quickly" and "fulfilling campaign promises," but raised questions about "a lack of coordination within the executive branch and with Congressional leaders like myself."

McCaul praised Kelly's course correction on the ban, which was mostly handled within the confines of the West Wing and not at the Cabinet level, according to media reports.

"I applaud you for quickly correcting what consider to be errors … which went a long way to remedy this executive order," McCaul said.

McCaul repeatedly stressed that he had no part in drafting the order, a point of confusion in the first days of the rollout when former New York Mayor Rudy Giuliani pointed to McCaul's advice as a genesis of the ban.

"We drafted a memo back last May or June to advocate to candidate Trump why a Muslim ban was unconstitutional and to look at vetting in high threat areas," McCaul said. "I had no participation in this executive order."

McCaul characterized the memo as "advocating a shift from a Muslim ban, which [Trump] was campaigning on, which we thought was unconstitutional, rather to an enhanced vetting process of immigrants and refugees based on risk – not religion – from high-threat areas."

---

The Texas Tribune thanks its sponsors. Become one.



Other Texans participated in the hearing, including U.S. Rep. Filemon Vela, a Brownsville Democrat, and Will Hurd, a Helotes Republican, who focused their questioning on the proposed border wall. Hurd, a prominent GOP critic of a full border wall, advocated using resources on boosting manpower at the border rather than on constructing a wall across rivers and lakes.

U.S. Rep. Sheila Jackson Lee, a Houston Democrat, also weighed in, with visceral criticism of the Trump administration's first weeks: "Fiery rhetoric of a campaign should not be the governing standard for this nation, and I believe this administration is off its wheels and needs to get back on its wheels."

U.S. Rep. John Ratcliffe, R-Heath, used his questioning time to draw attention to a family in his district that was killed in a car wreck caused by a previously deported, undocumented driver.

He then referenced the "fake tears of one of our Democratic colleagues last week in calling for compassion for folks trying to come to this country from terror hotspots," an allusion to Senate Minority Leader Charles Schumer.

"I think we need to finally start showing compassion for people who are already here, with real border security," Ratcliffe added.

 **Show 12 comments**

**REPUBLISH THIS STORY**

Find out how you can put this story on your website.

**LIKE THIS STORY?**

Become a member today and support our nonprofit newsroom.

## MOST READ

# RAOFIELD DECLARATION

# EXHIBIT N

# McClatchy DC BUREAU

WHITE HOUSE    CONGRESS    NATION    CARTOONS


GET VITAMINS. CHANGE LIVES.


**WHITE HOUSE**    JANUARY 30, 2017 7:33 PM

# GOP lawmaker says he warned Trump against 'Muslim ban'


GET VITAMINS. CHANGE LIVES.



Rep. Michael McCaul, R-Texas, talked with reporters after a meeting with Donald Trump at Trump Tower in New York in late November. A 'white paper' he wrote with former New York mayor Rudolph Giuliani is thought to have been the starting document for creation of the president's controversial immigration ban issued last week. **Evan Vucci** - AP

Anita Kumar and Alex Daugherty
McClatchy Washington Bureau



LINKEDIN

GOOGLE+

PINTEREST

REDDIT

PRINT

ORDER REPRINT
OF THIS STORY

WASHINGTON — The lawmaker who spurred Donald Trump's sweeping temporary halt on immigrants from seven Muslim-majority countries says he told the soon-to-president last year that a so-called Muslim ban would be "borderline unconstitutional."

Rep. Mike McCaul, the Texas Republican who heads the House Committee on Homeland Security and a member of Trump's national security advisory team during the campaign, spoke to Trump several times about vetting proposals but was surprised when the final version differed from the draft he submitted, according to committee spokeswomen Susan Phalen.

Phalen said the order was based in part on a memo McCaul and former New York mayor Rudolph Giuliani submitted to the Trump campaign last fall in which they discussed possible ways terrorists could enter the United States and how each path could be better secured.

"The white paper did talk about the idea of a Muslim ban, but in the context of what a bad idea that was," Phalen said. "More than half of the memo was about how borderline unconstitutional a Muslim ban would be."

McCaul declined to make a copy of the memo available to McClatchy.



# Protests across the U.S. oppose Trump's travel ban

Protests against Trump's refugee ban popped up across the country on Saturday and Sunday.

Alexa Ard / McClatchy

How the contentious executive order Trump signed Friday remains a key question as immigration lawyers and advocacy groups challenge its legality. Late Monday, acting U.S. attorney general Sally Yates, a holdover from the Obama administration, ordered Justice Department lawyers not to defend the order, which has been challenged in as many as 30 court cases around the country.

Yates said she had no confidence that the order was legal, though her decision is likely a temporary one until Trump's attorney general pick, Sen. Jeff Sessions, R-Alabama, is confirmed by the Senate.

Officials tracing the creation of the order for McClatchy noted that the order is similar to a bill McCaul introduced in 2015 that called for Syrian and Iraqi refugees to go through additional vetting before being allowed into the county.

The American Security Against Foreign Enemies Act of 2015, or the American SAFE Act of 2015, called for the FBI to certify to the Department of Homeland Security and the director of national intelligence that a would-be immigrant was not a U.S. security threat. Forty-six Democrats supported the bill in the House, but it died in the Senate.

Trump's order, which critics call a Muslim ban, froze refugee admissions and temporarily blocked people from seven nations – Iran, Iraq, Libya, Somalia, Sudan, Syria and Yemen – from entering the United States, even with valid visas.

Democrats and even some Republicans continued to criticize the order Monday while more than 30 lawsuits were filed on behalf of immigrants detained or barred from entering the United States. Trump defended his actions, though administration officials on Sunday backtracked on one aspect of the order and said they would allow legal permanent residents into the country.

One of the issues surrounding Trump's order is whether it was properly vetted before Trump signed it at the Pentagon on Friday. The White House has said it was shared with everyone who needed to see it. But precisely who drafted the order, who reviewed it and what objections they raised to it are questions

still to be answered.

A senior administration official with knowledge of the situation but not authorized to speak publicly said the drafting of the order began not in the White House, but on Capitol Hill, where congressional staffers with immigration portfolios wrote the initial draft during Trump's tumultuous presidential campaign.

They then refined their proposals throughout the transition and into the start of the administration a week before Trump signed the order.

"Republicans on Capitol Hill wrote it," the official said. "The top drafters of this were the top immigration experts on Capitol Hill."

> ❝
> ## THE PRESIDENT'S GONNA BE VERY PROACTIVE WITH PROTECTING THIS COUNTRY. WE'RE NOT GONNA WAIT UNTIL WE GET ATTACKED AND FIGURE OUT HOW WE CAN MAKE SURE IT DOESN'T HAPPEN AGAIN.
> White House Press Secretary Sean Spicer

Trump's teams of temporary political appointees that were deployed to the Department of Homeland Security also took part in the writing of the executive order, the official said. The so-called beachhead teams also played a role in determining how the order should be implemented.

The drafters apparently used the McCaul-Giuliani memo as a starting point.

Giuliani did not respond to a request for comment. But he told FOX News over the weekend that Trump asked him to convene a group that could design a "Muslim ban" and show him "the right way to do it legally." The group included McCaul, former U.S. Attorney General Michael Mukasey and Rep. Peter T. King, R-N.Y.

"We focused on, instead of religion, danger – the areas of the world that create danger for us," Giuliani said. "Which is a factual basis, not a religious basis. Perfectly legal, perfectly sensible. And that's what the ban is based on. It's not based on religion. It's based on places where there are substantial evidence that people are sending terrorists into our country."

> ❝
> ## IT GOES WITHOUT SAYING THAT WE SYMPATHIZE WITH THE CAUSE OF RELIGIOUS MINORITIES, AND PERSONS FLEEING VIOLENCE AND PERSECUTION. PREVENTING MUSLIMS AND SYRIAN REFUGEES FROM MIGRATING TO THE UNITED STATES IS ABHORRENT.
> the Rev. Michael-Ray Mathews, director of clergy organizing for PICO National Network, the largest network of congregations and faith-based groups in the country

Kris Kobach, Kansas secretary of state and architect of one of the nation's toughest immigration laws, who also advised Trump during the transition, said in an interview Monday that he, too, was "one of many people involved" in crafting the executive order.

Kobach said federal law gives the president broad authority to the restrict entry of immigrants he deems "will be detrimental to the interests of the United States."

"It's broad authority," he said. "There was a similar law in place going all the way back to 1789. George Washington had the Alien Act of 1789, which also gave him the authority to exclude people that posed a risk to the United States."

"The president is on a rock-solid legal footing," Kobach said Monday.

The White House said the order was reviewed and vetted by the National Security Council and Homeland Security Council. Senior members of the Department of Homeland Security were also consulted. The Justice Department's Office of Legal Council also signed off on the executive order, the senior administration official said.

"That is part of the normal transition process," the senior administration official said.

But other reports on the order's genesis have said it was shared with Department of Homeland Security officials only after it was signed.

*FRANCO ORDOÑEZ IN WASHINGTON AND BRYAN LOWRY OF THE WICHITA EAGLE CONTRIBUTED TO THIS ARTICLE.*

*Anita Kumar: 202-383-6017, @anitakumar01*

*Alex Daugherty: 202-383-6049, @alextdaugherty*

**MORE WHITE HOUSE** ☐

SUGGESTED FOR YOU

COMMENTS

**0 Comments**

Sort by    Newest ▾

Add a comment...

f  Facebook Comments Plugin

# RAOFIELD DECLARATION

# EXHIBIT O

### The Washington Post

**Post Nation**

# Judge orders government to turn over documents from Rudy Giuliani on travel ban

**By Matt Zapotosky**  May 13

A federal judge in Michigan this week ordered the Trump administration to turn over communications from Rudolph W. Giuliani and other advisers on the president's controversial travel ban. Those suing over the matter hope the documents will bolster their bid to prove the ban was motivated by animus toward Muslims.

Giuliani has been a key figure in the ban even before the first version was signed, and judges across the country have pointed to statements by the former New York mayor and close Trump ally as they have ordered the ban frozen. The judges have noted particularly a comment Giuliani made on Fox News in January, in which he seemed to suggest he helped the president craft a legal way to prevent Muslims from entering the U.S.

"So when first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally,' " Giuliani said at the time.

U.S. District Judge Victoria A. Roberts ordered the government to turn over to those suing a memo that Giuliani crafted, along with all "documents or communications" about the travel ban from him and several other Trump advisers, including Attorney General Jeff Sessions, White House Chief Strategist Stephen K. Bannon and senior adviser Stephen Miller during the period just before the election, before they were in their current roles.

Judges have noted Miller's comments, too, in putting the latest version of the ban on hold.

"We believe these documents will show exactly how the Muslim ban that Donald Trump called for on the campaign trail turned into the executive order he issued a week after taking office," said Miriam Aukerman, senior staff attorney at the ACLU of Michigan, in a written statement. "If the administration now still refuses to turn over these papers, the question will be: What is it trying to hide?"

The case in Michigan is not one of the two that have put Trump's latest travel ban on hold. It is proceeding at a slower pace and it could be significantly impacted by rulings elsewhere. On Monday, a three-judge panel with the U.S. Court of Appeals for the 9th Circuit Court is scheduled to hear arguments in one of those cases. The U.S. Court of Appeals for the 4th Circuit heard arguments this week.

In an interview, Giuliani said he was willing to turn over whatever documents he still had — but he noted the court's order was directed to the government, not to him personally. "Basically, the advice was you can't ban, based on any religion," Giuliani said.

A Justice Department spokeswoman declined to comment.

Giuliani also said his comment on Fox News had been misinterpreted, and that Trump had not asked him how to craft a legal Muslim ban.

"That's the incorrect interpretation," Giuliani said. He said Trump more accurately asked, "what can he do legally to keep the country safe" or "How can I do whatever I'm going to do legally?"

"For example, what we told him is he shouldn't do a Muslim ban," Giuliani said. "The way I interpreted it, it was, 'Tell me what I can do legally,' not, 'Tell me how I can get around and do a Muslim ban and find some kind of legal justification for it.' We did just the opposite."

Roberts ordered the government to turn over Giuliani's memo by May 19 and the rest of the materials by June 2.

Matt Zapotosky covers the Justice Department for the Washington Post's National Security team. 🐦 Follow @mattzap

2:17-cv-10310-VAR-SDD   Doc # 104-1   Filed 05/26/17   Pg 194 of 217   Pg ID 1871

# RAOFIELD DECLARATION

# EXHIBIT P

# The Washington Post

**The Fix**

# Trump asked for a 'Muslim ban,' Giuliani says — and ordered a commission to do it 'legally'

**By Amy B Wang** January 29

Former New York mayor Rudy W. Giuliani said President Trump wanted a "Muslim ban" and requested he assemble a commission to show him "the right way to do it legally."

Giuliani, an early Trump supporter who once had been rumored for a Cabinet position in the new administration, appeared on Fox News late Saturday night to describe how Trump's executive order temporarily banning refugees came together.

Trump signed orders on Friday not only to suspend admission of all refugees into the United States for 120 days but also to implement "new vetting measures" to screen out "radical Islamic terrorists." Refugee entry from Syria, however, would be suspended indefinitely, and all travel from Syria and six other nations — Iran, Iraq, Libya, Somalia, Sudan and Yemen — is suspended for 90 days. Trump also said he would give priority to Christian refugees over those of other religions, according to the Christian Broadcasting Network.

Fox News host Jeanine Pirro asked Giuliani whether the ban had anything to do with religion.

https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-...

"How did the president decide the seven countries?" she asked. "Okay, talk to me."

"I'll tell you the whole history of it," Giuliani responded eagerly. "So when [Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.' "

Giuliani said he assembled a "whole group of other very expert lawyers on this," including former U.S. attorney general Michael Mukasey, Rep. Mike McCaul (R-Tex.) and Rep. Peter T. King (R-N.Y.).

"And what we did was, we focused on, instead of religion, *danger* — the areas of the world that create danger for us," Giuliani told Pirro. "Which is a *factual* basis, not a religious basis. Perfectly legal, perfectly sensible. And that's what the ban is based on. It's not based on religion. It's based on places where there are substantial evidence that people are sending terrorists into our country."

It was unclear when the phone call Giuliani took place and when the commission began working. An email to the White House press office was not immediately returned Sunday.

Clips of the exchange between Giuliani and Pirro quickly went viral Saturday night, with some claiming that Giuliani's statement amounted to admitting Trump's intent had been to institute a ban based on religion.

Others, including Trump senior adviser Kellyanne Conway and White House Chief of Staff Reince Priebus, have insisted it is not a ban on Muslims, but rather one based on countries from which travel was already restricted under Barack Obama's administration.

Priebus appeared on CBS's "Face the Nation" Sunday morning to say it was possible Trump would expand the list of countries included in the travel ban.

"You can point to other countries that have similar problems, like Pakistan and others," Priebus told host John Dickerson. "Perhaps we need to take it further."

Priebus also said there had been weeks of work and "plenty of communication" between the White House, the State Department and the Department of Homeland Security regarding the ban.

"We didn't just type this thing up in an office and sign up," he told Dickerson.

Later on the same program, Rep. Keith Ellison (D-Minn.) called out Giuliani's interview with Pirro from the night before.

"They can't deny that this is a Muslim ban," Ellison told Dickerson. "On the campaign trail, [Trump] said he wanted a Muslim ban. ... Rudolph W. Giuliani who helped him write it said that they started out with the intention of a Muslim ban and then they sort of 'languaged' it up so to try to avoid that label, but it is a religiously based ban."

Senate Democrats vowed to draft legislation to block the travel ban.

"We're demanding the president reverse these executive orders that go against what we are, everything we have always stood for," Senate Minority Leader Charles E. Schumer (D-N.Y.) said in a news conference Sunday morning, noting later that his middle name, Ellis, was originally inspired by Ellis Island.

"It was implemented in a way that created chaos and confusion across the country, and it will only serve to embolden and inspire those around the globe those that will do us harm," Schumer added of the ban. "It must be reversed immediately."

Trump's executive order sparked massive protests at airports around the country Friday and Saturday, as reports surfaced that dozens of travelers from the affected countries, including green-card holders, were being detained.

The American Civil Liberties Union filed a lawsuit Saturday morning challenging Trump's order after two Iraqi men with immigrant visas were barred from entering the United States at New York's John F. Kennedy International Airport.

As Giuliani was speaking, Fox News simultaneously aired an alert that noted federal judge Ann M. Donnelly had issued a stay to stop the deportations nationwide.

Donnelly wrote that there was a strong likelihood the order had violated the petitioners' rights to due process and equal protection by the Constitution.

"There is imminent danger that, absent the stay of removal, there will be substantial and irreparable injury to refugees, visa-holders, and other individuals from nations subject to the January 27, 2017 Executive Order," Donnelly wrote.

The ACLU hailed the victory.

"Clearly the judge understood the possibility for irreparable harm to hundreds of immigrants and lawful visitors to this country," ACLU executive director Anthony D. Romero said in a statement. "Our courts today worked as they should as bulwarks against government abuse or unconstitutional policies and orders. On week one, Donald Trump suffered his first loss in court."

On Sunday, the Department of Homeland Security issued a statement saying it did not plan to back off enforcing Trump's orders.

"President Trump's Executive Orders remain in place — prohibited travel will remain prohibited, and the U.S. government retains its right to revoke visas at any time if required for national security or public safety," the statement read. "President Trump's Executive Order affects a minor portion of international travelers, and is a first step towards reestablishing control over America's borders and national security."

The department said that less than 1 percent of daily international air travelers to the United States had been "inconvenienced" on Saturday.

Matthew Kolken, an immigration attorney based in Buffalo said there has been "a systemic bias against individuals from Muslim countries in the U.S. immigration departments" for years, including under the Obama administration.

"This isn't unprecedented," Kolken told The Washington Post by phone Sunday. "The unfortunate reality is the executive branch does have vast discretionary authority to determine who they are going to [allow in or not]."

Still, Kolken said, he believes "Trump has gone a step further without a doubt" in including even people who are lawful permanent residents and suspending all immigration applications from people from the seven countries on the banned list.

If there was evidence of disparate treatment of individuals from the same country — if there were anecdotal evidence of, for example, a Syrian family of one religious background allowed to enter over that of another religious background — then that is where lawsuits could come into play, he said.

"The question becomes whether they're trying to do an end-around by couching the ban as a country-specific ban based on a security-related issues when in reality it's a religious ban," Kolken said.

**Read more:**

Fact Checker: What you need to know about terror threat from foreigners and Trump's executive order

'I am heartbroken': Malala criticizes Trump for 'closing the door on children' fleeing violence

A ship full of refugees fleeing the Nazis once begged the U.S. for entry. They were turned back.

Trump's travel ban could make Rex Tillerson's potential job harder, a former defense secretary says

Amy B Wang is a general assignment reporter for The Washington Post. 🐦 Follow @amybwang

# RAOFIELD DECLARATION

# EXHIBIT Q



**TOPICS** ▾          **MY ACCOUNT** ▾          SUBSCRIBE NOW

NEWS     ELECTIONS     CRIME     TEXAS LEGISLATURE     POLITICS     EDUCATION     INVESTIGATIONS



POLITICS     FEB 2

# Texas Rep. Michael McCaul: Don't blame me for Trump travel ban

*Katie Leslie, Washington correspondent*

Don't miss a story. Like us on Facebook.          Like 369K

WASHINGTON — As protests erupted over President Donald Trump's temporary ban on travelers from majority-Muslim countries last week, blame quickly fell on Texas Rep. Michael McCaul as having helped write the executive order.

Ever since, the Austin Republican has been working to clarify that he had little to do with it, while calling for Congress to have a role in fixing the policy.

McCaul, who as chairman of the House Homeland Security Committee has advocated for tougher vetting of refugees for terrorism ties, said he learned about the order from homeland security chief John Kelly last Friday. He was told that it was based on his past legislation, he said, as well as a memo he helped prepare for then-candidate Trump on extreme vetting.

He wasted little time praising Trump for "doing more to shut down terrorist pathways into this country than the last administration did in eight years."

But what he didn't know then, but would soon find out, he said, was that the explosive order blocked people already granted lawful entry into the country, including green-card holders and those with valid U.S. visas.

## By the numbers: Refugees in D-FW

In 2016, **nearly 9,000 refugees** admitted to the U.S. resettled in Texas — more than in any other state.



**NEXT »**

By Allan James Vestal, Ariana Giorgi and Jon McClure                    Source: U.S. State Department

As cries of a "Muslim ban" swelled and protests erupted at airports across the country, with images of adults and children arriving to America only to be detained, the magnitude set in — both for the country, and for McCaul, who is now on damage control over his role in the international crisis.

"I want to make it clear that I had nothing to do with the drafting, and had I been consulted, we could have remedied some of these provisions that would have stopped these horror stories," he told *The Dallas Morning News* in a lengthy interview this week. "Everyone's got protesters, and it's all on fire. And it's sad to me because had it been done the right way, we could effectuate good policy without the chaos and blowback that we've received."

Republican lawmakers may have been blindsided by the sweeping order, but they were forced to take a stand on political quicksand as Democrats and angry constituents blast the measure as unconstitutional.

Ted Cruz strongly backs Trump travel ban, while John Cornyn more cautious

McCaul, more than most, has felt the heat given his advisory role to Trump during the Republican's presidential campaign.

It didn't help that last weekend, former New York Mayor Rudy Giuliani told Fox News that he enlisted McCaul to draft an "extreme vetting" memo following Trump's campaign call for a "Muslim ban."

The Texan insists that the memo explicitly stated that a so-called Muslim ban is unconstitutional, and that the men prepared the document in order to steer Trump in a different direction.

A spokeswoman for Giuliani did not immediately respond to a request for the document, and McCaul's office didn't release it, pending their approval.

Quickly, some conflated their memo with the executive order itself.

"McCaul wrote the Muslim ban" read a sign held by a protester outside of McCaul's Austin office Wednesday, according to a local news report.



"Your work on this executive order is disgraceful and counter to the very bedrock ideals of the USA," another wrote on his Facebook page.



Michael McCaul
about 4 months ago

I agree with the Trump Administration that we must shut down terrorist pathways into America. But the Executive Order went too far. We should not be turning away people who have lawfully been approved to come to the United States. Instead the order should be focused on the vetting and issuance of new green cards and visas. Secretary Kelly is starting to fix these shortcomings. This issue could have been avoided through better coordination between the White House, Congress, ... See More

235      189      53

Supporters of the measure are taking McCaul to task for subsequent statements in which he criticized the scope of Trump's order, and he's facing criticism from both sides for backtracking his initial support. Others are praising him, erroneously believing he helped write it, he said.

McCaul — who was passed over for a national security post in the administration —  is among a growing number of Republican lawmakers willing to criticize the White House's rollout of the executive order.

Trump's willingness to target his critics is keenly felt on Capitol Hill. McCaul, like many, was careful to not directly skewer the president as much as the implementation of the order, saying the administration did a "really poor job."

Trump has annoyed many Republicans in Congress already, but few speaking out — so far

McCaul acknowledged the risk of publicly criticizing, but said: "There's concern by a lot of members [about the policy] and if someone like myself is speaking about this, then maybe it shows they can be more sincere."

Under the measure, people from Iran, Iraq, Syria, Yemen, Sudan, Somalia and Libya — countries that are majority Muslim but were designated as terrorism-prone in McCaul's previous legislation and by the Obama administration — are blocked from entering the country for 90 days. The order halts refugee admissions for 120 days, while refugees from Syria are blocked indefinitely.

McCaul is meeting with Kelly on Thursday to discuss what changes can be made to the policy, and he has asked the newly installed secretary to appear before his committee next week.

He's encouraged that Kelly has said green-card holders can enter the country, but noted the policy still blocks many travelers with previously approved visas. "There are a lot of students now who won't be able to get back home because their visas are now revoked," he said.

He agrees with the underlying premise of a temporary pause in immigration from countries associated with terror activity, he said, but — echoing concerns voiced by fellow Texas Republican Rep. Will Hurd — added that he's concerned the sloppy handling has done damage to U.S. foreign relations and could serve as a recruitment tool for terror groups.

"What greatly concerns me is it puts an ugly face on what I thought was good policy," he said. "It basically undermines the whole intent of what we were trying to achieve and it makes it more difficult to defend it."

○ VIEW COMMENTS

POLITICS     DONALD TRUMP     IMMIGRATION     TEXAS POLITICS

SPONSORED STORIES

## Get the Most Important D-FW News in Your Inbox

Sign up for our daily email newsletters

your@email.com

Get Headlines, Business, SportsDay, and GuideLive. Change.

SIGN UP NOW

## *NEWS*

↻ LOADING...

About Us

Careers

Advertise

Contact Us

Special Sections

FAQ

Privacy Policy

Terms of Service

Site Map

©2017, The Dallas Morning News Inc. All Rights Reserved.

# RAOFIELD DECLARATION

# EXHIBIT R

The New York Times | https://nyti.ms/2mJEIb1

**POLITICS**

# 2 Federal Judges Rule Against Trump's Latest Travel Ban

By ALEXANDER BURNS    MARCH 15, 2017

A federal judge in Hawaii issued **a nationwide order** Wednesday evening blocking President Trump's ban on travel from parts of the Muslim world, dealing a stinging blow to the White House and signaling that Mr. Trump will have to account in court for his heated rhetoric about Islam.

A second federal judge in Maryland ruled against Mr. Trump overnight, with a separate order forbidding the core provision of the travel ban from going into effect.

The rulings were a second major setback for Mr. Trump in his pursuit of a policy that he has trumpeted as critical for national security. His first attempt to sharply limit travel from a handful of predominantly Muslim countries ended in a courtroom fiasco last month, when a federal court in Seattle **halted it**.

Mr. Trump issued a new and narrower travel ban, affecting six countries, on March 6, trying to satisfy the courts by removing some of the most contentious elements of the original version.

But in a pointed decision that repeatedly invoked Mr. Trump's public comments, Judge Derrick K. Watson, of Federal District Court in Honolulu, wrote that a "reasonable, objective observer" would view even the new order as "issued with a purpose to disfavor a particular religion, in spite of its stated, religiously neutral purpose."

In Maryland, Judge Theodore D. Chuang echoed that conclusion hours later, ruling in a case brought by nonprofit groups that work with refugees and immigrants, that the likely purpose of the executive order was "the effectuation of the proposed Muslim ban" that Mr. Trump pledged to enact as a presidential candidate.

Mr. Trump lashed out at Judge Watson during a campaign-style rally in Nashville late on Wednesday. Raising his voice to a hoarse shout, Mr. Trump accused the judge of ruling "for political reasons" and criticized the United States Court of Appeals for the Ninth Circuit, which upheld the earlier decision against his administration and will hear any appeal to the Hawaii ruling.

"This ruling makes us look weak, which by the way we no longer are, believe me," Mr. Trump said, to mounting cheers from a loyal crowd.

Mr. Trump even said he might reissue the initial version of the order, rather than the one blocked on Wednesday, which he described as "a watered-down version of the first one."

After he signed the revised ban, Democratic attorneys general and nonprofit groups that work with immigrants and refugees raced back into court, claiming that Mr. Trump's updated decree was still a thinly veiled version of the ban on Muslim migration that he proposed last year.

Judge Watson, who was appointed by President Barack Obama, ruled that the State of Hawaii and an individual plaintiff, Ismail Elshikh, the imam of the Muslim Association of Hawaii, had reasonable grounds to challenge the order as religious

discrimination. And he concluded that allowing the travel restrictions to go into effect at midnight, as scheduled, could have caused them irreparable harm.

Judge Watson flatly rejected the government's argument that a court would have to investigate Mr. Trump's "veiled psyche" to deduce religious animus. He quoted extensively from the remarks by Mr. Trump that were cited in the lawsuit brought by Hawaii's attorney general, Doug Chin.

"For instance, there is nothing 'veiled' about this press release," Judge Watson wrote, quoting a Trump campaign document titled "**Donald J. Trump** is calling for a total and complete shutdown of Muslims entering the United States."

Judge Watson singled out Mr. Elshikh, an American citizen whose Syrian mother-in-law had been pursuing a visa to enter the United States, as having an especially strong claim that the travel regulations would harm him on the basis of his religion.

"This is a great day for democracy, religious and human rights," Mr. Elshikh, who was out of the country, said in a message relayed through Hakim Ouansafi, the chairman of the Muslim Association of Hawaii. "I am very pleased that the processing of my mother-in-law's paperwork will not stop now but more importantly that this Muslim ban will not separate families and loved ones just because they happen to be from the six countries."

Mr. Elshikh, who is Egyptian and previously worked in Michigan, was recruited to the Hawaii mosque more than a decade ago, Mr. Ouansafi said. And when the association began recruiting someone to serve as a plaintiff, the imam, who became a citizen last year, agreed to do so without reservation, Mr. Ouansafi said.

After he became the face of the lawsuit, he received several threats from the mainland, Mr. Ouansafi said. "If we lived in any other state, I would not have asked him to come forward," he said.

In the Maryland case, Judge Chuang, who was also appointed by Mr. Obama, declined to block the entire executive order from going into effect, but ruled that the most important section — banning travel from half a dozen countries — could not be

enforced. His decision cited Mr. Trump's public comments to conclude that there were "strong indications that the national security purpose is not the primary purpose for the travel ban," and that Mr. Trump may have intended to violate the constitutional prohibition on religious preferences.

In addition to the Hawaii and Maryland suits, a federal judge in Washington State heard arguments Wednesday in cases challenging the constitutionality of Mr. Trump's order, including one brought by a coalition of Democratic attorneys general, and another by nonprofit groups.

Administration lawyers have argued that the president was merely exercising his national security powers. In the scramble to defend the executive order, a single lawyer in the United States solicitor general's office, Jeffrey Wall, argued first to a Maryland court and then, by phone, to Judge Watson in Honolulu that no element of the order, as written, could be construed as a religious test for travelers.

Mr. Wall said the order was based on concerns raised by the Obama administration in its move toward stricter screening of travelers from the six countries affected.

"What the order does is a step beyond what the previous administration did, but it's on the same basis," Mr. Wall said in the Maryland hearing.

After Mr. Trump's speech in Nashville, the Justice Department released a more muted statement disputing the Hawaii decision, calling it "flawed both in reasoning and scope." Sarah Isgur Flores, a spokeswoman for the department, said it would continue to defend the legality of the presidential order.

Refugee organizations and civil rights groups greeted the Hawaii ruling with expressions of triumph and relief. Marielena Hincapié, executive director of the National Immigration Law Center, one of the groups that sued Mr. Trump in Maryland, hailed Judge Watson's ruling as "a strong and unequivocal rejection of the politics of hate."

At the same time, advocates for refugees and immigrants acknowledged that significant uncertainty would hang over some of their more practical decisions, as a longer legal process plays out around Mr. Trump's order.

"It's a preliminary decision, but it recognizes that there continue to be problems with the constitutionality of this revised order, particularly with discriminatory intent toward Muslims," said Betsy Fisher, policy director at the International Refugee Assistance Project at the Urban Justice Center.

The original ban, released on Jan. 27, unleashed scenes of chaos at American airports and spurred mass protests. Issued abruptly on a Friday afternoon, it temporarily barred travel from seven majority-Muslim nations, making no explicit distinction between citizens of those countries who already had green cards or visas and those who did not. It also suggested that Christian refugees from those countries would be given preference in the future.

After the federal court in Seattle issued a broad injunction against the policy, Mr. Trump removed major provisions and reissued the order. The new version exempted key groups, like green card and visa holders, and dropped the section that would have given Christians special treatment.

Mr. Trump also removed Iraq from the list of countries covered by the ban after the Pentagon expressed worry that it would damage the United States' relationship with the Iraqi government in the fight against the Islamic State.

Yet those concessions did not placate critics of the ban, who said it would still function as an unconstitutional religious test, albeit one affecting fewer people — an argument Judge Watson concurred with in his ruling.

The lawsuits have also claimed that the order disrupts the operations of companies, charities, public universities and hospitals that have deep relationships overseas. In the Hawaii case, nearly five dozen technology companies, including Airbnb, Dropbox, Lyft and TripAdvisor, joined in a brief objecting to the travel ban.

The second, now-halted executive order preserved major components of the original. It would have ended, with few exceptions, the granting of new visas and

green cards to people from six majority-Muslim countries — Iran, Libya, Somalia, Sudan, Syria and Yemen — for at least 90 days. It would have also stopped all refugees from entering for 120 days and limited refugee admissions to 50,000 people in the current fiscal year.

Mr. Obama had set in motion plans to admit more than twice that number.

Mr. Trump has said the pause is needed to re-evaluate screening procedures for immigrants from the six countries. "Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," he wrote in the order.

The two court orders were not a final ruling on the constitutionality of Mr. Trump's ban, and the administration has expressed confidence that courts will ultimately affirm Mr. Trump's power to issue the restrictions.

But the legal debate is likely to be a protracted and unusually personal fight for the administration, touching Mr. Trump and a number of his key aides directly and raising the prospect that their public comments and private communications will be scrutinized.

The lawsuits against the ban have extensively cited Mr. Trump's comments during the presidential campaign. Attorney General Bob Ferguson of Washington, who successfully challenged Mr. Trump's first order, has indicated that in an extended legal fight, he could seek depositions from administration officials and request documents that would expose the full process by which Trump aides crafted the ban.

As a candidate, Mr. Trump first proposed to bar all Muslims from entering the United States, and then offered an alternative plan to ban travel from a number of Muslim countries, which he described as a politically acceptable way of achieving the same goal.

The lawsuits also cited Rudolph W. Giuliani, the former New York City mayor who advises Mr. Trump. Mr. Giuliani said he had been asked to help craft a Muslim ban that would pass legal muster.

2:17-cv-10310-VAR-SDD    Doc # 104-1    Filed 05/26/17    Pg 215 of 217    Pg ID 1892

And they highlighted comments by **Stephen Miller**, an adviser to the president, who cast the changes to Mr. Trump's first travel ban as mere technical adjustments aimed at ushering the same policy past the review of a court.

Reporting was contributed by Julie Hirschfeld Davis, Gary Gately, Liz Robbins, Barbara Tanabe and Niraj Chokshi.

*Get updates about news across the United States via Twitter and in the Morning Briefing newsletter.*

A version of this article appears in print on March 16, 2017, on Page A1 of the New York edition with the headline: Federal Judge Blocks New Ban on Travel to U.S.

---

© 2017 The New York Times Company

# RAOFIELD DECLARATION

# EXHIBIT S

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                             Thursday, May 25, 2017

## Statement by Attorney General Jeff Sessions on the Fourth Circuit Court of Appeals Decision

Attorney General Jeff Sessions today issued the following statement on the Fourth Circuit Court of Appeals Decision:

"President Trump's executive order is well within his lawful authority to keep the Nation safe."

"The Department of Justice strongly disagrees with the decision of the divided court, which blocks the President's efforts to strengthen this country's national security. As the dissenting judges explained, the executive order is a constitutional exercise of the President's duty to protect our communities from terrorism. The President is not required to admit people from countries that sponsor or shelter terrorism, until he determines that they can be properly vetted and do not pose a security risk to the United States."

"This Department of Justice will continue to vigorously defend the power and duty of the Executive Branch to protect the people of this country from danger, and will seek review of this case in the United States Supreme Court."

**Topic(s):**
Immigration
National Security

**Component(s):**
Office of the Attorney General

**Press Release Number:**
17-579

*Updated May 25, 2017*