## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE ("ACRL"),**
on behalf of itself, its members, and its clients,
**AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN ("ACLU"),**
on behalf of itself and its members,
**AMERICAN ARAB CHAMBER OF COMMERCE,** on behalf of itself and its
members, **ARAB AMERICAN AND CHALDEAN COUNCIL ("ACC"),** on
behalf of itself and its clients, **ARAB AMERICAN STUDIES ASSOCIATION
("AASA"),** on behalf of itself and its members, **HEND ALSHAWISH, SALIM
ALSHAWISH, FAHMI JAHAF,** and **KALTUM SALEH,**
on behalf of themselves and all others similarly situated,

|  |  |
|---|---|
| Plaintiffs, | Case No. 17-cv-10310 |
|  | Hon. Victoria A. Roberts |
| v. | Mag. J. Stephanie D. Davis |

**DONALD TRUMP,** President of the United States, **U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"), U.S. CUSTOMS AND BORDER
PROTECTION ("CBP"), U.S. CITIZENSHIP AND IMMIGRATION
SERVICES ("USCIS"), U.S. DEPARTMENT OF STATE, U.S.
DEPARTMENT OF JUSTICE, OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE, KIRSTJEN M. NIELSEN,** Secretary of
Homeland Security, **KEVIN K. McALEENAN**, Commissioner of CBP,
**L. FRANCIS CISSNA**, Director of USCIS, **MICHAEL R. POMPEO**,
Secretary of State, **JEFF SESSIONS,** Attorney General, **DAN COATS**, Director
of National Intelligence, and the **UNITED STATES OF AMERICA**,

Defendants.

_____ /

## THIRD AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

## **INTRODUCTION**

1.      President Donald Trump has been very clear about his desire to prevent Muslims from entering the United States. He specifically promised to do so as a candidate, calling on December 7, 2015 "for a total and complete shutdown of Muslims entering the United States." He believed: "We have no choice." Throughout his campaign he reiterated his desire to prevent Muslims from coming to the United States and his belief that Muslims should not have equal rights with others in American society.

2.      On January 27, 2017, President Trump sought to fulfill his campaign promise by signing Executive Order 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "First Executive Order" or "EO-1"), 82 Fed. Reg. 8977 (Raofield Decl. ¶ 3, Ex. A), which banned entry into the United States of both refugees and the nationals of seven predominantly Muslim countries.

3.      The First Executive Order was developed by advisors to Mr. Trump whom he tasked with finding a way to implement a Muslim ban indirectly, after his original campaign proposal to ban Muslims was criticized as blatantly unconstitutional religious discrimination. In addition, as President Trump admitted on national television, through the January 27 Order he intended to favor Christian refugees over Muslim refugees. Rarely in American history has governmental

intent—at the highest levels—to discriminate against a particular faith and its adherents been so plain.

4.      The First Executive Order resulted in chaos and widespread civil rights abuses at airports, demonstrations nationwide, and emergency litigation across the country.

5.      Implementation of EO-1 was halted by the courts, including this one.

6.      Thereafter, President Trump promised to issue a new executive order. He claimed that injunctions by the courts imperiled national security. The President, however, delayed issuance of the new order. White House officials admitted that the purpose of the delay was to enable the President to benefit from favorable news coverage after his first address to Congress.

7.      White House officials explained that the revised order would contain only minor, technical changes from the First Executive Order, and would thus produce the same basic policy outcome. That basic goal and outcome was, and remains, the exclusion of Muslims from the United States.

8.      On March 6, 2017, President Trump rescinded and replaced the First Executive Order with a revised document, Executive Order 13780, 82 Fed. Reg. 13209, effective March 16, 2017 ("Second Executive Order" or "EO-2") (Raofield Decl. ¶ 4, Ex. B).

9.     The major provisions of the Second Executive Order were nearly identical to those of the First Executive Order. EO-2 banned individuals from six of the seven predominantly Muslim countries identified in EO-1 – Yemen, Libya, Somalia, Sudan, Iran and Syria – from entering the United States for at least 90 days. Like EO-1, EO-2 suspended the entire United States Refugee Admissions Program for at least 120 days and reduced the maximum number of refugees allowed into the United States for the current fiscal year from 110,000 to 50,000. EO-2 also contained language that associates Muslims with violence, terrorism, bigotry and hatred. That language inflicted stigmatic and dignitary harms. As a result, EO-2 had the same discriminatory and stigmatizing impact on Muslims as EO-1, which was itself a product of the President's clearly expressed intent to prevent Muslims from entering the United States.

10.     The courts, recognizing that EO-2 was motivated by the same impermissible religious animus as EO-1 and suffered from the same constitutional and statutory defects, blocked implementation of the Second Executive Order. The Supreme Court—although it did not hear the merits of these appeals before the cases became moot—subsequently narrowed the preliminary injunctions to enjoin enforcement of the relevant provisions with respect to foreign nationals who lacked any bona fide relationship with a person or entity in the United States. *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017).

11.     On September 24, 2017, President Trump yet again replaced an unconstitutional order with a new one, this time entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public Safety Threats," Proclamation 9645, 82 Fed. Reg. 45161 ("EO-3"). (Together, we refer to the January 27 Order, the March 6 Order, and the September 24 Proclamation as the "Executive Orders".)[1]

12.     EO-3 currently bans certain nationals of the predominantly Muslim countries of Iran, Libya, Somalia, Syria and Yemen (the "Designated Countries"). Unlike EO-1 and EO-2 (collectively, the "Prior Orders"), which imposed 90-day bans, EO-3 contains no set time limit. While EO-3 provides that this indefinite ban could be lifted in the future if circumstances change on a country-by-country basis, the absence of any time limit means that EO-3 essentially extends the earlier 90-day bans to last indefinitely. It also bans a small number of Venezuelan government officials and the nearly nonexistent entry of nationals of North Korea.

13.     EO-3 ostensibly permits individuals from the Designated Countries who pose no national security threat to obtain a waiver to enter the United States.

_____

[1] On October 24, 2017, President Trump signed Executive Order 13815 ("EO-4"), 82 Fed. Reg. 50,055, entitled "Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities."  EO-4 suspends entry of refugees from eleven specified countries—all but two of which are majority Muslim—and indefinitely suspends the "follow-to-join" program, which allows refugees admitted to the U.S. to apply for admission of their spouses and children.

However, the waiver provision of EO-3 has proven to be a sham. The majority of qualified applicants are denied waivers, allowing EO-3 to function as intended: to drastically curb Muslim immigration into the United States.

14.     All three Executive Orders have the same purpose and effect. All three were intended and designed to target and discriminate against Muslims, and all did and do just that in operation.

15.     Like the First and Second Executive Orders, EO-3 violates cherished constitutional protections: the guarantee that the government will not establish, favor, discriminate against, or condemn any religion; the guarantee of freedom of speech and association; and the guarantee of equal protection of the laws.

16.     The United States was born in part of an effort to escape religious persecution, and the Religion Clauses of the First Amendment reflect the harrowing history of our Founders. More than two centuries later, our nation is one of the most religiously diverse in the world and has become a sanctuary for immigrants and visitors of all faiths and no faith, including refugees fleeing persecution in their homelands.

17.     EO-3 flies in the face of our historical commitment to welcome and protect people of all faiths, and no faith. It violates the "clearest command of the Establishment Clause"—"one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

18.    The United States was likewise founded on the principle that all people—regardless of their faith or where they are born—are created equal. The equal protection guarantee of the Fifth Amendment reflects this country's rejection of official preferences on the basis of race, color, or religion.

19.    Freedom of speech and assembly are similarly fundamental to our democracy. The First Amendment guarantees our right to hear from and associate with speakers of different faiths. EO-3—which was motivated by animus toward Muslims and expressly discriminates on the basis of national origin—runs afoul of these core constitutional values as well.

20.    The Executive Orders embodied the unconstitutional targeting of Muslims. The purported justification—national security concerns—was intended to legitimize the travel ban but serves no legitimate rational purpose. EO-3 cannot "reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, No. 17-965, 585 U.S. __, slip op. at 32 (June 26, 2018).

21.    Plaintiffs challenge EO-3 as violating the Establishment Clause and the right to freedom of speech and association under the First Amendment, and the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

22.     Plaintiffs respectfully request that this Court issue appropriate declaratory relief and permanently enjoin EO-3 with respect to foreign nationals from the Designated Countries.

## PARTIES

### The Plaintiffs

23.     Plaintiff Arab American Civil Rights League ("ACRL") is a non-profit organization based in Dearborn, Michigan, that protects the civil rights of Arab Americans through education and advocacy. ACRL is a membership organization, the majority of whose members are practicing Muslims and are from Middle Eastern backgrounds, including from the majority-Muslim Designated Countries. Likewise, the majority of ACRL's clients are practicing Muslims and are from Middle Eastern backgrounds, including from the majority-Muslim Designated Countries. ACRL asserts claims on behalf of itself, its members, and clients. The rights of its clients that ACRL seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own names.

24.     Plaintiff American Civil Liberties Union of Michigan ("ACLU") is a nonprofit membership organization with more than 41,000 members, headquartered in Detroit, Michigan, and is a state affiliate of the national American Civil Liberties Union, which is itself a membership organization of more than 1.6

million members. The ACLU has long been dedicated to protecting the constitutional rights of its members and of all people in Michigan, including their rights to religious liberty, freedom of speech and association, and equal protection of the laws. The ACLU asserts claims on behalf of itself and its members.

25.     The American Arab Chamber of Commerce (hereinafter "Chamber") is a non-profit, membership organization dedicated to promoting and empowering its member businesses. Located in Dearborn, Michigan, the Chamber is currently the largest Arab American business organization in the country. The Chamber seeks to promote its members by offering networking opportunities as well as by fostering trade between Michigan-based companies and businesses located in the Middle East. The Chamber's membership includes businesses founded or run by immigrants from the Designated Countries and by refugees. Many of these business leaders are Muslim. The Chamber asserts claims on behalf of itself and its members.

26.     Arab American and Chaldean Council ("ACC") is a human services non-profit, headquartered in Detroit, Michigan, which has existed since 1979 and whose mission is to support the overall well-being of the Middle Eastern community in the Metro Detroit region by providing services in public and behavioral health, along with a focus on education, English as a Second Language (ESL) classes, employment, training and placement, youth life skills classes in

schools, youth recreation, cultural activities along with Woman, Infant and Children (WIC) and the Michigan Department of Health and Human Services (DHHS) support. ACC asserts claims on behalf of itself and its clients. The rights of ACC's clients that it seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its clients face numerous hurdles to bringing this suit in their own name.

27.     The Arab American Studies Association ("AASA") is a non-profit, nonpolitical organization of scholars and other persons interested in the study of Arab American history, ethnicity, culture, literature, art, music, politics, religion, and other aspects of the Arab American experience. The AASA is a membership organization, headquartered in Dearborn, Michigan. The AASA asserts claims on behalf of itself and its members.

28.     As set forth in greater detail below, implementation of the Executive Orders has caused substantial harm to, and will continue to harm, ACRL, its members, and its clients; the ACLU and its members; the American Arab Chamber of Commerce and its members; ACC and its clients; and AASA and its members.

29.     Plaintiff Hend Alshawish is a lawful permanent resident of the United States, a citizen of Yemen, and a Muslim. She is married to plaintiff Salim Alshawish. She resides in New York, and is a member of ACRL and of the American Civil Liberties Union.

10

30.     Plaintiff Salim Alshawish is a citizen of the United States and is Muslim. He is married to plaintiff Hend Alshawish, and the two reside in New York. Plaintiff Salim Alshawish is a member of ACRL and of the American Civil Liberties Union.

31.     Plaintiffs Hend and Salim Alshawish have two teenaged children who are citizens of Yemen and are Muslim. The children have been unable to join their parents in the United States due to the Executive Orders.

32.     Plaintiff Fahmi Jahaf is a citizen of the United States and is Muslim. He resides in Wayne County, Michigan and is a member of ACRL and of the ACLU. Plaintiff is married to Basema Al Reyashi, a citizen of Yemen. Ms. Al Reyashi is also Muslim, and currently resides in Djibouti. Due to the Executive Orders, Plaintiff Jahaf's wife cannot join him in the United States.

33.     Plaintiff Kaltum Saleh is a citizen of the United States and is Muslim. She resides in Wayne County, Michigan and is a member of the ACLU. Plaintiff Saleh's elderly mother, a Somali national, currently resides in Uganda. Due to the Executive Orders, Plaintiff Saleh's mother cannot join her in the United States.

34.     As set forth in greater detail below, implementation of the Executive Orders has caused and will continue to cause harm to Plaintiffs Hend Alshawish, Salim Alshawish, Fahmi Jahaf, and Kaltum Saleh (collectively, the "Individual Plaintiffs").

11

## **The Defendants**

35.     Defendant Donald Trump is the President of the United States. He issued the Executive Orders challenged in this suit. He is sued in his official capacity.

36.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection. The Executive Orders assign DHS a variety of responsibilities regarding implementation and enforcement.

37.     Defendant U.S. Customs and Border Protection ("CBP") is an agency within DHS. CBP's responsibilities include inspecting and admitting immigrants and nonimmigrants arriving at international ports of entry, including airports and land borders. The Executive Orders assign CBP a variety of responsibilities regarding implementation and enforcement.

38.     U.S. Citizenship and Immigration Services ("USCIS") is an agency within DHS. USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States, and it therefore has a variety of responsibilities regarding implementation and enforcement of the Executive Orders.

39.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government that is responsible for the issuance of immigrant and nonimmigrant visas abroad. The Executive Orders assign DOS a variety of responsibilities regarding implementation and enforcement.

40.     Defendant Department of Justice ("DOJ") is a cabinet-level department of the United States federal government. The Executive Orders assign certain responsibilities regarding implementation and enforcement to the Attorney General, who heads the Department of Justice.

41.     Defendant Office of the Director of National Intelligence ("ODNI") is an independent agency of the United States federal government. ODNI has specific responsibilities and obligation with respect to implementation of the Executive Orders.

42.     Defendant Kirstjen M. Nielsen is the Secretary of Homeland Security. Secretary Nielsen has responsibility for overseeing enforcement and implementation of the Executive Orders by all DHS staff, and staff of DHS's component agencies, CBP and USCIS. She is sued in her official capacity.[2]

---

[2] Where applicable, the official defendants named in prior complaints have been substituted with their successors pursuant to Fed. R. Civ. P. 25(d).

43.    Defendant Kevin K. McAleenan is the Commissioner of CBP and has responsibility for overseeing enforcement and implementation of the Executive Orders by all CBP staff. He is sued in his official capacity.

44.    Defendant L. Francis Cissna is the Director of USCIS and has responsibility for overseeing enforcement and implementation of the Executive Orders by all USCIS staff. He is sued in his official capacity.

45.    Defendant Michael R. Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Executive Orders by all DOS staff. He is sued in his official capacity.

46.    Defendant Jeff Sessions is the Attorney General of the United States. The Executive Orders assign certain responsibilities regarding implementation and enforcement to the Attorney General. He is sued in his official capacity.

47.    Defendant Dan Coats is the Director of National Intelligence, and has responsibility for overseeing enforcement and implementation of the Executive Orders by all ODNI staff. He is sued in his official capacity.

48.    Defendant United States of America includes all government agencies and departments responsible for enforcement and implementation of the Executive Orders.

## JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction over this action under 28

U.S.C. §§ 1331, 1343 and 1361. This court has further remedial authority pursuant

to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

50.     Venue is proper under 28 U.S.C. § 1391(e). Defendants are officers or

employees of the United States acting in their official capacities, agencies of the

United States, and the United States. Plaintiffs ACRL, ACLU, American Arab

Chamber of Commerce, ACC, AASA, Jahaf, and Saleh are residents of this

District, and no real property is involved in this action. Further, a substantial part

of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS
### President Trump's Expressed Intent to Target Muslims
### and to Favor Christians Seeking to Enter the Country

51.     President Trump has repeatedly made clear his intent to enact policies

that exclude Muslims from entering the United States and favor Christians seeking

to enter the United States.

52.     On December 7, 2015, then-Presidential Candidate Trump issued a

statement on his campaign website. Entitled "DONALD J. TRUMP STATEMENT

ON PREVENTING MUSLIM IMMIGRATION," the statement declared that

"Donald J. Trump is calling for a total and complete shutdown of Muslims entering

the United States until our country's representatives can figure out what is going on."

53.     The statement invokes stereotypes of Muslims, falsely suggesting that all Muslims believe in "murder against non-believers who won't convert" and "unthinkable acts" against women.

54.     The statement suggests that a Muslim ban is necessary to prevent "horrendous attacks" on U.S. soil because "there is great hatred towards Americans by large segments of the Muslim population."

55.     Defending his proposed Muslim ban the next day, Candidate Trump told *Good Morning America*, "What I'm doing is I'm calling very simply for a shutdown of Muslims entering the United States—and here's a key—until our country's representatives can figure out what is going on."

56.     At the time President Trump took the oath of office, the statement remained on his campaign website. And while this fact was highlighted in numerous lawsuits challenging the Executive Orders, President Trump elected to leave the statement on his campaign website until May 2017.

57.     When asked the same day on MSNBC how his Muslim ban would be applied by "a customs agent," Candidate Trump said, "That would be probably— they would say, are you Muslim?" A reporter followed up by asking, "And if they

said yes, they would not be allowed in the country[?]" Candidate Trump responded, "That's correct."

58.     This overt religious animus was consistent with statements and proposals Candidate Trump had previously made. For example, on September 30, 2015, while speaking at a campaign event in New Hampshire, Candidate Trump said that the 10,000 Syrian refugees admitted by the Obama administration in 2016 "could be ISIS" and promised "if I win, they're going back!"

59.     In addition, in a series of interviews in the weeks prior to the release of his statement, Candidate Trump had indicated that he would require Muslims in the United States to register with the government, and he had insisted that the country had "absolutely no choice" but to shut down mosques.

60.     President Trump's hostility toward Muslims is longstanding. In April 2011, Mr. Trump stated that he had been asked whether there was "a Muslim problem." He said he had replied:

> [A]bsolutely yes. . . . I mean I could have said, "Oh absolutely not . . . there's no Muslim problem, everything is wonderful, just forget about the World Trade Center. But you have to speak the truth. . . . The Koran is very interesting. . . . [T]here's something there that teaches some very negative vibe. . . . [T]here's tremendous hatred out there that I've never seen anything like it.

61.     Throughout the presidential campaign, Candidate Trump repeatedly reiterated his support for targeting Muslims seeking to enter the United States.

62.    At a rally on September 18, 2015, Candidate Trump did not disagree with an audience member who stated, "We have a problem in this country. It's called Muslims."  In response to the same audience member's question, "When can we get rid of them [the Muslims]?" Candidate Trump replied, "We're going to be looking at that and many other things."

63.    On November 16, 2015, Candidate Trump stated that he would "have to strongly consider" shutting down mosques, "because some of the ideas and some of the hatred—the absolute hatred—is coming from these areas."  Two days later, Candidate Trump concluded that there was "absolutely no choice" about shutting down mosques. Candidate Trump advocated shutting down mosques and the surveillance of mosques without suspicion on numerous occasions.

64.    Discussing the 9/11 terrorist attacks, on November 21, 2015, Candidate Trump asserted that "thousands and thousands of people [referring to Muslims] were cheering as that building was coming down. Thousands of people were cheering."  This claim has since been thoroughly debunked.

65.    On December 10, 2015, Candidate Trump tweeted two statements referring to a "Muslim problem," as well as a Washington Post article entitled, "Why Franklin Graham says Donald Trump is right about stopping Muslim immigration."

66.     Candidate Trump's statements suggest he sees no distinction between radical Islamic terrorism and Islam as a religion. In a televised interview on February 4, 2016, Candidate Trump was asked, "Is it really a Muslim problem, or is it a radical Islamist problem?"  He replied, "Maybe it's a Muslim problem, maybe it's not."

67.     On March 9, 2016, Candidate Trump stated, "I think Islam hates us. There's . . . a tremendous hatred there . . . . There's an unbelievable hatred of us . . . . [W]e can't allow people coming into this country who have this hatred of the United States . . . [and] of people that are not Muslim . . . ."  He again conflated Muslims and terrorists, rejecting that the two are distinct and stating that "[i]t's very hard to define."

68.     The next day, during a debate, Candidate Trump said he would "stick with exactly" what he had said the night before. When asked if he was referring to all 1.6 billion Muslims worldwide, he explained, "I mean a lot of them." Candidate Trump stated later in the same debate, "There is tremendous hate. There is tremendous hate. Where large portions of a group of people, Islam, large portions want to use very, very harsh means."

69.     On March 22, 2016, Candidate Trump stated that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," adding, "You need surveillance. You have to deal with the mosques,

whether we like it or not . . . . [T]hese attacks aren't . . . done by Swedish people, that I can tell you."

70.     The same day, Candidate Trump attacked Democratic candidate Hillary Clinton on Twitter, saying she wanted to "let the Muslims flow in."

71.     On June 13, 2016, one day after the Pulse nightclub shooting in Orlando, Candidate Trump delivered an address on "Terrorism, Immigration, and National Security," in which he declared: "I called for a ban after San Bernardino, and was met with great scorn and anger but now, many are saying I was right…. We cannot continue to allow thousands upon thousands of people to pour into our country, many of whom have the same thought process as this savage killer." In the address he blamed "Muslim communities" of refusing to "turn in the people who they know are bad—and they do know where they are."

**Development of the Pretext for Targeting Muslims Prior to the Election**

72.     During the summer of 2016, in response to widespread outrage at his proposed Muslim ban, Candidate Trump worked with others to develop a pretext to disguise his religious animus and justify his determination to take action targeting Muslims.

73.     In May of 2016, Candidate Trump asked former New York City Mayor Rudolph Giuliani to put together a "commission" to advise Candidate Trump on his proposed Muslim ban.

20

74.      In a televised interview, Mr. Giuliani explained: "So when he first announced it, he said 'Muslim ban.' He called me up. He said 'Put a commission together. Show me the right way to do it legally.'"

75.      On June 5, 2016, an interviewer asked Candidate Trump, "How are you going to get past [the] establishment to keep those promises," one of which was the "temporary ban on Muslim immigration"?  Candidate Trump presciently responded: "You are going to have to watch and are going to have to see. I have done a lot of things that nobody thought I could do."

76.      In early July 2016, Mr. Giuliani described a memorandum his commission had prepared for Candidate Trump, and he suggested that this memorandum had caused the candidate's proposal to shift from a "general ban" to "very specific, targeted criteria" focusing on specific countries.

77.      In a subsequent interview, Mr. Giuliani again attributed the purported evolution of the Muslim ban to the work of his commission, which included Congressman Michael McCaul and General Michael Flynn, among others: "We wrote a paper for him. And he amended it to the ban would be restricted to particular countries, and it would not be a ban. It would involve extreme vetting…. All the rest from countries [other than Syria] that contain dangerous populations of radical Islamic extremists, he will subject them to extreme vetting, but not a ban."

78.     In a July 24, 2016 interview on *Meet the Press*, Candidate Trump was asked if a plan similar to the Executive Orders at issue in this litigation was a "rollback" from "[t]he Muslim Ban." Candidate Trump responded: "I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territory." Candidate Trump continued: "People were so upset when I used the word 'Muslim.' 'Oh, you can't use the word 'Muslim.'' Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."

79.     In an address on August 15, 2016, Candidate Trump characterized a long list of terror attacks as all being linked by the "common thread" that they "involved immigrants or the children of immigrants." In this speech, invoking offensive Muslim stereotypes, he decried "the oppression of women and gays in many Muslim nations" and the targeting of "Christians driven from their homes," and he called for the establishment of an "ideological screening test" to ferret out those who do not share our values. He went on to proclaim that American "values should be taught by parents and teachers, and impressed upon all who join our society. Assimilation is not an act of hostility, but an expression of compassion."

80.     On August 17, 2016, the Trump campaign announced that Candidate Trump had convened a "Roundtable on Defeating Radical Islamic Terrorism," to discuss "improving immigration screening and standards" to keep radical Muslims

out of the country. This group included, among others, General Flynn, then-Senator Jeff Sessions, former Mayor Giuliani, Congressman Peter King, former Attorney General Michael Mukasey, and Congressman McCaul.

81.    In a debate on October 9, 2016, one month before the election, Candidate Trump claimed that: "The Muslim ban is something that in some form has morphed into extreme vetting from certain areas of the world."

**Continued Development of the Executive Order
During the Transition Period**

82.    Ordinarily, the President consults relevant cabinet-level officials and agencies before issuing an Executive Order. However, this usual process was not followed here.

83.    Shortly after his election victory, President-elect Trump selected General Flynn—a key member of the Giuliani commission—to serve as his national security adviser.

84.    Just a few months earlier, General Flynn had described "Islamism" in a televised speech as "a vicious cancer inside the body of 1.7 billion people on this planet" and stated that "it has to be excised."

85.    During the transition period following the election and before the inauguration, development of EO-1 was overseen by certain Trump advisors, including Stephen Bannon and Stephen Miller.

86.     Mr. Bannon has previously made anti-Muslim comments. He has stated that "most people in the Middle East, at least 50%, believe in being sharia-compliant," and that "[i]f you're sharia-compliant or want to impose sharia law, the United States is the wrong place for you."

87.     In 2003, Mr. Miller wrote: "We have all heard about how peaceful and benign the Islamic religion is, but no matter how many times you say that, it cannot change the fact that millions of radical Muslims would celebrate your death for the simple reason that you are Christian, Jewish or American."

88.     During the transition period, members of the Trump transition team consulted with staff working for the House Judiciary Committee. It has been reported that these staffers carried out this work unbeknownst to members of the Committee, and were required to sign nondisclosure agreements. Congressman Bob Goodlatte, the Chairman of the House Judiciary Committee, has verified that the staffers' involvement began after the election and ended before the inauguration.

89.     In late December 2016, as development of EO-1 was underway, President-elect Trump was asked whether he had changed his "plans to create a Muslim registry or ban Muslim immigration." He responded: "Hey, you've known my plans all along and it's, they've proven to be right. 100 percent correct."

90.     The numerous statements made by Candidate and President-elect Trump and his supporters calling for a Muslim ban and expressing negative stereotypes about Muslims demonstrate that EO-1 (and its successors) resulted from anti-Muslim animus, rather than legitimate national security concerns.

## Issuance of the First Executive Order
## Following the Inauguration

91.     On January 20, 2017, Donald J. Trump became the 45th President of the United States of America.

92.     President Trump selected the controversial Rev. Franklin Graham to speak at his inauguration. Rev. Graham had spent the past fifteen years characterizing Islam as "a religion of war" and insisting Islam "has not been hijacked by radicals. This is the faith, this is the religion."

93.     As of January 20, 2017, news reports indicated that an executive order would be signed shortly and would restrict entry to the country by individuals from seven majority Muslim countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.

94.     On January 27, 2017—just one week after his inauguration— President Trump sought to fulfill his campaign promise by signing an executive order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."  After reading this title aloud, President Trump clarified, "We all know what that means."

25

95.    The First Executive Order was intentionally designed to target Muslims, discriminate against Muslims, and disparage Islam, and it did just that in operation.

96.    Contemporaneous statements made by President Trump and his advisors around the signing of the First Executive Order confirm President Trump's intent to discriminate against Muslims.

97.    For instance, during the signing ceremony, President Trump made clear that the order was targeted at Muslims, pledging that it would "keep radical Islamic terrorists out of the United States of America."

98.    In an interview with the Christian Broadcasting Network released the same day that he signed the First Executive Order, President Trump stated that the Order was designed to give Christians priority when applying for refugee status. "If you were a Muslim you could come in [to the United States], but if you were a Christian, it was almost impossible," he said. "[T]hey were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."

99.    Consistent with this expressed animus towards Muslims and preference for Christians, EO-1 clearly disfavored Muslims while giving special treatment to non-Muslims.

100.   Section 3 of the Order, for example, banned any entry for 90 days for individuals from seven countries. All seven of these countries are predominantly Muslim: Syria, Sudan, Iraq, Iran, Libya, Somalia, and Yemen.

101.   EO-1 did not single out any countries that are not majority-Muslim for disfavored treatment.

102.   EO-1 provided a mechanism for the government to extend and/or expand the ban at the end of the 90-day period. Section 3 of the Order directed the Secretary of Homeland Security to "immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat," and to "submit to the President a report on the results of the review . . . within 30 days of the date of this order." At that point, the "Secretary of State shall request all foreign governments that do not supply such information to start providing such information," and 60 days after that – precisely at the end of the initial 90-day ban period – EO-1 provided for the President to issue a proclamation indefinitely banning travelers from a list of countries deemed to be non-compliant "until compliance occurs."

103.   Section 5 of the First Executive Order banned the admission of Syrian refugees indefinitely and prohibited other refugee admissions for 120 days.

27

104.   EO-1 discriminated between persons of majority and minority faiths in their country of origin. Section 5(b) of the Order required the government to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality" once the 120-day ban on refugee admissions is complete.

105.   During those 120 days, moreover, Section 5(e) of the First Executive Order allowed the admission of certain refugees on a discretionary case-by-case basis, "only so long as [the Secretaries of State and Homeland Security] determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution."

106.   The President has conceded that these provisions were intended to allow Christian refugees to enter the United States, even while Muslim refugees from the same countries were prohibited from doing so. And indeed, Muslims were severely disadvantaged by the minority-faith preferences set forth in Sections 5(b) and 5(e).

107.   There is no statutory, regulatory, or constitutional basis for favoring refugees from minority faiths over refugees from majority faiths. There is no basis in the Refugee Act of 1980, as amended – which governs the admission of refugees

to the United States and their resettlement herein – to prioritize refugees fleeing persecution on the basis of religion, as opposed to other congressionally-recognized bases. *See* 8 U.S.C. § 1101(a)(42) (defining "refugee").

108.   The indefinite ban on Syrian refugees contained in the January 27 Order also made plain, and put into practice, President Trump's intent to limit the entry of Muslims into the United States. In fiscal year 2016, Syrian refugees made up 32% of all Muslim refugees who entered the United States, but only 0.2% of the Christian refugees who entered the United States.

109.   Section 5(d) reduced, by more than half, the annual refugee admissions allotment that was set prior to fiscal year 2017 by President Obama (from 110,000 to 50,000).

110.   As of the end of February 2017, approximately 37,000 refugees had already been resettled in the United States. The number of refugees already somewhere in the U.S. Refugee Admissions Program pipeline at that time – well over 50,000 – would put the U.S. refugee resettlement total above Section 5(d)'s reduced admissions cap of 50,000.

111.   As a result, upon information and belief, Defendants undertook various actions to bring to a halt the U.S. refugee resettlement process as a result of Section 5(d)'s reduction in fiscal year 2017's figure.

112.   For example, upon information and belief, shortly after the First Executive Order was signed, Defendant USCIS, a component of Defendant Department of Homeland Security, cancelled nearly all refugee processing interviews abroad.

113.   Additionally, upon information and belief, Defendant Department of State suspended security checks for refugees, a process that often takes between 18-24 months.

114.   Further, on information and belief, since EO-1 was signed, CBP has questioned foreign nationals entering the United States about their religious beliefs to determine whether or not they are Muslim and their degree of religiosity, and has subjected Muslim travelers to disproportionate and discriminatory scrutiny and interrogation.

**The Chaotic and Irregular Implementation of the First Executive Order**

115.   The implementation of the First Executive Order was extremely unusual and chaotic. Upon information and belief, the White House bypassed regular channels for input and cooperation from other components of the Executive Branch, including the Secretaries of Homeland Security, Defense, and State. Moreover, upon information and belief, CBP was not given clear operational guidance during critical times in the implementation of EO-1.

116.   EO-1 was signed without final review or legal analysis from DHS, which—along with the DOS—was principally charged with implementing the Order.

117.   Then-Secretary of Homeland Security Kelly was reportedly in the midst of a conference call to discuss the Order when someone on the call learned from watching television that the Order they were discussing had been signed.

118.   Similarly, Secretary of Defense Mattis, who had publicly criticized President Trump's proposal to ban Muslims from the United States, reportedly did not see a final version of the order until the day it was signed, and was not consulted during its preparation.

119.   During the days leading up to and following the signing of the First Executive Order, its scope and provisions were repeatedly changed, despite the changes bearing no rational relationship to the purported reasons for the Order.

120.   For example, the night EO-1 was signed, the Department of Homeland Security issued guidance interpreting the Order as not applying to lawful permanent residents. Overnight, the White House overruled that guidance, applying the Order to lawful permanent residents subject to a case-by-case exception process. On information and belief, the decision to continue applying EO-1 to lawful permanent residents was taken on the advice of Mr. Bannon.

121.   After the detention at airports of many individuals, including lawful permanent residents, led to chaos nationwide, then-Secretary Kelly issued a statement "deem[ing] the entry of lawful permanent residents to be in the national interest." Secretary Kelly's statement was made pursuant to Section 3(g) of the order, which requires such a decision to be made jointly with the Secretary of State and "on a case-by-case basis."

122.   Finally, on February 1, the Counsel to the President purported to interpret the First Executive Order as exempting lawful permanent residents from the ban entirely.

123.   Similarly, initial guidance from DOS indicated that individuals with dual citizenship, with one country of citizenship subject to the ban, would be banned from entering the United States. On information and belief, word of a change in that policy spread irregularly, with notice being given to airlines and foreign nations but contradicted in official U.S. government communications.

124.   Finally, CBP announced a changed policy, explaining, in response to the question "Does 'from one of the seven countries' mean citizen, national or born in?" that "Travelers are being treated according to the travel document they present."

125.   The government also reversed itself on its policy toward holders of Special Immigrant Visas from Iraq. Holders of these visas are clearly banned under

the terms of EO-1, and they were refused entry when it went into effect. However, on February 2, 2017, the government changed course and allowed them to enter the United States despite EO-1.

126.    Still other aspects of the First Executive Order and its implementation demonstrate utter disregard for the individuals affected by it. For example, President Trump and officials involved in drafting the order knew that the Order would bar the entry of individuals who were literally mid-air when the Order was issued. Nonetheless, and absent any exigency that would justify it, the Order was signed late on a Friday afternoon and took immediate effect. That decision had a number of predictable consequences, including: making it more difficult for the federal employees tasked with enforcing the order to obtain instructions on how to interpret and enforce the Order's ambiguous provisions; prolonging the detentions at airports of those affected, and leading many to be wrongfully deported; and increasing the difficulty advocates had in accessing their clients and the courts.

127.    Other actions taken by DHS and DOS to enforce EO-1 exhibited a zealous desire to go beyond even the draconian measures the Order actually required.

128.    DOS, at the request of DHS, issued a letter purporting to provisionally revoke all immigrant and nonimmigrant visas of nationals of the seven designated countries on a categorical basis. The letter is dated January 27, 2017, but only

came to light on January 31, 2017, when Department of Justice lawyers filed it in pending litigation. DOS stated that this action was taken to "implement[]" EO-1.

129.   Ordinarily, visas are revoked only after individualized consideration of whether a particular visa should be revoked, not through mass simultaneous revocation of a broad swath of visas.

130.   Still further evidence of discriminatory intent and effect is reflected in the statements of President Trump and his Administration seeking to defend and justify EO-1 after it was issued.

131.   President Trump, for example, falsely stated that only 109 people were detained over the weekend following the issuance of EO-1, even though he knew or should have known that the number was far higher.

132.   Indeed, pursuant to a federal district court order, the federal government has since revealed that at least 746 individuals were detained over a period of just 27 hours during the weekend after EO-1 was signed. This 27-hour period did not begin until a day after EO-1 went into effect. So the total number of detained persons was necessarily higher, and perhaps much higher.

133.   The Inspector General of DHS conducted an investigation and reached conclusions corroborating the public reports regarding the chaotic implementation of the January 27 Order. According to a letter dated November 20, 2017, from the Inspector General to Senators Durbin, Duckworth, and McCaskill,

the Inspector General concluded, among other things, that there was no "evidence that CBP detected any traveler linked to terrorism based on the additional procedures required by the EO."

134.   These chaotic, irregular, and irrational policies, policy changes, and statements indicate that the purported justifications for the First Executive Order were pretextual and support Plaintiffs' allegation that the Order was motivated by an intent to discriminate against Muslims.

## The Courts Enjoin Implementation of the First Executive Order

135.   On February 2, 2017, this Court issued a nationwide injunction prohibiting enforcement of Sections 3(c) and 3(e) of the First Executive Order against lawful permanent residents.

136.   On February 3, 2017, the United States District Court for the Western District of Washington (Robart, J.) enjoined the government from enforcing Sections 3(c), 5(a), 5(b), 5(c), and 5(e) of EO-1.

137.   The same day and in response to the injunction, President Trump tweeted, "We must keep 'evil' out of our country!"

138.   President Trump also personally attacked Judge Robart as a "so-called judge," calling his opinion "outrageous," "ridiculous," and "terrible." President Trump falsely claimed that one consequence of Judge Robart's order is that now "anyone, even with bad intentions" must be allowed to enter the country, saying

that the judge had "open[ed] up our country to potential terrorists" and put it in "such peril." President Trump advised the public to "blame him and the court system" if "something happens." Comments like this by a President about a sitting judge are extremely unusual, if not unprecedented, and reflect a fundamental lack of respect for important constitutional principles.

139.    The government appealed Judge Robart's order to the Ninth Circuit and sought a stay pending appeal.

140.    After hearing oral argument, the Ninth Circuit issued a published decision denying the government's motion for a stay, noting that "although courts owe considerable deference to the President's policy determinations with respect to immigration and national security, it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

141.    In reaching its holding, the Court noted that the "[t]he Government has pointed to no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States." *Id.* at 1168.

142.    The Court also acknowledged "evidence of numerous statements by the President about his intent to implement a 'Muslim ban.'" *Id.* at 1167.

143.    Shortly after the Ninth Circuit issued its opinion, President Trump tweeted, "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT

STAKE!" He subsequently denounced the opinion as "a political decision" and stated, "[W]e're going to see them in court, and I look forward to doing that. It's a decision that we'll win, in my opinion, very easily."

144.   On March 7, 2017, the government withdrew its appeal of the February 3 Order, leaving in place the nationwide preliminary injunction of Sections 3(c), 5(a), 5(b), 5(c), and 5(e) of the January 27 Order.

### The Administration Struggles to Create Post-Hoc Justifications for the Executive Order

145.   Although some pronouncements by President Trump and his administration suggested that the government would seek to appeal the Ninth Circuit's decision, other White House officials indicated that they were drafting a new Executive Order in order to circumvent that court's and other judicial rulings regarding the constitutionality of the First Executive Order.

146.   On February 16, 2017, following the Ninth Circuit's per curiam decision, President Trump said, "[W]e can tailor the order to that decision and get just about everything, in some ways, more."

147.   On February 21, 2017, Senior White House Policy Advisor Stephen Miller, a key architect of the First Executive Order, stated that a revised order would be issued within a "few days" and that it was driven by the very same policy. "And so these are mostly minor, technical differences. Fundamentally, you are still going to have the same, basic policy outcome for the country." When Mr.

Miller was asked whether changes were being made in an attempt to alleviate constitutional concerns, he was defiant: "The rulings from those courts were flawed, erroneous and false. The president's actions were clearly legal and constitutional."

148.    Around this time, senior White House officials began to leak accounts that President Trump had ordered DHS to work with DOJ to collect information that would justify the temporary ban on travel from the seven affected countries included in EO-1. One White House official said, "DHS and DOJ are working on an intelligence report that will demonstrate that the security threat for these seven countries is substantial and that these seven countries have all been exporters of terrorism into the United States."

149.    Numerous intelligence officials began expressing their shock at this request, which was perceived as an attempt to politicize intelligence.

150.    At least two prior intelligence reports prepared by DHS refuted the justification for barring entry by individuals from the seven countries identified in the January 27 Order.

151.    One draft intelligence report prepared by DHS assessed the potential heightened threat of terroristic activity posed by individuals from the seven countries affected by EO-1 and concluded that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity." This report found that less

than half of the 82 individuals involved in terrorist activities since 2011 were foreign-born, and of those, "The top seven origin countries of the foreign-born individuals are: Pakistan (5), Somalia (3), and Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan (2)."

152.   A second intelligence assessment, prepared by DHS less than a week before issuance of the Second Executive Order, concluded that "most foreign-born, U.S.-based violent extremists likely radicalized several years after their entry to the United States, limiting the ability of screening and vetting officials to prevent their entry," and that many entered as minors and "nearly all parents who entered the country with minor-age children likely did not espouse a violent extremist ideology at the time they entered or at any time since, suggesting these foreign-born individuals were likely not radicalized by their parents." The report also found that integration and mentoring services provided by federal, state, and private organizations to refugees and asylees could address underlying factors that lead to the radicalization of foreign-born U.S. residents.

153.   Counter to the Trump Administration's initial rhetoric emphasizing the urgency of a travel ban, the release of the Second Executive Order was repeatedly delayed for political reasons.

154.   At one point, the White House indicated that President Trump would sign the Second Executive Order on March 1, 2017, but this was delayed yet again.

One Administration official told a news outlet on February 28 that a reason for President Trump's delay in signing an updated Executive Order was "the busy news cycle," and the desire of the President that the new order "get plenty of attention."

155.   A senior Administration official told a different news outlet on March 1, 2017, that a related reason for the delay in releasing the updated Executive Order was the "positive reaction" to President Trump's "first address to Congress" on the evening of Tuesday, February 28, 2017. The official said, "We want the (executive order) to have its own 'moment.'" The article reported that "[s]igning the executive order Wednesday, as originally indicated by the White House, would have undercut the favorable coverage," and the senior Administration official "didn't deny the positive reception was part of the [A]dministration's calculus in pushing back the travel ban announcement."

156.   On February 27, 2017, then-Press Secretary Sean Spicer discussed the soon-to-be-issued revised order (EO-2), saying: "the goal is obviously to maintain the way that we did it the first time."

157.   In a speech before Congress on February 28, 2017, President Trump asserted: "According to data provided by the Department of Justice, the vast majority of individuals convicted of terrorism and terrorism-related offenses since 9/11 came here from outside of our country."  However, on July 24, 2018, the

Department of Justice conceded in response to a FOIA request for this "data" that "no responsive records were located."

158.   The administration's delay in issuing EO-2 for purely political reasons, the transparent post-hoc attempts to rationalize EO-2 using nonexistent data, and the acknowledgements by the President and senior officials that EO-2 was intended to recreate the facially discriminatory EO-1 demonstrate that EO-2 was motivated by religious animus rather than legitimate national security concerns.

## The Second Executive Order Alleges a Different Purpose But Seeks the Same End Result

159.   On March 6, 2017—a full month after the District Court for the Western District of Washington enjoined the First Executive Order—President Trump issued the revised executive order. That Order is entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

160.   The same day the Second Executive Order was issued, Attorney General Sessions and then-Secretary of Homeland Security issued a joint letter to President Trump stating that "we believe that it is imperative that we have a temporary pause on the entry of nationals from certain countries to allow this review to take place." The fact that this letter was issued on the same day as the Second Executive Order demonstrates that the letter was a pretextual effort to justify that Order.

161.    In a press briefing the day the Second Executive Order was issued, then-Press Secretary Sean Spicer said that "the principles of the executive order remain the same." Spicer was correct: the key principle of anti-Muslim animus that doomed the First Executive Order to unconstitutionality was unchanged.

162.    The same day the Second Executive Order was issued, President Trump sent an email to supporters saying the order was fulfilling his promise to "keep America safe" by imposing restrictions on immigration from countries associated with "radical Islamic terrorism."

163.    The same day, the Department of Homeland Security published a "Q&A" document with answers to thirty-seven questions about the Second Executive Order. *See* Raofield Decl. ¶ 5, Ex. C.

164.    Consistent with the statement of top administration officials that the new order would seek to accomplish the same goals as the original order, EO-2, after explicitly referring to the Ninth Circuit's ruling, exempted certain categories of noncitizens that "have prompted judicial concerns" from the ban, and altered the original order's "approach to certain other issues or categories of affected aliens" "in order to avoid spending additional time pursuing litigation" over the constitutionality of the original order. *See* EO-2 §§ 1(c), (i).

165.   The Second Executive Order significantly revised and expanded the purpose and policy sections of the First Executive Order, while keeping the substantive impact of the two Orders much the same.

166.   The First Executive Order stated that "[i]t is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States." The Second Executive Order implicitly acknowledged that both U.S. and foreign citizens commit acts of terrorism, stating that "[i]t is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals." EO-2 § 1. Yet the Second Executive Order, like the First Executive Order, did not include any actions to address terrorist attacks by citizens of the United States.

167.   The purpose and policy sections of the First Executive Order drew heavily on stereotypes about Muslims, justifying the ban as protecting citizens from foreign nationals "who would place violent ideologies over American law," "who intend to commit terrorist attacks in the United States," or "who engage in acts of bigotry or hatred (including 'honor' killings . . .)." EO-1 §§ 1, 2. The Second Executive Order replaced some of those discriminatory allusions to Muslims (although retaining others, as described below). EO-2 asserted that "conditions in six of the previously designated countries . . . demonstrate why their

43

nationals continue to present heightened risks to the security of the United States."
EO-2, § 1(e). Brief country descriptions then followed. *Id.*

168.   EO-2 identified only two concrete examples of persons who have
committed terrorism-related crimes in the United States, after either entering the
country "legally on visas" or entering "as refugees":

a.   "[I]n January 2013, two Iraqi nationals admitted to the United States as
refugees in 2009 were sentenced to 40 years and to life in prison,
respectively, for multiple terrorism-related offenses." (Iraq is no longer
covered by the travel ban.)

b.   "And in October 2014, a native of Somalia who had been brought to the
United States as a child refugee and later became a naturalized United States
citizen was sentenced to 30 years in prison for attempting to use a weapon of
mass destruction[.]" *Id.* at 1(h). (EO-2 continued to bar entry to refugee
children from Somalia.)

169.   Notwithstanding the revised and expanded "Policy and Purpose"
section and certain other changes discussed more fully below, EO-2 was extremely
similar to EO-1 in most important respects.

170.   Like EO-1, EO-2 banned entry for a 90-day period for individuals
from six of the seven predominantly Muslim countries identified in the First
Executive Order: Syria, Sudan, Iran, Libya, Somalia and Yemen. EO-2 § 2(c). It

omitted Iraq from that list. The six countries it targeted have overwhelmingly Muslim populations that range from 90.7% to 99.8%.

171.   The comparable provision of the First Executive Order (Section 3(c)) was enjoined by the courts as unconstitutional. Nevertheless, the Second Executive Order retained this unconstitutional provision.

172.   Section 3 of the Second Executive Order differed from the original in that it did not immediately apply to individuals with existing visas,[3] and made exceptions from its travel ban for lawful permanent residents, dual nationals traveling on passports issued by a non-designated country, refugees living in the United States and certain other non-citizens.[4]

173.   Nevertheless, EO-2 barred entry for virtually all other nationals of the majority-Muslim designated countries, including: relatives of U.S. citizens from

---

[3] Under Section 3(a), "the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order; (ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and (iii) do not have a valid visa on the effective date of this order." EO-2 § 3(a)(i)-(iii).

[4] Section 3(b) listed categorical "exceptions" from Section 2: lawful permanent residents; foreign nationals who are admitted or paroled into the United States "on or after the effective date of this order"; foreign nationals with "a document other than a visa . . . that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document"; dual nationals traveling on passports issued by a non-designated country; foreign nationals traveling on certain diplomatic visas; and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States. *Id.* §§ 3(b)(i)-(iv).

the listed countries; family members of U.S. citizens who were seeking to reunite with their families on immigrant visas; students who had been admitted to study in the United States but not yet received visas; prospective employees who had been offered positions but not yet obtained visas; students and employees who may need to renew their visas; and many other individuals protected by prior court injunctions.[5]

174.   Like the First Executive Order, the Second Executive Order also provided a mechanism for the government to extend the 90-day ban at the end of the 90-day period and/or to expand the ban to nationals from additional countries. Section 2(a) of EO-2 directed the Secretary of Homeland Security to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in

---

[5] In the Department of Homeland Security's Q&A document about the Second Executive Order, DHS related that nationals from one of the six designated countries who were presently in the United States, and "in possession of a valid single entry visa," would have to obtain "a valid visa or other document permitting [them] to travel to and seek admission to the United States" in order to leave and obtain "subsequent entry to the United States." *See* Raofield Decl. Ex. C, at Q4. DHS also related that international students, exchange visitors and their dependents from the six designated countries—who were in the United States but whose visas "expire[] while the Executive Order is in place"— would have to "obtain a new, valid visa to return to the United States" if they had to "depart the country." *See id.* at Q25.

order to determine that the individual is not a security or public-safety threat." In addition, EO-2 explicitly provided that the review need not be conducted in a consistent manner between countries: "The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country." *Id.*

175.   As with the First Executive Order, the Second Executive Order provided for the submission of a report on the Secretary of Homeland Security's review within 20 days (rather than 30 days), a period (50 days rather than 60 days) for countries to respond to the review, and a provision for the President to thereafter issue a proclamation indefinitely banning nationals from a list of countries deemed to be non-compliant. *Id.* § 2.

176.   The corresponding provisions of EO-2 (Section 3) were not enjoined by the courts, and remained in effect through March 15, 2017. The country-by-country report required under EO-1 was due on February 26, 2017, eight days before EO-2 was issued. No such report was submitted to the President, however, until several months later.

177.   EO-2 stated that "Iraq presents a special case" because of the "close cooperative relationship between the United States and the democratically elected Iraqi government" and because the "Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi

nationals subject to final orders of removal." EO-2 § 1(g). With this justification,

EO-2 exempted foreign nationals of Iraq from the categorical ban on entry

applicable to other countries originally targeted by EO-1. Instead, Iraqis were

subject to "thorough review" and "consideration of whether the applicant has

connections with ISIS or other terrorist organizations." *Id.* § 4.

178.   Like the First Executive Order, the Second Executive Order cut the

number of refugees admissible to the United States for fiscal year 2017 from

110,000 to 50,000 and prohibited refugee admissions for 120 days, with an

exception for discretionary case-by-case admissions. *Compare* EO-1 § 5, *with* EO-

2 § 6.

179.   The 120-day suspension of refugee admissions—Section 5(a) of the

First Executive Order—was enjoined by the courts as unconstitutional.

Nevertheless, the Second Executive Order retained that unconstitutional provision,

in its Section 6(a).

180.   Section 6(a) of EO-2 was almost identical to its predecessor—

enjoined Section 5(a) of EO-1—and differed only cosmetically, such as by

modifying the refugee suspension to exclude those already scheduled for travel.

While EO-2 removed other refugee provisions enjoined by the courts (particularly

Section 5(c), which indefinitely suspended entry of Syrian refugees, and Section

5(e)'s explicit preference based on religious minority status), removal of those

provisions did not alter the virtually complete overlap between new Section 6(a) and enjoined Section 5(a).

181.   Section 6(a) of EO-2, like its predecessor, provided that after the 120-day period is over, "the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined" that "additional procedures"—identified by those officials as being necessary "to ensure that individuals seeking admission as refugees do not pose a threat" to the United States—have been "implemented" and "are adequate to ensure the security and welfare of the United States."

182.   Although EO-2 several times described the country ban as relating to "entry" into the United States, it also apparently barred ordinary visa processing for nationals of the six designated countries. Section 3(c) of EO-2 explained that "a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of" a person from the six countries. Issuance of a visa was described as a "[c]ase-by-case waiver" of what was evidently intended to be a ban not just on entry but on new visas, as well.

183.    The government conceded in a March 15, 2017 court hearing that the
Second Executive Order halted visa processing for individuals from the majority-
Muslim countries listed in that order:

> Although the Second Executive Order does not explicitly bar citizens
> of the Designated Countries from receiving a visa, the Government
> acknowledged at oral argument that as a result of the Second
> Executive Order, any individual not deemed to fall within one of the
> exempt categories, or to be eligible for a waiver, will be denied a visa.
> Thus, although the Second Executive Order speaks only of barring
> entry, it would have the specific effect of halting the issuance of visas
> to nationals of the Designated Countries.

*International Refugee Assistance Project v. Trump*, No. TD-17-0361, slip
op. at 21 (D. Md. March 16, 2017).

184.    Like the First Executive Order, the Second Executive Order allowed
for waivers to the six-country ban on a discretionary case-by-case basis. For the
country ban, the First Executive Order simply stated that visa and other
immigration benefits may be issued "when in the national interest," while the
Second Executive Order provided nine examples of situations where a waiver
could be appropriate, such as for "an individual needing urgent medical care."
*Compare* EO-1 § 3(g) *with* EO-2 § 3(c). The circumstances enumerated in EO-2
reflected specific examples of individuals whose denial of entry pursuant to EO-1
resulted in the filing of lawsuits and widespread public outcry.

185.    Likewise, the refugee ban remained subject to waivers on the same
terms as the First Executive Order: "[O]n a case-by-case basis, in their discretion,

but only so long as [the Secretaries of State and Homeland Security] determine[d]"
that the refugee's admission (1) "[was] in the national interest," and (2) d[id] not
pose a threat "to the security or welfare of the United States." EO-1 § 5(e); EO-2 §
6(c).

186.   Like the First Executive Order, the Second Executive Order
reinforced stereotypes about Muslims and associated Muslims with violence,
bigotry, and hatred, thereby discriminating against them and inflicting stigmatic
and dignitary harms, among other types of injury. A May 2018 study has shown
that hate crimes against Muslims in the United States have not only increased
dramatically since President Trump announced his candidacy, but also spiked
coincident with events such as his call for a Muslim ban.

187.   For example, Section 11 of EO-2 (Section 10 of EO-1) required the
Secretary of Homeland Security to periodically publish information about the
number of "foreign nationals" involved in, among other things, terrorism-related
activities, radicalization, and "gender-based violence against women, including so-
called 'honor killings'"—direct echoes of then-Candidate Trump's broad
statements disparaging Islam and Muslims.

188.   Similarly, Section 6(d) of EO-2 (which was identical to Section 5(g)
of EO-1) sought to expand the limited role State and local governments have in the
refugee resettlement process beyond that envisioned by Congress. That section

51

aimed to authorize and facilitate the stated desire and intent of some states and localities in the United States to discriminate against lawfully-admitted refugees on the basis of their nationality and/or religion. *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 838 F.3d 902 (7th Cir. 2016) (affirming preliminary injunction on equal protection grounds of state executive order issued by then-Governor of Indiana Mike Pence that sought to prevent the resettlement in the State of refugees from Syria).

189.   In short, EO-2 was motivated by the same anti-Muslim purpose that motivated EO-1. In replicating much of the substance of the First Executive Order, the Second Executive Order had the same effect as its predecessor: it broadly banned nationals from listed majority-Muslim countries from both entry and receipt of visas; it suspended the U.S. Refugee Admissions Program in order to prevent the entry of Muslims into the United States; and it reinforced stereotypes about Muslims by associating them with terrorism, violence, bigotry and hatred.

### The Courts Enjoin Enforcement of the Second Executive Order

190.   The United States District Court for the District of Hawaii granted a temporary restraining order against the Second Executive Order on the evening of March 15, 2017. The court concluded that an objective observer "would conclude that the Executive Order was issued with a purpose to disfavor a particular

religion, in spite of its stated, religiously-neutral purpose." *Hawaii v. Trump*, 241 F. Supp. 3d 1119, 1134 (D. Haw. 2017).

191. In response to the *Hawaii* restraining order, President Trump told a rally in Nashville the same evening:

> The order he blocked was a watered-down version of the first order that was also blocked by another judge and should have never been blocked to start with . . . . This new order was tailored to the dictates of the 9th Circuit's—in my opinion—flawed ruling . . . . And let me tell you something, I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first place.

192. The day after the *Hawaii* restraining order, the United States District Court for the District of Maryland issued a nationwide preliminary injunction against enforcement of Section 2(c) of the Second Executive Order, which restricted entry into the United States by nationals of the six listed countries. *IRAP v. Trump*, 241 F. Supp. 3d 539, 565–66 (D. Md. 2017). The court held that the plaintiffs showed a likelihood of success on the merits of their Establishment Clause claim. On May 25, 2017, the Fourth Circuit upheld the *IRAP* injunction in large part. *IRAP v. Trump*, 857 F.3d 554 (4th Cir. May 15, 2017), as amended (May 31, 2017), as amended (June 15, 2017).

193. On June 1, 2017, the Government filed an application for a stay of the *Hawaii* and *IRAP* injunctions with the Supreme Court and petitioned for a writ of certiorari in *IRAP*.

194.   The Ninth Circuit upheld the *Hawaii* injunction in large part on June 12, 2017, only lifting the injunction with respect to the review and reporting provisions of the Second Executive Order. *Hawaii v. Trump*, 859 F.3d at 741, 786. The court held that the Second Executive Order likely exceeded President Trump's authority under the INA. *Id.* at 741.

195.   The Second Executive Order was scheduled to expire on June 14, 2017. That day, the White House issued a Presidential Memorandum delaying the start date of all provisions which had been enjoined until 72 hours after the injunctions were lifted or stayed.

196.   On June 26, 2017, the Government petitioned for a writ of certiorari in *Hawaii*. The same day, the Supreme Court granted the petitions in both cases.

197.   The Supreme Court also stayed the *IRAP* and *Hawaii* preliminary injunctions "to the extent the injunctions prevent[ed] enforcement of § 2(c) with respect to foreign nationals who lack any bona fide relationship with a person or entity in the United States." 137 S. Ct. at 2087. The injunctions remained in force for individuals with bona fide relationships. The Court stated that a bona fide relationship for individuals required "a close familial relationship." A bona fide relationship for entities "must be formal, documented, and formed in the ordinary course, rather than for the purpose of evading [the Second Executive Order]." *Id.* at 2088.

198.   On July 13, 2017, the District of Hawaii modified the scope of its injunction pursuant to the Supreme Court's order. *Hawaii v. Trump*, 263 F. Supp. 3d. 1049 (D. Haw. 2017). The Ninth Circuit upheld the modified *Hawaii* injunction, ruling that the district court did not err in including grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States within the definition of bona fide relationships for individuals. *Hawaii v. Trump*, 871 F.3d 646 (9th Cir. 2017).

### President Trump Continues to Express an Intent to Target Muslims

199.   While the enforcement of the Second Executive Order was being litigated, President Trump continued to make official statements reflecting his intention to fulfill his campaign promise to block Muslims from entering the United States.

200.   On June 5, 2017, President Trump tweeted: "The lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!"

201.   Also on June 5, President Trump tweeted his desire for the Government to "seek [a] much tougher version" of the Travel Ban through court victories. The next day, White House Press Secretary Sean Spicer stated that President Trump's tweets were "official statements."

202.   On August 17, 2017, President Trump tweeted: "Study what General Pershing of the United States did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!" On information and belief, President Trump was referring to a story, now known to be a fabrication, that General Pershing killed Muslim insurgents in the Philippines with bullets dipped in pigs' blood.

203.   The next day, President Trump declared that "Radical Islamic Terrorism must be stopped by whatever means necessary! The courts must give us back our protective rights. Have to be tough!"

204.   President Trump tweeted on September 15, 2017, that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!"

205.   These statements are consistent with the statements President Trump made with respect to the prior iterations of the travel ban: decrying "watered down" versions of the Muslim ban he promised the electorate while simultaneously insisting that the bans nonetheless effectuate his campaign promise beneath a "politically correct" veneer.

## President Trump Issues a Third Executive Order Seeking the Same End Result

206.   On September 24, 2017, the day that the nationality ban of EO-2 expired, President Trump attempted a third time to follow Mr. Giuliani's instructions on implementing a Muslim ban "legally," issuing a proclamation

entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States By Terrorists and Other Public Safety Threats" ("EO-3" or "Third Executive Order").

207.   EO-3 achieves largely the same policy outcomes as both EO-2 and EO-1.

208.   Like its predecessors, EO-3's bans are based on nationality. EO-3 applies to five of the seven predominantly Muslim countries identified in EO-1— Iran, Libya, Somalia, Syria, and Yemen—and bans most, if not all, of their nationals. Syrian nationals, for example, are categorically banned, regardless of whether they seek to enter as immigrants or nonimmigrants.

209.   EO-3, however, goes even further than the Prior Orders by restricting entry by nationals of majority-Muslim nations *indefinitely*. EO-3 even bans individuals with bona fide relationships with persons or entities in the United States.

210.   In addition to indefinitely banning immigration, EO-3 bans the issuance of certain non-immigrant visas, such as tourist and business visas, to nationals from the Designated Countries.

211.   Reflecting EO-3's even harsher tack, President Trump told reporters on the day it was issued, "The travel ban: the tougher, the better."

212.   EO-3 indefinitely bans entry by nationals of the majority-Muslim countries, with limited exceptions,[6] as follows:

a)  Iran: All nationals of Iran are banned from entry into the United States as immigrants and as non-immigrants. Iranian nationals with valid student (F and M) and exchange visitor (J) visas are excepted from the ban but are subject to "enhanced screening and vetting requirements."

b)  Libya: All nationals of Libya are banned from entry into the United States as immigrants and on business (B-1), tourist (B-2), and business/tourist (B1/B-2) visas.

c)  Somalia: All nationals of Somalia are banned from entry into the United States as immigrants. Visa adjudications regarding the entry by Somalia nationals as non-immigrants are subject to "additional scrutiny."

---

[6] The immigration and visa bans do not bar entry into the United States by lawful permanent residents of the United States; foreign nationals admitted to the United States on or after the applicable effective date of EO-3; "any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document—valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter"; dual nationals; foreign nationals traveling on a diplomatic or diplomatic type visa, NATO visa, C-2 visa, or G-1, G-2, G-3 or G-4 visa; foreign nationals who have been granted asylum; refugees who have already been admitted; or individuals who have been granted relief under the Convention Against Torture. EO-3 § 3(b). EO-3 originally banned all nationals of Chad from entry into the United States as immigrants and on business (B-1), tourist (B-2), and business/tourist (B1/B-2) visas. On April 10, 2018, the White House lifted the bans with respect to nationals of Chad.

d) Syria: All nationals of Syria are banned from entry into the United States as immigrants and on any type of non-immigrant visa.

e) Yemen: All nationals of Yemen are banned from entry into the United States as immigrants and on any type of non-immigrant visa.

EO-3 §§ 2(b), (c), (e), (g), (h).

213.   The restrictions that apply to individuals who were subject to the operative provisions of the Second Executive Order—nationals from Iran, Libya, Somalia, Yemen, and Syria who do not have a credible claim of a bona fide relationship with a person or entity in the United States—went into effect on September 24, 2017. All other restrictions were scheduled to go into effect on October 18, 2017. *Id.* § 7.

214.   Like the Prior Orders, EO-3 ostensibly permits waivers to be granted where applicants establish that their exclusion would impose "undue hardship," that they do not pose a national security threat, and where their admission would be in the "national interest."  EO-3 § 3(c)(i). The waiver provision also provides ten examples of situations in which a waiver might be appropriate, such as when "the foreign national is an infant, a young child or adoptee" or "an individual needing urgent medical care." EO-3 § 3(c)(iv)(A)-(J). Also like the Prior Orders, waivers under EO-3 are purely discretionary and are issued, if at all, only on a case-by-case basis. EO-3 § 3(c).

215.   EO-3 directs the Secretaries of State and Homeland Security "to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants." EO-3 § 3(c).

216.   The Prior Orders directed the Secretary of Homeland Security to conduct a worldwide "review" of countries to identify the information needed to determine whether individuals from each country are terrorists. EO-1 § 3(a); EO-2 § 2(a). The Prior Orders further provided that, once the review was complete and the temporary ban expired, the Secretary would submit "a list of countries" to subject to an indefinite ban. EO-1 § 3(b); EO-2 § 2(b).

217.   Although EO-3 states that the DHS review had been completed and a report submitted to the President on July 9, 2017, although EO-3 indicates that information contained in the report has been shared with foreign governments pursuant to a "50-day engagement period," and although EO-3 purports to base the substance of the ban on national security concerns identified in the review, §§ 1(c)1(f), the DHS review has not been made public. According to EO-3, the Designated Countries "have 'inadequate' identity-management protocols, information-sharing practices, and risk factors" with respect to the "baseline." *Id.* § 1(e).

218.    EO-3 further states that DHS submitted a report on September 15, 2017, recommending entry restrictions. *Id.* § 1(h). This report has also not been made public.

219.    EO-3 continues to target nationals from five of the six majority-Muslim countries targeted in EO-2, even though the DHS reports leaked in early 2017 indicated that targeting these countries is not rationally calculated to preventing terrorism in the United States.

220.    The method by which the Government identified the countries whose nationals it would subject to the harsh travel restrictions in EO-3 is not rational, and cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

221.    According to EO-3, the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence "developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat." EO-3 § 1(c).

222.    The criteria used to establish the "baseline"—the integrity of the country's passport documentation, the country's information sharing practices, and

the country's "national security risk indicators"—are largely lifted from the requirements for participation in the Visa Waiver Program. *Compare* EO-3 § 1(c)(i)-(iii), *with* 8 U.S.C. § 1187(a)(12)(A)(i), (c)(2). The third criterion even expressly considers whether the country is a participant in the Visa Waiver Program. EO-3 § 1(c)(iii).

223.   Under the Visa Waiver Program, nationals of approximately 38 countries can visit the United States for less than 90 days without obtaining a visa. 8 U.S.C. § 1187(a)(1)-(11). The Visa Waiver Program criteria emphasize a country's passport documentation and information sharing practices because the program permits a foreign national to enter the United States without an in-person interview or a detailed written application. *Id.* Because the Visa Waiver Program makes entry into the United States quite simple for nationals of Visa Waiver countries, the passport documentation and information sharing practices of those countries are naturally important criteria in determining whether a country can participate in the Visa Waiver Program.

224.   By contrast, EO-3 imposes outright bans on entry, regardless of how much screening is done. EO-3's "baseline test" is not intended to identify countries whose nationals require an in-person interview or detailed written application for admission into the United States. Instead, EO-3's "baseline test" is used to identify countries whose nationals may not enter even with an in-person interview, a

detailed written application, or further screening. The criteria used to determine participation in the Visa Waiver Program are thus not rationally related to determining whether to impose outright bans on immigrant and/or nonimmigrant travel with respect to nationals of certain foreign countries. This is especially true considering that EO-3's outright ban applies even to the nationals of Designated Countries who reside in countries that participate in the Visa Waiver Program, and to infants and children.

225.    The results-oriented "baseline" review also irrationally fails to take into account the sufficiency of existing screening practices with respect to the countries evaluated. Given DHS's conclusion in early 2017 that targeting the countries designated by EO-1 (most of which overlap with the Designated Countries) was not rationally related to combating terrorism, this failure was likely intentional. Had the Government incorporated into the "baseline" review the historical success rate of screening potential terrorists, its review would not have yielded the desired result: targeting Muslims.

226.    In addition to the evidence that the "baseline" criteria described in EO-3 are not rationally related to EO-3's purported objective, there are numerous logical inconsistencies between EO-3's description of the results of the DHS review and the immigration bans EO-3 imposes. For example:

a) EO-3 retains Somalia on the list of banned countries even though it expressly admits that Somalia meets the Secretary of Homeland Security's "baseline" of U.S. ability to evaluate terrorist threats. EO-3 § 1(i).

b) EO-3 states that DHS identified 16 countries with "inadequate" "identity-management protocols, information-sharing practices, and risk factors." EO-3 § 1(e). EO-3 also states that 31 countries are "'at risk' of becoming 'inadequate.'" *Id.* Yet EO-3 does not explain why only eight countries—six of which are majority Muslim—were targeted. Notably, EO-3 does not place entry restrictions on nationals from non-majority-Muslim countries with "'widely documented' problems with information sharing, such as Belgium." *IRAP v. Trump*, 265 F. Supp. 3d at 593.

c) The General Accounting Office reported in May 2016 that more than a third of the 38 countries that participate in the Visa Waiver Program did not share the identity of terrorists or criminal histories, despite having agreed to do so as a condition of participating in the program. Yet EO-3 subjects none of the countries in the Visa Waiver Program—which are overwhelmingly European or Western—to any travel restrictions.

d) EO-3 states that the President, upon reviewing the DHS report, determined the "restrictions and limitations" imposed by EO-3 are "needed to elicit improved identity-management and information-sharing protocols and

practices from foreign governments." *Id.* § 1(h)(i). Yet EO-3 also states that immigrant visas for nationals from the majority-Muslim nations must be banned because individuals admitted on immigrant visas can become lawful permanent residents, who have "more enduring rights" than non-immigrant visitors and are "more difficult to remove," *id.* § 1(h)(ii), thus highlighting that the true concern is not information sharing but rather preventing individuals from the majority-Muslim nations from becoming part of the American community.

e) EO-3 imposes an absolute ban on immigrant visas from the majority-Muslim immigrant countries, although allowing entry for some non-immigrants from some of those countries, even as EO-3 acknowledges that "immigrants generally receive more extensive vetting than nonimmigrants." *Id.*

f) Neither EO-3 nor the Prior Orders imposed travel restrictions on nationals of Egypt, Lebanon, Saudi Arabia, or the United Arab Emirates—the countries of which the 9/11 attackers were citizens.

227.   In an effort to disguise the third iteration of the travel ban as religion-neutral, EO-3 also restricts entry into the United States by nationals of two additional non-Muslim countries, North Korea and Venezuela. *Id.* §§ 2(d), (f). Although the DHS review found that Venezuela has inadequate identity management protocols and information sharing practices, immigration from

Venezuela is not restricted. EO-3 only restricts entry into the United States of certain government officials and their immediate family members on business (B-1), tourist (B-2), and business/tourist (B1/B-2) visas. Nationals of North Korea—from which a negligible number of nationals enter the U.S.—are banned from entry into the United States as immigrants and as non-immigrants.

228.   The addition of North Korea and Venezuela to the ban is mere costuming. Only a handful of Venezuelan government officials and their immediate families are targeted. EO-3 has no practical effect on the ability of Venezuelan nationals to enter the United States. According to State Department statistics, the ban on entry by North Korean nationals will affect fewer than 100 people. *See Int'l Refugee Assistance Project* ("*IRAP*") *v. Trump*, No. TDC-17-0361, slip op. at 74 (D. Md. Oct. 17, 2017). If in effect in 2016, EO-3 would have barred 12,998 Yemenis, 7,727 Iranians, 2,633 Syrians, 1,797 Somalians, and 383 Libyans from obtaining immigrant visas. Meanwhile, only 9 North Koreans, and no Venezuelans, would have been prevented from obtaining immigrant visas in 2016. EO-3 thus bans the entry into the United States by Muslims on the same drastic scale as its predecessors, with virtually no effect on the entry of non-Muslims into the United States.

229.   These facts and provisions betray that EO-3's entry restrictions are not based on any rational or legitimate national security concerns, but rather are

motivated by a goal of preventing immigration from majority-Muslim countries. EO-3 applies to nationals of the targeted countries regardless of where they currently reside and even if they reside in countries with identity-management protocols, information-sharing practices, and risk factors determined by the DHS review to be adequate.

230.   Like the Second Executive Order, EO-3 purports to be religion-neutral and motivated by national security concerns. But the national security justification, as the leaked DHS reports confirm, does not provide any reasonable support for EO-3's drastic immigration and entry restrictions on nationals from majority-Muslim Designated Countries. Nor does the addition of North Korea and Venezuela have any practical effect. The restrictions imposed by EO-3—like those imposed by EO-1 and EO-2 before it—stigmatize and harm Muslims to a degree disproportionate to non-Muslims and to any national security ends.

## Continued Anti-Muslim Statements and Dysfunctional Waiver Process Following EO-3

231.   Statements by President Trump demonstrate that EO-3, like the Prior Orders, was motivated by his desire to target Muslims, and not by legitimate, rationally based national security concerns.

232.    On November 25, 2017, President Trump tweeted, "We have to get TOUGHER AND SMARTER than ever before, and we will. Need the WALL, need the BAN!"

233.    On November 29, 2017, President Trump re-tweeted three videos, of unverified origin, supposedly portraying Muslim individuals committing acts of violence. The videos had originally been tweeted by the leader of a far-right wing, ultranationalist British party which has repeatedly promoted anti-Muslim sentiments. The leader has previously been charged in the United Kingdom with "religious aggravated harassment." James R. Clapper, former Director of National Intelligence, told reporters that the President's re-tweets could "incit[e] or encourag[e] anti-Muslim violence."

234.    Also on November 29, 2017, a White House deputy press secretary defended President Trump's re-tweets of the violent videos and confirmed that the Prior Orders and EO-3 were motivated by anti-Muslim animus. In response to a reporter's question, "Does President Trump think Muslims are a threat to the U.S.?," the deputy press secretary responded, "The president has addressed these issues with the travel order that he issued earlier this year, and the companion proclamation."

235.    On April 30, 2018, a reporter suggested that President Trump apologize for anti-Muslim statements he made during his campaign. The President

asserted in response that "if I apologize, it wouldn't make 10 cents' worth of difference to them. There's nothing to apologize for."

236.   In addition, the DHS official appointed by President Trump to implement EO-3 and other presidential directives has a lengthy record of expressing anti-Muslim sentiments. For instance, this official, Frank Wuco, stated that "an Islamist could care less . . . that you believe that 'just getting along in a non-judgmental safe-place' has special healing powers. THEY STILL WANT TO KILL YOU."  About the Orlando, Florida nightclub shooter, he remarked that there was "nothing radical" about him. "He is a Muslim who is following the strictures of Islam and its guidance and prescriptions for violence and warfare against unbelievers."

237.   Although EO-3 directed the State Department and DHS to issue guidance, no guidance was issued until the State Department published brief FAQs on its website in response to the June 26, 2018 Supreme Court decision in *Trump v. Hawaii* (discussed below). No meaningful guidance on how to implement EO-3's waiver provisions has been issued.

### EO-3's Waiver Provisions Are a Sham

238.   Implementation of EO-3's waiver provisions has been, like that of the First Executive Order, chaotic and confused. Some applicants have reportedly not even been informed about the waiver process, and numerous others have received

pro forma denials of both visas and waivers by consular offices in Armenia, Turkey, Djibouti, Dubai, Abu Dhabi, and elsewhere. The capricious implementation of EO-3's waiver provisions evinces a familiar lack of foresight and strongly suggests that protecting the national security is not the driving force behind EO-3.

239.   Publicly available data regarding the rate at which waivers have been granted provide further evidence that the Government is enforcing a de facto Muslim ban, notwithstanding the exceptions and waivers provided for by EO-3.

240.   First, although EO-3 purports to provide a process for nationals of the Designated Countries to obtain waivers from the travel ban, only a tiny fraction of applicants eligible for waivers have been granted them. In a February 22, 2018 letter to Senator Van Hollen, the State Department stated that as of February 15, 2018—nearly two and one-half months since EO-3 went into full effect—only 2 waivers had been approved out of 8,406 applicants. The State Department stated that as of May 31, 2018, 768 applicants had been "cleared for waivers" out of 33,176 total applicants. Not all applicants who are "cleared" for waivers ultimately receive them.

241.   As of July 15, 2018, the Government has "cleared" only 3.6% of waiver applications for further review by State Department officials. Being "cleared" does not mean that the applicants will actually receive waivers. The

vanishingly small number of individuals who have received waivers demonstrates the illusory nature of this relief.

242.    Second, even though EO-3 generally does not prevent the issuance of student visas, except to nationals of Syria, the Government has sharply reduced the issuance of student visas to nationals of the Designated Countries. For example, from January through July 2018, only 100 student visas were granted to Yemeni applicants, even though 852 student visas were granted to Yemeni applicants in 2016.

243.    Third, even though EO-3 does not apply to refugee admissions, State Department data shows that the admission of Muslim refugees has almost entirely stopped since EO-3 was issued. For example, 10,786 Muslim refugees arrived from Somalia in 2016; by contrast, between January and July 2018, only 122 Muslim refugees from Somalia have entered the United States. Similarly, whereas over 15,000 Muslim refugees arrived from Syria in 2016, only 14 Muslim refugees have arrived from Syria between January and July 2018. Between January and July 2018, the United States has admitted zero Muslim refugees from Yemen, and one each from Iran and Libya.

244.    These data confirm what President Trump and his advisors have repeatedly asserted: that the modifications to EO-2 and EO-3 were only ever

intended to be window dressing, and not to substantively alter the Muslim ban that Candidate Trump promised.

245.   Whether EO-3 is reasonably related to a justification independent of unconstitutional grounds depends in part on whether the waiver process is sham, an issue which cannot be fully assessed without further information that is in the possession of Defendants.

## President Trump Issues a Fourth Executive Order

246.   At a September 2017 meeting with senior officials discussing refugee admissions, a representative from the National Counterterrorism Center was prepared to present a report that analyzed possible risks by refugees entering the United States. Before the representative could do so, Associate Attorney General Rachel Brand stated that Attorney General Sessions did not "agree with the conclusions of the report," and would not be guided by its findings. Civil servants at the interagency meeting were shocked by Brand's statement, which not only betrayed the Government's intention to supplant facts with an anti-Muslim agenda, but also rejected the view of the Federal Bureau of Investigation, which had contributed to the assessment.

247.   On October 24, 2017, President Trump signed EO-4, which continued the discriminatory practices against Muslim refugees that were contained in the Prior Orders. Although Plaintiffs do not challenge EO-4, its continuation of

President Trump's anti-Muslim refugee ban provides important context. EO-4 suspends entry of refugees from eleven designated countries and indefinitely suspends the "follow-to-join" program, which allows refugees admitted to the U.S. to apply for admission of their spouses and children. The eleven countries are: Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria and Yemen.

248.   Nine of the 11 countries targeted in EO-4 are majority-Muslim countries. Five of those majority-Muslim countries were identified in EO-3 as well as the earlier iterations of the Travel Ban—Iran, Libya, Somalia, Syria, Yemen. EO-4 also includes four additional majority-Muslim countries—Egypt, Mali, Iraq, and Sudan.

249.   Citizens of the eleven countries comprised 44 percent of the nearly 54,000 refugees admitted into the United States in the 2017 fiscal year, including Iraq, Somalia, Syria, and Iran, who account for the vast majority of refugees to the United States in recent years. In recent years, Iran and the eight other predominantly Muslim countries have been responsible for approximately 45% of the total refugees admitted to the United States, with the largest contingents coming from four countries: Iran, Iraq, Somalia, and Syria (which, together, made up 41%, 38%, and 45% of total refugees in 2016, 2015, and 2014, respectively).

250.   On the same day that the Executive Order was released, then-Secretary of State Rex Tillerson, then-Acting Secretary of Homeland Security Elaine Duke, and Director of National Intelligence Daniel Coats released a Memorandum to the President dated October 23, 2017, describing how that October 24 Executive Order would be implemented.

251.   The October 23 Memorandum acknowledges that refugee applicants from the 11 countries specified in EO-4 were already required to go through a heightened security-screening process called the Security Advisory Opinion (SAO) process. EO-4 found that "the refugee screening and vetting process generally meets the uniform baseline for immigration screening and vetting." EO-4 § 2(b).

252.   However, the October 23 Memorandum specifies that the Departments of State and Homeland Security will prioritize refugee applications from other countries (i.e., other than the 11 countries) and will "reallocate . . . resources" that would otherwise be "dedicated to processing nationals" of the 11 countries "to process applicants" from other countries.

253.   In other words, through the combination of EO-3 and EO-4 the President enacted the Muslim ban he intended to enact with EO-1 and EO-2. EO-3 provides for an even more severe indefinite ban on immigration from predominantly Muslim countries, while EO-4 enacts the Muslim refugee ban.

254.   The U.S. District Court for the Western District of Washington issued a nationwide preliminary injunction against enforcement of EO-4 with respect to foreign nationals who have a bona fide relationship with a person or entity in the United States. *Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017). The court concluded that the plaintiffs were likely to succeed in showing that EO-4 violates the Administrative Procedure Act and the INA. *Id.* at 1077, 1081-82.

## Immigrants Were Very Carefully Screened Long Before the Executive Orders Were Issued

255.   Individuals applying for family or employer-based visas are subject to an extensive, demanding vetting process that was already in place long before the Executive Orders were issued. A sponsor, such as an employer or family member, must first submit a petition on behalf of the visa applicant. In the case of family-based visas, the qualified sponsoring individuals must submit their petitions along with documentation establishing their U.S. citizenship or lawful permanent resident status, as well as documentation establishing their relationship with the visa applicant. Petitioners must also pay filing fees.

256.   Once petitions are approved, the applicants' information is then sent to the National Visa Center (NVC). The NVC collects additional fees, forms, and documents from visa applicants and their sponsors. Applicants must submit relevant birth certificates, adoption records, court and prison records, marriage certificates, marriage termination documents, military records, photocopies of

75

passports, and police certificates (for applicants 16 years old or older). Each

sponsor must also submit an Affidavit of Support and demonstrate that he or she

has the ability to support the applicant financially in the United States.

257.   Once the NVC has received all the relevant documentation, the visa

applicant must submit Form DS-260 on the Consular Electronic Application

Center. This form requires that the applicant fill in fields related to previous

addresses; prior work, education, and training; family information; medical and

health information; and criminal history.

258.   The information submitted in these various forms is screened against

various federal databases to verify that the applicant is not on any U.S. terrorism

watch lists and has not committed any immigration or criminal violations.

259.   Visa applicants are then scheduled for an interview with a consular

officer. Visa applications are not considered complete until the applicant has

interviewed with a consular officer.

260.   This robust vetting system works. No person from a Designated

Country has killed anyone in the United States in a terrorist attack in over 40 years.

## The Executive Orders Do Not Advance National Security

261.   There is no sound basis for concluding that Muslims generally, or

Muslims from particular countries, are more likely to commit violent acts of terror

than persons of other faiths or other countries.

262.    Many alternatives exist that do not involve targeting individuals based on their faith or nationality as a proxy for faith, are less restrictive than EO-3, and are more closely tailored to legitimate national security concerns.

263.    Though cast as measures to improve national security, the Executive Orders have been criticized by numerous national security experts as undermining their stated purpose.

264.    On January 30, 2017, over 100 former U.S. intelligence officials wrote a letter opposing the First Executive Order. The authors of this letter wrote,

> Simply put, this Order will harm our national security. Partner countries in Europe and the Middle East, on whom we rely for vital counterterrorism cooperation, are already objecting to this action and distancing themselves from the United States, shredding years of effort to bring them closer to us. Moreover, because the Order discriminates against Muslim travelers and immigrants, it has already sent exactly the wrong message to the Muslim community here at home and all over the world: that the U.S. government is at war with them based on their religion. We may even endanger Christian communities, by handing ISIL a recruiting tool and propaganda victory that spreads their horrific message that the United States is engaged in a religious war.

265.    Many of these same officials also filed a joint statement in the Ninth Circuit in *Washington v. Trump* further explaining the dangers posed by the First Executive Order. The signatories, which included former Secretaries of State, former CIA directors, former CIA deputy and acting directors, a former National Security Advisor, and a former DHS Secretary, concluded that the January 27 Order would harm the interests of the United States in several respects, including

endangering American soldiers fighting alongside allies from the affected

countries; disrupting key counterterrorism, foreign policy, and national security

partnerships; endangering intelligence sources in the field; feeding ISIL

recruitment efforts; disrupting ongoing law enforcement efforts; hindering family

reunification and humanitarian efforts; and causing severe economic damage to

American citizens and residents.

266.    In a joint statement by Senators Lindsey Graham, who sits on the

Senate Armed Services Committee, and John McCain, who sat on the Senate

Armed Services Committee and Homeland Security and Governmental Affairs

Committee, the two Republican Senators expressed their concerns about the poor

vetting and lack of consultation between the White House and numerous federal

departments tasked with protecting U.S. national security during the drafting of the

First Executive Order. In their joint statement, the two senators wrote, "Our most

important allies in the fight against ISIL are the vast majority of Muslims who

reject its apocalyptic ideology of hatred. This executive order sends a signal,

intended or not, that America does not want Muslims coming into our

country. That is why we fear this executive order may do more to help terrorist

recruitment than improve our security."

267.    U.S. counterterrorism officials expressed similar reservations about

EO-1. Paul Pillar, former Deputy Director of the CIA Counterterrorism Center,

said, "The whole order is and will be read as another anti-Islam, anti-Muslim action by this president and his administration. It is not targeted at where the threat is, and the anti-Islam message that it sends is more likely to make America less safe."

268.   Similarly, former CIA director Michael V. Hayden discussed the efforts by U.S. diplomats, military commanders, and agency station chiefs to limit the damaging fallout from EO-1 before concluding that the Order "inarguably has made us less safe. It has taken draconian measures against a threat that was hyped. The byproduct is it feeds the Islamic militant narrative and makes it harder for our allies to side with us."

269.   The Second Executive Order did not quell the concerns of intelligence officials, military leaders and diplomats about the damage that the Executive Orders have done to national security.

270.   On March 10, 2017, a bipartisan group of 134 cabinet Secretaries, senior government officials, diplomats, military service members and intelligence community professionals sent a letter to President Trump expressing their concern over the Second Executive Order. The letter states:

> We are deeply concerned that the March 6, 2017 executive order halting refugee resettlement and suspending visa issuance and travel from six Muslim-majority countries will, like the prior version, weaken U.S. national security and undermine U.S. global leadership…. The revised executive order will jeopardize our relationships with allies and partners on whom we rely for vital

counterterrorism cooperation and information-sharing. To Muslims—including those victimized by or fighting against ISIS—it will send a message that reinforces the propaganda of ISIS and other extremist groups, that falsely claim the United States is at war with Islam. Welcoming Muslim refugees and travelers, by contrast, exposes the lies of terrorists and counters their warped vision….

Following the 9/11 attacks, the United States developed a rigorous system of security vetting for travelers to our homeland, leveraging the full capabilities of the intelligence and law enforcement communities. Since then, the U.S. has added enhanced vetting procedures for travelers and has revised them continuously. Our government applies this process to travelers not once, but multiple times. Refugees are vetted more intensively than any other category of traveler. They are screened by national intelligence agencies and INTERPOL, their fingerprints and other biometric data are checked against terrorist and criminal databases, and they are interviewed several times. These processes undergo review on an ongoing basis to ensure that the most updated and rigorous measures are applied, and any additional enhancements can be added without halting refugee resettlement or banning people from certain countries.

271.   Although the Trump Administration had many months of notice regarding national security officials' serious concerns about the First and Second Executive Orders, the Trump Administration failed to address the problems these experts had identified when the Administration issued the Third Executive Order on September 24, 2017.

272.   The primary critique of the national security experts is that the Prior Orders banned individuals from entry based merely on the fact that they are nationals of certain majority-Muslim countries, rather than on a robust and tested metric: individualized factors identified in the screening process. Like the Prior

Orders, EO-3 not only fails to identify individuals who present a risk, it undermines national security by inflaming resentment against the United States.

273. On October 15, 2017, another bipartisan group of former intelligence officials, military leaders, and diplomats issued a Joint Declaration asserting that EO-3 suffered from many of the same defects as EO-3.[7] The Joint Declaration states in part:

> In our professional judgment, Travel Ban 3.0 would undermine the national security of the United States, rather than making us safer. If given effect, Travel Ban 3.0 would do long-term damage to our national security and foreign policy interests, and disrupt counterterrorism and national security partnerships. It would aid the propaganda effort of the Islamic State ("IS") and serve its recruitment message by feeding into the narrative that the United States is at war with Islam. It would hinder relationships with the very communities law enforcement professionals need to engage to address the threat. And apart from all of these concerns, the Ban offends our nation's laws and values.

274. On November 20, 2017, the Inspector General wrote a letter to Senators Durbin, Duckworth, and McCaskill, informing them, among other things, that there was no "evidence that CBP detected any traveler linked to terrorism based on the additional procedures required by the EO." The Inspector General referenced an 87-page report "regarding the travel into the United States of

---

[7] A version of this "Joint Declaration of Former National Security Officials" was filed in *Hawaii v. Trump*, No. CV 17-00050 DKW-KSC, ECF 383-1 (D. Haw. Oct. 15, 2017).

individuals from seven countries" that the Office of Inspector General submitted to DHS on October 15, 2017. This report has not been made public.

275.   The history of EO-3 and the Prior Orders, Candidate and President Trump's statements calling for and supporting a Muslim ban, the lack of justification for the restrictions imposed by EO-3, and the apparent operation of EO-3 as a Muslim ban despite its sanitized provisions, demonstrate that there is no rational basis for concluding that EO-3 resulted from a justification independent of anti-Muslim animus. Additional relevant facts are currently in the possession of the Government.

276.   In January 2018, DHS and DOJ issued a report that stated that approximately 73 percent of individuals convicted of international terrorism-related charges in U.S. federal courts between September 11, 2001, and December 31, 2016 were foreign-born. The report has been heavily criticized by several former Government officials, including a former Assistant Attorney General for DOJ's National Security Division. The Government's report excludes acts of domestic terrorism committed by groups such as white supremacists, which are more likely to be supported by those born in the United States. It also includes individuals who committed crimes overseas and were brought to the United States for trial.  The report's flawed methodology results in vastly overstating the risk posed by immigrants.

### Litigation Regarding EO-3 and the
### Supreme Court's Decision in *Hawaii v. Trump*

277.   On October 17, 2017, the U.S. District Court for the District of

Hawaii issued a nationwide temporary restraining order against the enforcement of

EO-3's entry restrictions on nationals from Chad, Iran, Libya, Somalia, Syria, and

Yemen. *Hawaii v. Trump*, 265 F. Supp. 3d 1130 (D. Haw. 2017). On October 20,

2017, the court converted the TRO into a preliminary injunction.

278.   Defendants applied to the Supreme Court for a stay of the order of the

U.S. District Court for the District of Hawaii granting the preliminary injunction

"pending disposition of the Government's appeal in the United States Court of

Appeals for the Ninth Circuit and disposition of the Government's petition for a

writ of certiorari, if such writ is sought." *Trump v. Hawaii*, No. 17-965, Docket

entry (Dec. 4, 2017). The Supreme Court granted the application for the stay on

December 4, 2017. *Id.*

279.   On December 22, 2017, the U.S. Court of Appeals for the Ninth

Circuit issued its ruling on the government's appeal from the preliminary

injunction. The Ninth Circuit affirmed in part and vacated in part, upholding the

injunction and concluding that plaintiffs showed a likelihood of success on their

statutory claims, but narrowing the scope of the injunction to give relief only to

individuals with a credible bona fide relationship with the United States, pursuant

to the Supreme Court's decision in *IRAP*, 137 S.Ct. at 2088. *Hawaii v. Trump*, 878 F. 3d 662 (9th Cir. 2017).

280.   Also on October 17, 2017, the U.S. District Court for the District of Maryland issued a preliminary injunction enjoining enforcement of EO-3's entry restrictions on nationals from Chad, Iran, Libya, Somalia, Syria, and Yemen who have a bona fide relationship with an individual or entity in the United States. *IRAP v. Trump*, 265 F. Supp. 3d 570 (D. Md. 2017). The court concluded that the plaintiffs demonstrated a likelihood of success on the merits of their claims under the INA. The court also concluded that plaintiffs demonstrated a likelihood of success on their Establishment Clause claim, noting that "there are substantial reasons to question whether the asserted national security purpose" for EO-3 was the primary purpose of the ban and observing that the DHS review "was at least partially pre-ordained." *Id.* at 76. On February 15, 2018, the Fourth Circuit affirmed the preliminary injunction issued by the U.S. District Court in Maryland but—like the Ninth Circuit—stayed its decision in light of the Supreme Court's stay. *IRAP v. Trump*, 883 F.3d 233, 274 (4th Cir. 2018).

281.   Defendants in the *IRAP* and *Hawaii* cases filed petitions for writs of certiorari in the Supreme Court of the United States. The Supreme Court granted the Government's petition for a writ of certiorari in *Hawaii v. Trump* on January 18, 2018. 138 S. Ct. 923 (mem.).

282.    On June 26, 2018, the Supreme Court reversed the judgment of the

Ninth Circuit and remanded the case for further proceedings. The Supreme Court

concluded that President Trump's issuance of EO-3 did not exceed the statutory

authority of the president under the INA. *Trump v. Hawaii*, No. 17-965, 585 U.S.

__, slip op. at 24 (June 26, 2018).

283.    In determining the likelihood of the plaintiffs' success on the merits of

their Establishment Clause claim, the Court "assume[d] that [it could] look behind

the face of" EO-3 and "consider . . . extrinsic evidence." *Id.* at 32. The Court

determined that the plaintiffs had not marshaled sufficient evidence to show they

were likely to succeed on a claim that EO-3 could "reasonably be understood to

result from a justification independent of unconstitutional grounds." *Id*. at 38.

284.    The Court noted that ongoing FOIA litigation revealed that the

September 2017 DHS report is 17 pages. *Id*. at 35. The Court conceded that this

information "offers little insight into the actual substance of the final report, much

less predecisional materials underlying it," *id.*, highlighting the relevance of the

multiple non-public reports and materials.

285.    In a concurring opinion, Justice Kennedy wrote that "[w]hether

judicial proceedings may properly continue in this case . . . is a matter to be

addressed in the first instance on remand." *Id.*, slip op. at 1 (Kennedy, J.,

concurring). Justice Breyer also observed in a dissenting opinion that "the Court's

decision . . . leaves the District Court free to explore these issues [whether EO-3 violates the Establishment Clause] on remand." *Id.*, slip op. at 8 (Breyer, J., dissenting).

286.   On June 28, 2018, the Supreme Court granted the petition for writ of certiorari in *Trump v. IRAP*, vacated the judgment, and remanded the case to the United States Court of Appeals for the Fourth Circuit for further consideration in light of the Supreme Court decision in *Trump v. Hawaii*.

## The Grave Harm to the Plaintiffs, Their Members and Their Clients

287.   Implementation and enforcement of the Executive Orders caused the organizational Plaintiffs, their members and their clients, as well as the Individual Plaintiffs, substantial, concrete, and particularized injury, and will continue to harm them if not permanently enjoined.

288.   The Individual Plaintiffs and many of the members and clients of the organizational Plaintiffs are Muslim. The Executive Orders convey an official message of disapproval and hostility towards Muslims, making clear that the government deems them outsiders, not full members of the political community. This marginalizes them, subjects them to suspicion and scrutiny and political isolation on the basis of religion and national origin, and inflicts other stigmatic and dignitary injuries.

289.   EO-3 and the Prior Orders deeply affected the Individual Plaintiffs
and the members and clients of the organizational Plaintiffs by conveying to them
that the United States discriminates against individuals who share their ethnicity
and who hold the same religious beliefs, including members of their own families.

290.   The Plaintiffs believe that, as a result of the Executive Orders, there
are now a favored and a disfavored religion in the United States—in other words,
that a religion has been established.

### Arab American Civil Rights League (ACRL)

291.   The ACRL works to build coalitions, promote understanding and
cooperation and combat negative stereotypes. Led by prominent civil rights
attorneys and advocates, the ACRL offers the community it serves a solid
commitment to ensuring that their rights are protected and preserved.

292.   ACRL works with Arab Americans from around the state of
Michigan, which is home to the second largest Arab American community in the
United States. ACRL's members have been and continue to be affected by both
EO-3 and the Prior Orders.

293.   Many of ACRL's members are refugees and/or family members of
people seeking to enter the United States as refugees. Many of ACRL's members
are from the majority-Muslim Designated Countries and/or are family members of

people from the Designated Countries who are seeking to immigrate to, travel to, study in, work in, or remain in the United States.

294.    Due to EO-3, members of ACRL live in forced separation from family members who are unable to enter the United States.

295.    ACRL members were stranded abroad following issuance of the First Executive Order, and ACRL has been working continuously with these members and other impacted individuals to ensure their return to the United States. Other ACRL members face real and immediate threats of future harm, including the inability to reunite with family members from the majority-Muslim Designated Countries and the inability to travel outside the United States with assurance that they will be able to return to the United States.

296.    EO-3 blocks ACRL's members, including U.S. citizens and lawful permanent residents, from receiving visits from, and/or reunifying with, their family members who live in the majority-Muslim Designated Countries.

297.    ACRL's members and clients who are Muslim or who are from the Designated Countries have been marginalized as a result of the anti-Muslim message conveyed by the Executive Orders and subjected to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin.

298.    ACRL has also been directly affected by EO-3 and the Prior Orders because it has had to divert resources from its ordinary activities to cope with the

fall-out from the Orders. ACRL has had to devote extensive leadership, attorney, and staff resources to responding to crises facing ACRL members as a result of the Orders, as well as to address widespread confusion and fear in the community that ACRL serves.

299.   ACRL's clients face numerous hurdles to bringing suit in their own name, including language and cultural barriers, lack of financial resources, rising Islamophobia which would subject them to intense scrutiny if they participate in litigation, and fear of retaliation by the Defendants given that Defendants have made anti-Islamic statements and have pledged aggressive action against immigrants and refugees.

## American Civil Liberties Union of Michigan

300.   The ACLU of Michigan is dedicated to protecting constitutional rights, including freedom of religion, freedom of speech, freedom of association and equal protection of the laws. The ACLU of Michigan and its members are harmed by EO-3 and the Prior Orders.

301.   As a result of EO-3 and the Prior Orders, the ACLU has had to divert its resources from other organizational activities to address the consequences of those orders. After the First Executive Order was issued, the ACLU responded to the crisis by coordinating emergency legal assistance for impacted individuals and responding to numerous individual requests for assistance. When the Second

Executive Order was enacted, the ACLU had to respond in a similar way. Now that the Third Executive Order has taken effect, the ACLU has again been forced to respond similarly. As a direct result of the Executive Orders, ACLU staff have spoken and will continue to speak at numerous community fora, have responded and will continue to respond to media requests for information, and have distributed and will continue to distribute Know Your Rights materials to impacted communities.

302.   The ACLU has members who are directly affected by EO-3 and its implementation, including individuals whose immediate family members are nationals of the majority-Muslim Designated Countries.

303.   EO-3 blocks the ACLU's members, including U.S. citizens, from receiving visits from, and/or reunifying with, their family members who live in the majority-Muslim Designated Countries.

304.   The ACLU has members of many faiths—Islam, Christianity, Judaism and others—whose ability to live out the teaching of their faiths, to interact with co-religionists and members of other faiths, and to provide assistance to immigrants and refugees as a matter of religious conviction is directly affected by the EO-3 and the Prior Orders.

305.   The ACLU has members who are U.S. citizens, permanent residents and other persons residing in the United States who wish to hear the speech of and

associate with people of all faiths who are now unable to travel to the United States because of EO-3 and the Prior Orders.

306.   The ACLU regularly organizes events to educate the public on pressing matters of public concern, including speakers who address civil liberties and civil rights issues of the moment. EO-3 has chilled, and continues to chill, the participation of speakers in such events.

307.   On May 3, 2018, the ACLU sponsored a local event along with partner organizations. The event included a spoken word performance, a panel discussion featuring local activists, and an interactive exhibit of stories of local Arab and Muslim community members impacted by immigration policies like EO-3 and the Prior Orders, Temporary Protected Status, and Deferred Action for Childhood Arrivals. Because community members feared having their immigration status compromised or their family member's immigration process delayed, they participated in the audiovisual and storytelling exhibit anonymously.

308.   On June 28, 2018, shortly after the Supreme Court's decision in *Trump v. Hawaii* was issued, the ACLU hosted an event for attorneys, community members, and individuals impacted by EO-3. Unfortunately, once again impacted family members did not speak publicly at the event for fear of Government reprisal.

309.   The ACLU plans to continue hosting educational events about the impact of EO-3 and hopes to include family members and individuals from the Designated Countries. The ACLU is sponsoring an event with the Arab American National Museum on September 14, 2018 related to anti-Muslim discrimination and has been asked repeatedly to provide individuals willing to speak out about their family's own experience with EO-3. To date, the ACLU has been unsuccessful, not because there is a dearth of individuals impacted, but because the arbitrary and volatile nature of the Government's implementation of the waiver provisions has silenced those seeking to successfully navigate them.

310.   Because EO-3 and Islamophobia are matters of pressing public concern, because EO-3 and the Prior Orders have created widespread fear within the Muslim and Arab-American communities in Michigan, and because the ACLU believes it is vitally important to counteract the rising tide of Islamophobia before it becomes even worse, the ACLU wishes to continue holding events related to EO-3 and Islamophobia.

311.   EO-3 and the Prior Orders have and continue to directly interfere with the ACLU's ability to hold such events.

312.   EO-3 will either prevent or create obstacles to the ACLU from organizing events with its desired speakers.

92

## The American Arab Chamber of Commerce

313.   The Chamber seeks to promote and empower its member businesses on a local, national and international level. The Chamber seeks to strengthen its members by offering networking opportunities, events, and seminars to promote member businesses. The Chamber also seeks to promote its member businesses internationally by fostering trade between Michigan-based companies and businesses located in the Middle East, including in the Designated Countries. To this end, the Chamber provides international referrals, sponsorship of delegations and trade missions; and resources for accessing Middle Eastern business markets.

314.   As the largest American-Arab business organization in the country, much of the Chamber's work focuses on building economic and cultural bridges, locally, nationally, and globally. Internationally, the Chamber fosters trade and establishes relationships between the U.S. and Middle Eastern countries, and many of the Chamber's member businesses have direct connections to Middle Eastern countries, including the Designated Countries. These efforts are largely led by the Chamber's International Business Development Committee, which pursues projects to connect Chamber members with international business opportunities. As part of its mission, the International Business Development Committee seeks to foster closer business relationships and trade through trade missions between the United States and the Middle East, including the Designated Countries.

315.   In order to establish and sustain their businesses, the Chamber's members must be able to interact with businesspeople from the Designated Countries and be able to invite those businesspeople to the United States. EO-3 and the Prior Orders directly interfere with the ability of the Chamber's members to conduct such business dealings.

316.   Many of the Chamber's members have employees who are immigrants from the Designated Countries or are refugees. EO-3 makes it more difficult and expensive for the Chamber's members to recruit, hire, and retain the best employees, and undermines the ability of the Chamber's members to attract talent, business, and investment to the United States.

317.   EO-3 also disrupts the Chamber's mission of encouraging constructive relations and enhancing mutual understanding between the United States and Arab nations. The Chamber has received numerous inquiries from its membership as to whether the enforcement of the Executive Orders will strain relations between the United States and Arab nations, thereby undermining the Chamber's mission of promoting greater understanding between the American people and Arab nations. Members are concerned that the Executive Orders create a negative stigma on Muslims and immigrants from the Designated Countries, directly conflicting with the missions and purposes of Chamber.

318.   The Chamber's membership includes businesses created or run by refugees and immigrants from the Designated Countries. Many of these business leaders are Muslim. Chamber members have been marginalized as a result of the anti-Muslim and anti-Arab message conveyed by the Executive Orders. These members have been subjected to baseless suspicion, scrutiny, and social isolation on the basis of religion and national origin.

319.   The Chamber assists its members with the certification and legalization process for exports. While this service is not limited to Arab nations, given the Chamber's members and its mission, this certification process primarily deals with exports intended for Arab nations, which includes the Designated Countries. The Chamber's export certification and legalization services have been adversely affected by the Executive Orders.

320.   Because of EO-3 and the Prior Orders, members of the Chamber cannot travel unencumbered and cannot complete legitimate business and social obligations unencumbered. These Executive Orders disrupt existing business ties with businesses in the Designated Countries, hinder the development of economic ties with the Designated Countries, and restrict the creation of any future business ventures between the Chamber's members and the Designated Countries.

## The Arab American and Chaldean Council ("ACC")

321.   ACC's mission is to serve the Middle Eastern community of Southeast Michigan by maximizing the community's skills, resources, and expertise, and by providing a variety of public health and behavioral health programs, many of which are directed towards immigrants, refugees, and their families. The ACC also seeks to promote understanding between the Middle Eastern community, its Middle Eastern clients and the larger community of Metropolitan Detroit. ACC has 40 outreach offices and annually serves more than 80,000 individuals in the metro Detroit.

322.   Many of ACC's clients are recent immigrants and refugees from the Middle East, and/or family members of people seeking to enter the United States as refugees or immigrants from the Middle East. Many of ACC's clients are from the Designated Countries and/or are family members of people from the Designated Countries. Many of ACC's clients are Muslim. Likewise, many of ACC's staff are refugees, immigrants from the Designated Countries, or family members of refugees and immigrants from the Designated Countries.

323.   EO-3 and the Prior Orders, by promoting the idea that people from majority-Muslim, Middle Eastern countries are dangerous and should be treated differently, directly interfere with ACC's ability to carry out its mission and harm ACC's clients.

324.   As a result of EO-3 and the Prior Orders, ACC has had to divert its resources from other organizational activities to address the consequences of those orders. For example, because ACC's clients and the community it serves have been severely impacted by the Executive Orders, ACC's senior leadership, as well as front-line staff, have had to set aside other responsibilities in order to educate the community about the Executive Orders, meet with other impacted organizations, respond to extensive press inquiries, and address pressing questions from impacted clients. Due to EO-3's effect as a travel ban, ACC was forced to remove one full-time employee from its refugee health assessment program, resulting in a drastic drop in billable services.

325.   EO-3 and the Prior Orders also directly interfere with many of the ACC's programs. A few representative programs that are harmed by EO-3 and the Prior Orders are described below. EO-3, like the Prior Orders, threatens these programs because many potential future clients for these programs, including immigrants and refugees, will no longer be able to enter the United States.

326.   ACC's Behavioral Health Division, which consists of five outpatient clinics, offers a comprehensive, community-based, outpatient program to address the emotional and psychological needs ACC's clients. Since many of the ACC's clients are individuals from the Designated Countries who have experienced persecution or even torture, the Behavioral Health Division offers services that

focus on family, PTSD and severe trauma treatment. EO-3, by barring entry to individuals from the Designated Countries, interferes with ACC's ability to carry out these programs and directly harms the clients of this program.

327.   ACC also assists refugee students and immigrant students, many of whom are from the Designated Countries, with ESL classes, career counseling, certification or professional license achievement, enrollment, and financial aid applications through three outreach offices at different Oakland Community College campus sites. EO-3 and the Prior Orders harm this program by barring admission into the United States for many future participants of the program. The Executive Orders also harm ACC's current clients in this program, who may not be able to obtain the necessary immigration documents to complete their studies, and harm ACC which must now expend resources advising these impacted students.

328.   The ACC provides a variety of employment and job training services for immigrants and refugees through its PATH program. The PATH program includes job counseling, resume writing workshops, vocational training, ESL and vocational ESL classes, and job placement services. Additionally, to ensure that all individuals can pursue a career, the PATH program offers access to Child Care services. EO-3 and the Prior Orders directly harm ACC's clients in the PATH program and also interfere with the PATH Program's ability to pursue community and economic development by interfering with the ability of potential immigrant

and refugee entrepreneurs to enter the United States and by diverting resources of Growth Center staff to addressing problems faced by their clients as a result of the Executive Orders.

329.   The ACC offers a range of English as a Second Language training courses as well as bilingual and trilingual services that help refugee and immigrant clients understand and complete official government documents. EO-3, by barring entry to citizens of the Designated Countries, interferes with ACC's ability to carry out these programs.

330.   EO-3, by restricting the flow of clients for ACC's programs and affecting funding for those programs, will have a significant financial impact on ACC. ACC anticipates that, as a result of EO-3, it will have to lay off staff from the impacted programs, or reassign those staff to fill vacancies in other programs. EO-3 also impacts ACC's decisions whether to renew certain leases because it is unclear whether ACC will be able to continue the programs for which it had previously leased those spaces.

331.   Some of ACC's clients and staff who are United States citizens or lawful permanent residents have close family members who are nationals of the Designated Countries. EO-3 prevents those ACC clients and staff from receiving visits from, and/or reunifying with, their family members who live in the majority-

Muslim Designated Countries. Due to EO-3, ACC clients live in forced separation from family members who are unable to enter the United States.

332.   ACC's clients face numerous hurdles to bringing suit in their own name, including language and cultural barriers, lack of financial resources, rising Islamophobia which would subject them to intense scrutiny if they participate in litigation, and fear of retaliation by the Defendants given that Defendants have made anti-Islamic statements and have pledged aggressive action against immigrants and refugees.

### The Arab American Studies Association ("AASA")

333.   The AASA facilitates communication among scholars through meetings; promotes cooperation among members of the Association and persons or organizations concerned with Arab American Studies; stimulates academic research in Arab American Studies; and explores intersections and comparative approaches among Arab American, Arab, and diasporic Arab experiences. The AASA and its members are harmed by the Executive Orders.

334.   The AASA has members who are U.S. citizens or lawful permanent residents whose national origin is from one of the Designated Countries, members with close family who are nationals of the Designated Countries, and members who engage in scholarly collaboration with nationals of the Designated Countries.

335.    Many AASA members work on issues of transnational migration, which requires study of where, why and how people leave their countries of origin and where, why and how they migrate to new areas. Such research necessarily involves research in countries where transnational migration originates, as well as close collaboration with scholars from those countries.

336.    Because the Designated Countries are significant sources of transnational migration, it is particularly important for the AASA members to travel to those countries for research; to recruit faculty and graduate students from those countries; and to invite scholars from those countries for academic conferences, academic exchanges, and other scholarly collaboration. EO-3 interferes with the ability of AASA members to do all of those things.

337.    The AASA and its members believe that in order for Arab American Studies to move forward as a field, it is critical that U.S.-based institutions recruit faculty and students from the Designated Countries, particularly given that these countries are pivotal to current understandings of transnational migration. AASA's members who are U.S.-based faculty have, in the past, sought to recruit potential colleagues and students from the Designated Countries. Due to EO-3, AASA members can no longer recruit potential colleagues and students from many of the Designated Countries since those faculty and students will be unable to obtain visas to work or study in the United States.

338.   AASA and its members have the goal of advancing learning and exchanging ideas with other scholars in the areas of Arab American studies, Middle Eastern Studies, Migration Studies and similar disciplines. This requires AASA and its members to be able to hear from, speak with, debate with and associate with scholars from the Designated Countries. EO-3 will prevent AASA and its members from inviting scholars from the Designated Countries to present at academic conferences and engage in other collaborative research and scholarship projects.

339.   The AASA will be harmed by EO-3. As part of its goal to advance learning, facilitate communication and promote cooperation, AASA sponsors conferences and other events that serve as a forum for scholarship, intellectual engagement, and pedagogical innovation. Due to EO-3, scholars from the Designated Counties will not be able participate in those conferences. AASA selects papers for its conferences based on the quality of the scholarship, not the nationality of the scholar, and its ability to make such merit-based decisions will be impaired if it cannot invite scholars from the Designated Countries. The AASA also fears that it will not be able to hold academic conferences outside the United States because AASA members who are nationals of the Designated Countries currently based at U.S. institutions may be unable to attend for fear of being unable to return to the United States.

340.   The AASA's members likewise host conferences, invite speakers and artists, and sponsor other events to promote scholarship, intellectual engagement and pedagogical innovation. Due to EO-3, scholars from the Designated Counties will not be able participate in those events.

341.   Because, and only because, the scholars, artists and students invited by the AASA and its members are from the majority-Muslim Designated Countries, those individuals cannot enter the United States to speak with and share ideas with the AASA and its members unless these scholars, artists and students obtain a case-by-case waiver under Section 3(c) of EO-3.

342.   Because Section 3(c) of EO-3 does not provide narrow, objective or definite standards for the issuance of case-by-case waivers, the AASA and its members do not know when or whether waivers will be approved, thereby interfering with the AASA's and its members' ability to plan for and organize conferences, invite speakers and artists, and sponsor other events.

343.   Under Section 3(c) of EO-3, in order for the scholars, artists and students invited by the AASA and its members to speak and share ideas with their colleagues in the United States, Defendants must evaluate the proposed purpose of their travel to the United States and decide that denying those scholars, artists and students the opportunity to speak and participate in academic exchange would cause "undue hardship" and that their entry into the United States "would be in the

national interest." Defendants cannot make such an assessment without considering the identity of the speaker and the content of the speech.

344.   AASA is further concerned that the desired scholars, artists and students from the majority-Muslim Designated Countries will decline to come to the United States as a result of the Executive Orders. Some foreign speakers who are Muslim or whose national origin is in one of the Designated Countries are now refusing to come to the United States because they do not want to be subjected to possible prolonged and intrusive questioning, including questioning about their religious beliefs, as has reportedly occurred at ports of entry since issuance of the First Executive Order.

345.   AASA members, particularly those who conduct research related to the Designated Countries, fear that they will be precluded from traveling to the Designated Countries when those countries institute reciprocal actions in response to EO-3 and the Prior Orders, as Iran has already done.

346.   The research of AASA members within the United States has also been hampered by EO-3's chilling effect on the speech of Muslim Americans. For example, an AASA member researching the history of Yemeni seafarers on the Great Lakes has found local Yemenis extremely hesitant or unwilling to speak about the research topic due to the increasing anti-Muslim sentiments caused by the Executive Orders.

347.    Some of AASA's members who are United States citizens or lawful permanent residents have close family members who are nationals of the Designated Countries. EO-3 prevents those AASA members from receiving visits from, and/or reunifying with, their family members. For example, one AASA member, who is a United States citizen and an assistant professor for U.S.-Arab Cultural Politics at a major university, has ailing parents in Yemen, including a mother whose health is critical and for whom she wishes to obtain medical care in the United States. That AASA member cannot bring his parents to the United States. Another AASA member who is a U.S. citizen is unable to bring a family member recently diagnosed with muscular dystrophy to the United States for further diagnosis and treatment.

348.    In addition, EO-3 could cause financial harm to AASA, by depriving it of membership dues and conference registration fees from individuals who cannot come to the United States as a result of EO-3.

## The Individual Plaintiffs

349.    Plaintiffs Hend and Salim Alshawish have four children. Their two youngest children, A.A. and M.A., are U.S. citizens and are currently residing in the United States. Their two other minor children, J.A.1 and J.A.2, are citizens of Yemen and are currently in Egypt.

350.   In November 2010, Mr. Alshawish petitioned for immigrant visas to bring his wife, Plaintiff Hend Alshawish, and their two Yemeni-citizen children, J.A.1 and J.A.2, to the United States.

351.   Ms. Alshawish and the two minor children underwent extensive security and medical screening, and attended a consular interview.

352.   On December 28, 2016, Ms. Alshawish was finally issued an IR1 spousal visa to enter the United States as a lawful permanent resident. Her visa was set to expire in six months.

353.   However, upon the completion of the interview, the immigrant visas of the two minor children were not issued at the same time. Ms. Alshawish intended to wait till her children's visas were issued before traveling to the United States.

354.   On January 27, 2017, the date the First Executive Order was issued, Ms. Alshawish was in Egypt with J.A.1 and J.A.2. Mr. Alshawish had traveled to Egypt around September 20, 2016 to join her and their children before traveling back to the U.S. together.

355.   As a result of the January 27 Order, Ms. Alshawish was barred from traveling to the United States.

356.   Ms. and Mr. Alshawish closely monitored the news regarding the Executive Order. They heard many inconsistent reports from government officials

about whether immigrant visas, such as the IR1 spousal visa Ms. Alshawish had

obtained, would be revoked and whether individuals with immigrant visas would

be allowed to obtain lawful permanent resident status.

357.   For that reason, Ms. Alshawish and Mr. Alshawish decided to travel

to the United States as soon as they learned that the First Executive Order had been

enjoined by the courts, as it was unclear whether the injunction would be

overturned on appeal. They booked last-minute tickets at considerable expense in

order to ensure that Ms. Alshawish had the opportunity to enter the country while

there was a window of opportunity to do so.

358.   The decision to travel was heart-wrenching for Ms. Alshawish and

Mr. Alshawish, because the immigrant visa applications for their two minor

children, J.A.1 and J.A.2, were still in administrative processing and had not yet

been approved. The couple had to decide whether Ms. Alshawish should travel

while the injunction was in effect, allowing her to join her husband and two U.S.-

citizen children in the United States and become a lawful permanent resident, even

though that meant leaving her two Yemeni-citizen children behind.

359.   In desperation, Ms. Alshawish and Mr. Alshawish decided to have

Mr. Alshawish's sister in Egypt care for J.A.1 and J.A.2, while Ms. Alshawish, Mr.

Alshawish, and their two U.S. citizen children traveled to the United States.

360.   On February 5, 2017, Ms. Alshawish was allowed to board a flight to the United States, and was allowed to enter the United States. Upon entry, her status became that of a lawful permanent resident. She is currently living with her two U.S.-citizen children.

361.   Mr. Alshawish returned to Egypt on March 4, 2017 to care for J.A.1 and J.A.2, but has since returned to the United States to reunite with Ms. Alshawish and their two younger children.

362.   Around December 2017, Mr. and Ms. Alshawish received a letter from the U.S. Embassy in Cairo rejecting their application for a visa for J.A.1 and J.A.2. The letter stated that "[t]he consular officer [was] reviewing [their] eligibility for a waiver" and that they would be "contacted with a final determination on [their] application as soon as practicable." Mr. and Ms. Alshawish have not received any communications since.

363.   EO-3 prohibits citizens of Yemen, including J.A.1 and J.A.2, from entering the United States, and halts ordinary visa processing, as did the Prior Orders.

364.    Due to EO-3, Mr. and Ms. Alshawish cannot reunite their family by bringing their two Yemeni-citizen children to the United States to be with their mother and father and two U.S.-citizen siblings.

365.   Mr. Alshawish also suffers stigmatic harm because the Executive Orders reinforce stereotypes about Muslims and associates Muslims with violence, bigotry, and hatred, thereby discriminating against them and inflicting stigmatic and dignitary harms, among other types of injury.

366.   Plaintiff Fahmi Jahaf, a U.S. citizen, married his wife, Basema Al Reyashi, in February 2011. Mr. Jahaf filed an immigrant petition for his wife after their marriage. The couple then waited four years to receive notice of the scheduling of a consular interview.

367.   Ms. Al Reyashi is from a region in Yemen where there is intense conflict and that is bombed regularly.

368.   Mr. Jahaf found out the petition for his wife's visa was dismissed in September 2015 for failure to respond to certain notices, but it was later determined that the National Visa Center has been sending notices to the wrong address. Mr. Jahaf refiled a petition in July 2016 for his wife and submitted documentation proving that the National Visa Center had been sending the letters to the wrong address. The National Visa Center expedited his petition and visa application when they learned they had made a mistake.

369.   Around July 2017, Ms. Al Reyashi went to an interview at the U.S. embassy in Djibouti.  She was given a document that stated, "your visa is approved." However, she was subsequently asked to provide additional

information, and she is still awaiting a final decision on her application. On July 19, 2018, Plaintiff Mr. Jahaf requested an update on the status of Ms. Al Reyashi's spousal visa application from the U.S. Embassy in Djibouti. On August 15, 2018, Mr. Jahaf received a message that Ms. Al Reyashi's application is "undergoing necessary administrative processing." Although the U.S. Embassy could not "estimate when this process will be completed," Mr. Jahaf was instructed not to request updates on the status of his wife's visa application.

370. Mr. Jahaf has been waiting for nearly eight years for his wife's visa to be approved so that she can join him in the United States. Ms. Al Reyashi is still waiting in limbo in Djibouti, unable to join her husband of seven years in the United States, and unable to return to her conflict-ridden home in Yemen.

371. The Executive Orders have prohibited citizens of Yemen, including Ms. Al Reyashi, from entering the United States, and have prevented ordinary visa processing.

372. Due to the Executive Orders, Mr. Jahaf has been unable to bring his wife to the United States.

373. Mr. Jahaf also suffers stigmatic harm because the Executive Orders, including EO-3, reinforce stereotypes about Muslims and associate Muslims with violence, bigotry, and hatred, thereby discriminating against them and inflicting stigmatic and dignitary harms, among other types of injury.

110

374.   Plaintiff Kaltum Saleh is a U.S. citizen of over twenty years who resides in Wayne County, Michigan. Ms. Saleh's elderly mother, Sahra Abdi Noor, is a Somali national and currently resides in Uganda. Ms. Noor is disabled and requires full-time care. Ms. Saleh's sister has been caring for Ms. Noor. The family determined that Ms. Noor would join Ms. Saleh in the United States, where Ms. Saleh would care for her.

375.   Ms. Saleh filed a petition for an immigrant visa for Ms. Noor on May 9, 2016. Ms. Noor attended an interview at the U.S. embassy in Nairobi, Kenya on March 20, 2018. Ms. Saleh traveled to Uganda, met her mother in Kenya for the interview, and cared for her mother during the trip.

376.   At the interview, Ms. Noor was given a letter informing her that she was ineligible for a visa as a result of EO-3. The letter stated that the consular officer was reviewing her eligibility for a waiver. Ms. Noor was told that she would be notified as to her eligibility for a waiver within one week. Ms. Saleh stayed with her mother in Nairobi to await the notification.

377.   After ten days had passed and Ms. Saleh and Ms. Noor had yet to receive a response, Ms. Saleh called the embassy for an update.  She was again told that she could expect to receive a determination shortly. Ms. Saleh cared for her mother in Nairobi for multiple months, continually checking the status of the waiver determination online and calling the embassy for updates.

378.   On May 15, 2018, Ms. Saleh sent an e-mail to the U.S. embassy in Nairobi, requesting that they expedite her mother's waiver application on humanitarian grounds. Two days later, Ms. Saleh received a reply e-mail with a generic response stating that the applicant would be contacted when a final determination was made.

379.   Finally, Ms. Saleh drove her mother back to her mother's home in Uganda, and Ms. Saleh returned to Michigan to rejoin her children.

380.   A determination of Ms. Noor's eligibility for a waiver from EO-3's travel restrictions is still pending.

381.   Due to the Executive Orders, Ms. Saleh has been unable to bring her elderly mother to the United States. Also due to the Executive Orders, Ms. Saleh was forced to spend multiple months away from her home and children in Michigan to care for her mother in Nairobi awaiting the promised response to the visa application.

382.   Ms. Saleh also suffers stigmatic harm because the Executive Orders, including EO-3, reinforce stereotypes about Muslims and associate Muslims with violence, bigotry, and hatred, thereby discriminating against them and inflicting stigmatic and dignitary harms, among other types of injury.

383.   It is unclear whether the Individual Plaintiffs will be determined to be eligible for a waiver under Section 3(c) of EO-3, whether such a waiver will be

granted if they are eligible, or how much longer the process of seeking a waiver could take.

384.  For the Individual Plaintiffs, pursuing a waiver on the theoretical possibility that it could be granted will involve additional time and expense. Consular processing for individuals from the Designated Countries frequently requires travel to a U.S. embassy in a third country.

385.  By requiring a waiver for any visa or entry into the United States from the Designated Countries, the Third Executive Order imposes additional obstacles to the reunification of the Plaintiffs' families. Those obstacles were imposed for the purpose of preventing Muslims from entering the United States.

## CLASS ACTION ALLEGATIONS

386.  The Individual Plaintiffs bring this action on their own behalf and on behalf of a class of all others similarly situated—that is, persons in the United States for whom EO-3 interferes with their ability to reunify with family members who are citizens of the Designated Countries (the "Plaintiff Class"). The Plaintiff Class includes but is not limited to individuals in the United States who currently have an approved or pending petition to the United States government to be reunited with family members who are nationals of the Designated Countries, or who will soon file such petition.

387.   The Plaintiff Class is so numerous that joinder is impracticable. According to the Annual Report of the Visa Office, in 2015, the United States issued approximately 70,000 immigrant and non-immigrant visas to nationals from the Designated Countries. As noted above, if in effect in 2016, EO-3 would have barred 12,998 Yemenis, 7,727 Iranians, 2,633 Syrians, 1,797 Somalians, and 383 Libyans from obtaining immigrant visas. The U.S. government previously estimated that between 60,000 and 100,000 people were affected by Section 3(c) of EO-1.

388.   A large number of such persons reside, or have recently resided, in Michigan. Many thousands of Arab-Americans in Michigan are originally from the Designated Countries, and have family members in those countries.

389.   The claims of the Plaintiff Class members share common issues of law, including but not limited to whether EO-3 violates their right to religious liberty, equal protection, freedom of speech and freedom of association under the First and Fifth Amendments to the United States Constitution.

390.   The claims of the Plaintiff Class members share common issues of fact, including but not limited to whether EO-3 was adopted with the purpose of discriminating against Muslims and whether EO-3 is being or will be enforced so as to prevent Plaintiff Class members or their family members from obtaining visas and entering the United States from abroad.

391. The claims of the Individual Plaintiffs are typical of the claims of members of the Plaintiff Class.

392. The Individual Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. The Individual Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class. The attorneys representing the Individual Plaintiffs include experienced civil rights attorneys and are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

393. Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

## COUNT I

## FIRST AMENDMENT
## ESTABLISHMENT CLAUSE

394. Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

395. The Establishment Clause of the First Amendment prohibits the federal government from preferring one religion over another.

396.   EO-3 and the Prior Orders constitute unlawful discrimination against Muslims, disfavoring and disadvantaging Islam as compared to other religions, and establishing a preference for one religion over another. Defendants have not pursued a course of neutrality with regard to different religious faiths.

397.   EO-3 and the Prior Orders have the purpose and effect of inhibiting religion, and are neither justified by, nor closely fitted to, any legitimate, much less compelling, governmental interest.

398.   Defendants' statements and actions before and during the implementation of EO-3 and the Prior Orders manifest an intent to discriminate against Muslims, disfavor and disadvantage Islam, and establish a preference for one religion over another.

399.   Defendants' statements and actions before and during the implementation of EO-3 and the Prior Orders have the effect of discriminating against Muslims, disfavoring and disadvantaging Islam, and establishing a preference for one religion over another.

400.   EO-3 and the Prior Orders provide no facially legitimate and bona fide reason for denying entry into the United States to nationals of the Designated Countries. References in EO-3 and the Prior Orders to non-religious justifications for the actions taken are transparently a pretext for the underlying aim to establish this preference.

401.   Given the overwhelming evidence of anti-Muslim animus already in the public record, considering the numerous logical deficiencies in the scope and manner of restrictions imposed, and given that publicly available evidence indicates the waiver process is a sham, EO-3 cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

402.   Discovery will likely reveal further evidence that EO-3 resulted from anti-Muslim animus, that the scope and manner of the restrictions are not rationally related to legitimate national security concerns, that the waiver process is a sham, and that EO-3 therefore cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

403.   Through the actions described in this Complaint, Defendants have violated the Establishment Clause. Defendants' violation inflicts ongoing harm upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

## COUNT II

### FIFTH AMENDMENT
### EQUAL PROTECTION

404.   Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

405.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees the right to equal protection of the laws.

406.   The equal protection requirement of the Due Process Clause requires strict scrutiny of governmental classifications that are based on religion.

407.   EO-3 and the Prior Orders were substantially motivated by animus and a desire to discriminate on the basis of religion and have a disparate effect on persons of the disfavored religion.

408.   The equal protection requirement of the Due Process Clause requires strict scrutiny of governmental restrictions on fundamental rights.

409.   EO-3 and the Prior Orders burden fundamental rights by restricting the ability of the Individual Plaintiffs and those similarly situated, and of the members and clients of the organizational Plaintiffs, to associate with their families and raise their children.

410.   EO-3 and the Prior Orders were substantially motivated by animus and a desire to restrict the fundamental rights of Muslims, and have a disparate effect on the ability of Muslims versus non-Muslims to exercise their fundamental rights to associate with their families and raise their children.

411.   The statements of President Trump and his advisors, as well as the other information set out in this Complaint, provide direct evidence that EO-3 and

the Prior Orders were adopted for discriminatory reasons, and that they are not tailored to the asserted government goal of promoting national security.

412.   EO-3 and the Prior Orders are not narrowly tailored to serve a compelling governmental interest, and thereby violate the equal protection requirement of the Due Process Clause.

413.   For the same reasons, EO-3 and the Prior Orders are not rationally related to a legitimate government interest.

414.   EO-3 and the Prior Orders do not provide a facially legitimate and bona fide reason for denying entry into the United States to nationals of the Designated Countries. The ostensibly neutral reasons for denying entry that are listed in EO-3 and the Prior Orders were made in bad faith and as a pretext for denying entry of Muslims into the United States.

415.   Given the overwhelming evidence of anti-Muslim animus in the public record, considering the numerous logical deficiencies in the scope and manner of restrictions imposed, and given the evidence that the waiver process is a sham, EO-3 cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

416.   Discovery will likely reveal further evidence that EO-3 resulted from anti-Muslim animus and cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

417.   EO-3 and the Prior Orders, as well as Defendants' statements and their actions to implement them, discriminate against individuals based on their religion and restrict their fundamental rights without lawful justification.

418.   Through the actions described in this Complaint, Defendants have violated the equal protection guarantee of the Fifth Amendment. Defendants' violation inflicts ongoing harm upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

## COUNT III

### FIRST AMENDMENT
### FREEDOM OF SPEECH AND ASSOCIATION

419.   Plaintiffs adopt and incorporate by reference all prior paragraphs as though fully set forth herein.

420.   The First Amendment to the United States Constitution protects the marketplace of ideas; the right to receive information; the right to access social, political, esthetic, moral and other ideas and experiences; and the right to association.

421.   Plaintiffs have a right to speak about EO-3, the Prior Orders, and the Administration's anti-Muslim policies. They also have a right to hear, speak, debate with, and associate with individuals whose entry into the United States is curtailed by EO-3 and the Prior Orders.

422.   EO-3 and the Prior Orders chill the ability of Plaintiffs to speak, since they fear that speaking will affect their ability to obtain waivers for reunification with their family members. EO-3 and the Prior Orders also restrict Plaintiffs' ability to hear from, speak with, debate with, and associate with nationals of the Designated Countries, a restriction which is based on the identity, national origin and religion of the speaker.

423.   EO-3 and the Prior Orders do not provide a facially legitimate and bona fide reason for chilling speech or for denying entry into the United States to persons with whom Plaintiffs wish to speak, debate or associate, or whose ideas they wish to hear. The ostensibly neutral reasons for denying entry that are listed in EO-3 and the Prior Orders were made in bad faith and as a pretext for denying entry of Muslims into the United States.

424.   Given the overwhelming evidence of anti-Muslim animus in the public record, considering the numerous logical deficiencies in the scope and manner of restrictions imposed, and given the evidence that the waiver process is a sham, EO-3 cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

425.   Discovery will likely reveal further evidence that EO-3 resulted from anti-Muslim animus and cannot reasonably be understood to result from a justification independent of unconstitutional grounds.

121

426. EO-3 and the Prior Orders chill Plaintiffs' ability to speak because they reasonably fear that this could impact their ability to obtain a case-by-case waiver under Section 3(c) of the March 6 Order and Section 3(c) of EO-3.

427. EO-3 and the Prior Orders condition Plaintiffs' ability to hear from, speak with, debate with or associate with nationals of the Designated Countries in face-to-face interactions within the United States on the ability of those nationals to obtain a case-by-case waiver under Section 3(c) of the March 6 Order and Section 3(c) of EO-3.

428. Section 3(c) of EO-3 provides that a case-by-case waiver cannot be granted unless "the foreign national has demonstrated to the [CBP] officer's satisfaction that denying entry during the suspension period would cause undue hardship, entry would not pose a threat to national security or public safety of the United States; and entry would be in the national interest."

429. Section 3(c) of EO-3 operates as a licensing scheme for speakers from the Designated Countries, but does not provide narrow, objective or definite standards for the issuance of case-by-case waivers. Section 3(c) of EO-3 gives the government unfettered discretion to determine whose speech will be permitted and whose speech will not.

430. Section 3(c) of EO-3 operates as a content-based restriction on protected First Amendment activities because it permits or requires Defendants to

evaluate the content of those activities to determine whether denying entry of a speaker from the Designated Countries would cause "undue hardship" and whether allowing Plaintiffs to hear from, speak with, debate with and associate with the speaker would "be in the national interest."

431.   Similarly, Section 3(c)(iii) of EO-3, which provides for a case-by-case waiver at the "discretion" of the consular officer or CBP agent, operates as a content-based restriction on protected First Amendment activities because it permits or requires Defendants to evaluate the content of those activities to determine whether they are an "appropriate" basis to grant entry into the United States.

432.   Section 3(c) of EO-3 permits or requires Defendants to engage in unconstitutional content-based and viewpoint-based discrimination because Defendants must determine whether denying entry of a speaker from the Designated Countries would cause "undue hardship" and whether allowing Plaintiffs to hear from, speak with, debate with, and associate with the speaker would "be in the national interest."

433.   EO-3 does not provide a facially legitimate and bona fide reason for requiring nationals of the Designated Countries to seek a case-by-case waiver in order to enter the United States, thereby making it more difficult for Plaintiffs to hear from, speak with, debate with, and associate with nationals of the Designated

Countries. The ostensibly neutral reasons for requiring nationals of the Designated Countries to seek a case-by-case waiver that are listed in EO-3 were made in bad faith and as a pretext for denying entry of Muslims into the United States.

434.   Defendants' violation of the First Amendment inflicts ongoing harm upon the Individual Plaintiffs and all those similarly situated, and on the organizational plaintiffs, their members and their clients.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Honorable Court grant the following relief:

A.      Issue a permanent injunction enjoining Defendants, their officials, agents, employees, assigns and all persons acting in concert or participating with them from implementing or enforcing EO-3 against nationals of Iran, Libya, Somalia, Syria and Yemen;

B.      Enter a judgment pursuant to 28 U.S.C. § 2201 declaring that EO-3 is unlawful and invalid;

C.      Award Plaintiffs reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act or any other applicable law; and

D.      Grant such other and further relief as the Court deems equitable, just and proper.

Dated: September 13, 2018                          Respectfully submitted,

**Counsel for Arab American Civil Rights League**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Arab Chamber of Commerce**

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
Helal Farhat (P64872)
Counsel for the American Arab
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

**Counsel for Hend Alshawish, Salim Alshawish, and Fahmi Jahaf**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
_____
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
_____
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


/s/ Ali K. Hammoud
_____
Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

/s/ Rula Aoun
_____
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
_____
/s/ Natalie C. Qandah
_____
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, and Kaltum Saleh**

/s/ Miriam Aukerman

Miriam Aukerman (P63165)
American Civil Liberties Union Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

/s/ Jason C. Raofield

Jason C. Raofield (D.C. Bar #463877)
Nishchay H. Maskay (D.C. Bar #998983)
Frederick C. Benson (D.C. Bar #1033399) (application forthcoming)
Benjamin L. Cavataro (D.C. Bar #1034839) (application forthcoming)
Rachel L. Fried (D.C. Bar #1029538) (application forthcoming)
Ingrid L. Price (D.C. Bar #1017436) (application forthcoming)
Taylor M. Steffan (D.C. Bar #1045250) (application forthcoming)
Covington & Burling LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5072
jraofield@cov.com

/s/ Michael J. Steinberg

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org

/s/ Margo Schlanger

Margo Schlanger (N.Y. Bar #2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al.,

*Plaintiffs*,

*v.*

**DONALD TRUMP**, et al.,

*Defendants*.

Case No. 2:17-cv-10310-VAR-SDD

Hon. Victoria A. Roberts

Mag. J.  Stephanie D. Davis

## NOTICE OF FILING THIRD AMENDED COMPLAINT
## BY LEAVE OF COURT

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, Local Rule 15.1 of the United States District Court for the Eastern District of Michigan, and the Court's Orders of November 16, 2017 (ECF #121) and July 24, 2018 (ECF #123) granting Plaintiffs leave to file a Third Amended Complaint, Plaintiffs, by and through undersigned counsel, hereby file a Third Amended Complaint in this action.

Dated: September 13, 2018                    Respectfully submitted,

**Counsel for Arab American Civil Rights League**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

/s/ Rula Aoun
Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah
Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah
/s/ Natalie C. Qandah
Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Arab Chamber of Commerce**

FARHAT & ASSOCIATES, PLLC
/s/ Helal Farhat
Helal Farhat (P64872)
Counsel for the American Arab
Chamber of Commerce
6053 Chase Rd.
Dearborn, MI 48126
(313) 945-5100
hfarhat@saflegal.com

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad
Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

2

**Counsel for Hend Alshawish, Salim Alshawish, and Fahmi Jahaf**

AYAD LAW, P.L.L.C.
/s/ Nabih H. Ayad

Nabih H. Ayad (P59518)
Attorney for Plaintiffs
645 Griswold St., Ste. 2202
Detroit, MI 48226
(313) 983-4600
nayad@ayadlaw.com

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC
/s/ Kassem M. Dakhlallah

Kassem Dakhlallah (P70842)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com


/s/ Ali K. Hammoud

Ali K. Hammoud (P73076)
6050 Greenfield Rd., Suite 201
Dearborn, MI 48126
(313) 551-3038
ah@hdalawgroup.com

/s/ Rula Aoun

Rula Aoun (P79119)
4917 Schaefer Rd.
Dearborn, MI 48126
(313) 633-0231
rula@acrlmich.org

VIDA LAW GROUP, PLLC
/s/ Mona Fadlallah

/s/ Natalie C. Qandah

Mona Fadlallah (P64197)
Natalie C. Qandah (P58434)
43050 Ford Road, Suite 160
Canton, MI 48187
Phone: (734) 456-9004
Facsimile: (734) 456-9003
Mona@vidalawpllc.com
Natalie@vidalawpllc.com

**Counsel for American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, and Kaltum Saleh**

/s/ Miriam Aukerman

Miriam Aukerman (P63165)
American Civil Liberties Union Fund
of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org


/s/ Jason C. Raofield

Jason C. Raofield (D.C. Bar #463877)
Nishchay H. Maskay (D.C. Bar
#998983)
Frederick C. Benson (D.C. Bar
#1033399) (application forthcoming)
Benjamin L. Cavataro (D.C. Bar
#1034839) (application forthcoming)
Rachel L. Fried (D.C. Bar #1029538)
(application forthcoming)
Ingrid L. Price (D.C. Bar #1017436)
(application forthcoming)
Taylor M. Steffan (D.C. Bar
#1045250) (application forthcoming)
Covington & Burling LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
(202) 662-5072
jraofield@cov.com

/s/ Michael J. Steinberg

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org


/s/ Margo Schlanger

Margo Schlanger (N.Y. Bar
#2704443 (3d Dept))
Cooperating Attorney,
American Civil Liberties Union
Fund of Michigan
625 South State Street
Ann Arbor, Michigan 48109
(734) 615-2618
margo.schlanger@gmail.com

4

## CERTIFICATE OF SERVICE

This Notice, the Third Amended Complaint, the Declaration of Jason Raofield in Support of Plaintiffs' Third Amended Complaint, and the exhibits thereto, were filed on September 13, 2018, via the Court's ECF system, which provides notice to all counsel of record.

/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **ARAB AMERICAN CIVIL RIGHTS LEAGUE**, et al., | |
| *Plaintiffs*, | Case No. 2:17-cv-10310-VAR-SDD |
| *v.* | Hon. Victoria A. Roberts |
| **DONALD TRUMP**, et al., | Mag. J.  Stephanie D. Davis |
| *Defendants*. | |

## DECLARATION OF JASON RAOFIELD
## <u>IN SUPPORT OF PLAINTIFFS' THIRD AMENDED COMPLAINT</u>

Pursuant to 28 U.S.C. § 1746(2), I, Jason Raofield, hereby declare as follows:

1.  I am a Partner at the firm of Covington & Burling and serve as counsel to Plaintiffs American Civil Liberties Union of Michigan, Arab American and Chaldean Council, Arab American Studies Association, and Kaltum Saleh in the above-referenced action.

2.  I respectfully submit this declaration in support of Plaintiffs' Third Amended Complaint.

3.  Attached hereto as **Exhibit A** is a true and correct copy of Executive Order 13769, 82 Fed. Reg. 8977, dated January 27, 2017 and entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

4.  Attached hereto as **Exhibit B** is a true and correct copy of Executive Order 13780, 82 Fed. Reg. 13209, issued March 6, 2017, effective March 16, 2017, and entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

5.  Attached hereto as **Exhibit C** is a true and correct copy of the Department of Homeland Security ("DHS") Q&A dated March 6, 2017 and entitled "Department of Homeland Security, Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States," available at https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entry-united-states.

6.  Attached hereto as **Exhibit D** is a true and correct copy of Proclamation 9645, 82 Fed. Reg. 45161, dated September 24, 2017, and entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats."

7.  Attached hereto as **Exhibit E** is a true and correct copy of Executive Order 13815, 82 Fed. Reg. 50055, dated October 24, 2017 and entitled "Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities."

8.  Attached hereto as **Exhibit F** is a true and correct copy of the document entitled "Memorandum to the President" dated October 23, 2017, by Secretary of State Rex Tillerson, Acting Secretary of Homeland Security Elaine Duke, and Director of National Intelligence Daniel Coats, available at https://www.state.gov/documents/organization/275306.pdf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of September, 2018.

/s/ Jason C. Raofield
Jason C. Raofield (D.C. Bar #463877)
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, D.C.  20001
(202) 662-5072
Email: jraofield@cov.com

# RAOFIELD DECLARATION
# EXHIBIT A

Federal Register

Vol. 82, No. 20

Wednesday, February 1, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13769 of January 27, 2017

## Protecting the Nation From Foreign Terrorist Entry Into the United States

By the authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, and to protect the American people from terrorist attacks by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1**. *Purpose.* The visa-issuance process plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States. Perhaps in no instance was that more apparent than the terrorist attacks of September 11, 2001, when State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals who went on to murder nearly 3,000 Americans. And while the visa-issuance process was reviewed and amended after the September 11 attacks to better detect would-be terrorists from receiving visas, these measures did not stop attacks by foreign nationals who were admitted to the United States.

Numerous foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after receiving visitor, student, or employment visas, or who entered through the United States refugee resettlement program. Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States. The United States must be vigilant during the visa-issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, the United States must ensure that those admitted to this country do not bear hostile attitudes toward it and its founding principles. The United States cannot, and should not, admit those who do not support the Constitution, or those who would place violent ideologies over American law. In addition, the United States should not admit those who engage in acts of bigotry or hatred (including ''honor'' killings, other forms of violence against women, or the persecution of those who practice religions different from their own) or those who would oppress Americans of any race, gender, or sexual orientation.

**Sec. 2**. *Policy.* It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

**Sec. 3**. *Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President

a report on the results of the review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists or criminals, pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C–2 visas for travel to the United Nations, and G–1, G–2, G–3, and G–4 visas).

(d) Immediately upon receipt of the report described in subsection (b) of this section regarding the information needed for adjudications, the Secretary of State shall request all foreign governments that do not supply such information to start providing such information regarding their nationals within 60 days of notification.

(e) After the 60-day period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of foreign nationals (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, C–2 visas for travel to the United Nations, and G–1, G–2, G–3, and G–4 visas) from countries that do not provide the information requested pursuant to subsection (d) of this section until compliance occurs.

(f) At any point after submitting the list described in subsection (e) of this section, the Secretary of State or the Secretary of Homeland Security may submit to the President the names of any additional countries recommended for similar treatment.

(g) Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h) The Secretaries of State and Homeland Security shall submit to the President a joint report on the progress in implementing this order within 30 days of the date of this order, a second report within 60 days of the date of this order, a third report within 90 days of the date of this order, and a fourth report within 120 days of the date of this order.

**Sec. 4.** *Implementing Uniform Screening Standards for All Immigration Programs.* (a) The Secretary of State, the Secretary of Homeland Security, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation shall implement a program, as part of the adjudication process for immigration benefits, to identify individuals seeking to enter the United States on a fraudulent basis with the intent to cause harm, or who are at risk of causing harm subsequent to their admission. This program will include the development of a uniform screening standard and procedure, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not

used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that the applicant is who the applicant claims to be; a process to evaluate the applicant's likelihood of becoming a positively contributing member of society and the applicant's ability to make contributions to the national interest; and a mechanism to assess whether or not the applicant has the intent to commit criminal or terrorist acts after entering the United States.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation, shall submit to the President an initial report on the progress of this directive within 60 days of the date of this order, a second report within 100 days of the date of this order, and a third report within 200 days of the date of this order.

**Sec. 5.** *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.* (a) The Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication process to determine what additional procedures should be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. Refugee applicants who are already in the USRAP process may be admitted upon the initiation and completion of these revised procedures. Upon the date that is 120 days after the date of this order, the Secretary of State shall resume USRAP admissions only for nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that such additional procedures are adequate to ensure the security and welfare of the United States.

(b) Upon the resumption of USRAP admissions, the Secretary of State, in consultation with the Secretary of Homeland Security, is further directed to make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality. Where necessary and appropriate, the Secretaries of State and Homeland Security shall recommend legislation to the President that would assist with such prioritization.

(c) Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of nationals of Syria as refugees is detrimental to the interests of the United States and thus suspend any such entry until such time as I have determined that sufficient changes have been made to the USRAP to ensure that admission of Syrian refugees is consistent with the national interest.

(d) Pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any such entry until such time as I determine that additional admissions would be in the national interest.

(e) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretaries of State and Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution, when admitting the person would enable the United States to conform its conduct to a preexisting international agreement, or when the person is already in transit and denying admission would cause undue hardship—and it would not pose a risk to the security or welfare of the United States.

(f) The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

(g) It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees. To that end, the Secretary of Homeland Security shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

**Sec. 6**. *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.* The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA, 8 U.S.C. 1182, relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda.

**Sec. 7**. *Expedited Completion of the Biometric Entry-Exit Tracking System.* (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section. The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order. Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

**Sec. 8**. *Visa Interview Security.* (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1202, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that non-immigrant visa-interview wait times are not unduly affected.

**Sec. 9**. *Visa Validity Reciprocity.* The Secretary of State shall review all nonimmigrant visa reciprocity agreements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If a country does not treat United States nationals seeking nonimmigrant visas in a reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by the foreign country, to the extent practicable.

**Sec. 10**. *Transparency and Data Collection.* (a) To be more transparent with the American people, and to more effectively implement policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available within 180 days, and every 180 days thereafter:

(i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation, or material support to a terrorism-related organization, or any other national security reasons since the date of this order or the last reporting period, whichever is later;

(ii) information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States, since the date of this order or the last reporting period, whichever is later; and

(iii) information regarding the number and types of acts of gender-based violence against women, including honor killings, in the United States by foreign nationals, since the date of this order or the last reporting period, whichever is later; and

(iv) any other information relevant to public safety and security as determined by the Secretary of Homeland Security and the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b) The Secretary of State shall, within one year of the date of this order, provide a report on the estimated long-term costs of the USRAP at the Federal, State, and local levels.

**Sec. 11.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 27, 2017.*

[FR Doc. 2017–02281
Filed 1–31–17; 11:15 am]
Billing code 3295–F7–P

# RAOFIELD DECLARATION
# EXHIBIT B

Federal Register

Vol. 82, No. 45

Thursday, March 9, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13780 of March 6, 2017

## Protecting the Nation From Foreign Terrorist Entry Into the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, and to protect the Nation from terrorist activities by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals. The screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program (USRAP) play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States. It is therefore the policy of the United States to improve the screening and vetting protocols and procedures associated with the visa-issuance process and the USRAP.

(b) On January 27, 2017, to implement this policy, I issued Executive Order 13769 (Protecting the Nation from Foreign Terrorist Entry into the United States).

(i) Among other actions, Executive Order 13769 suspended for 90 days the entry of certain aliens from seven countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. These are countries that had already been identified as presenting heightened concerns about terrorism and travel to the United States. Specifically, the suspension applied to countries referred to in, or designated under, section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), in which Congress restricted use of the Visa Waiver Program for nationals of, and aliens recently present in, (A) Iraq or Syria, (B) any country designated by the Secretary of State as a state sponsor of terrorism (currently Iran, Syria, and Sudan), and (C) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence. In 2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of three statutory factors related to terrorism and national security: ''(I) whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States; (II) whether a foreign terrorist organization has a significant presence in the country or area; and (III) whether the country or area is a safe haven for terrorists.'' 8 U.S.C. 1187(a)(12)(D)(ii). Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.

(ii) In ordering the temporary suspension of entry described in subsection (b)(i) of this section, I exercised my authority under Article II of the Constitution and under section 212(f) of the INA, which provides in relevant part: ''Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.''

8 U.S.C. 1182(f). Under these authorities, I determined that, for a brief period of 90 days, while existing screening and vetting procedures were under review, the entry into the United States of certain aliens from the seven identified countries—each afflicted by terrorism in a manner that compromised the ability of the United States to rely on normal decision-making procedures about travel to the United States—would be detrimental to the interests of the United States. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to grant case-by-case waivers when they determined that it was in the national interest to do so.

(iii) Executive Order 13769 also suspended the USRAP for 120 days. Terrorist groups have sought to infiltrate several nations through refugee programs. Accordingly, I temporarily suspended the USRAP pending a review of our procedures for screening and vetting refugees. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to jointly grant case-by-case waivers when they determined that it was in the national interest to do so.

(iv) Executive Order 13769 did not provide a basis for discriminating for or against members of any particular religion. While that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion. That order was not motivated by animus toward any religion, but was instead intended to protect the ability of religious minorities—whoever they are and wherever they reside—to avail themselves of the USRAP in light of their particular challenges and circumstances.

(c) The implementation of Executive Order 13769 has been delayed by litigation. Most significantly, enforcement of critical provisions of that order has been temporarily halted by court orders that apply nationwide and extend even to foreign nationals with no prior or substantial connection to the United States. On February 9, 2017, the United States Court of Appeals for the Ninth Circuit declined to stay or narrow one such order pending the outcome of further judicial proceedings, while noting that the ''political branches are far better equipped to make appropriate distinctions'' about who should be covered by a suspension of entry or of refugee admissions.

(d) Nationals from the countries previously identified under section 217(a)(12) of the INA warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delay issuing, or refuse to issue, travel documents.

(e) The following are brief descriptions, taken in part from the Department of State's *Country Reports on Terrorism 2015* (June 2016), of some of the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States:

(i) *Iran*. Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq. Iran has also been linked to support

for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts.

(ii) *Libya*. Libya is an active combat zone, with hostilities between the internationally recognized government and its rivals. In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. The Libyan government provides some cooperation with the United States' counterterrorism efforts, but it is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons, migrants, and foreign terrorist fighters. The United States Embassy in Libya suspended its operations in 2014.

(iii) *Somalia*. Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize the Somali identity documents. The Somali government cooperates with the United States in some counterterrorism operations but does not have the capacity to sustain military pressure on or to investigate suspected terrorists.

(iv) *Sudan*. Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas. Historically, Sudan provided safe havens for al-Qa'ida and other terrorist groups to meet and train. Although Sudan's support to al-Qa'ida has ceased and it provides some cooperation with the United States' counterterrorism efforts, elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

(v) *Syria*. Syria has been designated as a state sponsor of terrorism since 1979. The Syrian government is engaged in an ongoing military conflict against ISIS and others for control of portions of the country. At the same time, Syria continues to support other terrorist groups. It has allowed or encouraged extremists to pass through its territory to enter Iraq. ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate with the United States' counterterrorism efforts.

(vi) *Yemen*. Yemen is the site of an ongoing conflict between the incumbent government and the Houthi-led opposition. Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited this conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations, and embassy staff were relocated out of the country. Yemen has been supportive of, but has not been able to cooperate fully with, the United States in counterterrorism efforts.

(f) In light of the conditions in these six countries, until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high. Accordingly, while that assessment is ongoing, I am imposing a temporary pause on the entry of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen, subject to categorical exceptions and case-by-case waivers, as described in section 3 of this order.

(g) Iraq presents a special case. Portions of Iraq remain active combat zones. Since 2014, ISIS has had dominant influence over significant territory in northern and central Iraq. Although that influence has been significantly

reduced due to the efforts and sacrifices of the Iraqi government and armed forces, working along with a United States-led coalition, the ongoing conflict has impacted the Iraqi government's capacity to secure its borders and to identify fraudulent travel documents. Nevertheless, the close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment for Iraq. In particular, those Iraqi government forces that have fought to regain more than half of the territory previously dominated by ISIS have shown steadfast determination and earned enduring respect as they battle an armed group that is the common enemy of Iraq and the United States. In addition, since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal. Decisions about issuance of visas or granting admission to Iraqi nationals should be subjected to additional scrutiny to determine if applicants have connections with ISIS or other terrorist organizations, or otherwise pose a risk to either national security or public safety.

(h) Recent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security. Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States. They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees. For example, in January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon. The Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

(i) Given the foregoing, the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism remains a matter of grave concern. In light of the Ninth Circuit's observation that the political branches are better suited to determine the appropriate scope of any suspensions than are the courts, and in order to avoid spending additional time pursuing litigation, I am revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens.

**Sec. 2.** *Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat. The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the worldwide review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed from each country for adjudications and a list of countries that do not provide adequate information, within 20 days of the effective date of this order. The Secretary of Homeland Security

shall provide a copy of the report to the Secretary of State, the Attorney General, and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

(d) Upon submission of the report described in subsection (b) of this section regarding the information needed from each country for adjudications, the Secretary of State shall request that all foreign governments that do not supply such information regarding their nationals begin providing it within 50 days of notification.

(e) After the period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means. The Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

(f) At any point after the submission of the list described in subsection (e) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, may submit to the President the names of any additional countries recommended for similar treatment, as well as the names of any countries that they recommend should be removed from the scope of a proclamation described in subsection (e) of this section.

(g) The Secretary of State and the Secretary of Homeland Security shall submit to the President a joint report on the progress in implementing this order within 60 days of the effective date of this order, a second report within 90 days of the effective date of this order, a third report within 120 days of the effective date of this order, and a fourth report within 150 days of the effective date of this order.

**Sec. 3**. *Scope and Implementation of Suspension.*

(a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the effective date of this order;

(ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and

(iii) do not have a valid visa on the effective date of this order.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this order shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the effective date of this order;

(iii) any foreign national who has a document other than a visa, valid on the effective date of this order or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document;

(iv) any dual national of a country designated under section 2 of this order when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspension of entry pursuant to section 2 of this order, a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest. Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa issuance process will be effective both for the issuance of a visa and any subsequent entry on that visa, but will leave all other requirements for admission or entry unchanged. Case-by-case waivers could be appropriate in circumstances such as the following:

(i) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the effective date of this order, seeks to reenter the United States to resume that activity, and the denial of reentry during the suspension period would impair that activity;

(ii) the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of this order for work, study, or other lawful activity;

(iii) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;

(iv) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.,* a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;

(v) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(vi) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

(vii) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling

to conduct business on behalf of an international organization not designated under the IOIA;

(viii) the foreign national is a landed Canadian immigrant who applies for a visa at a location within Canada; or

(ix) the foreign national is traveling as a United States Government-sponsored exchange visitor.

**Sec. 4.** *Additional Inquiries Related to Nationals of Iraq.* An application by any Iraqi national for a visa, admission, or other immigration benefit should be subjected to thorough review, including, as appropriate, consultation with a designee of the Secretary of Defense and use of the additional information that has been obtained in the context of the close U.S.-Iraqi security partnership, since Executive Order 13769 was issued, concerning individuals suspected of ties to ISIS or other terrorist organizations and individuals coming from territories controlled or formerly controlled by ISIS. Such review shall include consideration of whether the applicant has connections with ISIS or other terrorist organizations or with territory that is or has been under the dominant influence of ISIS, as well as any other information bearing on whether the applicant may be a threat to commit acts of terrorism or otherwise threaten the national security or public safety of the United States.

**Sec. 5.** *Implementing Uniform Screening and Vetting Standards for All Immigration Programs.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall implement a program, as part of the process for adjudications, to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry. This program shall include the development of a uniform baseline for screening and vetting standards and procedures, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that applicants are who they claim to be; a mechanism to assess whether applicants may commit, aid, or support any kind of violent, criminal, or terrorist acts after entering the United States; and any other appropriate means for ensuring the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility or grounds for the denial of other immigration benefits.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Director of National Intelligence, shall submit to the President an initial report on the progress of the program described in subsection (a) of this section within 60 days of the effective date of this order, a second report within 100 days of the effective date of this order, and a third report within 200 days of the effective date of this order.

**Sec. 6.** *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.* (a) The Secretary of State shall suspend travel of refugees into the United States under the USRAP, and the Secretary of Homeland Security shall suspend decisions on applications for refugee status, for 120 days after the effective date of this order, subject to waivers pursuant to subsection (c) of this section. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. The suspension described in this subsection shall not apply to refugee applicants who, before the effective date of this order, have been formally scheduled for transit by the Department of State. The Secretary of State shall resume travel of refugees into the

United States under the USRAP 120 days after the effective date of this order, and the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that the additional procedures implemented pursuant to this subsection are adequate to ensure the security and welfare of the United States.

(b) Pursuant to section 212(f) of the INA, I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any entries in excess of that number until such time as I determine that additional entries would be in the national interest.

(c) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States, including in circumstances such as the following: the individual's entry would enable the United States to conform its conduct to a preexisting international agreement or arrangement, or the denial of entry would cause undue hardship.

(d) It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees. To that end, the Secretary of State shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

**Sec. 7**. *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility*. The Secretary of State and the Secretary of Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority permitted by section 212(d)(3)(B) of the INA, 8 U.S.C. 1182(d)(3)(B), relating to the terrorism grounds of inadmissibility, as well as any related implementing directives or guidance.

**Sec. 8**. *Expedited Completion of the Biometric Entry-Exit Tracking System*. (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for in-scope travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive set forth in subsection (a) of this section. The initial report shall be submitted within 100 days of the effective date of this order, a second report shall be submitted within 200 days of the effective date of this order, and a third report shall be submitted within 365 days of the effective date of this order. The Secretary of Homeland Security shall submit further reports every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9**. *Visa Interview Security*. (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1202, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions. This suspension shall not apply to any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; traveling for purposes related to an international organization designated under the IOIA; or traveling for purposes of conducting meetings or business with the United States Government.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that nonimmigrant visa-interview wait times are not unduly affected.

**Sec. 10**. *Visa Validity Reciprocity.* The Secretary of State shall review all nonimmigrant visa reciprocity agreements and arrangements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If another country does not treat United States nationals seeking non-immigrant visas in a truly reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by that foreign country, to the extent practicable.

**Sec. 11**. *Transparency and Data Collection.* (a) To be more transparent with the American people and to implement more effectively policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available the following information:

(i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

(ii) information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

(iii) information regarding the number and types of acts of gender-based violence against women, including so-called ''honor killings,'' in the United States by foreign nationals; and

(iv) any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b) The Secretary of Homeland Security shall release the initial report under subsection (a) of this section within 180 days of the effective date of this order and shall include information for the period from September 11, 2001, until the date of the initial report. Subsequent reports shall be issued every 180 days thereafter and reflect the period since the previous report.

**Sec. 12**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of the actions directed in this order.

(b) In implementing this order, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including, as appropriate, those providing an opportunity for individuals to claim a fear of persecution or torture, such as the credible fear determination for aliens covered by section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A).

(c) No immigrant or nonimmigrant visa issued before the effective date of this order shall be revoked pursuant to this order.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This order shall not apply to an individual who has been granted asylum, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this order shall be construed to limit the ability of an individual to seek asylum, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 13.** *Revocation.* Executive Order 13769 of January 27, 2017, is revoked as of the effective date of this order.

**Sec. 14.** *Effective Date.* This order is effective at 12:01 a.m., eastern daylight time on March 16, 2017.

**Sec. 15.** *Severability.* (a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

**Sec. 16.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 6, 2017.*

[FR Doc. 2017–04837
Filed 3–8–17; 11:15 am]
Billing code 3295–F7–P

# RAOFIELD DECLARATION
# EXHIBIT C



🇺🇸 Official website of the Department of Homeland Security

**U.S. Department of Homeland Security**

Enter Search Term

On DHS.gov

# Q&A: Protecting the Nation From Foreign Terrorist Entry To The United States

**Release Date:** March 6, 2017

March 6, 2017 11:30 a.m. EST
Office of Public Affairs
Contact: 202-282-8010

## Q1. Who is subject to the suspension of entry under the Executive Order?

Per the Executive Order, foreign nationals from Sudan, Syria, Iran, Libya, Somalia, and Yemen, who are outside the United States and who did not have a valid visa at 5 p.m. Eastern Standard Time on January 27, 2017, and do not have a valid visa on the effective date of this order are not eligible to enter the United States while the temporary suspension remains in effect. Thus any individual who had a valid visa either on January 27, 2017 (prior to 5:00 PM) or holds a valid visa on the effective date of the Executive Order is not barred from seeking entry.

## Q2. Will "in-transit" travelers within the scope of the Executive Order be denied entry into the United States and returned to their country of origin?

Those individuals who are traveling on valid visas and arrive at a U.S. port of entry will still be permitted to seek entry into the United States. All foreign nationals traveling with a visa must

continue to satisfy all requirements for entry, including demonstrating that they are admissible. Additional information on applying for admission to the United States is available on CBP.gov. (https://www.cbp.gov/travel/international-visitors/applying-admission-united-states)

# Q3. I am a national from one of the six affected countries currently overseas and in possession of a valid visa, but I have no prior travel to the United States. Can I travel to the United States?

Per the Executive Order, foreign nationals from Sudan, Syria, Iran, Libya, Somalia, and Yemen who have valid visas will not be affected by this Executive Order. No visas will be revoked solely based on this Executive Order.

# Q4. I am presently in the United States in possession of a valid single entry visa but I am a national of one of the six impacted countries. Can I travel abroad and return to the United States?

Regardless of the Executive Order, your visa is not valid for multiple entries into the Unites States. While the Executive Order does not apply to those within the United States and your travel abroad is not limited, a valid visa or other document permitting you to travel to and seek admission to the United States is still required for any subsequent entry to the United States.

# Q5. I am presently in the United States in possession of a valid multiple entry visa but am a national of one of the six affected countries, can I travel abroad and return to the United States?

Yes. Individuals within the United States with valid multiple entry visas on the effective date of the order are eligible for travel to and from the United States, provided the visa remains valid and the traveler is otherwise admissible. All foreign nationals traveling with a visa must satisfy all admissibility requirements for entry. Additional information on applying for admission to the United States is available on CBP.gov. (https://www.cbp.gov/travel/international-visitors/applying-admission-united-states)

# Q6. I am from one of the six countries, currently in the United States in possession of a valid visa and have planned overseas travel. My visa will expire while I am overseas, can I return to the United States?

Travelers must have a valid visa to travel to the United States, regardless of the Executive Order. Travelers who do not have a valid visa due to its expiration while abroad must obtain a new valid visa prior to returning to the United States.

# Q7. Will the Department of Homeland Security (DHS) and the Department of State (DOS) be revoking the visas of persons ineligible to travel under the revised Executive Order?

Visas will not be revoked solely as a result of the Executive Order. The Department of State has broad authority under Section 221(i) of the Immigration and Nationality Act to revoke visas.

# Q8. What is the process for overseas travelers affected by the Executive Order to request a waiver?

Waivers for overseas travelers without a valid U.S. visa will be adjudicated by the Department of State in conjunction with a visa application.

# Q9. How are returning refugees and asylees affected by the Executive Order?

Returning refugees and asylees, i.e., individuals who have already been granted asylum or refugee status in the United States, are explicitly excepted from this Executive Order. As such, they may continue to travel consistent with existing requirements.

# Q10. Are first-time arrival refugees with valid /travel documents allowed to travel to the United States?

Yes, but only refugees, regardless of nationality, whose travel was already formally scheduled by the Department of State, are permitted to travel to the United States and seek admission. The Department of State will have additional information.

# Q11. Will unaccompanied minors within the scope of the Executive Order be denied boarding and or denied entry into the United States?

The Executive Order applies to those who do not have valid visas.  Any individuals, including children, who seek entry to the United States must have a valid visa (or other approved travel document) before travel to the United States. The Secretary of State may issue a waiver on a case-by-case basis when in the national interest of the United States. With such a waiver, a visa may be issued.

# Q12. Is DHS complying with all court orders?

DHS is complying, and will continue to comply, with all court orders in effect.

# Q13. When will the Executive Order be implemented?

The Executive Order is effective at 12:01 A.M., Eastern Standard Time, on March 16, 2017.

# Q14. Will the Executive Order impact Trusted Traveler Program membership?

No.  Currently, CBP does not have reciprocal agreements for a Trusted Traveler Program with any of the countries designated in the Executive Order.

# Q15. When will CBP issue guidance to both the field and airlines regarding the Executive Order?

CBP will issue guidance and contact stakeholders to ensure timely implementation consistent with the terms of the Executive Order.

# Q16. Will first-time arrivals with valid immigrant visas be allowed to travel to the U.S.?

Yes. Individuals holding valid visas on the effective date of the Executive Order or on January 27, 2017 prior to 5:00 PM do not fall within the scope of the Order.

# Q17. Does this affect travelers at all ports of entry?

Yes, this Executive Order applies to travelers who are applying for entry into the United States at any port of entry—air, land, or sea—and includes preclearance locations.

# Q18. What does granting a waiver to the Executive Order mean? How are waivers applied to individual cases?

Per the Executive Order, the Departments of Homeland Security and State can review individual cases and grant waivers on a case-by-case basis if a foreign national demonstrates that his or her entry into the United States is in the national interest, will not pose a threat to national security, and that denying entry during the suspension period will cause undue hardship.

# Q19. Does "from one of the six countries" mean citizen, national, or born in?

The Executive Order applies to both nationals and citizens of the six countries.

# Q20. How does the lawsuit/stay affect DHS operations in implementing this Executive Order?

Questions regarding the application of specific federal court orders should be directed to the Department of Justice.

# Q21. Will nationals of the six countries with valid green cards (lawful permanent residents of the United States) be allowed to return to the United States?

Per the Executive Order, the suspension of entry does not apply to lawful permanent residents of the United States.

# Q22. Can a dual national who holds nationality with one of the six designated countries traveling with a passport from an unrestricted country travel to the United States?

The Executive Order exempts from its scope any dual national of one of the six countries when the individual is traveling on a passport issued by a different non-designated country.

# Q23. Can a dual national who holds nationality with one of the six designated countries and is currently overseas, apply for an immigrant or nonimmigrant visa to the United States?

Please contact the Department of State for information about how the Executive Order applies to visa applicants.

# Q24. Are international students, exchange visitors, and their dependents from the six countries (such as F, M, or J visa holders) included in the Executive Order? What kind of guidance is being given to foreign students from these countries legally in the United States?

The Executive Order does not apply to individuals who are within the United States on the effective date of the Order or to those individuals who hold a valid visa. Visas which were provisionally revoked solely as a result of the enforcement of Executive Order 13769 are valid for purposes of administering this Executive Order. Individuals holding valid F, M, or J visas may continue to travel to the United States on those visas if they are otherwise valid.

Please contact the State Department for information about how the Executive Order applies to visa applicants.

# Q25. What happens to international students, exchange visitors or their dependents from the

# six countries, such as F, M or J visa holders if their visa expires while the Executive Order is in place and they have to depart the country?

The Executive Order does not affect F, M, or J visa holders if they currently have a valid visa on the effective date or held a valid visa on January 27, 2017 prior to the issuance of the Executive Order. With that said, travelers must have a valid visa to travel to the United States, regardless of the Executive Order. Travelers whose visa expires after the effective date of the Executive Order must obtain a new, valid visa to return to the United States.

# Q26. Can U.S. Citizenship and Immigration Services (USCIS) continue refugee interviews?

The Departments of Homeland Security and State will conduct interviews as appropriate and consistent with the Executive Order. However, the Executive Order suspends decisions on applications for refugee status, unless the Secretary of Homeland Security and the Secretary of State jointly determine, on a case-by-case basis, that the entry of an individual as a refugee is in the national interest and would not pose a threat to the security or welfare of the United States.

# Q27. Can the exception for refugee admission be used for Refugee/Asylee Relative Petitions (Form I-730) cases where a family member is requesting a beneficiary follow to join?

No. Individuals who already have valid visas or travel documents that permit them to travel to the United States are exempt from the Executive Order. To the extent that an individual does not yet have such documents, please contact the Department of State.

# Q28. Does the Executive Order apply to those currently being adjudicated for naturalization or adjustment of status?

USCIS will continue to adjudicate Applications for Naturalization (Form N-400) and Applications to Register Permanent Residence or Adjust Status (Form I-485) and grant citizenship consistent with existing practices.

# Q29. Will landed immigrants of Canada affected by the Executive Order be eligible for entry to the United States?

Landed immigrants of Canada who hold passports from one of the six countries are eligible to apply for a visa, and coordinate a waiver, at a location within Canada.

# Q30. Has CBP issued clear guidance to CBP officers at ports of entry regarding the Executive Order?

CBP has and will continue to issue any needed guidance to the field with respect to this Executive Order.

# Q31. What coordination is being done between CBP and the carriers?

CBP has been and will remain in continuous communication with the airlines through CBP regional carrier liaisons. In addition, CBP will hold executive level calls with airlines in order to provide guidance, answer questions, and address concerns.

# Q32. What additional screening will nationals of restricted countries (as well as any visa applications) undergo as a result of the Executive Order?

In making admission and visa eligibility determinations, DHS and DOS will continue to apply all appropriate security vetting procedures.

# Q33. Why is a temporary suspension warranted?

The Executive Order signed on March 6, 2017, allows for the proper review and establishment of standards to prevent terrorist or criminal infiltration by foreign nationals. The Executive Order protects the United States from countries compromised by terrorism and ensures a more rigorous vetting process. Protecting the American people is the highest priority of our Government and this Department.

Congress and the Obama Administration designated these six countries as countries of concern due to the national security risks associated with their instability and the prevalence of terrorist fighters in their territories. The conditions in the six designated countries present a recognized threat, warranting additional scrutiny of their nationals seeking to travel to and enter the United States. In order to ensure that the U.S. Government can conduct a thorough and comprehensive analysis of the national security risks, the Executive Order imposes a 90-day suspension on entry to the United States of nationals of those countries.

Based on commitments from the Government of Iraq, the suspension of entry in this Executive Order will not apply to nationals of Iraq. Iraq has taken steps to increase their cooperation with the United States in the vetting of Iraqi nationals and as such it was determined that a temporary suspension is not warranted.

DHS will faithfully execute the immigration laws and the President's Executive Order, and will treat all of those we encounter humanely and with professionalism.

# Q34. Why is a suspension of the refugee program warranted?

Some of those who have entered the United States as refugees have also proved to be threats to our national security. For example, in October 2014, an individual admitted to the United States as a refugee from Somalia, and who later became a naturalized U.S. citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction in connection with a plot to set off a bomb at a Christmas tree-lighting ceremony in Portland, Oregon. The Federal Bureau of Investigation has reported that approximately 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations.

# Q35. How were the six countries designated in the Executive Order selected?

The six countries, Iran, Libya, Somalia, Sudan, Syria, and Yemen, had already been identified as presenting concerns about terrorism and travel to the United States. Specifically, the suspension applies to countries referred to in, or designated under—except Iraq—section 217(a)(12) of the INA, 8 U.S.C. § 1187(a)(12). In that provision Congress restricted use of the Visa Waiver Program by dual nationals of, and aliens recently present in, (A) Syria and Iraq, (B) any country designated by the Secretary of State as a state sponsor of terrorism (currently Iran, Syria, and Sudan), and (C) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence.In 2016, the former Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern regarding aliens recently present in those countries.

For the purposes of this Executive Order, although Iraq has been previously identified, based on commitments from the Government of Iraq, the suspension of entry in this Executive Order will not apply to nationals of Iraq. However, those who are dual nationals of Iraq and aliens recently present in Iraq continue to have restricted use of the Visa Waiver Program.

On the basis of negotiations that have taken place between the Government of Iraq and the U.S. Department of State in the last month, Iraq will increase cooperation with the U.S. Government on the vetting of its citizens applying for a visa to travel to the United States. As such it was determined that a temporary suspension with respect to nationals of Iraq is not warranted at this time.

# Q36. Why was Iraq treated differently in this Executive Order?

The close cooperative relationship between the United States and the democratically-elected Iraqi government, the strong U.S. diplomatic presence in Iraq, the significant presence of U.S. forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment. In particular, those Iraqi government forces that have fought to regain more than half of the territory previously dominated by ISIS have earned special status. In addition, since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to provide additional information about its citizens for purposes of our immigration decisions. Accordingly, it is no longer necessary to include Iraq in the temporary suspension applicable to the other six

Case 2:17-cv-10310-VAR-SDD ECF No. 124-2 filed 09/13/18 PageID.2596 Page 35 of 61

countries, but visa applications and applications for admission to the United States by Iraqi nationals will be subjected to additional scrutiny to determine if they have connections with ISIS or other terrorist organizations.

# Q37. Are Iraqi nationals subject to the Executive Order? Will they require a waiver to travel to the United States?

This Executive Order does not presently suspend the entry of nationals of Iraq. However, all travelers must have a valid travel document in order to travel to the United States. Admissibility will be determined by a CBP officer upon arrival at a Port of Entry. Please contact the Department of State for information related to visa eligibility and application.

Topics: Border Security (/topics/border-security) , Homeland Security Enterprise (/topics/homeland-security-enterprise) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: immigration (/keywords/immigration) , immigration enforcement (/keywords/immigration-enforcement)

Last Published Date: May 31, 2017

# RAOFIELD DECLARATION
# EXHIBIT D

# Presidential Documents

Proclamation 9645 of September 24, 2017

## Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats

**By the President of the United States of America**

**A Proclamation**

In Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), on the recommendations of the Secretary of Homeland Security and the Attorney General, I ordered a worldwide review of whether, and if so what, additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat. This was the first such review of its kind in United States history. As part of the review, the Secretary of Homeland Security established global requirements for information sharing in support of immigration screening and vetting. The Secretary of Homeland Security developed a comprehensive set of criteria and applied it to the information-sharing practices, policies, and capabilities of foreign governments. The Secretary of State thereafter engaged with the countries reviewed in an effort to address deficiencies and achieve improvements. In many instances, those efforts produced positive results. By obtaining additional information and formal commitments from foreign governments, the United States Government has improved its capacity and ability to assess whether foreign nationals attempting to enter the United States pose a security or safety threat. Our Nation is safer as a result of this work.

Despite those efforts, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, has determined that a small number of countries—out of nearly 200 evaluated—remain deficient at this time with respect to their identity-management and information-sharing capabilities, protocols, and practices. In some cases, these countries also have a significant terrorist presence within their territory.

As President, I must act to protect the security and interests of the United States and its people. I am committed to our ongoing efforts to engage those countries willing to cooperate, improve information-sharing and identity-management protocols and procedures, and address both terrorism-related and public-safety risks. Some of the countries with remaining inadequacies face significant challenges. Others have made strides to improve their protocols and procedures, and I commend them for these efforts. But until they satisfactorily address the identified inadequacies, I have determined, on the basis of recommendations from the Secretary of Homeland Security and other members of my Cabinet, to impose certain conditional restrictions and limitations, as set forth more fully below, on entry into the United States of nationals of the countries identified in section 2 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the

interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. They enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems.

(c) Section 2(a) of Executive Order 13780 directed a ''worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat.'' That review culminated in a report submitted to the President by the Secretary of Homeland Security on July 9, 2017. In that review, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat. That baseline incorporates three categories of criteria:

(i) *Identity-management information.* The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be. The identity-management information category focuses on the integrity of documents required for travel to the United States. The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.

(ii) *National security and public-safety information.* The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.

(iii) *National security and public-safety risk assessment.* The national security and public-safety risk assessment category focuses on national security risk indicators. The criteria assessed in this category include whether the country is a known or potential terrorist safe haven, whether it is

a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.

(d) The Department of Homeland Security, in coordination with the Department of State, collected data on the performance of all foreign governments and assessed each country against the baseline described in subsection (c) of this section. The assessment focused, in particular, on identity management, security and public-safety threats, and national security risks. Through this assessment, the agencies measured each country's performance with respect to issuing reliable travel documents and implementing adequate identity-management and information-sharing protocols and procedures, and evaluated terrorism-related and public-safety risks associated with foreign nationals seeking entry into the United States from each country.

(e) The Department of Homeland Security evaluated each country against the baseline described in subsection (c) of this section. The Secretary of Homeland Security identified 16 countries as being ''inadequate'' based on an analysis of their identity-management protocols, information-sharing practices, and risk factors. Thirty-one additional countries were classified ''at risk'' of becoming ''inadequate'' based on those criteria.

(f) As required by section 2(d) of Executive Order 13780, the Department of State conducted a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either ''inadequate'' or ''at risk,'' to improve their performance with respect to the baseline described in subsection (c) of this section. Those engagements yielded significant improvements in many countries. Twenty-nine countries, for example, provided travel document exemplars for use by Department of Homeland Security officials to combat fraud. Eleven countries agreed to share information on known or suspected terrorists.

(g) The Secretary of Homeland Security assesses that the following countries continue to have ''inadequate'' identity-management protocols, information-sharing practices, and risk factors, with respect to the baseline described in subsection (c) of this section, such that entry restrictions and limitations are recommended: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. The Secretary of Homeland Security also assesses that Iraq did not meet the baseline, but that entry restrictions and limitations under a Presidential proclamation are not warranted. The Secretary of Homeland Security recommends, however, that nationals of Iraq who seek to enter the United States be subject to additional scrutiny to determine if they pose risks to the national security or public safety of the United States. In reaching these conclusions, the Secretary of Homeland Security considered the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS).

(h) Section 2(e) of Executive Order 13780 directed the Secretary of Homeland Security to ''submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means.'' On September 15, 2017, the Secretary of Homeland Security submitted a report to me recommending entry restrictions and limitations on certain nationals of 7 countries determined to be ''inadequate'' in providing such information and in light of other factors discussed in the report. According to the report, the recommended restrictions would help address the threats that the countries' identity-management protocols, information-sharing inadequacies, and other risk factors pose to the security and welfare of the United

States. The restrictions also encourage the countries to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible.

(i) In evaluating the recommendations of the Secretary of Homeland Security and in determining what restrictions to impose for each country, I consulted with appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General. I considered several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors, such as whether it has a significant terrorist presence within its territory. I also considered foreign policy, national security, and counter-terrorism goals. I reviewed these factors and assessed these goals, with a particular focus on crafting those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. These restrictions and limitations are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments; and to advance foreign policy, national security, and counterterrorism objectives.

(ii) After reviewing the Secretary of Homeland Security's report of September 15, 2017, and accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to restrict and limit the entry of nationals of 7 countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. These restrictions distinguish between the entry of immigrants and nonimmigrants. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants even after national security concerns arise, which heightens the costs and dangers of errors associated with admitting such individuals. And although immigrants generally receive more extensive vetting than non-immigrants, such vetting is less reliable when the country from which someone seeks to emigrate exhibits significant gaps in its identity-management or information-sharing policies, or presents risks to the national security of the United States. For all but one of those 7 countries, therefore, I am restricting the entry of all immigrants.

(iii) I am adopting a more tailored approach with respect to nonimmigrants, in accordance with the recommendations of the Secretary of Homeland Security. For some countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section, I am restricting the entry of all nonimmigrants. For countries with certain mitigating factors, such as a willingness to cooperate or play a substantial role in combatting terrorism, I am restricting the entry only of certain categories of nonimmigrants, which will mitigate the security threats presented by their entry into the United States. In those cases in which future cooperation seems reasonably likely, and accounting for foreign policy, national security, and counterterrorism objectives, I have tailored the restrictions to encourage such improvements.

(i) Section 2(e) of Executive Order 13780 also provided that the "Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which

any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.'' The Secretary of Homeland Security determined that Somalia generally satisfies the information-sharing requirements of the baseline described in subsection (c) of this section, but its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory, present special circumstances that warrant restrictions and limitations on the entry of its nationals into the United States. Somalia's identity-management deficiencies and the significant terrorist presence within its territory make it a source of particular risks to the national security and public safety of the United States. Based on the considerations mentioned above, and as described further in section 2(h) of this proclamation, I have determined that entry restrictions, limitations, and other measures designed to ensure proper screening and vetting for nationals of Somalia are necessary for the security and welfare of the United States.

(j) Section 2 of this proclamation describes some of the inadequacies that led me to impose restrictions on the specified countries. Describing all of those reasons publicly, however, would cause serious damage to the national security of the United States, and many such descriptions are classified.

**Sec. 2**. *Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to categorical exceptions and case-by-case waivers, as described in sections 3 and 6 of this proclamation:

(a) *Chad.*

(i) The government of Chad is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Chad has shown a clear willingness to improve in these areas. Nonetheless, Chad does not adequately share public-safety and terrorism-related information and fails to satisfy at least one key risk criterion. Additionally, several terrorist groups are active within Chad or in the surrounding region, including elements of Boko Haram, ISIS-West Africa, and al-Qa'ida in the Islamic Maghreb. At this time, additional information sharing to identify those foreign nationals applying for visas or seeking entry into the United States who represent national security and public-safety threats is necessary given the significant terrorism-related risk from this country.

(ii) The entry into the United States of nationals of Chad, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(b) *Iran.*

(i) Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States. The Department of State has also designated Iran as a state sponsor of terrorism.

(ii) The entry into the United States of nationals of Iran as immigrants and as nonimmigrants is hereby suspended, except that entry by such nationals under valid student (F and M) and exchange visitor (J) visas is not suspended, although such individuals should be subject to enhanced screening and vetting requirements.

(c) *Libya.*

(i) The government of Libya is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding on that cooperation, including in the areas of immigration and border management. Libya, nonetheless, faces significant challenges in sharing several types of information, including public-safety

and terrorism-related information necessary for the protection of the national security and public safety of the United States. Libya also has significant inadequacies in its identity-management protocols. Further, Libya fails to satisfy at least one key risk criterion and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. The substantial terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(d) *North Korea.*

(i) North Korea does not cooperate with the United States Government in any respect and fails to satisfy all information-sharing requirements.

(ii) The entry into the United States of nationals of North Korea as immigrants and nonimmigrants is hereby suspended.

(e) *Syria.*

(i) Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism. Syria has significant inadequacies in identity-management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby suspended.

(f) *Venezuela.*

(i) Venezuela has adopted many of the baseline standards identified by the Secretary of Homeland Security and in section 1 of this proclamation, but its government is uncooperative in verifying whether its citizens pose national security or public-safety threats. Venezuela's government fails to share public-safety and terrorism-related information adequately, fails to satisfy at least one key risk criterion, and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. There are, however, alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela. As a result, the restrictions imposed by this proclamation focus on government officials of Venezuela who are responsible for the identified inadequacies.

(ii) Notwithstanding section 3(b)(v) of this proclamation, the entry into the United States of officials of government agencies of Venezuela involved in screening and vetting procedures—including the Ministry of the Popular Power for Interior, Justice and Peace; the Administrative Service of Identification, Migration and Immigration; the Scientific, Penal and Criminal Investigation Service Corps; the Bolivarian National Intelligence Service; and the Ministry of the Popular Power for Foreign Relations—and their immediate family members, as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended. Further, nationals of Venezuela who are visa holders should be subject to appropriate additional measures to ensure traveler information remains current.

(g) *Yemen.*

(i) The government of Yemen is an important and valuable counterterrorism partner, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Yemen, nonetheless, faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory. The government of Yemen fails to satisfy critical identity-management requirements, does not share public-safety and terrorism-related information adequately, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Yemen as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(h) *Somalia.*

(i) The Secretary of Homeland Security's report of September 15, 2017, determined that Somalia satisfies the information-sharing requirements of the baseline described in section 1(c) of this proclamation. But several other considerations support imposing entry restrictions and limitations on Somalia. Somalia has significant identity-management deficiencies. For example, while Somalia issues an electronic passport, the United States and many other countries do not recognize it. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. Terrorists use under-governed areas in northern, central, and southern Somalia as safe havens from which to plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The State Department's 2016 Country Reports on Terrorism observed that Somalia has not sufficiently degraded the ability of terrorist groups to plan and mount attacks from its territory. Further, despite having made significant progress toward formally federating its member states, and its willingness to fight terrorism, Somalia continues to struggle to provide the governance needed to limit terrorists' freedom of movement, access to resources, and capacity to operate. The government of Somalia's lack of territorial control also compromises Somalia's ability, already limited because of poor record-keeping, to share information about its nationals who pose criminal or terrorist risks. As a result of these and other factors, Somalia presents special concerns that distinguish it from other countries.

(ii) The entry into the United States of nationals of Somalia as immigrants is hereby suspended. Additionally, visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny to determine if applicants are connected to terrorist organizations or otherwise pose a threat to the national security or public safety of the United States.

**Sec. 3**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspensions of and limitations on entry pursuant to section 2 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date under section 7 of this proclamation;

(ii) do not have a valid visa on the applicable effective date under section 7 of this proclamation; and

(iii) do not qualify for a visa or other valid travel document under section 6(d) of this proclamation.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the applicable effective date under section 7 of this proclamation;

(iii) any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document—valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission;

(iv) any dual national of a country designated under section 2 of this proclamation when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum by the United States; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspensions of and limitations on entry set forth in section 2 of this proclamation, a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent with subsections (i) through (iv) of this subsection. The Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants.

(i) A waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that:

(A) denying entry would cause the foreign national undue hardship;

(B) entry would not pose a threat to the national security or public safety of the United States; and

(C) entry would be in the national interest.

(ii) The guidance issued by the Secretary of State and the Secretary of Homeland Security under this subsection shall address the standards, policies, and procedures for:

(A) determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;

(B) determining whether the entry of a foreign national would be in the national interest;

(C) addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;

(D) assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements of subsection (i) of this subsection; and

(E) determining the special circumstances that would justify granting a waiver under subsection (iv)(E) of this subsection.

(iii) Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa, but will leave unchanged all other requirements for admission or entry.

(iv) Case-by-case waivers may not be granted categorically, but may be appropriate, subject to the limitations, conditions, and requirements set forth under subsection (i) of this subsection and the guidance issued under subsection (ii) of this subsection, in individual circumstances such as the following:

(A) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date under section 7 of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

(B) the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date under section 7 of this proclamation for work, study, or other lawful activity;

(C) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

(D) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.*, a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

(E) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(F) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee), and the foreign national can document that he or she has provided faithful and valuable service to the United States Government;

(G) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;

(H) the foreign national is a Canadian permanent resident who applies for a visa at a location within Canada;

(I) the foreign national is traveling as a United States Government–sponsored exchange visitor; or

(J) the foreign national is traveling to the United States, at the request of a United States Government department or agency, for legitimate law enforcement, foreign policy, or national security purposes.

**Sec. 4**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of Homeland Security shall, in consultation with the Secretary of State, devise a process to assess whether any suspensions and limitations imposed by section 2 of this proclamation should be continued, terminated, modified, or supplemented. The process shall account for whether countries have improved their identity-management and information-sharing protocols and procedures based on the criteria set forth in section 1 of this proclamation and the Secretary of Homeland Security's report of September 15, 2017. Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies, shall submit a report with recommendations to the President, through appropriate Assistants to the President, regarding the following:

(i) the interests of the United States, if any, that continue to require the suspension of, or limitations on, the entry on certain classes of nationals of countries identified in section 2 of this proclamation and whether the restrictions and limitations imposed by section 2 of this proclamation should be continued, modified, terminated, or supplemented; and

(ii) the interests of the United States, if any, that require the suspension of, or limitations on, the entry of certain classes of nationals of countries not identified in this proclamation.

(b) The Secretary of State, in consultation with the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, the Director of National Intelligence, and the head of any other executive department or agency (agency) that the Secretary of State deems appropriate, shall engage the countries listed in section 2 of this proclamation, and any other countries that have information-sharing, identity-management, or risk-factor deficiencies as practicable, appropriate, and consistent with the foreign policy, national security, and public-safety objectives of the United States.

(c) Notwithstanding the process described above, and consistent with the process described in section 2(f) of Executive Order 13780, if the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, and the Director of National Intelligence, determines, at any time, that a country meets the standards of the baseline described in section 1(c) of this proclamation, that a country has an adequate plan to provide such information, or that one or more of the restrictions or limitations imposed on the entry of a country's nationals are no longer necessary for the security or welfare of the United States, the Secretary of Homeland Security may recommend to the President the removal or modification of any or all such restrictions and limitations. The Secretary of Homeland Security, the Secretary of State, or the Attorney General may also, as provided for in Executive Order 13780, submit to the President the names of additional countries for which any of them recommends any lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

**Sec. 5**. *Reports on Screening and Vetting Procedures.* (a) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies shall submit periodic reports to the President, through appropriate Assistants to the President, that:

(i) describe the steps the United States Government has taken to improve vetting for nationals of all foreign countries, including through improved collection of biometric and biographic data;

(ii) describe the scope and magnitude of fraud, errors, false information, and unverifiable claims, as determined by the Secretary of Homeland Security on the basis of a validation study, made in applications for immigration benefits under the immigration laws; and

(iii) evaluate the procedures related to screening and vetting established by the Department of State's Bureau of Consular Affairs in order to enhance the safety and security of the United States and to ensure sufficient review of applications for immigration benefits.

(b) The initial report required under subsection (a) of this section shall be submitted within 180 days of the date of this proclamation; the second report shall be submitted within 270 days of the first report; and reports shall be submitted annually thereafter.

(c) The agency heads identified in subsection (a) of this section shall coordinate any policy developments associated with the reports described in subsection (a) of this section through the appropriate Assistants to the President.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including those that provide an opportunity for individuals to enter the United States on the basis of a credible claim of fear of persecution or torture.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 of January 27, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry under the terms and conditions of the visa marked revoked or marked canceled. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 7.** *Effective Dates.* Executive Order 13780 ordered a temporary pause on the entry of foreign nationals from certain foreign countries. In two cases, however, Federal courts have enjoined those restrictions. The Supreme Court has stayed those injunctions as to foreign nationals who lack a credible claim of a bona fide relationship with a person or entity in the United States, pending its review of the decisions of the lower courts.

(a) The restrictions and limitations established in section 2 of this proclamation are effective at 3:30 p.m. eastern daylight time on September 24, 2017, for foreign nationals who:

(i) were subject to entry restrictions under section 2 of Executive Order 13780, or would have been subject to the restrictions but for section 3 of that Executive Order, and

(ii) lack a credible claim of a bona fide relationship with a person or entity in the United States.

(b) The restrictions and limitations established in section 2 of this proclamation are effective at 12:01 a.m. eastern daylight time on October 18, 2017, for all other persons subject to this proclamation, including nationals of:

(i) Iran, Libya, Syria, Yemen, and Somalia who have a credible claim of a bona fide relationship with a person or entity in the United States; and

(ii) Chad, North Korea, and Venezuela.

**Sec. 8.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 9.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fourth day of September, in the year of our Lord two thousand seventeen, and of the Independence of the United States of America the two hundred and forty-second.

[FR Doc. 2017–20899

Filed 9–26–17; 11:15 am]

Billing code 3295–F7–P

# RAOFIELD DECLARATION
# EXHIBIT E

# Presidential Documents

Executive Order 13815 of October 24, 2017

## Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1**. *Policy*. (a) It is the policy of the United States to protect its people from terrorist attacks and other public-safety threats. Screening and vetting procedures associated with determining which foreign nationals may enter the United States, including through the U.S. Refugee Admissions Program (USRAP), play a critical role in implementing that policy. Those procedures enhance our ability to detect foreign nationals who might commit, aid, or support acts of terrorism, or otherwise pose a threat to the national security or public safety of the United States, and they bolster our efforts to prevent such individuals from entering the country.

(b) Section 5 of Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to develop a uniform baseline for screening and vetting standards and procedures applicable to all travelers who seek to enter the United States. A working group was established to satisfy this directive.

(c) Section 6(a) of Executive Order 13780 directed a review to strengthen the vetting process for the USRAP. It also instructed the Secretary of State to suspend the travel of refugees into the United States under that program, and the Secretary of Homeland Security to suspend decisions on applications for refugee status, subject to certain exceptions. Section 6(a) also required the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, to conduct a 120-day review of the USRAP application and adjudication process in order to determine, and implement, additional procedures to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States. Executive Order 13780 noted that terrorist groups have sought to infiltrate several nations through refugee programs and that the Attorney General had reported that more than 300 persons who had entered the United States as refugees were then the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

(d) The Secretary of State convened a working group to implement the review process under section 6(a) of Executive Order 13780. This review was informed by the development of uniform baseline screening and vetting standards and procedures for all travelers under section 5 of Executive Order 13780. The section 6(a) working group compared the process for screening and vetting refugees with the uniform baseline standards and procedures established by the section 5 working group. The section 6(a) working group identified several ways to enhance the process for screening and vetting refugees and began implementing those improvements.

(e) The review process for refugees required by Executive Order 13780 has made our Nation safer. The improvements the section 6(a) working group has identified will strengthen the data-collection process for all refugee applicants considered for resettlement in the United States. They will also

bolster the process for interviewing refugees through improved training, fraud-detection procedures, and interagency information sharing. Further, they will enhance the ability of our systems to check biometric and biographic information against a broad range of threat information contained in various Federal watchlists and databases.

(f) Section 2 of Proclamation 9645 of September 24, 2017 (Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats), suspended and limited, subject to exceptions and case-by-case waivers, the entry into the United States of foreign nationals of eight countries. As noted in that Proclamation, those suspensions and limitations are in the interest of the United States because of certain deficiencies in those countries' identity-management and information-sharing protocols and procedures, and because of the national security and public-safety risks that emanate from their territory, including risks that result from the significant presence of terrorists within the territory of several of those countries.

(g) The entry restrictions and limitations in Proclamation 9645 apply to the immigrant and nonimmigrant visa application and adjudication processes, which foreign nationals use to seek authorization to travel to the United States and apply for admission. Pursuant to section 3(b)(iii) of Proclamation 9645, however, those restrictions and limitations do not apply to those who seek to enter the United States through the USRAP.

(h) Foreign nationals who seek to enter the United States with an immigrant or nonimmigrant visa stand in a different position from that of refugees who are considered for entry into this country under the USRAP. For a variety of reasons, including substantive differences in the risk factors presented by the refugee population and in the quality of information available to screen and vet refugees, the refugee screening and vetting process is different from the process that applies to most visa applicants. At the same time, the entry of certain refugees into the United States through the USRAP poses unique security risks and considerable domestic challenges that require the application of substantial resources.

**Sec. 2**. *Resumption of the U.S. Refugee Admissions Program.* (a) Section 6(a) of Executive Order 13780 provided for a temporary, 120-day review of the USRAP application and adjudication process and an accompanying worldwide suspension of refugee travel to the United States and of application decisions under the USRAP. That 120-day period expires on October 24, 2017. Section 6(a) further provided that refugee travel and application decisions could resume after 120 days for stateless persons and for the nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence jointly determine that the additional procedures identified through the USRAP review process are adequate to ensure the security and welfare of the United States. The Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have advised that the improvements to the USRAP vetting process are generally adequate to ensure the security and welfare of the United States, that the Secretary of State and Secretary of Homeland Security may resume that program, and that they will apply special measures to certain categories of refugees whose entry continues to pose potential threats to the security and welfare of the United States.

(b) With the improvements identified by the section 6(a) working group and implemented by the participating agencies, the refugee screening and vetting process generally meets the uniform baseline for immigration screening and vetting established by the section 5 working group. Accordingly, a general resumption of the USRAP, subject to the conditions set forth in section 3 of this order, is consistent with the security and welfare of the United States.

(c) The suspension of the USRAP and other processes specified in section 6(a) of Executive Order 13780 are no longer in effect. Subject to the conditions set forth in section 3 of this order, the Secretary of State may resume

travel of qualified and appropriately vetted refugees into the United States, and the Secretary of Homeland Security may resume adjudicating applications for refugee resettlement.

**Sec. 3.** *Addressing the Risks Presented by Certain Categories of Refugees.* (a) Based on the considerations outlined above, including the special measures referred to in subsection (a) of section 2 of this order, Presidential action to suspend the entry of refugees under the USRAP is not needed at this time to protect the security and interests of the United States and its people. The Secretary of State and the Secretary of Homeland Security, however, shall continue to assess and address any risks posed by particular refugees as follows:

(i) The Secretary of State and the Secretary of Homeland Security shall coordinate to assess any risks to the security and welfare of the United States that may be presented by the entry into the United States through the USRAP of stateless persons and foreign nationals. Under section 207(c) and applicable portions of section 212(a) of the INA, 8 U.S.C. 1157(c) and 1182(a), section 402(4) of the Homeland Security Act of 2002, 6 U.S.C. 202(4), and other applicable authorities, the Secretary of Homeland Security, in consultation with the Secretary of State, shall determine, as appropriate and consistent with applicable law, whether any actions should be taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country, and, if so, what those actions should be. The Secretary of State and the Secretary of Homeland Security shall administer the USRAP consistent with those determinations, and in consultation with the Attorney General and the Director of National Intelligence.

(ii) Within 90 days of the date of this order and annually thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall determine, as appropriate and consistent with applicable law, whether any actions taken to address the risks to the security and welfare of the United States presented by permitting any category of refugees to enter this country should be modified or terminated, and, if so, what those modifications or terminations should be. If the Secretary of Homeland Security, in consultation with the Secretary of State, determines, at any time, that any actions taken pursuant to section 3(a)(i) should be modified or terminated, the Secretary of Homeland Security may modify or terminate those actions accordingly. The Secretary of Homeland Security and the Secretary of State shall administer the USRAP consistent with the determinations made under this subsection, and in consultation with the Attorney General and the Director of National Intelligence.

(b) Within 180 days of the date of this order, the Attorney General shall, in consultation with the Secretary of State and the Secretary of Homeland Security, and in cooperation with the heads of other executive departments and agencies as he deems appropriate, provide a report to the President on the effect of refugee resettlement in the United States on the national security, public safety, and general welfare of the United States. The report shall include any recommendations the Attorney General deems necessary to advance those interests.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*October 24, 2017.*

[FR Doc. 2017–23630
10–26–17; 11:15 am]
Billing code 3295–F8–P

# RAOFIELD DECLARATION
# EXHIBIT F

MEMORANDUM TO THE PRESIDENT

OCT 2 3 2017

FROM:     Rex W. Tillerson
          Secretary
          Department of State

          Elaine Duke
          Acting Secretary
          Department of Homeland Security

          Daniel Coats
          Director
          Office of the Director of National Intelligence

RESUMING THE UNITED STATES REFUGEE ADMISSIONS
PROGRAM WITH ENHANCED VETTING CAPABILITIES

In section 6(a) of Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), you directed a review to strengthen the vetting process for the U.S. Refugee Admissions Program (USRAP). You instructed the Secretary of State to suspend the travel of refugees into the United States under that program, and the Secretary of Homeland Security to suspend decisions on applications for refugee status, for a temporary, 120-day period, subject to certain exceptions. During the 120-day suspension period, Section 6(a) required the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, to review the USRAP application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States, and to implement such additional procedures.

The Secretary of State convened a working group to implement the review process under section 6(a) of Executive Order 13780, which proceeded in parallel with the development of the uniform baseline of screening and vetting standards and procedures for all travelers under section 5 of that Executive Order. The section 6(a) working group then compared the refugee screening and vetting process with the uniform baseline standards and procedures established by the section 5 working group. This helped to inform the section 6(a) working group's identification of a number of additional ways to enhance the refugee screening and vetting processes. The Secretary of State and the Secretary of Homeland Security have begun implementing those improvements.

Pursuant to section 6(a), this memorandum reflects our joint determination that the improvements to the USRAP vetting process identified by the 6(a) working group are generally adequate to ensure the security and welfare of the United States, and therefore that the Secretary

of State may resume travel of refugees into the United States and that the Secretary of Homeland Security may resume making decisions on applications for refugee status for stateless persons and foreign nationals, subject to the conditions described below.

Notwithstanding the additional procedures identified or implemented during the last 120 days, we continue to have concerns regarding the admission of nationals of, and stateless persons who last habitually resided in, 11 particular countries previously identified as posing a higher risk to the United States through their designation on the Security Advisory Opinion (SAO) list. The SAO list for refugees was established following the September 11th terrorist attacks and has evolved over the years through interagency consultations. The current list of countries was established in 2015. To address these concerns, we will conduct a detailed threat analysis and review for nationals of these high risk countries and stateless persons who last habitually resided in those countries, including a threat assessment of each country, pursuant to section 207(c) and applicable portions of section 212(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1157(c) and 1182(a), section 402(4) of the Homeland Security Act of 2002, 6 U.S.C. 202(4), and other applicable authorities. During this review, the Secretary of State and the Secretary of Homeland Security will temporarily prioritize refugee applications from other non-SAO countries. DHS and DOS will work together to take resources that may have been dedicated to processing nationals of, or stateless persons who last habitually resided in, SAO countries and, during the temporary review period, reallocate them to process applicants from non-SAO countries for whom the processing may not be as resource intensive.

While the temporary review is underway, the Secretaries of Homeland Security and State will cooperate to carefully scrutinize the applications of nationals of countries on the SAO list, or of stateless persons who last habitually resided in those countries, and will consider individuals for potential admission whose resettlement in the United States would fulfill critical foreign policy interests, without compromising national security and the welfare of the United States. As such, the Secretary of Homeland Security will admit on a case-by-case basis only refugees whose admission is deemed to be in the national interest and poses no threat to the security or welfare of the United States. We will direct our staff to work jointly and with law enforcement agencies to complete the additional review of the SAO countries no later than 90 days from the date of this memorandum, and to determine what additional safeguards, if any, are necessary to ensure that the admission of refugees from these countries of concern does not pose a threat to the security and welfare of the United States.

Further, it is our joint determination that additional security measures must be implemented promptly for derivative refugees—those who are "following-to-join" principal refugees that have already been resettled in the United States—regardless of nationality.[1] At present, the majority of following-to-join refugees, unlike principal refugees, do not undergo enhanced DHS review, which includes soliciting information from the refugee applicant earlier

---

[1] When a refugee is processed for admission to the United States, eligible family members located in the same place as the refugee (spouses and/or unmarried children under 21 years of age) typically are also processed at the same time, and they receive the same screening as the principal refugee. Each year, however, resettled principal refugees also petition, through a separate process, for approximately 2,500 family members to be admitted to the United States as following-to-join refugees. The family member may be residing and processed in a different country than where the principal refugee was processed, and while most following-to-join refugees share the nationality of the principal, some may be of a different nationality.

in the process to provide for a more thorough screening process, as well as vetting certain nationals or stateless persons against classified databases.  We have jointly determined that additional security measures must be implemented before admission of following-to-join refugees can resume.  Based on an assessment of current systems checks, as well as requirements for uniformity identified by Section 5, we will direct our staffs to work jointly to implement adequate screening mechanisms for following-to-join refugees that are similar to the processes employed for principal refugees, in order to ensure the security and welfare of the United States. We will resume admission of following-to-join refugees once those enhancements have been implemented.

Rex W. Tillerson
Secretary
Department of State

Elaine Duke
Acting Secretary
Department of
Homeland Security

Dan Coats
Director
National Intelligence

UNCLASSIFIED

## Addendum to Section 6(a) Memorandum

### Executive Order 13780, *Protecting the Nation from Foreign Terrorist Entry into the United States*

Section 6(a) of Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), required a review of the United States Refugee Admissions Program (USRAP) application and adjudication process during a 120-day period to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States. The Secretary of State (State), in conjunction with the Secretary of Homeland Security (DHS) and in consultation with the Director of National Intelligence (ODNI) established an interagency working group (the Section 6(a) Working Group) to undertake this review.

This addendum provides a summary of the additional procedures that have been and will be implemented. A classified report provides further detail of this review and enhancements. The interagency working group has recommended and implemented enhanced vetting procedures in three areas: *application, interviews and adjudications, and system checks*.

### Interagency Approach to the Review

To conduct the review, the Section 6(a) Working Group conducted a baseline assessment of USRAP application and adjudication processes and developed additional procedures to further enhance the security and welfare of the United States. The Section 6(a) Working Group ensured alignment with other concurrent and relevant reviews undertaken under the Executive Order, such as the review under Section 5, which established uniform baseline screening standards for all travelers to the United States.

All individuals admitted through the USRAP already receive a baseline of extensive security checks. The USRAP also requires additional screening and procedures for certain individuals from 11 specific countries that have been assessed by the U.S. government to pose elevated potential risks to national security; these individuals are subject to additional vetting through Security Advisory Opinions (SAOs)[1]. The SAO list for refugees was established following the September 11th terrorist attacks and has evolved over the years through interagency consultations. The most recent list was updated in 2015. The Section 6(a) Working Group agreed to continue to follow this tiered approach to assessing risk and agreed that these nationalities continued to require additional vetting based on current elevated potential for risk. Each additional procedure identified during the 120-day review was evaluated to determine whether it should apply to stateless persons and refugees of all nationalities or only certain nationalities.[2]

---

[1] The SAO is a DOS-initiated biographic check conducted by the Federal Bureau of Investigation and intelligence community partners. SAO name checks are initiated for the groups and nationalities designated by the U.S. government as requiring this higher level check.
[2] Stateless persons in this regard means persons without nationality who last habitually resided in one of these countries.

UNCLASSIFIED

UNCLASSIFIED

**Additional Procedures for Refugee Applicants Seeking Resettlement in the United States**

Application Process:

- ➤ **Increased Data Collection:** Additional data are being collected from all applicants in order to enhance the effectiveness of biographic security checks. These changes will improve the ability to determine whether an applicant is being truthful about his or her claims, has engaged in criminal or terrorist activity, has terrorist ties, or is otherwise connected to nefarious actors.

- ➤ **Enhanced Identity Management:** The electronic refugee case management system has been improved to better detect potential fraud by strengthening the ability to identify duplicate identities or identity documents. Any such matches are subject to further investigation prior to an applicant being allowed to travel. These changes will make it harder for applicants to use deceptive tactics to enter our country.

Interview and Adjudication Process:

- ➤ **Fraud Detection and National Security:** DHS's U.S. Citizenship and Immigration Services (USCIS) will forward-deploy specially trained Fraud Detection and National Security (FDNS) officers at refugee processing locations to help identify potential fraud, national security, and public safety issues on certain circuit rides to advise and assist interviewing officers.   With FDNS officers on the ground, the United States will be better positioned to detect and disrupt fraud and identify potential national security and public safety threats.

- ➤ **New Guidance and Training:** USCIS is strengthening its guidance on how to assess the credibility and admissibility of refugee applicants.  This new guidance clarifies how officers should identify and analyze grounds of inadmissibility related to drug offenses, drug trafficking, prostitution, alien smuggling, torture, membership in totalitarian parties, fraud and misrepresentation, certain immigration violations, and other criminal activity. USCIS has also updated guidance for refugee adjudicators to give them greater flexibility in assessing the credibility of refugee applicants, including expanding factors that may be considered in making a credibility determination consistent with the REAL ID Act.  This enhanced guidance supplements the robust credibility guidance and training USCIS officers already receive prior to adjudicating refugee cases.  Additionally, the updated guidance equips officers with tactics to identify inadequate or improper interpretation.

- ➤ **Expanded Information-Sharing:** State and USCIS are exchanging more in-depth information to link related cases so that interviewing officers are able to develop more tailored lines of questioning that will help catch potential fraud, national security threats, or public safety concerns.

UNCLASSIFIED

UNCLASSIFIED

System Checks:

> **Updating Security Checks:** Measures have been put in place to ensure that if applicants change or update key data points, including new or altered biographic information, that such data is then subject to renewed scrutiny and security checks. This will add an additional layer of protection to identify fraud and national security issues.

> **Security Advisory Opinions (SAOs):** Departments and agencies have agreed to expand the classes of refugee applicants that are subject to SAOs, thereby ensuring that more refugees receive deeper vetting.

- USCIS' Fraud Detection and National Security Directorate is also expanding its "enhanced review" process for applicants who meet SAO criteria. This includes checks against certain social media and classified databases.

**Additional Review Process for Certain Categories of Refugee Applicants**

The Department of Homeland Security continues to have concerns regarding the admission of nationals of, and stateless persons who last habitually resided in, 11 particular countries previously identified as posing a higher risk to the United States through their designation on the SAO list. The SAO list for refugees was established following the September 11th terrorist attacks and has evolved over the years through interagency consultations. The current list of countries was established in 2015.

As such, for countries subject to SAOs, the Secretary of State and the Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Attorney General, will coordinate a review and analysis of each country, pursuant to existing USRAP authorities. This review will include an in-depth threat assessment of each country, to be completed within 90 days. Moreover, it will include input and analysis from the intelligence and law enforcement communities, as well as all relevant information related to ongoing or completed investigations and national security risks and mitigation strategies.

This review will be tailored to each SAO country, and decisions may be made for each country independently. While the temporary review is underway, the Secretaries of Homeland Security and State will cooperate to carefully scrutinize the applications of nationals of, and stateless persons who last habitually resided in, countries on the SAO list and will consider individuals for potential admission whose resettlement in the United States would fulfill critical foreign policy interests, without compromising national security and the welfare of the United States. As such, the Secretary of Homeland Security may admit on a case-by-case basis only refugees whose admission is deemed to be in the national interest and poses no threat to the security or welfare of the United States.

In addition, during this review period, the Secretary of State and the Secretary of Homeland Security will temporarily prioritize refugee applications from non-SAO countries. DHS and DOS will work together to take resources that may have been dedicated to processing nationals of, or stateless persons who last habitually resided in, SAO countries and, during the temporary

UNCLASSIFIED

UNCLASSIFIED

review period, reallocate them to process applicants from non-SAO countries for whom the processing may not be as resource intensive. This means that refugee admissions for nationals of, and stateless persons who last habitually resided in, SAO countries will occur at a slower pace, at least during the temporary review period and likely further into the fiscal year, as the deployment of additional screening and integrity measures have historically led to lengthier processing times. While DHS prioritizes its resources in this manner until the additional analysis is completed, DHS will interview refugee applicants as appropriate from SAO countries on a discretionary basis.

### Form I-730 Refugee Following-to-Join Processing

A principal refugee applicant may include his or her spouse and unmarried children under 21 years of age as derivative refugee applicants on his or her Form I-590, Registration for Classification as a Refugee. When these family members are co-located with the principal, the derivative applicants generally are processed through the USRAP and, if approved, travel to the United States with the principal refugee applicant. These family members receive the same baseline security checks as the principal refugee and, if found eligible, are admitted as refugees. Alternatively, a principal refugee admitted to the United States may file a Form I-730, Refugee/Asylee Relative Petition, for his or her spouse and unmarried children under 21 years of age, to follow-to-join the principal refugee in the United States. If DHS grants the petition after interview and vetting, the approved spouse or unmarried child is admitted as a refugee and counted toward the annual refugee ceiling. While the vast majority of eligible refugee family members admitted to the United States each year accompany, and are screened with, the principal refugee, principal refugees admitted to the United States file petitions for approximately 2,500 family members to join them in the United States through the following-to-join process. Following-to-join family members may be residing and processed in a different country than where the principal refugee was processed, and while most share the nationality of the principal refugee, some may be of a different nationality. In any given year, DHS receives petitions for beneficiaries representing over 60 different nationalities. In recent years, the nationalities most represented were Iraqi, Somali, Burmese, Congolese, Ethiopian and Eritrean.

The majority of following-to-join refugees do not receive the same, full baseline interagency checks that principal refugees receive. Nor do following-to-join refugees currently undergo enhanced DHS review, which includes soliciting information from the refugee earlier in the process to provide for more thorough screening and vetting of certain nationals or stateless persons against classified databases. DHS and State are expeditiously taking measures to better align the vetting regime for following-to-join refugees with that for principal refugees by 1) ensuring that all following-to-join refugees receive the full baseline interagency checks that principal refugees receive; 2) requesting submission of the beneficiary's I-590 application in support of the Form I-730 petition earlier in the process to provide for more thorough screening; 3) vetting certain nationals or stateless persons against classified databases; and 4) expanding SAO requirements for this population in keeping with the agreed-to expansion for I-590 refugee applicants. These additional security measures must be implemented before admission of following-to-join refugees—regardless of nationality—can resume. Once the security enhancements are in place, admission of following-to-join refugees can resume.

UNCLASSIFIED