UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARAB AMERICAN CIVIL RIGHTS
LEAGUE, et al.,

       Plaintiffs,

v.                               Case No. 17-10310
                                     Honorable Victoria A. Roberts

DONALD TRUMP, et al.,

       Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT [ECF No. 128]

## I.     INTRODUCTION

On September 24, 2017, President Donald J. Trump issued Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats" (the "Proclamation"), 82 Fed. Reg. 45161 (Sept. 27, 2017).

Four individuals and five organizations ("Plaintiffs") bring a constitutional challenge to the Proclamation, claiming that it violates: (1) the Establishment Clause of the First Amendment (Count I); (2) the equal protection component of the Fifth Amendment's Due Process Clause (Count II); and (3) their First Amendment rights to freedom of speech and association (Count III).

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint.  The Court **DENIES** the Motion.

## II.    BACKGROUND

### A.    The Proclamation

The Proclamation was the third iteration of the President's efforts to ban the entry of nationals from certain predominantly Muslim countries into the United States.  *See* Exec. Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017); Exec. Order 13,780, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-2"), 82 Fed. Reg. 13209 (Mar. 9, 2017).

Preceding EO-1, EO-2, and the Proclamation, President Trump, as a presidential candidate, president-elect, and President, repeatedly made public statements exhibiting prejudice against Muslims and describing his desire and intention to prevent Muslims from entering the United States.  For example, on December 7, 2015, then candidate Trump published a "Statement on Preventing Muslim Immigration" on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."  On March 9, 2016 during a televised interview, he stated: "I think Islam hates us" and "[W]e can't allow people coming into this country who have this hatred of the United States . . . and [of] people that are not Muslim."

In the summer of 2016, President Trump had Rudolph Giuliani, a campaign advisor, establish a commission to advise President Trump on his proposed Muslim ban; in a television interview, Giuliani explained that President Trump directed him to put the "Muslim ban" into effect "legally."  In early July 2016, Giuliani indicated that his

commission caused President Trump's proposal to shift from a "general ban" to "very specific, targeted criteria" focusing on specific countries.

President Trump quickly adopted the commission's recommended strategy for putting the "Muslim ban" into effect "legally."  For instance, in a July 24, 2016 interview, President Trump stated that he would accomplish his Muslim ban by barring entry from certain "territor[ies]" because "[p]eople were so upset when I used the word 'Muslim.'" During a debate on October 9, 2016, one month before the election, President Trump stated that "[t]he Muslim Ban is something that in some form has morphed into extreme vetting from certain areas of the world."

On March 6, 2017 – a month after EO-1 was enjoined – President Trump issued EO-2.  On March 15, 2017, the United States District Court for the District of Hawaii granted a temporary restraining order against EO-2.  In a rally that same evening, President Trump said EO-2 "was a watered-down version of the first order" and "I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first place."

While the legality of EO-2 was litigated, President Trump continued making statements reflecting his intention to fulfill his campaign promise to block the entry of Muslims into the United States.  On June 5, 2017, President Trump tweeted: "The lawyers and courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!"  President Trump expressed his intent to issue a third travel ban for the same purpose, stating that the Justice Department "should have stayed with the original Travel Ban, not the watered down, politically correct version" and that there should be a "much tougher version" of the ban.  On September 15, 2017, nine days

before the release of the Proclamation, President Trump tweeted that "the travel ban into the United States should be far larger, tougher, and more specific – but stupidly, that would not be politically correct!"

On September 24, 2017, EO-2 expired, and President Trump issued the Proclamation the same day.  He stated, "The travel ban: the tougher, the better."

On November 25, President Trump tweeted, "need the BAN."  On November 29, 2017, President Trump retweeted links to three anti-Muslim videos which portrayed Muslim individuals committing acts of violence.  In response to questions about those videos and whether President Trump thought Muslims are a threat to the United States, the President's deputy press secretary stated that "the President has been talking about these security issues for years now, from the campaign trail to the White House," and he "has addressed these issues with the travel order that he issued earlier this year and the companion proclamation."

On October 17, 2017, the United States District Court for the District of Hawaii enjoined enforcement of the Proclamation; it found that the plaintiffs were likely to succeed on their claim that the Proclamation exceeded the scope of the President's statutory authority under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1182(f) and 1185(a), as well as their claim that the Proclamation violates the INA's prohibition on nationality-based discrimination with respect to the issuance of immigrant visas, § 1152(a)(1)(A).  *Hawaii v. Trump*, 265 F. Supp. 3d 1140, 1158-59 (D. Haw.), *aff'd in part, vacated in part*, 878 F.3d 662 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 923 (2018), *and rev'd and remanded*, 138 S. Ct. 2392 (2018).

That same day, the United States District Court for the District of Maryland entered a preliminary injunction against enforcement of Section 2(c) of the Proclamation.  *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570 (D. Md. 2017), *aff'd*, 883 F.3d 233 (4th Cir. 2018), *judgment vacated*, 138 S. Ct. 2710 (2018).  In relevant part, the Maryland court held that plaintiffs were likely to succeed on their claim that the Proclamation violates the Establishment Clause.  *Id.* at 628-29.

The Government appealed the injunctions.  The Supreme Court granted a stay of the injunctions pending disposition of the Government's appeals.  The Fourth and Ninth Circuits affirmed the injunctions entered by the Districts of Maryland and Hawaii.  The Supreme Court granted the Government's petition for a writ of certiorari in both cases.

On June 26, 2018, the Supreme Court held that the plaintiffs had not demonstrated a likelihood of success on their claim that the Proclamation violated the Establishment clause.  *Trump v. Hawaii*, — U.S. —, 138 S. Ct. 2392, 2423 (2018).  Although not particularly relevant to any of Plaintiffs' claims here, the Court also overruled the plaintiffs' statutory challenges under the INA, finding that the Proclamation did not exceed the President's authority under 8 U.S.C. § 1182(f).  *Id.* at 2412, 2415.

**B.    The Proclamation**

In a recent decision deciding a similar motion to dismiss by the Government, *see Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 373 F. Supp. 3d 650 (D. Md. 2019), the United States District Court for the District of Maryland succinctly summarizes the relevant aspects of the Proclamation:

> The Proclamation states that "absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States" of nationals from Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries") "would be

5

detrimental to the interests of the United States." Procl. pmbl. Specifically, the Proclamation suspends the entry of all immigrants from seven of the eight Designated Countries, excepting only Venezuela. The ban on entry by nonimmigrants is "more tailored," with a narrower ban imposed on countries with mitigating circumstances such as a willingness to play a substantial role in combating terrorism. *Id.* § 1(h)(iii).

As justification for the ban, the Proclamation references a July 9, 2017 report by the Acting Secretary of Homeland Security, issued pursuant to the requirements of EO-2, describing a "worldwide review" conducted in consultation with the Secretary of State and the Director of National Intelligence. In that review, these officials selected baseline criteria for assessing the sufficiency of the information provided by foreign governments to permit the United States to confirm the identities of individuals seeking to enter the country and make a security assessment about them. *Id.* § 1(c) . . . .

According to the Proclamation, pursuant to the process set forth in EO-2, nearly 200 countries were evaluated based on the criteria. Of those, 16 nations were found to be "inadequate" and 31 were found to be at risk of becoming so. In accordance with Section 2(d) of EO-2, those nations were given 50 days to bring their information-sharing practices into compliance with the United States'[] expectations. At the end of that 50-day period, eight countries were determined to have continued inadequate information-sharing practices: Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen. In a September 15, 2017 report to the President[], the Acting Secretary of Homeland Security recommended that entry restrictions be imposed on all of those countries with the exception of Iraq. Although Somalia's information-sharing practices were found to be adequate, the Acting Secretary of Homeland Security recommended that Somalia also be subjected to entry restrictions. Venezuela is the only designated country for which entry of immigrants is not suspended. Limitations on the entry of Venezuelan nationals are confined to barring entry of specific government officials and their immediate family members, who are suspended from traveling to the United States on B-1, B-2, and B-1/B-2 visas.

In addition to providing exceptions for lawful permanent residents, dual nationals if traveling on a passport issued by a non-designated country, and foreign nationals who have been granted asylum status or who have been already admitted to the United States as refugees, the Proclamation provides for waivers, to be granted on a case-by-case basis by either a State Department consular officer or an official of United States Customs and Border Protection ("CBP"), based on criteria to be developed by the Secretary of State and the Secretary of Homeland Security. The Proclamation expressly provides that waivers may be granted only upon a

showing that (1) denying entry would cause the foreign national undue
hardship; (2) allowing entry would not pose a national security or public
safety threat; and (3) entry would be in the national interest.

The Proclamation went into effect when it was published as to foreign
nationals then barred by EO-2. For all other covered foreign nationals, it
became effective on October 18, 2017. On April 10, 2018, Chad was
removed from the list of Designated Countries.

*IRAP*, 373 F. Supp. 3d at 655-56.

### C.    Plaintiffs' Third Amended Complaint

After the Supreme Court vacated the injunctions entered by the Maryland and

Hawaii courts related to the Proclamation, Plaintiffs filed the Third Amended Complaint.

The four individual Plaintiffs – Hend Alshawish, Salim Alshawish, Fahmi Jahaf,

and Kaltum Saleh (the "Individual Plaintiffs") – reside in the United States and have

applied for immigrant visas for immediate relatives – spouses, parents, and minor

children who are citizens of either Yemen or Somalia – to join them in the United States.

The Individual Plaintiffs seek to represent a purported class of persons in the United

States whose ability to reunite with family members is hindered by the Proclamation.

The five organizational Plaintiffs – Arab American Civil Rights League, American

Civil Liberties Union of Michigan, American Arab Chamber of Commerce, Arab

American and Chaldean Council, and Arab American Studies Association (collectively

the "Organizational Plaintiffs") – seek to represent the interests of the Individual

Plaintiffs, their members and/or clients, and their own free speech interests in

sponsoring nationals of the Designated Countries to the United States.

Plaintiffs say the Proclamation violates: (1) the Establishment Clause of the First

Amendment to the United States Constitution (Count I); (2) the equal protection

component of the Fifth Amendment's Due Process Clause (Count II); and (3) their First Amendment rights to freedom of speech and association (Count III).

The Third Amended Complaint describes in great detail, President Trump's statements expressing his intent to prevent Muslims from entering the United States and demonstrating his longstanding hostility toward Muslims and Islam, including statements surrounding the development and implementation of EO-1, EO-2, and the Proclamation. Plaintiffs say the Proclamation, like the first two Executive Orders, is motivated by an unconstitutional targeting of Muslims, and it bears no rational or legitimate relationship to the national security concerns it purports to advance. Among other things, Plaintiffs claim that the Department of Homeland Security previously concluded that targeting the countries designated by EO-1 was not rationally related to combating terrorism, demonstrating that the Proclamation's entry restrictions are not rationally related to its purported objective.

Plaintiffs also say there are several inconsistencies between the results of the Homeland Security review and the Proclamation's entry restrictions and bans, which further show that the purpose of the travel ban was to target Muslims. For example, Plaintiffs say the Proclamation retains Somalia on the list of banned countries even though it expressly admits that Somalia meets Homeland Security's "baseline" for ability to evaluate terrorist threats. On the other hand, Plaintiffs say the Homeland Security review identified 16 countries with "inadequate" screening protocols and information-sharing practices, but the Proclamation only targeted eight countries – six of which are majority Muslim.

Moreover, Plaintiffs claim that the exceptions to the visa suspensions are not rationally related to a national security interest.  Although the Proclamation indicates that its restrictions are necessary for increased information sharing between the Designated Countries and the United States and acknowledges that immigrants generally receive more extensive vetting than nonimmigrants, the Proclamation bans immigrant visas from the Designated Countries but allows entry on some nonimmigrant visas.  Plaintiffs claim that this does not accomplish increased information sharing.  Based on the Proclamation's acknowledgement that immigrants have "more enduring rights" than non-immigrant visitors and are "more difficult to remove," Plaintiffs say the true concern is not information sharing; it is preventing individuals from the majority-Muslim countries from becoming part of the American community.

Plaintiffs say other features of the Proclamation also demonstrate its discriminatory purpose.  Plaintiffs claim that the Proclamation added North Korea and Venezuela, two non-Muslim-majority countries, to the list of countries for the first time in an effort to cover up the discrimination against Muslims and disguise the Proclamation as religion-neutral, because the Proclamation has little to no practical effect on foreign nationals from those countries.  Moreover, Plaintiffs allege in detail that the Proclamation's waiver process – which would exempt individuals from the entry restrictions on a case-by-case basis – is a sham.  Plaintiffs claim that publicly available data regarding the rate at which waivers are granted provide even more evidence that the Government enforces a *de facto* Muslim ban, notwithstanding the Proclamation's waivers and exceptions.

Defendants move to dismiss Plaintiffs' Third Amended Complaint.  The motion is fully briefed, and the parties each notified the Court of supplemental authority.

## III.   LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal sufficiency.  The federal rules require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Indeed, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible where the facts allow the Court to infer that the defendant is liable for the misconduct alleged.  *Id.*  This requires more than "bare assertions of legal conclusions"; a plaintiff must provide the "grounds" of his or her "entitlement to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *Twombly*, 550 U.S. at 555 (while detailed factual allegations are not required, a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action").  Ultimately, the question is "'not whether [the plaintiff] will ultimately prevail' . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citations omitted).

In deciding a motion under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff, accept as true all well-pled factual allegations, and draw all reasonable inferences in favor of the plaintiff.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  The Court "may consider the

Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

## IV.   ANALYSIS

Defendants argue that the Court should dismiss Plaintiffs' claims as a matter of law, because the Supreme Court rejected both statutory and constitutional challenges to the Proclamation in *Hawaii*, such that *Hawaii* forecloses Plaintiffs' suit.  Defendants also say the Organizational Plaintiffs lack standing to bring Establishment Clause claims, and the Court should dismiss two of the Individual Plaintiffs for improper venue.

### A.   Plaintiffs Have Standing to Bring an Establishment Clause Claim

Defendants say the Organizational Plaintiffs lack standing to bring an Establishment Clause claim.

Plaintiffs argue that because Defendants make a facial attack on subject matter jurisdiction, the Court must accept the allegations in the complaint as true; under this deferential standard, Organizational Plaintiffs say they have standing on three grounds: in their own right, on behalf of their members, and to assert the rights of their clients.

Under Article III of the Constitution, federal courts are limited to deciding "Cases" or "Controversies."  U.S. Const. art. III, § 2.  One essential element of a legal case or controversy is that the plaintiff has standing to sue.  *Hawaii*, 138 S. Ct. at 2416. Standing "requires allegations—and, eventually, proof—that the plaintiff 'personal[ly] suffered a concrete and particularized injury in connection with the conduct about which he complains."  *Id.* (citation omitted); *see also Barry v. Lyon*, 834 F.3d 706, 715 (6th Cir. 2016) ("Plaintiffs have standing if they suffer a 'concrete,' 'particularized,' and 'actual' or

11

'imminent' injury that is caused by a defendant's conduct and is likely to be 'redressed by a favorable decision.'" (citation omitted)).  "In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is 'directly affected by the laws and practices against which [his] complaints are directed.'"  *Hawaii*, 138 S. Ct. at 2416 (citation omitted).

In addition to having standing in its own right, an association has standing to bring suit on behalf of its members if: (1) the association's members have standing; (2) the interests at stake are relevant to the organization's purpose; and (3) the claims and relief do not require the participation of individual members.  *Barry*, 834 F.3d at 716 (citation omitted).

Defendants' standing arguments fail.

All Plaintiffs seek the same the relief under their Establishment Clause claim, and Defendants do not challenge the Individual Plaintiffs' standing.  The Supreme Court explained that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999) (holding that the presence of one party with standing assures that the controversy is justiciable); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that it was sufficient to confer standing under Article III where it was clear that at least one plaintiff had standing to challenge the constitutionality of the law in question, and that there was no need to "consider the standing issue as to the [other plaintiffs]").

Because the Individual Plaintiffs have standing to challenge the Proclamation under the Establishment Clause, this claim is justiciable and Article III's case or

controversy requirement is satisfied; there is no need to resolve whether the Organizational Plaintiffs also have standing.  *Id.*

Furthermore, without making a conclusion, it appears that the Organizational Plaintiffs do sufficiently allege standing for purposes of surviving a motion to dismiss. Defendants' argument to the contrary is conclusory and fails to meaningfully challenge the Organizational Plaintiffs' allegations regarding standing.

### B.     Venue is Proper

Defendants say venue is improper as to Plaintiffs Hend Alshawish and Salim Alshawish, and their claims should be dismissed, because they reside in New York and have no connection to this District.  Defendants appear to abandon this argument in their reply brief, because they fail to address Plaintiff's response on this issue. Regardless, the Court denies Defendants' request to dismiss the claims of Hend and Salim Alshawish.

Pursuant to 28 U.S.C. § 1391(e)(1)(C), venue is proper "in any judicial district in which . . . the plaintiff resides."  The Sixth Circuit construes the phrase "the plaintiff" in § 1391(e)(1)(C) to mean "any plaintiff."  *See Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 345-46 (6th Cir. 2005).

Because all Plaintiffs other than Hend and Salim Alshawish are residents of this District, venue is proper as to all Plaintiffs.  *See id.*

### C.     *Hawaii*, 138 S.Ct. 2392 (2018), is Not Dispositive of Plaintiffs' Claims

Unlike a typical motion to dismiss, Defendants do not challenge the sufficiency of Plaintiffs' factual allegations.  Rather, Defendants argue that the Supreme Court's

decision in *Hawaii* governs all three of Plaintiffs' claims, and that all three claims fail as a matter of law under *Hawaii*, regardless of Plaintiffs' factual allegations.

Plaintiffs say *Hawaii* was an Establishment Clause case; they claim that their equal protection and freedom of speech and association claims are subject to different standards of review.  Plaintiffs also say that *Hawaii* is not dispositive of their Establishment Clause claim or other claims because the issue there – whether plaintiffs demonstrated that they were likely to succeed for purposes of a preliminary injunction – is materially different than whether Plaintiffs plausibly allege violations of their constitutional rights for purposes of a motion to dismiss, when the Court must view the complaint in the light most favorable to them.

The Court agrees with Defendants that the same standard – i.e., the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972) and applied in *Hawaii* to the plaintiffs' Establishment Clause claim – applies to all three of Plaintiffs' claims.  *See Hawaii*, 138 S.Ct. at 2419 (explaining that "*Mandel's* narrow standard of review" applies "across different contexts and constitutional claims, including visa denials and "broad congressional" policies, and "'has particular force' in admission and immigration cases that overlap with 'the area of national security'" (citing *Fiallo v. Bell*, 430 U.S. 787, 795 (1977), and *Kerry v. Din*, — U.S. —, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring))); *see also IRAP*, 373 F. Supp. 3d at 669-70 (concluding that *Mandel's* standard "applies equally to all of Plaintiffs' [c]onstitutional [c]laims," including their Establishment Clause claim and their "other constitutional claims alleging that the Proclamation violates the equal protection and procedural due process components of the Fifth Amendment, the right to freedom of speech under the First Amendment, and

the right to freedom of association under the First Amendment").  "The analysis does not differ depending on the right that is alleged to have been impinged."  *IRAP*, 373 F. Supp. 3d at 670.

However, in arguing that *Hawaii* forecloses Plaintiffs' claims as a matter of law, Defendants misconstrue the Supreme Court's holding.

### 1.    Summary of the Supreme Court Decision and the *Mandel* Standard

In concluding that the plaintiffs failed to demonstrate a likelihood of success on the merits of their Establishment Clause claim, the Supreme Court applied the legal standard set forth in *Mandel*; under this standard, courts ask whether the policy is "facially legitimate and bona fide."  *Hawaii*, 138 S. Ct. at 2419-20.

While declining to "define the precise contours" of the *Mandel* inquiry in *Hawaii*, the Supreme Court concluded that it should "look behind the face of the Proclamation to the extent of applying rational basis review."  *Id.* at 2420.  In consideration of *Din*, looking behind the face of the Proclamation would be relevant to assessing the "bona fide" prong; if there is an "affirmative showing of bad faith on the part of the [decision maker]," the Court may look behind the action to evaluate whether its justification was bona fide.  *See Din*, 135 S. Ct. at 2141.

The Supreme Court explained that the rational basis standard of review "considers whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes," and that the Court "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."  *Hawaii*, 138 S. Ct. at 2420.

Applying the *Mandel* standard, the Supreme Court found that the Proclamation was facially neutral as to religion and was premised on legitimate national security interests.  *Hawaii*, 138 S. Ct. at 2420-21.  The Court acknowledged the extrinsic record presented by the plaintiffs – highlighting President Trump's hostility toward Muslims and how the Proclamation's stated concerns about vetting protocols and national security were not legitimate but mere pretext for discriminating against Muslims; however, the Court concluded that, "because there is persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility, we must accept that independent justification."  *Id.* at 2421.

Thus, the Court found that, "[u]nder these circumstances, the Government has set forth a sufficient national security justification to survive rational basis review. . . .We simply hold today that plaintiffs have not demonstrated a likelihood of success on the merits of their [Establishment Clause] claim."  *Id.* at 2423.

## 2.    Plaintiffs Allege Plausible Constitutional Challenges to the Proclamation and Survive Dismissal Under Rule 12(b)(6)

As set forth above, *supra* Section IV(C), the *Mandel* standard and rational basis review applies to each of Plaintiffs' claims.

Although rational basis is a highly deferential standard, the Supreme Court has invalidated governmental classifications for failing to meet this standard.  *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996) (invalidating a state constitutional amendment that barred governmental action to provide legal protections to gays and lesbians upon finding that it was "inexplicable by anything but animus toward the class it affects" and "divorced from any factual context from which we could discern a relationship to legitimate state interests"); *City of Cleburne v. Cleburne Living Center*,

16

473 U.S. 432, 448-50 (1985) (invalidating a zoning ordinance that required a group home for the mentally disabled, but not other multi-occupancy homes, to obtain a special use permit upon concluding that, because the evidence refuted all of the proffered reasons for the classification, the law "appear[ed] to . . . rest on an irrational prejudice against the mentally retarded"); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-36 (1973) (invalidating on rational basis review a federal restriction on providing food stamps to households of unrelated individuals upon finding that the proffered reason for the measure did not rationally support a ban on food assistance to all unrelated households).

Under this precedent, the Proclamation would fail rational basis review if the evidence revealed that for each of its proffered purposes, either that purpose was not a legitimate state interest or, if legitimate, the Proclamation was not rationally related to that purpose – such that it was unable to be explained by anything but animus toward Muslims.  *See IRAP*, 373 F. Supp. 3d at 671.  Ultimately, Plaintiffs will need to provide evidence to refute the assertion that the Proclamation is rationally related to the national security goals of preventing entry of inadequately vetted individuals and inducing other nations to improve information sharing.  *See id.* (citing *Hawaii*, 138 S.Ct. at 2421).

Defendants say the Proclamation survives rational basis review as a matter of law under *Hawaii*; they argue that because the Supreme Court found that the Proclamation was facially neutral as to religion and had legitimate grounding in national security interests, the inquiry should end there.  The Court disagrees.

17

The scope of the Supreme Court's review of the Proclamation and plaintiffs' Establishment Clause claim was materially different than this Court's review of Plaintiffs' claims at the motion to dismiss stage.

In reviewing a motion for preliminary injunction, a court considers the "likelihood of success on the merits" based on a limited factual record; if a plaintiff fails to show that she is likely to succeed on the merits under those limited facts, a preliminary injunction is not appropriate.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

When reviewing a motion to dismiss under Rule 12(b)(6), the Court is limited to deciding whether the complaint states a plausible claim for relief; in making this determination, the Court must construe the complaint in the light most favorable to the plaintiff, accept as true all well-pled factual allegations, and draw all reasonable inferences in favor of the plaintiff.  *Bassett*, 528 F.3d at 430.  Thus, denial of a motion for preliminary injunction does not mean that the complaint fails to state a plausible claim for relief.

The Supreme Court explicitly recognized the limited nature of its holding in *Hawaii*, stating that "[u]nder these circumstances" – i.e., based on the limited record presented – "the Government has set forth a sufficient national security justification to survive rational basis review. . . .We *simply hold today that* plaintiffs have not demonstrated a likelihood of success on the merits of their [Establishment Clause] claim."  *Hawaii*, 138 S. Ct. at 2423 (emphasis added).

Beyond their reliance on *Hawaii*, Defendants fail to meaningfully challenge the factual allegations of Plaintiffs' Third Amended Complaint.

Such a challenge would be unavailing. Plaintiffs' Third Amended Complaint contains extensive, detailed, and non-conclusory allegations that support their three claims. Specifically, Plaintiffs allege significant, well-pled and supported facts to refute that the Proclamation is rationally related to national security goals and to induce other nations to improve information sharing. *See*, *supra*, Section II(A), (C). It also plausibly alleges that the Proclamation is not able to be explained by anything but animus toward Muslims. *Id.*

An "impermissible motive," or animus, can include "a desire to harm a politically unpopular group," or "[i]t can . . . take the form of 'negative attitudes,' 'fear,' 'irrational prejudice,' or 'some instinctive mechanism to guard against people who appear to be different in some respect from ourselves.'" *Bassett v. Snyder*, 59 F. Supp. 3d 837, 847 (E.D. Mich. 2014) (citations omitted). The Sixth Circuit finds the following factors relevant for determining whether a facially neutral state action was motivated by a discriminatory purpose: "(1) the impact of the official action on the group challenging the classification; (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes; (3) the sequence of events that preceded the state action; (4) procedural or substantive departures from the government's normal procedural process; and (5) the legislative or administrative history." *Id.* (citations omitted). Plaintiffs' allegations go to the heart of several of these factors.

Although the Proclamation is facially neutral, its impact falls predominantly on Muslims. This is not surprising considering that the historical background of the

Proclamation and sequence of events preceding it "reveal[] numerous actions being taken for discriminatory purposes."

The Proclamation started as a Muslim ban, with President Trump calling for a total and complete shutdown of Muslims entering the United States.  When asked how his Muslim ban would be applied by a customs agent, President Trump said the agent would ask, "[A]re you Muslim?"  When a reporter asked, "And if [the person seeking entry] said yes, they would not be allowed in the country," President Trump responded, "That's correct."

After EO-1 and EO-2 were challenged successfully, President Trump issued the Proclamation and made numerous statements revealing that his true purpose remained to effectuate his long-desired Muslim ban; for example, he stated that they "should have stayed with the original Travel Ban, not the watered down, politically correct version," and "the travel ban into the United States should be far larger, tougher, and more specific – but stupidly, that would not be politically correct!"

The same day the Proclamation was issued, the President Trump's deputy press secretary said that "the companion [P]roclamation" – i.e., a companion to EO-1 and EO-2 – addresses the issues President Trump had been talking about for years, "from the campaign trail to the White House."  Notably, what President Trump made explicit while on the campaign trail was his desire and intention to ban Muslims from entering the United States – even if it meant framing the ban in terms of "territories."  President Trump has never disguised his true goal or the purpose of the ban; at all steps up to and after issuing the Proclamation, he has admitted that "[t]he Muslim Ban is something

20

that in ***some form*** has morphed into extreme vetting from certain areas of the world"
because "[p]eople were so upset when I used the word 'Muslim.'"

Accepting Plaintiffs' allegations as true and drawing all inferences in their favor –
as is required at this stage – it is reasonable to infer that the "morphed" executive orders
and "companion" Proclamation "rest on an irrational prejudice against [Muslims],"
*Cleburne*, 473 U.S. at 450, and are "inexplicable by anything but animus toward
[Muslims]," *Romer*, 517 U.S. at 632, especially considering that President Trump
admitted that the "Muslim ban" only morphed into "extreme vetting" because "people
were so upset" when he vociferously discriminated against Muslims.

Plaintiffs plausibly allege sufficient facts to demonstrate that the Proclamation is
not rationally related to national security goals of preventing inadequately vetted
individuals and inducing other nations to improve information sharing.  *See IRAP*, 373
F. Supp. 3d at 676.  Indeed, Plaintiffs present sufficient evidence that the Proclamation
is unable to be explained by anything but animus towards Muslims.

Plaintiffs survive dismissal under Rule 12(b)(6).

## V.    CONCLUSION

Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint is **DENIED**.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  July 10, 2019